UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.

ROSALIND HERMAN

Docket No. 12CR 10015-2

### SENTENCING MEMORANDUM OF ROSALIND HERMAN

Since the promulgation of the federal sentencing guidelines in 1986, sentencing in federal courts has undergone many twists and turns. A sentencing scheme designed to promote uniformity in sentencing devolved into a system that bordered on a pattern of mandatory sentencing. The Guidelines did contain "departures", but many of the more traditional grounds for reduced sentences were either prohibited or discouraged.

The United States Supreme Court in a series of decisions commencing in 2005 intervened, and the guidelines, while certainly relevant, are now considered "advisory."

This Court is well aware of those changes and its obligations to impose a sentence that is "sufficient but not longer than necessary" to accomplish the sentencing goals promulgated by 18 U.S.C. § 3553(a) (The Sentence Reform Act).

Under 18 U.S.C. § 3553(a), a sentencing Court now must consider a defendant's individual characteristics along with the enumerated reasons for imposing a particular sentence. If the Guidelines fail properly to reflect those characteristics, the Court may find that either a

departure or a variance, or both, from the recommended Guideline range may be imposed. See, Rita v. United States, 551 U.S. 38, 349-351 (2007)

Rather than rehash what has already been argued *ad nauseum* at sentencings in federal courts in recent years, the defense in this case will make a recommendation for sentence in this matter that will be broken down, first by asking for a downward departure under "traditional" Guideline requirements, then by requesting a "variant" sentence under the so-called "parsimony" clause of 18 U.S.C.§ 3553(a).

**A. Extraordinary Family Circumstances, USSG § 5H1.6**

**1. Departure**

Pre-Booker, USSG § 5H1.6 generally discouraged departures on the basis of extraordinary family circumstances and the effect a sentence of incarceration will have on innocent third parties. Ms. Herman is the sole caretaker for her disabled husband. He suffers from a variety of serious medical problems, is not ambulatory, is incontinent, and depends on her for all his needs.

His condition has deteriorated steadily during the past twenty years. Shortly after the indictment in this matter, he suffered a severe heart attack, rendering him unable to care for himself and causing Ms. Herman to return permanently to Massachusetts to care for him.

When Ms. Herman was ordered detained, a visiting nurse came once a week to administer to her husband. Their son Brad also helped take care of his father.

Shortly before Ms. Herman's release from custody, her husband's vascular disease has deteriorated to a serious degree and his foot was amputated. The day after Ms. Herman was released from custody, doctors amputated the rest of his leg.

Since then, his condition has not improved. He suffers from congestive heart failure, vascular disease and an aneurysm on his heart valve. He is connected to a medical apparatus 24 hours a day, which will alert his caretaker if there is a problem with his defibrillator or bypass stent. He needs attendance 24 hours a day.

Both of their sons are working fulltime, as is Ms. Herman's sister Janice. Her sister Sharon has medical problems of her own and is not available or capable of assisting with Keith's medical problems.

The 1st Circuit recognized that extraordinary family circumstances could warrant a departure from the Guideline sentencing range in an atypical case. United States v. Rivera, 994 F. 2d 942,947; 953-954 (1st Cir. 1993) accord, United States v. Pereira, 272 F. 3d 76 (1st Cir. 2001).

In spite of the "discouraged" nature for this basis for departure, In United States v. Dominguez, 296 F.3d 192 (3rd Cir. 2002) the Third Circuit Court of Appeals held that the district court erred when it concluded that it could not depart more than four levels in a bank fraud case for a defendant who resided with her elderly parents, who were physically and financially dependent on her. See also, United States v. Sclamo, 997 F. 2d 970-971-2 (1st. Cir. 1993) (Affirming downward departure due to the importance of the presence of the defendant to the defendant's stepson.)

To further aggravate her family's dilemma, the relative paucity of female inmates within the United States Bureau of Prisons results in a relative lack of facilities for incarcerated female inmates. Female inmates are frequently shipped to institutions far from their homes. We suspect that Ms. Herman will need protracted medical attention to treat her emaciation, palsy and pulmonary problems, as will be explained in more detail later in this memorandum. According to the BOP website, there are only two Federal Medical Facility with treatment services available for female inmates in the United States: FMC Carswell in Texas and FMC Lexington in Kentucky. Given her husband's serious medical problems, a lengthy period of incarceration will result in complete total estrangement from his wife until the date of her release.[1]

As noted by Justice Breyer in <u>United States v. Rivera</u>, 994 F 2d 942, 948 (1st Cir. 1993):

"At some point, the nature and the magnitude of family responsibility (many children? with handicaps? no money? no place for children to go?) may transform the ordinary case of such circumstances into a case that is not at all ordinary."

Given her husband's age and handicaps, Ms. Herman's incarceration will not create a mere "inconvenience" but a major impediment to his continued scare and survival. See United States v. Pereira, 272 F.3d 76, 83(1st Cir. 2001)

Ms. Herman and her husband live alone. Her role as the sole caretaker, custodian and companion for her husband should persuade this Court to depart downward from the recommended Guideline range in this case.

**2. Variant Sentence**

---

[1] United States BOP Policy Statement 5100.07 states that inmates should be placed, to the extent possible, within 500 miles of legal residence.

4

The holdings of the Supreme Court in <u>Booker</u> and <u>Rita</u> freed the sentencing court to consider extraordinary family circumstances and the harsh effect incarceration will have on innocent family members.

In <u>United States v. Antonakopoulos</u>, 399 F. 3d 68n (1st Cir. 2005) the 1st Circuit held that the district court, on remand for sentencing, can consider a defendant's role as caretaker for a brain-damaged son, even though alternative means of care existed.

In fashioning a sentence that takes into consideration the facts and circumstances of this case, as well as the facts and circumstances of her life, we urge the Court to vary below the recommended Guideline range. Ms. Herman's husband's illness occurred and became exacerbated independent of her offense conduct.  He is not alleged to have participated in, nor encouraged, any of the conduct which formed the basis for her indictment and conviction.  The harsh effect her imprisonment will have on this seriously infirm man should enable this Court to impose a sentence less than that recommended by the Guidelines.

**B. The Defendant's Need for Medical Care, USSG § 5H1.4**

1. **Departure**

Ms. Herman is more than 60 years old and is a first-time offender. She is physically infirm. She suffers from of an undiagnosed form of palsy.  Her hands shake visibly and uncontrollably.

She also suffers with serious undiagnosed pulmonary problems.  For example, she cannot walk across the cafeteria of this courthouse without stopping to catch her breath.  She coughs and clears her throat constantly.

5

Some time in 2008 she was diagnosed with cardiac problems and placed on medication. She reports that the medication created memory problems and also affected her ability to drive a motor vehicle. She stopped taking it.

During the trial, she became ill and had to leave the Courthouse. The Court clinician found that she was dehydrated and malnourished. She is emaciated and weighs less than 70 pounds.

Under the sentencing procedures that pre-dated the holdings of the Supreme Court in Booker and its progeny, a defendant's need for medical care was a "discouraged" ground for departure. USSG § 5H1.4. The Court had to find that a defendant's "physical appearance, including physique, [might] be relevant in determining whether a departure is warranted." Id. The Court had to determine that "the condition is present to an unusual degree and distinguishes the case from typical cases covered by the Guidelines." Under certain circumstances, the Court was warranted in imposing home detention in the case of a seriously infirm defendant. Id.

In United States v. Martin, 363 F. 3rd 25 (1st Cir. 2004) the First Circuit Court of Appeals granted a departure for a defendant in a fraud case "whose serious medical conditions make [his] health exceptionally fragile [and] ...we are not convinced that the BOP can adequately provide for [his] medical needs during an extended prison term [and] there is a high probability that lengthy incarceration will shorten [his] life span."

Unfortunately, Ms. Herman cannot present the Court with a detailed medical history. She does not have a primary care physician and rarely consults with doctors. When asked why she does not have a medical history, she shrugs her shoulders and says that she does not like doctors

based on her experience with her family. She has spent much of the last twenty years taking care of others.

Her husband's maladies are well known. Her son Brad suffers from brain damage, the result of a traffic accident. Her son Brian suffered an injury while employed part time by the Las Vegas Police Department. He was out of work for more than 18 months while his first child was being born. Ms. Herman supported him, his wife and child, along with her younger son Brad, who also had limited employment due to his head injury.

Her defense counsel can only relate anecdotally what we observed during the short months we have known Ms. Herman. (The Court was also able to make its own observations during the more than two years that she has appeared before the Court in this case, although not on as personal a level as defense counsel.)

She has been a heavy smoker for more than 45 years. It should be obvious even to an unpracticed eye that she suffers from some form of serious pulmonary problems. Whether it be lung cancer, emphysema or some other malady, is a matter of speculation at this point in time, but she appears to be in need of medical attention.

We recommend that the Court take into consideration her medical condition and depart downward from the applicable Guideline range in this case.

If the Court imposes a period of incarceration, we recommend that Ms. Herman initially be housed in a federal medical facility where she can be extensively evaluated. As was explained earlier in more detail, such a recommendation will result in an onerous estrangement for Keith Herman from his wife.

**2. Variant Sentence**

Under the auspices of 18 U.S.C. § 3553(A), the Court must make a sentencing determination based on the facts and circumstances of the case and the facts and circumstances of her life.

After taking into consideration the sentencing factors outlined in the statute, the Court is to impose a sentence that is "reasonable but not longer than necessary" to comport with those factors.

The trial of this case lasted seven business days. Ms. Herman appeared for numerous status conferences during the course of the litigation, and she most recently appeared at a post-trial hearing on potential Guideline sentencing enhancements. The Court has had ample opportunity to witness Ms. Herman's emaciated physical condition while in the courtroom.

While the Court was not privy to witness Ms. Herman's difficulty breathing and ambulating, defense counsel have related to the Court their observations of Mr. Herman's difficulties.

Mr. Caplitz, during his testimony at trial against Ms. Herman, testified about his interactions with Ms. Herman during a relationship that spanned more than 20 years. He commented about Ms. Herman's heavy use of tobacco and mentioned the strong smell of tobacco in her vehicles, in her homes and on her person.

While acknowledging that Ms. Herman's mistrust of doctors prevents the Court from having at its disposal a relatively precise diagnosis of her infirmity, the defense urges the Court

to grant Ms. Herman a variant sentence below that which is recommended by the Guidelines. Her extreme emaciation and coughing cannot be subject to any suggestion of malingering.

### B. Age USSG § 5H1.1

#### 1. Departure

Under the pre-Booker sentencing regime, "age, including youth, may be relevant in determining whether a departure is warranted, if consideration of age, individually or in combination with other offender characteristics, is present to an unusual degree and distinguish the case from the typical cases covered by the Guidelines, USSG § 5H1.1."

"Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration." Id.

While a departure for age was a so-called "discouraged" factor pre-Booker, it was not without precedent. In United States v. Baron, 914 F. Supp. 660 (D. Mass. 1995) the Court imposed a downward departure for a defendant in a bankruptcy fraud case who was 76-years-old and whose condition would only worsen while in prison.

Also, in United States v. Dusenberry, 9 F. 3d 110 (6th Cir. 1993) a downward departure was granted due to the defendant's age and medical condition.

The Department of Justice has found that "management problems with elderly inmates...are intensified in the prison setting and include: vulnerability to abuse and predation, difficulty in establishing social relationships with younger inmates," and the "need for special physical accommodations in a relatively inflexible physical environment. " See Correctional

<u>Health Care, Addressing the Needs of Elderly Chronically Ill, and Terminally Ill Inmates</u>, U.S. Department of Justice National Institute of Corrections, 9, 10 (2004)

The elderly are defined in the report as being age 50 or over and that first-time offenders are "easy prey for more experienced predatory inmates". <u>Id</u>.

A more recent report confirmed that older inmates are vulnerable to abuse and victimization by younger inmates. U.S. Dept. of Justice Office of the Inspector General, <u>The Impact of an Aging Inmate Population on the Federal Bureau of Prisons</u>, 9, 10 (May 2015)

As stated above, Ms. Herman appears to be suffering from undisclosed pulmonary problems. She is grossly emaciated and appears to be much older than her biological age. She is a first-time offender in a so-called "white collar" case who will be imprisoned within a population of younger women, the majority of whom have been convicted of crimes of violence or narcotics trafficking.

If incarcerated, she will be entering a prison population where the overwhelming majority of female inmates will be much younger than she. As of 2013, the percentage of female inmates incarcerated within the United States who were between the aged 60 or older was less than 3%. (Looking at the statistics from a different perspective, more than 61% of the female prison population in this country in 2013 was 39 years of age or younger.) Carson, E. Ann, Ph.D., <u>Prisoners in 2013</u>, U.S.Dept. of Justice Bureau of Justice Statistics, Table 7, p. 7 ; September 2014.

Also, although many statistics maintained by the Federal Bureau of Prisons are not broken down by gender, as of May 28, 2016 more than 72% of all inmates housed by the BOP

10

were being punished for crimes of violence, sexual predation and narcotics trafficking. See United States Bureau of Prisons, Inmate Statistics, and Offenses, updated May 28, 2016.

**2. Variant Sentence**

In Gall v. United States, 128 S.Ct. 586 (2007), one of the seminal cases establishing the possibility for sentences that "vary" rather than hew to a recommended Guideline range, the Supreme Court affirmed a sentence of probation in part based on the (young) age of a defendant at the time of his offense conduct.

In United States v. Chase, 560 F. 3d 828 (8th Cir. 2009), the 8th Circuit affirmed a variant sentence for a defendant based on his advanced age, health and work history, even if the sentencing Court did not find grounds for a downward departure based on those factors.

18 U.S.C. § 3553(a)(2)(C) requires the sentencing court "to consider the need for the sentence imposed…to protect the public from further crimes of the defendant." This purpose relates to a defendant's risk of recidivism and the future danger, if any, posed by a defendant. United States v. Rosales-Gonzalez 801 F. 3d 1177, 1184 (9th Cir. 2015)  Courts can consider that an offender's personal characteristics lessen her likelihood to re-offend. United States v. Baird, 580 F. Supp. 2d 889, 895 (D. Neb. 2008)

A recent study compiled by United States Sentencing Commission confirmed that old age is a factor in rates of recidivism. For _all_[2] inmates who were sentenced at age 60 or above, the rate of recidivism is 14%. The younger the inmate at the time of offense, the higher the rate of recidivism, which is 71.1% for inmates younger than 21 years of age. United States Sentencing

---

[2] The study did not distinguish between the rate of recidivism for males and females.

11

Commission, Recidivism and Offender Characteristics: A Comprehensive Overview, p. 23 March 2016.[3]

Given Ms. Herman's age, physical condition and complete lack of a criminal record, a sentence consistent with that recommended by the Guidelines for all intents and purposes will be a life sentence.

**D. Multiple Overlapping of Enhancements at Higher Offense Level**

1. Departure

Federal sentencing courts have noted that "in some circumstance an accumulation of somewhat overlapping enhancements, even if not amounting to double counting, can justify a downward departure." United States v. Jackson, 346 F. 3d 22, 26 (2d Cir. 2003). In that case the 2d Circuit Court of Appeals remanded a case for sentencing to the district court because "although the enhancements imposed by the District Court are permissible, they are all little more than different ways of characterizing closely related aspects of [the defendant's] fraudulent scheme."

In this case Ms. Herman was convicted of wire fraud, of investment fraud and of offenses against the Internal Revenue Service. The wire fraud and investment fraud counts were based substantially on the same behavior. Their prime distinguishing factor being the use of communication devices maintained by the federal government.

Ms. Herman was given a two-level enhancement to her base offense level because at least one of the victims of the investment fraud was "vulnerable" (USSG s 3A1.1(b)(1). She was

---

[3] Ironically, the same study indicated a ***higher*** rate of recidivism for offenders who had accepted responsibility as opposed to those who had gone to trial. Id. At p. 21

given an additional 4-level enhancement because her offense involved substantial hardship to 5 or more victims (USSG s. 2b1.1(b)(2)(B).  All the victims of the fraudulent misconduct were elderly. Some were infirm. With the possible exception of Mr. Burt, none of the victims was a "sophisticated" investor. The money that was lost had been earmarked for retirement or health costs and most of the victims were not in a position to absorb the loss. (See Paragraph 43 of the PSR)

Although the indictment alleged a conspiracy to commit investment fraud, she was given a two level enhancement because at the time of the offense conduct, her company was registered as an investment advisor.

As the enhancements were overlapping, but not technically double counting, we suggest that Ms. Herman is entitled to a downward departure.  The enhancements in this case amount to "little more than different ways of characterizing closely related aspects of [the defendant's] fraudulent scheme." See Jackson, infra.

2. Variant sentence

During the hearing on the enhancements, the Court expressed its concern about possible double counting. The government explained to the Court that the enhancements did not technically amount to double counting.

In United States v. Murray, 648 F. 3d 251, 258 (5th Cir. 2011), the 5th Circuit upheld a 120 month downward departure due to the overlap in enhancements in a mail and securities fraud case.

We suggest that Ms. Herman receive a sentence that reflects the overlap of the enhancements which were added to her base offense level.

### E. The Guideline Sentencing Range Overstates the Defendant's Relative Culpability

The decision of the Federal Sentencing Commission to apply loss amounts to culpability has long been criticized. See <u>United States v. Emmenegger</u>, 329 F. Supp. 416, 427-8 (S.D.N.Y. 2004) (fraud guidelines place undue weight on the amount of loss involved in the fraud… which can be a weak indicator of the moral seriousness of the offense or the need for deterrence")

There have resulted high sentencing ranges with weak or unexplained correlations to the sentencing goals of 18 U.S.C. § 3553(a), concurrent with an "unplanned upward drift" of sentences.

The Guideline recommended range for Ms. Herman is the product of an arithmetic application of the Guidelines and ignores the disparity in offense conduct between Ms. Herman and Mr. Caplitz.

Ms. Herman had little or no personal contact with any of the victims of this fraud. They were all long-term clients of Greg Caplitz. Almost to a person they testified that they considered Greg Caplitz, not Rosalind Herman, to be their investment advisor. Most of the victims expressed a personal dislike of Ms. Herman's at times abrasive personality.

Mr. Caplitz, by virtue of his education, experience and superior intelligence was able to forge trusting relationships with these people, concoct a plan to enrich himself by setting up a hedge fund, and make the initial funding by stealing his clients' money.

He deceived his clients. He forged their signatures. He stole from them.

By his own admission he held out hope that the fund would get off the ground and attract institutional investors with massive amounts of money until the day he was taken into custody for violating the terms of his release.

Although he believed that he would be able to repay the money, his efforts failed.

He admitted during his testimony that he never told Ms. Herman that he was stealing or borrowing from his clients.  He just kept sending her money to spend as she wished.

He also admitted during his testimony that he told Ms. Herman that the monies he was transferring into bank accounts under her control were hers to spend. That she had no tax liability because the monies were not income. Although that was not true, he testified that he believed that was what "she wanted to hear." (See Caplitz Testimony, April 4, 2006 at P. 20-21)

While such assurances may appear to be unbelievable to a duly licensed, Certified Financial Planner with an Honors Degree in Finance from Boston College, they were music to the ears of a woman with little more than a high school education, who during the course of the fraud conduct was the sole support of at least four, and as many as six people: her seriously infirm husband, her brain-damaged son, her unemployed and married son, her unemployed daughter-in-law and her two grandchildren.

The money is gone.  The amount of loss and the sad state of the victims result in the primary enhancements to her base offense level and the resulting Guideline range.

The attached letters speak of Ms. Herman's history of taking care of others.  Both of her sons attended Austin Preparatory School, a Catholic school administered by the Augustinian Fathers in Reading, MA.  Although Ms. Herman and her family are Jewish, she chose Austin

15

Prep for her sons because it was relatively affordable and provided a structure that her sons needed but were not getting in public school in Woburn.

She funded a scholarship more than 14 years ago in the names of her deceased parents, the Bernard and Hilda Gorsun Memorial Scholarship. The scholarship provides financial assistance to needy students who attend Austin Prep, and Ms. Herman participates in the selection of the recipients. She and her husband also have made donations to Austin Prep for the improvement of various educational departments and to enable the school to print colorized versions of its annual yearbook,

A former classmate of Brad Herman at Austin Prep, Joseph Lessard-Wray, has written a letter on Ms. Herman's behalf that is attached to this memorandum, as Exhibit A. Mr. Lessard-Wray credits Ms. Herman with urging him to continue his post-secondary school education. He is now a college graduate who is successful in life.

Charlene Herman, who testified during the trial, is now the divorced wife of Brian Herman. Her letter is also attached as Exhibit B and speaks to her observations of Ms. Herman and the help, moral and financial, that Ms. Herman provided to her during her times of need.

During the years, Ms. Herman opened her house to others who were on hard times and provided a place to stay for friends of the family who were homeless.

The attached letters paint a picture of a woman who was caring, and while she always put family first, she gave to others, in stark contrast from the picture painted by Mr. Caplitz, as he tried to explain his motivation for violating the trust of his clients. Exhibits C, D and E.

CONCLUSION

For all the reasons stated above, and keeping in mind the directive under the Sentencing Reform Act to impose a sentence that is "sufficient but not longer than necessary" in light of all the circumstances, we ask the Court to consider imposing a sentence of house arrest, with full restitution obligations and five years of supervisory release.

July 22, 2016                                    Respectfully submitted,

                                                 Rosalind Herman, defendant

                                                 By her attorneys
                                                 Raymond A. O'Hara
                                                 /s/ *Raymond A. O'Hara*
                                                 1 Exchange Place
                                                 Worcester, MA 01608
                                                 508 831-7551

                                                 Jason Benzaken
                                                 /s/ *Jason Benzaken*
                                                 Benzaken & Wood
                                                 1342 Belmont Avenue, Suite 102
                                                 Brockton, MA 02301
                                                 508 897-0001

CERTIFICATE OF SERVICE

I hereby certify that I served copies of the above Sentencing Memorandum and attached Exhibits on all parties of record and interest in this matter, by filing same electronically through the Court's electronic filing system.

July 22, 2016                                    */s/ Raymond A.O'Hara*
                                                 Raymond A. O'Hara