1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                              No. 1:12-cr-10015-WGY

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   ROSALIND HERMAN

11

12                          * * * * * * * * *

13

14                       For Jury Trial Before:
                        Judge William G. Young
15

16

17                       United States District Court
                        District of Massachusetts (Boston)
18                       One Courthouse Way
                        Boston, Massachusetts 02210
19                       Monday, March 28, 2016

20                          * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
23                United States District Court
        One Courthouse Way, Room 5510, Boston, MA 02210
24                bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   SARA M. BLOOM, ESQ.
     MARY B. MURRANE, ESQ.
 4       United States Attorney's Office
         J. Joseph Moakley U.S. Courthouse
 5       1 Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
 6       (617) 748-3971
         Email: Sara.bloom@usdoj.gov
 7       For the United States

 8

 9   RAYMOND A. O'HARA, ESQ.
         Law Office of Raymond A. O'Hara
10       1 Exchange Place
         Worcester, Massachusetts 01608
11       (508) 831-7551
         Email: Oharalaw@hotmail.com
12   and
     JASON G. BENZAKEN, ESQ.
13       Benzaken and Wood, LLP
         1342 Belmont Street, Suite 102
14       Brockton, Massachusetts 02301
         (508) 897-0001
15       Email: Attorneybenzaken@gmail.com
         For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2

 3   JURY SELECTION...............................   9

 4   INTRODUCTION TO JURY.........................  72

 5   OPENING STATEMENT BY MS. MURRANE.............  89

 6   OPENING STATEMENT BY MR. O'HARA..............  98

 7

 8   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 9

10   CARLA E. BIGELOW

11       By Ms. Bloom:      109

12       By Mr. O'Hara:

13

14                    E X H I B I T S

15

16     EXHIBITS 1 through 100....................... 107

17     EXHIBIT 120................................. 124

18     EXHIBIT 127................................. 126

19     EXHIBIT 290................................. 117

20     EXHIBIT 299................................. 121

21     EXHIBIT 424................................. 108

22

23

24

25
```

```
1              P R O C E E D I N G S

2         (Begins, 9:20 a.m.)

3         THE CLERK:  Now hearing Criminal Matter 12-10015,

4    the United States of America versus Rosalind Herman.

5         THE COURT:  Good morning.  We welcome to the bench

6    this morning the Honorable Francesca Whitling.  Judge

7    Whitling is a judge of the District Court of Villasave,

8    in Switzerland, and she's here studying at Harvard with

9    her husband, Dean Felix Boomer.  Dean Boomer is Dean of

10   the law school at the University of Lacerne.  So we

11   welcome them both.  And you know whenever I have a judge

12   I like the judge to sit up here with me so she can see

13   things the way I see it.  So we welcome both of them.

14        Let's deal with the objection and then I have one

15   thing at the sidebar.  I will say we are the only case

16   empaneling this morning so I imagine that Mr. McAlear

17   will have our jurors very shortly and we'll get rolling.

18        So, Mr. O'Hara, Ms. Gaudet says that you're fine

19   with these demonstrative aids and I will treat them as

20   demonstrative aids except you don't like where they have

21   pulled out, as I look at them, the, um -- actually I

22   don't know what they are, they're either investments or

23   --

24        You tell me.  What are these?

25        MR. O'HARA:  I believe they were expenditures.
```

1          THE COURT:  Expenditures to these different

2     companies from Mr. Connell and Ms. Wentzell.

3          And what's the matter with them?

4          MR. O'HARA:  I just would believe that at this

5     stage of the proceedings they're a little bit too

6     conclusive in terms of what happened or what didn't

7     happen and I think they'd be more properly produced as

8     chalks at the close of the case.

9          THE COURT:  Well, it's all a matter of degree.

10    What if I trash them in the sense that I say, um, in my

11    usual "Now we're going to have opening statements and I

12    understand the government is going to throw up certain

13    display materials so you can understand what they're

14    trying to prove, they made these up for the trial, these

15    are not evidence, we'll wait and see what the evidence

16    is," is that protective enough?

17         MR. O'HARA:  I believe so.

18         THE COURT:  All right, that's how we'll do it.

19         Could counsel and Ms. Herman come to the sidebar.

20

21         AT THE SIDEBAR

22         THE COURT:  Actually, seeing the ramp, Ms. Bloom,

23    you really do have someone who is in a wheelchair,

24    right?

25         MS. BLOOM:  Yes, your Honor, tomorrow.

1        THE COURT:  Tomorrow.  All right.  We've gone to

2    some length, as we should, to accommodate people in

3    wheelchairs.  We're going to pretend that this is always

4    here and we'll just leave it here throughout the course

5    of the trial so we don't call any attention to it.

6        I want to ask what I did when we got to the point

7    earlier on, before you were representing Ms. Herman, is

8    there a plea offer?

9        MS. BLOOM:  There has been an offer, um, on I

10   believe essentially the same terms that were offered.

11       THE COURT:  What are they?  I want it on the

12   record so she knows it.

13       MS. BLOOM:  Yes, just give me one second, your

14   Honor.

15       (Pause.)

16       THE COURT:  And Mr. O'Hara and Ms. Herman, you'll

17   understand that I'm not saying anything at all about a

18   plea, you're innocent, we'll see what the trial shows.

19   Just as I understand the law it makes sense for me to be

20   sure that you know what the government is offering.

21       Do you understand that, Ms. Herman?

22       THE DEFENDANT:  Yes.

23       THE COURT:  All right.

24       MS. BLOOM:  Your Honor, the offer would involve a

25   plea to all the current charges of the indictment and

1    the ultimate calculation, I believe, is an offense level

2    of 31 and at this point it would be only two points off

3    for acceptance, so that will bring it down to 29.

4          THE COURT:  So that's your position?

5          MS. BLOOM:  That would be the government's

6    position.  I could walk through it, your Honor?

7          THE COURT:  No, I don't need you to walk it

8    through, but what's that come out to, what's the range

9    of that?

10         MS. MURRANE:  Hold on.  I can double-check.

11         (Pause.)

12         MS. BLOOM:  So if we're looking at a Level 29,

13    that would be 87 to 108 months, assuming Criminal

14    History Category 1.

15         THE COURT:  And you do so assuming that.

16         And your position in that range is where?

17         MS. BLOOM:  The government would expect to

18    recommend a sentence within that range.

19         THE COURT:  Within that range.

20         Is that how you've heard it?

21         MR. O'HARA:  That's how I've heard it today.

22    Actually I've had no discussions along those lines.

23         THE COURT:  Not my business.

24         MR. O'HARA:  Okay.

25         THE COURT:  She's an innocent person.

1         But you've heard that?

2         MR. O'HARA:  Yes.

3         THE COURT:  And I don't mean to trench on

4    conversations between you and your client, but you've

5    conveyed the information to your client?

6         MR. O'HARA:  Just now she's heard it.

7         THE COURT:  Right.

8         MR. O'HARA:  But I don't know what happened with

9    predecessor counsel.

10        THE COURT:  I'm not asking.

11        MR. O'HARA:  Okay.

12        THE COURT:  But you've heard that?

13        THE DEFENDANT:  Yes.

14        THE COURT:  That's all I need to know.

15        MR. O'HARA:  Can I have a moment, Judge, to

16   discuss it with her briefly?

17        THE COURT:  Well, we're going to have time because

18   now I'm going to recess and we'll wait for the jury.

19        MR. O'HARA:  Okay.  Thank you.

20        THE COURT:  Very well.

21        THE DEFENDANT:  Thank you, your Honor.

22

23        (In open court.)

24        THE COURT:  We'll recess.

25        (Recess, 9:30 a.m.)

1          (JURY VENIRE present, 9:45 a.m.)

2          THE CLERK:  Criminal Matter 12-10015, the United

3     States of America versus Rosalind Herman.

4          THE COURT:  Well, good morning again, ladies and

5     gentlemen.  Again for the record here my name is Bill

6     Young, I'm one of the judges who presides here in the

7     United States District Court.

8          I'm accompanied on the bench this morning and we

9     welcome to our bench this morning the Honorable

10    Francesca Whitling.  Judge Whitling is a judge of the

11    District Court of Villasave in Switzerland and she's

12    here as a judge with her husband, Judge Felix -- not

13    "judge," Dean Felix Boomer, he's Dean of the law school

14    at the University of Lacerne in Switzerland, and the two

15    of them are studying at Harvard.

16         Now, when I have a visiting judge I always like

17    that judge to sit right up here with me because then the

18    judge sees things the way I see them.  So we welcome

19    Judge Whitling and Dean Boomer to the court this

20    morning.

21         Now, if you were listening when the Clerk called

22    the case, you would see that what you've been called

23    here on is a so-called criminal case.  This is a case

24    where the government has made various charges, charges

25    of wire fraud, charges of a violation of the Investment

1    Advisors Act, conspiracy, obstruction of the IRS.  Now,

2    they've made those charges against a particular

3    individual, Rosalind Herman.

4         Ms. Herman is an innocent woman.  She is innocent.

5    She is truly innocent.  The only way she could be

6    convicted of anything is if the jury that we pick comes

7    to believe -- after all the evidence is in, comes to

8    believe unanimously, beyond a reasonable doubt, that she

9    is guilty of one or more of these charges.  But I start

10   out this way because it is so crucial for you to

11   understand that here today, as we start off this trial,

12   we're dealing with an innocent person.  She's got

13   nothing to explain, she doesn't have to do anything, she

14   doesn't have to say anything, she can do those things,

15   but she's not required to, and you don't hold -- and if

16   she doesn't, you don't hold any of that against her.

17   She is truly innocent.

18        And here's how we proceed.  Ms. Gaudet is going to

19   put you on oath to answer my questions -- and now I do

20   have questions, to answer my questions honestly, and my

21   questions are not going to be terribly personal

22   questions but I'm going to introduce to you the

23   attorneys, I'm going to introduce to you Ms. Herman, and

24   I'm going to ask you "Do you know any of these people,

25   are you related to them, have you worked for them?"

1    Questions like that.  I'm going to read the list of

2    witnesses, "Do you know any of those people?  Do you

3    know anything about this case?  Do you have feelings

4    about the case that I ought know about going in?"  These

5    questions all assist me to see whether it's appropriate

6    that you sit as a juror in this particular case.

7           Now, what I want you to do is if you think your

8    answer -- if your answer's "yes" or you even think it

9    could be "yes," maybe it's "yes," perhaps it's "yes,"

10   could be "yes," raise your hand, and I'll -- and

11   Ms. Gaudet and I are watching, we'll see who raises

12   their hand.  And then when all -- when I've asked my

13   questions, we'll ask everybody who has raised their hand

14   in answer to any question to line up there in this aisle

15   over here.

16          Now, stop there by this railing.  You hear about

17   lawyers being members of the bar?  There's actually a

18   bar.  That's it.  The lawyers are the ones who practice

19   their profession up here where the symbolism is, this is

20   where the rug is a darker blue.  So the lawyers sit up

21   here.  So once we've got everyone lined up, then one by

22   one I'll have you up here and I will ask you some other

23   questions just to see whether it's appropriate that you

24   sit as a judge -- that's what we're talking about, as a

25   judge of the facts in this particular case.

1          Now, if I excuse you, I don't want you thinking
2     I'm saying, "Oh, he can't be fair, send him away,"
3     that's not it, it's just for whatever appropriate legal
4     reason I've decided that it's best that you not sit on
5     this case.  And you're not going anywhere.  We'll send
6     you back downstairs to where I first greeted you this
7     morning and we'll send you out on some other case.  We
8     have plenty here.  So you go back downstairs and we'll
9     go on with the remainder.
10          Now, once I've spoken to the people who raised
11    their hands, I will say, "I find this panel
12    indifferent," and we all have your names on a list, and
13    then Ms. Gaudet will fill the box from right -- yes,
14    right to left, second row first, then first row, right
15    to left, until we have 14 people in the box.  Then when
16    that's done, I will ask -- and this is just so we can
17    get to know you a little better, we will have called you
18    by name, so you don't have to stand up, you don't have
19    to introduce yourself, but I'd simply like to know where
20    you work and in a very few words what you do there and
21    if you're married could you tell us where your spouse
22    works and what does he or she do.  So we get that
23    information.
24          Then I will ask the lawyers to come over here to
25    the other side of the bench, we call this the "sidebar,"

1   and we'll huddle and maybe some more of you will be

2   excused.  Again I don't want you thinking that the

3   lawyers don't like you or that they find some character

4   flaw in you, that's not it, this simply shows the

5   meticulous care that we take to pick those people who

6   are the judges, the constitutional officers in this

7   case.  And once we've got the jury picked, we'll take a

8   brief recess, and the case will start.

9          So let's start by swearing the venire.

10         THE CLERK:  Please stand, raise your right hand,

11  and repeat after me using your own name after the

12  pronoun "I."

13         (Everybody stands and raises right hand.)

14         THE CLERK:  "I (States name.) do solemnly swear to

15  answer truthfully questions put to me concerning my

16  qualifications to sit as a juror."

17         (Repeated by venire.)

18         THE CLERK:  You may be seated.

19         (Everybody is seated.)

20         THE COURT:  Well, I said that this is a so-called

21  criminal case so the case is brought or it's prosecuted

22  by the Office of the United States Attorney here and the

23  prosecutors in this case, and I'll ask them to stand,

24  are Sarah M. Bloom and Mary B. Murrane.  And they may

25  stand and face you.  (Stand and face venire.)  Please be

```
 1     seated.  They are Assistant United States Attorneys and
 2     they work for the Office of the United States Attorney.
 3          The person who the government has accused here,
 4     she's innocent going into the case, is Ms. Rosalind
 5     Herman.  She'll stand to face you.  (Defendant stands.)
 6     Her attorney is Mr. Ramond O'Hara.  (Stands.)  And with
 7     him --
 8          Forgive me, I don't have your name here?
 9          MR. BENZAKEN:  Jason Benzaken.
10          THE COURT:  Jason Benzaken.
11          So those are her two attorneys.
12          (Counsel stands.)
13          THE COURT:  Thank you.  Please be seated.
14          (Counsel is seated.)
15          THE COURT:  Now, my first question is have any of
16     you heard, read, or seen anything at all concerning this
17     case?  There's really no reason why you would.  I don't
18     know if there's been any publicity.  But I need to ask.
19          Have you heard, read, or seen anything about a
20     case, a so-called criminal case against a person by the
21     name of Rosalind Herman?
22          (Silence.)
23          THE COURT:  And there's another fellow who I think
24     we're going to hear about named Gregg Caplitz in this
25     case.
```

1          So again, any case that involved those two?

2          (Silence.)

3          THE COURT:  Various companies are going to be

4    mentioned here, so I'll mention them.

5          New England Financial Independence Group.

6    Financial Resources Network Incorporated.  Financial

7    Design Consultants.  The Knew -- "Knew," K-N-E-W,

8    Finance Experts, Incorporated.  Financial Family

9    Holdings, LLC.  Insight-Onsite Strategic Management,

10   LLC.  Insight-Onsite Strategic Partners, LLC.  Insight-

11   Onsite Strategic Fund, LP.

12          Any case that perhaps involve any of those

13   entities?

14          (Silence.)

15          THE COURT:  Any of these attorneys?

16          (Person raises hand.)

17          THE COURT:  Yes.  Yes, ma'am.  Thank you.

18          All right.  Have any of you, or any member of your

19   family, do you own any shares or bonds or investments in

20   any of those companies?

21          (Silence.)

22          THE COURT:  All right.

23          Do you or have you, or any member of your family,

24   so far as you are aware, are you now or have you ever in

25   the past been employed either by Ms. Bloom, Ms. Murrane,

```
 1    the Office of the United States Attorney here in the
 2    District of Massachusetts, employed by Ms. Herman,
 3    employed by Mr. O'Hara or Mr. Benzaken as attorneys or
 4    individually.  Have you ever been involved in an
 5    employment relationship with any of these people?
 6         (Silence.)
 7         THE COURT:  While you and your family may not have
 8    been employed, have any of you ever been involved in any
 9    litigation -- any litigation, whether you were a witness
10    or whether you were a party to that litigation, which
11    did involve the Office of the United States Attorney,
12    these two Assistant United States Attorneys, or which
13    involved Mr. O'Hara or Mr. Benzaken, or involve
14    Ms. Herman -- and I'm not suggesting there was any, but
15    with Ms. Herman, or with any of these companies that I
16    mentioned, have you ever been involved in any litigation
17    in any way that involved any of these entities or the
18    people or the offices that they worked in?
19         (Silence.)
20         THE COURT:  Though you may not have heard or read
21    or seen anything about this particular case, has there
22    been any scuttlebutt about this case, any mention of the
23    case down in the jury room or on your way in or in the
24    days preceding your coming to court?  That sometimes
25    happens and I need to ask.
```

1       Anyone raise anything about this case?

2       (Silence.)

3       THE COURT:  Let me read to you the names of the

4   people who may be witnesses in this case.  I do not say

5   that they will all be witnesses.

6       (Pause.)

7       THE COURT:  Now I'm not saying that they will all

8   be witnesses, but I have them list all those people who

9   may be witnesses.

10      Carla Bigelow lives in Shirley, Massachusetts.

11  Melvin Burt of Billerica, Massachusetts.  This Gregg

12  Caplitz I've already mentioned, Lexington,

13  Massachusetts.  James Connell, Dracut, Massachusetts.

14  Bruce Gilmartin, Boothbay, Maine.  Brad Herman, Woburn,

15  Massachusetts.  Brian Herman, Woburn, Massachusetts.

16  Charlene Herman, Wareham, Massachusetts.  Carmen Lewell,

17  Pompano Beach, Florida.  Fay McNall, Boothbay, Maine.

18  Susan Paley, Newton, Massachusetts.  Patricia Wentzell,

19  Somerville, Massachusetts.  Paul White, he's employed by

20  the IRS.  Thomas Zappala, he's employed by the U.S.

21  Attorney's Office.  John Bigelow of Shirley,

22  Massachusetts.  Irene Burt of Billerica, Massachusetts.

23  Sharon Corser of Woburn, Massachusetts.  Charles Ekman

24  of Barre, Massachusetts.  Dan Goodness, he's employed by

25  an outfit called Bottom Line Specialists in Waltham.

```
 1    Janet Goodrich of Woburn, Massachusetts.  John Greene,

 2    also employed by Bottom Line Specialists of Waltham.

 3    David Savage of Pompano Beach, Florida.  And Steven

 4    Verraneau, he's employed by MWV Multi-Media Forensic

 5    Investigative Services.

 6          THE COURT:  Yes?

 7          MS. BLOOM:  I believe the name is "Carl Leuci,"

 8    not "Lewell."

 9          THE COURT:  "Leuci."  I misspoke.  Yes?

10          It's "Carmen Leuci," right?

11          MS. BLOOM:  Yes, thank you.

12          THE COURT:  Carmen Leuci of Pompano Beach,

13    Florida.

14          Those are the people who may be witnesses here.

15    Are any of you related to or acquainted with any of

16    those people?

17          (Silence.)

18          THE COURT:  Are you, any of you sensible of any

19    bias or prejudice whatsoever with respect to the case

20    about to be tried?  And when I say "are you sensible of

21    it," I mean are you aware of any?

22          (Silence.)

23          THE COURT:  Have any of you formed any opinion,

24    any opinion at all going in, before we've taken any

25    evidence, as to whether Ms. Herman is not guilty or
```

1    guilty of any of the charges to which I made mention?

2        (Silence.)

3        THE COURT:  Do any of you know any reason why you

4    do not stand indifferent in this case?  Now, "stand

5    indifferent," my questions are getting broader and I'm

6    trying to search out, you see, any feelings of which I

7    should be aware before we start.  Anything I ought to

8    know about going in.  So let me probe a little deeper.

9        Do you have feelings about prosecutors, about the

10   Office of the United States Attorney, this office or any

11   such prosecuting office, either in the federal level or

12   in the state level?  Any feelings about defense counsel

13   or people who defend individuals who are charged anyway

14   with crimes?  This is at least -- I know nothing about

15   this case but from the charges it would be what we would

16   call an "alleged" anyway white-collar criminal activity,

17   some sort of alleged fraud.  Any feelings, particular

18   feelings that pertain to Ms. Herman about that alleged

19   conduct?  Any feelings about our criminal justice

20   system, feelings about judges?  Any reason why you do

21   not stand indifferent in this case?

22       (A raised hand.)

23       THE COURT:  Yes, ma'am, thank you.

24       Now my last question is I'm going to tell you what

25   the schedule is on this case.  I cannot guarantee the

```
 1    schedule but the lawyers assure me that the case will be
 2    done in this amount of time.  I don't want to
 3    overemphasize the schedule, but I always believe that
 4    jurors are entitled to know what it is.
 5         We sit from 9:00 till 1:00.  I'll have you out of
 6    here every day at 1:00 until the time comes to give the
 7    case to the jury, then we expect you to stay here,
 8    available anyway, to deliberate about the case through
 9    the afternoon.  No one is going to be kept beyond normal
10    business hours, which are 9:00 to 5:00, no one is going
11    to sit on the weekend, we're not going to sequester this
12    jury, and the case is going to take two weeks or less to
13    try and you get a week from Wednesday, the 6th of April,
14    off.  That's my fault.  I have to be in Washington.
15         So that's the schedule.  They assure me they can
16    get it done in that amount of time.  So that's the
17    schedule.
18         But far more than the schedule I want you to
19    search back over all the questions that I have asked and
20    see if your answer might not be "yes" to some of those
21    questions.  And I you put it to you.
22         Do any of you know any important reason why you
23    ought not be called to sit as a juror in this case.
24         (People raise hands.)
25         THE COURT:  Thank you.
```

1          Now, would each of the people who raised their

2     hand in response to any of the questions, would you

3     please line up here in this aisle here.

4          (People line up.)

5

6          AT THE SIDEBAR

7          THE COURT:  Sir?

8          (First juror.)

9          THE COURT:  Can you just give us your name, sir.

10         THE JUROR:  Sure.  It's Brendan Decker.

11         THE COURT:  Yes, Mr. Decker, you answered "Yes"?

12         THE JUROR:  Yes.  My reason for answering "yes" is

13    I'm actually going on a three-week vacation with my

14    father to Europe and we're leaving on Saturday.  And I

15    am very concerned, I booked this over a year ago, I have

16    all my papers.  Um, this is an extensive vacation taken

17    for a few weeks.

18         THE COURT:  Yeah, I'm going to defer you, which

19    means we're going to call you back within the year and

20    we're going to do it again.

21         THE JUROR:  Okay.

22         THE COURT:  But you go ahead and have a great

23    vacation.

24         THE JUROR:  Oh, thank you, sir.

25         THE CLERK:  And that was Juror 35.

```
1              (Juror leaves.)

2              (Next juror.)

3         THE COURT:  Your name, sir?

4         THE JUROR:  Tim Loiselle.

5         THE COURT:  Your name?

6         THE JUROR:  Tim Loiselle.

7         Yes, I'm pretty sure I played basketball with one

8    of the witnesses growing up.

9         THE COURT:  Can you give the name?

10        THE JUROR:  Yeah, Brad Herman.

11        THE COURT:  And where did you --

12        THE JUROR:  In Woburn, Little League.

13        THE COURT:  And that's what you were, in Little

14   League?

15        THE JUROR:  Yeah, and I'm pretty sure.

16        THE COURT:  And who is this, is this some relative

17   of the defendant?  The son?

18        MS. BLOOM:  Yes, and maybe a witness.

19        THE COURT:  And maybe a witness.  Okay.

20        Now, let's say this is the same fellow.  Are you

21   going to believe his testimony any less or more than any

22   other witness?

23        THE JUROR:  No.

24        THE COURT:  Are you hostile to him or skeptical of

25   him?
```

1    THE JUROR:  Oh, I don't even know him.

2    THE COURT:  Yeah.  Do you truly think you could be

3    fair, fair to the government and fair to Ms. Herman in

4    this case?

5    THE JUROR:  Oh, definitely.

6    THE COURT:  We'll ask you to stay.  Thank you very

7    much.

8    THE JUROR:  Thank you.

9    THE CLERK:  That's Juror Number 20.

10   (Juror leaves.)

11   (Next juror.)

12   THE COURT:  Yes, ma'am?

13   THE JUROR:  My name is Winkie Xia.  I have a

14   vacation starting next week, my flight is for 7 weeks.

15   THE COURT:  And when do you have to go, ma'am,

16   what time of day?

17   THE JUROR:  Um, every day.

18   THE COURT:  No, every day, but what time do you

19   have to report?

20   THE JUROR:  Um, the schedule was set up in the

21   morning.

22   THE COURT:  It's not morning.

23   All right, we'll going to excuse you from service

24   on this jury and we wish you the very best.

25   THE CLERK:  The name again is X-I-A?

```
 1          THE COURT:  X-I-A.

 2          MS. MURRANE:  Number 30?

 3          THE CLERK:  No, 39.

 4          THE COURT:  Just give this to them downstairs and

 5     you're excused.  Good luck.

 6          THE JUROR:  Okay, thank you, Judge.

 7          (Juror leaves.)

 8          (Next juror.)

 9          THE COURT:  Name, sir?

10          THE JUROR:  Mark Grantner.

11          THE COURT:  Yes, Mr. Grantner.

12          THE JUROR:  I have a brother in law enforcement

13     and I also have a brother that's a convicted felon.

14     Also, I'm not sure if I can get the two weeks off from

15     work.

16          THE COURT:  Well, where do you work?

17          THE JUROR:  I work at Walgreens.

18          THE COURT:  First of all, the law absolutely

19     guarantees your job.

20          THE JUROR:  Okay.

21          THE COURT:  So nothing is going to happen to your

22     job if you're serving here.

23          THE JUROR:  Okay.

24          THE COURT:  But I'm not saying they have to pay

25     you.
```

```
 1              THE JUROR:  Oh, yeah, I understand.
 2              THE COURT:  But I'm saying that your job is
 3      absolutely secure.  And I appreciate what you've told
 4      me.
 5              THE JUROR:  Uh-huh.
 6              THE COURT:  So do either of those facts incline
 7      you going in, before we've heard anything, to favor one
 8      way or another?
 9              THE JUROR:  Kind of my brother.
10              THE COURT:  The brother?
11              THE JUROR:  The convicted brother.
12              THE COURT:  Oh, the convicted brother.  So you
13      sort of are sympathetic -- and I don't mean to put words
14      in your mouth, but you're sympathetic to Ms. Herman
15      because she's been accused?
16              THE JUROR:  Yes.
17              THE COURT:  All right, we'll excuse you, you did
18      just right, from service on this case.  All right?
19              Go back downstairs.
20              (Juror leaves.)
21              MS. MURRANE:  22.
22              THE CLERK:  22.
23              (Next juror.)
24              THE COURT:  Now we know who this is.
25              (Laughter.)
```

1          THE JUROR:  I think it's obvious, right?

2          THE COURT:  This is Lenore Glaser, a distinguished

3     attorney at our bar.

4          But you answered "yes" and why?

5          THE JUROR:  I do know the defense counsel, I know

6     the U.S. Attorney's Office, although not these counsel

7     personally, and I would love to be on a jury, but I

8     don't think that I would be fair and impartial.

9          THE COURT:  You don't?  You think because -- at

10    least -- and I don't mean to put words in your mouth,

11    but you tend to appear in defense of those accused of

12    crime, which is most distinguished, but you don't know

13    anything about this case, I take it?

14         THE JUROR:  But I know the, um -- the defense

15    attorney is well enough to know that I will be on their

16    side.  No offense.

17         THE COURT:  That's enough.  You're excused from

18    service on this case.  Go back downstairs.

19         THE JUROR:  Thank you.

20         (Juror leaves.)

21         MS. MURRANE:  46.

22         (Next Juror.)

23         THE COURT:  Your name, sir?

24         THE JUROR:  Jeffrey Souza.

25         THE COURT:  Yes, Mr. Souza.

1        THE JUROR:  Oh, the reason being is I've been in

2    that seat a number of times already and I don't know if

3    I could be fair or not.

4        THE COURT:  You --

5        THE JUROR:  I've been where she sits for the

6    crimes.

7        THE COURT:  I appreciate it.

8        THE JUROR:  And I know what my family went

9    through, I know what I went through, and it wasn't easy.

10       THE COURT:  So you would sympathize with her?

11       THE JUROR:  I know I would.

12       THE COURT:  You did just right to tell us, sir.

13       THE JUROR:  And being in here is giving me the

14   creeps.  It's been so long, though.

15       THE COURT:  All right, you're excused from this

16   case.  Go back downstairs.

17       THE JUROR:  Okay, thank you.

18       (Juror leaves.)

19       THE CLERK:  Juror 57.

20       (Next juror.)

21       THE COURT:  Can we have your name?

22       THE JUROR:  Daryl Whitehouse.

23       THE COURT:  Yes, Ms. Whitehouse.

24       THE JUROR:  I don't know whether I know the

25   Hermans or not, they might have lived below us in the

1   Cape.  I know they had a nephew, Brad.

2          THE COURT:  The people below you?

3          THE JUROR:  Yeah, they were Hermans.

4          THE COURT:  Okay.  What do we know, did Ms. Herman

5   live on the Cape?

6          MR. O'HARA:  Um, I don't believe Ms. Herman ever

7   lived on the Cape.  I can ask.

8          THE COURT:  Why don't you.

9          (Mr. O'Hara leaves sidebar.)

10         (Returns to sidebar.)

11         MR. O'HARA:  Ms. Herman tells me that she

12  vacationed there when she was younger, but before she

13  was married.

14         THE COURT:  And with a different name, her maiden

15  name?

16         MR. O'HARA:  I would assume so, yes.

17         THE COURT:  And so it doesn't look she's the same

18  person.

19         THE JUROR:  Yes, okay.

20         THE COURT:  But I do need to ask you.

21         I mean you do think you could be fair?

22         THE JUROR:  Yes, I just wanted to make sure there

23  was no connection, and they did have a nephew "Brad,"

24  so.

25         THE COURT:  You did just right.  So we'll ask you

1    to stay.

2           THE JUROR:  Okay.

3           (Juror leaves.)

4           (Next juror.)

5           THE COURT:  And your name, sir?

6           THE JUROR:  My first name is John, and my last

7    name is Roy, R-O-Y.

8           THE COURT:  Yes?

9           THE JUROR:  I have a civil case next week, I have

10   to testify against my former landlord.

11          THE COURT:  Um, well, if you're picked, we'll see

12   that that case get moved into the afternoon or sometime

13   when you're not here.

14          THE JUROR:  Because I'm coming in Wednesday and

15   Thursday.

16          THE COURT:  I understand.  But if you're a juror

17   here, we'll see that that case gets moved, so you can

18   testify.

19          THE JUROR:  All right.

20          THE COURT:  Yes, thank you.

21          THE CLERK:  44.

22          (Juror leaves.)

23          (Next juror.)

24          THE COURT:  Your name?

25          THE JUROR:  Madeleine Matthiesen.

1          THE COURT:  Yes, Ms. Matthiesen.

2          THE JUROR:  I'm sorry, I'm not sure if this is the

3    correct time for me, it would be very challenging for me

4    to sit on a jury for two weeks, I'm a resident doctor at

5    Mass. General, I'm supposed to be working at the ICU 80

6    hours a week for the next two weeks.  And this will also

7    be educational for me, this is part of my 4 years of

8    residency and --

9          THE COURT:  How long does your residency go?

10         THE JUROR:  It's two more years.

11         THE COURT:  Well, do you get any vacation?

12         THE JUROR:  Yes, but I have to submit my vacation

13   requests almost a year in advance.

14         THE COURT:  Well, what I'm going to do is I'm

15   going to defer you and then we'll call you back, when

16   there's time, and we'll give you notice, and then they

17   won't defer you again.

18         THE JUROR:  I e-mailed the court and said "Here's

19   my situation" and I was told I can't get a deferral for

20   two years because that's too long.

21         THE COURT:  Well, and I'm saying I'm deferring you

22   and they'll call you back in a year and then we'll see.

23         THE JUROR:  The problem is in a year I'm going to

24   have the same issue.

25         THE COURT:  Well, maybe you can schedule a

```
 1    vacation.
 2           THE JUROR:  Well --
 3           THE COURT:  I have to deal with what's before me
 4    and I am and I'm letting you go.
 5           THE JUROR:  Okay.
 6           THE CLERK:  What was the name again?
 7           THE JUROR:  Matthiesen.
 8           THE CLERK:  Okay.
 9           MS. MURRANE:  Number 40.
10           THE JUROR:  Is it worth me staying and seeing if I
11    would be selected anyway?
12           THE COURT:  Um, that's your choice.
13           What number is she?
14           THE CLERK:  She's 40.
15           THE COURT:  You're low down on this list.  But if
16    you're selected -- I mean I do everything I can to
17    accommodate jurors, so I sit 9:00 till 1:00, that's all
18    I need you until you deliberate.  You're working
19    terribly hard and I'm sensitive to that.  If you want to
20    stay, then you could be picked, but if not, then you're
21    good.
22           THE JUROR:  So if I'm deferred for a year until
23    next year and I can't schedule a vacation during that
24    time, I'll go through the same process again?
25           THE COURT:  You will before some other judge,
```

1   maybe me.

2       THE JUROR:  Okay, then I have to go.  I can't risk

3   not being able to work in the ICU.

4       THE COURT:  I understand.  You're deferred.  You

5   can give them this.  And I do wish you the best, ma'am.

6       THE JUROR:  Yes, thank you.

7       (Juror leaves.)

8       (Next juror.)

9       THE COURT:  Your name, sir?

10      THE JUROR:  Ean Wember.

11      THE COURT:  Yes, Mr. Wember.

12      THE JUROR:  I said two things, I think.  Was it

13  "National Financial Group" or "Advisors" you mentioned?

14      (Gets list.)

15      THE COURT:  No, "New England Financial

16  Independence Group."

17      THE JUROR:  What?

18      THE COURT:  "New England Financial Independence

19  Group."

20      THE JUROR:  Oh, there was a financial group that

21  we had dealt with.

22      THE COURT:  And what's the name of the one you

23  dealt with?

24      THE JUROR:  I think it was "National Financial" --

25  and I thought you mentioned who it was.

```
 1          THE COURT:  I don't know.
 2          THE JUROR:  Okay.
 3          So I am on-call for surgery at my practice and I
 4   have a doctor who does it, but if there's a complication
 5   I have to be there, so I'm actually on-call now.
 6          THE COURT:  Um, you know what I'd like to do?
 7          THE JUROR:  Sure.
 8          THE COURT:  Here's what I would like to do, and
 9   that way you get your service done.
10          I'd like to keep you.  I don't know if they have
11   enough jurors, but if you have to assist the doctor in
12   doing the surgery, then I'll spring you free.
13          THE JUROR:  Okay.
14          THE COURT:  Then you serve, you get your -- if
15   you're chosen.  You're either not chosen, in which case
16   then your free, or you're chosen, and you have my word
17   I'll let you go if you're called for surgery.
18          THE JUROR:  Even if I'm on the jury?
19          THE COURT:  Even if you're on the jury, because
20   I'll pick enough so that I can let you go.
21          THE JUROR:  Okay.  Thank you.  So just wait here?
22          THE COURT:  Yes.
23          (Juror leaves.)
24          (Next juror.)
25          THE COURT:  Good morning.  Your name, sir?
```

```
1              THE JUROR:  Edward Moss.

2              THE COURT:  Yes, Mr. Moss.

3              THE JUROR:  I have two concerns.  First, my uncle

4     passed away on Friday, the viewing's today, but the

5     funeral is tomorrow in New Jersey in the morning.  And

6     the second thing is I teach at Northeastern, we're in

7     Week 11, we have 14 weeks, and if I miss two weeks of

8     classes there's no substitute teacher to take over my

9     classes, it's not like public schools where there's

10    someone to teach classes.

11             THE COURT:  No, no, I know, I teach as well.

12             This is what we're going to do, we're going to

13    defer you, you'll be deferred for a year, then we'll

14    call you back, but then we're not going to defer you.

15             THE JUROR:  There's always May, June, July that

16    I'm good, so --

17             THE COURT:  Well, I can't guarantee that.  But

18    you're deferred now.  I'm sorry for your loss.  And

19    you're deferred.

20             THE JUROR:  Thank you.

21             THE COURT:  Give them that card downstairs.

22             (Juror leaves.)

23             (Next juror.)

24             THE COURT:  Yes, sir, can we have your name?

25             THE JUROR:  James Longley.
```

```
 1          THE COURT:  Yes, Mr. Longley.
 2          THE JUROR:  So I don't have any biases, but my
 3   wife is a lawyer for the Attorney General.
 4          THE COURT:  Of Massachusetts?
 5          THE JUROR:  Yes.
 6          THE COURT:  And she's in the civil division?
 7          THE JUROR:  The civil rights division.
 8          THE COURT:  Okay.  You did just right to tell us.
 9   And you anticipated my next question.
10          You don't feel that you favor the government
11   lawyers here nor do you favor Ms. Herman, you think you
12   can be fair and impartial?
13          THE JUROR:  Yes.
14          THE COURT:  Thank you.  We'll ask you to stay.
15          (Juror leaves.)
16          (Next juror.)
17          THE COURT:  Your name, ma'am?
18          THE JUROR:  Gina Driscoll.
19          THE COURT:  Yes, Ms. Driscoll.
20          THE JUROR:  I have a charge on my record of
21   attempted insurance fraud.
22          THE COURT:  And you did just right to tell us.
23   You were convicted of this charge?
24          THE JUROR:  I had to plead it out, yes.
25          THE COURT:  All right.
```

1     Now, I was given this form, but I've determined

2     you're eligible to sit, you did just right to tell the

3     parties.

4          Let me ask you, because you're fully a citizen,

5     you have the right to vote and therefore you have the

6     right to sit on a jury, but I ask you, having been

7     through a criminal process, do you really think you can

8     be fair and impartial, fair to the government and fair

9     to Ms. Herman?

10         THE JUROR:  Yes.

11         THE COURT:  Okay, then we'll ask you to stay.  And

12    thank you.

13         MS. MURRANE:  31?

14         THE CLERK:  19.

15         MS. MURRANE:  Okay.

16         (Juror leaves.)

17         (Next juror.)

18         THE COURT:  Your name, sir?

19         THE JUROR:  Nick Woodgate.

20         THE COURT:  Yes, Mr. Woodgate?

21         THE JUROR:  I just thought I should probably bring

22    it to your attention that I work in finance and that I'm

23    currently a candidate for the Charter Financial Analyst

24    program and I'm sitting for a Level 3 exam this June and

25    about 10 to 20 percent of the exam is devoted to

1    maintaining ethics in financial markets and as financial

2    advisors.  I just didn't know if that's a relevant piece

3    of information.

4         THE COURT:  It is a relevant piece of information

5    and you did just right to tell us, but of course jurors

6    are direct democracy and people from all walks of life.

7    The more pertinent question is, in this case do you --

8    do you think you can be scrupulously fair, fair to the

9    government and equally fair to Ms. Herman, making the

10   government prove its case beyond a reasonable doubt.  Do

11   you think you can do that?

12        THE JUROR:  Yes, probably, but I just -- yeah,

13   probably.

14        THE COURT:  I see you're a person who understands

15   what the ethical framework is and I will teach you the

16   legal framework.  Let me put the question this way.

17        Suppose you think -- and I know nothing about the

18   case so I'm not suggesting anything.

19        But suppose you come to think that she violated

20   various ethical duties but you don't think they proved

21   she violated the criminal statutes, would you have any

22   problem voting to acquit her, to say "not guilty"?

23        THE JUROR:  It would be potentially difficult, I

24   guess, but I guess I would have to do whatever is right

25   in terms of the law.

1          THE COURT:  And right is following the law?

2          THE JUROR:  Yes, right.

3          THE COURT:  Do you think you could do that?

4          THE JUROR:  Yeah.

5          THE COURT:  Then we'll ask you to stay.  Thank

6    you.

7          MS. MURRANE:  What number?

8          THE CLERK:  Number 12.

9          (Juror leaves.)

10         (Next juror.)

11         THE COURT:  Your name, ma'am?

12         THE JUROR:  Yes, Judith Osborn.

13         THE COURT:  Yes, Ms. Osborn?

14         THE JUROR:  I don't believe I can be impartial in

15   this case.

16         THE COURT:  Why?

17         THE JUROR:  I am a female financial planner and I

18   just feel sympathy for her being -- and I own my open

19   company.

20         THE COURT:  Okay.  Well, I don't know anything

21   about the case, but there may be similarities in that

22   respect.  I will tell the jury that they can't feel

23   sympathy or the thing doesn't turn on sympathy and the

24   like.

25         So let me put it to you this way.  If I instruct

1    that is the law, and it is, can you follow those

2    instructions or are you going to have a hard time doing

3    that?

4         THE JUROR:  I believe I'm going to have a hard

5    time to tell you the truth.

6         THE COURT:  Well, that's why I ask.  You haven't

7    done anything wrong.  That's why we're having this

8    discussion.  So you're excused from service on this

9    case.  Go right downstairs.  We'll find another case for

10   you.

11        THE JUROR:  Thank you.

12        (Juror leaves.)

13        (Next juror.)

14        THE COURT:  Can we have your name, sir?

15        THE JUROR:  Mohammed.

16        THE COURT:  Can you tell me your last name?

17        THE JUROR:  Mohammed.

18        THE COURT:  And your last name is what?

19        THE JUROR:  The same.

20        THE COURT:  Oh, the same.  That's fine.

21        And you answered "Yes" to what?  You answered

22   "yes" to about one of my questions?

23        THE JUROR:  To my name.

24        THE COURT:  Yes, you gave me your name.

25        THE JUROR:  Mohammed.

1          THE COURT:  So what's your problem?

2          THE JUROR:  Understanding.

3          THE COURT:  Understanding English?

4          THE JUROR:  Yes, because I don't -- I have a hard

5     time.

6          THE COURT:  You have a hard time understanding

7     what we we're doing?

8          THE JUROR:  Yeah, a little bit.  Yeah.

9          THE COURT:  Okay, I'm going to excuse you from

10    service on this case.  You're excused.

11         He's free to go.

12         Give them this and they'll let you go.  Give them

13    this downstairs.  Thank you for coming in.

14         THE JUROR:  Thank you.

15         (Juror leaves.)

16         (Next juror.)

17         THE COURT:  Hi, your name, sir?

18         THE JUROR:  Neil Good.

19         THE COURT:  Yes, Mr. Good?

20         THE JUROR:  I believe I have two problems that I'm

21    dealing with.  I've had surgery recently and there are

22    complications to the point where I might have to talk to

23    my doctor in the next week or two.

24         Second of all, I severely damaged my car this

25    morning in an accident just outside the courthouse, so

```
 1    transportation is going to be a problem.  But that's
 2    secondary, I'm sure.
 3         THE COURT:  All right, well, we're going to excuse
 4    you from service in this case.  Give them this
 5    downstairs and they'll let you go.  I'm sorry about your
 6    accident.
 7         THE JUROR:  Thank you.
 8         (Juror leaves.)
 9         (Next juror.)
10         THE COURT:  Your name?
11         THE JUROR:  Joanne Britt.
12         THE COURT:  Yes, Ms. Britt?
13         THE JUROR:  I'm not even sure if I should ask, but
14    I work for a private bank as the manager and I've just
15    gone into a committee for fraud.  I don't know if it has
16    anything to do with this.
17         THE COURT:  You did just right to tell us because
18    we do want people from all walks of life and in your
19    profession you have some experience with standards and
20    ethical requirements and the like.  It's my job in this
21    case to teach you what the legal requirements are.
22         So let me ask you.  Do you think, as I explain
23    them, you can follow the legal requirements the way I
24    teach it to you, do you think you can?
25         THE JUROR:  I think so, I'm just not sure exactly
```

```
 1   what the case is about.
 2        THE COURT:  And at this stage no one is, and I'm
 3   going to explain it and the lawyers are going to put it
 4   on.
 5        THE JUROR:  Okay.
 6        THE COURT:  So do you really think you could be
 7   fair, fair to the government and equally fair to
 8   Ms. Herman, do you think you can?
 9        THE JUROR:  I think so.
10        THE COURT:  Then we'll ask you to stay.
11        THE JUROR:  Okay.
12        (Juror leaves.)
13        (Next juror.)
14        THE COURT:  Your name, sir?
15        THE JUROR:  Robert Foley.
16        THE COURT:  Yes, Mr. Foley?
17        THE JUROR:  I have a potential hardship.  I got
18   married in 2015, my husband and I have been waiting for
19   an immigration interview for the last six months and we
20   finally got one, it turns out to be this Thursday.  And
21   I did this online and I didn't even know when we were
22   going to have our date, but it turns out this date --
23   this Thursday of this week.
24        THE COURT:  Well, what we're going to do is I'm
25   going to keep you, but if you're chosen, you give us the
```

1   contact information, we're going to be in touch with

2   them, and they'll do your interview in the afternoon and

3   I'll have you out of here at 1:00.

4          THE JUROR:  All right.

5          THE COURT:  Thank you.

6          (Juror leaves.)

7          (Next Juror.)

8          THE COURT:  Your name, sir?

9          THE JUROR:  Jacob Garfinkle.

10         THE COURT:  Yes, Mr. Garfinkle?

11         THE JUROR:  I hope this doesn't excuse me, but I'm

12   under a very strict fitness and nutrition program right

13   now.  The fitness I'm not so worried about because of

14   the scheduling, but I am concerned about needing to be

15   able to eat every two to three hours and being in

16   control of what I eat.  Is there any chance I will be a

17   distraction in the courtroom?

18         THE COURT:  Oh, no.

19         THE JUROR:  Okay.

20         THE COURT:  We've been there.  We've done that.

21   If you're at all concerned, I'll put you in the second

22   row, you can bring in whatever you need to eat, you can

23   eat it and that's fine.  It won't brother anyone.

24         THE JUROR:  Okay.

25         THE COURT:  No, but let me just ask you, do you

```
1   believe you can be fair, fair to the government and fair

2   to the defendant?

3           THE JUROR:  Oh, absolutely.

4           THE COURT:  Okay.  We'll ask you to stay.

5           (Juror leaves.)

6           (Next juror.)

7           THE JUROR:  Good morning.  I'm Shawn Newell.

8           THE COURT:  Your last name is?

9           THE JUROR:  Shawn Newell.

10          THE COURT:  Yes, Mr. Newell?

11          THE JUROR:  I just want to be clear on the

12  schedule, I become the sole care provider for my

13  children on 4-17.

14          THE COURT:  Yes, the case will be done.

15  Guaranteed.

16          THE JUROR:  Okay, thank you.

17          (Juror leaves.)

18          (Next juror.)

19          THE COURT:  Good morning.  My name is Patricia

20  McNulty.

21          THE COURT:  Yes?

22          THE JUROR:  Basically I'm here for a hardship.  I

23  just served on a state jury.  I'm self-employed, I'm the

24  primary wage earner for my family, and my husband is now

25  serving three months grand jury.  So basically we're
```

1    both out.

2         THE COURT:  Well, I try to deal with that by

3    getting you out of here every day at 1:00.  We need

4    people from all walks of life.  You have served.  This

5    is one of the places where it really doesn't match --

6         THE JUROR:  No, I'm not trying to get out of

7    anything --

8         THE COURT:  I know you're not.

9         THE JUROR:  But I run a company, I have no other

10   broker on record, I have 18 agents and there's nobody

11   there.

12        THE COURT:  I'm going to ask you to stay and we'll

13   see how it works out.  You've told the lawyers.

14        THE JUROR:  Okay, thank you.

15        (Juror leaves.)

16        (Next juror.)

17        THE COURT:  Your name, ma'am?

18        THE JUROR:  Julie Musante.

19        THE COURT:  Yes, Ms. Musante.

20        THE JUROR:  I may have a child care situation next

21   week.  My husband is on business travel, so --

22        THE COURT:  Well, it will probably go into next

23   week.  Can you cover the time 9:00 till 1:00?

24        THE JUROR:  I can potentially.  The problem is

25   we're trying to get my mother-in-law, but the problem is

```
 1   I'm worried that if I'm not there to drop the kids off,
 2   it takes me like almost over an hour to get here from
 3   Oxford.  So it would be iffy if I could get here on time
 4   in the morning.
 5        THE COURT:  Um, I really need people from all
 6   walks of life.  I think I'm going to ask you to stay.
 7   Try to work it out.  If you're chosen, we'll see how it
 8   works out.  We'll ask you to stay.
 9        THE COURT:  All right.  Yes, sir.
10        THE CLERK:  She is Juror 1.
11        MS. MURRANE:  Thank you.
12        (Juror leaves.)
13        (Next juror.)
14        THE COURT:  Can we have your name?
15        THE JUROR:  Daniel Parker.
16        THE COURT:  Yes, Mr. Parker?
17        THE JUROR:  I believe that the woman sitting
18   outside of this courtroom is named Janet, and I think
19   you said she was a witness?
20        THE COURT:  I wouldn't be surprised if the
21   witnesses are sitting outside.
22        Do you know one of them?
23        THE JUROR:  I think her name is Janet.  I think
24   you said she's from Woburn, Massachusetts.  So I believe
25   I'm acquainted with her from the Shell gas station on
```

1    Main Street in Worcester, I go three about three times a

2    week and get gas, and I often have a conversation with

3    her.  I just want to let you know that.

4         THE COURT:  There's nothing wrong with that.  You

5    did just right to tell us.

6         Let's assume she is a witness, and she probably

7    is, that's why she's sitting there.  So when she

8    testifies, just because you know who she is, are you

9    going to favor her testimony or believe her testimony

10   more than the other witnesses?

11        THE JUROR:  Well, I know her as a person and I

12   know she's a good person.

13        THE COURT:  All right.  You did just right to tell

14   us.  We'll excuse you on this case.  Go back downstairs.

15        (Juror leaves.)

16        MS. MURRANE:  Which number?

17        THE CLERK:  Juror 1.

18        (Pause.)

19

20        (In open court.)

21        THE COURT:  I find this panel indifferent.

22   Proceed, Madam Clerk.

23        THE CLERK:  Juror Number 1, Julie Musante, please

24   come forward and take Seat 1 in the back row.

25        (Takes seat in box.)

```
 1          THE CLERK:  Juror 2, Drew Carlson, please come

 2     forward, take Seat 2 in the back row.

 3          (Takes seat in box.)

 4          THE CLERK:  Juror Number 3, Jacob Garfunkle,

 5     please come forward and take Seat 3 in the back row.

 6          THE JUROR:  It's "Garfinkle" actually.

 7          THE CLERK:  "Garfinkle."

 8          THE JUROR:  Thank you.

 9          (Takes seat in box.)

10          THE CLERK:  Juror 4, Daryl Whitehouse, please come

11     forward and take Seat 4 in the back row.

12          (Takes seat in box.)

13          THE CLERK:  Juror Number 7, Amaurys Reynoso,

14     please come forward, take Seat 5 in the back row.

15          (Takes seat in box.)

16          THE CLERK:  Juror Number 8, Christine Hennegan,

17     please come forward, take Seat 6 in the back row.

18          (Takes seat in box.)

19          THE CLERK:  Juror Number 9, Kevin Rollins, please

20     come forward, take Seat 7 in the back row.

21          (Takes seat in box.)

22          THE CLERK:  Juror Number 10, Steven Rudolph,

23     please come forward, take Seat 1 in the front row.

24          (Takes seat in box.)

25          THE CLERK:  Juror Number 11, Jesse Faunce, please
```

1    come forward, take Seat 2 in the front row.

2              (Takes seat in box.)

3              THE CLERK:  Juror Number 12, Nicholas Woodgate,

4    please come forward, take Seat 3 in the front row.

5              (Takes seat in box.)

6              THE CLERK:  Juror Number 13, Gail Jennes, please

7    come forward, take Seat 4 in the front row.

8              (Takes seat in box.)

9              THE CLERK:  Juror Number 14, Daniel Galas, please

10   come forward, take Seat 5 in the front row.

11             (Takes seat in box.)

12             THE CLERK:  Juror Number 15, Edgar Matthews,

13   please come forward, take Seat 6 in the front row.

14             (Takes seat in box.)

15             THE CLERK:  Juror Number 16, Judith Harrington,

16   please come forward, take Seat 7 in the front row.

17             (Jury box is filled.)

18             THE COURT:  Now, as I explained, what we'll do is

19   I'll just ask each one of you -- you don't have to

20   introduce yourself, you don't have to stand up, but I'm

21   going to go in the order that you were picked, and I'd

22   simply like to know where you worked and in a few words

23   what you do there, and if you are married, where your

24   spouse works and what he or she does.  And we'll start

25   with Ms. Musante.

```
 1          THE JUROR:  I work at Skyworks, Incorporated,
 2     consumer electronics and communications.  I do software
 3     support for IT design.  I'm married and my husband works
 4     at Oracle, um, which is a software company.
 5          THE COURT:  And what does he do?
 6          THE JUROR:  He's a programmer.
 7          THE COURT:  Thank you.
 8          Mr. Carlson?
 9          THE JUROR:  I work at the State House for a state
10     representative and I do all the district work and
11     constituent services.  And I'm not married.
12          THE COURT:  Mr. Garfinkle?
13          THE JUROR:  I'm a project manager for a custom
14     residential construction company in Medway,
15     Massachusetts, RP Marzilli and Company.  As a project
16     manager I run the day-to-day scheduling and financial
17     aspects of completing the job to satisfaction and handle
18     all the clients special management services.  I have a
19     fiance, we'll be married in July, and she is a special
20     ed. teacher in Medford.
21          THE COURT:  Thank you.
22          Ms. Whitehouse?
23          THE JUROR:  I work for an animal hospital in
24     Falmouth, Massachusetts, we restrain the animals, prep
25     for surgery, keep the doctors from getting bitten.
```

```
 1            THE COURT:  Okay.

 2            Mr. Reynoso?

 3            THE JUROR:  I work for a transportation company,

 4       I'm a public bus driver.  I'm married and my wife is not

 5       working.

 6            THE COURT:  When she did work --

 7            She's at home in other words?

 8            THE JUROR:  Oh, yes.

 9            THE COURT:  Okay.  Fine.

10            Ms. Hennegan?

11            THE JUROR:  Um, I work in transportation

12       administration as a security officer at the airport.

13            THE COURT:  Thank you.

14            Mr. um -- I can't read my own writing here.

15            THE JUROR:  Rollins.

16            THE COURT:  Yes, Mr. Rollins.  Forgive me.

17            THE JUROR:  I'm a retired businessman.

18            THE COURT:  And what was your business, sir?

19            THE JUROR:  Dell Computers, a CEO.

20            THE COURT:  Yes, thank you.

21            Mr. Rudolph?

22            THE JUROR:  A general manager of the Garden Center

23       chain.

24            THE COURT:  Thank you.

25            THE JUROR:  And I am married and she is a dietary
```

1   technician of a nursing home.

2          THE COURT:  Thank you.

3          Mr. Faunce?

4          THE JUROR:  Self-employed contract mechanical

5   engineer and design, that sort of thing.  I am married

6   and my wife works for Bristol County Savings Bank, she's

7   a mortgage consultant.

8          THE COURT:  Thank you.

9          Mr. Woodgate?

10          THE JUROR:  I work at John Hancock, an investment

11   analyst, identifying and monitoring various securities.

12          THE COURT:  Okay.

13          THE JUROR:  My name is Gail Jennes, I work at the

14   Museum of Science in Boston, I'm a senior communications

15   officer and I do marketing for the institution.  I do

16   have -- I'm married and, um, my partner is retired now

17   from professional computer programming.

18          THE COURT:  Thank you.

19          Mr. Galas?

20          THE JUROR:  I'm a general manager for AC Moore

21   responsible for the daily operations of a business.  And

22   I'm single.

23          THE COURT:  Okay.  Thank you.

24          Mr. Matthews?

25          THE JUROR:  I'm a manager of an auto repair shop.

1    I'm not married.

2         THE COURT:  Thank you.

3         And Ms. Harrington?

4         THE JUROR:  I am retired.  I was a pastoral

5    minister to the sick and elderly and home bound in Fall

6    River.  My husband -- I'm a widow, my husband died 14

7    years ago.

8         THE COURT:  And what was his profession?

9         THE JUROR:  He worked for the power company, the

10   electric company.

11        THE COURT:  Thank you.

12        Counsel.

13        (Pause.)

14

15        AT THE SIDEBAR

16        THE COURT:  Counsel?

17        Okay, the government has 7 and the defense has 11

18   and the last two empaneled are the alternates.  The

19   government will exercise theirs and the defense will

20   exercise theirs, and the next round the defense will go

21   first and then the government and so on until we have

22   the jury.

23        All right.  The government?

24        MS. BLOOM:  Numbers 2 and 4.

25        MS. MURRANE:  Juror Number 2 in Seat Number 2.

```
 1              THE COURT:  And that's Mr. Carlson.  He's excused.
 2    And?
 3              MR. O'HARA:  Wait.
 4              MS. MURRANE:  Do we go back and forth?
 5              THE COURT:  No, you don't, you keep going.
 6              And 4 is Ms. Whitehouse?
 7              MS. BLOOM:  Yes.
 8              THE COURT:  Okay.  You're otherwise content?
 9              MS. BLOOM:  No.  And then Number 16.
10              THE COURT:  Okay, just one moment.  So
11    Ms. Whitehouse is challenged.  And now it's helpful to
12    me if you say the name and the number.
13              MS. MURRANE:  Harrington.
14              THE COURT:  The very last one, Harrington?
15              MS. MURRANE:  Yes.
16              THE COURT:  She's excused.
17              And you're otherwise content?
18              MS. BLOOM:  Yes.
19              MR. O'HARA:  I have a question, your Honor?  Is
20    the front row numbered from 1 to 7 and the back row from
21    8 to 14 or do I have them reversed?
22              THE COURT:  Well, I don't know what the number is
23    in view of the numbers on the list, but we started with
24    the second row, the second row was filled in first.
25              MR. O'HARA:  So 1 through 7 is the second row?
```

1        THE COURT:  Yes.

2        MR. O'HARA:  Thank you.

3        Okay, we would strike, um, Juror Number 3 in Seat

4   3.

5        THE COURT:  That's Mr. Garfinkle?

6        MR. O'HARA:  Yes.

7        THE COURT:  He's excused.

8        MR. O'HARA:  Okay.

9        (Pause.)

10       MR. O'HARA:  And Number 9 in Seat 7, Mr. Rollins.

11       THE COURT:  Mr. Rollins?

12       MR. O'HARA:  Number 9, Mr. Rollins, in Seat 7.

13       THE COURT:  Yes, he's excused.

14       MR. O'HARA:  Then Mr. Woodgate.

15       THE COURT:  Mr. Woodgate in the front row is

16   excused.

17       MR. O'HARA:  Yes, he's Number 12.

18       THE COURT:  He's excused.

19       Otherwise content?

20       MR. O'HARA:  No, Juror Number 14 in Seat 4.

21       MS. MURRANE:  Gail Jenner?

22       MR. O'HARA:  Yes, Gail Jenner.

23       THE CLERK:  No, Ms. Jennes, Judge.

24       THE COURT:  Ms. Jennes.  She's excused.

25       MR. O'HARA:  How many?

1          THE COURT:  You've done five.

2          Otherwise content?  No, four.  I'm sorry.

3          MR. O'HARA:  Okay, Juror Number 1, Ms. Musante.

4          THE COURT:  She's excused?

5          MR. O'HARA:  Yes.

6          THE COURT:  Okay.

7          MR. O'HARA:  And I think that's it.

8          THE COURT:  Very well.  Those jurors are excused.

9

10          (In open court.)

11          THE CLERK:  Will the following jurors please come

12  forward, you've been excused from this case.

13          Juror Number 1, Julie Musante.  Juror Number 2,

14  Drew Carlson.  Juror Number 3, Jacob Garfinkle.  Juror

15  Number 9, Kevin Rollins.  Juror Number 12, Nicholas

16  Woodgate.  Juror Number 13, Gail Jennes.  Juror Number

17  16, Judith Harrington.

18          (Pause.)

19          THE CLERK:  And Juror Number 4, Mr. Whitehouse.

20          (People leave the box.)

21          THE CLERK:  Juror Number 17, Diego Freitas, please

22  come forward, take Seat 1 in the back row.

23          (Takes seat in box.)

24          THE CLERK:  Juror Number 19, Gina Driscoll, please

25  come forward, take Seat 2 in the back row.

1            (Takes seat in box.)

2            THE CLERK:  Juror Number 20, Timothy Loiselle,

3     please come forward, take Seat 3 in the back row.

4            (Takes seat in box.)

5            THE CLERK:  Juror Number 21, Faye Cassell, please

6     come forward, take Seat 4 in the back row.

7            (Takes seat in box.)

8            THE CLERK:  Juror Number 23, Keith Maurizi, please

9     come forward, take Seat 7 in the back row.

10           (Takes seat in box.)

11           THE CLERK:  Juror Number 24, Julie Hersh, please

12    come forward, take Seat 3 in the front row.

13           (Takes seat in box.)

14           THE CLERK:  Juror Number 25, Stephen Ford, please

15    come forward, take Seat 4 in the front row.

16           (Takes seat in box.)

17           THE CLERK:  Juror Number 26, Kostas Kalamaras,

18    please come forward, take Seat 7 in the front row.

19           (Box is filled.)

20           THE COURT:  And now the same question for the

21    folks who have just joined us, starting with

22    Mr. Freitas.

23           THE JUROR:  I work for Apple, Inc. and I am

24    technical support for Apple Corporate.  My wife is a

25    housewife and she takes care of our two children.

```
 1           THE COURT:  Thank you.
 2           Ms. Driscoll?
 3           THE JUROR:  I work for Attentive Home Care and I'm
 4   not married.
 5           THE COURT:  Thank you.
 6           Mr. Loiselle?
 7           THE JUROR:  I work for Suffolk University, I'm an
 8   admissions officer, and my wife is in the educational
 9   publishing industry.
10           THE COURT:  All right.
11           Ms. Cassell?
12           THE JUROR:  I teach history at Newton South High
13   School and I'm not married.
14           THE COURT:  Thank you.
15           Mr. Maurizi?
16           THE JUROR:  Maurizi.
17           THE COURT:  Maurizi.  Forgive me, sir.
18           THE JUROR:  I'm a retired restaurant chef and I'm
19   married and my wife is a house cleaner.
20           THE COURT:  Thank you.
21           Ms. Hersh?
22           THE JUROR:  I am a global sourcing manager for a
23   medical device company.
24           THE COURT:  For?
25           THE JUROR:  A medical device company.
```

```
1              THE COURT:  Thank you.
2         Mr. Ford?
3              THE JUROR:  I work for Brown Brothers Harriman as
4    a financial reporting analyst and I'm not married.
5              THE COURT:  Thank you.
6         Mr. Kalamaras?
7              THE JUROR:  I work for Delaware Life Insurance
8    Company as an insurance tax manager doing legal aspects
9    of scheduling and criminal audits, and my wife is an
10   educator.
11             THE COURT:  Your wife is --
12             THE JUROR:  An educator.  She's a teacher.
13             THE COURT:  Oh, no, I follow, but can you just
14   give us like the age or what type of --
15             THE JUROR:  She's 30 --
16             THE COURT:  No, not her age, but who does she
17   teach?
18             THE JUROR:  Oh, in Brookline.
19             THE COURT:  In Brookline, what, elementary, high
20   school?
21             THE JUROR:  Oh, she teaches elementary.
22             THE COURT:  All right.  Thank you.
23        Counsel.
24
25             AT THE SIDEBAR
```

1          THE COURT:  Okay.  Now, the defense?

2          MR. O'HARA:  Juror -- Ms. Cassell, Juror Number

3     21.

4          THE COURT:  Ms. Cassell.

5          Ms. Cassell, she is Asian American, why are you

6     challenging her?

7          MR. O'HARA:  Is she?  Actually it was --

8          THE COURT:  She's the one that teaches at Newton

9     South.

10          THE JUROR:  Your Honor, I don't know if I can --

11     well, it has nothing to do with her ethnic background,

12     it's more to do with where she works.

13          THE COURT:  She works at Newton South.

14          MR. O'HARA:  Yes.  And one of the witnesses lives

15     in Massachusetts and it's believed that one of the

16     witnesses -- she may have taught one of the witness's

17     children.

18          THE COURT:  Okay, I'll excuse her.

19          Anyone else?

20          MR. O'HARA:  Yes.  Juror 25, Mr. Ford.

21          THE COURT:  Mr. Ford is excused.

22          THE JUROR:  And Juror Number 26, Mr. Kalamaras.

23          THE COURT:  And Mr. Kalamaras.

24          MR. O'HARA:  And may I just have a moment to --

25          THE COURT:  Of course.

```
 1          MR. O'HARA:  (Pause.)  That's it.  We're content.

 2          THE COURT:  Very well.

 3          The government?

 4          MS. MURRANE:  We have three left?

 5          THE COURT:  That is correct.

 6          MS. BLOOM:  Number 19.

 7          THE COURT:  Who is that?

 8          MS. MURRANE:  Gina Driscoll.

 9          THE COURT:  Ms. Driscoll is excused.

10          MS. BLOOM:  And no one else, your Honor.

11          THE COURT:  Very well, those jurors may be

12     excused.

13

14          (In open court.)

15          THE CLERK:  Would the following jurors please come

16     forward, you've been excused from this case.

17          Juror Number 19, Gina Driscoll.  Juror Number 21,

18     Faye Cassell.  Juror Number 25, Stephen Ford.  Juror

19     Number 26, Kostas Kalamaras.

20          (People leave box.)

21          THE CLERK:  Juror Number 27, Elizabeth Myers,

22     please come forward, take Seat 2 in the back row.

23          (Takes seat in box.)

24          THE CLERK:  Juror Number 28, Robert Foley, please

25     come forward, take Seat 4 in the back row.
```

1          (Takes seat in box.)

2          THE CLERK:  Juror Number 29, Aida Spohn, please

3    come forward, take Seat 4 in the front row.

4          (Takes seat in box.)

5          THE CLERK:  Juror Number 30, Antonio Casimiro,

6    please come forward, take Seat 7 in the front row.

7          (Box is filled.)

8          THE COURT:  And the same question for the folks

9    who have just joined us, starting with Ms. Myers.

10         THE JUROR:  I'm an elementary math coordinator for

11   Sandwich Public Schools and my husband is an investment

12   manager.

13         THE COURT:  Okay.

14         Mr. Foley?

15         THE JUROR:  I'm a graphic designer for Tank

16   Design, Inc. and my husband works as a shipping

17   coordinator at Shipco, which is a company in

18   Bridgewater.

19         THE COURT:  Thank you.

20         Ms. Spohn?

21         THE JUROR:  I'm a caregiver for my mother and my

22   husband is retired.

23         THE COURT:  And retired from what?

24         THE JUROR:  He was the director of manufacturing

25   for Pfizer.

1        THE COURT:  Thank you.

2        And Mr. Casimiro?

3        THE JUROR:  I'm a process engineering for Proctor

4   and Gamble, I have a wife that works for the State of

5   Rhode Island as a disability insurance administrator.

6        THE COURT:  Did I hear right, a "disability

7   insurance administrator"?

8        THE JUROR:  Yes.

9        THE COURT:  Thank you.

10        Counsel?

11

12        AT THE SIDEBAR

13        THE COURT:  The government?

14        MS. BLOOM:  We're content, your Honor.

15        THE COURT:  The defense?

16        MR. O'HARA:  Your Honor, we would strike Juror 27,

17   Ms. Myers.

18        THE COURT:  Ms. Myers is stricken.

19        MR. O'HARA:  And Number 29, Ms. Spahn or Spohn.

20        THE COURT:  Okay, both jurors are excused.  I note

21   that there's only two women on this jury, but that's

22   neither here nor there.  And you have one challenge left

23   and we have two spaces and that leaves two alternates in

24   the order they are picked.  Very well.

25

1          (In open court.)

2          THE CLERK:  Would the following jurors please come

3     forward, you've been excused.

4          Juror Number 27, Elizabeth Myers and Juror Number

5     29, Aida Spohn.

6          (Jurors leave box.)

7          THE CLERK:  Juror Number 31, Suzanne Piscitelle,

8     please come forward, take Seat 2 in the back row.

9          (Takes seat in box.)

10          THE CLERK:  Juror Number 32, Walter Keenan, please

11     come forward, take Seat 4 in the front row.

12          (Box is filled.)

13          THE COURT:  And the same question for you two

14     folks starting with Ms. Piscitelle.

15          THE JUROR:  I'm a medical technologist for IVF New

16     England and I'm a widow, my husband was an engineer and

17     mathematician.

18          THE COURT:  In what area of expertise?

19          THE JUROR:  He was in engineering at Northeastern

20     and he worked for the Army Research Labs.

21          THE COURT:  Thank you.

22          Mr. Keenan?

23          THE JUROR:  I'm a power technician at Verizon and

24     my wife works for Blue Cross as an analyst.

25          THE COURT:  Thank you.

1        Counsel?

2

3        AT THE SIDEBAR

4        THE COURT:  The defense?

5        MR. O'HARA:  We are content.

6        THE COURT:  Is the government content?

7        MS. BLOOM:  Nope, the government strikes Juror 32,

8   Walter Keenan.

9        THE COURT:  Mr. Keenan is stricken.

10   Ms. Piscitelle is Alternate Number 1.  All right.

11

12        (In open court.)

13        THE CLERK:  Juror Number 32, Walter Keenan, please

14   come forward, you've been excused.

15        (Person leaves box.)

16        THE CLERK:  Juror Number 33, Connie McKelvey,

17   please come forward, take Seat 4 in the front row.

18        (Box is filled.)

19        THE COURT:  And, Ms. McKelvey, the same question

20   for you, ma'am.

21        THE JUROR:  I'm an X-ray technologist for Emerson

22   Hospital, I'm divorced, my ex-husband was a software

23   engineer.

24        THE COURT:  Thank you.

25        Counsel?

1

2        AT THE SIDEBAR

3        THE COURT:  Is the government content?

4        MS. BLOOM:  Yes, your Honor.

5        THE COURT:  The defense?

6        MR. O'HARA:  Yes.

7        THE COURT:  She is Alternate Number 2.

8        And we'll take a recess until 11:30 and then I

9   have some instructions for them.  We'll start after

10  that.

11

12       (In open court.)

13       THE COURT:  Well, now we have our jury in this

14  case.  And for the rest of you, Ms. Gaudet is going to

15  give you your cards and will you all please go back

16  downstairs to the second floor to the jury assembly area

17  and we'll have something else for you.

18       So my instructions now -- the next thing we're

19  going to do is take a recess, but before we do I have

20  some very important instructions for those of you who

21  are going to be the judges in this case.

22       Now, Mr. Rudolph, the Court appoints you foreman

23  of this jury.  And I'm not going to take too long and in

24  a moment Ms. Gaudet is going to take you out to the jury

25  room, which is really right behind our courtroom, and

1    we've got refreshments for you there and you can relax

2    until 11:30, and at 11:30 we'll have you back in here

3    and the case will start.

4         Now, let me tell you a word about the schedule to

5    start off first.  We sit from 9:00 in the morning till

6    1:00 in the afternoon, so I'll have you out of here

7    every day at 1:00.  We will not sit a week from

8    Wednesday, April 6th.  Maybe the case will be done by

9    then, but if it isn't, it will be get done that week,

10   the week after this week.  And when you come to decide

11   the case, then we'll expect you to stay full days, 9:00

12   in the morning until 5:00 in the afternoon, deliberating

13   among yourselves.

14        Now, my instructions now are three-fold.  First,

15   keep your minds suspended, and what does that mean?

16   Trials are linear, the burden of proof here rests on the

17   government, it never moves to Ms. Herman, she doesn't

18   have to explain anything or do anything, though she may

19   call witnesses and her lawyers may cross-examine

20   witnesses, but the government will go first.  So you'll

21   hear who the government wants to call first.  But keep

22   your minds suspended.  The last witness is as important

23   as the first and the first witness is as important as

24   the last.  So don't start making up your mind today.  I

25   think by today we'll get into the evidence, you'll start

1     to see some evidence in this case, but don't start

2     making up your mind, keep your minds suspended.

3           Second, don't talk about this case with anyone.

4     Now, everything in this case is public, everything, the

5     whole case will take place right here in this courtroom,

6     it's a public courtroom, people have the right to be in

7     here, and at 1:00 today you're free to go.  Now, you can

8     go home, you can go back to work, whatever suits you.

9     Naturally your life has been disrupted here, so whoever

10    you need to tell, you can tell them, you can say, "Oh,

11    yeah, I went and, yeah, they kept me.  He says the case

12    is going to go two weeks, no longer."  You can tell them

13    of what I say about the schedule, you'll be out at 1:00,

14    whatever you need to say about the schedule.  But just

15    as sure as tonight will follow today, whoever you're

16    talking to, at home or at work, they're all going to

17    say, "What kind of case is it?"  Because jury service,

18    while it is the right of every citizen, falls randomly

19    at any one time on a few, and people want to know what

20    you're doing.  You've got to say, "And the judge has

21    told us we can't say anything about the case while it's

22    going on."  That's crucial.  Nothing about the case.

23          And in this day of social media, I don't want any

24    of you twitting or tweeting or any sort of back and

25    forth on the internet or however you communicate, "Guess

1    what?  I'm serving on a jury," because inevitably

2    whoever you do that to is going to come back at you and

3    there's impetus to reply.  Don't talk about the case.

4    That's talking about the case.  That's forbidden.  And

5    the reason is obvious.  You now have a very special role

6    here, you're the constitutional officers, you are the

7    judges of the facts, the only judges of the facts that

8    this case is ever going to have, you are the judges of

9    the facts.  And when it's over you can say anything to

10   anyone, but while it's going on, no talking to anyone

11   about the substance of the case.

12        Now, it's also -- I mean it may not technically be

13   talking about the case, but don't take it into your mind

14   to start doing your own research, go on the internet and

15   start Googling the names of people or firms or places --

16   don't look me up on the internet, not now -- when it's

17   over, but not now, all the evidence that's germane to

18   this case is going to be presented to you right here in

19   court.  And the reason that we insist on that is that's

20   the only fair way where both sides get a chance to

21   cross-examine and they can both test the strengths and

22   expose the weaknesses of what you're being told.  That's

23   what's so key here.  So no talking about the case.

24        And then last, don't start talking about the case

25   among yourselves.  Now that one's a little

1   counterintuitive because you are the judges on this

2   case, so why can't you talk about it?  The reason is

3   that I've told you to keep your minds suspended and if

4   you start talking about the case now, you can't talk

5   about it without taking a slant on it.  Just the very

6   fact of talking about it, you take a slant on it.

7   You're not to do that.  You're to keep your minds

8   suspended.

9       Now I have these distinguished visitors from

10  Switzerland.  Well, I'm going to be talking about the

11  law, I'm going to be talking about our practice, but I

12  will not talk about the substance of this case with them

13  nor will I permit them to talk about it with me, and

14  none of the other court family.  Because while I have

15  nothing to say about the facts, I don't want to get into

16  a slant about it lest that might somehow translate into

17  how I rule on legal issues in the case.  You do the

18  same.

19      Now, I'm not saying don't talk.  Once Ms. Gaudet

20  went in -- and you'll find the jury rooms are very nice

21  here and we have a huge big conference table for you,

22  there were all the jury, all ready to go, sitting around

23  a table, utterly silent.  No, get to know each other.

24  You're a wonderful jury, you are just what the

25  Constitution expects, you come from all backgrounds, all

1   walks of life, you don't know each other, this is a

2   communitarian effort, get to know each other, just don't

3   talk about what goes on in this room, nothing about what

4   goes on in this big courtroom.  Nothing.  Not what we're

5   wearing or why I wear a robe or anything about what goes

6   on in this room.  But everything else, feel free to talk

7   about.

8        Now we've got magazines back there, we've got

9   books back there, I try to keep your time back there to

10  a minimum, but you'll be back there from time to time.

11  I tell you those are for you, you can take them home,

12  they're souvenirs for you, if any of are you interested,

13  walk off with them.  My wife will bless you if you clean

14  out some of those things.  And you'll find it's

15  comfortable back there.

16       Our tradition is that once we have the jury, all

17  the standing up is for the jury, the direct democracy of

18  the American people, and so as we go in and out we all

19  stand up for you, you are the jury in this case.  And

20  I'm not going to beat all this to death, though these

21  are very important instructions, but each time we part,

22  whether it's a recess or at 1:00, I will say, "Keep your

23  minds suspended, do not discuss the case either among

24  yourselves nor with anyone else."

25       Now you may stand in recess until 11:30 and we

1  will start the case.

2          THE CLERK:  All rise for the jury.

3          (Jury leaves, 11:15 a.m.)

4          (Resumed, jury present, 11:35 a.m.)

5          THE COURT:  We'll start by swearing in the jury.

6          (THE JURY, sworn.)

7          THE COURT:  At this time in this courtroom there

8  are 15 judges.  You 14 men and women are the judges of

9  the facts, you are the only judges of the facts, that is

10  not my function.  You are going to determine the facts

11  in this case as fairly and impartially as humanly

12  possible.  No bias, no prejudice, no sympathy, no desire

13  that anyone have revenge, just following the law and

14  then taking this evidence and sifting it coolly and

15  carefully to the end that in this case justice truly may

16  be done.  You are judges, think of yourselves as judges.

17          You have the right to take notes.  Ms. Gaudet's

18  going to pass out to you notebooks and pens.  No one

19  says you have to take notes.  No one is going to look at

20  whether you take notes or not.  When the trial is over,

21  if notes have been taken, Ms. Gaudet is the only one

22  who's going to actually rip them out of the notebooks

23  and destroy them, they'll never be seen.  But if you're

24  a person who by background, training, life experience is

25  in the habit of taking notes to keep names and dates

1  straight, by all means feel free to take notes.  Equally

2  if you get your best judgment by the way you live your

3  life, by watching the witnesses very very carefully as

4  they testify, no one says you have to take notes.  A

5  juror who takes notes is no better than a juror who does

6  not take notes.  Don't pass your notes around in the

7  jury room, they're not evidence, they're just to refresh

8  you as to what has gone on.

9        Now, you probably should put your name on those

10 notebooks and if you see other names crossed out there,

11 or if they look dog-eared, don't worry about that, it is

12 after all a tax-supported operation and we use the

13 notebooks over and over.  When we take the break in the

14 morning you can feel free to leave your notebooks right

15 there on your chair, nobody goes in that jury box except

16 the jury.  At the end of each day take your notebook out

17 with you, Ms. Gaudet will lock them up, and then they'll

18 be provided to you the next morning of trial.  So put

19 your name on there so you can know which one is yours.

20        You have the right to ask questions.  Now these

21 are fine lawyers, they know what they're doing, you

22 should reserve a question for something you think is

23 really important, but you have the right to ask

24 questions, so don't hesitate if you think something is

25 important.  The way you ask a question is write it out,

 1   rip it out of your notebook, pass it down to the

 2   foreman, Ms. Gaudet and I are watching, one of us will

 3   come and get it.  Eventually it will get to me.

 4        Now, I might not ask it.  If I don't ask it,

 5   probably the reasons are that legally it doesn't make

 6   any difference and I wouldn't let the lawyers ask it.

 7   So I then just give it to Ms. Gaudet, she puts it out on

 8   the front of her bench, the lawyers get to see it,

 9   anything that comes from you to me they get to see

10   because maybe they can figure out an appropriate way to

11   inquire into what I wouldn't let them ask.

12        Likewise I will not ask the question if, as I sit

13   here, I can't see how the witness who's testifying could

14   know the answer.  Witnesses can only testify to things

15   they know, that they saw, touched, tasted, heard,

16   smelled, not what other people told them, or usually not

17   what other people told them.  And so I may be very -- it

18   may be a fine question and I'm interested to see what

19   kind of evidence we're going to have on this, but I

20   don't see how this witness knows, so I won't ask the

21   question.  Again give it to Ms. Gaudet, she puts it out

22   there.  The lawyers may have another witness, they may

23   know a way to get at the subject, and they're entitled

24   to know, if you write a question out, what's in the mind

25   of the particular juror.

1        Now, if I ask the question, what I'll do is I'll

2    just circulate it, I'll have Ms. Gaudet get up, walk

3    around the courtroom so each of the lawyers can see it,

4    but I won't slow anything down, then I'll take it back,

5    and then I'll sit here with it until a time when I think

6    it's courteous to ask your question and then I'll ask

7    it.  Now, I'm still a lawyer, I know how to ask

8    questions, and then I'll ask it openended, who, what,

9    where, when, how, describe, explain.  Now I may not ask

10   it in precisely the terms you've written it, but I'll

11   ask the question, and I might ask a couple of follow-up

12   questions just to see what the witness has to say about

13   the matter about which you inquired.  Don't you put any

14   special emphasis on a question asked by a fellow juror

15   or if you asked the question, don't you put any special

16   emphasis on that, it's just another question, it just

17   adds to the data that you have before you to make a

18   judgment about this case.

19       As I say, the lawyers practice their profession

20   here within the bar enclosure, they have the right to

21   come up close to ask witnesses questions.  Sometimes,

22   and it's inadvertent because they get intense, they may

23   plant themselves between you and the witness, you can't

24   see the witness as the witness answers the question.  I

25   should shoo them off to one side or another.  If I

1    don't, raise your hand, we'll get them out of the way so

2    you can watch the witness as the witness answers the

3    questions.   It's the answers that are the evidence, not

4    the questions.   Answers are the evidence.

5         The acoustics here are very good so I imagine

6    you'll be able to hear everything, but if someone

7    mutters or drops their voice and you don't hear, again

8    just raise your hand, I'll have the witness repeat the

9    answer so that you can see and hear everything the

10   witness has to say.

11        In addition to the testimony of witnesses, I

12   rather imagine we may have exhibits, documents, papers

13   that are in evidence.   The fact they're in evidence

14   doesn't mean you believe them, it just means that

15   they're before you.   You decide what you believe.   You

16   decide what you believe about witnesses's testimony.

17   These are the sources on which you can base your

18   judgments about the case.

19        It's too hot in here, it's been too hot in here

20   all morning, Ms. Gaudet has called the building

21   management and if it goes on being too hot tomorrow, you

22   feel free to let me know and again we will call.

23   Nothing will happen, but we will have -- as we did this

24   morning, we'll have the cathartic advantage of having

25   made the call.

1          (Laughter.)

2          THE COURT:  The truth is that the heating and

3     cooling of this huge building is quite a trick really,

4     that to keep these lovely large courtrooms comfortable

5     and not make the small rooms on the periphery either too

6     hot or too cold.  And the fact is they're working on it

7     right now and by this afternoon, after you've gone, I'll

8     be fine.

9          (Laughter.)

10         THE COURT:  I say that because I want you to feel

11    truly as judges here, you're all equal, but you're

12    judges.  So if there's something that distracts you in

13    the trial of this case -- this case is going to be

14    presented to you, not to me, it's going to be presented

15    to you.  So if something distracts you or you can't see

16    or hear or understand, let me know, I will try to

17    rectify it.

18         Now, I tried very hard to stick to a schedule.  I

19    need you here by 9:00 a.m. every morning because I want

20    to start right at the dot of 9:00.  If you're here

21    before 9:00 ready to come through that door at 9:00,

22    they'll all be ready, a witness will be ready, a witness

23    will come up to the box, we'll just keep moving right

24    along.  I need you here to be ready to go at 9:00.

25         Normally I take a recess from 10:45 to 11:15, a

1    whole half an hour, time enough to have a cup of coffee,

2    relax, and then we go from 11:15 to 1:00.  So I go in

3    two 1 and 45 minute blocks.  That's the usual.  And I

4    give you my word, I'm stopping at 1:00 each day, you can

5    set your watch by it.  You'll be out of here until the

6    case has to be decided by the jury and then I expect you

7    to be here every day.

8         Now, though I'm following this schedule, if you

9    would like a rest hall, just raise your hand and tell

10   me, we'll stop.  I don't want you sitting there praying

11   for it to be 10:45 so you can go back to the bathroom

12   back there.  If you're uncomfortable, let me know, we

13   can always take 5 or 7 minutes so that everyone is

14   comfortable.  You are the judges of the facts.

15        Now I'm the judge of the law and let me -- and you

16   have to take the law the way I explain it to you, that's

17   the only fair way.  That way this case will be tried

18   here in Massachusetts exactly the same way it would be

19   tried in the District of Montana, in the Northern

20   District of Alabama, and the District of Kansas.  The

21   law is the same throughout the land.  What's different

22   of course is what the evidence is, what the evidence may

23   show or not show.  And we start with two supremely

24   important principles, I've mentioned one of them.

25        Ms. Herman is an innocent woman.  She is truly

1    innocent.  You don't draw anything against her because

2    we're here in court and we're going to have a trial.

3    Nothing.  That's unfair.  The only way she could be

4    convicted of anything is if the jury unanimously, beyond

5    a reasonable doubt, comes to believe she is guilty of

6    one or more of these charges.  She starts truly

7    innocent.  You don't suspect her because the government

8    has made charges.  That doesn't mean anything.  They've

9    made charges, now we'll see if they can prove them.

10        So the first principle is this person, Rosalind

11   Herman, she's innocent.  And the second principle is as

12   important as the first and explains how the first works,

13   that means the burden of proof here is on the government

14   and the burden of proof on the government as to each of

15   the charges -- and I'm going to go over what they are,

16   is proof beyond a reasonable doubt.  She doesn't have to

17   do anything.  She certainly doesn't have to testify.

18   You can't make a charge and bring someone into court and

19   say, "Well, explain yourself," that's not our way, the

20   government made charges, let the government prove the

21   charges.  That tells us a lot about the case or at least

22   it tells us how the case is going to work, it tells us

23   the government's got to go first, the government's got

24   to prove the evidence, she need do nothing.

25        Now, she may do a variety of things, she can call

1   witnesses, she can testify, Mr. O'Hara or his colleague,

2   they may cross-examine the witnesses the government

3   calls, they may introduce evidence, anything the

4   government can do she can do through her attorneys, but

5   the important thing is she doesn't have to do anything.

6   And to the extent she doesn't, don't draw any

7   conclusions against her from that, because if you were

8   to do that, then that would like shift that burden of

9   explaining to her.  Not fair.  Not our way.  She starts

10  the trial innocent and the government has to prove the

11  case beyond a reasonable doubt.

12      Now, a few words about the trial.  We know now the

13  government's going to go first.  Everything I do in a

14  trial is law teaching.  You have to take the law from

15  me, but I'm also responsible for presiding over the

16  trial and I will try, by and large, to stay out of the

17  way, but it's perfectly appropriate for the lawyers to

18  object to another lawyer's question.  They're not doing

19  anything wrong if they object.

20      Now I will try to be quick, it's what I do here.

21  So the trial is going on and we're going question,

22  answer, question, answer, question, "Objection."  Now

23  I'll try to be quick and I'll say "sustained," which

24  means "Hey, you can't ask that question, ask something

25  else," or I'll say "overruled," "No, that question is

```
 1    all right," and then the answer will come.  They don't
 2    have to sit still for that.  They've prepared the case,
 3    they know more about the case than I do, their job is
 4    the hardest job, they too are teachers, they're teachers
 5    both of the evidence -- they'll try to marshal the
 6    evidence and point out its strengths or its weaknesses,
 7    that's what lawyers do, but also they're very familiar
 8    with the law, perhaps more familiar than I.  I have the
 9    duty to make the final call, but they are very familiar
10    with the law and they may say, "Judge, can I approach?"
11    or "Sidebar, Judge?" or words like that.  I know what
12    they mean.  And that means they want to come up here,
13    out of your hearing, and they want to have a little
14    talky-talk about the law.
15              (Judge moves to sidebar area.)
16              THE COURT:  I'll tell you right now what we're
17    talking about, we're talking about whether the 17th or
18    the 23rd exception to the rule against hearsay applies
19    to a specific question?  We don't have to talk about it
20    over there, we could just talk about it in front of you,
21    except it's distracting, it's not evidence, it's
22    technical talk about the law.  Now, if I do that, if I'm
23    huddled over there, don't you folks think that you are
24    chained to those chairs, you're not, stand up, move
25    around, and I'm not kidding here, keep the blood
```

1    flowing, walk around in there.  These are the biggest

2    jury boxes of any jury box in any courthouse in the

3    land.  But don't talk.  The arched ceiling makes for

4    very good acoustics and it will distract me while I'm

5    over there whispering with the lawyers.

6         One time a lawyer told me that he always smiled at

7    the end of a bench conference hoping the jury would

8    think he was winning the case.

9         (Laughter.)

10        THE COURT:  Wrong.  The case is not won or lost

11   over there, we're just talking about the law.  Nothing

12   else.  Now let's get to it.

13        What is it now, what are the charges, what does

14   the government have to prove in this case?  Well, the

15   government has a variety of charges, I'm going to touch

16   on them briefly.  At the end of the trial I will be back

17   to explain it in more detail, but I think, to make sense

18   of everything, you ought to know what it is the

19   government is setting out anyway to prove.

20        The government has four charges of so-called "wire

21   fraud."  Now, to prove wire fraud the government has to

22   prove first that there was a scheme to defraud or obtain

23   money or property by means of false or fraudulent

24   pretenses regarding a material fact.  Now, what do those

25   things mean?  Well, first of all, a "scheme to defraud."

1    "Fraud" is to say something or to fail to say

2 something, where under the circumstances you have a

3 legal duty to speak accurately, in order to say

4 something that makes a difference to the other party --

5 and that's what makes it material, that it makes a

6 difference, to say something that's not true in order

7 that that person will part with money or property.  Now

8 the fraud -- fraud is not accomplished by negligence,

9 it's intentionally to say something known to be untrue

10 that is material with the idea that the other person

11 will part with money or property.

12    Now, second, that the scheme to defraud involved

13 misrepresentation, as I explained it, or concealment of

14 this material fact.

15    Third, that this lady, Ms. Herman, knowingly and

16 willfully participated in this scheme with the intent to

17 defraud, that she had the intent to defraud.

18    And then fourth, that she or somebody in on this

19 scheme caused the interstate wire communications system

20 of the United States to be involved.  That's what brings

21 us into federal court.  Fraud is a violation of state

22 law, the various state laws, but we're in the courts of

23 the United States, so this last piece is as important as

24 the other ones.

25    So there has to be this fraudulent

misrepresentation of a material fact, with a scheme to
defraud involving that representation, they've got prove
beyond a reasonable doubt that she knowingly and
willfully participated in that scheme with the idea in
her mind to defraud a person or persons, and, as part of
the scheme, the wire communications -- and that also
includes the wireless communications, of the United
States were involved, that's commerce, and Congress gets
the right to regulate commerce.

Now, there's four of those charges and then, um,
the -- they have a conspiracy charge.  Now, conspiracy,
they've been specific as to this, in conspiracy each
charge has to be different.  The wire fraud charges are
different only in that there are supposedly different
instances of wire fraud, different times, different
representations, each one different.  The conspiracy,
they charge that she and this fellow, I mentioned his
name, Gregg Caplitz, he's supposed to be the other
conspirator, engaged in a conspiracy to commit wire
fraud.  So what do they have to prove for conspiracy?
Three things.

First, that she -- this lady, Ms. Herman, and this
fellow, Gregg Caplitz, entered into an agreement to do
something that the law forbids.  It's got to be a
genuine agreement.  It doesn't have to be in writing, it

1    doesn't have to be a handshake, it doesn't have to be a

2    wink or a nod, but it's got to be a real deal.  She

3    isn't guilty of anything because she hung around with

4    the wrong people.  She isn't guilty of anything if

5    perhaps Mr. Caplitz was in on some scam and he was

6    scamming people and she knew about it.  She's not a

7    conspirator then.  She's got to be part of it with him

8    and he with her, that's conspiracy, two or more

9    conspirators.  That's the first thing.

10          And the second thing is why is it a deal, what is

11   the specific intent of those people to engage in -- at

12   least what the government says here, the government

13   alleges wire fraud, to engage in this scheme to defraud

14   people.

15          And then third -- conspiracy, you don't have to do

16   it, you have to conspire to do it, and then the third

17   point is one of them, one of the co-conspirators did

18   something, took some step to make the conspiracy come

19   about.

20          Then there's two other slightly different charges.

21   The government charges that -- well, let's see here.

22   (Pause.)  A violation of the Investment Advisors Act.

23   So what's different about that is the very first thing

24   they have to prove is that Ms. Herman was an investment

25   advisor.  That's what she was.  That's what she was

1  engaged in.

2       And then they have to prove that she, as an

3  investment advisor, employed a device, scheme, or

4  artifice to defraud a client or a prospective client,

5  engaged in a course of business which operated as a

6  fraud, or engaged in an act, practice, or cause of

7  business which was fraudulent and deceptive.  That's the

8  second thing.

9       The third thing is that she did so as an

10  investment advisor, engaging in that course of conduct

11  of fraud, she did so knowingly and willfully with an

12  intent to deceive, manipulate, or defraud.

13       And then lastly, that the fraudulent scheme

14  involved direct or indirect use of the mail or some

15  other instrumentality, and it can be wire, of interstate

16  commerce.

17       And lastly they charge her with impeding and

18  obstructing the administration of the tax laws.  And for

19  this they have to prove first that she corruptly -- now

20  "corruption" here means that she did something with the

21  wrong intent -- not that she filled out her taxes wrong

22  and made a mistake, that's not a crime, and not even

23  that she was grossly negligent in responding to their

24  inquiries, but that she did it corruptly, that is she

25  knew what she was doing when she was dealing with the

1    administration of the tax laws, she corruptly tried --

2    she doesn't have to get away with it, but she

3    endeavored, she tried to do something which would

4    obstruct or impede the administration of the Internal

5    Revenue Laws.

6        Now, to those charges, four wire fraud, one

7    conspiracy, one Investment Advisors Act, one impede the

8    IRS, seven total, she's innocent of each and every one

9    of those charges.  We'll see over the next few days what

10   it is, if anything, that the government can prove.  You

11   must keep your minds suspended until you've heard all

12   the evidence in the case.

13       Now, the way we start a case is let the lawyers

14   make what's called an opening statement.  Let me say

15   something about the lawyers.  These are good lawyers,

16   they know what they're doing, both sides, and they will

17   act both ethically and properly, but I have this

18   caution, they weren't there.  The government lawyers

19   don't know what went on.  Mr. O'Hara and Mr. Benzaken,

20   they don't know what went on.  They are operating based

21   on the evidence that they're going to lay before you, to

22   point out its strengths and point out its weaknesses.

23   They're not the source of evidence.  I'm not the source

24   of evidence.  I've just been sketching for you the legal

25   framework of this case.

1          So now I give them a chance to make openings, now

2     they're going to talk about what they think can be

3     proved or cannot be proved, they're going to talk about

4     the facts, the evidence in the case.  You just take a

5     caution that what they say is not evidence.  It's like a

6     road map or a guide book of the evidence to come over

7     these next few days.  Evidence is what witnesses say and

8     what exhibits, documents in fact show.

9          Now, because it is the government that bears this

10    burden of proof beyond a reasonable doubt, the

11    government gets to go first.  And it's fair to say

12    something just to launch into this.

13         The government properly prepared, they made some

14    diagrams that they want to show you as part of their

15    opening statement.  Now, of course they're saying to you

16    that these diagrams are going to be backed up by

17    evidence in the case.  Just remember they made up these

18    diagrams, these diagrams aren't themselves evidence,

19    these are diagrams of what the government hopes you will

20    come to believe when you look at the actual evidence.

21         None of this is improper, it's like a teaching

22    tool, it's like a demonstrative aid.  It's like in the

23    old days we used to have blackboards in courtrooms and

24    people would draw on the backboards.  Well, rather than

25    draw on the blackboards, they've now, with all our bells

 1    and whistles and computers, they can flash something up

 2    before you.  Fine, if it helps you understand what's

 3    coming.  But it is not evidence.  It's materials the

 4    government has made up hopefully, they hope, will help

 5    you understand the evidence.  But you focus on the

 6    actual evidence.

 7         So because the government bears the burden of

 8    proof and they go first, who will open for them?

 9    Ms. Murrane?  Okay.  15 minutes a side and then we'll

10    get to their witnesses.

11         Ms. Murrane.

12         MS. MURRANE:  I'm just getting the podium, your

13    Honor, if that's okay?

14         THE COURT:  Oh, yes, we need a minute.  Things are

15    going to be shown to you and you each have little

16    screens, or rather each two of you, and in the second

17    row they're between you and you have to pull them out.

18         (Jury pulls out screens.)

19         THE COURT:  When I went to school I remember desks

20    that worked like those second row ones.  And then she'll

21    turn them on for you.

22         All right.  Go ahead, Ms. Murrane.

23

24    OPENING STATEMENT BY MS. MURRANE:

25         Good morning, ladies and gentlemen.  This is a

1    case about greed and control.  The defendant, Rosalind

2    Herman, took more than $1.3 million from people who were

3    told and who believed that their money was going into an

4    investment, a logical belief because Rosalind Herman

5    owned and ran a company that placed investments and gave

6    investment advice.  But Rosalind Herman didn't invest

7    that money, she spent it, $1.3 million on BMWs, plane

8    tickets, a house with a pool in Vegas, and many many

9    more mundane things like groceries and cigarettes, $1.3

10   million, that until Rosalind Herman spent it, was the

11   savings of regular folks like a plumber, a teacher, a

12   woman who worked for 28 years as a telephone operator.

13   And Rosalind Herman also defrauded the United States on

14   her tax filings when she filed them, she lied about her

15   income, she lied about her expenses, she lied about the

16   income and expenses of the company that she ran, and as

17   I mentioned, many years she simply just didn't file any

18   taxes at all.  Rosalind Herman did this because of greed

19   and she accomplished it through control, control of a

20   company, control of money, and you will also hear in

21   this trial about control of her people.  Let's talk a

22   little bit about that, the company, the money, and the

23   people.

24        Here's a chart that shows Rosalind Herman's

25   company, 1, 2, 3, 4, 5, 6, 7, 8 companies in the

business of providing financial advice and selling investment products.  Some of them were formerly registered with the Securities and Exchange Commission as "registered investment advisors."  These companies placed millions into various investments and insurance products for their clients and then in return Rosalind Herman and her company received millions in commissions. Rosalind Herman controlled these companies, but she was not the face of the organization, that job fell to a man named Gregg Caplitz.  Gregg Caplitz was a Certified Financial Planner and he is the one who went out and met with the clients, visited them, visited with them in their homes, and developed relationships with them. Rosalind Herman was not the relationship manager, she managed the operation, took in the money, picked the investments, controlled the company's bank accounts.  In the late 1990s and into the early 2000s it was a very lucrative business.

        But in about 2008 the commissions started to dry up so Caplitz and Rosalind Herman decided that instead of just getting commissions on the sale of investments from other companies, Caplitz would recommend that people invest in a hedge fund company owned and started by Rosalind Herman.  Caplitz went out to existing clients and told them this hedge fund company was a good

1   investment.  These folks, they trusted his advice for

2   years and they trusted him again, but what these folks

3   didn't know is that this investment was entirely

4   different, not different because it involved a hedge

5   fund, which is a very risky kind of investment that

6   Caplitz would have never otherwise recommended to these

7   people, and it wasn't different just because it was a

8   startup or because it was owned by Rosalind Herman who

9   had absolutely no experience in starting a new fund, it

10  was different because this investment wasn't an

11  investment, there was no hedge fund company, there was

12  nothing, the money wasn't invested in anything, the only

13  thing that the $1.3 million from these unsuspecting

14  investors funded was a personal spending account for

15  Rosalind Herman.  You will see the bank records to these

16  company accounts and you will see the money coming in

17  and the money going out, but not going out for

18  investments or business startup costs, but spent for

19  Rosalind Herman and her family.

20          For example, on February 25th, 2009, James Connell

21  paid $100,000 to Knew Finance Experts for the Rosalind

22  Herman hedge fund investment.  That money was actually

23  used to open and finance a brand new account for Knew

24  Finance Experts with Town and Country Bank.  Let's look

25  at the first bank statements of this account.

1          And if you look at the details on this, this bank

2     statement would show you that $100,000 goes in and then

3     over the course of that month $68,000 goes out.  So

4     where did Mr. James Connell's savings go?  Pizza.  Plane

5     tickets.  The dating website at E-Harmony.com.  Kids

6     clothes.  Wal-Mart.  A tobacco shop.  This statement is

7     from February of 2009 and let's take a look at June, the

8     same year, the same account.  This month a woman named

9     Patricia Wentzell paid $105,000 to Knew Finance Experts

10    for the hedge fund company investment.  Where did

11    Patricia Wentzell's savings go?  Groceries.  Bickfords

12    Restaurant.  Target.  Walgreens Company.  The Olive

13    Garden.  You'll get to meet Patricia Wentzell, she's one

14    of the folks that I mentioned at the beginning, before

15    her retirement she spent 28 years working as a telephone

16    operator for the local telephone company.

17         This chart shows each victim, the date they made

18    the investment, and how much money they lost.  And I

19    know with so many lines it's too small to read on this

20    screen, but each of these lines is a story of deceit and

21    money lost, in total more than $1.3 million gone from

22    folks who thought they were doing the right thing

23    because they were investing their money with a company

24    that was in that business.  During the trial you'll get

25    to meet Patricia Wentzell and some of the other folks

1   listed on this chart and you'll hear how they believed

2   that the money that they had saved for years was safely

3   tucked away in investments, but in reality it was

4   getting spent at break-net speed by Rosalind Herman.

5        The first investment in this supposed hedge fund

6   company started -- occurred in 2008, but the story of

7   this case actually starts much earlier than that and

8   that is because the years when Rosalind Herman and her

9   companies were making millions in commissions, they were

10  defrauding the IRS.  A revenue agent from the IRS will

11  testify in this trial and he will tell you exactly when

12  Rosalind Herman and her company filed and didn't file

13  tax returns from 2003 to 2011.  This revenue agent has

14  reviewed all of those filings as well as bank records

15  and other IRS records and he will tell you what income

16  he was able to trace, meaning what income was actually

17  paid to Rosalind Herman and the Rosalind Herman

18  companies versus what income was reported to the IRS.

19       From 2003 through 2012 he traced nearly $4.8

20  million in income and Rosalind Herman and her companies

21  failed to report more than a third of it, and on that

22  income they paid $24,608 in taxes total, $24,000 on $4.8

23  million, about 1/2 of 1 percent.  How so low?  Pretty

24  easy.  About half the time Rosalind Herman and her

25  companies didn't file taxes, so no taxes were paid those

1    years, and then when she did file she underreported the

2    income and overreported the expenses making the

3    purported net, the amount on which taxes are actually

4    owed, falsely small.

5         Another witness, a financial investigator from the

6    U.S. Attorney's Office, he will walk you through the

7    records, I expect.  He's gone through hundreds of pages

8    of bank records for Rosalind Herman and her companies

9    and then looked at the money coming in and the money

10   going out and he will explain to you how the money in

11   those accounts was spent and you'll see for yourself

12   that the expenditures were not business expenditures,

13   they were house payments, cars for Rosalind Herman and

14   her family, on-board cruise expenses for her son and

15   daughter-in-law's honeymoon to Hawaii and Tahiti,

16   groceries, pet care, these are the kind of expenses paid

17   out of these business accounts.

18        He will also explain to you who controlled these

19   things.  The same bank accounts that received the $1.3

20   million from folks who thought they were investing in a

21   hedge fund company, you will see who the signatories

22   were, Rosalind Herman and her family.  Who wrote the

23   checks?  Rosalind Herman and her family.  Who spent the

24   money?  Rosalind Herman and her family.  The money trail

25   tells the story of this case.  But you will also get to

```
 1   hear the story of this case from another source, one who
 2   was there every step of the way, Rosalind Herman's
 3   business partner, Gregg Caplitz.  Caplitz will take the
 4   stand and explain to you how he and Rosalind Herman
 5   together took $1.3 million from unsuspecting investors
 6   and defrauded the IRS.
 7        Caplitz will explain to you the complicated
 8   relationship he had with Rosalind Herman, they were not
 9   just business associates, they were romantically
10   involved, and the word "complicated" is deliberate
11   because Rosalind Herman was married, but not to Caplitz,
12   Rosalind Herman was married -- actually still is married
13   to Keith Herman, and Caplitz is going to tell you that
14   he was head-over-heels in love with Rosalind Herman, and
15   that in the relationship she ruled the roost, he did
16   what she said, he played by her rules, and as the bank
17   records made clear, one of those rules was that Rosalind
18   Herman controlled the money, she controlled the bank
19   accounts, Caplitz had no authority over these bank
20   accounts.
21        We discussed earlier that Rosalind Herman had
22   control over companies, control over money, and control
23   over people.  Caplitz will tell you that Rosalind Herman
24   controlled him, he will tell you that she was expert at
25   manipulating him to protect her.  Caplitz will tell you
```

1    that at one point Rosalind Herman was concerned that

2    people might find out that they were having an affair so

3    Rosalind Herman decided that Caplitz should start

4    telling people that he was gay.

5         THE COURT:  5 more minutes, Ms. Murrane.

6         MS. MURRANE:  He does this.  In fact you will hear

7    that when the IRS was investigating Caplitz and

8    interviewed him, he told the IRS Special Agent that he

9    was gay.  Rosalind Herman got Caplitz to lie about his

10   sexuality to protect her.  And why is Caplitz going to

11   tell all of this to you?  Because he pled guilty, he

12   signed a plea agreement admitting to these crimes.

13        Now, you may be thinking to yourself, isn't

14   Caplitz just going to say all of this because -- about

15   Rosalind Herman and where the money went to try and save

16   his own skin and didn't he already lie to the

17   government?  Gregg Caplitz is going to confess to you

18   what he did, but the real diary for these crimes is the

19   bank records and bank records do not lie, and as we

20   discussed in this case, the records will show you

21   exactly where the money went and how it was spent.

22        These records will show that Rosalind Herman

23   committed investment advisor fraud and wire fraud when

24   she took the $1.3 million from people who believed it

25   was going into an investment and instead spent it on her

1    personal lifestyle, and this is the basis for the

2    charges in Counts 2 and 4 through 7.  The records also

3    show that for years Rosalind Herman and her companies

4    failed to file tax returns, filed them late, and then

5    lied about the income expenses on the occasions when

6    they did file them, and this is the basis for Count 9 of

7    the indictment.  And finally the records show, along

8    with the testimony of Caplitz, that Rosalind Herman and

9    Caplitz conspired to do all of these things, which is

10   the basis for the conspiracy charge in Count 1.

11         After you see these records, hear the victims'

12   stories, and consider all of the evidence admitted in

13   this trial, we will ask you to return a verdict of

14   guilty against Rosalind Herman on all counts.  Thank

15   you.

16         THE COURT:  Mr. O'Hara, do you wish to open now or

17   reserve?

18         MR. O'HARA:  I will open now, your Honor.

19         THE COURT:  You may.

20         MR. O'HARA:  Thank you.

21

22   OPENING STATEMENT BY MR. O'HARA:

23         Ladies and gentlemen, Gregg Caplitz is an

24   acknowledged tax cheat, liar, and thief.  You're going

25   to be inundated with hundreds and hundreds and hundreds

of exhibits, of records, as we've just outlined for you
by the U.S. Attorney in this case.  You're also going to
hear from witnesses, at least eight, maybe more, who had
money stolen from them, and you can tell from the color
of my hair and from the lines on my face that
unfortunately I'm reaching retirement age and I will
tell you in all candor that when I first read reports
about this case, about people who were reaching
retirement age or were at retirement age and had money
stolen from them, I was a little upset and a little
disconcerted, but as her attorney I had to step back and
look behind what had happened in order to properly
represent her in this case, and what's important in this
case is that all the paper documentation, all the bank
records, all the cancelled checks, and the statements
from the witnesses who had money stolen from them, that
entire case, the glue that holds that all together is
Gregg Caplitz and he is an acknowledged tax cheat and
thief and liar.

You are jurors, as the judge told you, you also
have to take a step back the same way I did, and I'm not
going to repeat what Judge Young told you in much better
and clearer terms than I ever could, but I'm asking you
to keep an open mind, because if you're not convinced
beyond a reasonable doubt that Ms. Herman knowingly

1    participated in this scheme with Mr. Caplitz, you must

2    find her not guilty, that's the law, that's what you've

3    sworn to do, and as jurors you've reached the highest

4    level of civil service available to the citizens of this

5    country and you have to abide by the rules as they apply

6    to you, and I'm sure you will.

7         Gregg Caplitz and Ms. Herman met each other around

8    1992.  At the time he had graduated from college, he had

9    a dual degree in economics and finance, he also had been

10   working as an investment advisor and he had developed a

11   core of clients for whom he was supplying investment

12   advice and he also was selling insurance policies to

13   people worth a lot of money and making a significant

14   amount of money on the commissions he was earning from

15   those companies, and he had devised a scheme or a plan

16   where he would assign the money that he was getting from

17   the insurance companies to a company that he ran and

18   you'll hear testimony about flow-through taxation with

19   small businesses and that money was eventually taxed to

20   him.

21        Ms. Herman sold him a suit, she was working at a

22   business which is now bankrupt called Adams Mens

23   Warehouse, it was a discount clothing store for men,

24   they sold cheap clothes, I was one of their customers,

25   and they struck up a conversation and she found out what

he did for a living and as they were speaking he learned

that she, besides working as a clerk in a low-end men's

clothing store, had another part-time job and also was

an amateur stock-picker, it was like a family hobby

within her family, and eventually he talked her into

going into business with him.

He's not a good business person, he's not

organized, he's constantly in debt, as much money as he

was making he couldn't manage it properly.  You're going

to find out that he filed for personal bankruptcy not

once but twice in the last 20 years, he was so inept at

managing his own finances.  And what happened was after

this meeting Ms. Herman began running the business part

of his business for him, but not immediately, she

installed members of her family to work as secretarial

staff, and eventually she formed a company of her own

and Mr. Caplitz began assigning his insurance

commissions to her company.

Now the insurance commissions were coming to him

on his Social Security number, he was not an employee of

the insurance companies, there was no tax withholding

like you have if you have a normal job, you know, with a

steady paycheck, so he's supposed to be paying estimated

taxes every year on what he's getting in these

commission checks and he wasn't doing it, he passes his

1    tax responsibility on to a company that this woman, this

2    clerk at a men's clothing store, had set up.  And she

3    was paying him about $41,000, $42,000 a year, and by his

4    agreement she was also picking up the expenses for his

5    personal mortgage, where he was living, she was paying

6    his health insurance even though technically, according

7    to the way they were filing stuff, he wasn't an

8    employee, and she was also running the business for him,

9    and in return for that he was assigning over the

10   insurance commission checks.

11        As Ms. Murrane told you, they did very well for a

12   couple of years except he was not reporting the income

13   he was making from the insurance companies on his

14   returns, he was only reporting 41-point-some-odd-

15   thousand dollars a year, and he wasn't reporting the

16   fact that she was paying for his health insurance

17   because technically that was income for him also, but he

18   wasn't an employee.  So basically he dumps his tax

19   responsibility on her and she screws it up, there's no

20   two ways about it.

21        Things were doing well for a couple of years until

22   the companies got involved in a series of lawsuits that

23   they were defending or that they had filed and they had

24   monstrous legal expenses in bringing the suits or

25   defending the suits and all this money that he was

```
 1    bringing in on his insurance commissions began getting
 2    spent to pay for attorneys and all of a sudden the cash
 3    flow dissipates, the insurance commission checks stopped
 4    coming in.  He was making, in some years, over a million
 5    dollars, but it gets reduced to a trickle, and he has
 6    his own personal problems with his finances.
 7          He files for personal bankruptcy in 1995, two or
 8    three years after he meets her.  He files for personal
 9    bankruptcy back in 2009, a year after he gets the idea
10    to start the hedge fund, and he's looking, as he's
11    always looking, for the next big thing, the next way he
12    can get out from underneath his debts.  When you file
13    for bankruptcy, ladies and gentlemen, it means that what
14    you owe is so high and what you have is so little that
15    you just want to flush your debts down the drain, and
16    he's done that twice and left his creditors holding the
17    bag, a bag of empty promises.  So back in 2008 he's got
18    financial problems, her businesses have financial
19    problems, she is paying all the legal expenses for him
20    and for her and for the businesses and then he comes up
21    with this great idea, "Let's start a hedge fund."
22          Now, he has the licenses with the Securities and
23    Exchange Commission, I believe he has seven of them,
24    along with his degree from Boston College and along with
25    a master's degree in financial planning, plus he's a
```

1    Certified Financial Planner, so he think he has the

2    inside track on how to make this money.  And maybe --

3    and I'll be honest with you, I've been looking at this

4    case for months and I still don't understand hedge

5    funds, and neither did he, you'll hear that he refers to

6    it as "magic," that he doesn't really understand how the

7    money could be made.  But we're all from the Boston area

8    and a lot of us read the Boston Globe today, and the Red

9    Sox start next week, the baseball season, and most of us

10   know that the owner of those two institutions, at least

11   the principal owner is John Henry, and where did he get

12   the money to buy the Globe and the Red Sox?  He managed

13   hedge funds.  So Caplitz thinks he's found the goose

14   that's going to lay the golden eggs and solve all their

15   problems forever because if you manage a hedge fund, at

16   least as he understood it, you're entitled to take a

17   percentage of the funds you have under management.

18        If you have $100 million in the fund, you can take

19   up to 2 percent, that's $2 million a year, just for

20   managing the money, whether the hedge fund increases or

21   it goes down, which is why they're so risky, which is

22   why you're not supposed to invest in them if you can't

23   afford the loss, and he's trying to get the hedge funds

24   up and off the ground and he's trying frantically to

25   find the funding to get it off the ground.  And there's

legal expenses in starting the fund, and he has legal

expenses of his own, because of his bankruptcy filing

and the lawsuits he's about to lose his certification as

a financial planner and he has to go down to Washington

D.C. and fight that with a lawyer and he's trying,

trying, trying to put everything together.  And who's

going to invest in a hedge fund that a retail investment

adviser has set up?  And he finds out that there's an

niche, an undisturbed segment of the hedge fund

investment market, if they're run by minorities, and

he's not a minority, he's just a white guy, but she's a

woman, so he takes her, the clerk from a clothing store

who likes to pick stocks, and he makes her the head of

the hedge fund, and then everything falls apart.

    And right up until the last minute, until they're

arrested, he still believes he can pull it together

because his history is one of scamming and scheming and

borrowing from Peter to pay Paul.  You're going to hear

that he stole money from his investment clients, people

who had invested with him for 20, 25 years, entrusted

him, people who he had met through his family, he forges

signatures and signs money over.  He goes and advises

them to invest in his hedge fund without even telling

them what the risk might be and he gives them promises

that "You're not getting into a hedge fund, you're

1   getting into the management of the hedge fund," the old
2   John Henry model, "You're going to be able to get a
3   piece of what we earn every year just based upon the
4   money that's in there."  And it's difficult to
5   understand and the people who he victimizes don't really
6   understand what's going on and that's how the money gets
7   funneled into bank accounts in a business that she
8   controlled.
9          THE COURT:  5 more minutes, Mr. O'Hara.
10         MR. O'HARA:  Thank you, your Honor.
11         So what I want you to keep in mind is that for
12  years he's been taking advantage of people, for years
13  he's been taking advantage of systems that enable him to
14  escape and wiggle around with his constant indebtedness,
15  and for years he's been leading people down a path which
16  often leads to destruction and certainly did here.
17         Why is he suddenly telling the truth, why is he
18  suddenly telling the truth now after lying to federal
19  agents -- which by the way is a crime punishable by 5
20  years in prison, why is he all of a sudden coming clean?
21  Because his latest scheme is one he's going to
22  perpetrate on you, he wants you to believe him, but this
23  time it's not to get out from underneath financial
24  problems, but this time so he can get out from
25  underneath a jail sentence.

1          And keep in mind also that from early 2000 until

2     2012 or 2013, she wasn't even living in Massachusetts,

3     she was living three time zones away.  He was in charge

4     of business over here.  All of these people who got

5     ripped off were people who he was visiting, he was

6     seeing, and he was stealing from, and she's three time

7     zones and 3,000 miles away.  And so I suggest to you

8     strongly that if you keep an open mind until all the

9     evidence comes in, you will not be convinced beyond a

10    reasonable doubt that she knowingly participated in this

11    scheme.  Thank you.

12          THE COURT:  You may call your first witness.

13          MS. BLOOM:  The United States calls Carla Bigelow.

14          THE COURT:  She may be called.

15          MS. BLOOM:  At this time, your Honor, I would like

16    to move into evidence, pursuant to stipulation, Exhibits

17    1 through 100 and Exhibit 424.

18          THE COURT:  There's no objection?

19          MR. O'HARA:  No objection, your Honor.

20          THE COURT:  All right.

21          MS. BLOOM:  We'll read some of the stipulation at

22    a later moment, but I'll just --

23          THE COURT:  So 1 through 100 and Exhibit 424?

24          MS. BLOOM:  Yes, your Honor.

25          (Exhibits 1 through 100, marked.)

1        (Exhibit 424, marked.)

2        THE COURT:  Now, obviously Ms. Herman starts the

3   trial an innocent person, but not everything is disputed

4   and no one wants to waste your time here, so what this

5   agreement -- what this -- the only agreement is you can

6   look at these exhibits, so we won't take any time laying

7   foundations for them.  So things that are in evidence,

8   they get numbers, so we now know we have 101 exhibits,

9   they're numbered Exhibits 1 through 100 and Exhibit 424.

10  All exhibits will go back with you to the jury room at

11  the end of the trial.  And so those exhibits are in

12  evidence.

13        Go ahead.  Well, we're waiting for a witness.

14        MS. BLOOM:  Carla Bigelow.

15        THE COURT:  They keep the witnesses outside, which

16  is perfectly appropriate, so they don't hear each other

17  testify, but sometimes they get lost or they go to the

18  bathroom and we can't get them, and if that happens I'll

19  tell you stories about the courtroom that have nothing

20  to do with the case.  (Pause.)  And so I will.

21        The courtroom is really a very -- oh, here's

22  someone.

23        (Woman enters courtroom.)

24        (CARLA E. BIGELOW, sworn.)

25

```
 1        * * * * * * * * * * * * * * * *
 2        CARLA E. BIGELOW
 3        * * * * * * * * * * * * * * * *
 4
 5   DIRECT EXAMINATION BY MS. BLOOM:
 6   Q.    Could you state your name.
 7   A.    I'm Carla E. Bigelow.
 8   Q.    Where do you live, Ms. Bigelow?
 9         THE COURT:  Just your city and town is all we
10   need, not your home address.
11         THE WITNESS:  All right.
12   A.  Shirley, Massachusetts.
13         THE COURT:  Thank you.
14   Q.    Do you have a family?
15   A.    Yes, I do, I have three children and six
16   grandchildren and a husband.
17   Q.    And, um, can you briefly describe for the jury
18   your education?
19   A.    Um, I grew up in Haverhill, Massachusetts and went
20   to grammar school and high school there, after high
21   school I went to the University of Massachusetts for a
22   year and a quarter, and then I transferred to Salem
23   State and graduated from Salem State.
24   Q.    And how have you been employed?
25   A.    Um, when I was younger I worked my aunt's dress
```

1    stop in Haverhill and when I graduated college I worked

2    two years as an elementary teacher in Haverhill and then

3    got married and worked two years as an elementary

4    teacher in Ayer, Massachusetts.

5    Q.    And could you also describe for the jury your

6    husband's employment?

7    A.    My husband is a master plumber, we own our own

8    business from 1975 until 2009.

9    Q.    Did you play a role in that business as well?

10   A.    Yes, I was his secretary, um, all the time, I

11   guess.

12   Q.    Okay.  And, um, at some point did you meet Gregg

13   Caplitz?

14   A.    Yes, I did.

15   Q.    How did you come to meet Gregg Caplitz?

16   A.    Um, after we had been in business for a few years

17   we were looking for someone to help us with our

18   financial, um, we knew nothing about finances, we were a

19   teacher and a plumber and we had three small children,

20   and we just were lost as far as how to save money and

21   invest money or anything like that.  So we went down to

22   our local bank in Ayer and they introduced us to Gregg,

23   um, he happened to be giving a talk that evening at the

24   Bull Run Restaurant in Shirley, and we went to the Bull

25   Run and listened to him and we liked what he said and he

1    sounded very interesting, so we called him later on and

2    that's how we met him.

3    Q.    And did you end up employing Mr. Caplitz or his

4    company?

5    A.    Um, yes, we did.

6    Q.    And why did you decide to employ him?

7    A.    Um, to help us -- um, we knew nothing about

8    finances and we met with him and we liked him and we

9    trusted him and he sounded like he knew what he was

10   talking about, so, um, that's why we employed him.

11   Q.    At some point did you meet Rosalind Herman?

12   A.    Yes, I only met her once and I believe it was she.

13   Um, my daughter was married in 1991 and Mr. Caplitz

14   brought her as a guest to my daughter's wedding.

15   Q.    And at some point did you come to understand that

16   she also was playing some role in Mr. Caplitz's

17   business?

18   A.    Yes, after a few years.  When we first met him he

19   was in business with a couple of men, um, then later on

20   he told us that he was in another company and he told us

21   about Rosalind and that she was the President of the

22   company, and -- so that's how she became a part of it.

23   Q.    Did Mr. Caplitz tell you anything about what role

24   he was playing and what role she was playing?

25   A.    Um, he said Rosalind did all the investing as far

1    as, you know, into the stock market and any investing,

2    and I know he visited many businesses and individuals to

3    get the customers, sort of, and tell them about the

4    product and whatever.

5    Q.    And did you entrust money to those -- the company?

6    A.    Yes, we did.

7    Q.    Approximately how much money did you entrust over

8    the years, if you can remember?

9    A.    Well, I think it had to have been -- between our

10   company and ourselves it had to have been a million

11   dollars at least.

12   Q.    And was that just for you and your husband or were

13   there also for others?

14   A.    Um, no, except for my three children we invested,

15   um, I think $10,000 each into an IRA, when they were

16   going to college, to start them off on their own IRA,

17   um, and then we invested somewhat into, um, some real

18   estate and so forth for our company's profit-sharing

19   plan, and the rest was ours.

20   Q.    For the profit-sharing plan, for whom was that?

21   A.    That was for our retirement and we employed three

22   men at the time and they were included.  They had to be

23   vested first and had been with us for a number of years

24   first.

25   Q.    Did Mr. Herman ever -- sorry.

```
 1         Did Mr. Caplitz ever tell you anything about his
 2    personal relationship with Ms. Herman?
 3    A.    Yes.
 4         MR. O'HARA:  Objection.
 5         THE COURT:  Come to the sidebar.
 6
 7         AT THE SIDEBAR
 8         THE COURT:  What's the ground for that objection?
 9         MR. O'HARA:  Hearsay.
10         THE COURT:  Yeah.
11         What's your answer?
12         MS. BLOOM:  Um, these are the co-conspirators and
13    he's describing them.
14         THE COURT:  Well, that's the problem, you see.  I
15    understand the First Circuit law, but you must
16    understand here that I have to make a determination at
17    the close of your case and then at the close of all the
18    evidence whether there is a conspiracy and whether the
19    statements that you've offered are made during the
20    conspiracy and in furtherance of the conspiracy.  Now
21    I've listened with great care to the opening.  All this
22    financial business, it seems to me, at least for
23    starters it makes good sense that it's in furtherance of
24    the conspiracy, and at least coming from Caplitz, so I
25    probably would overrule it, but this personal business,
```

1   who's having an affair with whom and "Tell them that

2   you're gay" and the like, I'm not clear how that

3   furthers the conspiracy.  But you say it does.  And the

4   downside risk is this, and I'll say it now, if I don't

5   agree with you, when all the dust has settled, I can't

6   strike this out and we're going to have to try this case

7   again, a result that you would not want, um, either

8   side.

9        Go ahead.

10       MS. BLOOM:  Well, I think that the general

11  explanation of the relationship between them is part of

12  telling -- is telling the story not so much for the

13  truth of the matter but whether the relationship existed

14  or not.

15       THE COURT:  Well, then it's not relevant.

16       MS. BLOOM:  You know what?  I'll move on, your

17  Honor.

18       THE COURT:  Okay, there may be other witnesses or

19  other circumstances when you get into it, but I think

20  you're wise to move on.  All right.

21

22       (In open court.)

23       THE COURT:  You'll put another question,

24  Ms. Bloom, thank you.

25  Q.   I'd like to now ask you to take a look at what has

1    been marked for identification as Exhibit GK, it should

2    show up on your screen, but at this time it's marked for

3    identification so it should not show up on the jurors'

4    screen.

5         THE COURT:  The Clerk understands.

6         So you get the protocol, if they have letters,

7    we're not clear whether you'll be able to see them,

8    we'll see as we go along.  If we do, we'll give them a

9    number.  So for now it's GK for identification.

10        Go ahead, Ms. Bloom.

11        MS. BLOOM:  I'm wondering if I could have it on my

12   screen?

13        (Clerk assists.)

14        MS. BLOOM:  Thank you.

15        MS. MURRANE:  It is showing on this screen.  If

16   you could turn this one off?

17        MS. BLOOM:  Can we just move that one, turn it

18   around?

19        THE COURT:  Yeah.  Well, go ahead, Ms. Murrane,

20   help out.

21        (Moves courtroom monitor around.)

22        THE COURT:  For hundreds of years we've tried

23   cases without computer screens and we took a document

24   and just handed it to the witness and we said, "This is

25   for identification," and then if it got in evidence,

1    then we said, "Well, here it is."

2          Thank you all.  Go ahead, Ms. Bloom.

3    Q.    Do you recognize this document?  You need to see

4    the last page in order to recognize it.

5    A.    Yes, I mean I've seen something similar, but I

6    don't know if it's the exact same thing, but --

7    Q.    Okay, why don't we go to Page 9.

8    A.    Okay.  (On screen.)  Yes.

9          MS. BLOOM:  And I'm going to take your suggestion,

10   your Honor, and get the paper.

11   Q.  I'm showing you what is marked for identification as

12   Exhibit GK.  Do you recognize that document?

13   A.    Yes.

14   Q.    What is that?

15   A.    Um, well, it's an advisory document that -- with

16   my signature on it, um, that I presume I filled out 25

17   years ago or more that, um -- when we first started

18   working with Gregg.

19   Q.    If you look to the front page of the document and

20   read the title?

21   A.    "Investment Advisory Agreement."

22   Q.    Um, and do you recognize the name of the company

23   with whom the Investment Advisory Agreement is entered?

24   A.    Yes, "Insight Onsite Strategic Management."  I

25   believe -- but sometimes the name was a little bit

1   different, but it was always "Insight Onsite," though.

2        MS. BLOOM:  At this time I would offer this

3   document.

4        THE COURT:  No objection?

5        MR. O'HARA:  No objection.

6        THE COURT:  Very well.

7        MS. BLOOM:  May we publish it?

8        THE COURT:  Well, let's give it the next number

9   now.  I don't know what number is on it?

10       MS. BLOOM:  It's previously marked as 290.

11       THE COURT:  Okay, 290 then in evidence and it may

12  be published to the jury, yes.

13       (Exhibit 290, marked.)

14       MS. BLOOM:  Okay.  And now I'm going to try to

15  blow up some of this so that you can all read it.  Oops.

16  And have it slide away.  No, okay, it's there.

17  Q.   Okay.  As you see there it says, the first

18  sentence, "We" -- "(I) We understand that Insight Onsite

19  Strategic Management, LLC, hereafter referred to as

20  'Insight Onsite Advisor,' offers a security investment

21  management program, and (I) we wish to retain you,

22  Insight Onsite, to act as our investment advisor with

23  regard to such program."

24       Did you decide to employ Insight Onsite Strategic

25  Management as your investment advisor?

1    A.    Yes.

2          MS. BLOOM:   If we can turn to Page 3 of this

3    agreement.

4          (On screen.)

5    Q.    If you look to the middle of --

6          MS. BLOOM:   Yeah, I think I can scroll us down.

7    Q.    -- to page 3, do you see a section on advisory

8    fees?

9    A.    Yes.

10   Q.    Was there any agreement between you and Insight

11   Onsite as to whether you would pay fees for these

12   services?

13   A.    Um, yes.

14   Q.    And did you understand that there was going to be

15   some kind of fee charged for the investment advisor

16   services of Insight Onsite?

17   A.    Yes.

18         MS. BLOOM:   If we could just turn to now Page 6.

19         (On screen.)

20   Q.    If you look to Page 6, um, do you see there in the

21   middle it says "Representations"?

22   A.    Yes.

23   Q.    And could you read the first sentence.

24   A.    "Advisor represents that it is a registered

25   investment advisor under the Investment Advisors Act of

1    1940 and that such registration is currently effective."

2    Q.    Did you understand that the company that you had

3    hired to manage your investments was a registered

4    investment advisor?

5    A.    I believed it was, yes.

6    Q.    And what did that mean to you?

7    A.    Just that it was registered with whoever needed to

8    be in the financial world or the federal government or

9    whoever, you know, that they were advisors who were

10   registered with whoever they needed to invest or to

11   register with.  I suppose I didn't fully understand, you

12   know, where it was invested -- you know, not invested,

13   but registered, but I just believed that it was -- that

14   they were registered somewhere, yes.

15        MS. BLOOM:  And if you could just turn to Page 7,

16   scroll down on that page.

17        (On screen.)

18   Q.    Do you see, in the middle of the page, a section

19   entitled "Insight Onsite Strategic Management, LLC

20   Services"?

21   A.    Yes.

22   Q.    And do you see in the middle that it says

23   "Mrs. Rosalind Herman and Mr. Gregg Caplitz are normally

24   available during business hours to provide consultation

25   to clients"?

A.     Yes.

Q.     Whom did you understand was available, from this company, to provide investment advice to you?

A.     Well, reading that it seems as though both of them would be, although, um, Mr. Caplitz is the only one that I really had any kind of a relationship with other than I -- once in a while, when we had to sign things, Rosalind's name was on it also.  But mainly we dealt with Mr. Caplitz.

Q.     And whom did he tell you was making some of the stock -- the investment decisions?

       MR. O'HARA:  Objection.

Q.     Did he tell you anything about who was making the investment decisions?

A.     He told me that Rosalind did all the investing.

       MS. BLOOM:  And now if we could turn to Page 9.

Q.     Who's signature is that?

A.     That's mine.

       MS. BLOOM:  And if we could turn to Page 10.

       (Turns.)

Q.     And whom do you see signing for Insight Onsite Strategic Management, LLC?

A.     Rosalind Herman.

Q.     I'd now like to draw your attention to what has previously been marked as Exhibit GK -- I'm sorry, GT,

1    and I'll bring that up to you.  And I'm going to turn

2    you to the last page.

3         Do you recognize that signature?

4    A.    Yes, that's my husband's.

5    Q.    And do you recognize this overall document?

6    A.    Yes, it's the same one.

7    Q.    Is that a similar investment advisory agreement by

8    your husband?

9    A.    Yes.

10   Q.    Okay.

11        MS. BLOOM:  At this time I would offer this

12   agreement as well.

13        THE COURT:  No objection to GT?

14        MS. BLOOM:  As Exhibit 299.

15        MR. O'HARA:  No, your Honor.

16        THE COURT:  Then it's admitted as Exhibit 299 in

17   evidence.

18        (Exhibit 299, marked.)

19   Q.    At some point did you have a conversation with

20   Mr. Caplitz about a possible or potential hedge fund

21   investment?

22   A.    Yes.

23   Q.    How did that come about?

24   A.    Um, we were in the process of planning our

25   retirement and, um, we had talked to Mr. Caplitz about

1    having funds to put towards our retirement as well as we

2    already had the profit-sharing plan, and, um, he told us

3    that he and Rosalind were putting together a hedge fund.

4    And at the time I just kind of hesitated because I had

5    heard about the Bernie Madoff "mess," shall we say, and,

6    um, a hedge fund, just, you know, was a light in my

7    mind, and I just looked at him and I said, "Gregg, I

8    don't think we want to be in a hedge fund," and he says,

9    "Oh, it's going to be wonderful, you can make as much as

10   $10,000 a year on it and so forth," and I said, "Well,

11   I'm not sure we want to be in it," and he said, "You

12   already are," "You've been in it a little while" or

13   something like that.

14   Q.    And what was your reaction to that?

15   A.    I was very surprised.

16   Q.    So what did you do?

17   A.    Well, when he presented it to us he wanted us to

18   put $100,000 into the hedge fund and I said, "We are?"

19   and he said, "Yes, you already have $100,000 in the

20   hedge fund," and I couldn't believe it.  And then, um, I

21   started looking back in my paperwork and he indicated

22   that he had taken $100,000 and put it in there, but he

23   had taken it out of one of our accounts, and then I

24   found, looking through our accounts, that $100,000 had

25   been transferred into this name which I didn't

1    recognize, it was the "Knew Finance Experts," via a bank

2    out west somewhere first.  So it had been sent from New

3    York out west and then to the Knew Finance Experts.  The

4    next visit, when we were talking about it again, I asked

5    him what that was and he said it was a startup company

6    for the hedge fund.

7    Q.    And what did you say you wanted to do then?

8    A.    So I said, "Gregg, I don't want to be in the hedge

9    fund."  He also was trying to get us to put $100,000

10   more and I said, "Definitely not," and he gave me a

11   short list of five people that supposedly he was

12   contacting to go into it, um, and our name was on it --

13   my husband's name was on it.  So I said, "Gregg, I don't

14   want to be in it and we'd like our money back because we

15   don't want to be involved in it," and he said, "I'll

16   speak to Rosalind and we will get you your money back."

17   Q.    Okay, at this point, before we go further, I'd

18   like to have you take a look at what has been marked for

19   identification as Exhibit W.

20         (Pause.)

21         MS. BLOOM:  I will load that up for you.

22         (On screen.)

23   Q.    Do you recognize that?

24   A.    Yes.

25   Q.    What is that?

A.    Um, yeah, it is for the $100,000.  I'm sorry, it's
for the $100,000, um, it's to Washington Mutual Bank,
um, giving them directions to take the $100,000.

Q.    From your account?

A.    From our account, yeah.

Q.    And do those appear to be you or your husband's
signature down at the bottom?

A.    Yes.

      MS. BLOOM:  At this time I would offer this
exhibit.

      MR. O'HARA:  No objection.

      MS. BLOOM:  It's Exhibit 120.

      THE COURT:  Exhibit 120 in evidence.

      MS. BLOOM:  Okay.

      (Exhibit 120, marked.)

Q.    Do you recall ever signing this letter?

A.    I don't recall signing it.  As a matter of fact,
when he used the word "hedge fund" at first, I just
related it back to Madoff.  But I really don't recall
signing it.

Q.    Were there ever occasions where you were provided
with documents, um, by Mr. Caplitz for you to sign when
you didn't understand exactly what they were?

A.    Not that I -- he brought documents out from time
to time, he generally explained what they were, um,

1    investing here and there.  Um, once in a great while

2    he'd let me know that he changed his mind or it wasn't a

3    good idea and he told me that he had torn up the

4    document, whatever it was, and that he wasn't going to

5    do it.  Um, this one I don't recall.

6    Q.    When you found out about this investment and asked

7    for your money back, what happened?

8    A.    He said he would talk to Rosalind.  It was over a

9    period of time and then it came time for our retirement

10   and so forth and I said, "Gregg, we really need that

11   money," and he says, "Oh, we're going to get it for

12   you," but he never did.

13   Q.    At this point I'd like you to have you take a look

14   at what is marked for identification for Exhibit AB.

15   A.    (Looks.)

16   Q.    Do you recognize this document?

17   A.    Um, it has our name on it, but it's a little

18   blurred though.  Oh, that's better.  Okay.  Yes, that is

19   a letter that, um, I wrote to Gregg -- a letter that I

20   wrote to Gregg.  I'm sorry, I keep moving over.

21   Q.    That's okay.

22         MS. BLOOM:  I would now offer this as Exhibit 127.

23         THE COURT:  No objection?

24         MR. O'HARA:  No objection.

25         THE COURT:  It may be received as Exhibit 127 in

1    evidence.

2            (Exhibit 127, marked.)

3    Q.    And why did you write this letter?

4    A.    Well, because we hadn't heard anything on, um --

5    as I said we had closed some of our business in 2009,

6    and this is 2011, and that's two years later, and we

7    still had not heard from getting our money back.

8    Q.    Okay.  Could you read the letter for the jury.

9    A.    Read it?

10   Q.    Yes.

11   A.    "Dear Gregg, in view of the fact that thus far we

12   have not received any refund of the $100,000 that you

13   encouraged us to give to you in May of 2008, we feel

14   necessary to put this request in writing and be on

15   record with respect to this issue, as we will be

16   traveling, should anything happen to us."

17           And I'll just qualify that we did go down to

18   Florida for a month, a couple of winters, and that must

19   have been written in.

20           "As you are aware, we had informed you last fall

21   that we wanted our $100,000 deposit returned and you

22   have indicated to us that you will be doing so.

23   Apparently to date frequent efforts on your behalf have

24   not produced our requested refund.  Our concern is that

25   we have never received a deposit receipt or other detail

1    regarding this, although recently, actually it was late

2    last spring, you indicated to us that we would be

3    participating in sort of a hedge fund and you provided

4    detail to us regarding an Insight Onsite Strategic

5    Partners, LLC.  As you will remember, we specifically

6    informed you that we did not realize you had put us into

7    such an arrangement and told you that we did not want to

8    do this."

9    Q.    All right.  Now the next section for you.

10   A.    "This is a real concern to us in that having no

11   receipt we only can see the $100,000 was wired from our

12   account by a copy of the letter you had us sign back on

13   May 12th, 2008 which went to a Washington Mutual Bank in

14   Las Vegas, Nevada, the Knew -- for the benefit of an

15   FDO, the Knew Finance Experts.  You had never discussed

16   this organization with us or how it might be involved

17   with respect to the $100,000 you had wired from our

18   account."

19   Q.    You can stop there.

20         Did you ever get that money back?

21   A.    No.

22         MS. BLOOM:  No further questions for this witness.

23         THE COURT:  All right.

24         Do you wish to inquire of this witness?

25         MR. BENZAKEN:  Yes, your Honor.

1          THE COURT:  Well, we'll do it tomorrow.  You may

2    step down, ma'am.

3          (Witness steps down.)

4          THE COURT:  We'll stop taking testimony at this

5    time and pick up at 9:00 a.m. tomorrow.

6          Keep your minds suspended, do not discuss the case

7    either among yourselves nor with anyone else.  You may

8    stand in recess until 9:00 a.m. tomorrow morning.  The

9    jury may recess.

10          (Jury leaves, 1:00 p.m.)

11

12                    C E R T I F I C A T E

13

14          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

15    do hereby certify that the foregoing record is a true

16    and accurate transcription of my stenographic notes,

17    before Judge William G. Young, on Monday, March 28,

18    2016, to the best of my skill and ability.

19

20

21

22    /s/ Richard H. Romanow 09-16-16
      _____
23    RICHARD H. ROMANOW   Date

24

25