1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3                           No. 1:12-cr-10015-WGY

4

5

6   UNITED STATES OF AMERICA

7

8   vs.

9

10  ROSALIND HERMAN

11

12                    *********

13

14                 For Jury Trial Before:
                   Judge William G. Young
15

16

17                 United States District Court
                   District of Massachusetts (Boston)
18                 One Courthouse Way
                   Boston, Massachusetts 02210
19                 Tuesday, March 29, 2016

20                    ********

21

22        REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter
23            United States District Court
       One Courthouse Way, Room 5510, Boston, MA 02210
24               bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3   SARA M. BLOOM, ESQ.
     MARY B. MURRANE, ESQ.
 4      United States Attorney's Office
        J. Joseph Moakley U.S. Courthouse
 5      1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
 6      (617) 748-3971
        Email: Sara.bloom@usdoj.gov
 7      For the United States

 8

 9   RAYMOND A. O'HARA, ESQ.
        Law Office of Raymond A. O'Hara
10      1 Exchange Place
        Worcester, Massachusetts 01608
11      (508) 831-7551
        Email: Oharalaw@hotmail.com
12   and
     JASON G. BENZAKEN, ESQ.
13      Benzaken and Wood, LLP
        1342 Belmont Street, Suite 102
14      Brockton, Massachusetts 02301
        (508) 897-0001
15      Email: Attorneybenzaken@gmail.com
        For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1                        I N D E X

 2

 3   WITNESS               DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   CARMINE LEUCI

 6        By Ms. Murrane:      6              66

 7        By Mr. O'Hara:           40                   67

 8

 9   CARLA E. BIGELOW  (Continued.)

10        By Ms. Bloom:                       75

11        By Mr. Benzaken:          69

12   MELVIN R. BURT, JR.

13        By Ms. Bloom:      77              124

14        By Mr. Benzaken:         117

15

16   BRUCE GILMARTIN

17        By Ms. Murrane:    126

18        By Mr. O'Hara:          139

19   SUSAN PALEY

20        By Ms. Murrane:    144

21        By Mr. Benzaken:        151

22

23   JAMES G. CONNELL

24        By Ms. Murrane:    155

25        By Mr. O'Hara:
```

1                       E X H I B I T S

2

3       EXHIBIT 132.....................................    98

4       EXHIBIT 133.....................................   112

5       EXHIBIT 134.....................................    95

6       EXHIBIT 137.....................................   114

7       EXHIBIT 138.....................................   104

8       EXHIBIT 142.....................................   160

9       EXHIBIT 143.....................................   166

10      EXHIBIT 148.....................................   170

11      EXHIBIT 149.....................................   168

12      EXHIBIT 151.....................................   164

13      EXHIBIT 152.....................................   162

14      EXHIBIT 166.....................................   136

15      EXHIBIT 181.....................................    37

16      EXHIBIT 186.....................................   150

17      EXHIBIT 258.....................................    24

18      EXHIBIT 261.....................................    27

19      EXHIBIT 291.....................................    87

20      EXHIBITS 293 to 295.............................    87

21      EXHIBIT 298.....................................   157

22      EXHIBIT 300.....................................   133

23      EXHIBIT 301.....................................    11

24      EXHIBIT 303.....................................   146

25

```
 1              E X H I B I T S
 2        (Continued.)
 3
 4        EXHIBIT 429................................... 107
 5        EXHIBIT 439................................... 116
 6
 7            P R O C E E D I N G S
 8            (Jury enters, 9:15 a.m.)
 9        THE COURT:  Good morning, ladies and gentlemen,
10   thank you so very very much for all being here, for
11   making your efforts to be here on time, we really
12   appreciate it and it really makes a difference.
13            Now, my normal line at this point is because
14   you're all here, they're all here ready to go, only
15   they're not, and I was told the witness was coming into
16   the building.
17            Now is that true or are we going on to another
18   witness?
19        MS. BLOOM:  I was also told the witness is coming
20   into the building but I was --
21        THE COURT:  That's not good enough, I expect these
22   witnesses to be here before 9:00.  Now if she's not
23   here, call your next witness and I will tell --
24            With respect to the first witness -- we're not
25   going to waste your time, you keep your minds suspended
```

```
 1    because Mr. O'Hara hasn't had any chance to ask that
 2    first witness any questions, but we'll just take a
 3    witness out of order.
 4          Call the next witness.
 5          MS. MURRANE:  The government calls Carmine Leuci.
 6          THE COURT:  The witness may be called.
 7          (Witness takes stand.)
 8          (CARMINE LEUCI, sworn.)
 9
10          * * * * * * * * * * * * *
11          CARMINE LEUCI
12          * * * * * * * * * * * * *
13
14    DIRECT EXAMINATION BY MS. MURRANE:
15    Q.    Good morning.
16    A.    Good morning.
17    Q.    Can you please state your name for the jury.
18    A.    Yes, Carmine Leuci.
19    Q.    And can you tell the jury what city and state you
20    live in?
21    A.    I live in Pompano Beach, Florida.
22    Q.    Who do you live with?
23    A.    I live with my partner, David Savage.
24    Q.    And how long have you lived in Pompano Beach,
25    Florida?
```

A.      Um, a year and a half now.

Q.      Where did you live before you moved to Pompano
Beach?

A.      Plum Island in Newburyport, Massachusetts.

Q.      Can you tell the jury a little bit about your
educational background?

A.      Yes, I had two years -- I went to high school and
I had two years at Northeastern, um, business class
courses.

Q.      And, Mr. Leuci, so we have a Court Reporter here
who's taking down everything that you say and I say
today so I'll just slow it down a little bit so we can
make sure the Court Reporter can get both my questions
and your answers.

A.      Okay.

Q.      All right.  So you said you graduated from high
school when?

A.      Um, in 1962.

Q.      And then after high school what did you do?

A.      I went to, um -- well, I went to Northeastern
nights and I worked for the Shawmut Bank.

Q.      What's your current employment status?

A.      I'm retired.

Q.      When did you retire?

A.      In 2005.

1    Q.    What were you doing before your retirement in
2    2005?
3    A.    Before my retirement I was working for U.S. Food
4    Service in sales.
5    Q.    How long did you work for the U.S. Food Service?
6    A.    38 years.
7    Q.    Can you tell the jury just briefly what other jobs
8    you've held?
9    A.    I worked at Shawmut Bank, I worked for Mutual of
10   Omaha.  That's about it.
11   Q.    How long did you work for the bank?
12   A.    Um, on and off I was there several times from '62
13   to the mid '70s, and then I went into the Mutual of
14   Omaha for a couple of years and then after that I went
15   to U.S. Food Service.
16   Q.    Do you know a man named Gregg Caplitz?
17   A.    Yes, I do.
18   Q.    How do you know him?
19   A.    He was my financial advisor.
20   Q.    When did you meet him?
21   A.    I met him in the -- um, let's see, in the early
22   '70s.
23   Q.    How do you meet him?
24   A.    I met him -- I had some investment money and I had
25   met a woman, I had nowhere to -- I didn't have any idea

1    where to put it, and she said to me, "You should look up

2    Mr. Pantano's office, he's very good," she had invested

3    some money, and Gregg was working with, um, Mr. Pantano.

4    Q.    Do you know Rosalind Herman?

5    A.    Yes, I do.

6    Q.    How do you know Rosalind Herman?

7    A.    I know her because she worked -- um, she was more

8    or less in charge of the Insight Onsite Financial Group.

9    Q.    And what was the Insight Onsight Financial Group?

10   A.    It was a financial advisory management company.

11   Q.    And did that have some association with Gregg

12   Caplitz?

13   A.    Yes.

14   Q.    What was the relationship between Gregg Caplitz,

15   Insight Onsite, and Rosalind Herman?

16   A.    Well, when Gregg took it over he was running it by

17   himself and then all of a sudden Rosalind turned up, and

18   I got no explanation, he just said he was taking -- that

19   somebody else was coming into the firm and I thought

20   nothing more of it.

21   Q.    And do you see Rosalind Herman in the courtroom

22   today?

23   A.    Yes, I do.

24   Q.    Where is she sitting?

25   A.    She's sitting between those two gentlemen.

1          MS. MURRANE:  May the record reflect that the

2     witness has identified Rosalind Herman.

3          THE COURT:  It may.

4          MS. MURRANE:  May I approach the witness, your

5     Honor?

6          THE COURT:  You may.

7     Q.    Mr. Leuci, I'm going to be handing you what's been

8     premarked as Exhibit GV?

9     A.    Uh-huh.

10    Q.    And ask you to just take a look through it.

11    A.    Okay.  (Looks.)  This is an agreement that I

12    allowed them to make, um, investments for me, sort of

13    like an agreement between a client and an investment

14    advisor.

15    Q.    Okay.  So if you flip to the last page of that

16    agreement, is that -- whose signatures are on that page?

17    A.    Um, that's just my signature.

18    Q.    On the last page?

19    A.    (Looks.)  Oh, I'm sorry, there's one more page.

20    Yes, my name and Rosalind's name.

21    Q.    And what's the title of the document?

22    A.    Um, "Investment Advisory Agreement."

23         MS. MURRANE:  The government would offer this into

24    evidence.

25         THE WITNESS:  I'm sorry?

```
 1            THE COURT:  She's talking to me.
 2            THE WITNESS:  Oh, okay, I'm sorry.
 3            THE COURT:  But she'll ask a question.
 4            THE WITNESS:  Okay.
 5            MS. MURRANE:  As Exhibit 301.
 6            THE COURT:  Okay.
 7            No objection?
 8            MR. BENZAKEN:  No.
 9            THE COURT:  And did you say 301?
10            MS. MURRANE:  301, your Honor.
11            THE COURT:  GB is admitted in evidence as Exhibit
12      301.
13            MS. MURRANE:  And if we could bring that up on the
14      screen for the jurors.
15            (On juror screens.)
16            (Exhibit 301, marked.)
17      Q.    If we could take a look at the first two
18      paragraphs on this page.
19      A.    Okay.
20      Q.    Mr. Leuci, you can follow along either in the
21      paper copy or on the screen, whichever is easier for you
22      to read.
23      A.    Okay.
24      Q.    Could you read for the jury the first sentence of
25      that second paragraph.
```

1    A.    "I (we) understand that Insight Onsite Strategic

2    Management, LLC, hereafter referred to as 'Insight

3    Onsite,' the 'advisor,' offers a securities investment

4    management program, and I, or we, wish to retain you,

5    Insight Onsite, to act as investment advisor with

6    regards to such program."

7    Q.    And did retain Insight Onsite to act as your

8    investment advisor?

9    A.    Yes, I did.

10         MS. MURRANE:  If we could take a look at Page 11

11   of this agreement.

12   A.    (Looks.)

13   Q.    And we'll look at the signature lines at the top,

14   that first line where it says "primary account holder,"

15   whose signature is that?

16   A.    "Carmine W. Leuci," mine.

17   Q.    And that's your signature, you signed this?

18   A.    Yes.

19   Q.    All right.  And then below that, what's the name

20   that's signed below yours?

21   A.    "Rosalind Herman."

22   Q.    And below that what's the identification on that?

23   A.    It says "Insight Onsite Strategic Management,

24   LLC."

25         MS. MURRANE:  Now, if we could just take a look at

1    Page 6.  (On screen.)  And there's a section in the

2    middle called "Representations."  Let's look at the

3    paragraph.

4    Q.    The first paragraph under "Representations," can

5    you read that?

6    A.    Yes.  "Advisor represents that it is a registered

7    investment advisor under the Investment Advisors Act of

8    1940 and that such registration is currently effective."

9    Q.    Okay, thank you.

10         MS. MURRANE:  We're done with that exhibit.

11         (Off screen.)

12   Q.    Now, what was it that you were looking for your

13   investment advisor to do for you?

14   A.    I was looking for him to make decisions for us,

15   um, notify us, um, and sort of follow through and keep

16   us up to date with hopefully making money for us.

17   Q.    And based on your interactions with, um, the folks

18   from Insight Onsite, what were the role of Rosalind

19   Herman and Gregg Caplitz here?

20   A.    Um, Gregg was more or less out on the road most of

21   the time and Rosalind was the inside person.  I was told

22   once that he was --

23         MR. O'HARA:  Objection, your Honor.

24         THE COURT:  No, wait a minute.  Well, the

25   objection's not timely.  He may tell us what his

1  understanding was.

2         You can finish your answer.

3         THE WITNESS:  Okay.

4  A.    He basically was the salesman for the company and

5  Rosalind was the inside person doing paperwork.  I don't

6  believe she was out on the road getting customers.  But

7  I don't know that for sure.

8         THE COURT:  Now, where did you get that

9  understanding?

10        THE WITNESS:  Because that's the way it always --

11 well, Gregg told me that, that he was the salesman,

12 because I asked what the roles -- well, not the roles in

13 that way, but he said he was the outside person and he

14 would do the selling, and she was in the office and she

15 was also down in Las Vegas.  So I don't know if -- but

16 she wasn't on the road, from what I knew, getting

17 clients.

18 Q.    And was this your experience, in dealing with

19 Mr. Caplitz, that you met with him, he was the salesman,

20 he visited you?

21 A.    Yes.

22 Q.    And was this your experience, with respect to

23 Ms. Herman, that she was working in the office?

24 A.    She was basically --

25        MR. O'HARA:  Objection, your Honor.

1          THE COURT:  Well, sustained, you're leading the
2    witness.  Don't lead the witness.
3    Q.    Did you ever go to the office of Insight Onsite?
4    A.    Yes, I did.
5    Q.    Where was the office you visited?
6    A.    The one, um, that was in Wilmington,
7    Massachusetts.
8    Q.    And when you went to the office, did you see
9    Rosalind Herman there?
10   A.    At times she was there.
11   Q.    And did you interact with her when she was in the
12   office?
13   A.    Um, sometimes.
14   Q.    Could you tell from your visit what was happening
15   in the office and what she was doing there?
16   A.    Well, she was -- she was in between both Vegas and
17   she was in Wilmington, and when I went in she would come
18   in at times, sit with Gregg when we had questions, he
19   would always ask Rosalind her opinion of certain things,
20   I myself also asked her if she thought, about certain
21   things, they were right or they were wrong, and if she
22   was there she would talk to us.  But she didn't stay for
23   any lengthy meetings.
24   Q.    Did you have -- can you give the jury an
25   approximation of how many times you went to the office

1    in Wilmington and met with Rosalind Herman?

2    A.    Oh, it was on and off -- as I said I'd go to the

3    office probably to sign papers or whatever, or meet up

4    with Gregg, probably twice a month, if that, and

5    sometimes she was there and sometimes she wasn't.

6    Q.    When you had conversations with Rosalind Herman at

7    the office in Wilmington, did she seem to be

8    knowledgeable about --

9           MR. O'HARA:  Objection, your Honor.

10          THE COURT:  Sustained.  Don't lead the witness.

11          Leading the witness is suggesting the answer.

12   Let's see what this witness has to say.  The question

13   could be something like this, um, "What did you get from

14   what she said or how she worked about what her function

15   was?"  And we'll ask that question.

16          So what did you get, what did you --

17   A.    Well, she seemed to be --

18          THE COURT:  Tell the jury.

19   A.    She was the head of the -- I took it as the head

20   of the Insight Onsite firm because she seemed to make

21   all the decisions, Gregg would go to her.  If we were

22   talking I would say to Greg, "Well, what do you think of

23   this?" and he'd say, "Well, let me go over it with

24   Rosalind."  I questioned him one time, "Why do you have

25   to go over everything with Rosalind?" and he would say,

1    "Well, she has" -- "She's a little bit more experienced

2    in this than I am," so he'd say, "I just want to get her

3    idea if this is the right thing to do or not to do."

4    Q.    At some point in time did anyone from Insight

5    Onsite come and talk to you about investing in a hedge

6    fund?

7    A.    Yes.

8    Q.    Who did?

9    A.    Um, Gregg Caplitz.

10   Q.    What did he tell you?

11   A.    He told me there was an investment that Rosalind

12   was heading up and they wanted investors and they asked

13   if we would be interested in going into this hedge fund.

14   In the beginning I said I wasn't sure we'd -- that both

15   of us, David and I, we weren't sure we wanted to do it,

16   we didn't know where we were going to put the money.  So

17   this was in October of 2010, October or November.  I

18   then talked to Rosalind at the time and got her opinion,

19   because two heads are better than one, and Gregg said it

20   was an excellent investment.  I called Rosalind, they

21   were trying to get the investors to help fund the fund.

22   And so after talking to the two of them -- and I did say

23   to Gregg, "Gregg, do you think this is a good investment

24   for us?" and he said, "I think it's an excellent one,

25   you are not going to lose any money."

1    Q.    And what did Rosalind Herman talk to you about?

2    A.    And Rosalind agreed, she said, "I think you'll be

3    very happy with this investment over time."

4    Q.    Did you --

5          THE COURT:  Excuse me.  Let me just caution the

6    jury in this respect.

7          I've explained what the charges are here and you

8    will all understand that investing money carries with it

9    risk and no one has violated the criminal laws if money

10   is invested and the money is lost, that in fact you do

11   lose money, people may be unhappy about that, but that's

12   not a crime, that goes along with investing.  But

13   remember there has to be the fraud aspect, as I

14   explained at the beginning, and the government has told

15   you what they hoped they can prove.  But just keep in

16   mind that simply to invest money and lose it doesn't

17   constitute a crime, it doesn't mean that anyone

18   committed a crime.

19         Go ahead, Ms. Murrane.

20   Q.    Mr. Leuci, let's place this on a timeline a little

21   bit.  The conversations that you just described

22   regarding the hedge fund investment and Mr. Caplitz and

23   Ms. Herman, what year is this?

24   A.    This is 2010.

25   Q.    And what were you doing in 2010, were you working

1    or retired?

2    A.    I was retired.

3    Q.    What were your investment goals in that time

4    period?

5    A.    Our investment goals were to have enough money put

6    aside so that my partner could retire earlier and, um,

7    we would get a vacation house and basically live the

8    good life, better than what we were doing.

9    Q.    Was your -- can you tell the jury a little bit

10   about your finances at the time and whether, um, you had

11   significant retirement savings or not significant

12   retirement?

13   A.    Well, we were working for significant, we were

14   pretty well off but it was still not enough for David to

15   retire.  I was retired, I was on Social Security, he was

16   still working.  So we figured that when he would, you

17   know, retire, then we would be able to do things

18   differently than what we were doing.

19   Q.    So let's go back to the hedge fund and we were

20   discussing, um, conversations about whether -- well,

21   conversations about it.  Did you make a decision whether

22   to invest or not?

23   A.    Yes, we did.

24   Q.    What was your decision?

25   A.    We decided to go into it.

Q.     What did you do?

A.     We gave Gregg $100,000.

Q.     When was that?

A.     This was in November, I believe, of 2010.

Q.     What were your expectations regarding this
investment?

A.     Well, we were told by both Rosalind and Gregg that
we were not investors, we were owners of the hedge fund,
1 percent owners, and that each year after the audit,
after it was funded and the auditors looked at the
paperwork, um, by the end of January of each year we
could get up to $10,000 to $20,000 of, I hate to say, a
"dividend check," or whatever you want to call it, from
the hedge fund.  They were also going to take out a life
insurance policy on each of us, in case one of us had
passed away, that the money from the life insurance
would pay the hedge fund, our portion of it.  And that
Rosalind eventually -- it was her hedge fund, from what
I understood, because she was the head of it, and she
was going to pay everybody back plus all these dividends
from year to year and that she would own the hedge fund
primarily.

Q.     Was there any discussion about when you might
start seeing these dividends?

A.     We were told we would see it in January of 2012.

```
 1    Q.    And who told you that?
 2    A.    Um, Gregg did, and Rosalind said it would take
 3    about a year for all the funding and after the first
 4    audit.  So from her also she said it would probably be
 5    in January.
 6    Q.    Okay.  So let's go forward in time about a year.
 7    And what happened in January of 2012 with this hedge
 8    fund?
 9    A.    Well, in January nothing happened.
10    Q.    So no monies were --
11    A.    No monies.  No calls.  I would call through the
12    year and say, "How is the hedge fund coming?"  "Oh,
13    we're doing great, it should be funded very shortly.
14    Everything is on track."
15    Q.    So you said you made calls.  Who did you call?
16    A.    I called, um, Gregg.
17    Q.    When did you start calling Gregg?
18    A.    I started calling him -- well, when I would talk
19    to him about other investments I would talk to him about
20    the hedge fund and always inquire about it and say, "How
21    is it going?"
22    Q.    And what was Gregg's response?
23    A.    Gregg was saying, "It's going excellent, you have
24    nothing to worry about."
25    Q.    As we go in -- further into 2012, what happened
```

1   with respect to receiving money on that investment?

2   A.    Nothing, but I did put calls into Rosalind and I

3   was a little upset because I couldn't get any definite

4   answers, and she told me, she says, "You know, Carl, the

5   lawyers are holding this up," she says, "the Is have to

6   be dotted and the Ts have to be crossed," and she said

7   this, "We're just waiting, we should have funding in the

8   next few weeks."

9          MS. MURRANE:   And if I might approach the witness,

10  your Honor?

11         THE COURT:   You may.

12  Q.    Mr. Leuci, I'm going to hand you what's been

13  premarked as Exhibit FE.

14  A.    Uh-huh.  (Looks.)

15  Q.    What is this document?

16  A.    (Looks.)

17  Q.    Sometimes it's easier to start from the bottom and

18  just read up.

19  A.    Oh, okay.

20  Q.    And I don't want you to read it out loud but just

21  to read it to yourself and then tell the jury what the

22  document is?

23  A.    Okay, it's I wanted him to set up a conference

24  call with Rosalind on April 27th.

25  Q.    And what is the piece of paper that you're

```
 1   holding?
 2   A.      That's an e-mail.
 3   Q.      And the e-mail is from whom?
 4   A.      From me to Insight Onsite, to Gregg's e-mail.
 5   Q.      And are there other responses, is this -- what
 6   else is on there?
 7   A.      Yeah, I put there, um, "Not tomorrow, Gregg, maybe
 8   Saturday in the a.m., let me know, and I will check
 9   availability, please.  Thanks."  That's in a reply
10   message to a conference call with Rosalind.  And then,
11   um, he sent one back to me, "I will firm a time up for
12   tomorrow and call you with the time, probably early
13   afternoon our time."  And I believe probably they were
14   in Vegas if he said "early afternoon our time."
15           MS. MURRANE:  Your Honor, the government would
16   offer Exhibit FE into evidence.
17           THE COURT:  No objection?
18           MR. O'HARA:  No.
19           THE COURT:  Is it "FE," "E" as in "Edward"?
20           MS. MURRANE:  Yeah, "Frank" "Edward."
21           THE COURT:  FE in evidence as?
22           MS. MURRANE:  258.
23           THE COURT:  258 in evidence.
24           MS. MURRANE:  And I would ask to publish this for
25   the jury.
```

1           THE COURT:  You may.

2           (Exhibit 258, marked.)

3    Q.    And let's start at the bottom e-mail there at the

4    bottom of the page.

5           MS. MURRANE:  If we could scroll in on that bottom

6    of that first page there.

7           (Scrolls on screen.)

8    Q.    So as we look at the bottom of the page there's an

9    e-mail, um, that says "Sent Thursday April 26th, 2012,"

10   do you see that?

11   A.    Yes.

12   Q.    And the "From" line, what is that e-mail address?

13   A.    From "cleuci@verizon.net."

14   Q.    Whose e-mail address is that?

15   A.    That's mine.

16   Q.    And then the "To" line, there's an

17   "Insightonsite@comcast.net" e-mail.

18         Is that an e-mail that you used to communicate?

19   A.    With Gregg, yes.

20   Q.    Okay.  And, um, what did you write to Greg

21   Caplitz?

22   A.    "Gregg, please set up a conference call with

23   Rosalind on Friday, for 4-27.  Thanks."

24   Q.    All right.  And then as we scroll up we'll see a

25   response back.  And then if we could go to the next one

1    we have "From rherman14@cox.net" to

2    "Insightonsite@comcast.net."

3          Are you familiar with the e-mail address

4    "rherman14@cox.net"?

5    A.    Yes, that's Rosalind's e-mail address.

6    Q.    Is that an e-mail address that you used in

7    communications with Rosalind Herman?

8    A.    Yes.

9          MS. MURRANE:  And then if we could scroll up to

10   the top one.

11         (On screen.)

12   Q.    We've got an e-mail from Insightonsite@comcast.net

13   to Carl Leuci and what's the text of this e-mail?

14   A.    It says "Dear Carl, I will firm up a time tomorrow

15   and call you with, probably early afternoon our time.

16   Thank you, G. Caplitz."

17   Q.    Did you have conference calls with Rosalind Herman

18   and Gregg Caplitz?

19   A.    Um, yes, several times.

20   Q.    And during this time period of, I'm sorry, April

21   of 2012?

22   A.    Yes, there were 1 or 2.

23   Q.    What were the conversations during those calls?

24   A.    Well, I can remember it was basically about the

25   hedge fund, trying to get information on it, you know

1    when we could expect -- um, find out if the funding was
2    done, when it could be expected, um, sort of get any
3    information from the two of them because we weren't
4    getting any information.
5    Q.    What did Rosalind tell you?
6    A.    She said again, you know, it takes time, "These
7    things take time," um, "We're waiting for the funding,
8    we have one person" -- and I believe she told me it was
9    -- that somebody from Europe was sending money in and
10   that's what they were waiting for.
11        MS. MURRANE:  Your Honor, if I could approach the
12   witness?
13        THE COURT:  You may.
14   Q.    And I'm going to hand you what's been premarked as
15   Exhibit FH.
16   A.    (Looks.)
17   Q.    All right.  What is this document?
18   A.    Okay.  (Reads.)  Just one minute.  (Reads.)  Oh, I
19   was away and I sent an e-mail and, um -- and she wanted
20   to have a conference call with me and, um -- well, she
21   didn't want to discuss the e-mails on an -- she told me
22   she doesn't discuss e-mails on the phone or in e-mails.
23   Because I was thinking I was -- I was so upset I was
24   going to cut my vacation short and they sort of wrote
25   back to me and said, "Don't do it everything is fine,"

1    um, and just, you know, pacifying me basically.

2    Q.    But this is a communication between you and

3    Insight Onsite?

4    A.    Yes.

5          MS. MURRANE:  Your Honor, the government would

6    offer Exhibit FH into evidence.

7          MR. O'HARA:  No objection.

8          THE COURT:  No objection to FH.

9          And the number?

10         MS. MURRANE:  261.

11         THE COURT:  FH is admitted, Exhibit 162.

12         (Exhibit 261, marked.)

13         MS. MURRANE:  If we can publish that for the jury.

14         THE COURT:  It may be.

15         (On screen.)

16         MS. MURRANE:  And we'll go to Page 2.

17         (On the screen.)

18    Q.    If we take a look at the bottom of Page 2, that's

19    the first in this e-mail chain, the "To" line, who is

20    this e-mail from?

21    A.    This is, um, from Rosalind.

22    Q.    So I'm looking at the bottom of the page, the

23    original message, and then we've got -- oh, it's from

24    Rosalind, I'm sorry, and who is it to?

25    A.    Um, to me and David.

1   Q.    All right.  And, um, what does this e-mail say,

2   can you read it?

3   A.    "I never received any e-mails from you.  I do not

4   wish to discuss this by e-mails.  When you both return

5   from your cruise I would be more than happy to have

6   another conference call to provide you with any update.

7   You really should relax and enjoy yourself, everything

8   is well.  I look forward to speaking to you when you

9   return.  Have a safe trip.  Rosalind Herman, managing

10  member, Insight Onsite Strategic Partners, LLC."

11  Q.    And in reading this e-mail do you know what the

12  reference would be to "I do not wish to discuss this by

13  an e-mail"?

14  A.    She never did.  Any time I called her, tried to

15  call her in Vegas, or whether she was in Wilmington, she

16  told me she would not -- "under no circumstances will I

17  talk or send any e-mails concerning the hedge fund.

18  She's very adamant about it.

19      MS. MURRANE:  If we can go up two e-mails on this

20  chain to the top of Page 2.  Um, up one more e-mail.

21      (On screen.)

22  Q.    So we have one from "Rherman14@cox.net" to

23  "cleuci" and "insightonsite," do you see that e-mail?

24  A.    Um, no.

25  Q.    On the screen can you see where it says "original

1    message"?

2    A.    Oh, yes.  Okay.  All right.  "Carl, I will talk to

3    you when you get back, not with e-mail, sorry, but I

4    just told you that.  Enjoy your vacation with your

5    wonderful partner.  This was discussed when we talked."

6    Q.    Okay.  And then the e-mail goes on to the second

7    page?

8    A.    Okay.  "I told you we will talk when you both

9    return, but not with e-mails please.  I have a bad flu

10   and I'm trying to fight back.  It has won."  "Thanks

11   again and relax."  "Sent from my HTC Inspire 4G on AT &

12   T."

13        MS. MURRANE:  If we could scroll up to the top

14   e-mail.

15        (Scrolls.)

16   Q.    And who is this e-mail from?

17   A.    Okay, this is from Insight Onsite.

18   Q.    To whom?

19   A.    A carbon copy to Rosalind.  And I -- I don't see

20   Gregg's name here.  But it's from Insight Onsite.  And

21   it says, "Dear Carl, once again the timeline you were

22   given hasn't changes" -- I guess he meant to say

23   "changed."  "Rosalind would prefer to have a conference

24   call to discuss any questions you have.  You agreed we

25   would speak when you return.  What has changed?  She

1    doesn't like to do these type of items by way of e-mail.

2    The hedge fund is fine, there is absolutely no need to

3    cut your vacation short.  I have answered every single

4    e-mail you have sent.  Please stop.  It is fine.  Please

5    relax and enjoy your vacation.  Thank you, G. Caplitz."

6    Q.    So this e-mail said that the hedge fund is fine.

7    Is that the communication that you --

8          MR. O'HARA:  Objection, your Honor.

9          THE COURT:  Well, don't characterize it, put

10   another question.  Put a question.

11   Q.    So this e-mail chain was in May of 2012?

12   A.    Uh-huh.

13   Q.    Can you describe for the jury then what happened

14   in June of 2012?

15   A.    In June of 2012 it was the same thing, we didn't

16   get any information.  I was on vacation.  I was trying

17   to -- it ruined my vacation because we thought we were

18   -- we were told every month there was a check going to

19   be coming, there was a check going to be coming, but it

20   never came.

21   Q.    Were there any discussions about whether, um --

22   what discussions, if any, were there about whether the

23   hedge fund was funded?

24         THE COURT:  Discussions with whom?

25   Q.    With either Mr. Caplitz or Ms. Herman.

A.      Okay.

        THE COURT:  You may answer that.

        THE WITNESS:   Okay.

A.      Okay, I did get a call from Rosalind one day, and
David was on the phone, a conference call, and she says,
"I'm happy to tell you both," and she had a big sigh,
and she said, "We finally have the funding we needed."
And I said, "Now does that mean the fund will start
making money and we'll start to see checks each year
like we were promised?"  She said, "Yes," she said,
"It's coming in, it's being wired in, but we are all set
now."

Q.      Well, let's talk about July of 2012.  What
happened in July?

A.      In July of 2012 we still didn't receive any check,
we couldn't get any information, we couldn't get any
calls, so I put a call into Vegas and I got her son
Brad, I left a message, she never returned any calls.
It was getting towards the end of the month and I
decided to write -- to get a package of -- a letter
written up, a "to whom it may concern" type of letter,
and send it out to the different agencies -- because we
didn't even know if there was a hedge fund that existed,
nobody had -- we didn't have any idea, we couldn't get
any information, there was no paperwork, there was

1    nothing, and so we were going to send out a "to whom it

2    may concern" letter basically looking for help to see

3    who we could contact to find out if there was a

4    legitimate hedge fund and that was going to go to Martha

5    Coakley's office, Bill Gavin, the Secretary of State, I

6    believe, the Securities and Exchange Commission, and a

7    couple of others, and we had them ready to go and I

8    believe that was the 21st.  But I hadn't mailed them

9    out, I was going to but I said, "Let's give them another

10   week or so and see if, you know, they come through."

11   Q.    And so you waited another week or so?

12   A.    I waited basically, yeah, another week before we

13   sent it and then -- and if you want me to go on?  And

14   then we get a knock on the door from Amy Diamond and

15   John Connolly, um --

16   Q.    Well, let's wait a minute.

17   A.    Okay.  Okay.

18   Q.    So you said that this is in July you're writing,

19   you called it, "to whom it may concern?"

20   A.    -- "it may concern," yes.

21   Q.    And were there -- what discussions were there, if

22   any, with Rosalind Herman and Gregg Caplitz regarding

23   the hedge fund and whether you would receive a return?

24   A.    Well, they had promised again that a check was

25   coming through, but never did, so we broke that up,

1    ready to go if we have to send it.

2            MS. MURRANE:  May I approach the witness, your

3    Honor?

4            THE COURT:  You may.

5    Q.    I'm going to hand you what's been premarked as

6    Exhibit LO.

7    A.    Okay.  (Looks.)

8    Q.    What is this?

9    A.    Okay.  This is a letter that says that they were

10   going to -- that they understand our frustration.  And

11   this was on 7-24.  "We attempt once again to answer your

12   questions.  You should have received the check we sent

13   by now.  We thank you and hope you know we appreciate

14   your patience.  As you know you get 1 percent of the

15   gross management fees received on the hedge fund's

16   asset, this is determined by an audit conducted early in

17   2013.  We expect the audit to be completed sometime in

18   February of 2013, as you were told numerous times

19   previously, at which time distributions will be made.

20   Please" --

21   Q.    Mr. Leuci, I'll stop you here for a second.

22   A.    Okay.

23           MS. MURRANE:  And, your Honor, this exhibit

24   actually was, um -- I had forgotten, was one that was

25   stipulated to by the parties and it has been entered as

1   Exhibit 424.

2       THE COURT:  Thank you.

3       MS. MURRANE:  So I would ask if we could publish

4   this for the jury.

5       THE COURT:  It may be.

6       (On screens.)

7   Q.    And I'm going to have you start -- I'm sorry,

8   Mr. Leuci, on the second page of this document.

9   A.    Okay.

10  Q.    Can you tell the jury what this e-mail is on this

11  page?

12  A.    Okay, this is --

13  Q.    Well, not necessarily read it to them, but what it

14  is and who sent it.

15  A.    Okay, we sent this to Rosalind and Gregg and

16  telling them that it was our last attempt to get any

17  information.  We wanted to know -- and this was on

18  Monday, July 23rd.  And I said to them, "By Tuesday the

19  24th we want answers to the following questions," um,

20  about the hedge fund, and I listed them, the four or

21  five questions that we wanted answered.

22  Q.    And, um, what discussions were you having with

23  Mr. Caplitz or Ms. Herman in this time frame of July

24  23rd?

25  A.    Well, we were basically again just trying to get

1    information and we couldn't get any information and this

2    is why I had sent this letter because they had told us

3    it was funded, there was no talk about it being funded,

4    they wouldn't say when we could expect our first check,

5    so why is it taking so long?  So these were the

6    questions we wanted before we sent out that letter "to

7    whom it may concern."  So we were giving them one more

8    shot to get back to us.

9            MS. MURRANE:  And if we can go to the first page

10   of this document and look at the e-mail on the top.

11   A.    Right, and they sent this on the 24th.

12   Q.    And when you say "they," who do you mean?

13   A.    Well, it came from -- I'm sorry, it came from

14   Rosalind Herman and, um, I don't know who Richard

15   Gottlieb is but he was --

16   Q.    Who signs the e-mail?

17   A.    I'm sorry?

18   Q.    Who signs this e-mail?

19   A.    Um, Rosalind.  Is that what you asked me, who is

20   it?

21   Q.    Yeah, who had signed this e-mail at the bottom.

22   A.    Oh, Gregg Caplitz.  I'm sorry.

23   Q.    Okay.  And, um, you don't need to read the e-mail

24   for the jury but can you describe what the response was?

25   A.    Well, he just said that we should receive a check,

1    um, he explains what we're supposed to be receiving out

2    of the hedge fund, according to the audit, um, you know,

3    when the managed fund is supposed to be completed, um,

4    and as he's telling me, he's explained this to me a

5    numerous number of times.  And he's saying we should

6    have received a check, but we hadn't.

7    Q.    Well, so what day is this e-mail response?

8    A.    This is on Tuesday, July 24th, at 10:56 in the

9    morning.

10        MS. MURRANE:  Okay, if I could approach the

11   witness, your Honor?

12        THE COURT:  You may.

13   Q.    I'm going to hand you what's been premarked as

14   Exhibit BF.

15   A.    (Looks.)

16   Q.    Now, when you look at this exhibit on the top are

17   some handwritten notes.  Who's writing is this?

18   A.    This is my writing.

19   Q.    What's the date on it?

20   A.    Um, the 24th of July, 2000.

21   Q.    When did you write this note?

22   A.    I wrote this -- if I may explain?  On July 23rd I

23   listed the demands we wanted, gave him till July 24th to

24   answer them -- and that was at 8:46 in the morning I

25   sent the e-mail out, and that afternoon the mail came on

1    July 23rd and we did receive a check.  So I wrote this

2    just to remember, if this ever went to where we are now,

3    that I would remember that after I sent the e-mail I did

4    receive a check that afternoon for $3,000.

5    Q.    And what is the -- what is on the bottom of the

6    page?

7    A.    And it's a check made out to me and David and it's

8    for $3,000.

9          MS. MURRANE:  Your Honor, the government would

10   offer this exhibit into evidence.

11         THE COURT:  Any objection?

12         MR. O'HARA:  No, your Honor.

13         THE COURT:  CF is admitted and it's been given the

14   number of what?

15         MS. MURRANE:  181.

16         THE COURT:  181, in evidence.

17         (Exhibit 181, marked.)

18         MS. MURRANE:  If we could publish this for the

19   jury.

20         (On screen.)

21   Q.    Well, first we'll take a look at the handwritten

22   note on the top.

23   A.    (Looks.)

24   Q.    So what was it that you wrote here on this?

25   A.    Well, Gregg had told us, um, earlier, a week or so

1    earlier, that he had a check that he was going to

2    deliver, and again, as I say, we were told we were

3    supposed to receive a large amount every year of $10,000

4    plus, we were told, but of course we never saw anything.

5    And so he said he wanted to deliver it, hand-deliver it,

6    because he wanted to see the expressions on our faces.

7    So here we are thinking, "Oh, my gosh, it must be a

8    phenomenal check because, you know, 'Surprise, this is

9    how much your hedge fund has made for you over the

10   year,'" and I was ready to apologize to him and all, but

11   anyway he never delivered it, for one reason or another,

12   he said he was up in Vermont, he couldn't get down to

13   us, that Rosalind made a mistake, that instead of coming

14   by overnight mail, she sent it through priority mail.

15   And then we still didn't get it.  And then finally this

16   check came through and I wrote to him and I said, um, on

17   Monday, just to keep my head, my memory, for $3,000, and

18   I put in here "We were originally told we were going to

19   receive a check for $10,000," and I just put "Attached

20   is a copy of an e-mail I sent to both Gregg and Rosalind

21   for information on the investment, and it is now

22   Tuesday, 7-24, and they have not responded."  And then

23   we got this letter here.

24   Q.    And so if you look at the bottom part of this

25   page, which is Exhibit 181, what is this document?

```
 1   A.     Um, this is a check.

 2   Q.     Who is it made payable to?

 3   A.     It's made out to Carmine Leuci and David Savage.

 4   Q.     What's the date on it?

 5   A.     July 17th.

 6   Q.     What's the amount that is payable?

 7   A.     Um, $3,000.

 8   Q.     On whose account is it drawn?

 9   A.     "Insight Onsite Strategic Management."

10   Q.     And where is that located?

11   A.     Um, that's in -- now this one here is Las Vegas,

12   it was written from the Las Vegas account.

13   Q.     What's written in the memo line of the check?

14   A.     Down the bottom it says "Thank you, enjoy the

15   gift."

16   Q.     And what's the writing on the top there?

17   A.     It says "Gift" and it's underlined.

18   Q.     Did you write either of those things?

19   A.     No, I did not.

20   Q.     And who signed the check?

21   A.     Um, Rosalind Herman.

22   Q.     Did you consider this a gift?

23   A.     Nope, I was told -- Gregg told me that we were the

24   only ones, of all the people in the investment, to

25   receive this because I was causing so much aggravation
```

1    to them that they wanted to give us something, but it --

2    but supposedly it wasn't part of the hedge fund.

3    Q.    After this $3,000 check, did you receive any other

4    payment on your investment?

5    A.    No, I did not.

6    Q.    And did you ever get your initial $100,000 back?

7    A.    No, I did not.

8          MS. MURRANE:  I have no further questions, your

9    Honor.

10         THE COURT:  Mr. O'Hara, any question for this

11   witness?

12         MR. O'HARA:  Thank you, your Honor.

13         May I use the podium?

14         THE COURT:  Of course you may.

15         MR. O'HARA:  Thank you.

16

17   CROSS-EXAMINATION BY MR. O'HARA:

18   Q.    Good morning, Mr. Leuci.

19   A.    Good morning.

20   Q.    We've never met before.  I'm Ms. Herman's lawyer.

21   A.    Yes.

22   Q.    You have testified in this matter previously, do

23   you remember that?

24   A.    Yes.

25   Q.    And that was with a different lawyer, right?

1    A.    Yes.

2    Q.    And that was back in April of 2013?

3    A.    Yes.

4    Q.    Um, almost, um, three years ago, right?

5    A.    Yes.

6    Q.    And you've testified today based upon your memory

7    of events that occurred between you and Ms. Herman and

8    Mr. Caplitz, right?

9    A.    Yes.

10   Q.    And when you testified back in April of 2013 --

11   well, let me ask the question a different way.

12         You're aware of the fact that Mr. Caplitz has

13   pleaded guilty in this case, right?

14   A.    Yes.  Yes.

15   Q.    When you testified back in April of 2013, he

16   hadn't pleaded guilty at that time, had he?

17   A.    No.

18   Q.    Now, you and your partner have lost a significant

19   amount of money based upon this investment strategy that

20   was projected to you by Mr. Caplitz and Ms. Herman and

21   the company they represented, right?

22   A.    Yes.

23   Q.    And you are understandably not happy about that?

24   A.    No.

25   Q.    And, um, I want to ask you a few questions about

1    the way that this, um, investment project was proposed

2    to you because your relationship, um, with these people

3    started off with your meeting with Mr. Caplitz, right?

4    A.    Yes.

5    Q.    I believe you testified earlier that you met him

6    sometime in the early '70s?

7    A.    Yes.

8    Q.    Um, I think -- and I want to suggest to you that

9    maybe it was a little bit later than the 1970s, that it

10   could have been maybe in the '90s?

11   A.    No, no, it was not.

12   Q.    But you've known Mr. Caplitz for more than 25

13   years?

14   A.    Probably 35 up, yup.

15   Q.    And you met him through a mutual friend, correct?

16   A.    Well, through a person who recommended him.  I

17   can't even remember who the person was.

18   Q.    And through Mr. Caplitz you made a variety of

19   investments, right?

20   A.    Yes.

21   Q.    And he had access to some of your investment

22   money, didn't he?

23   A.    Yes.

24   Q.    And he provided you with advice on what to invest

25   in?

1    A.    Yes.

2    Q.    Um, mutual funds, real estate trusts?

3    A.    Yes.

4    Q.    And on some of the investments he advised you

5    about you did okay?

6    A.    On some of them.

7    Q.    And some of them you didn't do very well?

8    A.    Exactly.

9    Q.    But you trusted him?

10   A.    Yes.

11   Q.    And you gave him authorization at times to move

12   your money around?

13   A.    Well, yes, if he called me on it.  Pretty much we

14   were in a lot of real estate, so the money was stuck

15   there in the real estate.

16   Q.    Okay.  And, um, your relationship with him was

17   professional?

18   A.    Yes.

19   Q.    And you stated that you're currently living down

20   in Florida?

21   A.    Yes.

22   Q.    But you've only lived there for the past year and

23   a half?

24   A.    Yes.

25   Q.    So for the 35 years that you've known Mr. Caplitz,

```
 1    for 33 of those years you were primarily living up in
 2    Newburyport, right?
 3    A.    There and also in Revere.
 4    Q.    In Revere?
 5    A.    Yes, I've lived there.
 6    Q.    Okay.  And isn't it true that not only would you
 7    visit Mr. Caplitz in his business offices, he would come
 8    to your house?
 9    A.    Yes.
10    Q.    He would come to your house frequently, wouldn't
11    he?
12    A.    Yes.
13    Q.    And he would come to your house for business
14    purposes?
15    A.    Yes.
16    Q.    And he would come to your house because he had
17    investments that he wanted you to invest in?
18    A.    Well, that and to bring us up to date on certain
19    other investments, yes.
20    Q.    And he would come unannounced or would he always
21    call ahead of time?
22    A.    Always announced.
23    Q.    Always announced ahead of time.
24    A.    Yes, always.
25    Q.    And you would meet with him?
```

1    A.     Yes, we both did.  Yeah.

2    Q.     Okay.  And, um, you don't have an estimate of how

3    many times he would meet with you, but it was frequent,

4    wasn't it?

5    A.     It was -- yeah, I would talk to him at least once

6    a week on the phone probably a couple of times a week.

7    Q.     So not only were you meeting with him face to

8    face, you were also on the phone with him almost

9    constantly?

10   A.     Yes.

11   Q.     And that was because you were concerned about the

12   financial state of your investments?

13   A.     Yes.

14   Q.     Now, Mrs. Herman never came to your house, did

15   she?

16   A.     No.

17   Q.     And you spoke with her on the telephone

18   infrequently?

19   A.     Yes.

20   Q.     And you didn't meet with her very often either,

21   did you?

22   A.     Um, I met with her but not really because she was

23   in Vegas most of the time.

24   Q.     All right.  I think when you testified back in

25   April of 2013, I believe your testimony was that you saw

1    her maybe seven or eight times?

2    A.    Yeah, I mean, right, she wasn't there all that

3    often.

4    Q.    And when you were making, um, decisions about

5    investments, those conversations took place between you

6    and Mr. Caplitz, right?

7    A.    And sometimes if she was in the office Gregg would

8    call her in, yes.

9    Q.    Okay.  But as you stated before, um, she moved to

10   Las Vegas?

11   A.    Yes.

12   Q.    And you were aware of the fact that she left

13   Massachusetts sometime between 2002, 2003?

14   A.    Could be, I can't remember.

15   Q.    But you never went out to Las Vegas to see her?

16   A.    No.  No.

17   Q.    Now, Mr. Caplitz was the person who pitched this

18   investment to you, right?

19   A.    He was the one that brought it up to me, yes.

20   Q.    Right.  It wasn't Mrs. Herman who approached you

21   and said, "Hey, why don't you, you know, give us

22   $100,000 in this investment," did she?

23   A.    No.

24   Q.    And Mr. Caplitz made certain projections to you

25   about how much money you could make on this, right?

A.      Yes.

Q.      I believe he told you that you could expect

returns of between 9 and 20 percent on the investment?

A.      Well, yeah, 9 to -- he said 9 to -- it could even

go up to $20,000 a year, he said.

Q.      Right, and those are representations that were

made to you in order to induce you into making this

investment?

A.      While he was explaining it, yes.

Q.      Well, he was selling it to you?

A.      Yeah, he was selling it, right, he's a salesman.

Q.      Yeah, and he's a good salesman?

A.      Uh-huh.

Q.      And this projection that he made to you about what

your return could be, he made that to you, right, when

he came to you and showed you and explained to you what

this investment was?

A.      Um-huh.  Yes.

Q.      Mrs. Herman didn't explain that to you, did she?

A.      No, but I did call her in her office and asked her

her opinion on it.  I can't remember whether she said

"Gregg is right" because they worked together and I --

you know she didn't come out, as I say, I dealt mostly

with Gregg, but I did talk to her about the investment

also.

1    Q.    Right.  But, um, a couple of times today, when you
2    were talking about what happened, you kept referring to
3    him, Mr. Caplitz, right?
4    A.    Yes.
5    Q.    And in your mind over this at least 15 to 20 years
6    of your relationship with Mr. Caplitz, he was your
7    investment advisor, right?
8    A.    Yes.
9    Q.    And then you came to understand, at some point in
10   time, that Mr. Caplitz was working with Mrs. Herman?
11   A.    Yes.
12   Q.    I believe you testified that when you originally
13   met Mr. Caplitz he had a different business partner?
14   A.    Yes, in the beginning, Mr. Pantano.
15   Q.    And then at some point in time, um, 2000 or so,
16   Ms. Herman came on the scene?
17   A.    Well, Gregg was out on his own, he had an office,
18   and all of a sudden Ms. Herman came on the scene.
19   Q.    Okay.  But still your investment advisor -- your
20   personal investment advisor was Mr. Caplitz, right, not
21   Ms. Herman?
22   A.    Yes, correct.
23   Q.    And you never really had a full understanding of
24   what the business relationship was between the two of
25   them?

```
 1    A.     No.
 2    Q.     At some times he told you they were partners,
 3    right?
 4    A.     Yes.
 5    Q.     At some times he told you she was his boss?
 6    A.     Yes.
 7    Q.     But you are clear in your mind that he would
 8    always tell you that he was going to speak with her
 9    about this investment that you were making, right?
10    A.     Yes.
11    Q.     And there were times on the telephone where she
12    chimed in and said it looked like a good investment?
13    A.     Yes.
14    Q.     Now, you also -- over the course of your
15    relationship with Mr. Caplitz, you loaned him money,
16    didn't you?
17    A.     Yes.
18    Q.     And in fact you loaned him money, um -- and I'm
19    not really sure because -- I've reviewed some notes here
20    but I've noticed that you've been interviewed by federal
21    agents about this case, right?
22    A.     Yes.
23    Q.     And you also, as you said before, testified at an
24    earlier hearing on this case?
25    A.     Yes.
```

Q.    How much money did you loan Mr. Caplitz, um, most
recently?

A.    I think it was around 3,000 or 4,000.

Q.    And you had trouble getting him to pay that money
back to you, right?

A.    Um, yes, I did.

Q.    And you're a man of your word, right?

A.    Yes.

Q.    When you say you're going to do something, you do
it?

A.    Uh-huh.

Q.    And you expect to be treated the same way by other
people who you're dealing with, right?

A.    Yes.

Q.    And Mr. Caplitz was somebody who you had known for
years?

A.    Yes.

Q.    And he asked you to loan him some money because he
was having some personal financial problems?

A.    Yes.

Q.    And you and he agreed upon the terms of that loan,
right?

A.    Yes.

Q.    And how the loan would be repaid?

A.    Yes.

Q.    And it was a $3,000 or $4,000 personal loan you
made to him, right?

A.    Yes.

Q.    And I don't believe it was memorialized in
writing, was it?

A.    No.

Q.    But it was something where he promised that he
would pay the money back to you at a time certain,
right?

A.    Yes.

Q.    And he didn't pay it back to you at a time
certain, did he?

A.    Correct.

Q.    In fact he was late?

A.    Yes.

Q.    He was supposed to pay you that $4,000 back, I
believe, in one lump sum with interest, right?

A.    I believe so, but I -- probably so, yeah.

Q.    Well, that's a fair answer and I don't want you to
answer it if you're not exactly sure.

A.    Okay.  Yeah.

Q.    But he didn't pay it back to you in one lump sum
with interest, did he?

A.    No.

Q.    He paid it back to you piecemeal?

```
1    A.      True.
2    Q.      And it was extremely late when he paid you back,
3    right?
4    A.      Yes.
5    Q.      And you had to keep calling him on the telephone?
6    A.      Yes.
7    Q.      And asking him, "When are you going to pay me
8    back?"  Right?
9    A.      Yes.
10   Q.      And reminding him, "When are you going to pay me
11   back?"
12   A.      Yes.
13   Q.      And I believe the word that was used the last time
14   you testified is you had to "badger him" to get him to
15   pay you back?
16   A.      Yes.
17   Q.      And finally he did pay it back to you, right?
18   A.      Yes.
19   Q.      Are you aware of the fact that Mr. Caplitz was a
20   Certified Financial Planner?
21   A.      Yes.
22   Q.      Did you know that it was a violation of the rules
23   of Certified Financial Planning to have loan
24   arrangements with your investors?
25   A.      No, I did not know that.
```

1    Q.    But the fact that he was so late and so negligent

2    in his obligations to you gave you some pause for

3    concern about him, right?

4    A.    Yes.

5    Q.    And he came to you after he had finally paid this

6    loan back and he tried to borrow money from you again,

7    right?

8    A.    Yes.

9    Q.    But you had been burned once and you weren't about

10   to do that again, right?

11   A.    Correct.  Right.

12   Q.    Okay.  Now, um, when he made these projections to

13   you about these payments you were going to receive if

14   you invested in his management company that managed a

15   hedge fund, when you didn't get those payments, as you

16   were expecting them, you were not happy with that

17   either?

18   A.    Correct.

19   Q.    And this problem that you had with Mr. Caplitz

20   regarding the loan payments -- um, excuse me, the

21   investment returns not being made, this happened after

22   you had had the problem with him on the personal loan,

23   right?

24   A.    Yes.

25   Q.    So you began badgering him on that also?

1    A.    Yes.

2    Q.    You had a negative experience with him on one

3    obligation he had to you?

4    A.    Correct.

5    Q.    And now you were upset because he seemed to be

6    welching on another representation he had made to you

7    about a return?

8    A.    Correct.

9    Q.    So as was your practice dealing with these

10   investments and dealing with Mr. Caplitz, you were

11   calling him on the telephone every week saying, "What's

12   the story with the hedge fund?"  Right?

13   A.    Correct.

14   Q.    "You told me I could expect 9,000 to $10,000,

15   where is it?"

16   A.    Correct.

17   Q.    And you were supposed to get the 9,000 to $10,000

18   I believe within a year, there was a projection time,

19   right?

20   A.    Yes.

21   Q.    And that time went and passed, right?

22   A.    Correct.

23   Q.    The money wasn't there?

24   A.    Correct.

25   Q.    You're calling him on the telephone all the time

1      asking him, "What's the deal, Gregg?"

2      A.      Yes.

3      Q.      And he's giving you evasive answers, right?

4      A.      Correct.

5      Q.      He's ducking you?

6      A.      But I called Rosalind too, also.

7      Q.      He put Rosalind on the telephone with you, right?

8      A.      Um, well, I called her in Vegas myself, I called

9      her home.

10     Q.      Uh-huh.  And this was after you were having

11     trouble getting answers from Mr. Caplitz?

12     A.      Yes.

13     Q.      And as far as you know Mr. Caplitz was constantly

14     speaking with Ms. Herman?

15     A.      I don't know that, but I know they were in touch.

16     Of course they worked together, but I don't know how

17     often they talked.  But I called her myself.

18     Q.      And you had only spoken to her maybe seven or

19     eight times in your life, right?

20     A.      Um, yes.  Before that, yes.

21     Q.      Okay.  So you didn't have a relationship with her

22     at all, right?

23     A.      No, not like I did with Gregg.  No.

24     Q.      And when the presentations were made to you about

25     this hedge fund, she wasn't present, was she?

1    A.    No.

2    Q.    Mr. Caplitz came to your house?

3    A.    Correct.

4    Q.    He gave you the written information about the

5    hedge fund, right?

6    A.    Correct.

7    Q.    I believe that it was lost or misplaced, right?

8    A.    Yes.  Yeah, we had --

9    Q.    And then he came out and gave it to you again?

10   A.    Right.

11   Q.    And he explained to you how it worked?

12   A.    Yes.

13   Q.    He explained to you that you weren't investing in

14   a hedge fund but that you were investing in a management

15   company of a hedge fund, right?

16   A.    True.

17   Q.    And he told you that when the hedge fund gets off

18   the ground, then the management of the hedge fund takes

19   a percentage of the money that's in the fund?

20   A.    Correct.

21   Q.    Did he make representations to you also about how

22   much money was going to be in this fund that was going

23   to be managed?

24   A.    Um, no, he did not.

25   Q.    He didn't say how many hundreds of millions of

1     dollars were --
2     A.     No, I really truthfully don't understand the hedge
3     fund and shame on me, but --
4     Q.     Well, join the club, I'm sorry to say.
5     A.     Yeah.  (Laughs.)
6     Q.     Sorry.  But you were under the understanding that
7     you could make a significant amount of money by making
8     this investment, right?
9     A.     Yes.  Yes.
10    Q.     And that was because of information that was
11    provided to you by Mr. Caplitz?
12    A.     Yes.
13    Q.     Your long-term experienced financial advisor?
14    A.     Right.
15    Q.     You never knew anything about Ms. Herman's
16    background, did you?
17    A.     No, I didn't.
18    Q.     (Pause.)  So it never occurred to you that
19    Mr. Caplitz, who was evading responsibility for not
20    making the return on the investment, right, was
21    constantly coming up with excuses to get you off of his
22    back, it didn't occur to you that maybe he had asked
23    Ms. Herman to make representations to you to get you off
24    of his back?
25    A.     Um, I think that's unfair because I -- you know

```
1    she was -- she had her signatures on documents and I
2    talked to her myself on the phone and she told me that
3    funding was coming through, she called me and said, with
4    a big sigh on the other end of the phone to both David
5    and myself, she says, "I have great news, we are finally
6    funded."  I said, "Rosalind, that's wonderful."  I said,
7    "Does that mean now?"  She said, "Everything's a go."
8    Q.    And Mr. Caplitz was making similar representations
9    to you, right?
10   A.    Um, he never called and told me it was funded, she
11   was the one that told me.
12   Q.    Well, he was the one who told you that you were
13   going to get your first return check, right?
14   A.    Well, that it was expected, right.
15   Q.    And he called you up and he said -- does he call
16   you "Carl"?
17   A.    "Carl."
18   Q.    So he says, "Carl, I've got great news," right?
19   A.    He didn't call, she was the one that called me and
20   said that.
21   Q.    But he called you up and he said, "I've got a
22   check for you"?
23   A.    Yeah, he said, "Yes, we have a check for you"?
24   Q.    Yeah, your first distribution check, right?
25   A.    No, he did not say it was a distribution, he said,
```

"We have a check for you."  He said, "No one else is
getting this check but you."  I said, "Why is that?"  He
said, "Because you've been the only one who has
complained so much," he said, "We're sending you a
check."

Q.    But before he had that conversation with you he
told you he was going to come out, he was going to give
you a check, and he wanted to see the expression on your
face, right?

A.    True.  Yes.

Q.    He wanted to see the expression on your face
because he was giving you a check which was finally
going to be a return on your investment?

A.    Um, I thought that, yes.

Q.    Yeah, he didn't tell you, "Hey, Carl, I'm coming
out to your house because Rosalind's giving you a $3,000
check to shut you up," right?

A.    No, he never said that.

Q.    "I want to see the expression on your face when
you see this $3,000 check that says 'gift' on it"?

A.    No, he did not.  No.

Q.    So you were expecting to get a check that was a
much larger amount, right?

A.    Absolutely.

Q.    Based upon what he told you?

1     A.     Yes.

2     Q.     And when he came to your house two times and

3     pitched this investment to you, he never explained to

4     you that there was a risk, did he?

5     A.     Well, I knew everything -- there's a risk in

6     everything, of course, I mean I know that, I mean I'm

7     not, um -- you know you go into a stock, there's a risk,

8     of course there's a risk, but I mean the way it was

9     presented it looked pretty good.  He explained -- and I

10    can't remember how it was all explained to me, as I said

11    I had dealt with him so many years.  And on the

12    investment, even though I had lent him money, I got it

13    back.  And on the investment end of him investing money

14    for me, he did fairly a good job.  Yes, we had profits,

15    we had losses.

16    Q.     But he didn't tell you that anything involved with

17    a hedge fund is highly risky, did he?

18    A.     No.

19    Q.     That people who invest in hedge fund or hedge fund

20    management companies are supposed to be, quote, unquote,

21    "accredited investors"?

22    A.     Well, again I had -- I talked to him, asked him if

23    he thought it was a good investment for us, he said he

24    felt it was an excellent one.  I called Rosalind and

25    said, "Rosalind, we're thinking of doing this, how do

1   you feel?"  She says, "I think you'll be very happy with
2   it."  And we never got into anything or talked about
3   risks or anything like that, to be truthful.
4   Q.    So he didn't offer you any information about how
5   risky it was, right?
6   A.    Neither did, neither one of them did.
7   Q.    Okay.  But he did describe it to you as a
8   management of a hedge fund, right?
9   A.    Yes.
10  Q.    That you were buying into a 1 percent ownership of
11  the management of the hedge fund?
12  A.    Yes.
13  Q.    And not necessarily what the hedge fund was
14  investing in, but what the hedge fund had in terms of
15  its assets, right?
16  A.    Yes.  Yes.
17  Q.    And he kept correcting you when he made that pitch
18  to you, right?
19  A.    Yes.
20  Q.    Because you were a little bit confused, right?
21  A.    Yes.
22  Q.    You thought you were making a straight investment
23  and he kept saying, "No, no, Carl, this is different,
24  you're buying a percentage of a company that's managing
25  a hedge fund," correct?

1    A.    Right.  Correct.

2    Q.    Now, I noticed that, um, during your long

3    relationship with Mr. Caplitz, approximately 20 to 25

4    years ago, you were aware of a problem that he created

5    with some of your money, right?

6    A.    Yes.

7    Q.    And in fact he had taken some of your money

8    without authorization, is that a fair statement?

9    A.    Yes.

10   Q.    And you are fairly meticulous in your

11   recordkeeping, right?

12   A.    Yes.

13   Q.    You look at your statements?

14   A.    Well, I didn't have a statement on this.  It was

15   funny because he came and saw me at work and he said, "I

16   have to explain something to you," he said, "I took some

17   money out of your account, I've replaced it, but I

18   shouldn't have done it," and he said, "I don't know if

19   the," um -- "if it's the tax people who are going to

20   come and question me," he said, "but I could get into a

21   lot of trouble."  I wasn't happy with it.  Um, and again

22   that's when I should have run, um, then, um, I should

23   have changed over, but I didn't.

24   Q.    But isn't it true that he also offered to pay your

25   legal expenses if you had problems?

1   A.     Um, I can't remember that one.

2   Q.     Well, you spoke with, um -- you spoke with federal

3   investigators who were looking into this case back in,

4   um, excuse me, June of last year, okay, do you remember

5   that?

6   A.     Um, no, the only ones that came out were John

7   Connolly and Amy Diamond.

8   Q.     Okay.  But, um, you told them that -- that

9   Mr. Caplitz had taken money from you 20 years ago, but

10  he had returned it, and that he would pay your lawyer if

11  you had a problem collecting the money?

12  A.     Um, truthfully I don't remember that.

13  Q.     But he told you that he had stolen money from you

14  before you found out about it, right?

15  A.     Yes, that he took money and he replaced it, right.

16  Q.     And he didn't want you to report him for what he

17  had done?

18  A.     True.

19  Q.     He was very concerned about that?

20  A.     Yes.

21  Q.     Um, he also spoke with you after he got indicted

22  in this case, didn't he?

23  A.     Um, I never heard any more about that, to be

24  truthful with you, about that case.

25  Q.     I understand that and I apologize for asking the

1    question wrong.

2            When he was indicted recently --

3    A.      Yes.

4    Q.      -- okay, he had telephone conversations with you,

5    or you called him, but there was some interaction

6    between the two of you, right?

7    A.      There was some interaction because I called him

8    and I said, "Do you know" -- I said, "What's going on

9    here?"  I said, "Do you realize the FBI came out and

10   they're investigating you?"  And he said, "Yes," he

11   said, "There's a guy up there that's after me."  And I

12   said, "You know, Gregg, we can't afford to lose this

13   $100,000," and he said, "Don't worry, you are not going

14   to lose one penny."

15   Q.      And he told you -- and you were concerned because

16   you read that he had been indicted?

17   A.      Oh, yes.  Yes.

18   Q.      And he's on the hook for a $100,000 investment you

19   made with him?

20   A.      Well, with him, yes, and the company.

21   Q.      And you discussed that back in June with

22   Ms. Diamond and the other agents?

23   A.      Yes.

24   Q.      And at that time you told them that Mr. Caplitz

25   admitted to you that he was being investigated and he

asked you not to talk?

A.    He told me he was being investigated, um, but I don't remember him saying -- um, that was several years ago when he took the money that he told me not to talk, but nothing --

Q.    No, I'm talking about recently, like two or three years ago he's indicted, you're upset, you're concerned, you speak with him, correct?

A.    Right, yeah.

Q.    And he tells you not to cooperate with the investigation?

A.    Um, no, he never did, all he said was "It will work out," he said, "They're after me," he said, "This has happened before," and I was going away again and I just said to him, "You know, we can't afford to lose the $100,000," and he said, "Don't worry, you're not going to lose a penny."

Q.    Okay.  But in terms of your investment history, with the exception of this $100,000 loss that you suffered, all your previous investments were through your personal investment advisor, Mr. Caplitz?

A.    Right, correct.

Q.    And the only time you ever had any kind of input with any investment was with this particular investment?

A.    Yes.

1    Q.    And that was after you were having problems with

2    Mr. Caplitz living up to his word on what the expected

3    return would be, right?

4    A.    Right.  Right.

5          MR. O'HARA:  Could I have a moment, your Honor?

6          THE COURT:  Yes.

7          MR. O'HARA:  Thank you.

8          (Pause.)

9          MR. O'HARA:  I have no further questions.  Thank

10   you, sir.

11         THE WITNESS:  Okay, thank you.

12         THE COURT:  Just wait a second.

13         THE WITNESS:  Oh, okay.

14         THE COURT:  She has to figure if she wants to ask

15   you anything further.

16         THE WITNESS:  Oh, okay.

17         THE COURT:  Any redirect?

18         MS. MURRANE:  Just a little, your Honor.

19         THE COURT:  Okay.

20

21   REDIRECT EXAMINATION BY MS. MURRANE:

22   Q.    Mr. Leuci, we looked earlier in your testimony at

23   a document that was called an "Investment Advisor

24   Agreement," do you recall that?

25   A.    Yes.  Yes.

1   Q.    And who was that agreement with, what was the

2   company name?

3   A.    Um, "Insight Onsite."

4   Q.    And who signed that agreement?

5   A.    I think it was Rosalind.

6   Q.    Did Gregg Caplitz sign that agreement?

7   A.    No.

8   Q.    Had you asked Rosalind Herman about investment

9   advice with respect to this hedge fund?

10  A.    Um, not advice but I called her and asked her what

11  she thought of it and if she felt it was good for both

12  David and myself.

13  Q.    And who did you understand was going to be

14  operating this hedge fund company?

15  A.    Rosalind.

16        MS. MURRANE:   No further questions, your Honor.

17        THE COURT:   Nothing further for this witness?

18        MR. O'HARA:   Could I just ask one question, your

19  Honor?

20        THE COURT:   Sure.

21

22  RECROSS-EXAMINATION BY MR. O'HARA:

23  Q.    Did she tell you, "I'm running this hedge fund"?

24  A.    No, she did not.

25  Q.    Okay.   Thank you.

1    THE COURT:  Nothing further for this witness?

2    MR. O'HARA:  No.

3    THE COURT:  Nothing further, Ms. Murrane?

4    MS. MURRANE:  Nothing further, your Honor.

5    THE COURT:  You may step down.

6    THE WITNESS:  Okay.  Thank you.

7    (Steps down.)

8    THE COURT:  Now let's call Ms. Bigelow back, while

9  we still have her in mind, since she wasn't here on

10  time, and we'll see if we can finish with her.

11    MS. MURRANE:  Your Honor, may I just grab the

12  exhibits?

13    THE COURT:  Of course you can.

14    (Pause.)

15    THE COURT:  So now stories about the courtroom,

16  since they can't find people out there.

17    It's a very traditional courtroom, but one of the

18  remarkable things about it -- and here she is, and while

19  she's coming up, are these arches and the arches on the

20  four walls of the courtroom have a very important

21  symbolism.  The arch back there stands for the public,

22  the room has to be kept open so that the public can come

23  in here and see that justice is being done.  The arch

24  over your jury box of course stands for that portion of

25  the public -- and you may be seated, ma'am, for direct

```
 1    democracy, which is the jury in this particular case.
 2    This arch is for the judge, the teacher of the law.  And
 3    the most subtle arch is this one here and it makes the
 4    most sense to you because you view that arch which is
 5    framing the attorneys, those mediating influences, those
 6    officers of the court whose duty it is to present
 7    evidence to you.  That's what the arches mean.  And now
 8    we're all ready to go.
 9         Ms. Bigelow, you understand that you remain under
10    oath here today --
11         THE WITNESS:  Oh, yes, your Honor.
12         THE COURT:  -- so Mr. O'Hara can ask you some
13    questions.
14         THE WITNESS:  Oh, yes.
15         THE COURT:  And you did want to ask her questions?
16         MR. O'HARA:  Your Honor, Mr. Benzaken.
17         THE COURT:  Oh, Mr. Benzaken.  Mr. Benzaken, you
18    go right ahead.
19         MR. BENZAKEN:  Thank you, your Honor.
20
21    CROSS-EXAMINATION BY MR. BENZAKEN:
22    Q.    Good morning.
23    A.    Good morning.
24    Q.    In the years that you and your husband were
25    investing money your relationship was with Gregg
```

1    Caplitz, right?

2    A.    Correct.

3    Q.    And during the more than 20 years you had a

4    relationship with him, you never consulted Ms. Herman,

5    correct?

6    A.    No.  No.

7    Q.    You didn't have any phone conversations with

8    Ms. Herman, correct?

9    A.    Um, no, I called her once but she never returned

10   the call.  But that's immaterial, I guess.

11   Q.    Okay, and the only time you believed you may have

12   met her was if she was the guest, at your daughter's

13   wedding, with Mr. Caplitz, right?

14   A.    Yes.

15   Q.    And -- now that wedding was in 2001, correct?

16   A.    Um, in 1991.

17   Q.    Oh, in 1991.  I'm sorry.  So you had already been

18   working with Mr. Caplitz for sometime before that

19   wedding?

20   A.    Yes, since around 1980.

21   Q.    And you and your husband had the kind of

22   relationship with him that you invited him to your

23   daughter's wedding?

24   A.    True, yes.

25   Q.    And when you were working with him during -- from

1  the 1980s on, he would come to your house to meet with

2  you sometimes?

3  A.    Yes.

4  Q.    And you would occasionally go to meet him at his

5  office?

6  A.    Just once, I believe, most of the time he came to

7  our house.

8  Q.    And so he would meet with you and your husband

9  there?

10  A.    Yes.

11  Q.    And he would meet your children as well?

12  A.    Yes, when they were younger.  Yes.

13  Q.    And you also spoke to him by phone pretty

14  regularly?

15  A.    Yes, if I needed to.  Yeah.

16  Q.    Okay.  And between you and your husband, you both

17  spoke with him, um, in regards to your investments, is

18  that right?

19  A.    Yes.

20  Q.    And you frequently -- even if one of you was

21  speaking with him, it was while the other was present,

22  right?

23  A.    Correct.

24  Q.    Okay.  Now, you indicated that there was a

25  document yesterday that you looked at which involved a

1    $100,000 transfer that you said you had no memory of

2    signing, correct?

3    A.    Right.

4    Q.    I just want to clarify your statement that you had

5    no memory of signing it.

6    A.    Yes.

7    Q.    In the normal course you'd expect to have a memory

8    of signing a document involving a transfer of $100,000,

9    right?

10   A.    Um, correct, I would, yeah.

11   Q.    And you did speak with the FBI about this

12   particular document, correct?

13   A.    Yes.

14   Q.    And it's fair to say that, in looking at it, you

15   do acknowledge that there were often occasions where you

16   would sign a document for Mr. Caplitz but you weren't

17   really sure what it was?

18   A.    Well, he would explain it to me but sometimes he

19   would call me later or another day and say that we

20   weren't going to go that way and so he was just going to

21   throw it away or something, so.

22   Q.    Well, let me just take that step by step.

23   A.    Yeah.

24   Q.    There would be times that you would sign documents

25   and you would be reminded of what he was explaining to

1    you as to what this document meant, right?

2    A.    Oh, yes.  Yes.

3    Q.    Right, so you would be signing these documents,

4    not really understanding it, but you would be trusting

5    what he would be explaining to you when you would be

6    signing it?

7    A.    Right.

8    Q.    And it would be fair to say that when you would

9    execute something with him the assumption was that you

10   were going to follow through on that course of action

11   you were agreeing to, right?

12   A.    Yes.

13   Q.    But nevertheless you indicated that there were

14   times that you would learn after the fact that he would

15   have shredded some documents you signed and not follow

16   through on them?

17   A.    Well, I don't know if he always did, but I believe

18   that he always called us and told us that we weren't

19   going to do whatever he had thought we would when he

20   went into our house but not --

21   Q.    But at that point he had already made that

22   decision and he was informing you?

23   A.    Yes, it was something I believe he made in the

24   office.

25   Q.    And that was something you allowed him to do in

1    your relationship at the time?

2    A.    Yes.

3    Q.    Okay.  Now, again so that was one of the reasons

4    you suggest you may not have a memory of this document

5    is because you had signed things that you were not

6    always aware of?

7    A.    Um, yes.

8    Q.    Now -- but again with this document, while we're

9    looking at it, you also had some concern that perhaps

10   this was not ever signed by you, correct?

11   A.    Um, I'm really not sure because I can't remember

12   the specific document, um, and that's the only thing.

13   Q.    But when you spoke with the FBI you specifically

14   indicated that you were concerned that someone else may

15   have signed your name on it?

16   A.    It's quite possible but I can't say for sure.  I

17   mean it's my signature and my husband's signature on

18   there but --

19   Q.    But you agree your signature very legibly reads

20   your name?

21   A.    Yes.

22   Q.    And Mr. Caplitz had access to many documents with

23   your signature on them?

24   A.    Yes.

25   Q.    And that was specifically one of the reasons you

1   expressed concern that you may not have signed that to

2   the FBI?

3   A.    Yes.

4   Q.    Okay.  (Pause.)  Did Mr. Caplitz have the

5   authority to move some of your money around?

6   A.    Yes.

7   Q.    So that was something he was allowed to do without

8   talking to you about it?

9   A.    Yes.

10        MR. BENZAKEN:  I have no further questions.  Thank

11   you.

12        THE COURT:  Ms. Bloom, no redirect for this

13   witness?

14        MS. BLOOM:  Just one question.

15        THE COURT:  You may.

16

17   REDIRECT EXAMINATION BY MS. BLOOM:

18   Q.    When you, um, tried to call Ms. Herman, why did

19   you try to call her?

20   A.    When I called her it was to request the $100,000.

21   I had written the letter from yesterday that we talked

22   about to Mr. Caplitz and he would just tell me that he

23   had talked to her and between he and she we were going

24   to get our money back.  Um, and I had written the letter

25   to Gregg and I spoke to him on the phone many times and

1    I just told him that, um -- I did mention I was going to

2    call Rosalind and talk to her directly.  Um, when I

3    called there was no answer but I left a message.  But I

4    never got a return call.

5          MS. BLOOM:  Nothing further.

6          THE COURT:  Nothing further, Mr. Benzaken?

7          MR. BENZAKEN:  Nothing further.  Thank you, your

8    Honor.

9          THE COURT:  You may step down.  Thank you.

10         (Steps down.)

11         THE COURT:  Call your next witness.

12         MS. BLOOM:  The United States calls Melvin Burt.

13         THE COURT:  He may be called.

14         (Pause.)

15         MS. BLOOM:  A sidebar, your Honor, for a moment?

16         THE COURT:  You may.

17

18         AT THE SIDEBAR

19         MS. BLOOM:  I just wanted to clarify that once

20   these victims and witnesses have testified, that they

21   may stay in the courtroom to observe the proceedings?

22         THE COURT:  I think that's fine.

23         Any objection?

24         MR. O'HARA:  No.

25         THE COURT:  Okay, that's fine.

```
 1            When are we going to get into Caplitz?
 2            MS. BLOOM:  Um, Wednesday or Thursday.
 3            THE COURT:  You're moving right along, I hope?
 4            MS. BLOOM:  Yes, we've got about six victims that
 5     we're going to try to get on.
 6            MR. O'HARA:  You're more than welcome to rest.
 7            THE COURT:  No, I think they're moving along quite
 8     well, better than I expected.
 9            Now I see two long witnesses here, I see Caplitz
10     and I see your bank auditor.
11            MS. BLOOM:  Uh-huh.
12            THE COURT:  And that's right, isn't it?
13            MS. BLOOM:  Oh, yes, and that should be it.
14            THE COURT:  Okay.  I'm hoping we'll be done
15     Tuesday of next week.
16            MS. BLOOM:  So are we.
17
18            (In open court.)
19            (MELVIN R. BURT, JR., sworn.)
20
21            * * * * * * * * * * * * * * * * * *
22            MELVIN R. BURT, JR.
23            * * * * * * * * * * * * * * * * * *
24
25     DIRECT EXAMINATION BY MS. BLOOM:
```

```
1    Q.    Would you state your name, please.
2    A.    (Silence.)
3    Q.    I'm sorry, could you state your name, please.
4    A.    Oh, yes, it's Melvin R. Burt, Jr.
5          THE COURT:  Mr. Burt, we want you to be
6    comfortable and that mike moves, so pull it to you.
7          THE WITNESS:  Oh, okay.  Fine.
8          THE COURT:  Just pull it by the base.
9          THE WITNESS:  Thank you.
10         THE COURT:  And just sit in the chair comfortably
11   for you.
12         THE WITNESS:  Okay.
13         THE COURT:  That's right, just get the mike close
14   -- move it up further.
15         THE WITNESS:  Oh, okay.
16         THE COURT:  And now the jury can hear you.
17         And go ahead, Ms. Bloom.
18         THE WITNESS:  Thank you.
19         MS. BLOOM:  Okay, thank you.
20   Q.    Can you state the city and state where you live?
21   A.    Billerica, Massachusetts.
22   Q.    And could you describe for the jury your
23   educational background?
24   A.    I'm a graduate of Somerville High School, um, I
25   have a degree in business management from Northeastern.
```

1    Q.    And could you also describe for the jury, um, your
2    family?
3    A.    I have a wife and two daughters and four
4    grandchildren.
5    Q.    And, um, what's your wife's name?
6    A.    Irene.
7    Q.    Could you briefly describe for the jury your work
8    history?
9    A.    Pardon me again?
10   Q.    Your work history, could you describe your work
11   history.
12   A.    Oh, I worked in the local area, I worked at
13   Sylvania, at Arthur D. Little, and I worked 30 years for
14   Itek Optical Systems, which became Litton Industries.  I
15   was a business manager.  I was also the treasurer of the
16   credit union for a term at Litton Industries.
17   Q.    What does it mean to be the business manager, what
18   did you do at Itek Industries?
19   A.    Actually I was handling government contracts, I
20   was working budgeting and had the financial
21   responsibility for the government contract -- the
22   subcontract that we were working on.
23   Q.    At some point did you meet Gregg Caplitz?
24   A.    Um, actually he was suggested by a family friend
25   and it was a time that, um, I was the power of attorney

1   for my wife's uncle --

2   Q.   Okay.

3   A.   -- and they kind of suggested, um, through

4   experience that, um, that I meet Gregg and see what he

5   could do for me.

6   Q.   Um, first of all, can you hear me clearly?

7   A.   I can't really, no, I --

8   Q.   Um, I can speak louder.  Is that better?

9   A.   That's better.

10   Q.   Okay, if you can't hear me just give me a little

11   hand signal, let me know, and hopefully I won't drive

12   everybody else -- well, it would be too loud.

13   A.   No, it's much better.

14   Q.   Okay, I will try and keep my voice up.

15       You mentioned your wife's uncle.  Can you explain

16   what the situation was, who he was and what the

17   situation was?

18   A.   Yes.  Um, my wife's uncle lived by himself in

19   Newton and as he got older he wanted our assistance --

20   my wife is a registered nurse and I had a business

21   background and he hoped that I would help him with

22   investments and my wife would help him with medical

23   requirements and some of his household needs.  So I kind

24   of worked with him on investing his CDs and things that

25   he had with banking and so forth and my wife took care

1    of his medical requirements.

2    Q.    What was his name?

3    A.    Cesidio Salvucci, better known as "Joseph."

4    Q.    And, um, did you -- I think you -- in answer to my

5    question "At some point did you meet Gregg Caplitz?" you

6    mentioned something about your uncle, can you explain

7    the connection?

8    A.    Yes, I -- I think my wife probably suggested this

9    more than I did, um, actually the monies involved

10   belonged to my wife and Mr. Salvucci, she thought that

11   maybe we could use something -- some professional help

12   with the investing and so forth and I didn't disagree, I

13   asked her basically for her input, and Mr. Salvucci at

14   that time was comfortable with that and, um, I did go

15   ahead and meet with Mrs. Herman and Gregg.

16   Q.    And do you know how Mr. Salvucci had earned the

17   money that you were helping him manage?

18   A.    Yes, he was a landscaper in Newton for many years,

19   he worked very hard, and it was just him and his wife,

20   his wife was deceased, and basically my wife, Irene, was

21   one of the few family members that remained.  So he kind

22   of solicited our help because he -- I think he thought

23   we had the right background to give him the help that he

24   needed.

25   Q.    Had he ever served in the military?

```
 1    A.     Pardon me?

 2    Q.     Had Mr. Salvucci also served in the military?

 3    A.     Yes, he was a World War II veteran.

 4    Q.     And did you approach someone to help you invest

 5    Mr. Salvucci's money?

 6    A.     I approached Mrs. Herman and Gregg Caplitz in

 7    December of 2002, I think it was.

 8    Q.     And --

 9    A.     Oh, 2008, I think it was, I'm sorry, and we

10    discussed how to invest and what I might do to maximize

11    Mr. Salvucci's funds.  Um, and a short time after that I

12    --

13    Q.     Okay, wait, I'm going to stop you on that.

14    A.     Okay.

15    Q.     You said, um -- did you have a meeting with

16    anyone?

17    A.     Yes, I did have a meeting with them.

18    Q.     With whom did you meet?

19    A.     We had probably a couple of meetings at that time

20    and they discussed what their capabilities were and we

21    discussed what our needs were and they convinced us, at

22    that time, that they could further our financial

23    situation and do it in a conservative manner so that we

24    wouldn't suffer any losses.

25    Q.     Who was the "they" that you're talking about at
```

1    this point?

2    A.    Pardon me?

3    Q.    When you said "They convinced us," who are "they"?

4    A.    Mrs. Herman and Gregg Caplitz were meeting

5    together with myself and my wife.

6    Q.    Did you talk to Mr. Herman and Ms. -- I'm sorry,

7    Ms. Herman and Mr. Caplitz, about Mr. Salvucci and his

8    situation?

9    A.    Yes, I explained, you know, what his situation

10   was, I believe he was 84 years old at the time, and, um,

11   although he was still -- you know still able to do a lot

12   of the things necessary -- you know his health was

13   failing a little bit and he was a little older and his

14   wife had, um, conducted most of the financial

15   responsibilities for, um, the family and, um, he wasn't

16   terribly familiar with investing and CDs and how things

17   roll over and so forth and so he asked me if I would

18   help him and I agreed to it.

19   Q.    And could you describe what Mr. Caplitz and

20   Ms. Herman told you about what they could do for you and

21   Mr. Salvucci in those meetings?

22   A.    Yes, they assured me that they were familiar with,

23   um, many financial investments that they considered to

24   be somewhat conservative, um, with a low risk tolerance,

25   and I told them that was probably the primary concern, I

1   said we don't necessarily have to make money but we

2   don't want to lose it, and we would like to grow the

3   money as much as possible.  And, um, not knowing what

4   the future might hold, we decided to go in that

5   direction.

6   Q.    And, um, did you make a decision about whether to

7   work with Mr. Caplitz and Ms. Herman?

8   A.    Yes, we did, we actually signed an agreement

9   shortly after that to proceed and they helped me convert

10  a lot of the instruments that he was involved in, like

11  CDs and annuities and so forth, to get cash available to

12  make some of the investments that they were suggesting.

13  Q.    Okay.

14        MS. BLOOM:  May I approach, your Honor?

15        THE COURT:  You may.

16  Q.    At this time I want to show you four documents.

17  If you could first just tell me if you know what those

18  are?

19  A.    (Looks.)

20  Q.    They're different signature pages.

21  A.    Certainly.  The first document I'm looking at is

22  an Investment Advisory Agreement that was given to

23  myself and my wife on the first day that we met with

24  Mrs. Herman and Mr. Caplitz.

25  Q.    Is that marked on the front "GL"?

1    A.    Pardon me?

2    Q.    Does it have a little marking on the front,

3    "Exhibit GL"?

4    A.    Yes, "GL."

5    Q.    Okay.  And then what is "GN"?

6    A.    It shows, um, "Investment Objectives Being

7    Conservative in Growth."

8    Q.    I think --

9          THE COURT:  I think she asked you another

10   question.

11         THE WITNESS:  Oh.

12         THE COURT:  Go to the one marked "GN."

13         THE WITNESS:  Oh, I'm sorry, we're going one after

14   the other?  Okay.

15   Q.    Would you just identify the documents first and

16   then we'll start to go through them because that way I

17   can bring them up to the jury.

18   A.    Oh, okay.  So "GP" --

19         THE COURT:  "GN," she's asking about.

20   A.    Oh, it looks like you've given me four copies of

21   the same thing.

22   Q.    I have given you four different documents, they're

23   marked "GL," "GM," "GO," and "GP," and if you look to

24   the last page I think you'll see that there are

25   different signatures.

1    A.    Oh, I'm looking at "GO," I'm sorry, is that where

2    I want to be?

3    Q.    I'm sorry, I should have done it one by one, I was

4    trying to --

5    A.    Yeah, I was kind of thinking -- okay, I have "GO."

6    Q.    Okay.  Is "GO" an Investment Advisory Agreement

7    signed by you?

8    A.    Yes, it is.

9    Q.    Okay.  Now, if you could look at one of the other

10   documents there and tell me what letter you're looking

11   at?

12   A.    Um, "GP."

13   Q.    Okay.  And is that an Investment Advisory

14   Agreement?

15   A.    It is.

16   Q.    Could you look at the last page.

17   A.    The last page?

18   Q.    Yes.  Who signed that one?

19   A.    It's signed by my wife, Irene Burt, and

20   Mrs. Herman, um, Rosalind Herman.

21   Q.    Okay.  And if you can now look at "GN."

22   A.    (Looks.)  Okay.  The last page?

23   Q.    Yes.

24   A.    Yeah, that was signed by myself and also Rosalind

25   Herman.

1    Q.    Okay, thank you.  And if you could now look at

2    "GL."

3    A.    (Looks.)  Um, that was signed by me as power of

4    attorney for Cesidio Salvucci, and also my wife, Irene

5    Burt, and also Rosalind Herman.

6         MS. BLOOM:  Okay, at this time I'd like to move

7    all four exhibits into evidence.  I'd like to move "GL"

8    into evidence as Exhibit 291.

9         THE COURT:  Well, let's see if there's an

10   objection.

11        There's no objection?

12        MR. O'HARA:  No objection, your Honor.

13        THE COURT:  And why don't you recite as you were

14   going through the letters and numbers.  Go ahead.

15        MS. BLOOM:  "Gl" as Exhibit 291.

16        THE COURT:  In evidence.

17        MS. BLOOM:  "GN" as Exhibit 293.

18        THE COURT:  293 is "GN."

19        MS. BLOOM:  "GO" is Exhibit 294.

20        THE COURT:  "GO" is 294.

21        MS. BLOOM:  And "GP" as 295.

22        THE COURT:  "GP" is 295 in evidence.

23        (Exhibits 291, 293 through 295, marked.)

24   Q.    Okay, let's just take a look at Exhibit GL or now

25   291, if we could.

A.      Uh-huh.

        MS. BLOOM:  And if we could, could we now bring

that up on the screen.

        (On screen.)

        MS. BLOOM:  And I'm going to try to blow up the

top, it always slides off the screen right at the

beginning.

        (Enlarges on screen.)

Q.      Okay.  Do you see where it says, um, at the top,

"I understand that Insight Onsite Strategic Management,

hereafter referred to as 'Insight Onsite,' offers a

security investment management program."

A.      Yes.

Q.      What is "Insight Onsite Strategic Management,

LLC"?

A.      What was it?

Q.      Yes.

A.      They were a management investment business.

Q.      And who did you understand ran that business?

A.      Rosalind Herman was the managing partner and, um,

a couple of employees, one was Gregg Caplitz, and they

also had a secretary employed.

Q.      And is that the company that you were describing

earlier that you employed to help you with

Mr. Salvucci's investments?

1    A.      Yes, it was.

2            MS. BLOOM:   Okay, if we could turn to Page 3 of

3    this document.

4            (Turns on screen.)

5    Q.      As part of this agreement, was there any

6    arrangement concerning fees?

7    A.      Yes, there was a 1 percent fee on the

8    end-of-the-month balance on the account to be extracted

9    from the proceeds.

10   Q.      And why did you decide that it was a good -- why

11   did you decide to employ an investment advisor to help

12   you manage Mr. Salvucci's funds?

13   A.      Well, as I mentioned, I think my wife was a little

14   more interested in doing that than I was, I've had some

15   experience in investing, and, um -- but she thought

16   that, after consulting with some of her friends, that

17   they might be able to give us some insight and help us

18   with some things that maybe we weren't aware of.  So we

19   decided to meet with them and after a couple of meetings

20   and, um, we decided to enter into a business arrangement

21   with them.

22           MS. BLOOM:   And if we could turn to Page 6.

23           (Turns on screen.)

24   Q.      Do you see there, in the middle of the page, where

25   it says "Representations," that it represents that this

1    entity is a registered investment advisor?

2    A.    Yes, they demonstrated that they have the proper

3    documentation and so forth to do this particular work.

4    Q.    And was it significant to you that they were

5    registered investment advisors?

6    A.    Yes, very much.

7    Q.    Why?

8    A.    Well, I think any time you're dealing with

9    somebody you want to make sure they have the proper

10   credentials and they have the background to handle your

11   problem and they appeared to have that background.

12   Q.    Okay.

13         MS. BLOOM:   And then if we could turn to the last

14   page of this document, I believe it might be Page 10.

15         (Turns on screen.)

16   Q.    I think you described this earlier, but it wasn't

17   up on the screen.   Who signed the signature "Cesidio

18   Salvucci"?

19   A.    Um, I signed it as power of attorney for

20   Mr. Salvucci and it was signed by my wife and also by

21   Rosalind Herman.

22   Q.    And what happened to Mr. Salvucci after you met

23   with -- you first met with Mr. Caplitz?

24   A.    Um, approximately, and I'm trying to remember

25   exactly, but about a year later Mr. Salvucci had a fall

in his house and, um, he entered into dementia or
Alzheimer's and he was not able to communicate after
that time, um, and I was then or at that time, um,
appointed as power of attorney, and he went into a rest
home for a period of about six years and I attempted to
pay his bills and do all his financial problems at that
time.  And my wife, you know, and I both went to see him
at least twice a week during that time frame and, um,
tried to carry on and do what had to be, um -- well,
after it became apparent that he was going to be in the
hospital or be in the hospital/rest home for a period of
time, we realized that selling his home would probably
be a necessity, so I was involved in that and many other
things, trying to make sure that we could pay his bills,
they were approximately $130,000 a year in a rest home.
And so that went on for almost a period of six years.

          THE COURT:  Ms. Bloom, I'm not crowding you, but
will you be done with your direct examination in the
next 5 or 10 minutes?

          MS. BLOOM:  I'm not sure that I will, your Honor,
so why don't we take the break.

          THE COURT:  So let's take the morning recess.
We'll take the morning recess at this time, ladies and
gentlemen.  You have not heard all the evidence, so
please keep your minds suspended, do not discuss the

1    case either among yourselves nor with anyone else.  You

2    may stand in recess for one half hour to a little bit

3    after 11:15.  The jury may recess.

4            (Jury leaves, 10:47 a.m.)

5            (Resumed, 11:20 a.m.)

6            THE COURT:  You may proceed, Ms. Bloom.

7            MS. BLOOM:  Thank you.

8    Q.    Okay.  Just before the break, um, Mr. Burt, I

9    believe you were explaining about Mr. Salvucci's

10   situation and I want to ask you this question.

11           Did you ever talk to Ms. Herman and Mr. Caplitz

12   about Mr. Salvucci's situation, his health situation?

13   A.    Yes, we did discuss it and, um, they kind of

14   pointed out that sometimes these things are long term

15   and that it would be best that I invest the money that

16   he had available so that the money would grow to some

17   point and be able to continue to pay his sizable

18   expenses for as long as was necessary.

19   Q.    And when you met with Mr. Caplitz and Ms. Herman,

20   did either of them explain to you what role each of them

21   played in the business?

22   A.    Yes, um, Mrs. Herman told me that she was the

23   managing partner responsible for investing, she told me

24   she would oversee all of the investments that I made,

25   um, some of which were suggested by her, some by

1    Mr. Caplitz.  She told me she had a conservative nature

2    and that she would invest things with the idea that the

3    risk would be minimal and, um, we kind of proceeded

4    along those lines.

5    Q.    And did she indicate to you, um, whether she would

6    have any knowledge of what Mr. Caplitz was doing on your

7    part?

8    A.    Yes, she made it clear there that any investments

9    that he might suggest would have to be approved by her,

10   that she would review them.

11   Q.    And, um, when you visited the office and met with

12   Mr. Caplitz and Ms. Herman, did you make any

13   observations about their cars, their style of dress,

14   anything like that?

15   A.    Um, Mrs. Caplitz had a new, a newer, um, foreign

16   model --

17        THE COURT:  Mrs. Caplitz?

18        THE WITNESS:  Oh, I'm sorry, Mrs. Herman.  I'm

19   sorry.

20        MS. BLOOM:  Thank you.

21   A.    And Mr. Caplitz always seemed to be very

22   conservative, he didn't have a -- he did have a

23   late-model car, he dressed conservatively, he apparently

24   lived conservatively and, um --

25        MR. BENZAKEN:  Objection.

Q. Just talk about what you observed.

THE COURT: He's giving his observations, that's what he thinks. All right. Put another question.

Q. Do you remember the type of car that she drove?

A. Um, it was a late model, um, a foreign car, but I can't remember exactly what it was.

Q. Do you recall previously telling us that it was a Jaguar?

A. I believe that's what it was, yes.

Q. Okay. And at some point, um, did somebody raise with you the concept of a hedge fund?

A. Yes, um, this was probably a couple of years into our investment cycle. It was Gregg, I guess, that brought this up first. He mentioned that he thought that the money in investing, um, it would come more readily from being involved in hedge funds. I pointed out to him that I wasn't terribly knowledgeable in how hedge funds worked, I hadn't had the experience, and he told me that he had researched this for a period of time. He actually referred to spreadsheets that gave some idea of what we might be able to do with an investment, what direction it would go in and how it might prosper over some period of time. And after talking to me at length I decided that I would underwrite or provide seed money for his investment to

1    get involved in a hedge fund.  He told me there was

2    considerable upfront legal expenditures, et cetera, to

3    start up a hedge fund.  So I agreed to get involved with

4    him in that way.

5    Q.    Did he tell you who would be owning or running the

6    hedge fund?

7    A.    Well, it was called "Hermcap" so, um, I, at that

8    point I knew that certainly Mrs. Herman was involved and

9    she was definitely going to be the forward thrust in it

10   and he would basically handle the day-to-day activity, I

11   guess.

12   Q.    Okay, I'd like to show you what has previously

13   been marked as Exhibit AK.

14   A.    (Looks.)

15   Q.    Mr. Burt, is that an example of the projections

16   that Mr. Caplitz showed you?

17   A.    Yes, that appears to be the actual sheets that he

18   gave me to review.

19         MS. BLOOM:  Okay, at this time I would offer this

20   as Exhibit 134.

21         THE COURT:  No objection?

22         MR. O'HARA:  No objection.

23         THE COURT:  AK is admitted as Exhibit 134.

24         (Exhibit 134, marked.)

25   Q.    Okay, and we're just going to take a quick look at

1    some of this in the middle section.  (On screen.)  Do

2    you see where it says "Total management fee excess of

3    200 million"?

4    A.    Um-hum.

5    Q.    And then down at the bottom there's a line that

6    says "Cash flow per 1 percent of ownership"?

7    A.    Right.

8    Q.    Were those projections that he gave you of the

9    cash flow if you invested for 1 percent of ownership?

10   A.    Yes, those are the numbers that he projected.

11   Q.    And do you recall how much he was telling you it

12   would cost to get 1 percent of ownership?

13   A.    Um, I think the $200,000 that I invested would

14   reap a 1 percent share in the fund.

15   Q.    And do you know --

16   A.    Well, based on information that he had upfront.

17   Q.    Okay.  And then, um, if you go all the way over to

18   the right, um, are these --

19         MS. BLOOM:  Why don't I blow this up again so that

20   the jury can see it.

21         (On screen.)

22   Q.    Are these projections by year?

23   A.    Right.

24   Q.    Um, so 2011, 2012, 2013, 2014, and 2015.  And then

25   all the way to the right, um, do you see where it says

```
 1    "$782,946"?

 2    A.    Yes.

 3          MS. BLOOM:  And let me see if I can highlight that

 4    to make it a little more obvious.

 5          (Highlights on screen.)

 6    Q.    Was that the projected amount that would be paid

 7    over five years on the initial investment of 1 percent?

 8    A.    Yes, that's correct.

 9    Q.    And for a 2 percent ownership, did it project $1.5

10    million over five years?

11    A.    Uh-huh.

12    Q.    Okay.  And did you decide to make an investment

13    into the ownership of this hedge fund?

14    A.    Did I decide?

15    Q.    Right, what did you decide to do?

16    A.    I, um, only involved -- only agreed to get

17    involved in the upfront seed money that I needed to

18    invest, I told him I'd want to see some history, some of

19    his expertise, some of their expertise in investing,

20    before I decided whether I would get involved in such an

21    instrument.

22    Q.    And, um, when you agreed to provide the seed

23    capital, whose capital did you use, whose money did you

24    use to do that?

25    A.    That was money from Mr. Salvucci and my wife,
```

1    Irene Burt.

2    Q.    And why did you decide to do that with

3    Mr. Salvucci's money?

4    A.    Well, he promised an investment of 12 percent,

5    which I thought was a little aggressive, but he sort of

6    pointed out to me that this was sort of the average for

7    people that got involved in hedge funds and he didn't

8    feel that that was a reach to be able to achieve that

9    kind of money.  And as I say I was faced with very

10   sizeable medical bills at that time for Mr. Salvucci and

11   decided to at least give him the front money and give

12   him the opportunity to get this established and then

13   review it at a later time to see if I really wanted to

14   get involved.

15   Q.    Okay.  And now I'm going to ask you to take a look

16   at what's been marked as Exhibit AI for identification.

17   A.    (Looks.)

18   Q.    Is that a promissory note that you executed in

19   connection with that seed money?

20   A.    It is.

21        MS. BLOOM:  I'll now offer Exhibit AI as Exhibit

22   132.

23        MR. O'HARA:  No objection.

24        THE COURT:  AI is admitted as Exhibit 132.

25        (Exhibit 132, marked.)

1          MS. BLOOM:   May it be published?

2          THE COURT:   It may.

3          MS. BLOOM:   Thank you.

4          (On screen.)

5    Q.    Now, could you explain to the jury what this is?

6    A.    This is a promissory note that I entered into with

7    Mrs. Herman for a $200,000 investment to basically

8    provide early money or what they call "seed money" to

9    get a hedge fund that he was attempting to establish off

10   the ground, and it had a 12 percent interest rate

11   payable quarterly and, um, I agreed to proceed against

12   that and we, um, signed an agreement to proceed.

13   Q.    Okay.  This promissory note is dated July 24th,

14   2008 and it says "For value received, the undersigned,

15   Financial Family Holdings, LLC, the borrower, at 10916

16   Summer Quail Avenue, Las Vegas, Nevada, promises to

17   pay."

18         Whom did you understand "Financial Family

19   Holdings" to be?

20   A.    Um, that was Rosalind Herman's, um, I believe her

21   current or at that time what was the name of her

22   operation.  I know that previous to that time I was more

23   involved with Insight Onsite.  But I believe at about

24   that time they osmosed into a, um, different

25   terminology.

1    Q.    Okay, and how much money did you give them as seed

2    capital?

3    A.    $200,000.

4    Q.    And over what period of time were you to be

5    repaid?

6    A.    Um, initially it was set up for three years, um,

7    they requested that I extend that to a four-year period,

8    and after some thought I decided that I could extend

9    that to a four-year period.

10   Q.    Um, and what did you understand the money was

11   going to be used for?

12   A.    He told me it was for what he called "seed money,"

13   establishing the hedge fund, he kind of pointed out

14   there was a tremendous amount of legal obligation to

15   establish a fund of that nature and that there was --

16   that it was going to take some time and, um, I agreed to

17   fund him for that operation.

18         MS. BLOOM:   And turning to the second page of this

19   document.  (Turns on screen.)  If we go down -- first

20   let's go through to the middle of the document.

21         (Enlarges on screen.)

22   Q.    It says here, in the middle, "The lender, at their

23   sole discretion" -- who was the lender here?

24   A.    The lender was myself and, um -- well, and my wife

25   and Mr. Salvucci, actually I was acting on his behalf as

1    power of attorney.

2    Q.    Okay.  And then it says, "The lender, at their

3    sole discretion, may convert the principal balance to

4    two units of Hermcat Management, LLC, 2 percent of the

5    ownership, on the second anniversary date of the note

6    and on each such subsequent anniversary date.  Said

7    conversion will terminate this note in full.  If

8    conversion right is not exercised by the fourth

9    anniversary date, then all principal and the unpaid

10   interest will be due in full on July 24, 2012."

11         What did you understand this note gave you, on

12   behalf of Mr. Salvucci, and your wife the right to do?

13   A.    Um, it gave us the opportunity -- if we thought it

14   was doing well at that time, it gave us a chance to get

15   involved in the hedge fund itself rather than just fund

16   the early-on obligations.

17   Q.    Um --

18   A.    It gave us some opportunity to look at the

19   performance of the fund before we decided to get active

20   in the fund.

21   Q.    And then finally who signed this agreement?

22         MR. BENZAKEN:  Objection.

23         THE COURT:  Who signed.

24         Are you familiar with this signature?

25         THE WITNESS:  Yes.

1          THE COURT:  Who is it?

2          THE WITNESS:  Rosalind Herman.

3          THE COURT:  Well, did you see her sign it?

4          THE WITNESS:  Did -- no, I did not see her sign

5     it.

6          THE COURT:  Are you familiar with her signature,

7     what her signature looks like?

8          THE WITNESS:  Um, I can't say that I am completely

9     familiar.  I've seen her signature before.  I was able

10    to read it, so I assumed that it was her legal

11    signature.

12         THE COURT:  Right, and you read it as Rosalind

13    Herman's?

14         THE WITNESS:  I did.

15         THE COURT:  All right.

16    Q.    Whom did you understand signed -- whom did you

17    believe signed this agreement?

18    A.    Pardon me?

19    Q.    Whom did you believe had signed this agreement for

20    Financial Family Holdings?

21    A.    Um, Rosalind Herman was the managing member and I

22    just assumed that basically -- that basically I had an

23    agreement with her and it was basically a one-on-one

24    agreement.  Um, that even though Gregg Caplitz presented

25    the document to me, he made it clear that the

1    arrangement was between us and Rosalind Herman, that he

2    would do the day-to-day activity, but that she would

3    ultimately be responsible for it.

4    Q.    And then there's a signature first of "Cesidio

5    Salvucci" and "Melvin R. Burt, POA."  What does that

6    mean?

7    A.    "Power Of Attorney."

8    Q.    Okay, so you signed for Mr. Salvucci under your

9    power of attorney?

10   A.    Correct.

11   Q.    Okay.  And who's the last signature?

12   A.    And my wife, Irene Burt.

13   Q.    Okay.

14         MS. BLOOM:  And if we could bring up Exhibit AO

15   now.

16         (On screen.)

17   Q.    Do you recognize that as the letter that, um, you

18   executed to transfer the $200,000?

19   A.    Yes.

20         MS. BLOOM:  I would offer this as Exhibit 138.

21         THE COURT:  No objection?

22         MR. O'HARA:  No objection.

23         THE COURT:  The letters again?

24         MS. BLOOM:  The letters were "AO."

25         THE COURT:  AO is admitted as Exhibit 138.

1          MS. BLOOM:   Thank you, your Honor.

2          (Exhibit 138, marked.)

3          MS. BLOOM:   And I'll try to blow this up.

4          (Enlarges on screen.)

5    Q.    Okay.   Did you give instructions to transfer the

6    $200,000 to the Washington Mutual Bank?

7    A.    Correct, I did.

8    Q.    For the benefit of -- and it has it down here, the

9    "Knew Finance Experts, Inc."?

10   A.    Correct.

11   Q.    And what did you understand the "Knew Finance

12   Experts, Inc." was?

13   A.    That was the, um, the name of the investment that

14   Rosalind Herman conducted.

15   Q.    Did you ever have occasion to talk to Ms. Herman

16   about the payments on this promissory note?

17   A.    Um, yes, um, as time went on, as the payments

18   became due, um, it was rather difficult for me to get

19   the increments that were due us and many times I had to

20   make phone calls or discussions, I actually wrote a

21   letter at one time to her, um, requesting, um, a more,

22   you know, immediate response to some of the dates that

23   we had arranged.   We continued to slip two and three and

24   four months sometimes and it became a hardship.   And,

25   um, I was also told at the time that she might be

1   interested in actually satisfying the note and paying it
2   off early and I told them that I was agreeable to that
3   if she could arrange it as things were not going as I
4   had been promised.
5   Q.     During this time period did you receive any
6   payments on the promissory note?
7   A.     What, were payments made?
8   Q.     Yes.
9   A.     Yes, they were made.
10  Q.     And were they ever made on --
11  A.     It was just interest payments only, there was
12  never a payment on principal.
13  Q.     Were they made on time?
14  A.     No, they were always late.  There might have been
15  one or two that were -- early on that were very close to
16  being paid on time, but as time went on they became more
17  delinquent.
18  Q.     And when you first didn't get the payments on
19  time, who did you call first?
20  A.     Um, probably Gregg Caplitz, I think he was -- as I
21  say he was the Onsite, you know, representative, and I
22  would talk to him first.  I always requested a
23  conversation with Rosalind, but, um, it became
24  difficult, he sort of said that she was involved with
25  other things and didn't really want to get too involved

1    in this.  And I brought it to his attention that she

2    signed the note and that I really would like to, you

3    know, deal more directly with her and kind of find out

4    what the problem might be with our payments.

5    Q.     And did you ultimately get to talk to her directly

6    on any number of occasions?

7    A.     Um, I've talked to her on the phone on a couple of

8    occasions, yes.

9    Q.     Specifically about the payments on this note?

10   A.     Yes, right.

11   Q.     And when you talked to her on the phone about the

12   note, what do you recall she said?

13   A.     Well, I think she told me to be patient and that,

14   um, you know, that they would -- that, you know, a lot

15   of the front-end obligation was difficult,

16   time-consuming, and that I should exercise patience and

17   not jump to conclusions on their financial condition.

18   Q.     And you mentioned a few minutes ago that you sent

19   her a letter at one point?

20   A.     I did.

21   Q.     I'd like now to have you take a look at what is

22   marked as -- for identification as Exhibit LT.

23   A.     (Looks.)

24   Q.     Do you recognize that as the letter you just

25   mentioned that you sent to her?

1   A.     I do.  I do.

2          MS. BLOOM:  I would now offer that as Exhibit 429.

3          THE COURT:  No objection?

4          MR. O'HARA:  No objection.

5          THE COURT:  Say again the letters?

6          MS. BLOOM:  It was "LT."

7          THE COURT:  LT in evidence, Exhibit 429.

8          (Exhibit 429, marked.)

9   Q.     Okay.  Mr. Burt, the first part of this --

10         MS. BLOOM:  Sorry, let me blow this up so we can

11  get the date on it.

12         (Enlarges on screen.)

13  Q.     Can you just read that first sentence.

14  A.     "Dear Rosalind, received your $2,000 payment.  I'm

15  not sure what you meant by 'I thought this had been

16  paid.'"  I think she was referring to that Gregg Caplitz

17  should have taken care of this and he had not.

18  Q.     And, um, when you say "I'm not sure what you meant

19  by 'I thought this had been paid'," is that a reference

20  to something she had said to you in some way?

21  A.     Yes, she had mentioned that, I think verbally, and

22  that's what I reiterated here in the note.

23  Q.     Okay.  And then, um, I'm going to skip down.

24         MS. BLOOM:  If we can go to the next page.

25         (On screen.)

1   Q.    Is there a discussion there about some other

2   investments in your letter?

3   A.    Um --

4   Q.    I'm just skipping over the discussion there about

5   other investments.

6   A.    Oh, yes, there was, um -- Gregg had made a

7   suggestion that I get involved in a gold speculation

8   investment.

9   Q.    Okay.

10  A.    I was not terribly in favor of that initially, um,

11  you know, because gold is --

12  Q.    Okay, I'm going to just skip over that because

13  that isn't the focus of the case here, so I was just

14  pointing out that we were going to skip those paragraphs

15  and go down to the end of the letter.

16  A.    Oh, okay.

17  Q.    Um, can you read this paragraph that I've blown up

18  on the screen.

19  A.    "To sum up I told him I was not going to share" --

20  Q.    Oh, I'm sorry, I blew up too much.  Could you just

21  read the last paragraph.

22  A.    Okay.  Is this the part you want me to start

23  reading?

24  Q.    Yes, start again "As of 10-24-09."

25  A.    All right.  "As of 10-24-09 you still owe me

1    $2,000.  Gregg mentioned that you might want to pay off

2    the note.  I'm agreeable to that.  Please don't forget

3    the deal was broken by you folks and" --

4    Q.    Yeah, I'll blow up the next page.

5    A.    I remember it, exactly where it is.

6          -- "you even extended the time frame from three

7    years to four years.  Our relationship has been

8    strained, to say the least, the interest rate is good,

9    but I have no interest in pleading for my payment every

10   quarter for the next four years.  Please let me know if

11   this is agreeable to you."

12         "P.S." at the bottom, "I would prefer to work with

13   you on this as your name appears on the promissory note

14   as the managing member."

15   Q.    Did you send this letter to Ms. Herman?

16   A.    Yes, I did.

17   Q.    And when you're referencing that you're owed

18   $2,000 in this letter, is that how much you were behind

19   at that point?

20   A.    Yes, this was, you know, fairly early on in our

21   relationship with this investment and that we weren't

22   seriously behind at that time, but, you know, I was

23   still concerned with getting a regular payment.

24   Q.    And, um, after that what happened with the

25   payments?

1   A.   Well, they became more delinquent at that time,

2   they became three, four, five months delinquent at some

3   times.  And, um, even though payments were made, I

4   didn't think we were --

5   Q.   Okay, before I go on, I'm sorry, is this another

6   part of the letter that you sent to Ms. Herman, this

7   last page?

8   A.   Um, yes, I think that was the, um, the final page,

9   it was a summation of what had been paid to date, um,

10  the due dates when they were promised and the dates I

11  finally received the funds.  I think it shows the first

12  one was only a week or so late, after that it became a

13  month, after that two months, and the final one was more

14  like three months late.

15  Q.   And after that what happened with the payment

16  streams?

17  A.   Um, again they became, you know, more delinquent

18  as time went on and finally the payments stopped, and I

19  told them at that time that, you know, I had to do

20  something about this and that they -- um, they promised

21  to make a lump payment that would bring me up to -- you

22  know, up to a break-even point on the interest rate at

23  least and I agreed to that and kind of waited for a

24  check to come from them as promised.

25  Q.   Okay, let me just take you back.  When the

1    payments stopped coming, um, did you make any calls?

2    A.    Yes.

3    Q.    Who did you call?

4    A.    Um, well, I talked to Mr. Caplitz almost on a

5    daily basis, I also talked to Mrs. Herman.

6    Q.    And as a result of those calls -- and did you

7    express concern in those calls --

8    A.    Absolutely.

9    Q.    -- and what did you say in the calls?

10   A.    Oh, yes, I did.

11   Q.    And what did they say to you?

12   A.    Well, they agreed to make one major payment to

13   kind of bring the note up to, you know, current standing

14   and I agreed to that and waited patiently for it to

15   arrive, and again it was late, but it finally did come

16   to me.

17   Q.    And prior to receiving that, um, later payment or

18   later check, um, did up indicate what you were going to

19   do if you didn't get your money?

20   A.    Well, I told them that, you know, I was losing

21   patience and that, um, you know, I was really

22   questioning their ability to satisfy the note, and that,

23   um, I sort of threatened them with the idea of going to

24   the authorities and disclosing that they weren't acting

25   properly as investment people.

1    Q.    And it was after that that they agreed to make

2    this lump-sum payment?

3    A.    Oh, it coincided with that.  I think that, you

4    know, at that time they said it wouldn't be wise for me

5    to do that, if I ever wanted to collect the money that

6    was due, um, if I, you know, tried to prosecute them in

7    any way, that that would be difficult for me to obtain

8    the money that was due.  So at that time they agreed to

9    send me a check and I patiently waited for that check to

10   arrive.

11   Q.    Okay.  And at some point, um, did you get a check?

12   A.    I did get the check.

13   Q.    And I'm now going to show you what's been marked

14   for identification as Exhibit AJ.  (On screen.)  What is

15   Exhibit AJ?

16   A.    That's a check addressed to me for $34,000.

17         MS. BLOOM:  At this time I would offer Exhibit AJ

18   as Exhibit 133.

19         THE COURT:  No objection?

20         MR. O'HARA:  No.

21         THE COURT:  AJ is admitted, Exhibit 133.

22         (Exhibit 133, marked.)

23   Q.    What did you do with Exhibit AJ?

24   A.    They requested at that time that I wait a little

25   longer, be patient, they were moving funds around or

1   whatever and they told me that they would appreciate if

2   I would wait a few weeks before I attempted to cash

3   that.  I actually waited, I think, for a month.  And

4   finally I said, "Look, I've got to cash this," and I

5   took it to my local bank, they made a telephone call to

6   the bank in Las Vegas, found out that this account had

7   been closed for quite a long period of time, you know,

8   that it had a 0 balance.

9   Q.    So did you ever get this $34,000?

10  A.    No, I did not.

11  Q.    Did you ever get any further payments on your

12  promissory note?

13  A.    No, I did not, that was the last, um --

14  Q.    I'm going to show you what has been marked as

15  Exhibit AN for identification.

16  A.    (Looks.)

17  Q.    What is Exhibit AN?

18  A.    This is a summation of some of the payments, the

19  due dates, the activity that I had experienced over a

20  couple years in the history of this note.  It shows that

21  I received $70,000 in interest only through a period of

22  time and that -- and that's the last date, I believe,

23  was 6-14-12 that I received any funds.

24          MS. BLOOM:  At this time I would offer Exhibit AN

25  --

```
1            MR. O'HARA:  No objection.

2            MS. BLOOM:  -- as Exhibit 137.

3            THE COURT:  AN is admitted, Exhibit 137.

4            (Exhibit 137, marked.)

5    Q.    Okay.  And is this -- oh, sorry.  Is this -- you

6    were explaining what this was, but it wasn't in front of

7    a jury at that time.

8            Is this a calculation by you of what payments --

9    or a listing of what payments you received when and what

10   payments were due when?

11   A.    Correct.

12   Q.    Okay.

13           MS. BLOOM:  And if we could go to the second page

14   to the totals there.

15           (On screen.)

16   A.    It's the amount of money that was due and what I

17   actually experienced.

18   Q.    Okay.  So at that point, as of 12-24-2013, um, it

19   looks as if -- the total you listed is $130,000 due?

20   A.    Right.

21   Q.    And what was paid was 70,000?

22   A.    Correct.

23   Q.    And the unpaid was 60,000?

24   A.    Correct.

25   Q.    And is that just the amount of interest?
```

A.    That was interest only at that point, yes.

Q.    That doesn't account for the return of the

$200,000 principal?

A.    No.

Q.    (Pause.)  I'm sorry, Mr. Burt.  Your calculations

are just of the amounts of interest, the payments that

were due?

A.    Yes.

Q.    And it doesn't -- in addition to that you

ultimately would have expected the repayment of your

$200,000 principal?

A.    Correct.

Q.    And after you found out that there were no funds

in the account, um, to pay the $34,000 check, what did

you do?

A.    I contacted the authorities, made a telephone

call, and I wrote a letter that, um, indicated that I

thought that they were operating in an unlawful way.

And that I made this known to the authorities and had

subsequent meetings with some different people,

Mr. Doherty, Mr. Ahern --

Q.    Okay, let me just stop you there.  I'm going to

show you what's been marked for identification as

Exhibit MD.

          (On screen.)

Q.    What is this?

A.    This is a letter that I wrote to Mr. Ahern that,
um -- of the Attorney General's office, pointing out
that I had made an investment with these people, that it
wasn't conducted properly, and that I wanted to make
sure that they were aware of what was going on.  And,
um, that I use this as a mechanism to report them to my
problem.

          MS. BLOOM:  At this time I would offer this as
Exhibit 439.

          MR. O'HARA:  No objection.

          THE COURT:  MB?

          MS. BLOOM:  "MD" as in "doctor."

          THE COURT:  "MD," 439 in evidence.

          (Exhibit 439, marked.)

Q.    Do you know how long it took Mr. Salvucci to save
up the money that you were investing for him?

A.    That was a lifetime of his endeavors.  You know he
worked as a landscaper where he worked very hard and
intelligently and this was his lifetime savings
basically.

Q.    And other than the payments that were listed of
interest in Exhibit AN, did you ever get any of it back?

A.    Um, no, I did not.

          MS. BLOOM:  No further questions at this time.

1          THE COURT:  Mr. O'Hara, any questions for this

2     witness?  Oh, Mr. Benzaken.

3          MR. BENZAKEN:  Yes, your Honor.

4          THE COURT:  You may go ahead.

5

6     CROSS-EXAMINATION BY MR. BENZAKEN:

7     Q.    Good morning, sir.

8     A.    Good morning.

9     Q.    You indicated that you began to work with, um,

10    Mr. Caplitz and Ms. Herman starting around 2005, right?

11    A.    Correct.

12    Q.    All right.  And initially you were turned on to

13    Mr. Caplitz, correct?

14    A.    Um, not really, I was turned on to both of them

15    actually.

16    Q.    Okay.  And then the first meeting you had was you

17    met with them in 2005 at the Woburn office, correct?

18    A.    That is correct.

19    Q.    And when you get to that meeting both Ms. Herman

20    and Mr. Caplitz were present?

21    A.    They were.

22    Q.    And at that time Ms. Herman also was presented to

23    you as sort of the stock-picker of the two, correct?

24    A.    Um, yes, he told me that she had an extensive

25    background in picking stocks and so forth, that was her

1    expertise passed on by her father and somebody in the

2    family.

3    Q.    And they presented Caplitz as the one who directed

4    the other investments, correct?

5    A.    Pardon me?

6    Q.    And Mr. Caplitz presented himself as the one who

7    directed the other investments, right?

8    A.    Um, not really, no, he just mentioned that she had

9    an expertise in picking stocks, he didn't say that she

10   was not involved in any other investment.  He made it

11   clear that she was the managing partner, that he was

12   going to conduct day-to-day activities.  But I assumed

13   that I was dealing with both individuals, not just one.

14   Q.    But when you spoke with the -- again you spoke

15   with members of the FBI involving this case, correct?

16   A.    Oh, later on, yes, I did.

17   Q.    And you indicated to them that it seemed like

18   Mr. Caplitz ran the show?

19   A.    I had more involvement because he happened to be

20   on the scene.  When Mrs. Herman ended up in Las Vegas,

21   it was very difficult to conduct much business with her,

22   so, um, I did deal probably more with Mr. Caplitz at

23   that point, but he was on the phone constantly with her

24   and they were pretty much in sink I think with what my

25   problem was.

1    Q.    You communicated to the FBI as well that after

2    that initial meeting you had only spoken to Ms. Herman

3    maybe three or four times?

4    A.    That's probably correct, yes.

5    Q.    So again in this meeting in 200 -- well, after

6    this 2005 meeting, um, and -- but nevertheless these

7    obvious investment activities were going on up through

8    2012, 2013, right?

9    A.    Right.

10   Q.    And even so you were speaking to Mr. Caplitz and

11   at some point you indicated you were speaking to him on

12   a daily basis?

13   A.    Um, pretty close to a daily basis, yes.

14   Q.    All right.  And even a number of times when you

15   would call Ms. Herman, Mr. Caplitz would be the one who

16   would call you back and speak with you?

17   A.    Um, most of the interface was with Mr. Caplitz,

18   correct.

19   Q.    And it's fair to say that there were even some

20   phone calls that you had where both Mr. Caplitz and

21   Ms. Herman were involved in the phone call, but she

22   essentially was just in the background of the

23   conversation, it was primarily between you and

24   Mr. Caplitz?

25   A.    Well, because she wasn't, you know, there in the

1    office and I wasn't able to, you know, talk in length

2    with her, yes, she would be on the phone at different

3    times.

4    Q.    Right, but even during those phone conversations,

5    the conversation was dominated by Mr. Caplitz, correct?

6    A.    Um, that would be fair to say, yes.

7    Q.    Now, so in 2008 Mr. Caplitz comes to you and --

8    now, did you meet with him in an office or did he come

9    to your home when he brought you these documents related

10   to the hedge fund?

11   A.    You mean the promissory note?

12   Q.    Yes.

13   A.    Yes, he came to our property on Cape Cod.

14   Q.    And was that unusual for him to come to meet you

15   at your property?

16   A.    Well, it's the first time that he ever met us

17   offsite in our home, we had met, you know, at

18   restaurants and things like that, coffee shops, to do

19   different business.

20   Q.    Very well.  And then when he met you and showed

21   you the promissory note, the little signature line said

22   that Rosalind Herman had already signed, correct?

23   A.    Right.

24   Q.    All right.  So you never saw her sign it?

25   A.    I did not, no.

1    Q.    So you were not part of any conversation with her

2    at the time that Mr. Caplitz was presenting this

3    document and discussing it with you, correct?

4    A.    Right, correct.

5    Q.    So the spreadsheet that was shown to you before

6    shows what was involved in this hedge fund that

7    Mr. Caplitz was trying to put together, correct?

8    A.    Excuse me?

9    Q.    There's a spreadsheet of projections, correct?

10   A.    Oh, yes.  Okay, yes, I'm with you.

11   Q.    And obviously you were looking at that trying to

12   make a decision of whether or not to loan him this

13   money, right?

14   A.    Absolutely, yes.

15   Q.    And in the lines which showed the projections

16   there were different projections whether or not you were

17   a 1 percent owner versus a 2 percent owner in the

18   management, correct?

19   A.    Yes, right.

20   Q.    And that's because ownership in the management

21   gets a percentage of what's in the fund and then it's

22   separate from what the people who actually invest in the

23   actual fund receive, correct?

24   A.    Correct.

25   Q.    All right.  So again the projections that you were

1    looking at were based on what you would receive based on

2    a loan to them for the management end of this fund,

3    correct?

4    A.    That's correct.

5    Q.    All right.  And also you used the term "seed

6    money," correct?

7    A.    I did use that term, yes.

8    Q.    And you specifically mentioned "legal expenses,"

9    correct?

10   A.    Right.

11   Q.    Because separate from the found which is being

12   invested, there are expenses that are associated with

13   the management of the fund, correct?

14   A.    Correct.

15   Q.    For instance, such as having to pay the legal

16   fees?

17   A.    Right.

18   Q.    So money will have to be spent out that's separate

19   from what is actually in the fund, correct?

20   A.    That's correct.

21   Q.    All right.

22   A.    I understood at that time that there was little or

23   no funds actually invested at that point, they were

24   still trying to establish it, so this was strictly

25   upfront investment to get the thing sort of off the

1    ground, legal expenses, et cetera.

2    Q.    Right, so that management was -- the income that

3    would have been generated for the management was based

4    on projections of what would occur once the funding came

5    in?

6    A.    It's a projection, correct.  That's correct.

7    Q.    All right.  And when Mr. Caplitz explained this to

8    you, the reason it was called "Hermcap" was he explained

9    that he wanted -- it was being presented as a

10   minority-owned hedge fund, correct?

11   A.    That's correct.

12   Q.    And that means it's headed by a person of either

13   an ethnic minority or a woman, right?

14   A.    That is correct.

15   Q.    And hence the name "Herman"?

16   A.    That is correct.

17   Q.    Now, when you first met with Mr. Caplitz in that

18   meeting in 2005, you understood that he had an SEC

19   license as well?

20   A.    Right.

21   Q.    (Pause.)  And the reason that letter, that you

22   wrote in 2009, the reason you wrote that letter to

23   Ms. Herman was because her name appeared on that

24   promissory note that you had signed?

25   A.    That's correct.

1    Q.    You were unsatisfied with the response you were

2    getting from Mr. Caplitz?

3    A.    That is correct.

4    Q.    But after sending that letter, the responses you

5    received were from Mr. Caplitz, correct?

6    A.    Right.  Yes.

7          MR. BENZAKEN:  May I have a moment, your Honor?

8          THE COURT:  You may.

9          (Pause.)

10         MR. BENZAKEN:  Nothing further, your Honor, thank

11   you.

12         THE COURT:  Nothing further for this witness?

13

14   REDIRECT EXAMINATION BY MS. BLOOM:

15   Q.    Just to clarify, Mr. Burt, um, after sending that

16   letter, when you didn't get further payments, did you

17   have any further conversation with Ms. Herman about the

18   payments as well?

19   A.    After the letter or --

20   Q.    After the first letter in '09 when you hadn't

21   gotten about $2,000.

22   A.    Yes, at that point, yes, we had some

23   conversations.  Yes.

24   Q.    And that that included the conversation you

25   discussed earlier about, um, your potentially going to

```
 1    the authorities?
 2    A.      Um, yes.
 3            MS. BLOOM:  No further questions.
 4            THE COURT:  Nothing further for this witness?
 5            MR. BENZAKEN:  Nothing further, your Honor.
 6            THE COURT:  You may step down.  Thank you.  Call
 7    your next witness.
 8            THE WITNESS:  Thank you.
 9            (Steps down.)
10            MS. MURRANE:  Thank you, your Honor.  The
11    government calls Bruce Gilmartin.
12            THE COURT:  She may be called.
13            Terese Gilmartin?
14            MS. MURRANE:  It's Bruce, Bruce Gilmartin.
15            THE COURT:  Okay.
16            (Pause.)
17            THE COURT:  So what else do we know about this
18    courtroom?
19            (Laughter.)
20            THE COURT:  In many respects it's traditional, it
21    is traditional in the courtrooms of the Commonwealth of
22    Massachusetts, the state courtrooms -- there she is,
23    that there are books behind the judge's bench, that's,
24    um --
25            Come forward, ma'am.
```

```
 1          MS. MURRANE:  It's actually "sir," it's "Bruce."
 2          THE COURT:  Oh, "sir," "Bruce."  I see.  And there
 3     he is.  Fine.  All right.
 4          So it's traditional to have the books behind the
 5     bench.
 6          This stenciling is traditional in the courts in
 7     Suffolk and Bristol and Barnstable Counties.
 8     Stenciling's been used throughout the history of the
 9     Commonwealth in courtrooms, stenciling is cheap, and
10     it's an appropriate decoration in public spaces, and so
11     they use stenciling here.  This stenciling is a
12     computer-generated arc that repeats the arc of the great
13     glass wall behind the, um, or in front of the doors of
14     the courtroom.
15          I can go on.
16          (Laughter.)
17          (BRUCE GILMARTIN, sworn.)
18
19          * * * * * * * * * * * * * * *
20          BRUCE GILMARTIN
21          * * * * * * * * * * * * * * *
22
23     DIRECT EXAMINATION BY MS. MURRANE:
24     Q.   Good afternoon, Mr. Gilmartin, I'm hiding here in
25     the back.  Do you see me?  Can you hear me fine if I
```

```
 1    talk into the microphone?
 2    A.    I can.
 3    Q.    Okay.  Can you please state your name for the
 4    jury?
 5    A.    Bruce James Gilmartin.
 6    Q.    What city and state do you live in?
 7    A.    I live in Boothbay, Maine.
 8    Q.    How long have you lived in Boothbay, Maine?
 9    A.    Um, four years living in the new house, so
10    probably 8 years all together.
11    Q.    Where did you live before you lived in Boothbay,
12    Maine?
13    A.    In Boxford, Massachusetts.
14    Q.    Are you married?
15    A.    Pardon me?
16    Q.    Are you married?
17    A.    Yes, I am.
18    Q.    What's your wife's name?
19    A.    It's Fay Gilmartin.
20    Q.    Do you have any children?
21    A.    I do.
22    Q.    How many?
23    A.    I have two, a boy and a girl.
24    Q.    How about grandchildren?
25    A.    I have three grandchildren.
```

1    Q.    Can you describe for the jury briefly your
2    educational background?
3    A.    My educational background was I went to high
4    school at Lynn English High School, I graduated, I went
5    into the military, and after I came out of the military
6    I went to a technical school to get a federal license to
7    fix commercial aircraft, but then before I took that job
8    I was offered a job by a computer corporation -- well,
9    it was before computers, it was a mechanical
10   corporation, and then I stayed with them for 25 years.
11   Q.    What year did you graduate from high school?
12   A.    1958.
13   Q.    How long were you in the military?
14   A.    I was in four years.
15   Q.    What branch?
16   A.    U.S. Army.
17   Q.    Where were you stationed?
18   A.    Korea and Vietnam.
19   Q.    And I think you said after you got out of the
20   military you went to technical school for a little while
21   but then took a job before you got a job in that
22   industry?
23   A.    Yes, correct.
24   Q.    And what was the name of the company you worked
25   for and what did you do?

```
1    A.    NCR Corporation, it used to be a national cash
2    register company.
3    Q.    What did you do for them?
4    A.    Well, I fixed and repaired accounting equipment
5    and cash registers.
6    Q.    How long did you work for NCR?
7    A.    25 years.
8    Q.    What did you do after you worked for NCR for 25
9    years?
10   A.    I went to work for a biomedical company out of
11   Madison, Wisconsin, Nicolet Biomedical, they build and
12   sell neuro-diagnostic medical equipment.
13   Q.    Did you move to Madison, Wisconsin?
14   A.    No, no, I had months of training there but I never
15   had to move.
16   Q.    Where were you based?
17   A.    I was based in Boston and New England.
18   Q.    How long did you work for that company?
19   A.    I worked for them about 8 to 10 years.
20   Q.    Are you currently working?
21   A.    No, I'm not.
22   Q.    What are you doing, are you retired?
23   A.    I am retired.
24   Q.    When did you retire?
25   A.    In 2003.
```

Q.    Do you know someone named Gregg Caplitz?

A.    I do.

Q.    How did you meet Gregg Caplitz?

A.    Um, he was, um, recommended by my wife, who wasn't my wife at the time, who had recently had some investments with him and they were doing pretty good, and I needed an investment counselor at the time.

Q.    Do you remember approximately when this was?

A.    Um, in the late 1990-somethings.

Q.    Do you know a woman named Rosalind Herman?

A.    Yes, I do.

Q.    How do you know Rosalind Herman?

A.    Well, I met Rosalind once at the little office they had in Burlington, Massachusetts and one time on the phone.

Q.    When you say "the office they had," who do you mean by "they"?

A.    Rosalind and Gregg.

Q.    Do you remember that first meeting with Ms. Herman in the office?

A.    Um, vaguely, yes.

Q.    What do you remember about it?

A.    Um, it was turmoil, it was very confusing, um, she had a separate office, um, Gregg and I were trying to conduct some sort of a business and she was constantly

1    in and out and interfering and yelling things from the

2    other room.

3    Q.    Yelling what kind of things?

4    A.    Oh, just comments about what we were doing and,

5    um, just very unprofessional.

6    Q.    Who did you deal with primarily, um, for your

7    investments?

8    A.    Who did I deal with?

9    Q.    Primarily for your investments.

10   A.    I still didn't get that?

11   Q.    Who was it that you dealt with primarily with your

12   investments?

13   A.    Gregg.  I dealt with Gregg.

14   Q.    So you dealt with Gregg?

15   A.    Yeah.

16   Q.    Okay.  What information did Gregg give you in

17   connection with investments?

18   A.    Very little.  Gregg would always say he had a

19   "great place to make a lot of money" and "we're going to

20   look good."  Only one of them turned out to be right.

21   Q.    Did Rosalind Herman ever make comments about your

22   investments?

23   A.    Yes, yes, she did.  Gregg was trying to, um, get

24   me to invest in some stock that I wanted no part of and

25   I wasn't going to buy into it and we were discussing

1    this on the phone and Gregg was -- "You've got to buy

2    this, this is a good deal, you're going to make a lot of

3    money on this, this is a wonderful," and I kept saying

4    "No," "No," "No," and I could hear Rosalind in the other

5    room yelling something, she was yelling one word over

6    and over and over, and at first I couldn't pick out what

7    she was yelling and then I finally realized what she was

8    yelling from the other room.

9    Q.    And what was she saying?

10   A.    A very derogative low-class remark.

11   Q.    And what was it?

12   A.    She was calling me a "pussy."

13        MS. MURRANE:  May I approach the witness, your

14   Honor?  May I approach?

15        THE COURT:  Oh, of course you may.  I'm sorry.

16   Q.    Mr. Gilmartin, I'm going to hand you what's been

17   premarked as Exhibit GU and just have you take a look

18   through it.

19   A.    (Laughs.)

20   Q.    And I'll have you -- I'll have you turn to the

21   last page of that document and take a look at the

22   signature there and ask if that's your signature?

23   A.    That is my signature.

24        MS. MURRANE:  The government would offer into

25   evidence Exhibit GU.

1          THE COURT:  No objection?

2          MR. O'HARA:  No objection, your Honor.

3          MS. MURRANE:  Exhibit 300.

4          THE COURT:  GU is Exhibit 300 in evidence.

5          (Exhibit 300, marked.)

6          MS. MURRANE:  And if we may publish that for the

7     jury.

8          (On screen.)

9     Q.   And let's take a look at -- we'll take a look at

10    the first page, the first paragraph, and you can look at

11    that document either in paper in front of you or it's

12    also going to appear on the screen right by you on the

13    witness stand, whichever one is easier for you to read.

14         And can you read for the jury the title of that

15    document?

16    A.   "Investment Advisory Agreement."

17    Q.   And if you take a look at the second paragraph

18    down --

19         MS. MURRANE:  If we can scroll out.

20         (Scrolls on screen.)

21    Q.   If you take a look at the second paragraph down,

22    can you just read that first sentence?

23    A.   "I hereby retain you, Insight Onsite, as an

24    investment advisory for my account."

25         MS. MURRANE:  Now, if we can scroll to Page 9,

1   which is last page of that agreement.

2        (Scrolls on screen.)

3   Q.    And we'll take a look at the signatures on that

4   page.

5        On the top there above the words "primary account

6   holder," whose signature is that?

7   A.    That is mine.

8   Q.    And that's your signature, your true signature, is

9   that right, that's your handwriting?

10  A.    (Silence.)

11  Q.    Mr. Gilmartin?

12  A.    That is my handwriting.

13  Q.    Okay.  And then below that, above "Insight Onsite

14  Strategic Management, LLC," whose signature appears

15  there?

16  A.    Um, it looks like Rosalind's.

17       MR. O'HARA:  Objection, your Honor.

18       THE COURT:  Well, in view of the answer, do you

19  press the objection?

20       MR. O'HARA:  No.

21       THE COURT:  Very well.  It's withdrawn.

22  Q.    Did you hire Insight Onsite Strategic Management

23  to be your investment advisor?

24  A.    Um, yes, I did.  He was running under another

25  name, his investment company was running under a

1    different name, and then one day he just said, "I'm

2    rearranging everything, we have this new organization

3    we're going to use, and you're going to like it a lot

4    better."  And that's all the knowledge I got about it, I

5    never got any mailings or pamphlets or explanations,

6    it's just "For now on we're Insight Onsite."

7    Q.    And what did you expect your investment advisor to

8    do for you?

9    A.    I expected him to make me money.  I didn't expect

10   to make 100 percent on everything, I knew there would be

11   a few losers in there, but I expected him to make me

12   money.

13   Q.    At some time did anyone come and talk to you about

14   a hedge fund investment?

15   A.    Well, um, not to my knowledge.  At the time that

16   we invested, um, with Insight Onsite, I wasn't aware of

17   what a hedge fund was, I would not have allowed him to

18   invest my money in a hedge fund, knowing how they work

19   now.

20   Q.    Did anyone come and talk to you about investing in

21   a hedge fund that was going to be managed and owned by

22   Rosalind Herman?

23   A.    No.

24   Q.    Then why do you have a very specific memory of

25   that?

A.    Because I didn't want anything to do with her and
if someone had said that to me I would have just pulled
my money and ran.

        MS. MURRANE:  If I can approach the witness, your
Honor?

        THE COURT:  You may.

Q.    Mr. Gilmartin, I'm going to hand you what's been
premarked as Exhibit BQ.

A.    (Looks.)

Q.    And, Mr. Gilmartin, if you can look at that
exhibit and turn to the last page.

A.    (Looks.)

Q.    There's a signature on that page.  Is that your
signature?

A.    Yes, indeed it is.

Q.    And what's the title of this document?

A.    It's an "IRA distribution request."

        MS. MURRANE:  The government would offer Exhibit
BQ into evidence.

        MR. O'HARA:  No objection.

        THE COURT:  BQ is admitted as?

        MS. MURRANE:  Exhibit 166.

        THE COURT:  Exhibit 166.

        (Exhibit 166, marked.)

Q.    So, Mr. Gilmartin, let's take a look at the first

1    page of this document in the first column there, do you

2    see on the top left there's a reference to payment in

3    the amount of $51,000?

4    A.    I do.

5    Q.    A one-time distribution?

6    A.    I see that's checked.

7    Q.    Do you have a memory of giving authorization for a

8    one-time distribution of $51,000.

9    A.    No, I don't.

10   Q.    Now we'll scroll down to the bottom of that page

11   on the right-hand side, do you see the box at the bottom

12   that starts with an ADA number and then it has a bank

13   name?

14   A.    Yes.

15   Q.    And what's the bank name that's listed there?  Do

16   you see the bank name on that document?

17   A.    It's Town and Country Bank.

18   Q.    And where is that located?

19   A.    It's in Las Vegas, Nevada.

20   Q.    And there's a line that says "for the benefit of,"

21   what does that say?

22   A.    Um, Bruce Gilmartin.

23   Q.    Well, that's a little lower down, right, so

24   further above that do you see the "for the benefit of"

25   line?

1    A.    "Insight Onsite Strategic Management."

2    Q.    And then if we can go back to Page 3 of this

3    document again.

4    A.    (Turns.)

5          MS. MURRANE:   And we'll just show the jury the

6    signature block on this.  They haven't seen it yet.

7          (On screen.)

8    Q.    And that's your signature?

9    A.    Yup, that's my signature.

10   Q.    And that's March 8th, 2012?

11   A.    Correct.

12   Q.    Do you remember executing this document?

13   A.    (Silence.)

14   Q.    Mr. Gilmartin, do you remember signing this

15   document?

16   A.    Oh, I'm sorry.  Um, no, what would happen with

17   Gregg, and it happened numerous times, he would give me

18   a call and say, "I'm changing some stuff, I'm going to

19   send you something to sign, please get it back to me as

20   quickly as possible," and basically what I'd get is a

21   page similar to this and it would have a little "Sign

22   here" and I'd sign there and I would fax it back to him,

23   and, um, not knowing what it was even attached to.

24   Q.    Did you authorize any payments to a hedge fund

25   owned by Insight Onsite Strategic Management?

1    A.    No, I did not.

2    Q.    And did you ever receive any distributions from a

3    hedge fund under that name or a hedge fund owned by

4    Rosalind Herman?

5    A.    No, I did not.

6    Q.    And did you ever receive any investment back or

7    principal back from any investment into a hedge fund?

8    A.    No, not that I know of.

9          MS. MURRANE:  No further questions, your Honor.

10          THE COURT:  Mr. O'Hara?

11          MR. O'HARA:  Thank you.

12

13    CROSS-EXAMINATION BY MR. O'HARA:

14    Q.    Good afternoon, Mr. Gilmartin.  We've never met,

15    I'm Ms. Herman's attorney.

16    A.    Okay.

17    Q.    I just have a few questions to ask you.  I promise

18    I'll try to be as brief as possible.

19    A.    Okay.

20    Q.    You've only had, I believe, two conversations

21    briefly -- actually two interactions with Ms. Herman

22    your entire life, right?

23    A.    Yes, that's correct.

24    Q.    It would be the one time that you were in the

25    office consulting business with Mr. Caplitz, right, and

1    she was interrupting the business by walking in and out

2    and making comments?

3    A.    Correct.

4    Q.    And you didn't take a shine to her when you first

5    met her, is that a fair statement?

6    A.    That's correct.

7    Q.    And then the only other time you ever believed you

8    had an interaction with her was when you were having a

9    telephone conversation with Mr. Caplitz and he was

10   trying to push a stock on to you, right?

11   A.    Correct.

12   Q.    And, um, that was a telephone conversation, you

13   couldn't see who was in the office, could you?

14   A.    No, I could not.

15   Q.    And you and Mrs. Herman, it's fair to say, were

16   not on a first-name basis?

17   A.    Well, not that I know of.

18   Q.    No, no, I mean then.

19   A.    Oh, then?  Um, yeah, I would think so.

20   Q.    You knew her name and she knew your name?

21   A.    Yes.

22   Q.    Because when you spoke to the FBI about, um, the

23   time you believed she insulted you on the phone, you

24   told them that you were speaking to Mr. Caplitz and that

25   you heard her shouting the word "pussy" in the

1    background?

2    A.    Correct.

3    Q.    And you don't know who else was in the office when

4    she was making those remarks?

5    A.    No, I don't.

6    Q.    The office wasn't very big, was it?

7    A.    No, it wasn't.

8    Q.    And you don't know if she was directing those

9    comments at you, at Mr. Caplitz, or at somebody else in

10   the office?

11   A.    No, I don't.

12   Q.    Also it appears that you signed an investment

13   agreement, um, with Insight Onsite Management that

14   contained the signature of it on the document from

15   Rosalind Herman, right?

16   A.    Yes.

17   Q.    You looked at that?

18   A.    Yes.

19   Q.    And you are not familiar with Ms. Herman's

20   signature, are you?

21   A.    No, I'm not.

22   Q.    When you signed that document, she wasn't present,

23   was she?

24   A.    No, she wasn't.

25   Q.    So the signature of Rosalind Herman had been put

1    on that document before you signed it, correct?

2    A.    I can't recall.

3    Q.    Or it could have been put on after you signed it?

4    A.    It could have been.

5    Q.    Also, the, um -- the withdrawal or the transfer of

6    the $51,000 from the IRA account, there's a form that

7    was filled out by hand on that transfer form?

8    A.    Okay.

9    Q.    And you're not familiar with the handwriting of

10   the person who filled that out, are you?

11   A.    No, I'm not.

12   Q.    But it's true that Mr. Caplitz was your personal

13   financial advisor, right?

14   A.    Yes.

15   Q.    And he also was a personal financial advisor for

16   your wife?

17   A.    Well, we weren't married at the time.

18   Q.    I'm sorry.

19   A.    So I -- I would think, yes, he was.

20   Q.    Because you weren't married at the time and I

21   believe that, um, and correct me if I'm wrong, um, there

22   was a death in your wife's family and that was how she

23   came into contact with Mr. Caplitz to invest some money

24   that she had inherited?

25   A.    Yes.

```
1    Q.    Okay, and it was through her relationship with
2    Mr. Caplitz that you developed a professional
3    relationship with Mr. Caplitz?
4    A.    Correct.
5    Q.    Okay.  And Mr. Caplitz had authorization from you
6    to move your money around?
7    A.    Um, yes.
8    Q.    And he was supposed to get your permission before
9    he would move your money around?
10   A.    Yes, he was.
11   Q.    As your financial advisor he was supposed to
12   discuss with you what he was doing?
13   A.    Yes.
14   Q.    And apparently he didn't do that, did he?
15   A.    He did not.
16   Q.    But Mrs. Herman didn't have any authorization to
17   have access of anything that you owned?
18   A.    No, not by me.
19   Q.    Thank you.
20         THE COURT:  Nothing further for this witness,
21   Ms. Murrane?
22         MS. MURRANE:  Nothing further, your Honor.
23         THE COURT:  You may step down.  Thank you.  Call
24   your next witness.
25         (Witness steps down.)
```

1          MS. MURRANE:  Susan Paley.

2          THE COURT:  Ms. Paley may be called.

3          (SUSAN PALEY, sworn.)

4

5          * * * * * * * * * * *

6          SUSAN PALEY

7          * * * * * * * * * * *

8

9    DIRECT EXAMINATION BY MS. MURRANE:

10   Q.     Good afternoon.  Can you please state your name

11   for the jury.

12   A.     Susan Paley.

13   Q.     What city and state do you live in?

14   A.     I live in Newton, Massachusetts.

15   Q.     Are you married?

16   A.     Yes, I am.

17   Q.     What's your husband's name?

18   A.     Martin Paley.

19   Q.     Do you have a family?

20   A.     Yes, we have one daughter.

21   Q.     How old is she?

22   A.     She's 21.

23   Q.     Can you describe briefly your educational

24   background for the jury.

25   A.     Yes, I have a bachelor's degree from Simmons

1    College and a master's from Boston University.

2    Q.    What do you do for work?

3    A.    I'm vice-president of community relations for the

4    Village Bank in Newton, Massachusetts.

5    Q.    How long have you worked there?

6    A.    8 years.

7          MS. MURRANE:  May I approach, your Honor?

8          THE COURT:  You may.

9    Q.    Ms. Paley, I'm going to hand you what's been

10   premarked as Exhibit GX.

11   A.    (Looks.)

12   Q.    What is that document?

13   A.    It is a, um, an Investment Advisory Agreement.

14   Q.    And if you look at the last page of that

15   agreement.

16   A.    (Looks.)

17   Q.    Is your signature -- is that your signature on

18   this document?

19   A.    Yes, it is.

20         MS. MURRANE:  The government would offer into

21   evidence Exhibit GX.

22         MR. O'HARA:  No objection.

23         THE COURT:  GX is admitted as?

24         MS. MURRANE:  Exhibit 303.

25         THE COURT:  GX is admitted as Exhibit 303.

1              (Exhibit 303, marked.)

2    Q.    Take a look at the first page of this document.

3    Can you tell the jury what the title is?

4    A.    "Investment Advisory Agreement."

5    Q.    And if you look at the, um, second paragraph of

6    the text of this agreement, can you read that first

7    sentence.

8    A.    "I hereby retain you, Insight Onsite, as

9    investment advisor for my account."

10   Q.    A little bit further down there's a section, the

11   title is "Investment Objectives," and do you see there

12   are two checkmarks there?

13   A.    Yes.

14   Q.    What are the things that are checked?

15   A.    "Conservative Growth" and "Growth"?

16   Q.    Do you have a memory of what that is referencing

17   with respect to this agreement?

18   A.    Um, I don't have, um, a lot of memory about it, my

19   husband took care of most of the investment decisions

20   and he came to me, um, basically for the signature.

21   Q.    Um, were you, as an investor, looking for

22   aggressive investments or conservative investments?

23   A.    Very conservative.

24          MS. MURRANE:  And then we'll take a look at the

25   last page again, which is Page 10.

1          (On screen.)

2    Q.    Above the line that says "Primary account holder,"

3    whose signature is that?

4    A.    That's my signature.

5    Q.    And then whose name appears above the title

6    "Insight Onsite Strategic Management"?

7    A.    Rosalind Herman as a managing member.

8    Q.    Do you know a man named Gregg Caplitz?

9    A.    Yes, I do.

10   Q.    How do you know Gregg Caplitz?

11   A.    Um, approximately 20 years ago, or perhaps a

12   little longer than that, my husband was contemplating a

13   career as a financial, um, manager and met Gregg and was

14   trained by him for a period of probably a year or two,

15   and then Gregg handled our investments.

16   Q.    Do you know Rosalind Herman?

17   A.    Yes.

18   Q.    Did you have interactions with Rosalind Herman?

19   A.    I had very few interactions with Rosalind Herman

20   personally, um, most of our relationship was with Gregg.

21   Q.    Do you remember any particular interactions with

22   Ms. Herman?

23   A.    Um, there was one in particular where, um, in 1994

24   I had just gotten -- literally had just gotten home from

25   the hospital, after delivering my daughter, when

1    Rosalind called me and accused me of forging my own

2    signature on a document, and was very belligerent and

3    unpleasant, so at that point I refused to speak to her

4    on the phone.

5    Q.    A document related to what?

6    A.    I can only -- again this was 1994, I can only

7    imagine that it had something to do with an investment

8    that we had made and, um, after that, as I said, I

9    refused any contact with her.

10   Q.    So after that who was it that you were dealing

11   with primarily?

12   A.    Gregg Caplitz.

13   Q.    Did Mr. Caplitz provide information to you on the

14   roles that were played by he and Rosalind Herman with

15   respect to the company?

16   A.    Not really, as I understood it investment

17   decisions were made by him.

18   Q.    And did Mr. Caplitz discuss with you his feelings

19   for Ms. Herman?

20         MR. O'HARA:  Objection.

21         THE COURT:  Yeah, sustained, you're, um --

22         MS. MURRANE:  8033, your Honor.

23         THE COURT:  Oh, I understand what you're doing,

24   you're leading the witness.  And you have in mind our

25   earlier sidebar.

1        (Silence.)

2        THE COURT:  But I didn't -- I didn't -- I

3   sustained it on the ground that it was leading.  I'm

4   just telling you, you have in mind our earlier sidebar.

5   You proceed.

6   Q.    What if anything did Mr. Caplitz say to you

7   regarding his feelings for Ms. Herman?

8        MR. O'HARA:  Objection.

9        THE COURT:  Noted, but she may have it.

10        Did he talk about that?

11        THE WITNESS:  Yes, I believe that they were

12   romantically involved and I believed actually that they

13   were married --

14        THE COURT:  What did he say?

15        THE WITNESS:  He referred to her as his wife, he

16   referred to her sons as his children, on more than one

17   occasion.

18        THE COURT:  Go ahead.

19   Q.    Did you and your husband invest in a hedge fund?

20   A.    We did not invest in a hedge fund, we invested in

21   what we believed to be in the management company for the

22   hedge fund.

23        MS. MURRANE:  May I approach the witness, your

24   Honor?

25        THE COURT:  You may.

1   Q.     Ms. Paley, I'm going to hand you what's been

2   premarked as Exhibit CK.

3   A.     (Looks.)

4   Q.     What is that document?

5   A.     That's a check written off of the account of my

6   husband and mine, and my husband signed it, it is to

7   "Insight Onsite Strategic Partners."

8          MS. MURRANE:   The government would offer into

9   evidence Exhibit CK?

10         THE COURT:   No objection?

11         MR. O'HARA:   No objection.

12         THE COURT:   CK is admitted as?

13         MS. MURRANE:   Exhibit 186.

14         THE COURT:   186 in evidence.

15         (Exhibit 186, marked.)

16  Q.     So, Ms. Paley, um, what's the date on this check?

17  A.     August 3rd of 2012.

18  Q.     Who was it payable to?

19  A.     "Insight Onsite Strategic Management, LLC."

20  Q.     For how much?

21  A.     $26,000.

22  Q.     Whose signature is on the signature line of this?

23  A.     My husband's, Martin Paley.

24  Q.     Do you know what this check was for?

25  A.     I believe that it was for an investment in the

```
 1   management company for the hedge fund.
 2   Q.    What was your understanding about the hedge fund
 3   and how did you get that understanding?
 4   A.    Um, I understood that we were to get the $26,000
 5   back plus some amount of interest, which I'm unclear on.
 6   Um, that's really all the recollection I have.
 7   Q.    And was this the only payment that was made for
 8   this investment into the management of the hedge fund by
 9   you and your husband?
10   A.    I believe there were two others.
11   Q.    What returns did you see from these investments?
12   A.    Nothing.
13   Q.    And how much of the principal of these investments
14   did you get back?
15   A.    Nothing.
16         MS. MURRANE:  No further questions, your Honor.
17         THE COURT:  Any questions?
18         MR. BENZAKEN:  Briefly, thank you.
19         THE COURT:  Okay, Mr. Benzaken.
20
21   CROSS-EXAMINATION BY MR. BENZAKEN:
22   Q.    Good afternoon, ma'am.
23   A.    Good afternoon.
24   Q.    You first began to do work with Mr. Caplitz after
25   your husband was connected with him for employment
```

purposes, correct?

A.     Yes.

Q.     And did you start investing with him while your
husband was still working with him or only after?

A.     I don't remember.

Q.     But from then on, um, it was shortly after you'd
started investing with him that you received that phone
call in 1994 after your daughter's birth as you
described?

A.     Um, it was probably -- maybe two years.  I don't
recall at this point.

Q.     And that phone call stands out in your mind as
being the reason you didn't want to speak to Ms. Herman?

A.     Exactly.

Q.     So from then on you dealt exclusively with
Mr. Caplitz in directing your investments?

A.     Correct.

Q.     And fair to say, because of your experience in
banking, that you were part of a lot of the
conversations that occurred with Mr. Caplitz?

A.     Not a lot, my, um, expertise is not in investment
management or finance, that's my husband's area of
expertise, so most things were done between my husband,
Gregg, and perhaps Rosalind Herman.

Q.     But you were a part of a lot of those discussions

1    and meetings -- I'm sorry, you were a part of a lot of

2    those discussions with Mr. Caplitz nevertheless?

3    A.    Yes.

4    Q.    All right.  And it's fair to say that during a lot

5    of discussions with investments, um, some of them are

6    very complicated, correct?

7    A.    Correct.

8    Q.    And in fact you didn't understand some of these

9    investments, right?

10   A.    Correct.

11   Q.    And you -- and he could be kind of a bully when

12   you would have those conversations with him, correct?

13   A.    He was a friend.

14   Q.    Okay.  You spoke with the FBI about this matter,

15   correct?

16   A.    Correct.

17   Q.    And you were told then that you felt that Caplitz

18   could sometimes bully you into some of your investments?

19   A.    He could be a bully, but so could I.

20   Q.    Okay.  Well, he would yell during some of the

21   conversations, "What are you stupid, this is going to

22   make lots of money?"

23   A.    That was his style.

24   Q.    That was his style, right.

25   A.    He was also brilliant.

1    Q.    So notwithstanding you were willing to go along

2    with these investments at the time?

3    A.    Yes.

4    Q.    Okay.  And again anything that you described as

5    far as your understanding about the relationship, any

6    personal relationship between Mr. Caplitz and

7    Ms. Herman, it's only from what Mr. Caplitz told you,

8    correct?

9    A.    That is correct.

10   Q.    All right.  You observed nothing between them that

11   would lead you or inform your understanding of their

12   relationship, correct?

13   A.    That's correct.

14        MR. BENZAKEN:  Nothing further.  Thank you.

15        THE COURT:  Nothing further for this witness?

16        MS. MURRANE:  Nothing further, your Honor.

17        THE COURT:  You may step down.  Thank you.  Call

18   your next witness.

19        (Steps down.)

20        MS. MURRANE:  James Connell.

21        THE COURT:  He may be called.

22        (Pause.)

23        (JAMES G. CONNELL, sworn.)

24

25        * * * * * * * * * * * * * * * *

```
 1          JAMES G. CONNELL

 2          * * * * * * * * * * * * * * * *

 3

 4     DIRECT EXAMINATION BY MS. MURRANE:

 5     Q.     Please state your name for the jury.

 6     A.     James G. Connell, Sr.

 7     Q.     And can you -- can you move the microphone a

 8     little closer to you.  The whole base can move so that

 9     it can come in, um, and you can sit there.

10            (Moves microphone.)

11     Q.     Thank you.

12            What city and state do you live in?

13     A.     Um, Dracut, Massachusetts.

14     Q.     Do you have a family?

15     A.     Um, yes.

16     Q.     Do you have children?

17     A.     Yes.

18     Q.     How many?

19     A.     Two boys.

20     Q.     Any grandchildren?

21     A.     Um, four.

22     Q.     Can you describe very briefly for the jury your

23     educational background.

24     A.     Um, grade school, high school, and a year of

25     technical school.
```

```
 1    Q.    When did you graduate high school?

 2    A.    1964.

 3    Q.    Where did you go to high school?

 4    A.    Dracut High.

 5    Q.    I'm sorry, where?

 6    A.    Dracut High.

 7    Q.    And what do you do for work now?

 8    A.    I'm retired.

 9    Q.    What did you do before you retired?

10    A.    I was an air conditioner and refrigeration

11    mechanic.

12    Q.    How long did you have that job?

13    A.    Oh, 45 years.

14          MS. MURRANE:  If we could bring up, for the

15    witness only, what's been premarked as Exhibit GS.

16          (On witness's monitor.)

17    Q.    Mr. Connell, if you look at the screen that's on

18    the witness stand next to you, can you see a document

19    there?

20    A.    Yes.

21    Q.    Okay, and what's the title of that document?

22    A.    "Investment Advisory Agreement."

23          MS. MURRANE:  If we could flip to the last page of

24    that document.

25          (On screen.)
```

1   Q.    Whose signature is that on the left?

2   A.    Um, that's mine.

3         MS. MURRANE:  The government would offer into

4   evidence Exhibit GS.

5         MR. O'HARA:  No objection.

6         THE COURT:  GS is admitted as exhibit?

7         MS. MURRANE:  298.

8         THE COURT:  298 in evidence.

9         (Exhibit 298, marked.)

10        MS. MURRANE:  And while we're here on the last

11  page -- excuse me.

12  Q.    That's your signature on the left, is that

13  correct?

14  A.    Yes.

15  Q.    And then whose signature is that on the right?

16  A.    My wife's.

17        MS. MURRANE:  If we can look at the next page of

18  this agreement.

19        (On screen.)

20  Q.    And here again we see a signature on the left,

21  whose is that?

22  A.    That's mine.

23  Q.    And on the right?

24  A.    My wife's.

25  Q.    And whose name appears above the line "Insight

1    Onsite Strategic Management"?

2    A.    Um, Rosalind Herman.

3          MS. MURRANE:  If we can go to Page 1 of this

4    agreement.

5          (On screen.)

6          MS. MURRANE:  And take a look at the second

7    paragraph.

8          (Moves on screen.)

9    Q.    Can you read the first sentence of the second

10   paragraph there?

11   A.    "We hereby retain you, Insight Onsite, as

12   investment advisor for my or our account.  I or we place

13   under your supervision securities and/or cash separately

14   listed to manage same upon the basis of your Insight

15   Onsite managed account program."

16   Q.    Okay, that's fine, Mr. Connell.  Now, if we go

17   down just a little bit on that page to a section called

18   "Investment Objectives," and do you see there's a box

19   there checked "Conservative Growth"?

20   A.    Yes.

21   Q.    When you, um, hired Insight -- did you hire

22   Insight Onsite to be your investment advisor?

23   A.    Yes.

24   Q.    When they were hired, what were your investment

25   goals, did you want to be placed in risky investments or

1    conservative investments?

2    A.    Conservative to risky at times.

3    Q.    Who was it that you dealt with primarily from

4    Insight Onsite Management Services?

5    A.    Um, Gregg Caplitz.

6    Q.    How did you come to know Gregg Caplitz?

7    A.    Um, he was referred to me by an employee I used to

8    work with.

9    Q.    And when was it that you were referred to

10   Mr. Caplitz?

11   A.    I believe it was around 1995.

12   Q.    Are you familiar with Rosalind Herman?

13   A.    I think I met her once, and that was about it.

14   Q.    When did you meet her?

15   A.    One time when I was having a meeting with Greg she

16   had passed through the office and he just -- he just

17   introduced her to me and my wife.

18   Q.    Where was the office?

19   A.    I'm not sure if it was in Woburn at the time or,

20   um, in Reading.  I'm not sure which one it was.  I'm not

21   sure what town it was.

22   Q.    At some point in time did someone come and discuss

23   a hedge fund investment with you?

24   A.    Yes.

25   Q.    Who did that?

1    A.    Gregg Caplitz.

2    Q.    What did he tell you about it?

3    A.    Um, that it was a good deal, um, there was plenty

4    of profit to be made, um, it would take a while but --

5    um, that was about it.

6    Q.    Did he show you any documents regarding it?

7    A.    Yes.

8          MS. MURRANE:  I'd ask to put up, for the witness

9    only, what's been premarked as Exhibit AS, like "Sam."

10         (On screen.)

11   Q.    Does this document look familiar to you?

12   A.    Yes.

13   Q.    What is it?

14   A.    Um, the hedge fund that we talked about.

15   Q.    Is this one of the documents that Mr. Caplitz

16   provided to you?

17   A.    Um, yes.

18         MS. MURRANE:  The government would offer into

19   evidence Exhibit AS.

20         MR. O'HARA:  No objection.

21         THE COURT:  AS is admitted as?

22         MS. MURRANE:  Exhibit 142.

23         THE COURT:  As Exhibit 142 in evidence.

24         (Exhibit 142, marked.)

25         MS. MURRANE:  So let's take a look at sort of this

1    first top third of the document.

2          (Enlarges on screen.)

3    Q.    So what's the title that's shown there?

4    A.    "Insight Onsite Strategic Fund LC Fee Projection."

5    Q.    And then underneath that, what's the title?

6    A.    "Worst case, 9 percent annual return."

7    Q.    What did you -- is this a document -- what did

8    Mr. Caplitz tell you about this document?

9    A.    That the investment return would be 9 percent or

10   higher and it was a hedge fund.

11         MS. MURRANE:  And if we scroll down to the next

12   third of the document.

13         (Scrolls on screen.)

14   Q.    What's the subtitle there?

15   A.    "Expected case, 12 percent annual return."

16   Q.    And what did you understand that to mean?

17   A.    That if the hedge fund did a lot better, we'd be

18   getting a 12 percent return.

19         MS. MURRANE:  And then if we take a look at the

20   next third.

21         (Scrolls on screen.)

22   Q.    What's the subtitle there?

23   A.    "Best case, 15 percent annual return."

24         MS. MURRANE:  Let's take a look at the document,

25   just for the witness, that's been premarked as Exhibit

1    BC.

2         (On witness's screen.)

3    Q.    What is this document, Mr. Connell?

4    A.    I believe that's the agreement that, um, my wife

5    and myself signed, and Gregg signed, for the hedge fund.

6         MS. MURRANE:   The government would offer into

7    evidence Exhibit BC.

8         MR. O'HARA:   No objection.

9         THE COURT:   BC is admitted as exhibit?

10        MS. MURRANE:   152.

11        THE COURT:   152 in evidence.

12        (Exhibit 152, marked.)

13   Q.    So you were saying that Mr. Caplitz discussed

14   investing it in a hedge fund, did you decide to -- what

15   did you decide about investing in a hedge fund?

16   A.    What did I decide?

17   Q.    Yes.

18   A.    We decided we were going to do it.

19   Q.    For how much?

20   A.    Well, it ended up a total of roughly $275,000.

21   Q.    And what does -- what's the date on this document?

22   A.    Oh, I'm sorry, 2-26-2009, or 2-20.

23   Q.    Who wrote it out?

24   A.    Um, Gregg Caplitz.

25   Q.    And what did you understand this document to do?

1    A.    Well, that we had invested in the hedge fund and

2    we returned a pretty good sizable percentage return.

3    Q.    Can you read the first -- can you read this

4    document out loud.

5    A.    "This serves as an agreement between Insight

6    Onsite Strategic Partners, LLC and Linda and James

7    Connell, 366 Loon Hill Road, Dracut, Massachusetts,

8    01826.  If their second $100,000 investment is

9    considered a taxable distribution, Insight Onsite will

10   reimburse the Connells the entire" --

11         I'm not sure what that word is?

12   Q.    "Incremental" maybe.

13   A.    -- "incremental federal and state tax cost as

14   determined by Daniel P. Goodness of Bottom Line

15   Specialist in April of 2010.  If the unit" --

16         I'm sorry, I can't read that word.  What is it?

17   Q.    "Remains" maybe?

18   A.    -- "remains in the IRA, the agreement is void."

19   Signed "Gregg Caplitz."

20   Q.    This makes reference to a second $100,000

21   investment.  As of this date had there already been a

22   first $100,000 investment by you and your wife?

23   A.    Yes.

24   Q.    And did you agree to make this second $100,000

25   investment?

```
 1   A.      Yes.
 2           MS. MURRANE:  Let's take a look at what's been
 3   premarked as Exhibit BB, for the witness only.
 4           (On witness's screen.)
 5   Q.      What is this document, Mr. Connell?
 6   A.      Um, that was an additional $75,000 for the hedge
 7   fund.
 8   Q.      Who wrote this letter?
 9   A.      Gregg Caplitz.
10   Q.      What's the date on it?
11   A.      5-14-2009.
12           MS. MURRANE:  The government would offer into
13   evidence Exhibit BB.
14           MR. O'HARA:  BB?  No objection.
15           THE COURT:  EB?
16           MR. O'HARA:  "B" as in "Boy" and "B" as in "Boy"?
17           MS. MURRANE:  Yes.
18           THE COURT:  And the numbers?
19           MS. MURRANE:  151.
20           THE COURT:  BB is admitted, Exhibit 151.
21           (Exhibit 151, marked.)
22   Q.      What does this document reflect, Mr. Connell?
23   A.      That was the additional $75,000 that we gave him.
24   Q.      So you had invested initially, I think you said,
25   $100,000, is that right?
```

```
1    A.    All together?

2    Q.    No, in stages.

3    A.    Oh, yeah.

4    Q.    So what were the payments that you made into this

5    hedge fund investment?

6    A.    I think it was 100,000, 100,000, and 75,000.

7    Q.    And what does this document reflect, which of

8    those payments?

9    A.    Um, the 75,000.

10   Q.    What was Mr. Caplitz, if anything, saying about

11   this hedge fund investment as you were making these

12   payments over time?

13   A.    That there would be a return, whatever the return

14   turned out to be, and that's what we would receive.

15         MS. MURRANE:  The government would ask, to show to

16   the witness only, what's been premarked as Exhibit AT,

17   "Apple," "Tomato."

18         THE COURT:  You may.

19         (On witness's monitor.)

20   Q.    What is this document, Mr. Connell?

21   A.    I believe that was my total portfolio amount.

22   Q.    Who provided this document to you?

23   A.    Gregg Caplitz.

24         MS. MURRANE:  The government would offer into

25   evidence Exhibit AT.
```

```
 1            MR. O'HARA:  No objection.
 2            THE COURT:  AT is admitted as?
 3            MS. MURRANE:  Exhibit 143.
 4    A.     Exhibit 143, in evidence.
 5            (Exhibit 143, marked.)
 6    Q.     Now, Mr. Connell, what we'll do is focus on the
 7    first one, two, three, four columns there on the top.
 8    Do you see that?
 9    A.     Yes.
10    Q.     So there are several things listed there under
11    "Investment Company," do you know what those refer to?
12    Do you know what "Lightspeed" was?
13    A.     Oh, "Lightspeed" was the name of the company that
14    Gregg Caplitz told me about.
15    Q.     Was that a, um --
16    A.     Oh, no, I'm sorry, "Lightspeed," that was one of
17    the stocks of one of the companies.
18    Q.     And then "Strategic Storage"?
19    A.     That was one of the stocks.
20    Q.     "Insight Onsite Strategic," what is that?
21    A.     I'm not positive.
22    Q.     Was that related to the hedge fund?
23    A.     Um -- yes.
24    Q.     And if you look over to the right you'll see, um,
25    two amounts listed, $175,000 and $100,000?
```

1    A.    Yes.

2    Q.    Do those amounts correlate to the amount that you

3    had invested in the hedge fund?

4    A.    Yes.

5    Q.    And then if you look just one column further, the

6    account value, do you see that?

7    A.    Yes.

8    Q.    What was it that was listed as the account value

9    on the $175,000 investment into the hedge fund?

10   A.    Um, 500,000.

11   Q.    And then how about the $100,000 investment?

12   A.    250,000.

13         MS. MURRANE:  Can we take a look at what has been

14   premarked as Exhibit AZ, just for the witness.

15         (On witness's screen.)

16   Q.    And, Mr. Connell, what's the title of this

17   document?

18   A.    "IRA Distribution Request."

19         MS. MURRANE:  If we take a look at Page 3.

20         (On screen.)

21   Q.    Whose signature is that on that page?

22   A.    That's mine.

23         MS. MURRANE:  The government would offer into

24   evidence Exhibit AZ.

25         MR. O'HARA:  No objection.

1          THE COURT:  AZ is admitted as?

2          MS. MURRANE:  149.

3          THE COURT:  Exhibit 149 in evidence.

4          (Exhibit 149, marked.)

5          MS. MURRANE:  We'll scroll -- well, we'll take a

6    look -- again just for the jury to see, on Page 3 at the

7    top of that page.

8          (On screen.)

9    Q.    Whose signature is that?

10   A.    That's mine.

11   Q.    What's the date?

12   A.    "9-21."

13   Q.    What year?

14   A.    "12."  2012.

15         MS. MURRANE:  And let's go back to the first page.

16         (Moves on screen.)

17   Q.    What's the title of this document?

18   A.    "IRA Distribution Request."

19         MS. MURRANE:  And if we turn to Page 2, um, on the

20   top left there's a figure written in there.

21         (On screen.)

22   Q.    Can you see that amount?

23   A.    Yeah, it's 11,000 -- and I really can't make that

24   out, it's something-6.91 dollars.  So $11,006.91.

25         MS. MURRANE:  And then if we go back out and look

1    at the bottom right.

2            (On screen.)

3    Q.    Do you see that box there?

4    A.    Yes.

5    Q.    What's the bank account that is listed there, that

6    second line?

7    A.    "Town and Country Bank."

8    Q.    Where is it located?

9    A.    Las Vegas, Nevada.

10   Q.    And then two lines below that, what's the company

11   name that's listed there?

12   A.    "Insight Onsite Strategic Management."

13   Q.    Do you remember authorizing a distribution of

14   $11,006.91 from your IRA to be paid to Insight Onsite in

15   September of 2012?

16   A.    Not paid to Insight Onsite, no.

17           MS. MURRANE:   Let's take a look at what has been

18   premarked as Exhibit AY, for the witness only.

19           (On witness's screen.)

20   Q.    What is this document, Mr. Connell?

21   A.    Um, that was the document about the hedge fund.

22   Q.    Did there come a point in time where you were

23   asking about this hedge fund investment?

24   A.    Yes.

25   Q.    Who were you talking to?

1    A.     Gregg Caplitz.

2    Q.     What were you saying and what was he saying?

3    A.     I was asking him what was going on because it

4    seemed like it was running on and on, that, um, I'm not

5    receiving anything from the hedge fund, and he just kind

6    of kept putting me off in different ways and stuff like

7    that.

8    Q.     And what's the date on this document?

9    A.     Um, "2-15-2012."

10   Q.     Is it a "12" or a "3"?

11   A.     Oh, it could be a "3".

12          MS. MURRANE:  The government would offer into

13   evidence Exhibit AY.

14          MR. O'HARA:  No objection.

15          THE COURT:  AY is admitted and the numbers are?

16          MS. MURRANE:  The exhibit number is 148.

17          THE COURT:  AY is admitted, Exhibit 148.

18          (Exhibit 148, marked.)

19   Q.     What is this document, Mr. Connell?

20   A.     That was for the hedge fund, the money that I gave

21   Gregg.

22   Q.     Do you remember why this document came about, what

23   preceded this?

24   A.     I'm not really sure.

25   Q.     Was it after you were having discussions about

1    Mr. Caplitz and when you would see returns or what was

2    happening with the hedge fund?

3    A.    That could have been.

4    Q.    What distributions did you receive from the hedge

5    fund investment?

6    A.    Nothing.

7    Q.    And what did you get back on the principal of the

8    $275,000 that you paid to the investment?

9    A.    Nothing.

10          MS. MURRANE:  And can I just have one moment, your

11   Honor?

12          THE COURT:  You may.

13          (Pause.)

14   Q.    Mr. Connell, we've been looking at documents this

15   afternoon that, um, span a few years time.

16          Was there a period of time during this that your

17   wife was quite ill?

18   A.    Yes.

19   Q.    When was that?

20   A.    Um, it started in 2008.

21   Q.    And, um, how long was she sick?

22   A.    Um, six years.

23   Q.    And when did she die?

24   A.    Um, 2014.

25   Q.    What kind of medical care did she require at the

1    time?

2    A.    Um, actually she was in a nursing home towards the

3    end and, um, before that quite a bit as far as me taking

4    care of her.

5    Q.    Was your wife's condition something that you

6    discussed with your -- with Mr. Caplitz?

7    A.    Yes.

8    Q.    Was it relevant to your investing and your

9    investment goals?

10   A.    I don't know if it was relative to investing.

11   Q.    But it was something that you had talked to

12   Mr. Caplitz about?

13   A.    Oh, sure, I mean he knew all about, you know, her

14   situation.

15        MS. MURRANE:  The government would like to bring

16   up what's been stipulated to as Exhibit Number 10.

17        THE COURT:  All right.  Exhibit 10.

18        (On screen.)

19   Q.    Mr. Connell, do you see here where there's a

20   reference to a $100,000 payment?

21   A.    Yes.

22   Q.    And it's a payment to the "Knew Experts, Inc." in

23   Las Vegas, Nevada?

24   A.    Yes.

25   Q.    And then your name appears at the bottom of this?

1    A.    Yes.

2    Q.    And you said that, um, you made several

3    investments, one of which -- the first of which was

4    $100,000 into the hedge fund?

5    A.    Yes.

6          MS. MURRANE:  Can we pull up what's been marked as

7    Exhibit Number 11.

8          (On screen.)

9          THE COURT:  It's 1:00, I'm taking your -- this is

10   about your last question, is it, or not?

11         MS. MURRANE:  I have four questions.

12         THE COURT:  Then they'll be four questions

13   tomorrow.

14         MS. MURRANE:  Okay.

15         THE COURT:  We'll stop at 1:00.

16         You've not heard all the testimony, keep your

17   minds suspended, do not discuss the case either among

18   yourselves nor with anyone else.  We'll start promptly

19   at 9:00 tomorrow morning.  The jury may stand in recess

20   until that time.  I'll remain on the bench.

21         (Jury leaves, 1:00 p.m.)

22         THE COURT:  You may step down, sir.

23         I take it it's Mr. Caplitz tomorrow?

24         MS. BLOOM:  There will be some other witnesses

25   before Mr. Caplitz.  We may get to Mr. Caplitz tomorrow.

```
 1          THE COURT:  One devoutly hopes.  We'll recess,

 2     9:00 tomorrow morning.

 3          (Adjourned, 1:00 p.m.)

 4

 5                    C E R T I F I C A T E

 6

 7          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 8     do hereby certify that the foregoing record is a true

 9     and accurate transcription of my stenographic notes,

10     before Judge William G. Young, on Tuesday, March 29,

11     2016, to the best of my skill and ability.

12

13

14

15     /s/ Richard H. Romanow 09-16-16

16     _____
       RICHARD H. ROMANOW  Date

17

18

19

20

21

22

23

24

25
```