<pre>
 1                  UNITED STATES DISTRICT COURT

 2                   DISTRICT OF MASSACHUSETTS

 3                             No. 1:12-cr-10015-WGY

 4

 5

 6   UNITED STATES OF AMERICA

 7

 8   vs.

 9

10   ROSALIND HERMAN

11

12                       *********

13

14                   For Jury Trial Before:
                     Judge William G. Young
15

16

17                   United States District Court
                     District of Massachusetts (Boston)
18                   One Courthouse Way
                     Boston, Massachusetts 02210
19                   Wednesday, March 30, 2016

20                       ********

21

22          REPORTER:  RICHARD H. ROMANOW, RPR
                     Official Court Reporter
23               United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
24                   bulldog@richromanow.com

25
</pre>

```
 1                    A P P E A R A N C E S

 2

 3    SARA M. BLOOM, ESQ.
      MARY B. MURRANE, ESQ.
 4        United States Attorney's Office
          J. Joseph Moakley U.S. Courthouse
 5        1 Courthouse Way, Suite 9200
          Boston, Massachusetts 02210
 6        (617) 748-3971
          Email: Sara.bloom@usdoj.gov
 7        For the United States

 8

 9    RAYMOND A. O'HARA, ESQ.
          Law Office of Raymond A. O'Hara
10        1 Exchange Place
          Worcester, Massachusetts 01608
11        (508) 831-7551
          Email: Oharalaw@hotmail.com
12   and
      JASON G. BENZAKEN, ESQ.
13        Benzaken and Wood, LLP
          1342 Belmont Street, Suite 102
14        Brockton, Massachusetts 02301
          (508) 897-0001
15        Email: Attorneybenzaken@gmail.com
          For the defendant
16

17

18

19

20

21

22

23

24

25
```

I N D E X

WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

JAMES G. CONNELL  (Continued.)

    By Ms. Murrane:       5

    By Mr. Benzaken:             6

PATRICIA WENTZELL

    By Ms. Bloom:        11

    By Mr. Benzaken:            25

CHARLENE HERMAN

    By Ms. Murrane:    33                  79

    By Mr. O'Hara:             65

BRAD HERMAN

    By Ms. Bloom:      80

    By Mr. O'Hara:            100

GREGG D. CAPLITZ

    By Ms. Bloom:      110

    By Mr. O'Hara:

1                       E X H I B I T S

2

3      EXHIBIT 176............................... 165

4      EXHIBIT 255............................... 122

5      EXHIBIT 307...............................  18

6      EXHIBIT 408...............................  44

7      EXHIBIT 409............................... 128

8      EXHIBIT 410............................... 114

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          THE COURT:  Good morning, ladies and gentlemen,
 4   thank you so much for your promptness.  I don't just say
 5   this by rote, you set the tone here and it's very
 6   important and we deeply appreciate your promptness.
 7   Everyone is ready to go.  Let's remind the witness.
 8          THE CLERK:  I'd like to remind you, sir, that
 9   you're still under oath.
10          Do you understand that, sir?
11          THE WITNESS:  Yes.
12          THE COURT:  And, Ms. Murrane, you may continue.
13          MS. MURRANE:  Thank you, your Honor.
14
15   DIRECT EXAMINATION BY MS. MURRANE:  (Continued.)
16   Q.    Good morning, Mr. Connell.
17   A.    Good morning.
18   Q.    I have just a few more questions that I wanted to
19   ask you.
20          MS. MURRANE:  And I'd ask if we could bring up
21   Exhibit Number 11, which has been stipulated to and is
22   entered into evidence.
23          (On screen.)
24   Q.    If we take a look at this wire transfer record,
25   can you tell the jury what the amount is on this wire
```

1    transfer?

2    A.    $100,000.

3    Q.    And who's the beneficiary?

4    A.    Um, the Knew Finance Experts.

5    Q.    Who's the originator?

6    A.    Myself.

7          MS. MURRANE:  If we could take a look at Exhibit

8    Number 12.

9          (On screen.)

10   Q.    And on this wire transfer record, I'd ask the same

11   three questions, the amount, the beneficiary, and the

12   originator?

13   A.    Okay, the amount was $33,000, the beneficiary was

14   the Knew Finance Experts, and the originator was myself.

15         MS. MURRANE:  No further questions, your Honor.

16         THE COURT:  Now, Mr. Benzaken?

17         MR. BENZAKEN:  Thank you, your Honor.

18

19   CROSS-EXAMINATION BY MR. BENZAKEN:

20   Q.    Good morning, sir.

21   A.    Good morning.

22   Q.    You've never met Ms. Herman, correct?

23   A.    I think maybe one time.  I'm not sure.  I think

24   maybe one time she came through Gregg Caplitz's office

25   and we were introduced, a long time ago.

1    Q.    But you had no deals with her, correct?

2    A.    Correct.

3          THE COURT:  Try to speak into that microphone or

4    pull it.  I want you to be comfortable.  And the base

5    will move too.  Pull it there close to you because the

6    jury has to hear.

7          Go ahead, Mr. Benzaken.

8          MR. BENZAKEN:  Thank you, your Honor.

9    Q.    And so most of the meetings in terms of deciding

10   and directing investments were with Mr. Caplitz?

11   A.    Yes.

12   Q.    And some of those meetings happened at your home,

13   correct?

14   A.    Yes.

15   Q.    In fact, um, during the last few years your wife,

16   Linda, was at home quite a bit and he came and visited

17   you both there, correct?

18   A.    Yes.

19   Q.    And he would come to you and he would speak with

20   your wife as she was ill?

21   A.    Yes.

22   Q.    And you felt he took advantage of maybe her weak

23   emotional state?

24   A.    Yes.

25   Q.    And you trusted him at that time, correct?

A.      Oh, yes.

Q.      He led you to believe that he was going to still help you make some money?

A.      Yes.

Q.      All right.  And you didn't understand these investments totally that he was describing, correct?

A.      No.

Q.      And you relied on him, you trusted him to follow through on what he was telling you, right?

A.      Yes.

Q.      All right.  And for that reason he had access to some of your accounts, correct?

A.      Yes.

Q.      And you testified earlier about there being a transfer yesterday of over $11,000 that you don't recall signing for?

A.      I don't recall receiving that, um, a whole amount of the $11,000, no.

Q.      All right.  And is this because you don't recall signing any document along those lines and if you signed a document, that you didn't know what it was for, you just trusted him, right?

A.      I would say I didn't know because he would give me a bunch of papers and I just trusted him, I would just sign them.

1    Q.    And when you became aware of that missing money,
2    did you ask him about it?
3    A.    I asked him about a lot of it, yeah.
4    Q.    And he indicated he would fix the problem?
5    A.    He indicated that he would fix all our problems.
6    Q.    He said, "Don't worry, I'll take care of it"?
7    A.    Yeah.
8    Q.    And you trusted him to do that, to fix these
9    problems you were noticing?
10   A.    Yes.
11   Q.    And in your discussions is it fair to say you
12   found he was pretty much a smooth talker, right?
13   A.    Yes.
14   Q.    Thank you very much, sir, and I'm sorry for your
15   loss.
16   A.    Thank you.
17         MR. BENZAKEN:  No further questions, your Honor.
18         THE COURT:  No further questions?
19         MS. BLOOM:  No further questions, your Honor.
20         THE COURT:  You may step down.  Thank you.  Call
21   your next witness.
22         (Steps down.)
23         MS. BLOOM:  The United States calls Patricia
24   Wentzell.
25         THE COURT:  She may be called.

```
 1            MS. BLOOM:  Can I just move the chair over?
 2            THE CLERK:  Yes.
 3            (Witness in wheelchair.)
 4            THE COURT:  Do you need help?
 5            (Witness at stand.)
 6            THE WITNESS:  Thank you.
 7            THE COURT:  Good morning.
 8            (PATRICIA WENTZELL, sworn.)
 9            THE COURT:  I want you to be comfortable, ma'am.
10            THE WITNESS:  I'm sliding in this chair, so.
11            THE COURT:  Well, the base of the mike moves, so
12    just get that mike --
13            THE WITNESS:  I just want you to know that I'm
14    sliding in this chair, so I'm not comfortable, so that's
15    the problem.
16            THE COURT:  Well, you take what time you need to
17    be as comfortable as you can and if you slide you can
18    always stop and adjust yourself.
19            THE WITNESS:  Okay.  Thank you.
20            THE COURT:  Go ahead, Ms. Bloom.
21            MS. BLOOM:  Good morning, Ms. Wentzell.  But
22    before we begin, would you prefer we bring in another
23    chair and you could move to that chair?
24            THE WITNESS:  I think I'll be all right.  Thank
25    you very much.
```

```
 1          MS. BLOOM:  Okay.  If at any point you'd like to
 2     switch, you let us know and we can take a break and do
 3     that.
 4          THE WITNESS:  Thank you.
 5
 6          * * * * * * * * * * * * * * * * *
 7          PATRICIA WENTZELL
 8          * * * * * * * * * * * * * * * * *
 9
10     DIRECT EXAMINATION BY MS. BLOOM:
11     Q.    Could you state your name.
12     A.    Patricia Ann Wentzell.
13     Q.    Where do you live, Ms. Wentzell?
14     A.    I live in Somerville.
15     Q.    How long have you lived there?
16     A.    32 years.
17     Q.    Could you, um, describe your education for the
18     jury?
19     A.    I graduated from high school in 1967.
20     Q.    Where did you go to high school?
21     A.    The Cotting School, it's now in Lexington, but I
22     went in Boston.
23     Q.    And, um, have you worked?
24     A.    Yes.
25     Q.    Can you describe your employment for the jury?
```

```
 1   A.    I worked for the telephone company starting in
 2   1968, I worked as a long-distance operator, then a
 3   directory-assistance operator, and then as an
 4   administrative assistant.
 5   Q.    What is a long-distance operator do?
 6   A.    Places -- well, in the old days it was working on
 7   the switchboard and placing calls for customers.
 8   Q.    Like the old Lilly Tomlin skit, you actually move
 9   the plug from one to the other?
10   A.    Yes.
11   Q.    And then what did you do after that?
12   A.    I worked in directory assistance, which was a
13   little bit different, um, it wasn't a switchboard, and
14   it was just looking up telephone numbers for people all
15   day.
16   Q.    And, um, why did you stop working?
17   A.    I stopped working for physical reasons, the last
18   job I had was physically demanding and my body couldn't
19   take it anymore.
20   Q.    What is your condition?
21   A.    I have cerebral palsy from birth.
22   Q.    And how does that affect you?  Just a brief
23   description.
24   A.    It affects me in different things that I can do.
25   When I was younger, a lot of things like walking and
```

1    getting from place to place were easier, and now it's a

2    little more difficult.

3    Q.    Um, at some point did you meet Gregg Caplitz?

4    A.    I met Gregg after a financial advisor I had left

5    and she was the person that introduced me to Gregg.

6         MS. BLOOM:  I see you looking very uncomfortable.

7    Are you sure we can't bring a chair in for you?

8         THE WITNESS:  Um, I'm just sliding.  I am

9    uncomfortable, but I'm just sliding in it.

10        MS. BLOOM:  Would it help if we took your coat?

11        THE WITNESS:  Um, maybe.  I don't know.  I don't

12   use this chair at all, so.

13        MS. BLOOM:  What do you usually sit in?

14        THE WITNESS:  I don't use the wheelchair, I just

15   sit in a -- you know, in a regular chair or a sofa or

16   whatever.

17        MS. BLOOM:  We can bring in a regular chair.

18   Would you be able to move over?

19        THE WITNESS:  I don't know because I didn't bring

20   my crutches with me this time, so I don't know.  It's

21   all right, I can do it.

22        MS. BLOOM:  Do you want help with the coat?

23        THE WITNESS:  Yes.  Thank you.

24        Sorry, your Honor.

25        THE COURT:  That's quite all right.

1          (Takes off coat with assistance.)

2          THE COURT:  I've got a witness chair there.  Would

3     you like to switch to that chair?

4          THE WITNESS:  Yes, maybe.  My apologies.  I know

5     I'm having a problem here.

6          THE COURT:  No apology is necessary.  Let's see if

7     we can't move the chair up.

8          MS. BLOOM:  Do you want to bring that down here?

9          THE COURT:  I'll move the chair up.

10         (Brings in chair.)

11         THE COURT:  There we go.

12         (Helps into chair.)

13         MS. BLOOM:  Would it help if you stayed to the

14    side so you could keep your feet up?

15         THE WITNESS:  No, that's okay.  Thank you all very

16    much.

17    Q.    Ms. Wentzell, do you normally use a wheelchair?

18    A.    No.

19    Q.    How do you normally get around?

20    A.    I get around with crutches.

21    Q.    All right.

22         I believe I was asking you how you first met Gregg

23    Caplitz?

24    A.    I met Gregg after, um, my original financial

25    advisor had left and I was introduced to Gregg in that

1    way.

2    Q.    Do you know when that was?

3    A.    Approximately 20 years ago.

4    Q.    And, um, why did you use a financial advisor?

5    A.    Well, I had some money and I wanted to try to

6    invest it the best way I could.  Um, not overly so, but

7    I wanted to try to make my money grow.

8    Q.    Where did your money come from?

9    A.    Well, it came from my job and it came from, you

10   know, saving my own money and gifts at different times

11   from different people.

12   Q.    And, um, when you met Mr. Caplitz, what role did

13   he play for you?

14   A.    He was my financial advisor.

15   Q.    And did you also get to know him?

16   A.    Yes, I did.

17   Q.    And could you describe how often you would see him

18   and what it was like?

19   A.    Um, depending on what we were working on, um, if

20   there was nothing going on I might see him every six

21   months, but if we were working on something, it could be

22   by phone maybe once a week or something like that,

23   depending on the situation.

24   Q.    And, um, did he -- where did you meet with him?

25   A.    I'm sorry?

Q.      Where did you meet with him?

A.      At my house.

Q.      And where is your house?

A.      I live in Somerville, Massachusetts, on Broadway.

Q.      And could you describe the place, your house where he meets with you?

A.      Well, I have two rooms, a bedroom and a living room, um, and we met in the living room.

Q.      And did you talk about anything other than investments?

A.      Yes, we became friends.

Q.      What else did you talk about?

A.      Oh, family, friends, children, baseball, anything like that.

Q.      Um, did you share a love for a certain baseball team?

A.      Sure, the Boston Red Sox.

Q.      And, um, what did he do for you with respect to your investments?

A.      Well, he, um, he invested and we talked about different investments, but he invested them for me because I don't know about investments, I'm not in that field or anything.  So being a professional I figured that he could help me and suggest on what to invest in.

Q.      And at some point did you hear about Rosalind

1    Herman?

2    A.    Yes.

3    Q.    How did you come to hear about her?

4    A.    Oh, Gregg, you know, I knew that he worked with

5    her and, um, you know, he would make calls at different

6    times -- you know he would have to say, "Excuse me, I

7    need to make this phone call," or whatever the situation

8    might be.

9    Q.    I'm sorry, when he said, "Excuse me, I need to

10   make this phone call," how was that connected to

11   Rosalind Herman?

12   A.    Well, there were different times when he would

13   say, um, "Rosalind" or "Rosalind whatever," and he would

14   call her, and I knew who he was talking to at that

15   point.

16   Q.    And what role did you understand that she came to

17   play in the business?

18   A.    I understood that she was his boss.

19   Q.    Okay.  And I'm now going to ask you to take a look

20   at a document, I'm going to bring up a copy.

21        MS. BLOOM:  But we could also bring it to the

22   screen as Exhibit HB for identification.

23        (On screen.)

24   Q.    I'm showing you what has previously been marked as

25   Exhibit HB.  If you want, take a look through that, to

1    the last page.

2    A.     Okay.  (Looks.)

3    Q.     Do you recognize that document?

4    A.     Um, I have to say "No," but I obviously signed it.

5    Q.     Okay.

6           MS. BLOOM:  At this time I would offer the

7    document.

8           MR. O'HARA:  No objection.

9           THE COURT:  No objection.

10          And the number?

11          MS. BLOOM:  307.

12          THE COURT:  HB is admitted, Exhibit 307.

13          (Exhibit 307, marked.)

14    Q.    Okay, let go to the last page, Page 9.

15    A.    (Turns.)

16    Q.    Do you recognize a signature for a primary account

17    holder there?

18    A.    Yes.

19    Q.    Whose signature is that?

20    A.    That's mine.

21    Q.    And what name do you see signed below?

22    A.    "Rosalind Herman, managing member."

23    Q.    And do you see the name "Insight Onsite Strategic

24    Management, LLC"?

25    A.    Yes.

1    Q.    Do you know what "Insight Onsite Strategic

2    Management LLC" is, what was your understanding?

3    A.    Um, "Insight Onsite Strategic Management," my

4    understanding is that that's the name of the company and

5    "LLC" means "Limited Liability."

6    Q.    And whose company did you understand that to be?

7    A.    Gregg and Rosalind together.

8    Q.    Okay.  And if we can turn to the first page.

9    A.    (Turns.)

10   Q.    Just looking at the very first paragraph where it

11   says, "I understand that Insight Onsite Strategic

12   Management, LLC, hereafter referred to as 'Insight

13   Onsite,' the advisor, offers a securities investment

14   management program and I wish to retain you, Insight

15   Onsite, to act as investment advisor with regard to such

16   program."

17        Did you retain Insight Onsite as your investment

18   advisor?

19   A.    Yes, I did.

20   Q.    Did you understand that there would be any charges

21   for those services?

22   A.    Yes.

23   Q.    And --

24        MS. BLOOM:  If we can look to Page 3.  Oh, wait,

25   before we go on to Page 3, I'd like to highlight the

1    middle of this page.

2         (Highlights on screen.)

3    Q.    Do you see where it says "Investment Objectives"?

4    A.    Yes.

5    Q.    If you -- I think now if you look at the screen, I

6    may have blown it up for you.

7    A.    Okay.  Yes.

8    Q.    It says -- there's a check at "Conservative

9    Growth."  Was that your investment objective?

10   A.    Yes.

11   Q.    And why did you want "Conservative Growth"?

12   A.    Because I was a little bit afraid of the stock

13   market and I wanted to make money, but I didn't want to

14   lose money, so I felt that "Conservative" was the best

15   way to go.

16   Q.    Um, at some point --

17        MS. BLOOM:  I think we're done with this exhibit.

18   Thank you.

19   Q.    At some point did Mr. Caplitz talk to you about a

20   potential investment in connection with a hedge fund?

21   A.    Yes.

22   Q.    And what do you recall about that?

23   A.    Um, I recall that -- I was told that I would have

24   a partial -- a small partial ownership in the fund.

25   Q.    And did you agree to put money in that?

1    A.    Yes, I did.

2    Q.    And did you -- and did you understand that to be

3    some kind of investment?

4    A.    Yes.

5    Q.    Did anybody recommend that investment to you?

6    A.    Gregg recommended it to me as an investment.

7    Q.    And did he give you reasons for why it would be a

8    good investment?

9    A.    I have to say I don't remember the specifics of

10   it.

11   Q.    Okay.  Why did you decide to put money in it?

12   A.    I wanted -- I wanted to try, you know, to make

13   more money and I trusted him thinking that it would be a

14   way to make more money with what I had already saved.

15   Q.    And do you know how much money you ended up

16   putting in that investment?

17   A.    I don't know exactly, no.

18   Q.    Okay, let me show you a couple of documents.

19          MS. BLOOM:  If we could first bring up Exhibit

20   2.02, Page 42.

21          (On screen.)

22          MS. BLOOM:  And if we could, yeah, blow up that

23   first wire there.

24          (Enlarges on screen.)

25   Q.    Do you see there that there is a wire, dated June

1    19th, 2009, for $105,000?

2    A.    Yes.

3    Q.    Do you recall ever obtaining a cashier's check in

4    connection with this investment?

5    A.    I don't know if it was a cashier check, but I

6    remember going to the bank with Gregg.

7    Q.    Do you remember what bank you went to?

8    A.    To, um, Cambridge Savings Bank in Porter Square.

9          MS. BLOOM:   Okay, if we could go to Page 52 of

10   these records.

11         (On screen.)

12   Q.    And do you recall to whom the check that you got

13   from Cambridge Savings Bank was made out to?

14   A.    Oh, I didn't see the actual check, but I see it

15   here and the name on it is --

16   Q.    You don't recognize the name, the "Knew Finance

17   Experts, Inc."?

18   A.    I do, but I did not see the check from -- you

19   know, the original check from the bank.

20   Q.    Okay.  Does that refresh your recollection that

21   one of the times that you put money in this investment

22   it was in the amount of $105,000?

23   A.    Yes.

24   Q.    Okay.  And was that on or about June of 2009?  You

25   can see the date right here.

1    A.    Yes.

2    Q.    Okay.

3         MS. BLOOM:   If we could now go to Exhibit 4.02,

4    Page 1.

5         (On screen.)

6    Q.    Do you see there that there's a deposit slip for

7    two checks, um, one is $2,773 and one is $167,226?

8    A.    Yes.

9    Q.    Okay.

10         MS. BLOOM:   And now if we could go to the next

11    page.

12         (On screen.)

13    Q.    Do you see there a check from you for $2,773?

14    A.    Yes.

15    Q.    And it's written out to the "Financial Resources

16    Network"?

17    A.    Yes.

18    Q.    In October of 2009?

19    A.    Yes.

20         MS. BLOOM:   And then if you look to the next

21    check.

22         (On screen.)

23    Q.    You see a check for $167,226 and it has your name

24    on the bottom.

25         Do you know what this check is?

A.    (Looks.)   I don't remember that far back.

Q.    Do you recall cashing in a life insurance policy
and having the money go to this hedge fund investment?

A.    No.

Q.    From you see it's "Aviva Life and Annuity
Company," do you recall having life insurance?

A.    I know Aviva but I don't -- I don't remember
cashing in a life insurance policy.

Q.    Does just seeing these two checks refresh your
recollection that your second investment into the hedge
fund was in the nature of $170,000?

A.    It does refresh my memory, yes.

Q.    Okay.  And so was the total amount that you
believe you put into this $275,000?

A.    Yes.

Q.    Okay.  What did you understand you would get back
for this investment?

A.    That I -- I understood that I would have -- it was
a small percentage of ownership, but that it would make
money for me.

Q.    Okay.  Did you ever get any money back from this
investment?

A.    No.

Q.    Did you ever intend to give this money to Rosalind
Herman to spend?

```
 1          MR. O'HARA:  Objection.
 2          THE COURT:  No, I'm going to allow the question in
 3     that form.
 4     A.    Well, I didn't know the money was given to anyone
 5     to spend.
 6     Q.    And if you had understood that this money was
 7     going to be given to Rosalind Herman to spend on her own
 8     expenses, would you have agreed to make the investment?
 9     A.    Not at all.
10     Q.    (Pause.)  After this money was taken out, how much
11     was left or how much was left of the money you had put
12     under management with Insight Onsite in your account?
13     A.    Probably about $9 and something after all the fees
14     had been taken out.
15          MS. BLOOM:  No further questions at this time.
16          THE COURT:  Mr. Benzaken?
17          MR. BENZAKEN:  Yes, your Honor.
18
19     CROSS-EXAMINATION BY MR. BENZAKEN:
20     Q.    Good morning, ma'am.
21     A.    Good morning.
22     Q.    You've never met Ms. Herman, correct?
23     A.    That's right.
24     Q.    And you've never spoken to her, correct?
25     A.    That's right.
```

1  Q.     And you had a relationship with Mr. Caplitz for

2  over 20 years?

3  A.     Approximately 20 years, yes.

4  Q.     And, um, after being first referred to him he

5  would regularly come to your apartment and meet you in

6  your home, correct?

7  A.     Not really regularly, but often enough, yes.

8  Q.     And that's where a lot of these in-person meetings

9  you had with him were at, in your home?

10  A.     That's all the meetings that we had except the

11  time we went to the bank to get that check.

12  Q.     Now, your investments started with him at the very

13  beginning of your relationship with him, correct?

14  A.     Yes.

15  Q.     And as you indicated that sometimes not much was

16  going on and you wouldn't speak with him for about six

17  months?

18  A.     Right.

19  Q.     But when there was a lot of activity or

20  transactions occurred, you would speak to him about once

21  a week?

22  A.     That's right, approximately.

23  Q.     So during the course of -- so from the time you

24  first met him to approximately 2009 when the hedge fund

25  came up, you were keeping in touch with him about your

1    investments?

2    A.    Yes.

3    Q.    And you were pleased about what was happening?

4    A.    Yes.

5    Q.    And again at that time it was only through

6    Mr. Caplitz that you understood that Ms. Herman was

7    supposedly his boss, correct?

8    A.    That was my own impression.

9    Q.    Okay, but that impression was given to you based

10   on what Mr. Caplitz said and did in front of you,

11   correct?

12   A.    Right.  Right.

13   Q.    Okay.  Now, at some point there was a document

14   that was shown to you, that you signed sometime in 2009,

15   agreeing for Insight Onsite to become your financial

16   advisors?

17   A.    That's right.

18   Q.    Now, at the time that was presented to you you

19   still understood that Mr. Caplitz was actually going to

20   be acting as your financial advisor, correct?

21   A.    That's right.

22   Q.    So although that form did not have his name on it,

23   you understood in signing that he was the one who was

24   going to be acting as your financial advisor?

25   A.    Yes.

1   Q.    Okay.  And it's fair to say that you relied on him

2   in terms of signing that document, right?

3   A.    Yes.

4   Q.    So you didn't question as to why his name did not

5   appear on that document?

6   A.    No, I didn't.

7   Q.    You didn't think there was a reason to?

8   A.    No.

9   Q.    Okay.  Now, at that time -- so he explained to

10  you -- did you have a full understanding of what this

11  hedge fund was?

12  A.    No, not really, but I trusted Gregg.

13  Q.    But he explained to you it was a very complicated

14  type of investment?

15  A.    Yes.

16  Q.    Did he explain to you that he was specifically

17  trying to set up a hedge fund that was going to be

18  headed by a woman, correct?

19  A.    I don't -- I don't recall that, no.

20  Q.    But he also described to you that you were going

21  to be purchasing a portion of the management company of

22  the hedge fund, correct?

23  A.    I can't say that, I'm not sure that -- either I

24  missed it or -- I'm not sure that I was purchasing a

25  part of the management company.  I'm not sure about

1   that.

2   Q.    When you spoke with him, did you understand the

3   difference between investors in the management company

4   of the hedge fund as opposed to the investors in the

5   actual fund itself?

6   A.    Would you repeat the question please?

7   Q.    When speaking to Mr. Caplitz, did you understand

8   the difference between investors in the management

9   company for that hedge fund as opposed to investors in

10  the hedge fund itself?

11  A.    No.

12  Q.    So it's fair to say that's a level of complexity

13  you did not understand?

14  A.    Right.

15  Q.    Okay.  Now, based on what he explained though, you

16  agreed to invest approximately $275,000 in that hedge

17  fund?

18  A.    Yes.

19  Q.    Okay.  And, um, you did this over the course of a

20  number of months?

21  A.    Yes.

22  Q.    Okay.  And again you had repeated discussions with

23  Mr. Caplitz in doing so?

24  A.    Yes.

25  Q.    Now --

1    (Pause.)

2    MR. BENZAKEN:  May I have a moment, your Honor?

3    THE COURT:  Yes, you may.

4    (Pause.)

5  Q.    Now, even though you indicated that you started

6  investing again -- in 2009 you started doing investments

7  in the hedge fund?

8  A.    Yes.

9  Q.    And you also indicated that you didn't receive any

10  return on those investments?

11  A.    No, I didn't.

12  Q.    Okay.  Now, in 2010 you still had not received any

13  returns on that investment you had made in that previous

14  year, correct?

15  A.    Right.  Yes, sir.

16  Q.    But at that time Mr. Caplitz still asked you to

17  give him a personal loan for $42,000?

18  A.    Um, I don't recall the exact amount, but, yes, I

19  gave him a couple of personal loans.

20  Q.    You gave him a personal loan for $42,000, another

21  one of $6,000, does that sound about right?

22  A.    Yes.

23  Q.    And did you know that you were not -- that a

24  financial advisor is not supposed to receive loans from

25  his clients?

1   A.    I didn't know that, no.

2   Q.    He didn't explain that to you?

3   A.    No.

4   Q.    And at some point in 2012 he even asked to borrow

5   your credit card?

6   A.    Yes.

7   Q.    And you lent it to him?

8   A.    Yes.

9   Q.    And then after lending it to him you started

10  noticing some pretty expensive and high charges to an

11  auto store?

12  A.    Yes.

13  Q.    And you had to cancel his authority to use that

14  credit card?

15  A.    Yes.

16  Q.    And again at that time you didn't know that you

17  were not supposed to be loaning him money?

18  A.    I did not.

19  Q.    And at that time you still had not received --

20  after loaning him that money, you still hadn't received

21  any return on the investment that you had made to the

22  hedge fund?

23  A.    That's right.

24  Q.    And let me ask this.

25        When you put together some of the checks or the --

```
 1    when you drafted some of the checks, did you have to go
 2    to the bank at all in order to finalize any of these
 3    transactions, such as investments in the hedge fund or
 4    the loans to him?
 5    A.    No, I made out personal checks.
 6    Q.    You made out personal checks?
 7    A.    Yes.
 8    Q.    And you gave them to him?
 9    A.    Yes.
10    Q.    At your home?
11    A.    Yes.  (Laughs.)
12    Q.    All right.
13          MR. BENZAKEN:  If I may have a moment?
14          THE COURT:  You may.
15          (Pause.)
16          MR. BENZAKEN:  I have nothing further.  Thank you,
17    ma'am.
18          THE COURT:  Nothing further, Ms. Bloom, for this
19    witness?
20          MS. BLOOM:  No further questions, your Honor.
21          THE COURT:  And if the security officer could help
22    me.
23          THE WITNESS:  Thank you, sir.
24          THE COURT:  And you have your bag down there,
25    ma'am.
```

1        THE WITNESS:  Oh, thank you.

2        THE COURT:  We'll do exactly the same thing.

3    Yeah, they'll take your papers.

4        (Moves to wheelchair and leaves courtroom.)

5        THE COURT:  Call your next witness.

6        MS. MURRANE:  Thank you, your Honor.  The

7    government calls Charlene Herman.

8        THE COURT:  She may be called.

9        (CHARLENE HERMAN, sworn.)

10

11        * * * * * * * * * * * * * * *

12        CHARLENE HERMAN

13        * * * * * * * * * * * * * * *

14

15   DIRECT EXAMINATION BY MS. MURRANE:

16   Q.   Good morning, Ms. Herman, there's a microphone on

17   the stand and you can move that so that you'll be able

18   to use that so the jury can hear you.

19        Can you please state your name for the jury.

20   A.   Charlene Herman.

21   Q.   And maybe move the microphone just a little bit.

22   The base of it moves and you can slide it on the table

23   there.

24   A.   Where do you want it?

25   Q.   Just a little closer.  Thank you.

```
1          THE COURT:  Just so it amplifies your voice.  You
2   be comfortable.  Move the chair so it's comfortable for
3   you and --
4          THE WITNESS:  I think that's close enough.
5          THE COURT:  Yeah, I think it is.
6          THE WITNESS:  Thank you.
7          THE COURT:  Go ahead, Ms. Murrane.
8   Q.    I'm sorry.  So say your name again.
9   A.    Charlene Herman.
10  Q.    And how old are you?
11  A.    34.
12  Q.    Are you related to Rosalind Herman?
13  A.    She's my mother in law.
14  Q.    And who are you married to?
15  A.    Brian Herman.
16  Q.    That is Rosalind's son?
17  A.    Um-hum.
18  Q.    When did you and Brian Herman get married?
19  A.    2006.
20  Q.    Are you still married?
21  A.    Yes.
22  Q.    Are you living together?
23  A.    No.
24  Q.    Where are you living now?
25  A.    In Wareham.
```

```
 1    Q.    With who?
 2    A.    My grandparents and my children.
 3    Q.    Did you, um -- how many children -- are the
 4    children from you and Brian?
 5    A.    Yes.
 6    Q.    And how many did you have?
 7    A.    Two.
 8    Q.    How old are they?
 9    A.    6 and 9.
10    Q.    Does Rosalind Herman have children other than her
11    son Brian?
12    A.    Her son Brad.
13    Q.    How old is Brad?
14    A.    I think 33.
15    Q.    Who's older Brad or Brian?
16    A.    Brian.
17    Q.    How old is Brian?
18    A.    37.
19    Q.    Is Rosalind Herman married?
20    A.    Yes.
21    Q.    What's her husband's name?
22    A.    Keith.
23    Q.    How long has Rosalind been married?
24    A.    I don't know.
25    Q.    Has she been married the entire time you've known
```

1    her?

2    A.    Yes.

3    Q.    How long have you known Rosalind Herman?

4    A.    Since 2000.

5    Q.    Can you tell the jury where you were living in

6    2003?

7    A.    In 2003?  Parts of it were in Massachusetts and

8    parts of it were in Nevada.

9    Q.    Which part -- where did you start and where did

10   you end up?

11   A.    We started in Massachusetts and moved to Nevada in

12   April.

13   Q.    How was it it came that you moved to Las Vegas and

14   into Nevada, I'm sorry, in April?

15   A.    We drove to visit and we decided to stay.

16         THE COURT:  I'm sorry, I didn't hear your answer,

17   your job something?  Tell the jury.  I didn't hear you.

18         THE WITNESS:  What was the question?

19         THE COURT:  The way I got her question was, how is

20   it you started in Massachusetts and wound up in Nevada?

21         THE WITNESS:  Oh.

22   A.    Because we drove to visit and we ended up staying

23   there.

24   Q.    Who was the "we"?

25   A.    Me and Brian.

```
 1    Q.    Okay.  And, um --
 2    A.    And then I applied for school there.
 3    Q.    Who was it you went to visit?
 4    A.    His mom.
 5    Q.    When you stayed there, where did you live?
 6    A.    Um, in her house.
 7    Q.    Her house being Rosalind Herman's house?
 8    A.    Yes.
 9    Q.    And how long did you live in Las Vegas?
10    A.    Um, until 2013, I believe.
11    Q.    When you went to Las Vegas in 2003 with Brian,
12    were you and Brian married then?
13    A.    No.
14    Q.    Did you get married while you were living in Las
15    Vegas?
16    A.    Yes, we came home and got married in New
17    Hampshire, but we were still living there, yes.
18    Q.    And were you living in Las Vegas when you had your
19    two children?
20    A.    Yes.
21    Q.    Did you have a job when you lived in Las Vegas?
22    A.    No.
23    Q.    Who paid for the house that you lived in?
24    A.    I believe it was Rosalind.
25    Q.    Who paid for the groceries?
```

```
 1   A.     Rosalind, most of the time, unless Brian was
 2   working, and then we would contribute.
 3   Q.     Who paid for the utilities?
 4   A.     Rosalind.
 5   Q.     Did you own a car?
 6   A.     No.
 7   Q.     How did you get around?
 8   A.     Um, with her vehicle.
 9   Q.     I'm sorry, could you --
10          THE COURT:   With her vehicle.
11   A.     With her vehicles.
12   Q.     Who is "her"?
13   A.     Rosalind.
14   Q.     What vehicle?
15   A.     Um, whatever was available.
16   Q.     What vehicles did she have?
17   A.     Um, an Escalade and a Jaguar.
18   Q.     Did she have any BMWs?
19   A.     A long time ago, yes.
20   Q.     When you were living in Las Vegas with her?
21   A.     I'm not sure if we were living there then.  I
22   don't remember.
23   Q.     Were there any other cars?
24   A.     Um, yup, she had a Corvette and, um, that's it, I
25   believe.
```

1   Q.    Did you have keys for those cars?

2   A.    No.

3   Q.    How would you get access to them?

4   A.    Ask for them, um, if I had to go somewhere.

5   Q.    Who did you need to ask?

6   A.    Rosalind.

7   Q.    Can you describe for the jury what the house

8   looked like?

9   A.    Um, four bedrooms, um, a living room, a kitchen,

10  an office, and two bathrooms.

11  Q.    How many stories?

12  A.    Two.

13  Q.    What was the outside like?

14  A.    Small.  Um, there was a pool and, um, a play-set

15  for my children.

16  Q.    Who took care of the pool?

17  A.    Um, we used to have a pool guy that came to do it

18  monthly or weekly, I forget, and then Brian started

19  doing it.

20  Q.    When did you get married?

21  A.    In 2006.

22  Q.    Where?

23  A.    In Derry, New Hampshire.

24  Q.    What was the name of the place where you had the

25  reception?

```
1    A.    "Promises To Keep."

2    Q.    Did Rosalind --

3          THE COURT:  I'm sorry, I didn't hear it?

4          THE WITNESS:  "Promises To Keep."

5          THE COURT:  "Promises To Keep."  Thank you.

6    Q.    Did Mrs. Herman, um, pay for any of the wedding?

7    A.    Some of it.

8    Q.    What did she pay for?

9    A.    I don't know.

10   Q.    Did you have a limo for the wedding?

11   A.    No.

12   Q.    Where did you go on your honeymoon?

13   A.    Um, Hawaii and Tahiti.

14   Q.    And, um, how did you get to Hawaii and Tahiti?

15   A.    Um, an airplane took us to Hawaii and then in

16   Hawaii we got on a boat -- a ship, a cruise ship.

17   Q.    So a cruise from Hawaii to Tahiti?

18   A.    Uh-huh.

19   Q.    On the cruise did you and Brian charge different

20   items?

21   A.    I don't remember.

22   Q.    Things like drinks or meals or entertainment?

23   A.    I don't remember if it was included or not.

24         MS. MURRANE:  Could we bring up what has been

25   premarked as Exhibit KY, for the witness only.
```

1           (On witness's screen.)

2           MS. MURRANE:  And if we can turn to the second

3     page of this document.

4           (Turns on screen.)

5           MS. MURRANE:  And, Ms. Gaudet, I think there's

6     some -- can you clear the screen?

7           (Clerk helps.)

8           MS. MURRANE:  Thank you very much.

9     Q.    Let's take a look at the first few lines of these

10    items at the top of this document.

11          Do you see this list of charges?

12    A.    Uh-huh.  Yes.

13    Q.    Does that seem consistent with -- does that

14    refresh your memory as to whether there were charges on

15    the cruise?

16    A.    It doesn't refresh my memory but it looks

17    accurate, I mean it looks like they're charges from the

18    cruise.  But I don't remember them.

19    Q.    Do those look like expenses that you would have

20    had, things you would have done while you were on the

21    cruise with your husband?

22          MR. O'HARA:  Objection.

23          THE COURT:  Yeah, sustained, you're leading the

24    witness.

25    Q.    What kinds of things did you do with your husband

1    on the cruise, did you go to the pool bar?

2         MR. BENZAKEN:  Objection.

3         THE COURT:  Sustained.  Don't lead the witness.

4    Q.    What kinds of things did you do on the cruise with

5    your husband?

6    A.    Just the activities that were on the ship.

7    Q.    And what kind of activities were there?

8    A.    Bingo.  Um, we met a couple, we hung out with them

9    most of the time, and that's about it.

10   Q.    Did you eat?

11   A.    Yeah, that was included in the cruise, three meals

12   a day.

13   Q.    Did you go to the bar?

14   A.    Yes.

15   Q.    Did you see any shows?

16   A.    No, there was -- I don't remember if there was a

17   show or not.

18   Q.    Was there a casino?

19        MR. BENZAKEN:  Objection.

20        THE COURT:  Come to the sidebar.

21

22        AT THE SIDEBAR

23        THE COURT:  Look, things have been going smoothly

24   for you but now you're a little out of order, at least

25   it seems so to me.

1          MS. MURRANE:  Okay.

2          THE COURT:  Now, you've got documents and I take

3     it that at some stage we're going to connect those

4     documents to money in which was perhaps not formally but

5     informally what I would say impressed with a trust,

6     money from clients that was designed for proper

7     investments, but instead it gets --

8          MS. BLOOM:  Not this time, it's 2006.

9          THE COURT:  Okay, so what does this have to do

10    with anything?

11         MS. BLOOM:  It's charged to a corporate account

12    and taken as a business expense.

13         THE COURT:  Okay, so you're going to put these

14    into some corporate account and taken as a business

15    expense.  Well, um, I don't know how far we get with

16    this witness.  Did she go to a casino or not?

17         MS. BLOOM:  Is there any objection to the document

18    coming in?

19         THE COURT:  Yeah, do you have any objection to the

20    document?  I'll allow that.

21         MR. O'HARA:  No.

22         MS. BLOOM:  Okay, then why don't we do that.

23         THE COURT:  Then maybe we can move on then.

24

25         (In open court.)

```
 1            THE COURT:  We think we can save time because
 2      Mr. O'Hara indicated he has no objection to the
 3      admission of what's been marked for identification as
 4      KY, so it will have numbers of what?
 5            MS. MURRANE:  408.
 6            THE COURT:  So KY is in evidence, Exhibit 408.
 7            (Exhibit 408, marked.)
 8            THE COURT:  Anything else for this witness?
 9            MS. MURRANE:  Yes, your Honor.
10            THE COURT:  Go ahead.
11      Q.    Was Rosalind Herman employed while you lived with
12      her in Las Vegas?
13      A.    I believe so.
14      Q.    What was her -- I'm sorry?
15      A.    I believe so.
16      Q.    What was her business?
17      A.    Um, financial planning.
18      Q.    Where did she work?
19      A.    At home.
20      Q.    Did she have an office in the house?
21      A.    Yes.
22      Q.    Where was it?
23      A.    In the front part of the home.
24      Q.    Did you see her in the office in the house when
25      you were living there doing work?
```

1   A.     Yes.

2   Q.     What did you see her doing?

3   A.     I don't -- I didn't pay attention to what she was

4   doing when she was in her own office.

5   Q.     Did she have a computer there?

6   A.     Um, yes, some of the time.

7   Q.     Did you see her working on the computer?

8          MR. O'HARA:  Objection.

9   A.     I've already --

10         THE COURT:  Wait a minute.  Um, what was she

11  doing?  Well, you're technically leading.

12         So when you saw her in there, so far as you

13  thought working, what was she doing?

14         THE WITNESS:  Um, I'd hear her talking on the

15  telephone or --

16         THE COURT:  Tell the jury.

17         THE WITNESS:  Talking on the telephone or I don't

18  really know what she was doing, but she was at her desk.

19         THE COURT:  At her desk?

20         THE WITNESS:  Yes.

21         THE COURT:  Well, what about computers, was there

22  some computer around there?

23         THE WITNESS:  She had a laptop, so sometimes it

24  was there, sometimes it wasn't.

25         THE COURT:  Okay.  What interaction did you see

1    her have, if any, with the laptop?

2            THE WITNESS:  Um, I didn't look at the screen.

3            THE COURT:  So you don't really know?

4            THE WITNESS:  I don't know what she was working

5    on.

6            THE COURT:  For instance, I have a laptop but I

7    don't know zip about computers.

8            (Laughter.)

9            THE COURT:  But you can tell the jury.  In this

10   case now sometimes she had a laptop, sometimes she

11   didn't, sometimes it was open, sometimes it wasn't?

12           THE WITNESS:  Right.

13           THE COURT:  And sometimes she was on the phone,

14   sometimes she wasn't?

15           THE WITNESS:  Right.

16           THE COURT:  You did understand though that she

17   considered that room her office for her work?

18           THE WITNESS:  Yes.

19           THE COURT:  And from time to time she was there?

20           THE WITNESS:  Yes.

21           THE COURT:  Okay.

22           Anything else?

23   Q.    Did your husband, Brian, work for Rosalind

24   Herman's business?

25   A.    Um, I don't know if it was formal or not or what

1   his job was.  I don't know.

2   Q.    Did you see your husband do work for the business?

3   A.    Um, no.

4   Q.    Was your husband employed -- otherwise employed

5   when you lived in Las Vegas?

6   A.    Yes.

7   Q.    What did he do?

8   A.    Um, he was hired by the Metropolitan Police

9   Department for a little while and then he got hurt, and

10  then he was a security guard for two separate companies.

11  Q.    What about Rosalind's other son Brad, did he work

12  for the business?

13  A.    Um, I don't know.  I don't --

14  Q.    Was he employed when you were living in Las Vegas?

15  A.    I don't think so.

16  Q.    And just -- I'm not sure if I asked this question

17  before.

18        When you were living in Las Vegas, who lived in

19  the house together?

20  A.    Myself, Brian, Brad, Rosalind, Keith, and my two

21  children.

22  Q.    Were there any pets?

23  A.    Yes.

24  Q.    How many?

25  A.    Three.

```
 1    Q.    What were they?
 2    A.    Well, it depends on the year.  I mean we had two
 3    dogs that passed away.
 4    Q.    And what was the third pet?
 5    A.    Um, then we got another one and then, um -- and
 6    then we had two more later on when the other ones had
 7    passed away.  So we always had three.
 8    Q.    Did you work for Rosalind Herman's business?
 9    A.    No.
10    Q.    Did Ms. Herman's husband, Keith, work for the
11    business?
12    A.    Um, I don't know.
13    Q.    Did Mr. Herman have a job, Keith Herman have a job
14    when you were living with them in Las Vegas?
15    A.    No.
16          MS. MURRANE:  I'd like to bring up what has
17    already been admitted into evidence as Exhibit 1.05.
18          (On screen.)
19          MS. MURRANE:  If we can focus in on the top of
20    this document up here.
21          (Enlarges on screen.)
22    Q.    Do you see, on the right-hand side of this
23    document, what the title is, it starts with the word
24    "Business" --
25    A.    -- "Master Account Agreement."
```

```
 1    Q.    Okay, and what's the name of the bank?

 2    A.    Washington Mutual Bank.

 3    Q.    The account title, what's the name of the company

 4    there?

 5    A.    The "Knew Finance Experts, Inc."

 6    Q.    And the address that's listed below, "10916 Summer

 7    Quail Ave." in Las Vegas, do you know that address?

 8    A.    Yes.

 9    Q.    Where is that?

10    A.    That's where we live.

11    Q.    The business phone that's listed there on the

12    bottom, "702-242-2446," is that a number that's familiar

13    to you?

14    A.    Yes.

15    Q.    What is that telephone number?

16    A.    That's the phone number to the Las Vegas home.

17    Q.    And underneath where it says "Contact Person," who

18    is listed?

19    A.    "Brian J. Herman."

20          MS. MURRANE:  And if we could clear that out and

21    take a look at the, um --

22          (Clears screen.)

23    Q.    Do you see there where it says "Date opened"?

24    A.    Yeah.

25    Q.    What's the date listed?
```

1    A.    10-9-2007.

2          MS. MURRANE:   Okay, and if we could clear that.

3          (Clears screen.)

4    Q.    At the bottom do you see there are three blocks and

5    below each box it says "Signator"?

6    A.    Yes.

7    Q.    The bottom left box has your name on the top, do

8    you see that?

9    A.    Yes.

10   Q.    Is that your signature below?

11   A.    Yes.

12   Q.    And then who are the signatures -- are you

13   familiar with your husband, Brian's, signature?

14   A.    Sort of.

15   Q.    Does that look like his signature there on the

16   right?

17   A.    Um, yes.

18   Q.    Now, why were you listed as a signator for an

19   account, um, in the name of Knew Finance Experts with a

20   bank in Las Vegas?

21   A.    I'm not sure.

22   Q.    Do you remember signing these documents and

23   agreeing to be a signator on these accounts?

24   A.    Vaguely, yes.

25   Q.    How did that come about?

1    A.    I don't know.  2007 is when I had my first child.

2    I don't remember any of these conversations.

3    Q.    Do you remember who, if anyone, asked you to do

4    this?

5    A.    I don't know who.

6         MS. MURRANE:  Let's take a look at what has been

7    marked into evidence as Exhibit 1304.

8         (On screen.)

9         MS. MURRANE:  And we'll start with Page 75.

10        (On screen.)

11   Q.    Do you remember writing any checks on this

12   account?

13   A.    No.

14   Q.    So do you see this check that's on the screen

15   right now, it's made out to the City of Las Vegas sewer?

16   A.    Yeah.

17   Q.    And there's two signatures there on the right-hand

18   side, do you see those?

19   A.    Yes.

20   Q.    Is one of those yours?

21   A.    Yes.

22   Q.    Do you remember writing this check?

23   A.    No.

24   Q.    Do you remember -- did anyone ask you to write out

25   checks on this account?

1   A.     No.

2   Q.     Was it your responsibility to pay bills for the

3   house?

4   A.     Nope.

5   Q.     Was it your responsibility to pay bills for the

6   Knew Finance Experts?

7   A.     No.

8          MS. MURRANE:   Let's go to Page 260.

9          (On screen.)

10  Q.     Do you see that check?

11  A.     Yes.

12  Q.     Who's it payable to?

13  A.     BMW Bank.

14  Q.     Does it have your signature on it?

15  A.     Yes.

16  Q.     Do you have a memory of writing this check out?

17  A.     No.

18  Q.     Do you know why you would have written this check

19  out?

20  A.     I didn't write this check out.  My signature's on

21  it but I did not write it out.

22  Q.     Do you recognize the handwriting on the check?

23  A.     I do not.

24         MS. MURRANE:   Let's take a look at Page 264.

25         (On screen.)

1   Q.    Again who is payable on this check, who is it

2   payable to?

3   A.    "NV Energy."

4   Q.    What is that?

5   A.    It's an electric company.

6   Q.    Is that your signature on the signature line there

7   on the right?

8   A.    Yes.

9   Q.    Do you remember signing this check?

10  A.    I don't remember signing it, but it is my

11  signature, so I must have signed it.

12  Q.    Did you write this check out?

13  A.    No.

14        MS. MURRANE:  Let's take a look at Page 269.

15        (On screen.)

16  Q.    Who is this check payable to?

17  A.    "JC Penny."

18  Q.    Did anyone in the family shop at JC Penny?

19  A.    Um, yes.

20  Q.    Who?

21  A.    Um, I don't know, we all have at one point.

22  Q.    Is that your signature on the bottom right?

23  A.    Yes.

24  Q.    Is that your handwriting on the check?

25  A.    No.

1   Q.    Do you have a memory of writing out this check or,

2   I'm sorry, of signing this check?

3   A.    No.

4        MS. MURRANE:  And the last one, let's take a look

5   at Page 270.

6        (On screen.)

7   Q.    Who is this check payable to?

8   A.    "Direct TV."

9   Q.    What is "Direct TV"?

10  A.    A television provider, um, cable.

11  Q.    Did you have Direct TV at the house in Las Vegas?

12  A.    Um, I believe at one point we did.

13  Q.    Is that your signature on the bottom right?

14  A.    Yes.

15  Q.    Did you write out the rest of this check?

16  A.    No.

17  Q.    And do you have a memory of this check?

18  A.    No.

19       MS. MURRANE:  If we could take a look at what has

20  been admitted into evidence as Exhibit 201.

21       (On screen.)

22       MS. MURRANE:  And we'll take a look at the top of

23  this.

24       (Scrolls down on screen.)

25  Q.    What's the title of this document?

1    A.    "Account Agreement."

2    Q.    Who's the bank?

3    A.    Where is that?

4    Q.    Under the institution name and address.

5    A.    "Town and Country Bank."

6    Q.    In what town and state?

7    A.    In Las Vegas, Nevada.

8    Q.    Who was the account title listed for?

9    A.    The Knew Finance Experts, Inc.

10        MS. MURRANE:  If we could clear that.

11        (Clears screen.)

12   Q.    Are you able to read that, there's a "Signer

13   Information 1," is that big enough to read or should I

14   blow that up a little more?

15   A.    A little bit more.

16        (Enlarges on screen.)

17   Q.    Who is listed as "Signer Information 1" for this

18   account with the Knew Finance Experts?

19   A.    Brian Herman.

20        MS. MURRANE:  And if we can look at the second box

21   there, "Signer Information 2."

22        (On screen.)

23   Q.    Who is listed there?

24   A.    Brad Herman.

25        MS. MURRANE:  Can we scroll back out.

```
 1          (Scrolls out on screen.)
 2          MS. MURRANE:  And if we can take a look at the
 3    signature block.
 4    Q.    Do you see your name at the bottom of this
 5    document?
 6    A.    Yes.
 7    Q.    As an authorized signer?
 8    A.    Uh-huh.
 9    Q.    Is that your signature?
10    A.    Yes.
11    Q.    Do you remember going to Town and Country Bank and
12    signing up as a signator for an account there for the
13    Knew Finance Experts?
14    A.    I don't remember doing it, but I must have done
15    it.
16    Q.    Do you remember who asked you to do that?
17    A.    No, I do not.
18    Q.    Did your husband ask you?
19          MR. BENZAKEN:  Objection.
20    A.    I don't remember.
21          THE COURT:  In view of the answer, you don't
22    object?  She says she doesn't remember.
23          MR. O'HARA:  No objection.
24          THE COURT:  All right, it's waived.
25          Go ahead.
```

1      MS. MURRANE:  Let's take a look at Page 2 of this

2  document.

3      (On screen.)

4  Q.    And here we have a box that says "Owner Signer

5  Information 3," whose name is there?

6  A.    My name.

7  Q.    And then below it you see that there's another box

8  that says "Owner Signer Information 4," whose name is

9  listed there?

10  A.    Nobody.

11  Q.    So the three signers on this document are you,

12  your husband, Brian, and Brad Herman?

13  A.    Yes.

14      MS. MURRANE:  Let's take a look at what's been

15  marked as Exhibit 2.02 in evidence.

16      (On screen.)

17  Q.    So this is a, um -- these are bank statements.

18  Can you read the name on the account in the upper left?

19  A.    "The Knew Finance Experts, Inc."

20  Q.    What's the statement date?

21  A.    Um, 3-31-09.

22      MS. MURRANE:  And if we can scroll out from that

23  for a minute.

24      (Scrolls screen.)

25  Q.    So looking at some of these charges, did you have

1    a -- did you have a mobile phone when you lived in Las

2    Vegas?

3    A.    Um, at times.

4    Q.    Who paid for that?

5    A.    Um, I don't know but maybe Brian when he was

6    working.

7         MR. O'HARA:  Objection.

8         THE COURT:  Well, you can't just guess, but you

9    can give us your best memory.

10   A.    When Brian was working he was contributing.

11   Q.    And when Brian wasn't working who paid --

12        THE COURT:  I'm going to let that stand.

13        Excuse me, Ms. Murrane.  Now put a question.

14   Q.    And when Brian was not working, who paid for the

15   mobile phone?

16   A.    Um, if we had one, it would have been Rosalind.

17   Q.    What's Upper Crust Pizza?

18   A.    It's a pizza place.

19   Q.    Is that a pizza place that was in Las Vegas?

20   A.    Yes.

21   Q.    Borders Books?

22   A.    Yes.

23   Q.    Is that a store that was in Las Vegas when you

24   lived there?

25   A.    Yes.

```
1    Q.    How about Wal-Mart?

2    A.    Yes.

3    Q.    What's "Little Tykes"?

4    A.    It's a children's toy company.

5    Q.    Was that a store that was in Las Vegas when you

6    lived there?

7    A.    No.

8    Q.    Where is Little Tykes?

9    A.    I don't know.  It looks like, from this document,

10   um, Ohio.

11   Q.    What's "eharmony.com"?

12   A.    I think it's a dating website.

13   Q.    And the "Olive Garden"?

14   A.    It's a restaurant.

15   Q.    Is that a place that you and your family ate

16   occasionally?

17   A.    Yes.

18   Q.    What's "Trenton Smoke"?

19   A.    It's a smoke shop.

20   Q.    Who in the family smoked?

21   A.    Um, myself, um, I smoked for a while, um,

22   Rosalind, and Brad.

23   Q.    What's "Albertson's"?

24   A.    A supermarket.

25   Q.    Is that someplace that the family bought
```

1    groceries?

2    A.    Yes.

3    Q.    "Shell Service Station," was there a Shell Service

4    Station in Las Vegas that the family used?

5    A.    Yes.

6    Q.    How about "Chucky Cheese"?

7    A.    "Chucky Cheese," you know, we had a birthday party

8    there.

9    Q.    What's "Vaughn's"?

10   A.    A supermarket.

11   Q.    Is that a place where the family shopped?

12   A.    Yes.

13         MS. MURRANE:   If we can look at Page 2.

14         (On screen.)

15   Q.    For this account, the Knew Finance Expert account,

16   did you have, um, an ATM card to use?

17   A.    No.

18   Q.    Um -- I'm sorry.

19         MS. MURRANE:   Can we look at Page 17.

20         (On screen.)

21   Q.    Do you know who had an ATM card for this account?

22   A.    No.

23   Q.    So here where we see "Foreign ATM Withdrawals," do

24   you know who had access on this account to take money

25   out with an ATM card?

1    A.    No, I do not.

2    Q.    What's "The House of Blues"?

3    A.    I don't know exactly, I don't know if it's a

4    restaurant or not.  I don't know.

5    Q.    Is it a business in Las Vegas?

6         MR. O'HARA:  Objection.

7         THE COURT:  No, she may press it, if she knows.

8         And the objection calls this to mind.  Questions

9    aren't evidence of anything, answers are evidence.  Now,

10   it's up to you whether you believe the answers of any of

11   these witnesses and you can, that's your power as a

12   jury, you can believe anything that the witness answers,

13   equally you can disbelieve anything a witness answers,

14   you can believe some things, disbelieve other things.

15        So she says she doesn't know what "The House of

16   Blues" is and now the question is, what, "Is it a

17   restaurant in Las Vegas?"  Is that your question?

18        MS. MURRANE:  "Is it a business that's in Las

19   Vegas?"

20        THE COURT:  A business in Las Vegas.

21        Do you know that?

22        THE WITNESS:  I don't even know that.  I don't.

23        THE COURT:  All right, that's the testimony.

24        Go ahead.

25        MS. MURRANE:  So let's take a look at page -- one

```
 1     more page on these records, Page 18.
 2             (On screen.)
 3     Q.     What is "Trader Joe's"?
 4     A.     A supermarket.
 5     Q.     Is that a shop where the family shopped?
 6     A.     I didn't particularly, but I think, um -- yes.
 7     Q.     How about "Islands Restaurant"?
 8     A.     I don't know.
 9     Q.     "Carvel"?
10     A.     "Carvel" is ice cream cake.
11     Q.     Is that somewhere that the family went?
12     A.     Um, yes.
13     Q.     "Panda Express"?
14     A.     Yes.
15     Q.     What is it?
16     A.     Um, it's a type of Chinese food.
17     Q.     I'm sorry, I couldn't hear you?
18             THE COURT:  A type of Chinese food.
19     Q.     And is that a place that this family would go to
20     eat sometimes?
21     A.     Occasionally, yeah.
22             MS. MURRANE:  Let's take a look at Page 21.
23             (On screen.)
24             MS. MURRANE:  And I'll focus in on a couple of
25     these checks.
```

1              (Enlarges on screen.)

2    Q.    All right.  So the top check there, um, who is the

3    payor, who is it payable to?

4    A.    Brian Herman.

5    Q.    Whose signature is that on the right-hand side?

6    A.    Um, myself and I think Brian's.

7    Q.    Did you write out a check, do you remember writing

8    out a check to Brian Herman?

9    A.    No.

10   Q.    Is that your handwriting on the rest of the check?

11   A.    No.

12   Q.    And then the check below that, "Blackburn Pest,"

13   do you know what that is?

14   A.    It's a pest control company.

15   Q.    Is that a service that the family used at the

16   house?

17   A.    Yes, in Las Vegas you have to have a pest control

18   company, there's black widows and scorpions.

19          MS. MURRANE:  Can we take a look at Page 78 and

20   we'll start with the top two checks there.

21          (On screen.)

22   Q.    Again this check written on the Knew Finance

23   Expert's, Inc., is that your signature on the bottom

24   right?

25   A.    Yes.

```
1    Q.    Who is it payable to?
2    A.    Which one?
3    Q.    The top one.
4    A.    "Exxon Mobile."
5    Q.    And was Exxon Mobile a gas station that the family
6    used?
7    A.    Not usually.
8    Q.    What did the family usually use?
9    A.    Um, Shell.
10   Q.    Did you write out the rest of this check other
11   than your signature?
12   A.    No.
13   Q.    Whose signature is above yours?
14   A.    Brian's, I believe.
15   Q.    And the check below it, who is that payable to?
16   A.    "JC Penny."
17   Q.    And is that your signature on the bottom right?
18   A.    Yes.
19   Q.    Whose signature is above you?
20   A.    Brian's.  I can't say for certain that that's
21   Brian's signature though, I don't -- I can only say that
22   that's mine.
23   Q.    Are you familiar with your husband's signature?
24   A.    Yes, but I'm not familiar with his brother's and
25   if his brother had -- I don't know which one is which.
```

1    Q.    Okay.

2          MS. MURRANE:  And if we take a look at this last

3    check.

4          (On screen.)

5    Q.    "Nevada Energy," what is that again?

6    A.    An electric company.

7    Q.    And was it an electric company for the service

8    provided at the house?

9    A.    Um, yes, I believe.

10   Q.    Is that your signature on the bottom right?

11   A.    Yes.

12   Q.    (Pause.)  The money that was spent from these

13   accounts, the Town and Country Bank account and the, um,

14   Washington Mutual Bank account, do you know where the

15   money came from that funded those accounts?

16   A.    No.

17         MS. MURRANE:  No further questions, your Honor.

18         THE COURT:  Any questions for this witness?

19         MR. O'HARA:  Thank you, your Honor.

20         THE COURT:  Yes, Mr. O'Hara.

21

22   CROSS-EXAMINATION BY MR. O'HARA:

23   Q.    Good morning.

24   A.    Good morning.

25   Q.    I'm Ray O'Hara.  We finally meet.

```
1    A.     Yes.

2    Q.     We've spoken a few times on the telephone, right?

3    A.     Uh-huh.

4    Q.     And, um, regarding your educational background,

5    you graduated from high school around 2000?

6    A.     Yeah.

7    Q.     And where did you graduate from?

8    A.     Abington High School.

9    Q.     And around 2000, shortly after you graduated from

10   high school, you began working, um, in an office in

11   Woburn, right?

12   A.     Yeah, or volunteering my time.  Yes.

13   Q.     Yeah, you were volunteering your time about two or

14   three days a week?

15   A.     Yeah.

16   Q.     And that office was in an office run by

17   Mrs. Herman, right?

18   A.     Yes.

19   Q.     And also by Mr. Caplitz?

20   A.     Yeah.

21   Q.     And your duties -- your volunteer duties when you

22   were there were answering the telephone?

23   A.     Yes.

24   Q.     Did you do any light typing, filing?

25   A.     Yeah.
```

1    Q.    Did you do any inputting in terms of checks or

2    expenses?

3    A.    I might have.  I don't remember.

4    Q.    Okay.  But you worked there from 2000 until you

5    moved to Las Vegas, right?

6    A.    Um, yes.

7    Q.    And just refresh my memory, you moved to Las Vegas

8    in 2003?

9    A.    Right.

10   Q.    Okay.  Before you moved to Las Vegas, Mrs. Herman

11   had already moved to Las Vegas, right?

12   A.    Yes.

13   Q.    In fact she moved to Las Vegas around 2000, 2001,

14   is that about right?

15   A.    I don't remember.

16   Q.    Okay.  But, um, you continued working at that

17   office when she wasn't there?

18   A.    Yes.

19   Q.    And when you were in the office you frequently had

20   contact with Mr. Caplitz, right?

21   A.    Yes.

22   Q.    He was in the office a lot?

23   A.    Yes.

24   Q.    And you would see what he was up to and doing

25   without specifically knowing what he was doing, right?

1    A.    Yes.

2    Q.    And it's fair to say that when he was in the

3    office he was frequently seated with his feet up talking

4    on a speaker phone?

5    A.    Yes.

6    Q.    And you could hear what he was saying on his

7    speaker phone, right?

8    A.    Yes.

9    Q.    Not exactly the words but the tone he was using?

10   A.    Yes.  Yes.

11   Q.    And he was usually arguing with people, wasn't he?

12   A.    Yes.

13   Q.    In fact when he was in the office there was almost

14   constant turmoil, wasn't there?

15   A.    Yeah.

16   Q.    Because he was constantly yelling at people,

17   slamming files, screaming at people on the telephone,

18   right?

19   A.    Yes.

20   Q.    He was also yelling at some staff members who were

21   there?

22   A.    Yes.

23   Q.    Um, Mrs. Herman's sister Janice worked there while

24   you were there, didn't she?

25   A.    Yes.

1   Q.    And if you can recall, I think her other sister

2   Sharon worked there too, didn't she?

3   A.    I don't remember if she was there when I was --

4   Q.    But it wasn't unusual for Mr. Caplitz to be

5   yelling at you, to be yelling at Mrs. Herman's sister,

6   right?

7   A.    No, it wasn't unusual.

8   Q.    And he was also yelling at Mrs. Herman?

9   A.    Yes.

10   Q.    And days when he wasn't in that office were

11   relatively tranquil, weren't they?

12   A.    Yeah.  Yes.

13   Q.    And when you would see these disputes going on

14   between Mr. Caplitz and other people, either on the

15   phone or in person, he would blow up in frustration,

16   wouldn't he?

17   A.    Yes.

18   Q.    And he would yell at people and tell them, "Don't

19   worry, I'll take care of it"?

20   A.    Yes.

21   Q.    That was his favorite expression, wasn't it?

22   A.    Uh-huh.

23   Q.    So in 2003 you had met and decided to have a

24   relationship with Mrs. Herman's older brother Brian?

25   A.    That was in 1999.

1    Q.    Okay.  So you and he were an item from 1999 until

2    you separated last year, right?

3    A.    Yeah.

4    Q.    And in 2003 you and Brian decided to drive out to

5    Las Vegas to see your future mother-in-law?

6    A.    Well, at the time, no, we weren't engaged then.

7    Q.    No, but I mean she ended up being your mother-in-

8    law, and I'm sorry if I phrased it in a dumb way?

9    A.    Yes.

10   Q.    But you drove out there, right?

11   A.    Yes.

12   Q.    And you liked the area?

13   A.    Yes.

14   Q.    It's very hot in Las Vegas, isn't it?

15   A.    At times.

16   Q.    Yeah, so, um, that house that you ended up living

17   in that Mrs. Herman already owned was air conditioned,

18   wasn't it?

19   A.    Yes, it has to be.

20   Q.    And you've stated that in the house there was an

21   office?

22   A.    Yeah.

23   Q.    And you stayed there from 2003 until 2013?

24   A.    Yes.

25   Q.    More or less?

```
 1    A.     Yes.

 2    Q.     And after you were out there, um, you decided to

 3    get married, right?

 4    A.     Yes.

 5    Q.     When you first arrived, you were attending school?

 6    A.     Yes.

 7    Q.     And you got married, I believe you said, in 2006?

 8    A.     Yes.

 9    Q.     And you gave testimony today regarding a honeymoon

10    you took and a wedding?

11    A.     Yes.

12    Q.     The wedding took place here on the East Coast?

13    A.     Uh-huh.   Yes.

14    Q.     And the wedding, most of the wedding was paid for

15    by your grandparents, right?

16    A.     Yes.

17    Q.     And then you had this honeymoon where you flew to

18    Hawaii and then took a cruise to Tahiti and back?

19    A.     Yes.

20    Q.     You paid for that, didn't you, you and Brian?

21    A.     Yes, with our gift money.

22    Q.     With your gift money you got from the wedding?

23    A.     Um-hum.

24    Q.     Mrs. Herman didn't pay for that, did she?

25    A.     No.
```

1    Q.    You're sure of that?

2    A.    I'm positive.

3    Q.    And when you were living out in Las Vegas, you

4    mentioned that it wasn't unusual for you or family

5    members to, um, do shopping, right?

6    A.    Right.

7    Q.    When you would buy clothing you would buy it at

8    Wal-Mart or Target, right?

9    A.    Yes.

10   Q.    You weren't going to Nordstroms?

11   A.    No.

12   Q.    Um, when you were back in Massachusetts you

13   weren't shopping down on Newbury Street, right?

14   A.    Never.   Never.

15   Q.    And when you were grocery shopping with

16   Mrs. Herman it wasn't unusual for you and for her to be

17   clipping coupons --

18   A.    Absolutely.

19   Q.    -- right out of the newspaper --

20   A.    Um-hum.

21   Q.    -- because, um, you weren't starving but life was

22   a little bit difficult financially, wasn't it?

23   A.    Yes.

24   Q.    Now, the cars that Mrs. Herman owned when she was

25   out in Las Vegas, you don't know whether they were

1     leased or owned, do you?

2     A.    I don't.

3     Q.    And as far as, um, the home that you were living

4     in with her, you don't know whether she owned that or

5     whether she rented it?

6     A.    Um, no.

7     Q.    But after you, um, met the Herman family, you also

8     met Mr. Herman, right?

9     A.    Which Mr. Herman?

10    Q.    Keith.

11    A.    Oh, yes.

12    Q.    I'm sorry, Mrs. Herman's husband.

13    A.    Yes.

14    Q.    And he had a heart attack, didn't he?

15    A.    Yes.

16    Q.    Back in 2002?

17    A.    It sounds about right.

18    Q.    Okay.  And after he had his heart attack, his

19    physical condition deteriorated, didn't it?

20    A.    Yeah.

21    Q.    He was constantly having physical problems, wasn't

22    he?

23    A.    Yeah.

24    Q.    And you could see that that presented a strain

25    emotionally on the family?

```
1    A.     Absolutely.

2    Q.     It was an emotional strain on Mrs. Herman and on

3    her husband, right?

4    A.     Yes.

5    Q.     And Mr. Keith Herman, um, after Mrs. Herman was

6    out in Las Vegas, he came out there to live also, didn't

7    he?

8    A.     Yeah.

9    Q.     And he stayed there, more or less, until like

10   2012, 2013, also?

11   A.     Yes.

12   Q.     And around 2013 he came back to Massachusetts,

13   didn't he?

14   A.     Yeah.

15   Q.     And you knew that the reason he came back was

16   because he had jury duty?

17   A.     Yes.

18   Q.     And while he was back here in that time his health

19   took a serious serious turn for the worse?

20   A.     Yes.

21   Q.     So as emotionally distressful and straining as

22   things were up, until 2012 and 2013, things got a lot

23   worse, didn't they?

24   A.     Yes.

25   Q.     When you were living in Las Vegas, um,
```

1    Mrs. Herman, you said, had an office that was part of

2    the house, right?

3    A.    Yeah.

4    Q.    And there was a printer there also?

5    A.    Yes.

6    Q.    And you never used that, she used it?

7    A.    Yes.  I mean I might have made copies on it

8    before.

9    Q.    Oh, it was a copy machine also?

10   A.    Yeah.

11   Q.    Okay.  And filing cabinets?

12   A.    Yes.

13   Q.    And you knew that she was involved -- I think you

14   said you heard that she was involved in the financial

15   advising business?

16   A.    Yes.

17   Q.    She would occasionally run seminars?

18   A.    Yes.

19   Q.    Okay?  And did you ever attend any of those

20   seminars?

21   A.    Yes.

22   Q.    And you knew that she had to go out and buy food

23   and rent, for example, conference rooms and hotels in

24   order to have those seminars, right?

25   A.    Yes.

1    Q.    And Mr. Caplitz would come out also like four or

2    five times a year, right?

3    A.    Yes.

4    Q.    And he would stay for like three to five days, is

5    that like a ballpark figure?

6    A.    Yes.   Um-hum.

7    Q.    And when he would come out to Las Vegas, um, this,

8    um, combative personality you described, that came with

9    him, didn't it?

10   A.    Yeah.

11   Q.    As soon as he would come out the arguments began,

12   didn't they?

13   A.    Yes.

14   Q.    And as a matter of fact the arguments between

15   Mr. Caplitz and whoever he was arguing with were so loud

16   that you would hold up in your room with your child,

17   after your child was born, to keep them away from the

18   noise?

19   A.    Yes.

20   Q.    And to be honest here, um, a lot of the arguments

21   he was having were between him and Mrs. Herman, right?

22   A.    Yes.

23   Q.    And you couldn't understand what the arguments

24   were about?

25   A.    No.

1   Q.    And, um, she's no shrinking violet, she would
2   respond to his arguments, right?
3   A.    Um-hum.
4   Q.    But you noticed that there was a pretty
5   significant difference between their physical
6   appearance, right?
7   A.    Yes.
8   Q.    She's very small?
9   A.    Yeah.
10  Q.    Very thin?
11  A.    Yes.
12  Q.    And he's not my height, but he's up there, isn't
13  he?
14  A.    Yeah.
15  Q.    And, um, there was never any violence between the
16  two of them, right?
17  A.    No, not physical.
18  Q.    No.  But you were not part and parcel to
19  understand what they were discussing when they were
20  having arguments?
21  A.    No.
22  Q.    But when he wasn't there life was quiet, wasn't
23  it?
24  A.    Yes.
25  Q.    He also, um, offered to help you, um, with your

1   homework, didn't he?

2   A.    Yes.

3   Q.    Because you were studying when you were out there,

4   right?

5   A.    Um-hum.  Yes.

6   Q.    And when he would help you with your homework he

7   became confrontational also, didn't he?

8   A.    Yes.

9   Q.    He would become frustrated and start yelling at

10  you?

11  A.    Yes.

12  Q.    And once again, when you were out there and he was

13  around, he was constantly yelling and throwing his hands

14  up in the air in exasperation and yelling, "Don't worry

15  about it, I'll take care of it"?

16  A.    Yeah.

17  Q.    So you understood that the arguments that were

18  taking place were arguments about what he had

19  responsibilities for doing and when he was confronted

20  with that that was when he would yell, "Don't worry

21  about it, I'll take care of it"?

22         MS. MURRANE:  Objection, your Honor.  The witness

23  is testifying not --

24         THE COURT:  Well, please.  Please.  I understand

25  the objection.  He may put the question in that form.

1   His questions aren't evidence of anything either.  And

2   we'll see what she answers.

3         Is that right, is that how he said it?

4         THE WITNESS:  Yeah.

5   A.    Yes.

6   Q.    So you felt uncomfortable around him?

7   A.    Yes.

8         (Pause.)

9         MR. O'HARA:  May I just have a moment, your Honor,

10  I'm sorry?

11        (Pause.)

12        MR. O'HARA:  I have nothing further.  Thank you.

13        THE COURT:  Any redirect for this witness,

14  Ms. Murrane?

15        MS. MURRANE:  Just a couple of questions, your

16  Honor.

17        THE COURT:  Go ahead.

18

19  REDIRECT EXAMINATION BY MS. MURRANE:

20  Q.    Did Gregg Caplitz ever give you checks to sign?

21  A.    Um, not that I'm aware of.

22  Q.    And in that household where you lived in Las

23  Vegas, who was it that controlled the money?

24  A.    Um, Rosalind Herman.

25        THE COURT:  I didn't hear it?

1          THE WITNESS:  Rosalind Herman.

2          THE COURT:  Thank you.

3          MS. MURRANE:  No further questions, your Honor.

4          THE COURT:  Nothing further for this witness,

5     Mr. O'Hara?

6          MR. O'HARA:  No, your Honor.  Thank you.

7          THE COURT:  You may step down.  Thank you.  Call

8     your next witness.

9          (Witness steps down.)

10          MS. BLOOM:  At this time the government calls Brad

11     Herman.

12          THE COURT:  He may be called.

13          (BRAD HERMAN, sworn.)

14

15          * * * * * * * * * *

16          BRAD HERMAN

17          * * * * * * * * * *

18

19     DIRECT EXAMINATION BY MS. BLOOM:

20     Q.    Could you state your name, please.

21     A.    Brad Herman.

22     Q.    Where do you live?

23     A.    Woburn, Massachusetts.

24     Q.    How long have you lived there?

25     A.    Um, I moved back -- for the past three years.

1   Q.     Where did you live before that?

2   A.     Las Vegas, Nevada.

3   Q.     How long did you live there?

4   A.     Um, 10 years, 12 years.

5   Q.     Where did you live when you lived in Las Vegas,

6   Nevada?

7   A.     Um, Summerlin.

8   Q.     And the address?

9   A.     10916 Summer Quail Avenue.

10  Q.     And, um, with whom did you live at that address in

11  Las Vegas?

12  A.     My mother, my father, my brother, his wife, and my

13  nieces.

14  Q.     Could you describe your education for the jury?

15  A.     I graduated in '02 from Austin Prep and college at

16  UNLV.

17  Q.     And did you -- and, I'm sorry, did you graduate

18  from UNLV?

19  A.     No, I did not.

20  Q.     And could you describe your employment history for

21  the jury?

22  A.     Um, I worked for my family business, my mother's

23  company, and then I did school and now I work at Woburn

24  Concrete Masonry Supply in Woburn.

25  Q.     And until when did you work for the family

```
1    business?
2    A.    Um, I don't recall the exact dates and year.
3    Q.    What did you do for the business?
4    A.    Um, I did filing, answered phones, um, I went
5    around to the Post Office, and I did whatever pretty
6    much needed to be done for a secretary.
7    Q.    Um, who is Rosalind Herman?
8    A.    My mother.
9    Q.    Did you ever, um -- during the time that you lived
10   in the house in Las Vegas, do you recall ever observing
11   business meetings occurring in the house?
12   A.    Um, I believe sometimes.
13   Q.    What do you recall?
14   A.    Um, just that there were people there and there
15   was a meeting.
16   Q.    Anybody other than Gregg Caplitz that you recall
17   coming to the house for business?
18   A.    Other than Gregg Caplitz?
19   Q.    Yes.
20   A.    Oh, yes.
21   Q.    Who?
22   A.    Excuse me?
23   Q.    Who?
24   A.    Oh, I don't recall their names.
25   Q.    Do you recall clients ever coming to the house?
```

1    A.    Yes, that's what I'm talking about.

2    Q.    Okay.  And on how many occasions do you recall

3    that happening?

4    A.    I do not know.

5    Q.    Do you, um -- did you control any of the money for

6    your mother's businesses?

7    A.    What do you mean by that?

8    Q.    Did you decide how any money got spent?

9    A.    No, I did not.

10   Q.    Did you earn any of the money for the business,

11   did you recruit clients?

12   A.    Um, no, I did not.

13   Q.    Did you have any client contact?

14   A.    Um, no, I did not.

15   Q.    Did you, um -- who made the decisions as to how

16   the money was spent?

17   A.    Um, mainly Gregg Caplitz.

18   Q.    Gregg Caplitz made the decisions as to how the

19   money was spent for the business?

20   A.    Yeah, when it came down to the business, Gregg

21   Caplitz.

22   Q.    And how did you know that?

23   A.    Because whatever Gregg Caplitz wanted, he was

24   pretty much the person that did all the deals and dealt

25   with the clients.  So if he said to put money somewhere,

1    that's probably pretty much where it went.

2    Q.    Do you know who wrote the checks from the bank

3    accounts?

4    A.    Um, my mother.

5    Q.    And how often did you see her --

6         THE COURT:  I'm a little unclear here, um, "from

7    the bank accounts"?  What bank accounts, in your

8    question, Ms. Bloom -- well, I'll ask you.

9         When you answered that question, what bank

10   accounts did you think she was asking about?  Tell the

11   jury.

12        THE WITNESS:  Um, I have no idea which one.  I

13   figured, um, the one that was out of Vegas.

14        THE COURT:  "The one that was out of Vegas"?

15        THE WITNESS:  Um, I think it was the Knew Finance.

16        THE COURT:  Okay.  What bank accounts were there

17   that your mother had signing authority over, if you

18   know?

19        THE WITNESS:  I actually do not know if she did.

20        THE COURT:  You don't know.  Was there a personal

21   account, did she have a personal account, do you know?

22        THE WITNESS:  I don't know if she had a personal

23   account, no.

24        THE COURT:  You don't know if she did.  And as to

25   so-called "business accounts," you don't know what the

1    names are beyond what you told us?

2          THE WITNESS:  Yes, I --

3          THE COURT:  Oh, you do.  Well, tell us.

4          THE WITNESS:  There was the Knew Finance Expert,

5    um, I'm pretty sure she was a signer for that company,

6    and also myself, I think.

7          THE COURT:  The Knew Finance Expert and you were a

8    signer on that one too?

9          THE WITNESS:  I think.  I'm not 100 percent

10   positive.

11         THE COURT:  All right.

12         Go ahead, Ms. Bloom.

13         MS. BLOOM:  Thank you, your Honor.

14   Q.    All right.

15         MS. BLOOM:  At this time I'd like to show you what

16   has been marked, and it's in evidence, as, um -- I'm

17   going to show you a set of Exhibits 2.05, 3.05, 4.08,

18   5.07, and 6.06.

19         (On screen.)

20         MS. BLOOM:  Oh, I'm sorry about that.

21         (Pause.)

22         MS. BLOOM:  And if we could just bring it up, the

23   first page of 2.05 on the screen.

24         (On screen.)

25   Q.    I'd like to bring your attention first to Exhibit

1    2.05.

2    A.    (Looks.)

3    Q.    Do you see that that is a stack of checks all of

4    which are made payable to you?

5    A.    Yes.

6    Q.    And looking at the first check dated March 6th,

7    2009, it's for, um -- it looks like $1,350, did I get

8    that right?

9    A.    Yes.

10   Q.    And the next check is $950?

11   A.    Yes.

12   Q.    And the next check is $100?

13   A.    Yes.

14   Q.    And if you look to the second check in that stack,

15   um, who made out that check to you?

16   A.    The second one?

17   Q.    Yes.

18   A.    Um, I don't recall the handwriting.

19   Q.    Do you see the handwriting where it says "Print

20   name," "Brad Herman"?

21   A.    Yes.

22   Q.    You don't recognize that handwriting?

23   A.    That is not mine.

24   Q.    Okay.  And the handwriting under $950, you don't

25   recognize that handwriting?

1    A.    The $950 check?  Yeah, the signature's mine, but I
2    don't know who made the check out.
3    Q.    Did you decide who got checks?
4    A.    No, I did not.
5    Q.    Who decided who got checks?
6    A.    What do you mean?
7    Q.    Who decided to whom to write checks on the Town
8    and Country Bank account in Las Vegas, Nevada when you
9    were living in the Las Vegas house?
10   A.    Um, I don't know.  Usually if a check needed to be
11   written, it got written.
12         THE COURT:  Move the mike a little closer to your
13   mouth.
14         THE WITNESS:  Oh, okay.
15         (Moves microphone closer.)
16   Q.    When you received these checks, did you cash them?
17   A.    I didn't.
18   Q.    You didn't?
19   A.    I did.
20   Q.    And what did you do with the money?
21   A.    Um, I would bring it back to the office and put it
22   on the desk in the front.
23   Q.    Did you give it to anyone?
24   A.    Um, well, sometimes my mother would be sitting at
25   the desk and if Gregg Caplitz was in Vegas he was

1    sitting at the desk, so Gregg Caplitz would take it and

2    my mother would take it.

3    Q.    Mr. Herman, do you recall testifying before the

4    grand jury in this matter?

5    A.    Yes.

6    Q.    And at that time did you swear to tell the truth?

7    A.    I did.

8    Q.    And at that time was your mother present in the

9    room?

10   A.    No.

11   Q.    And do you recall what you said about what you did

12   with every check that you cashed?

13   A.    Not every check but, yeah, as I said, I brought it

14   back to the office, I'd give it to my mother.

15   Q.    And do you recall that you testified that you

16   would never give it to anyone else but your mother?

17   A.    Well, that was false then, I must have got

18   confused, because Gregg Caplitz also took it when he was

19   there too.

20   Q.    So are you saying that you gave false testimony to

21   the grand jury?

22   A.    I probably got confused with your line of

23   questioning, yes.

24   Q.    (Pause.)  Mr. Herman, if I may I'd like to put a

25   copy of your testimony in front of you and I'd ask you

1    to take a look at it and I'm going to start down at the

2    bottom of the page where it says "34."

3    A.    (Reads.)  Okay.

4    Q.    Okay.  And do you see where there's a question,

5    "Did you ever, on any of the errands that you did or for

6    any reason, cash a check and then distribute the cash to

7    other individuals, such as Gregg Caplitz, for example?"

8    A.    And I said, "No," and I was wrong.

9    Q.    Okay, well, let's keep going.  And then the

10   question was asked again, "You didn't do that?"  Okay,

11   and what was your answer?

12   A.    "I wouldn't be standing here right now."

13   Q.    And the questioner asked, "I'm sorry?"  And what

14   did you say again?

15   A.    I said, "I probably wouldn't be standing here

16   right now."

17   Q.    Okay, and then what did you say?

18   A.    Um, "My mom is very tight-ship."

19   Q.    So she would disapprove if you gave cash to Gregg

20   Caplitz?

21   A.    I never said that, that's not what --

22   Q.    And what did you say in response to that question?

23   A.    "Oh, yes."

24   Q.    And then the questioner said, "Okay, why is that?"

25   What did you say?

1   A.    I said, "Well, it's just my mum."

2   Q.    And the questioner said, "Okay, tight-ship, in

3   control?"  And what did you say?

4   A.    "I'm surprised I don't have a GPS right now" --

5   Q.    I'm sorry, could you read that again.

6   A.    "I'm surprised I don't have a GPS right now stuck

7   in my mouth."  But I was talking as a -- personally, not

8   as business.

9   Q.    You were asked questions about whether you would

10   ever give the money to Gregg Caplitz and you said you

11   wouldn't, didn't you?

12   A.    Well, I didn't hand it to him but if he's sitting

13   at the desk I would put it on the desk and if he grabbed

14   it that's up to him.

15   Q.    You told the grand jury that you wouldn't be

16   standing there right now if you had given cash to Gregg

17   Caplitz, didn't you?

18   A.    Yeah, but I never -- like I'm not saying I handed

19   it to him, but if he was sitting at the desk in the

20   office and I would put it down there and then if he took

21   it that's up to him.

22   Q.    You don't know whether he ever took the cash, do

23   you?

24   A.    I do not know.

25   Q.    And in fact you knew that it was very important

1   that you gave the cash back to your mother, right?

2   A.    I did, I would hand it to her.

3   Q.    And let's keep reading here.

4         So it says, "So is it fair to say that your mother

5   knew what was going on in her businesses?"  What did you

6   say?

7   A.    Where are we right now?

8   Q.    Go to Line 20.

9   A.    Oh, Line 20?  Okay.  Yes, I said -- "Yes."

10  Q.    You said, "I'd say so, yes," didn't you?

11  A.    Yes.

12  Q.    And then you were asked the question, "That she

13  was something of a control freak, I think you used the

14  word 'control freak'?"  And what did you say?

15  A.    "Yeah, that might be a personal word, yes."

16  Q.    And you were asked the question, "But she was in

17  control?"

18  A.    "To my knowledge, yes."  I said "Yes."

19  Q.    "And that was true, isn't it?"

20  A.    Yes.

21  Q.    "And that's fair, and managed the corporate

22  entities?"

23  A.    "Yes, um, to my knowledge, yes."

24  Q.    And then the question was asked, "And apparently

25  of you to this day?"  And what was your answer?  What

1    did you say?

2    A.    "Okay, insofar to say that she watched" --

3    Q.    Okay, I'm sorry, that's the question.  Your answer

4    was "Oh, to this day?"

5    A.    Yes.

6    Q.    And then you were asked again the question, "And

7    so fair to say that she watched where the money went?"

8    A.    Um, "To my knowledge, yes."

9    Q.    "And if she had given you something to cash and

10   you gave money to somebody else, that would be a

11   problem?"

12   A.    Yeah.

13   Q.    And you said -- what did you say?

14   A.    "That would never happen."

15   Q.    And you were asked again the question, "That would

16   never happen?"  And what was your answer?

17   A.    I said, um, "No, just to her."

18   Q.    In fact you said, "No, I would never give anybody

19   money, just to her," isn't that correct?

20   A.    Yes.

21   Q.    Now, the stack of checks that you have in front of

22   you --

23   A.    (Coughs.)  Excuse me.

24   Q.    -- all of those pages have several checks per

25   page, correct?

1    A.    Um, yes.

2    Q.    And they're all made out to you?

3    A.    No, they're not.

4    Q.    Some of them are made out to your brother?

5    A.    Yes.

6    Q.    And all the ones that were made out to you?

7    A.    On this first page, 2.05, are we still on this

8    one?

9    Q.    No, I'm saying of all the checks that were made

10   out to you --

11   A.    Oh, yes?

12   Q.    -- did you take them to the bank, cash them, and

13   take the money back to your mother?

14   A.    Yes, we took them all to the office.

15   Q.    Okay.

16         MS. BLOOM:  Now I'm going to show you what's been

17   marked in evidence as Exhibits 5.06 and 4.07.

18         THE COURT:  Now, Ms. Bloom, it's about time for

19   the morning recess.  Now I'm good for another 5 minutes

20   before I have to take the recess, but would it be better

21   to take it now or do you want to run another 5 minutes?

22         MS. BLOOM:  Why don't we take it now, your Honor.

23   Thank you.

24         THE COURT:  We'll do it at this time.

25         Ladies and gentlemen, you have not heard all the

```
 1    testimony, please therefore keep your minds suspended,

 2    do not discuss the case either among yourselves nor with

 3    anyone else.  We'll stand in recess for one half hour

 4    until 11:15.  We'll recess.

 5            THE CLERK:  All rise for the jury.

 6            (Jury leaves, 10:45 a.m.)

 7            (Resumed, 11:15 a.m.)

 8            THE COURT:  All right, proceed, Ms. Bloom.

 9    Q.    Mr. Herman, if you could turn to the exhibit in

10    front of you, I believe it's 5.07?

11    A.    Yes.

12    Q.    Do you see that that is a stack of checks made out

13    to you?

14    A.    Um, yes.

15    Q.    Okay.  If we could turn to the check on, I

16    believe, it's Page 6, um, where there's a yellow flag

17    there for you.

18    A.    Oh, yes.

19    Q.    Um, do you see a Check Number 227 made out to you?

20    A.    Yes.

21    Q.    And who signed the check?

22    A.    Um, I believe my mother.

23    Q.    Are you familiar with your mother's handwriting

24    through the course of your life?

25    A.    I'm not an expert in handwriting, but I believe
```

1    that's her handwriting.

2    Q.    And do you also recognize her handwriting making

3    out the check to you?

4    A.    It looks like her handwriting, yes.

5          MS. BLOOM:  Okay, can we go to the next check.

6          (On screen.)

7          MS. BLOOM:  Could we blow that one up as well.

8          (Enlarges on screen.)

9    Q.    Do you recognize the signature on that check?

10   A.    Yes.

11         THE COURT:  You best hold up a second, Ms. Bloom,

12   a juror can't see.

13         MS. BLOOM:  Thank you, your Honor.

14         (Clerk looks at juror's monitor.)

15         THE CLERK:  We have a monitor that must have just

16   blown, so maybe we could have the jurors move down one?

17         THE COURT:  Okay, yes, why don't you folks just

18   move down to the adjacent monitor.  I apologize.

19         (Jurors move down seats in box.)

20         THE COURT:  And I thank the juror for bringing it

21   to our attention.

22         Proceed, Ms. Bloom.

23   Q.    Do you recognize the signature on this check,

24   Check 2315?

25   A.    It looks like my mother's.

1   Q.    And do you recognize the handwriting making the

2   check out to you?

3   A.    Yes, it looks like my mother's.

4         MS. BLOOM:  Can we go to the next page.

5         (On screen.)

6         MS. BLOOM:  Oh, is that the next page?  Oh, I'm

7   sorry.

8   Q.    Do you recognize the signature on that check?

9   A.    Yes, the same.

10  Q.    And do you recognize the handwriting making the

11  check out to you in the amount of $1600?

12  A.    It looks like my mother's, yes.

13  Q.    Okay, and have you had an opportunity -- can you

14  take an opportunity to flip through that stack of checks

15  and tell me whether they all appear to be made out to

16  you and signed by your mother?

17  A.    Okay.  (Looks through stack.)

18  Q.    Well, why don't I just stop you there.

19        For the ones you've just looked through so far, do

20  they all appear to be made out to you and signed by your

21  mother?

22  A.    Yes.

23  Q.    Okay.  If you could just put those aside for the

24  moment.

25        And I'll bring to you what are already in evidence

1   as Exhibits 1.07, 2.04, 3.04, 4.07, and 5.06.  (Hands to

2   witness.)

3         Would you look at those stacks of checks and tell

4   me if they all appear to be made out to your brother,

5   Brian Herman?  And I'm not asking you to look through

6   every single one of them --

7   A.    Well --

8   Q.    -- but look and see if that's what they appear --

9   what the stacks appear to be?

10  A.    (Looks.)  Yes.

11  Q.    Okay.

12        MS. BLOOM:  And I'm going to blow up a section of

13  a check which is in 1.07 -- and actually I overblew it

14  up.

15        (Enlarges on screen.)

16  Q.    But I'm going to ask you to take a look at 1.07,

17  the very first check in 1.07, and tell me if you can

18  identify the signatures in the bottom right-hand corner?

19  A.    It looks like the top one is my brother's, but I

20  can't make out the bottom one at all.

21  Q.    Is either of them your signature?

22  A.    Um, I don't think so.  I can't really see it.

23  Q.    Do you know whether anyone else was ever signing

24  your signature to checks at the house?

25  A.    Um, not to my -- um, I wouldn't know.

1          MS. BLOOM:  Um, let's go to the next check.

2          (On screen.)

3          MS. BLOOM:  So this is 1.07, 002, Check 1161.

4     Q.    Again can you identify the signatures in the

5     bottom right-hand corner?

6     A.    Um, the top one, once again, looks like my

7     brother's signature, and I can't tell that bottom one.

8     Q.    Okay.  And do you recognize the handwriting for

9     Brian Herman, $1,600?

10    A.    It looks like my mother's.

11    Q.    And to your recollection who made the decision as

12    to to whom checks were written off the corporate

13    accounts?

14    A.    To my knowledge I wouldn't really know.

15    Q.    Okay.

16          When you lived at the Las Vegas house, who paid

17    the expenses of the house?

18    A.    Um, I believe my mother.

19    Q.    Who paid for the pool service?

20    A.    Um, my mother.

21    Q.    Who paid for the cars?

22    A.    Um, that was my mother.

23    Q.    Who paid for the food?

24    A.    The food?  Um, my dad, my mother, sometimes me.

25    Q.    Who paid for the, um -- the supplies for the

1    house, the power, the lights, the utilities at the

2    house?

3    A.    I believe my mother and father, to my knowledge.

4    Q.    Was your father working?

5    A.    Um, no, he got sick and he was on disability.

6    Q.    Did you, um, have a personal bank account or any

7    source of checking account at that time?

8    A.    Personal?

9    Q.    Yes.

10   A.    I know I had one a long time ago, but I never

11   really used it.

12   Q.    Okay.  And did you own a car at that time?

13   A.    Personally, no, I do not.

14   Q.    Did you use a car?

15   A.    I used my mother's car.

16   Q.    Which car?

17   A.    Um, her Jaguar.

18   Q.    To your knowledge did you ever receive any W-2

19   statements or 1099s for any work done on behalf of your

20   mother's business?

21   A.    Um, no, I did not.

22         (Pause.)

23         MS. BLOOM:  No further questions at this time.

24         THE COURT:  Mr. O'Hara?

25         MR. O'HARA:  Yes, your Honor.

1

2    CROSS-EXAMINATION BY MR. O'HARA:

3    Q.    Mr. Herman, when you were 17 you were involved in

4    a serious traffic accident, weren't you?

5    A.    Yes.

6    Q.    And you suffered head injuries and a broken neck

7    in that accident?

8    A.    Um, I suffered a cranial bleed, I broke my

9    vertebrae in my neck in two spots, an inch away from the

10   spine, and my pelvis.

11   Q.    Okay.  And as a result of that accident you're

12   still receiving some form of treatment today?

13   A.    Um, not some form, but it took me a long time to

14   get back.

15   Q.    Are you currently under any medication?

16   A.    Um, no.

17   Q.    And did the -- it's fair to say that the accident

18   has affected your ability to remember things?

19   A.    Very much so.

20   Q.    And you get confused easily?

21   A.    Very easily.

22   Q.    And your confusion also is heightened somewhat

23   when you're in stressful situations, right?

24   A.    Yes.

25   Q.    And when you testified, a couple of years ago in

1    the grand jury, that was a stressful experience for you,

2    wasn't it?

3    A.    Very stressful.  A lot of anxiety.

4    Q.    Excuse me.  I didn't mean to interrupt you.

5    A.    I said I was feeling like I was getting like a

6    panic attack.

7    Q.    You were being asked to testify against your

8    mother?

9    A.    Yes.

10   Q.    And you didn't want to do that?

11   A.    No.

12         THE COURT:  Let me just caution.

13         Mention is made of this other proceeding.  That

14   doesn't count in this case at all, it has no bearing on

15   this case, the relationship is only that a transcript

16   was prepared and you can see that that transcript has

17   been used in this proceeding and you're entitled to hear

18   what he did say on that occasion.  But don't draw

19   anything from the fact that that procedure has been

20   followed, that's a procedure out of a protection for

21   people in the position of Ms. Herman.  It has no bearing

22   on this proceeding at all.  You're the jury in this

23   proceeding, you're the only jury.

24         Excuse me, Mr. O'Hara.

25         MR. O'HARA:  And thank you for clarifying that.

1          THE COURT:  But you may inquire about it, of

2     course.

3     Q.    And you don't feel comfortable today, do you?

4     A.    No, I do not.

5     Q.    You're a little bit confused?

6     A.    Yes.

7     Q.    Okay.

8          MR. O'HARA:  Could I ask to see the two checks

9     that were drawn, um, in Exhibit 5.07, 2315 and 2343.

10         (Pause.)

11         MR. O'HARA:  If they could be put on the screen

12    again, please.  It was exhibit -- according to my notes,

13    5.07, um, and there were a number of checks shown but

14    the one I'm asking for is Check Number 2315.

15         (On screen.)

16         MR. O'HARA:  Yes.  Okay.

17    Q.    And you can see that, Mr. Herman, can't you?

18    A.    Yes.

19    Q.    And you've identified the signature at the bottom

20    of that check as your mother's signature, right?

21    A.    I believe it looks like hers, yes.

22    Q.    Well, would it be fair to say that the "R" in

23    "Rosalind" and the "H" in "Herman" are distinctive,

24    they're unusual, aren't they?

25    A.    Yes.

```
 1          MR. O'HARA:  Um, Ms. Rojas, could you put up Check
 2     2343.
 3          (On screen.)
 4          MR. O'HARA:  Thank you.
 5   Q.    Once again, Mr. Herman, looking at the signature
 6     on that check, that's your mother's signature, right?
 7   A.    It looks like hers.
 8   Q.    Okay, and the "R" and the "H" are as distinctive
 9     on that check as they were in the other check?
10   A.    Yes.
11          MR. O'HARA:  Could I just have a brief second,
12     your Honor?
13          THE COURT:  You could.
14          (Pause.)
15   Q.    Thank you, Mr. Herman.
16   A.    Okay.
17          MR. O'HARA:  Nothing further, your Honor.
18          THE COURT:  Nothing further for this witness,
19     Ms. Bloom?
20          MS. BLOOM:  No, your Honor.
21          THE COURT:  You may step down.  Thank you.  Call
22     your next witness.
23          (Steps down.)
24          MS. BLOOM:  At this time, your Honor, I would like
25     to read into evidence the stipulations between the
```

1    parties.

2         THE COURT:  You may do that.

3         Now, again here's what a stipulation is.  Even

4    though it's Ms. Bloom who's going to be talking, in

5    order to save time and because in all honesty not

6    everything is disputed, the parties can agree to certain

7    things and those are stipulations.  She's going to agree

8    to them -- she's going to read them to you, I'll turn to

9    Mr. O'Hara and ask him to confirm on the record that he

10   does so stipulate, and that's evidence.

11        Now, indeed it's a special type of evidence.  You

12   don't have to debate it, you can take that as a given

13   because everybody agrees.  Having said that, so powerful

14   is your role as jurors, that just like the testimony of

15   a witness, you can disregard it if you choose to.  But I

16   tell you that stipulations are agreed to by the parties.

17        Go ahead, Ms. Bloom.

18        MS. BLOOM:  And I'm going to read this, but it is

19   also marked as an exhibit, I believe as 100, and just

20   for convenience, and so if we bring that up on the

21   screen maybe the jury can follow along if they wish to.

22        THE COURT:  You may.  Go right ahead.

23        (On screen.)

24        MS. BLOOM:  "The United States and Rosalind Herman

25   hereby agree as follows:

1       If called to testify, representatives of the

2    financial institutions listed below would identify the

3    trial exhibits detailed herein as authentic original

4    records or duplicates of original records in the custody

5    of their respective financial institutions and would

6    further testify that these records were made at or near

7    the time of the occurrence of the matter set forth by,

8    or from information transmitted by a person with

9    knowledge of those matters, and those records were kept

10    in the ordinary course of regularly-conducted business

11    activity.  It was the regular practice of these

12    businesses to make such records and the financial

13    institutions and trial exhibits are further identified

14    as follows below.

15       And listed below is Washington Mutual Bank, which

16    is Exhibit 1 and all subparts, Town and Country Bank,

17    Exhibits 2 and 3 and all subparts, Bank of America,

18    which is Exhibits 4 and 8 and all subparts, US Bank,

19    Exhibit 5 and all subparts, Wells Fargo Bank, Exhibit 6

20    and all subparts, Metro Credit Union, Exhibit 7 and all

21    subparts, Lightspeed Trading, LLC, Exhibit 9 and all

22    subparts, and Federal Reserve Bank of Boston, Exhibits

23    10, 11 and 12.

24       (2) If called to testify, a representative of the

25    Federal Reserve Bank of Boston would testify that the

1    wire transfer transactions reflected in Exhibits 10, 11,

2    and 12, were Fedwire fund transfers that involved

3    interstate wire communications.

4         (3) If called to testify, a representative of

5    Verizon Communications would identify the electronic

6    mail communication from insightonsite@comcast.net to

7    cleuci@verizon.net on July 24, 2012 reflected in Exhibit

8    424 and would testify that the processing of this e-mail

9    communication involved the transmission of data in

10   interstate commerce."

11        MS. BLOOM:  Your Honor, if I may I would like to

12   summarize some of the rest of the stipulation rather

13   than read every word, if the defense does not object?

14        THE COURT:  You may propose it and you listen,

15   Mr. O'Hara, to see if you agree.

16        MR. O'HARA:  I agree, your Honor.

17        MS. BLOOM:  This will be available for the jury,

18   but I don't know that every word is essential.

19        THE COURT:  I understand, and he agrees with that

20   procedure.  You go ahead and summarize it.

21        MS. BLOOM:  So Number 4 basically brought into

22   evidence Exhibits 14 and 15, which were from the United

23   States Securities and Exchange Commission, and

24   identifies certain forms filed with the Securities and

25   Exchange Commission, which we will be talking about

1    later.

2         Number 5, um, basically says that all the other

3    business records that have been agreed upon in evidence,

4    in our exhibits basically 21 to, I believe, 39, are

5    business records of the various entities and therefore,

6    we're agreed upon, could come in as evidence.

7         Exhibit Number 6 identifies records from American

8    Express, Visa, and Mastercard, as Exhibits 40 and 50,

9    and agrees to the facts necessary for those to come into

10   evidence by agreement.

11        Number 7 identifies records from the Internal

12   Revenue Service and the facts necessary for those to

13   come into evidence by agreement.

14        Number 8 is records of the Secretary of State for

15   Exhibits 81, 82, 83, and subparts.  And just to explain

16   "subparts," that means like when we're talking about

17   "83.01," that's a subpart of 83.

18        Number 9 is about the records of the Secretary of

19   State of Nevada for records of business entities that

20   are in evidence as Exhibits 84 through 89.

21        And Number 10 is the basis for records from the

22   Registry of Motor Vehicles from the Commonwealth of

23   Massachusetts for Exhibits 90, 91, 92, and 93.

24        And then the last paragraph simply reflects the

25   parties agreement:  "The United States and Rosalind

1   Herman further agree and stipulate that the bank records

2   from the entities listed above, as well as the tax

3   records provided in discovery and the other public

4   agency records, may come in as agreed-upon exhibits for

5   all purposes and that the defendant will not raise any

6   objection as to the authenticity or foundation as

7   business records of the records described above."

8        THE COURT:  As she's characterized it, you do so

9   stipulate, Mr. O'Hara?

10       MR. O'HARA:  Yes, I do, your Honor.

11       THE COURT:  Very well, that's the stipulation.

12  You may proceed.

13       MS. BLOOM:  There's a second stipulation --

14       THE COURT:  Go ahead.

15       MS. BLOOM:  -- which I will read.  And I don't

16  know if we can get this one on the -- it's not in

17  evidence, but I don't know if we can get this onto the

18  ELMO.

19       Do we call it the "ELMO" anymore?  I don't know.

20  It's the "document camera."

21       This says:  "Second set of stipulations, the

22  United States and Rosalind Herman hereby agree as

23  follows:

24       Mr. Caplitz was a licensed insurance broker who

25  generated income by way of commissions he received for

writing insurance policies.  There were a number of
civil lawsuits involving Ms. Herman, Mr. Caplitz, and
various companies controlled by Ms. Herman beginning in
2003.  The issues in those lawsuits were not directly
related to the allegations in this case.  In those
lawsuits Mr. Caplitz and Ms. Herman's businesses were
found to have breached fiduciary duties and made
misrepresentations and Ms. Herman was aware of this in
2006."

THE COURT:  So stipulated, Mr. O'Hara?

MR. O'HARA:  Yes, your Honor.

THE COURT:  Had you -- were you done reading?

MS. BLOOM:  Nope, I'm going to go to the next
paragraph.

THE COURT:  Go ahead.

MS. BLOOM:  "As a result of those civil lawsuits,
Mr. Caplitz's ability to sell insurance policies was
severely restricted resulting in a loss of income to him
and to Ms. Herman and her companies.  Bringing and
defending those lawsuits also resulted in legal fees in
excess of $1,000,000 that were due and/or paid by
Ms. Herman out of bank accounts controlled by her
businesses, this includes all legal fees paid to Robert
Cohan and Cohan, Rasnick & Myerson.  None of the
expenses incurred by Mr. Caplitz, Ms. Herman, and

```
 1    Ms. Herman's businesses, in bringing and defending these
 2    lawsuits, including all payments to Robert Cohan and
 3    Cohan, Rasnick & Myerson, were related in any way to the
 4    formation of this hedge fund or to companies that
 5    received funds earmarked for this hedge fund."
 6         That completes the stipulation.
 7         THE COURT:  So stipulated?
 8         MR. O'HARA:  So stipulated.
 9         THE COURT:  Very well.  Those are the
10    stipulations.
11         Proceed, Ms. Bloom.
12         MS. BLOOM:  At this time the United States calls
13    Gregg Caplitz.
14         THE COURT:  He may be called.
15         MS. BLOOM:  Ms. Gaudet, I think there's something
16    on the screen.  Can we clear the screen?
17         (Screen is cleared.)
18         (GREGG CAPLITZ, sworn.)
19
20         * * * * * * * * * * * * *
21         GREGG CAPLITZ
22         * * * * * * * * * * * * *
23
24    DIRECT EXAMINATION BY MS. BLOOM:
25    Q.   Would you please state your name.
```

A.      Gregg Darrell Caplitz.

Q.      Would you briefly describe your education?

A.      I graduated from Chelsea High School in 1977,
graduated from Boston College in 1981, graduated from --
received my Certified Financial Planner's designation in
the mid '80s, and a master's in financial planning from
the College of Financial Planning in the early 1990s.

Q.      And how are you currently employed?

A.      I am a seafood manager at Star Market on Lexington
Street in Waltham.

Q.      How long have you been employed in that position?

A.      Three years.

Q.      Could you describe your work history prior to
1992?

A.      I started working when I was 12 years old in the
family business, which was in the transportation of
special needs and taxicab.  I worked for my dad until I
was 24 in 1984, and then I went to work for First
Investors Corporation and was there for two years until
1986.  And then in 1986, along with two other
individuals, we formed the New England Financial
Consultants Limited, which was a financial planning and
money management insurance firm on the North Shore, and
I worked there until 1990 when I left and formed New
England Financial Consultants Limited, which was a

1    financial planning firm located in Burlington,

2    Massachusetts.

3    Q.    And at some point did you meet Rosalind Herman?

4    A.    Yes.

5    Q.    When did you meet Rosalind Herman and how?

6    A.    I met Rosalind Herman in the early 1990s, she was

7    working as a manager at Adam's Men's Warehouse and she

8    sold me a suit.

9    Q.    What happened next in connection with Ms. Herman?

10   A.    Um, I asked her out a large number of times, we

11   finally went out for coffee, and then we began a

12   romantic relationship.

13   Q.    For how long did you remain in a romantic

14   relationship with Ms. Herman?

15   A.    Until April of 2013.

16   Q.    At some point in time did Ms. Herman take on a

17   role in the business with you?

18   A.    Yes, she did.

19   Q.    Could you describe how that came about?

20   A.    In approximately 1993, um, I had lost the woman

21   who was managing the business, I approached Rosalind,

22   asked her if she was willing to manage the business for

23   me.  The Men's Warehouse store had closed.  She was then

24   working as a manager of a tobacco store at the Woburn

25   Mall.  She said she didn't want to work for me because

1    it would wreck our relationship, so I said to her,

2    "Fine, I'll work for you," and I transferred the 51

3    percent ownership that I had in the business to her.

4    Q.    And what was the name of that business?

5    A.    New England Financial Consultants Limited.

6    Q.    And from that point on generally --

7    A.    Oh, I'm sorry, New England Financial Independence

8    Group, Inc.

9    Q.    And did you remain in business -- for how long did

10   you remain in a business relationship with Ms. Herman?

11   A.    Until April of 2013.

12   Q.    And what roles generally did each of you play in

13   the business?

14   A.    Generally I was the financial planner, I was also

15   the person responsible for securing clients and

16   generating sales.

17   Q.    What role did Ms. Herman play in the business?

18   A.    She supervised the back end of the business, paid

19   bills, hired people, and then beginning in approximately

20   2000 she began to manage the individual equities

21   portions of the clients' accounts.

22   Q.    Okay.  I'm going to ask you now to take a look at

23   what has been premarked for identification as Exhibit

24   "LA" on the screen.  (On screen.)

25   A.    (Looks.)

```
1    Q.    Have you had an opportunity to look over this

2    chart?

3    A.    Yes.

4    Q.    And, um, does it accurately reflect the identities

5    of Ms. Herman's companies and the roles that she played

6    and the establishment date for each of those companies,

7    to your knowledge?

8    A.    Yes, it does.

9          MS. BLOOM:  At this time I would offer this into

10   evidence as Exhibit 410.

11         THE COURT:  Any objection?

12         MR. O'HARA:  No objection.

13         THE COURT:  It is admitted, Exhibit 410.

14         (Exhibit 410, marked.)

15         MS. BLOOM:  And if I may, your Honor, I have a

16   board for this exhibit.  And I don't know if it would

17   help the jury, but I'll put that up.  I'll give it a

18   try.

19         (Puts up chalk.)

20         MS. BLOOM:  It will be on the screen as well.

21   Q.    Okay.  Looking at this chart, can we look first at

22   the first block for New England Financial Group.

23   What was that company?

24   A.    That was the company that I initially formed in

25   1990, I had owned 51 percent of the business and my
```

1    cousins, Jeff Caplitz and Mildred Burnholtz, owned the

2    other 49 percent.

3    Q.    And this says "Rosalind Herman as of 1993."  What

4    does that mean?

5    A.    That's the point in time where I transferred the

6    ownership -- I think the ownership actually might have

7    been transferred a little bit earlier than that, and

8    that's the point in time where she recorded the change

9    with the Secretary of State's Office in Massachusetts.

10   Q.    And what titles did she have in the business?

11   A.    She held all of the officer's positions and was

12   also the Director of the firm.

13   Q.    Okay.

14         MS. BLOOM:  And if we can go to the next company.

15         (On screen.)

16   Q.    And what is this company?

17   A.    It's Financial Resources Network, Inc., which is a

18   Massachusetts C Corporation that was formed in 1995 by

19   Mrs. Herman, um, and that began to be the ongoing

20   operating entity.

21   Q.    And why a new company?

22   A.    Because Rosalind didn't want to work with my

23   cousins and didn't think that they were entitled to any

24   return on the business.

25         MS. BLOOM:  And going to the next company.

1           (On screen.)

2    Q.    "Financial Design Consultants, Inc."  What is that

3    company?

4    A.    That's a Nevada corporation that was established,

5    it's an S Corporation that was established in 2000 by

6    Ms. Herman.

7    Q.    And what's an "S Corporation"?

8    A.    An "S Corporation" is an entity which acts as a

9    conduit where all of the income and deductions

10   ultimately flow through and show up on the shareholder's

11   individual income tax as a Schedule E.

12   Q.    And who is the shareholder here?

13   A.    My understanding is Rosalind was the sole

14   shareholder.

15   Q.    And did she also hold the positions listed on the

16   chart, "President," "Treasurer," "Secretary" and

17   "Director"?

18   A.    To the best of my knowledge, yes.

19         MS. BLOOM:  Let's go to Company 4.

20         (On screen.)

21   Q.    And what was this company?

22   A.    This is a company called "New Finance

23   Experts, Inc.," which is also a Massachusetts S

24   Corporation.  Oh, I'm sorry, a Nevada S Corporation,

25   which was established in 20 -- 22, and, um --

Q.    Did you mean 2002?

A.    In 2002, yes.  -- and Rosalind was the President,
Treasurer, Secretary and Director.

Q.    Do you know why this was established?

A.    Yes.

Q.    Why?

A.    It was set up to be what Rosalind called an
"intercorporate finance company," its purpose was to
balance money between the companies.  It would hold
money when companies had surpluses and give them money
when they had deficits.

        MS. BLOOM:  And could we go the Number 5.

        (On screen.)

Q.    What is "Financial Family Holdings, LLC"?

A.    "Financial Family Holdings, LLC" is a Nevada
limited liability company that was established in 2002,
it's purpose was to hold the ownership of all of the
other entities, and it was designed to be an asset
protection tool as well as an estate planning tool.

        MS. BLOOM:  And then if we can look at the last --
the group of the last three companies together.

        (On screen.)

Q.    Can you explain why all of those companies were
created in 2008?

A.    Yes, these corporations were established by Sadis

1    & Goldberg as part of the process of creating --

2    allegedly creating the hedge fund.

3    Q.    And was the name of those entities all some

4    version of "Insight Onsite Strategic"?

5    A.    Yes.

6    Q.    Why so many companies?

7    A.    The prior corporations were set up as a means of

8    control, she would use these entities to direct various

9    incomes to these entities.  The three companies that

10   were set up in 2008 is a fairly typical structure when

11   you set up a hedge fund.

12   Q.    Who prepared the documents to set up the

13   corporations for the first five companies or the first

14   two, three, four and five?

15   A.    Two, three and four were created by Rosalind

16   Herman and five was created by an attorney in Waltham by

17   the name of Leo Cushing.

18   Q.    And do you know how she learned to set up

19   companies?

20   A.    She has a paralegal background.  She went to

21   paralegal school.

22   Q.    Okay.  Now, you had described, um, setting up your

23   business early in the '90s.  Can you describe for the

24   jury what you did in your business?

25   A.    The firm was set up to provide financial planning,

1    money management, and insurance and estate planning

2    primarily to, um, upper middle class and small business

3    owners.

4    Q.    And is that something that the firm continued to

5    do until 2013?

6    A.    Less so in the later years, but in the early --

7    well, certainly up and through the early part of the

8    decade, yes.

9    Q.    And what was your role in that process?

10   A.    Um, I was the financial planner, I held the

11   securities licenses, the insurance licenses, I was the

12   person who was most responsible for engaging directly

13   with clients in their relationships.  I worked with

14   professionals, other professionals in the business, and

15   also supervised the creation of the financial plans for

16   the clients.

17   Q.    Did you also sell insurance products?

18   A.    Yes.

19   Q.    Did Rosalind Herman like to meet with clients?

20   A.    No.

21   Q.    Why not?

22   A.    She found it stressful.

23   Q.    Can you explain?

24   A.    She didn't like to get questioned by clients and

25   it was something that she did when necessary, usually

1    under duress when a client really insisted on meeting

2    with her, but her preferred method was to have me meet

3    with clients and she would stay in her office and do her

4    thing.

5    Q.    How often during the time that you were in

6    business together did you and Ms. Herman communicate

7    with each other and by what means?

8    A.    We communicated multiple times daily, we would

9    communicate by phone, e-mail, and by text.

10   Q.    And at some point did she move to Las Vegas?

11   A.    Yes.

12   Q.    And did you continue to have regular contact?

13   A.    Yes.

14   Q.    And how did that work once she moved to Las Vegas?

15   A.    We would talk probably more than a dozen times a

16   day either by phone, text, e-mail, or some combination

17   of all three.

18   Q.    And when did she move to Las Vegas?

19   A.    Approximately in 2001.

20   Q.    At some point did you decide to, um, register the

21   business as a registered investment advisor?

22   A.    Yes.  Well, all of the businesses beginning in

23   1986 with the company I formed with the two gentlemen,

24   they had all -- they had all been registered investment

25   advisors at the federal level beginning in 1986 and

1    continuing up until the SEC shut the businesses down in

2    2013.

3    Q.    And why were they registered investment advisors?

4    A.    It is a requirement that if you were going to

5    manage client assets, that you register as either a

6    state or a federal registered investment advisor, once

7    you go over very small limits as to what you can --

8    numbers of clients which vary from state to state.

9    Q.    And did your business, throughout this time

10   period, have assets in excess of that very small amount?

11   A.    Yes.

12   Q.    And could you identify the particular entities on

13   the chart, which is 410, that were registered investment

14   advisors?

15   A.    Yes, New England Financial Consultants.  New

16   England Financial Independence Group was the registered

17   investment advisor from 1990 through the beginning of

18   '95.

19   Q.    And that's Number 1?

20   A.    That's Number 1.

21   Q.    Okay.

22   A.    Then, Number 2, Financial Resources Network was

23   the registered investment advisors from 1995 till

24   approximately 2010ish, at which point Insight Onsite

25   Strategic Management, LLC became the RIA.

1    Q.    And that's Number 6?

2    A.    Yes.

3    Q.    And did Ms., um -- who controlled each of those

4    companies from approximately 1993 on?

5    A.    Rosalind did.

6    Q.    I'd now like to show you what has been marked for

7    identification as Exhibit FB.

8          (On screen.)

9    Q.    What is that?

10   A.    It's an e-mail that I sent on April 12, 2012 to

11   Rosalind, Brian, with an office copy back to the

12   Massachusetts office.

13         MS. BLOOM:  At this time I would offer Exhibit FB

14   as Exhibit 255.

15         MR. O'HARA:  No objection.

16         THE COURT:  It's F?

17         MS. BLOOM:  I'm sorry, "F" as in "Fred," B, as in

18   "boy."

19         THE COURT:  FB is admitted.

20         MS. BLOOM:  255.

21         THE COURT:  As Exhibit 255.

22         (Exhibit 255, marked.)

23   Q.    What is it that you, um -- in this e-mail dated

24   April 12, 2012, um, you send this to Rosalind D. Herman.

25   Can you explain?

A.     Yes, the e-mail program that we used recognized

two e-mail addresses as Rosalind's, the top one is --

was "rherman14@cox.net," which was the address that

Rosalind used in Las Vegas, and the e-mail address below

is "insightonsite@comcast.net," which is the one we used

for the office.  Um, with the exception of Rosalind, we

did not have individualized e-mail addresses.

Q.     And what it is that you are sending attached to

this e-mail?

A.     I am sending a draft of a plain language brochure

which we created -- which I created in approximately

early April of 2012 which was part of a new set of

requirements for, um, federal RIAs where there had

previously been a form which was very difficult for

people to understand and the new requirements were that

you take the form and put it into a plain language

explanation that could be given to clients for them to

understand the relationship between the RIA and the

client.

Q.     And did you attach a draft of that brochure to

this e-mail?

A.     I did.

Q.     And if you could just turn to the next page.

A.     (Turns.)

Q.     Is that the brochure you attached?

1    A.     Yes.

2    Q.     And did you review that with Ms. Herman?

3    A.     Yes.

4    Q.     And did you review it with Brian Herman?

5    A.     Yes.

6    Q.     And after reviewing it with them, what did you do?

7    A.     I made some changes, primarily grammatical and

8    spelling.

9    Q.     And then what did you do?

10   A.     It was filed along with the ADV with the U.S.

11   Securities and Exchange Commission.

12   Q.     What's an "ADV"?

13   A.     An "ADV" is an application for a registered

14   advisor that was filed electronically with the

15   Securities and Exchange Commission through FINRA.

16          MS. BLOOM:   Okay.   I'm now going to show you what

17   is already in evidence as Exhibit 14.01.

18          (On screen.)

19   Q.     What is that?

20   A.     That is the application for an ADV that I -- that

21   we had previously discussed.

22   Q.     So is this the one that you filed with the SEC?

23   A.     Yes, ma'am.

24          MS. BLOOM:   And I'd now like to have you look at

25   Page 33.

1            (On screen.)

2    Q.    If you can see that section that's been blown up,

3    what is that describing there?

4    A.    That's describing the -- the application process

5    requires that you identify individuals who hold what

6    they call a "control person role," which simply means

7    people who make meaningful decisions on behalf of the

8    registered investment advisor, and that describes

9    Rosalind's role in that entity.

10   Q.    And did you also -- were you also listed as a

11   "control person"?

12   A.    Yes, I was.

13   Q.    And can you read the section where it says,

14   "Briefly describe the nature of control," for Rosalind

15   Herman?

16   A.    "Control person is managing member of Insight

17   Onsite Strategic Management, LLC and is also managing

18   member of its sole shareholder, Financial Family

19   Holdings, LLC, she is the Chief Investment Officer of

20   the advisor."

21   Q.    Was that all correct?

22   A.    Yes.

23   Q.    And did you review that with Ms. Herman prior to

24   filing it?

25   A.    Yes.

1          MS. BLOOM:   I'm now taking you to the brochure, if

2     we could go to 14.02 at Page 25.

3          (On screen.)

4          MS. BLOOM:   If we could go to the final page of

5     that document.

6          (On screen.)

7     Q.    Who is that a description of on the final page?

8     A.    Myself.

9     Q.    And what does it say about supervision?

10    A.    It says "Gregg Caplitz is supervised" -- there's a

11    typo, "Gregg Caplitz's name is supervised by Rosalind

12    Herman, managing member.  She reviews Mr. Caplitz's work

13    through frequent office interactions as well as remote

14    interaction.  She also reviews Mr. Caplitz's actions

15    through our client relationship management system."  And

16    then there's the contact information.

17    Q.    And is that -- whose e-mail address is that below?

18    A.    That was Rosalind's address in Las Vegas.

19    Q.    And up to the sentence -- is the sentence that you

20    were supervised by Rosalind Herman, the managing member,

21    did you review that with Ms. Herman prior to filing it?

22    A.    I did.

23    Q.    Is that correct?

24    A.    Yes.

25    Q.    And the fact that she reviewed your work through

1   frequent office interactions as well as remote

2   interactions, did you review that with Ms. Herman prior

3   to filing it?

4   A.    I did.

5   Q.    Is that correct?

6   A.    It is.

7   Q.    It also says, "She also reviews Mr. Caplitz's

8   activity through our client relationship management

9   system."

10   Is that correct?

11   A.    No.

12   Q.    Why not?

13   A.    We did not have a client relationship management

14   system.

15   Q.    Okay.  What does it mean to be an "investment

16   advisor"?

17   A.    An "investment advisor" means that you have a

18   fiduciary obligation to -- and a "fiduciary obligation,"

19   in its simplest terms, means that the individuals who

20   are managing the money have a legal obligation to put

21   the investment assets of the client ahead of their own

22   interest.  There can be no conflicts.

23   Q.    And did the company that you worked with with

24   Ms. Herman charge any fees for the services provided?

25   A.    They did.

```
1    Q.    And approximately how was that done?
2    A.    It was done most of the time, um, from 2000 on, it
3    was a basis of percentage fee charged against assets
4    under management, and that was 1 percent of the assets
5    under management.  It included all assets, even the ones
6    that were not actively traded.
7          MS. BLOOM:  At this time I would like you to take
8    a look at what has previously been marked as Exhibit KZ,
9    marked for identification.
10         (On screen.)
11   Q.    Do you recognize this document?
12   A.    I do.
13   Q.    What is it?
14   A.    It's a plea agreement that I entered into with the
15   government in February of 2014.
16         MS. BLOOM:  At this time the United States would
17   offer this as an exhibit.
18         THE COURT:  No objection?
19         MR. O'HARA:  No objection.
20         THE COURT:  It may be received.  It's numbered?
21         MS. BLOOM:  409.
22         THE COURT:  It's admitted in evidence as Exhibit
23   409.
24         (Exhibit 409, marked.)
25   Q.    Mr. Caplitz, what crimes --
```

1    MS. BLOOM:   And we can blow up the next paragraph

2    of the agreement, please.

3         (Blows up.)

4    Q.    Mr. Caplitz, what crimes did you plead guilty to?

5    A.    I pled guilty to a crime of conspiracy, a crime of

6    investment advisor fraud, false filings with the SEC,

7    wire fraud, impeding the administration of the Internal

8    Revenue laws, and in filing a false tax return.

9    Q.    And why did you plead guilty to those crimes?

10   A.    Because I was guilty.

11   Q.    Did you agree to make any kind of restitution?

12   A.    Yes.

13   Q.    And did you also make any agreement with respect

14   to cooperation with the government?

15   A.    Yes, I did.

16   Q.    What did you agree to do?

17   A.    I agreed to provide any information that I knew

18   about the case and to testify, if necessary, at any

19   trials.

20   Q.    And, um, were there any requirements about how you

21   would testify at trial?

22   A.    Only one.

23   Q.    What's that?

24   A.    That I tell the truth.

25   Q.    Has anybody made any promises to you about what

1    sentence you're going to receive in this case?

2    A.    No.

3    Q.    Do you understand that under the sentencing

4    guidelines, what your recommended guideline sentencing

5    range is?

6    A.    I do.

7    Q.    What is it?

8    A.    6 1/2 to 8 years.

9    Q.    Do you expect to go to prison for years?

10   A.    Yes, I do.

11   Q.    Other than this matter, have you ever been

12   convicted of a felony?

13   A.    No.

14   Q.    Have you ever been found to have committed -- made

15   a civil misrepresentation?

16        MR. O'HARA:  Objection.

17        THE COURT:  Um, I'll hear you.  Come to the

18   sidebar.

19

20        AT THE SIDEBAR

21        THE COURT:  Well, I assume she's trying to claw

22   the teeth of your cross-examination, but why shouldn't I

23   let her?

24        MR. O'HARA:  No, I reacted instinctively to the

25   form of the question.

1        THE COURT:  So you're okay with that?

2        MR. O'HARA:  Yes.

3        MS. BLOOM:  I thought it was within the stip.  I

4    wasn't planning to go into details.

5        THE COURT:  Very well.

6

7        (In open court.)

8        THE COURT:  Well, the objection is withdrawn.  Put

9    the question again.

10   Q.    Have you ever been found to have made a civil

11   misrepresentation?

12   A.    Yes.

13   Q.    When?

14   A.    In civil litigation that began in approximately

15   2004.

16   Q.    And did that involve conduct engaged in together

17   with Ms. Herman?

18   A.    Yes.

19        THE COURT:  Well, as I was listening to those

20   stipulations, it's stipulated that that has nothing to

21   do with any of the charges in this case.  The reason

22   she's allowed to ask that question and get an answer

23   from this witness is you've got to assess, as you will

24   with any witness, whether you believe this witness,

25   disbelieve the witness, believe parts of what a witness

1    says, and when you have that responsibility, if there's

2    any occasion, any occasion, whether it has anything to

3    do with this case or not, where the witness has not told

4    the truth, the witness can be asked about it.  So she's

5    allowed to ask.  But it doesn't suggest that that

6    litigation, to which reference has just been made, that

7    earlier litigation, whether that has anything to do with

8    this case.  If I've got it right, it's stipulated it has

9    nothing to do with this case.

10         Go ahead, Ms. Bloom.

11         MS. BLOOM:  Your Honor, may I be seen at sidebar

12   about that?

13         THE COURT:  You may.

14

15         AT THE SIDEBAR

16         THE COURT:  Aren't I listening carefully enough?

17         MS. BLOOM:  You were listening carefully enough.

18   But I think there's one more point.  When you said it

19   has nothing to do with this case, it shows Ms. Herman's

20   knowledge of Mr. Caplitz back to 2006.  So I think it's

21   relevant to her state of mind and knowledge.

22         THE COURT:  Well, my instruction to the jury is

23   not inconsistent with that.  You can argue it.

24         MS. BLOOM:  Okay, as long as you don't think

25   that's inconsistent, then I think we're fine.

1
2          (In open court.)
3  Q.    Mr. Caplitz, do you understand that if you do not
4  testify truthfully in this proceeding, that you will not
5  receive any benefit from accepting responsibility in
6  your plea agreement and may be sentenced to a longer
7  sentence?
8  A.    Yes, I do.
9  Q.    Mr. Caplitz, do you understand that if you
10 intentionally lie here today, that that is perjury and
11 that you could also be prosecuted for that crime in
12 addition to the others as to which you've already pled
13 guilty?
14 A.    Yes, I do.
15 Q.    Okay.  I'd like to talk to you for a few moments
16 about taxes.
17 Did you and Ms. Herman have discussions about how to
18 approach the payment and reporting of taxes for the
19 businesses you worked together in?
20 A.    Yes, we did.
21 Q.    Could you describe those conversations?
22 A.    Yes.  Um, I had suggested that the -- Rosalind
23 didn't like to pay federal income tax and I didn't like
24 to pay federal income tax, so my suggestion had been to
25 report all of the income and then to use all the

1    deductions, including ones that were not legitimate

2    deductions, to minimize the income, but still leave

3    income that would have to be paid -- that taxes would

4    have to be paid on.

5    Q.    And what was Ms. Herman's position?

6    A.    Um, the position was formulated early on when we

7    first started to make a lot of money when we got a phone

8    call --

9          MR. O'HARA:  Objection, your Honor.

10         THE COURT:  Yeah, it's sustained at that point.

11   And I'm a little -- what was her position?  Why don't

12   you ask him and what did she say in response to that

13   proposal?

14         What did she say in response to what you were

15   proposing?

16         THE WITNESS:  She felt that it would still leave

17   too much income that we would have to pay taxes on.

18         THE COURT:  And go from there, Ms. Bloom.

19   Q.    And why did you feel that -- why did you -- did

20   you explain to Ms. Herman why you would report all the

21   income that you received?

22   A.    Yes.

23   Q.    And what was your reasoning?

24   A.    Because all of the income was in the form of

25   checks which would be -- that 1099s would be issued for

1    it and it would be extremely easy to verify if we

2    weren't reporting all the income.

3    Q.    And, um, was there a -- what was the discussion

4    about how to handle the expenses and the reporting of

5    expenses then?

6    A.    There was a discussion, many discussions, some of

7    them quite loud, about what deductions we could

8    fabricate to minimize the income.  I was of the

9    impression that you could leave -- that you could push

10   things up and, in some cases, amounts were simply

11   created to fabricate huge deductions that we had

12   absolutely no justification for.

13   Q.    And was the debate between you whether to do this

14   legally or illegally?

15   A.    No.

16   Q.    What was the debate, was the essence of the

17   debate?

18   A.    The likelihood to get caught.

19         MS. BLOOM:  I'm going to show you what has been

20   marked Exhibits 21 to 39.  They are all in evidence.

21         (On screen.)

22   Q.    Can you tell this jury what those are?

23   A.    These appear to be checks and 1099s that I would

24   have received as commissions.  These look to be from

25   2003.

1    Q.     And, um, from the time that Ms. Herman took over

2    the ownership of the business, um, how did you handle

3    commission checks?

4    A.     Commissions were assigned to the corporation.   The

5    corporations would deposit the checks that I received,

6    um, with some exceptions.

7    Q.     So who received those commission checks?

8    A.     They were received at the office in my name.

9    Q.     And why were you getting those commission checks?

10   A.     Because I had made sales to companies for which I

11   had contracts and they paid me a commission.

12   Q.     And what was the range of the commission checks in

13   2003, let's say, the total?

14   A.     Cumulative?

15   Q.     Yeah.

16   A.     Um, north of a million and a half dollars.

17   Q.     And what did you do with each of those or most of

18   those checks?

19   A.     They were endorsed and deposited into various

20   corporations controlled by Rosalind.

21   Q.     You said they were "endorsed."  Did you endorse

22   them?

23   A.     Some of them.

24   Q.     And then to whom did you endorse them?

25   A.     I didn't endorse them to anybody, I simply signed

1    the back of the check.

2    Q.    And then what did you do with the check?

3    A.    I usually gave them to the woman in the office and

4    she would talk with Rosalind about which checks would be

5    deposited into the local account and which checks would

6    be sent out to Las Vegas to be deposited there.

7    Q.    And were those checks deposited into one or more

8    of the entities that are listed, shown on Exhibit 410?

9    A.    Yes, they were.

10   Q.    Can you tell the jurors which companies they were

11   usually deposited in?

12   A.    In 2003?

13   Q.    Yes.

14   A.    Financial Resources Network or Financial Designing

15   Consultants.

16   Q.    So Number 2 or Number 3?

17   A.    Correct.  And there might have been some deposited

18   into the Finance Experts as well.  But once I signed the

19   checks, I wasn't asked as to which company they were

20   deposited in.

21   Q.    And who decided which company to deposit them

22   into?

23   A.    Rosalind.

24   Q.    And why were you signing all these checks over to

25   these companies?

1    A.    Because I wanted to.

2    Q.    Why did you want to?

3    A.    Because I wanted to make Rosalind happy.

4    Q.    Um, and was the income from these commission

5    checks, to your knowledge, was that going to be reported

6    on either the corporate or Ms. Herman's tax returns?

7    A.    Yes.

8    Q.    And then did you talk about what to do concerning

9    the payment of taxes on that income?

10   A.    Yes.

11   Q.    And what did you decide to do?

12   A.    Um --

13   Q.    Did you and Ms. Herman talk about it?

14   A.    Yes, we did.

15   Q.    And do you recall any particular debates about or

16   concerns about paying taxes for Ms. Herman?

17   A.    Yes.

18   Q.    Can you describe that?

19   A.    I believe it was either in 2000 -- I think it was

20   2003, she had had to write a check for approximately

21   $60,000 on very short notice to the Internal Revenue

22   Service as payment of taxes on the prior year, 2002.

23   Q.    And what happened?

24   A.    She got very angry.

25   Q.    At whom?

1    A.    At me.

2    Q.    Why?

3    A.    Because she said it was my fault, that I had a

4    master's in taxation, I should have been able to figure

5    out a way that we didn't have to pay taxes.

6    Q.    And on approximately how much income was she

7    having to pay $60,000 in taxes?

8    A.    More than a million dollars.

9          MS. BLOOM:  Now, I'm going to ask you to take a

10   look at what is in evidence as Exhibit 68.  If we could

11   go to the next page and then blow up the first section.

12         (Blows up.)

13   Q.    What is that document?

14   A.    That's an, um, Sub S Corporation Return 1120S for

15   financial designing consultants for 2003.

16   Q.    Okay.  When you say it's a "Sub S" something, is

17   that the tax return for that corporation?

18   A.    It is a, um, what Sub S Corporations file what's

19   called an "informational return," which means that they

20   don't pay taxes themselves, they file their income and

21   expenses and then the net results, whether a loss or

22   income, flows through to the shareholder's individual

23   personal account, the personal return.

24   Q.    And whose personal return would that be here?

25   A.    Rosalind Herman's.

1  Q.    And if we look first at the line for "gross

2  receipts," how much is reported as gross receipts?

3  A.    $1,504,231.

4  Q.    And where did that money come from?

5  A.    Commissions.

6        MS. BLOOM:  And now if we can look to the bottom

7  of the page.

8        (On screen.)

9  Q.    Who signed the tax return?

10 A.    Rosalind.

11 Q.    And below there is listed a signature.  Do you

12 know whose signature that is for "Preparer"?

13 A.    "Daniel Goodness."

14 Q.    And did you work with Mr. Goodness and Ms. Herman

15 in connection with the preparation of materials for

16 taxes?

17 A.    I did.

18 Q.    And who made the decisions as to what would be

19 reported as income and deductions?

20 A.    There is a computer program that Rosalind used to

21 enter in all of the checks that were issued and which

22 appropriate accounts they would be deducted from, and

23 then that file was turned over to Mr. Goodness who then

24 used that information to prepare the actual tax return.

25 Q.    And the information as to what would be reported

1    as certain categories of deductions, was that decided by

2    Mr. Goodness or by Ms. Herman?

3          MR. O'HARA:  Objection.

4    A.    Ms. Herman.

5          MS. BLOOM:  I'm sorry, I didn't hear, was there --

6          THE COURT:  There was an objection and I'm pausing

7    to contemplate it.  But I'm going to let it stand.

8          MS. BLOOM:  All right.

9          Now, if we could look to Page 10, first, if we

10   could go back up and look at the total amount of

11   deductions here in the middle of the page.

12         (On screen.)

13   Q.    What was the total amount of deductions reported

14   for this entity in 2003?

15   A.    $1,306,490.

16   Q.    And is that actually the total of "Other

17   Deductions," and then there's total deductions of

18   1,388,000?

19   A.    Yes.

20   Q.    And based on your participation in this business,

21   did it have more than 1.3 million in business expenses

22   in 2003?

23   A.    No, it did not.

24   Q.    Can you explain how you know that?

25   A.    Because it's a service business that has -- it

1   does not have those kinds of expenses, it doesn't pay a

2   lot of commissions, it didn't have travel expenses,

3   didn't have the kind of expenses that would generate

4   that kind of deduction.

5       MS. BLOOM:  Can we bring this exhibit up for the

6   jury.  I'm sorry, I didn't realize it wasn't on their

7   screens.

8       (On screen.)

9       MS. BLOOM:  It's still not on their screens,

10  right?

11      THE CLERK:  Do you have it?  I have it.

12      MS. BLOOM:  Okay.

13      (On screens now.)

14      MS. BLOOM:  Oh, it's still not on the juror

15  screens.

16      (Pause.)

17      THE COURT:  We have electronic limitations.

18  Apparently she can't bring that up on the screen.

19      MS. BLOOM:  Well, we'll try to describe it a

20  little bit better then.

21  Q.    I'd now like to take you to Page 10 of Exhibit 68.

22      MS. BLOOM:  Your Honor, if I could have a little

23  license to lead just to describe the documents then?

24      THE JUROR:  They are here.

25      THE COURT:  Oh, now we're back.  Thank you.  I

1    thank the jurors.

2         MS. BLOOM:  Okay.

3         (Jurors's screens working now.)

4    Q.    What is this?

5    A.    It is the list that is prepared of other

6    deductions which have been subtracted from income on

7    Page 1.

8    Q.    And is this a part of Exhibit 68, the 2003 return

9    for Financial Design Consultings, Inc.?

10   A.    It is.

11   Q.    And have you looked over these expenses that are

12   listed for Financial Design and Consulting, Inc.?

13   A.    I have.

14   Q.    And starting with the first one, "Automobile and

15   Truck Expense," did the business have $115,252 of

16   automobile and truck expenses?

17   A.    It did not.

18   Q.    Did -- is it possible that Ms. Herman had $115,252

19   of automobile and truck expenses?

20   A.    It is.

21        MR. O'HARA:  Objection.

22        THE COURT:  Wait a minute.  The question is, "Is

23   it possible?"  The objection is sustained.

24   Q.    What automobile and trucks did Ms. Herman own at

25   that time period, or use?

1    A.    A 2000 Chevrolet Corvette, a 2000 -- a 1999 Jaguar

2    XJR, a 1999 Jaguar S-type, a 2001 2500 Jimmy truck.  And

3    a GMC Denali.  Along with a 99 Nissan Pathfinder.

4    Q.    And who drove the Pathfinder?

5    A.    I did.

6    Q.    Were those other vehicles used in the business?

7    A.    With the exception of the Jaguar XJR that

8    Ms. Herman would drive when she went out on the

9    occasional business, the other vehicles were not used

10   for business purposes.

11   Q.    How were they used?

12   A.    By Rosalind's family members.

13   Q.    And if you can look further down on this list to

14   commissions of $563,000.

15   A.    (Looks.)

16   Q.    Do you recall commissions of $563,000 being paid

17   from Financial Design and Consultants, Inc. for this

18   year?

19   A.    To the best of my recollection, no.

20   Q.    If you look down to "Legal and Professional,"

21   84,600.

22         Did Financial Design and Consultants, Inc. have

23   expenses of $84,000 in legal and professional expenses

24   in this year?

25   A.    No.

1          MR. O'HARA:  Objection.

2          THE COURT:  Would you ask the question again.

3    Q.    Did Financial Design and Consultants, Inc. have

4    legal and professional expenses of $84,600 in this year?

5          THE COURT:  She may have that question.

6          Did they, to your knowledge?

7    A.    They did not.  To my knowledge those were

8    deductions for checks paid to attorneys primarily in

9    civil matters that related to other corporations.

10   Q.    And there's a line for "office expense," $138,000.

11   Did Financial Design and Consultants, Inc. have $138,000

12   in office expenses?

13   A.    They did not.  In fact, Financial Design and

14   Consultants really didn't have an actual office, they

15   shared space at Rosalind's home.

16   Q.    And do you know what was included in that 138,000

17   to get to that number?

18   A.    The only way I can see that that number would come

19   up would be that the expenses for Rosalind's home, which

20   she had the office as well as the office in Woburn at

21   the time, would have to be included to get anywhere near

22   that total.

23   Q.    Did you ever have discussions with her about the

24   tax treatment of the entire Las Vegas house?

25   A.    Conversations with her?

Q.     Yes.

A.     No, I did not.

Q.     Were you aware of how she had treated the Las
Vegas -- the purchase of the Las Vegas house for tax
purposes?

A.     Only very recently.

Q.     Okay.  Going to the item for "Travel," $238,000.
Did this -- did Financial Design and Consultants, Inc.
have $238,000 in Travel in 2003?

A.     It most definitely did not.

Q.     And looking down to the Section 179 expense, down
below.

       Did Financial Design and Consultants, Inc. have
56,000 as a Section 179 expense, and what is that?

A.     A Section 179 expense is -- there's a provision in
the tax code which allows businesses, under certain
conditions, to expense items that would normally have to
be depreciated.  It's my understanding that this 179
deduction represented the purchase of a Cadillac Denali
SUV and that that was expensed entirely.

Q.     Did your financial planning business have any need
for another Denali SUV?

A.     It did not.  An Escalade.  I'm sorry.

       MS. BLOOM:  Now I'm going to ask you to take a
look at exhibit -- what is in evidence as Exhibit 61.

```
 1            (On screen.)

 2            MS. BLOOM:  If you can blow up the top half.

 3            (Blows up.)

 4    Q.      What is this?

 5    A.      It's an individual 1040 filed by Rosalind Herman.

 6            MS. BLOOM:  And if we could go to Page 4, the

 7    bottom half.

 8            (On screen.)

 9    Q.      Who signed the return?

10    A.      Rosalind Herman.

11    Q.      And what connection does this return have to the

12    return we just looked at or to the filing we just looked

13    at as Exhibit 68?

14    A.      The net income from the 1120S would flow through

15    onto this return.

16            MS. BLOOM:  So if we could go to the first page

17    again.

18            (On screen.)

19            MS. BLOOM:  And blow up the income -- oh, I'm

20    sorry, the second page.

21            (On screen.)

22    Q.      If you look to line -- I believe it's Line 17, um,

23    do you see the $65,433?

24    A.      Yes.

25    Q.      And what is that?
```

1    A.    That's the net income reported by the 1120S.

2    Q.    And what is it?

3    A.    That 1120S and the other 1120Ss.

4    Q.    And among other things, it is net of all those

5    expenses we just looked at on Page 10 of Exhibit 68?

6    A.    Yes, it is.

7    Q.    So what is the impact of listing all of those $1.3

8    million in deductions?

9    A.    You would systematically reduce the amount of

10   income taxes that you would have to pay.

11   Q.    Did you have any discussions with Ms. Herman

12   about, um, claiming particular categories of personal

13   expenses as business expenses?

14   A.    Yes.

15   Q.    Can you give some examples?

16   A.    There was a stockade fence that was put in at

17   Rosalind's home at 27 Davis Street which was expensed as

18   rental property improvements at a property at 43-45

19   Blossom Street, which was owned by one of the entities,

20   New England Financial Independence Group.

21   Q.    I'm sorry.  So was the rental -- was the fence

22   actually a business expense?

23   A.    No, it was not.

24   Q.    And what did you and she decide to do about it

25   or -- who decided what to do about it?

1    A.    That was a joint decision.

2    Q.    And what was done about it?

3    A.    It was taken as a deduction.

4    Q.    A business deduction?

5    A.    Yes, ma'am.

6    Q.    And did -- what about things like personal cars

7    and travel and other personal expenses, did you have

8    discussions about how to report those?

9    A.    We had, um, some conversations about them

10   certainly, um, I would -- my position would not have

11   been to push as hard as we did.  I would have certainly

12   taken false deductions and tried to -- tried to move the

13   income down, but not to the -- not to the level this was

14   done.

15   Q.    Why would you not have gone to this level?

16   A.    Because it was very likely to be caught.

17   Q.    Who handled the bank accounts for the business

18   after 1993?

19   A.    Rosalind, primarily.

20   Q.    And did you write checks on the business after

21   that time period?

22   A.    I did not.

23   Q.    And to your recollection did you have signatory

24   control over the bank accounts after that time period?

25   A.    No.

1   Q.    I would ask you to take a quick look at Exhibit

2   45.01, Page 163.

3   A.    (Looks.)

4   Q.    And first looking at Page 1.

5   Do you recognize what this document is?

6   A.    It looks to be a duplicate copy of an American

7   Express statement.

8         MS. BLOOM:  I'm sorry.  Could we go to Page 163.

9         (On screen.)

10   Q.    And whose --

11         MS. BLOOM:  First of all, can we blow up whose

12   American Express statement this is?

13   A.    Rosalind Herman's.

14   Q.    And is it her personal statement or corporate

15   statement?

16   A.    It's a corporate statement for Financial Resources

17   Network.

18   Q.    Okay.  And going down to the expenses charged to

19   that, do you see an entry at May 7th, 2006 to "Promises

20   to Keep," "Derry," "Food and Beverage"?

21   A.    Yes.

22   Q.    Can you tell us what "Promises to Keep" in Derry,

23   New Hampshire is?

24   A.    It's a wedding facility where Brian and Charlene

25   were married.

Q.    And the entry for $2,433.50, do you know who paid that?

A.    The corporation.

Q.    At this time, in 2006, did Ms. Herman use personal bank accounts?

A.    No, she did not.

Q.    Why not?

A.    In sometime in 2005 a joint account that Rosalind had with her husband, Keith, had a trustee process in Nevada and something like $5,000 was taken out of the account and given to the civil defendants as partial settlement of their judgment.

Q.    So after that time from what accounts did Ms. Herman pay her personal expenses?

A.    The corporations'.

Q.    Did anyone else work for the corporations other than you?

A.    As employees?

Q.    In any capacity.

A.    Yes.

Q.    Who else worked for the corporations?

A.    Rosalind, um, her sister, Janice Goodrich, over the years her other sisters, some of her nieces had worked there, um, and in the '90s we had an independent employee by the name of Doris Ruderman.

1   Q.    And what role did her sisters and Doris Ruderman

2   play?

3   A.    Administrative support.

4   Q.    And did you have any discussion with Ms. Herman

5   about how to report payments to the other people who

6   worked in the business?

7   A.    Yes.

8   Q.    What were the nature of those discussions?

9   A.    That with the exception of me, I felt that they

10  could -- that we couldn't make the argument that they

11  were 1099 employees, um, independent contractors.

12  Q.    I'm sorry, you said you could or could not make

13  the argument?

14  A.    Could not make the argument that they were

15  independent contractors.

16  Q.    Okay.  So what did you recommend she do?

17  A.    That we treat the employees, the administrative

18  staff as employees, and treat me as an independent

19  contractor.

20  Q.    And if you treated them as employees, what would

21  you need to do?

22  A.    You would need to withhold taxes and then the

23  corporations would need to match FICA and Medicare and

24  they would also need to pay state of Massachusetts

25  unemployment tax and obtain a Workman's Comp. Bond -- or

1    policy.

2         THE COURT:  And "FICA" means?

3         THE WITNESS:  I don't remember the exact meaning

4    of it, but it's the deduction for Social Security, and

5    then there's a second deduction for Medicare.  I don't

6    know the abbreviation.  I'm sorry.

7    Q.    And did, um, Ms. Herman's businesses issue those

8    W-2s and make those deductions?

9    A.    They did not.

10   Q.    What did she just say about that?

11   A.    That she was going to treat them as independent

12   contractors.  As long as the income was reported by the

13   people who received the income, then the only penalty

14   she could face was a failure to file an appropriate form

15   at $25.

16   Q.    And did you have discussions about whether she

17   needed to file 1099s for those payments?

18   A.    Yes.

19   Q.    And what were those discussions?

20   A.    Um, 1099s were filed early in the decade of the

21   2000s and then they stopped being filed because there

22   was no desire to pay an accountant to prepare the 1099s

23   and file them.

24   Q.    And when you say there was "no desire," who had no

25   desire to pay an accountant to file 1099s?

```
1    A.    Rosalind.  I had actually prepared the 1099s prior
2    to that, but we no longer had the accounting software
3    that I needed to prepare them, so I couldn't prepare
4    them anymore.
5    Q.    So for the people who work in the business after
6    that date, were either 1099s or W-2s prepared and filed?
7    A.    No, and there was none prepared for myself either.
8    Q.    Okay.
9          MS. BLOOM:  At this time I would like to have you
10   look at Exhibit 2.02, and if we could, um -- no, we're
11   going to go down a couple of pages, if we could, to the
12   check, the fourth page in.
13         (On screen.)
14   Q.    If you could take a look at some of the checks on
15   that page.
16         (On screen.)
17   Q.    Well, let me just ask you.  The debit --
18         MS. BLOOM:  Well, let's go down a few more checks,
19   please.
20         (Down more.)
21         MS. BLOOM:  Can you blow those up.
22         (Blows up.)
23   Q.    Do you see that there are checks here made out to
24   -- and let's just look at the one, a check withdrawal
25   slip for $950 to Brad Herman there at the top of the
```

1    screen?

2    A.    Yes.

3    Q.    Whose handwriting is in the name of "Brad Herman,"

4    if you know?

5    A.    I don't know because this is something that's

6    filled out at the bank.

7    Q.    Well, let's keep going down to the next page then.

8    And coming to the check that's to Nevada Energy there,

9    "NV Energy," do you see that, 1001?

10   A.    Yes, I do.

11   Q.    Do you recognize the handwriting filling out that

12   check to "NV Energy"?

13   A.    Yes, I do.

14   Q.    Whose handwriting is that?

15   A.    Rosalind Herman's.

16   Q.    And what about the signatures at the bottom right-

17   hand corner, do you know who those are?

18   A.    The top one is Brian Herman and the second one is

19   Brad Herman, although I don't know if it's Brad Herman

20   actually signing it.

21   Q.    And why do you say that?

22   A.    Because often Brad would not sign the checks,

23   Brian would sign for Brad.

24   Q.    Did you observe that?

25   A.    Yes.

```
 1    Q.    And did you observe who prepared the checks for
 2    these businesses?
 3    A.    Mostly it was Rosalind.
 4    Q.    And do you recognize the handwriting filling out
 5    the "date" and the "pay to the order of" and the
 6    "amount" in each of these checks?
 7    A.    Yes, I do.
 8    Q.    And whose is that?
 9    A.    Rosalind's.
10    Q.    And did you observe stacks of checks being signed
11    at any time?
12    A.    Yes, I did.
13    Q.    Can you describe that?
14    A.    Um, Rosalind would prepare the checks and the, um
15    -- and Brian would come by and sign the checks, and
16    sometimes Brad would sign it, if he was around, but if
17    not Brian would sign in Brad's name with Brad's
18    permission.
19    Q.    In the time that you and Rosalind Herman were in
20    business together, at least from 2003 until 2013, who
21    made the decisions as to what would be reported as
22    business expenses in the tax filings?
23    A.    Rosalind.
24    Q.    Who made the decisions as to what would be
25    reported as income in the tax filings?
```

1    A.    Rosalind.

2    Q.    Who made the decisions as to whether to pay

3    employees as employees and report their income on W-2s?

4    A.    Rosalind.

5    Q.    Who made the decisions as to whether to file 1099s

6    for payments to staff?

7    A.    Rosalind.

8    Q.    Who made the decisions as to who could charge

9    things to the corporate account?

10   A.    Rosalind.

11   Q.    And who could and did charge things to the

12   corporate account?

13   A.    Myself, Rosalind, Brad, Brian, and I'm not sure if

14   there were other people.

15   Q.    Okay.  And I'd now like to turn your attention to

16   the time period of 2007 and early 2008.

17   How was the business doing?

18   A.    Not well.

19   Q.    Why?

20   A.    Um, the result of the civil litigation was that it

21   made it very difficult for me to get licensed with new

22   insurance carriers in the business -- well, the primary

23   source of commissions in that business were insurance

24   related and since we worked at the high end, in the

25   insurance end, you needed to be with the carriers that

1    had the best products and that was not something that

2    stayed.  So once we lost Indianapolis Life as a primary

3    carrier as a result of the litigation in the 2005ish,

4    then I was unable to get new companies to issue me

5    licenses so I could only work with the ones that I had,

6    and it was very difficult to get the kind of products we

7    needed.  Also, I was wrapped up spending more and more

8    time reading depositions and appearing in legal works

9    and going through evidence and basically doing a lot of

10   legal work that wasn't productive in terms of financial

11   revenue.

12   Q.    Did you have discussions with Rosalind Herman

13   about what was happening to the business?

14   A.    Yes.

15   Q.    And, um, can you describe those discussions?

16   A.    We were talking about what we were going to do,

17   whether the business should continue to operate or it

18   should shut down.

19   Q.    And what did you two decide to do?

20   A.    We decided to create a -- we attempted to create a

21   minority-owned hedge fund and then market the -- a

22   portion of the ownership shares to our existing clients

23   to generate revenue for the business.

24   Q.    And what was Rosalind Herman's view of this

25   concept and proposed business or way of raising money?

1    A.    Um, initially it was somewhat skeptical and then

2    over time she became an enthusiastic supporter of the

3    idea.

4    Q.    And what was it that she liked about it?

5    A.    It was the only thing we'd ever handled as a

6    company where Rosalind routinely complained that when I

7    sold an investment it had a small commission rate, 2

8    percent, 3 percent, 5 percent, we do all the work and

9    then we only make a little bit of money, and in this

10   case all of the money was going into the corporate

11   accounts and could all be utilized.  So it was 100

12   percent of the assets that were spent, that we received,

13   were available to be spent.

14   Q.    Okay.  In all the prior investments that you had

15   sold to your clients, what -- well, had any of them been

16   businesses that you or Rosalind Herman owned?

17   A.    No.

18   Q.    Did you prepare projections for the clients of

19   what they would get from this proposed investment?

20   A.    Yes, I did.

21   Q.    And did you review those with anyone?

22   A.    I reviewed them with Rosalind and Brian.

23   Q.    And did you discuss -- well, what steps in

24   implementing this plan did you discuss with Rosalind

25   Herman?

```
 1    A.      Every step.

 2    Q.      How often did you talk to her about it?

 3    A.      Multiple times a day.

 4    Q.      Did you talk about what clients you would go to

 5    see?

 6    A.      Yes.

 7    Q.      Did you talk about what you would tell them?

 8    A.      Yes.

 9    Q.      Did you talk to her before you went to them?

10    A.      Yes.

11    Q.      Did you talk to her after you left?

12    A.      Yes.

13    Q.      Did you talk to her about what happened in the

14    client meetings?

15    A.      Yes.

16    Q.      And at times did she participate by phone or in

17    person in client meetings?

18    A.      Absolutely.

19    Q.      And as part of this investment, um, what did you

20    tell clients you were selling them?

21    A.      Um, ownership in Insight Onsite Strategic

22    Partners, LLC, which was the entity on that first -- and

23    I'm going back to that first screen and it would have

24    been the middle entity, and that would have been the

25    entity that if the fund had actually gotten up and
```

1    running, which it never did, would have received the

2    incentive management fee.

3    Q.    And how much of the company were you selling to

4    the investors for $100,000?

5    A.    1 percent.

6    Q.    How did you come up with 100 percent for 1 percent

7    of the company?

8    A.    We basically picked a number, said that $10

9    million sounded like a good valuation, and we valued

10   the company at that.  So 1 percent of a company for

11   $100,000 would create a $10 million valuation on the

12   entity.

13   Q.    Um, this $10 million valuation, this was for a

14   company that was not operational?

15   A.    No.

16   Q.    I'm sorry.  Was it operational?

17   A.    No.

18   Q.    And, um, had you ever worked in a hedge fund?

19   A.    I had not.

20   Q.    Had Ms. Herman ever worked in a hedge fund?

21   A.    She had not.

22   Q.    Did you have anybody working, employed in the

23   business, who had ever worked at a hedge fund?

24   A.    No.

25   Q.    Did you have any independent basis for the -- any

1   independent valuation of the company at $10 million?

2   A.    No.

3   Q.    How much capital did you or Ms. Herman put into

4   the company?

5   A.    Nothing.

6   Q.    And what did Ms. Herman pay for the 100 percent of

7   the company -- how much of the company did you initially

8   assign to Ms. Herman?

9   A.    100 percent of the company was assigned to

10  Financial Family Holdings, which was a single member

11  LLC, and it simply means it was an alter ego for

12  Rosalind.

13  Q.    And what did she pay for that?

14  A.    Nothing.

15  Q.    And then you sold off 1 percent interest for

16  $100,000 each?

17  A.    Yes.

18  Q.    Did you have any discussions with Ms. Herman about

19  disclosures to the clients about the risks?

20  A.    Yes.

21  Q.    And what were those discussions?

22  A.    Prior to this investment we had always had a

23  policy, and Rosalind was very strict on enforcing this

24  policy, that we had a prospectus receipt signed on any

25  investment and a prospectus receipt was a one-page

1    document that said that we had given the client a

2    prospectus which simply explains the risks and

3    opportunities of an investment and they had signed --

4    they had read and understood it and signed it.

5    Q.    Did you prepare one of those here?

6    A.    We did not.

7    Q.    Did you talk about it with Ms. Herman?

8    A.    Yes.

9    Q.    And what did she say?

10   A.    She told me to prepare it because she didn't want

11   to spend the money to have a lawyer prepare it, it would

12   have been somewhere between 30,000 and $50,000 to

13   prepare.

14   Q.    What did you tell her?

15   A.    I said I didn't have the foggiest idea of where to

16   start to prepare it.

17   Q.    If you had prepared a proper disclosure statement

18   for such an investment and explained it properly to your

19   clients, could you have gotten them to give you the

20   money?

21   A.    No.

22   Q.    Why?

23   A.    Because if I explained that it was an entity that

24   was not up and operational, that had a high likelihood

25   it would never be up and operational, and that the money

1    was going to be used not for corporate purposes but to

2    supply the funds to maintain Rosalind and her family's

3    lifestyle and, to some extent, mine, um, then none of

4    them, despite the nice relationship I had with all of

5    them, would have written the check.

6    Q.    Was Ms. Herman aware of all of those facts that

7    you just described?

8    A.    Yes.

9    Q.    Was such an investment in the ownership of a hedge

10   fund consistent with the investment goals and strategies

11   of any of your clients?

12   A.    No.

13   Q.    Were any of them sophisticated investors?

14   A.    No.

15         MS. BLOOM:   At this point I would like to bring up

16   what has been marked for identification as Exhibit CA.

17         (On screen.)

18   Q.    Do you recognize this document?

19   A.    I do.

20   Q.    What is it?

21   A.    It's a limited liability company agreement, the

22   initial version of which was prepared by Sadis &

23   Goldberg, which formed Insight Onsite Strategic

24   Partners, LLC, which as I previously described was the

25   entity that we sold shares of.

1     MS. BLOOM:  At this time we would offer this into

2  as evidence as Exhibit 176.

3     MR. O'HARA:  No objection.

4     THE COURT:  The letter, please?

5     MS. BLOOM:  CA is now 176.

6     THE COURT:  It is admitted, Exhibit 176.

7     (Exhibit 176, marked.)

8  Q.    Could you read the first paragraph of this

9  agreement.

10  A.    "This limited liability company agreement, this

11  agreement of Insight Onsite Strategic Partners, LLC, the

12  company, is entered into as of November 7th, 2008 by

13  Financial Family Holdings, LLC and Nevada Limited

14  Liability Company, James Connell, IRA, Priscilla

15  Laroque, Patricia Wentzell, and Daniel Goodness, who

16  collectively with any individuals and/or entities who

17  subsequently become members of the company in the future

18  in accordance with the terms hereof, are referred to

19  herein as members."

20  Q.    Okay, why don't I stop you.  Can you explain what

21  that means?

22  A.    Yes, it means that this agreement is a statement

23  in which Financial Family Holdings, which was the

24  limited liability company, and these named individuals

25  all collectively agreed to form Insight Onsite Strategic

1    Partners.

2    Q.    And Financial Family Holdings Company, that's

3    Company Number 5 on that chart, the orange one?

4    A.    Yes.

5    Q.    And whose company was that?

6    A.    It was a single member LLC and 100 percent of the

7    interest was controlled by Rosalind.

8          MS. BLOOM:  And now if we could go to the last

9    pages of this document.

10          (Turns.)

11    Q.    This is the second-to-last page, correct?

12    A.    Yes.

13    Q.    And, um, why does it have all of these names here

14    for signatures?

15    A.    Um, this type of document requires a wet ink

16    signature of all of the members of the firm, and some of

17    these people aren't listed in that first paragraph

18    because there's language there that says "and additional

19    members."

20    Q.    So as additional people joined, did you add them

21    to the list of signatories?

22    A.    Yes.

23          MS. BLOOM:  And then if we can go to the next

24    page.

25          (On screen.)

1  Q.    Is that a listing of the people to whom you sold

2  as of this time of this agreement or purported to sell

3  shares in this limited liability company?

4  A.    Yes.

5  Q.    Um, and it shows Financial Family Holdings at this

6  point as an initial capital contribution of $92.50?

7  A.    Yes.

8  Q.    Did Ms. Herman, in fact, contribute $92.50 to this

9  company?

10  A.    No, none of these people -- that's just a figure

11  used in these types of documents.

12  Q.    And the next one listed is "James Connell, IRA,

13  $3.50," it shows for a 3.5 percent interest.

14  Approximately how much did Mr. Connell pay in for that

15  interest?

16  A.    Approximately $275,000.

17  Q.    And, um, skipping down to Carmine Leuci and David

18  Savage, it shows them as having a 1 percent interest.

19  How much did they contribute?

20  A.    $100,000.

21        MS. BLOOM:  And going to the next page.  And I

22  can't go to the next page?  Then let's go back to the

23  previous page then.

24        (On screen.)

25        MS. BLOOM:  Where is the signature page?  Oh,

1    there we go.  Thank you.  Sorry.

2    Q.    Who signed this document on behalf of Financial

3    Family Holdings, Inc. -- LLC, sorry?

4    A.    Rosalind Herman.

5    Q.    Do you recognize that signature?

6    A.    I do.

7    Q.    And whose signature is that?

8    A.    Rosalind's.

9    Q.    And, um, did you arrange for Ms. Herman to sign

10   this document on various occasions?

11   A.    I did.

12   Q.    Why?

13   A.    Um, this page she signed initially and I didn't

14   have to have it resigned, but the next page, which added

15   people over time, each time we did that I would fax the

16   document from the, um -- well, by this time the

17   Wilmington office to Las Vegas for Rosalind to sign and

18   fax back.

19   Q.    Um, did you ever copy Ms. Herman on any

20   communications relating to your communications with

21   clients and potential investors in this proposed hedge

22   fund?

23   A.    Yes, it was my policy to copy Rosalind on

24   effectively every e-mail that I wrote, with some very

25   few exceptions.

1    Q.    And did you also have communications with her on a

2    regular basis about what was going on?

3    A.    Many times.

4    Q.    Okay.

5          MS. BLOOM:  I'd like to show you what has been

6    marked as Exhibit BE.

7          (On screen.)

8    Q.    What is that document?

9    A.    It's an e-mail I sent to, um, Fred Ekman and Ginny

10   Ekman on or about April 23, 2011.

11   Q.    And there's a cc line there to

12   "rherman14@cox.net."  Who is that?

13   A.    Rosalind Herman.

14   Q.    Um, if we can go down to the second paragraph of

15   that e-mail, could you read the paragraph beginning "per

16   our conversation."

17   A.    "Per our conversation I have attached information

18   concerning Insight Onsite Strategic Fund, LLP.  We

19   expect to begin operation of the fund with an initial

20   investment of between 70 and 80 million on or before

21   June 1, 2011.  This fund is not currently operational

22   and this is not a solicitation for you to invest in the

23   fund."

24   Q.    And can you keep going.

25   A.    "I am providing you with the attached spreadsheet,

1   the offering memorandum, the limited partnership

2   agreement, subscription documents, and the explanation

3   contained in this cover e-mail concerning Insight Onsite

4   Strategics Fund, LP."

5   Q.    And could you read the next paragraph.

6   A.    "Insight Onsite Strategic Fund, LP is a newly-

7   created hedge fund that is not yet operational, the fund

8   managers, more than 90 percent minority owned (women

9   owned)" --

10  Q.    Okay, I'm going to stop you there.  Let's skip

11  down to the next paragraph.

12  A.    "In order to meet the requirement of most

13  institutional investors the fund must have a minimum of

14  25 million in plan assets with a target for our seed

15  investors to provide 75 to $100 million.  We have

16  completed negotiation with the seed investors and expect

17  to meet our June 1, 2011 deadline.  The spreadsheet --"

18  Q.    Go ahead.

19  A.    "-- shows the return for purchases of 1 percent

20  interest in the Insight Onsite Strategic Partners, LLC

21  at a cost of $100,000.  Utilizing a 9 percent growth

22  assumption in return for the 1 percent investment

23  purchase is slightly less than $700,000 over the

24  five-year period.  These amounts are simply projections

25  and will differ from actual results.  This would seem to

1    be particularly attractive as an investment for people

2    such as yourself who seek to maximize potential income."

3    Q.    And did you provide projections along with this

4    letter?

5    A.    I did.

6    Q.    And did you provide a copy of those to Ms. Herman

7    when you e-mailed this letter to the Ekmans?

8    A.    Yes.

9    Q.    And did Ms. Herman ever tell you not to send this

10   information to potential contributors?

11   A.    (Silence.)

12   Q.    After you sent this letter to the Ekmans, did

13   Ms. Herman say, "Don't make those projections, don't

14   send that information," or anything like that?

15   A.    She did not.

16   Q.    And did you review the information that you were

17   going to send to these clients before you sent it to

18   them?

19   A.    I did.

20   Q.    With Ms. Herman?

21   A.    I did.

22   Q.    Had you ever, at any time prior to this, raised

23   $25 million in assets under management?

24   A.    No.

25   Q.    And, um, did you have any -- had you ever raised

1    anything close to 75 to $100 million?

2    A.    No.

3    Q.    Did you in fact raise that money by June of 2011?

4    A.    We did not.

5          MS. BLOOM:   Um, if we could now take a look at

6    Exhibit BK.

7          (On screen.)

8    Q.    Is that a copy of the projections that were

9    attached to the letter we just saw?

10   A.    I believe they are.

11         MS. BLOOM:   And I'm going to try to blow up the

12   final lines here.

13         (Blows up.)

14   Q.    First of all, does this say "worst case 9 percent

15   annual return"?

16   A.    Yes, it does.

17   Q.    And did the projections that you provided to

18   clients and shared with Ms. Herman routinely provide a

19   worst case?

20   A.    Yes, they did.

21   Q.    And was that the worst case --

22   A.    It was.

23   Q.    -- 9 percent?

24   A.    It was.

25   Q.    Okay.  And now looking at the numbers here, um,

1    and I've blown them up so badly that I should have

2    Ms. Rojas do it.

3    Does this show the expected return for each of five

4    years on an investment of $100,000?

5    A.    Yes, it does.

6    Q.    Okay, can you explain --

7          MS. BLOOM:  Ms. Herman, can you blow it up -- I'm

8    sorry, Ms. Rojas, can you blow it up so that they can

9    see the context.

10          (On screen.)

11          THE JUROR:  The monitors are out again.

12          THE COURT:  We're going to have to --

13          MS. BLOOM:  Your know what, your Honor?  It's 1

14    minute before 1:00, should we just --

15          THE COURT:  We're going to stop and try to sort

16    this out.

17          Ladies and gentlemen, you have not heard all the

18    evidence.  We're going to start promptly at 9:00

19    tomorrow.  Keep your minds suspended.  Do not discuss

20    the case either among yourselves nor with anyone else.

21          We'll stand in recess until 9:00 tomorrow morning.

22    I'll remain on the bench.

23          (Jury leaves, 1:00 p.m.)

24          THE COURT:  You may step down.  I need to see

25    counsel for just a moment.

1

2          AT THE SIDEBAR

3          THE COURT:  We've got a problem with a juror.

4   You'll recall that Mr. Foley and his partner have an

5   immigration interview tomorrow morning.  He has been

6   absolutely upfront with all the data so that we can

7   contact Immigration.  We have done so promptly.  We're

8   getting the run-around from them.

9          I'm going to talk to him now.  I have no

10  particular pride of place.  Unless I get an answer that

11  they're going to deal with him tomorrow afternoon, then

12  I'm cutting him loose.

13         Any objection?

14         MR. O'HARA:  No.

15         MS. BLOOM:  No, your Honor.

16         THE COURT:  All right, so I'll take care of it,

17  but if he's not here tomorrow, we have to put that into

18  effect.

19         MS. BLOOM:  Thank you, your Honor.

20         THE COURT:  All right.  9:00 tomorrow morning.

21  We'll recess.

22         THE CLERK:  All rise.

23         (Adjourned, 1:00 p.m.)

24

25

1             C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes,

7     before Judge William G. Young, on Wednesday, March 30,

8     2016, to the best of my skill and ability.

9

10

11

12    /s/ Richard H. Romanow 09-16-16
      _____
13    RICHARD H. ROMANOW   Date

14

15

16

17

18

19

20

21

22

23

24

25