```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3                            No. 1:12-cr-10015-WGY

 4

 5

 6   UNITED STATES OF AMERICA

 7

 8   vs.

 9

10   ROSALIND HERMAN

11

12

13                     *********

14

15                 For Jury Trial Before:
                   Judge William G. Young

16

17                 United States District Court
                   District of Massachusetts (Boston)
18                 One Courthouse Way
                   Boston, Massachusetts 02210
19                 Thursday, March 31, 2016

20                     ********

21

22          REPORTER: RICHARD H. ROMANOW, RPR
                   Official Court Reporter
23              United States District Court
         One Courthouse Way, Room 5510, Boston, MA 02210
24                 bulldog@richromanow.com

25
```

```
 1                    A P P E A R A N C E S

 2

 3   SARA M. BLOOM, ESQ.
     MARY B. MURRANE, ESQ.
 4      United States Attorney's Office
        J. Joseph Moakley U.S. Courthouse
 5      1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
 6      (617) 748-3971
        Email: Sara.bloom@usdoj.gov
 7      For the United States

 8

 9   RAYMOND A. O'HARA, ESQ.
        Law Office of Raymond A. O'Hara
10      1 Exchange Place
        Worcester, Massachusetts 01608
11      (508) 831-7551
        Email: Oharalaw@hotmail.com
12  and
     JASON G. BENZAKEN, ESQ.
13      Benzaken and Wood, LLP
        1342 Belmont Street, Suite 102
14      Brockton, Massachusetts 02301
        (508) 897-0001
15      Email: Attorneybenzaken@gmail.com
        For the defendant
16

17

18

19

20

21

22

23

24

25
```

1                     I N D E X

2

3    WITNESS               DIRECT  CROSS  REDIRECT  RECROSS

4

5    GREGG D. CAPLITZ (Continued.)

6        By Ms. Bloom:        5

7        By Mr. O'Hara:              89

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E X H I B I T S

EXHIBIT 103................................    56

EXHIBIT 116................................    36

EXHIBIT 118................................    52

EXHIBIT 154................................    13

EXHIBIT 155................................    17

EXHIBIT 156................................    16

EXHIBIT 159................................    19

EXHIBIT 160................................    14

EXHIBIT 167................................    31

EXHIBIT 169................................    34

EXHIBIT 268................................    55

EXHIBIT 382................................    26

EXHIBIT 385................................    28

EXHIBIT 387................................    29

EXHIBIT 430................................    23

EXHIBIT 431................................    24

EXHIBIT 440................................     9

EXHIBIT 441................................    79

EXHIBIT 485................................    28

```
1          P R O C E E D I N G S
2          (Jury enters, 9:00 a.m.)
3          THE COURT:  Good morning, ladies and gentlemen.
4   Thank you for all your efforts to be here on time.
5   We're all ready to go.
6          And if you'd remind the witness.
7          THE CLERK:  I'd like to remind you, sir, that you
8   are still under oath.
9          Do you understand?
10          THE WITNESS:  Yes, I do.
11          THE COURT:  All right.
12          Ms. Bloom, you may continue.
13          MS. BLOOM:  Thank you, your Honor.
14
15   DIRECT EXAMINATION BY MS. BLOOM:  (Continued.)
16   Q.    Okay.  I'd like to begin this morning by going
17   back to a few things we discussed yesterday.  We
18   discussed yesterday a stack of commission checks that
19   you assigned over to Ms. Herman and her companies.
20   What did you get back out of those monies from the
21   commission checks?
22   A.    I got $450 a week in cash and for a period of
23   time, which ended in approximately 2006, um, my mortgage
24   on my personal residence at 120 Beacon Street was paid,
25   it was approximately $1400 -- oh, excuse me,
```

1    approximately $1200 a month, and there was also some

2    other personal credit cards that would receive payments.

3    Q.    And what happened to your personal residence in

4    2006?

5    A.    There was an attachment issued from Indianapolis

6    Life in regards to the civil suit and once the

7    attachment issued Rosalind said that it was stupid to

8    pay the mortgage because ultimately Indianapolis Life

9    was going to take the house from me and she was not

10   interested in making any more payments.

11   Q.    And what happened to your house?

12   A.    I subsequently came to an agreement with

13   Indianapolis Life, they allowed me to sell the house and

14   a portion of the proceeds went to them and a portion of

15   the proceeds went to me.

16   Q.    And where did you live after that?

17   A.    I lived primarily at Rosalind's home at 27 Davis

18   Street in Woburn, Massachusetts.

19   Q.    And was anyone else living there?

20   A.    Not initially, and then Keith Herman was living

21   there later on.

22   Q.    And so what percentage approximately of the

23   commission checks that you brought in did you get back

24   to live on?

25   A.    Um, a very small percentage, certainly less than

1    10 percent.

2    Q.    And then once you began raising money from the

3    investors in the purported hedge fund, how much of that

4    money went into the corporate accounts?

5    A.    All of the money went into the corporate accounts.

6    Q.    And how much did you receive back, approximately?

7    A.    Um, the 450 had stopped, so I would receive

8    intermittent amounts of a couple of hundred dollars.   I

9    was living basically hand to mouth.

10   Q.    If you asked Ms. Herman for money, would she give

11   it to you?

12   A.    Occasionally.

13   Q.    (Pause.)  What kind of car did you drive?

14   A.    Um, I drove a '99 Nissan Pathfinder and then, um,

15   when the insurance was cancelled on that vehicle and I

16   could no longer drive it, I drove a -- I believe it was

17   a '99 Jetta that belonged to Rosalind personally.

18   Q.    Why were you transferring most of the money to

19   Ms. Herman and her companies?

20   A.    (Pause.)  Because I was madly in love with her.   I

21   thought that this was what we were going to do.  She had

22   already told me she would protect me, that we were in

23   this together and it was what we had done.

24   Q.    Had you ever not testified truthfully in the past?

25   A.    Yes.

1    Q.    In what context?

2    A.    In regards to the civil matters, um, beginning in

3    2004.

4    Q.    And what were some of the topics about which you

5    testified untruthfully in those civil matters?

6    A.    About my relationship with Rosalind, my sexuality,

7    how we reported taxes, and a number of other things.

8    Q.    Other things that were significant to the civil

9    lawsuit?

10   A.    Yes.

11   Q.    Why -- did you discuss with Rosalind Herman what

12   you were going to say in those statements, sworn

13   statements before you made them?

14   A.    Yes.

15   Q.    And why did you decide to testify untruthfully?

16   A.    Because -- well, specifically the things about our

17   relationship and my sexuality was because Rosalind said

18   that "I'm going to tell them that I'm happily married

19   and that we've never been in a relationship and you

20   can't make me look like a liar," so I decided to lie

21   about things.  I lied about it in the deposition, I even

22   told my family about it, I told clients about it, I told

23   everybody about it, and much to my later shame.

24   Q.    And why did you do that?

25   A.    To protect Rosalind.

1  Q.    I'm going to show you what's been marked for
2  identification as Exhibit ME.
3  Would you take a moment to look through those.
4  A.    (Looks.)
5  Q.    What are those?
6  A.    E-mails that I sent to Rosalind.  I believe these
7  are all e-mails from me, but I haven't looked at every
8  page.
9  Q.    And there may also be some back from her in there?
10  A.    There may be.
11       MS. BLOOM:  At this time I would offer this as
12  Exhibit 440.
13       MR. O'HARA:  No objection.
14       THE COURT:  No objection, ME is admitted, Exhibit
15  440 in evidence.
16       (Exhibit 440, marked.)
17       MS. BLOOM:  And I'm going to blow up the top of
18  the first e-mail.  Thank you.
19       (Blows up.)
20  Q.    This is dated February 2, 2005.
21  What is this e-mail?
22  A.    It's an e-mail that I sent to Rosalind on February
23  2nd.
24  Q.    And in this e-mail, in 2005, you address her as
25  "My sweet Rosalind" and sign "Love, Gregg."

1    Why did you do that in 2005?

2    A.    Because in 2005 I had not yet testified, so there

3    was no reason for me to act as if the relationship

4    didn't exist.

5    Q.    And do most of the e-mails in that stack that are

6    in front of you have you addressing Ms. Herman in

7    similar language?

8    A.    They do.

9          MS. BLOOM:  Can we just go to the next one.

10         (On screen.)

11   Q.    Here we have an e-mail dated March 24, 2005.

12   At some point did you stop addressing her that way in

13   signing, "Love, Gregg"?

14   A.    Yes.

15   Q.    And why did you do that?

16   A.    The civil litigation had gotten hot and heavy and

17   the decision had been made that I was going to lie about

18   the relationship and then to lie about my sexuality.

19   Q.    And, um, did Ms. Herman give you any instructions

20   about whether you should send e-mails like this?

21   A.    She very clearly told me I should never send an

22   e-mail like this again, or a text.

23         MS. BLOOM:  Could we go to the last document.

24         (On screen.)

25         MS. BLOOM:  You need to go back a couple of pages.

1    Q.    Do you recognize this e-mail?

2    A.    I do.

3    Q.    And who is it from?

4    A.    Rosalind.

5    Q.    And what is the date?

6    A.    January 1, 2011.

7    Q.    And can you read the message?

8    A.    "Thank you.  Love you very much."  All

9    abbreviated.  "Keith won."

10   Q.    And what is your understanding of what it means,

11   "Keith won"?

12   A.    Um, they had gone to Red Rock Casino for New

13   Year's Eve.

14         MS. BLOOM:  And can we turn to the next page, the

15   picture.

16         (On screen.)

17   Q.    Who is that?

18   A.    Rosalind.

19         MS. BLOOM:  Okay.  We can take that down.

20         (Off screen.)

21   Q.    And I would now like to turn back to the

22   discussions about the hedge fund.

23   When you were working out the plan to get money for this

24   purported hedge fund, did you have any discussions with

25   Ms. Herman about where the money would be deposited that

1    came from the clients?

2    A.    Yes.

3    Q.    And what was the discussion?

4    A.    Since Rosalind no longer had personal accounts, it

5    was made very clear that the money had to go into

6    business accounts and it also made it much more, um,

7    likely that the clients would look at this as a

8    reasonable transaction as opposed to the unreasonable

9    transaction that it really was.

10   Q.    And was that something that you and Ms. Herman

11   discussed, that putting it into corporate accounts would

12   make it look more legitimate?

13   A.    Absolutely.

14   Q.    Um, did you ever pay any of the clients who put

15   their money into this investment, the hedge fund

16   connected investment, any return on the investment?

17   A.    To my knowledge there was only one check ever

18   issued.

19   Q.    And to whom was that issued?

20   A.    Mr. Carl Leuci and Mr. David Savage.

21   Q.    And that was that $3,000 supposed gift?

22   A.    Yes.

23   Q.    Did any of the clients ever receive back their

24   principal?

25   A.    No, they did not.

1    Q.    Okay.

2          MS. BLOOM:  I'm going to take you back to what has

3    been marked for identification as Exhibit BE, that we

4    were looking at yesterday, which I believe I failed to

5    move into evidence.

6          (On screen.)

7    Q.    Do you see that this is an e-mail from Insight

8    Onsite to Mr. Ekman and copied to Ms. Herman?

9    A.    I do.

10         MS. BLOOM:  At this time I would move this into

11   evidence as Exhibit 154.

12         MR. O'HARA:  No objection.

13         THE COURT:  BE is admitted in evidence, Exhibit

14   154.

15         (Exhibit 154, marked.)

16   Q.    And this is the e-mail that we talked about

17   yesterday.

18         MS. BLOOM:  If we can just scroll down so the jury

19   can see it.

20         (On screen.)

21   Q.    And I believe we talked about this yesterday but

22   we didn't have it up in front of the jury.

23   So is there a paragraph there that says, "In order to

24   meet the requirements of most institutional investors,

25   the fund must have a minimum $25 million in plan assets

1   with a target for our seed investors to provide 75 to

2   100 million"?

3   A.    Yes.

4   Q.    And then it goes on to say:  "The spreadsheet

5   shows the return for purchase of 1 percent interest in

6   the Insight Onsite Strategic Partners, LLC at a cost of

7   $100,000 utilizing a 9 percent growth assumption.  The

8   return for the 1 percent interest purchases is slightly

9   less than $700,000 over the five-year period."

10  A.    Yes.

11  Q.    Was this an e-mail that you copied to Ms. Herman?

12  A.    Yes, I did.

13        MS. BLOOM:  And then if we can go to Exhibit BF.

14  No, I'm sorry, BK.

15        (On screen.)

16        MR. O'HARA:  Is that "B" as in "boy"?

17        MS. BLOOM:  "B" as in boy.  "K" as in -- why am I

18  blanking on "K" words?  "Kick."

19  Q.    Are these the attachments -- the projections that

20  you attached to that e-mail?

21  A.    Yes.

22        MS. BLOOM:  I would offer these as Exhibit 160.

23        MR. O'HARA:  No objection.

24        THE COURT:  BK is admitted as Exhibit 160.

25        (Exhibit 160, marked.)

1  Q.    Now, up in the left-hand corner after the title it

2  says, "worst case annual, 9 percent annual return."

3  When you provided these projections to clients, did you

4  have a worst case 9 percent annual return that you

5  presented to them?

6  A.    Yes, we did.

7  Q.    And did you provide copies of those projections

8  when you did that to anyone?

9  A.    Copies of the projections were provided to

10 Rosalind.

11 Q.    Okay.

12        MS. BLOOM:  And now if we could go down to what it

13 shows for the cashflow for this worst case.  Yes.  And

14 you can stop there.

15        (On screen.)

16 Q.    How much did you tell the clients 1 percent

17 ownership would cost?

18 A.    $100,000.

19 Q.    And how much, in this projection, did you tell the

20 Ekmans their $100,000 would return in the worst case

21 over five years from 2011 to 2015?

22 A.    $694,112.

23 Q.    And if they purchased 2 percent, how much would

24 the return be?

25 A.    $1,388,225.

1   Q.    And how did the other projections that you

2   provided beyond the worst case compare to this

3   projection?

4   A.    They would be much greater.

5   Q.    Okay.

6         MS. BLOOM:  At this time I would like to bring up

7   Exhibit BG.

8         (On screen.)

9   Q.    What is this document?

10  A.    It's an e-mail I sent to Fred Ekman on the 20 --

11  sorry, I'm having I hard time seeing it.  Yes, the 28th

12  of May, 2011.

13        MS. BLOOM:  I would offer this document BG as

14  Exhibit 156.

15        MR. O'HARA:  No objection.

16        THE COURT:  EG is admitted.

17        MS. BLOOM:  BG.

18        THE COURT:  Oh, BG is admitted, Exhibit 156.

19        MS. BLOOM:  Can we publish that?

20        (Exhibit 156, marked.)

21  Q.    Did you copy anyone on this e-mail?

22  A.    Yes, Rosalind.

23  Q.    And can you tell -- it's a little garbled there,

24  but can you tell is that the company e-mail or also her

25  personal e-mail?

1    A.    It's the e-mail that she used in Las Vegas,

2    rherman14@cox.net.

3         MS. BLOOM:  And now if we could look at Exhibit

4    BF.

5         (On screen.)

6         MS. BLOOM:  We're having a problem with the

7    electronics.  Let's see if we can do this by paper.

8         Oh, okay, every time I threaten the paper, it

9    behaves.

10        (On screen.)

11   Q.    Okay.  What is this document?

12   A.    It's a letter that I worked on with Rosalind over

13   Rosalind's signature that was sent to the Ekmans on May

14   28th, 2011.

15   Q.    And was that the attachment to the e-mail cover

16   sheet that we just looked at?

17   A.    It was one of the attachments.

18   Q.    Okay.

19        MS. BLOOM:  I would now offer Exhibit BF as 155.

20        MR. O'HARA:  No objection.

21        THE COURT:  BF is admitted, Exhibit 155.

22        (Exhibit 155, marked.)

23        MS. BLOOM:  And if we can just go through some of

24   this.

25   Q.    What was the agreement that you were setting out

1   here with the Ekmans?

2   A.    It was that they were purchasing, or Fred was

3   purchasing with funds from his IRA, his personal IRA, a

4   unit in the hedge fund, in Insight Onsite Strategic

5   Partners, for $100,000, and then there were other terms

6   and conditions such as the purchase of life insurance,

7   the ability to -- what he would receive back if he

8   decided to terminate it.  There was a termination clause

9   in his language, which I believe was something like 50

10  days from the date.

11  Q.    Well, why don't we actually look down to Item

12  Number 7 on the screen, it says:  "Proof of the initial

13  $80 million investment in Insight Onsite Strategic Fund

14  LP will be provided to both of you within 50 days."

15  Did you provide proof of an $80 million investment

16  within 50 days of May of 2011?

17  A.    No, we did not.

18  Q.    Did you have an $80 million investment ever?

19  A.    No, we did not.

20  Q.    And it also says on Number 8:  "If proof of

21  funding is not provided, $100,000 will be optionally

22  returned to Fred's self-directed IRA immediately upon

23  request."

24       Did the Ekmans enter into this agreement?

25  Mr. Ekman?

```
 1    A.    There are several drafts of this letter.  They did
 2    enter into a later draft, yes.
 3          MS. BLOOM:  Okay.  Why don't we go to that.  Let's
 4    look at BH.
 5          (On screen.)
 6          MS. BLOOM:  You know what?  Let's just skip right
 7    on, let's go to BJ.
 8          (On screen.)
 9    Q.    What is that?
10    A.    (Silence.)
11    Q.    Is that an e-mail from you to Mr. Ekman on June 1,
12    2011?
13    A.    It is.
14          MS. BLOOM:  I'd offer it into evidence as 159.
15          MR. O'HARA:  No objection.
16          THE COURT:  The letters again?
17          MS. BLOOM:  BJ.
18          THE COURT:  BJ is admitted, Exhibit 159.
19          (Exhibit 159, marked.)
20    Q.    Now, I'm going to ask you again, what is this?
21    A.    It is an e-mail which was the cover communication
22    for the final draft version, which I believe is the
23    attachment that will follow.
24    Q.    And did you copy this e-mail to anyone?
25    A.    I copied it -- I sent a copy of it to Rosalind and
```

1    then a file copy of it back to, um, the office, which is

2    the Insight Onsite.

3            MS. BLOOM:   Okay.   And I will now show you what

4    has been previously marked as BK.

5            (On screen.)

6            MS. BLOOM:   I'm sorry.   Let's now go back to BH.

7    I think we already put BK in.

8            Can we go back a second page?

9            (On screen.)

10   Q.    Did you ultimately enter into an agreement with

11   the Ekmans?

12   A.    Yes.

13   Q.    And did they transfer any money to the corporate

14   accounts?

15   A.    Yes, they transferred just shy of $105,000.

16   Q.    And did anything happen to the Ekmans after that?

17   A.    Shortly after, um, this agreement was entered into

18   in the early fall of that year, Mr. Ekman suffered a

19   very serious stroke.

20   Q.    And did the Ekmans make any request or demand with

21   respect to their $100,000?

22   A.    They demanded that the money be returned somewhat

23   later than that.

24   Q.    And was it after the 50 days had gone by for

25   funding the hedge fund?

```
1    A.    Certainly.

2    Q.    Did they get any of their money back?

3    A.    They did not.

4    Q.    Did you discuss with Ms. Herman the fact that they

5    wanted their money back?

6    A.    I did.

7    Q.    What did she say?

8    A.    She said there wasn't any money to give them back

9    and the only way we can get them out is to find someone

10   else to take another unit.

11   Q.    And did you try to find more money?

12   A.    I did.

13   Q.    And did you raise more money?

14   A.    I did.

15   Q.    And when you did that, did any of it go to the

16   Ekmans?

17   A.    It did not.

18         MS. BLOOM:  At this time I'd like to have you take

19   a look at what's been marked as Exhibit LU.

20         (On screen.)

21   Q.    What is this document?

22   A.    Could you blow that up a little more, please?  I

23   can't quite read it.

24         (Blows up.)

25   A.    Thank you.  It's an e-mail that I sent on May 5th
```

1    of 2012 to, um, Ginny, Fred and Chris.  Chris is the

2    Ekmans's son.  By this time Fred was home.  And it says:

3    "Please disregard the prior e-mail, I inadvertently

4    attached a version of the LLC agreement that did not

5    have the proper signature page.  Attached this is the

6    correct version.  Sorry about the mix-up.  Per my

7    conversation with Ginny this morning, I will await your

8    call."

9    Q.    So approximately how long after the Ekmans's

10   original investment is this e-mail?

11   A.    Close to a year.

12   Q.    And, um, did you copy anyone on this e-mail?

13   A.    Yes, I copied Rosalind and the office.

14   Q.    And, um, did you attach any projections to this

15   e-mail as well?

16   A.    Yes, I attached the Insight Onsite, um -- I

17   attached the projections, yes.

18   Q.    And what else did you attach?

19   A.    I attached an updated copy of the, um, LLC

20   agreement for Insight Onsite Strategic Partners.

21         MS. BLOOM:  And could you now look at Exhibit LB.

22         (On screen.)

23   Q.    What is this document?

24         MS. BLOOM:  I'm sorry, did I offer LU into

25   evidence as Exhibit 430?

```
 1            THE COURT:  You did not.
 2            MS. BLOOM:  May I do that now?
 3            THE COURT:  You may do it.
 4            Any objection?
 5            MR. O'HARA:  No, your Honor.
 6            THE COURT:  LU is admitted, Exhibit 430.
 7            (Exhibit 430, marked.)
 8   Q.    What is Exhibit LV?
 9   A.    It's --
10   Q.    I'm sorry, we're -- now we're going to LV.
11   A.    Um, it's an e-mail that I sent to Rosalind and
12   Rosalind's response to that e-mail on or about May 5th,
13   2012.
14   Q.    Is that the same date as the e-mail to the Ekmans
15   that we just looked at?
16   A.    Um --
17   Q.    Do you need to see 430 again?
18   A.    Yes, please.
19            MS. BLOOM:  I'm going to challenge Ms. Rojas on
20   the fly here.
21            Could we put them up side by side?
22            (On screen side by side.)
23   Q.    Now, looking at Exhibit 430, can you see that the
24   date is May 5, 2012?
25   A.    Yes.
```

1    Q.    And now looking at Exhibit 431.

2          MS. BLOOM:  Sorry, which I don't believe we've

3    offered into evidence.

4          Could I offer Exhibit LV as Exhibit 431?

5          MR. O'HARA:  No objection.

6          THE COURT:  LV is admitted, Exhibit 431.

7          (Exhibit 431, marked.)

8    A.    Yes, they were both sent on the same date, May 5,

9    2012.

10         MS. BLOOM:  Okay.  And if we could now focus in on

11   Exhibit 431.

12         (On screen.)

13   Q.    What did you send to Ms. Herman and what did she

14   respond?

15   A.    I sent -- the e-mail reads:  "Attached is the

16   final version of the Insight Onsite Strategic Partners,

17   it includes all of the additional units but does not

18   include the reserve unit for Daniel Laroque and the

19   potential additional partial unit for Bruce Gilmartin.

20   We have also removed the Bigelows as we discussed."

21   Q.    And what was the discussion about removing the

22   Bigelows?

23   A.    The Bigelows had requested their money back

24   sometime significantly earlier than this.

25   Q.    And had you -- what had you done to try and -- had

1   you done anything to try and get them their money back?

2   A.     Yes, I had gotten a new investor.

3   Q.     And what happened with the money from the new

4   investor?

5   A.     It was not used to purchase the Bigelows' unit.

6   Q.     Do you know where the money went?

7   A.     Into the corporate account.

8   Q.     And what response did Ms. Herman send to you about

9   sending this agreement to her?

10  A.     She said, um, "Are you nuts to send this info in

11  an e-mail?"

12  Q.     And what was your understanding of what

13  Ms. Herman's position was on sending things in an e-mail

14  like this?

15  A.     She didn't like anything sent in an e-mail.

16  Q.     Did she ever say why?

17  A.     She said that e-mails were -- that -- primarily

18  she said two things.  One, she said that the internet is

19  forever and anything you put out on the internet is not

20  secure and will always be there.

21  Q.     And you said two things?

22  A.     The internet is forever and anything you send is

23  not secure.

24  Q.     Okay.  And was this the only occasion where she

25  told you not to write things in an e-mail?

1    A.     No.

2    Q.     How often did that happen?

3    A.     Fairly frequently, usually when she was mad at me.

4           MS. BLOOM:  I'd now like to bring up what has been

5    marked as Exhibit JY.

6           (On screen.)

7    Q.     What is this document?

8    A.     This is a document that's from an e-mail that I

9    sent to Rosalind, um, in very early in April of 2008,

10   um, which has the original -- well, one of the original

11   projections because at this point in time it's still

12   called "HermCap Asset Management."

13          MS. BLOOM:  I'd offer this into evidence as

14   Exhibit 382.

15          MR. O'HARA:  No objection.

16          THE COURT:  The letters?

17          MS. BLOOM:  JY.

18          THE COURT:  JY?

19          MS. BLOOM:  JY.

20          THE COURT:  JY is admitted, Exhibit 382.

21          (Exhibit 382, marked.)

22   Q.     And, Mr. Caplitz, you just said something about

23   this, about HermCap.  Can you explain what that was?

24   A.     Early on, before the actual entities were formed,

25   the name of the firms that were going to be created

1    wasn't "Insight Onsite" in some version of what they

2    were, it was "HermCap" specifically for the asset

3    management company and most likely for the partner

4    agreement retaining Insight Onsite as the operating

5    company.

6    Q.    And in this e-mail you wrote:  "Here are the

7    revised spreadsheets and the new performance report I

8    did, please look at them and we will talk."

9    Did you talk?

10   A.    Yes.

11   Q.    And did you make revisions?

12   A.    I don't remember.  It's a very long time ago.

13   Most likely.

14         MS. BLOOM:  And I'm going to show you what has

15   been marked as Exhibit KB.

16         (On screen.)

17   Q.    Do you see that that is an April 23, 2009 e-mail

18   from you?

19   A.    (Looks.)

20         MR. O'HARA:  Excuse me.  What was that again?

21         MS. BLOOM:  It's KB.

22         MR. O'HARA:  KB?

23         MS. BLOOM:  Yes.

24         MR. O'HARA:  Sorry.

25   A.    Yes.

```
 1          MS. BLOOM:  I would offer it as Exhibit 485.
 2          MR. O'HARA:  No objection.
 3          THE COURT:  KB is admitted, Exhibit 485.
 4          (Exhibit 485, marked.)
 5          MS. BLOOM:  I'm sorry.  I'm told that it is 385
 6     and not 485.
 7          THE COURT:  It's premarked and it will be admitted
 8     as 385 in evidence.
 9          (Exhibit 385, marked.)
10     Q.    To whom did you send this e-mail?
11     A.    To David Martin.
12     Q.    Who is David Martin?
13     A.    David Martin is a broker we had a business
14     relationship with in Texas, his clientele were primarily
15     oil people.
16     Q.    And why did you send this to Mr. Martin?
17     A.    We were looking to raise additional units and also
18     he potentially had a client that might have been seed
19     capital.
20     Q.    And did you copy this e-mail to anyone?
21     A.    I copied the e-mail, as was my normal practice, to
22     Rosalind.
23     Q.    And what did you attach to this e-mail?
24     A.    Um, two things, one was the, um, asset fee
25     projections, which we've seen previously, and then there
```

1    was a report which was put together based on -- an

2    unaudited report based on what our accounts had done in

3    the prior year.

4    Q.    Okay.

5          MS. BLOOM:  At this time I'd like to have you take

6    a look at what has been marked for identification as

7    Exhibit KD.

8          (On screen.)

9    Q.    Is that an e-mail from you to Rosalind Herman

10   dated October 26th, 2010?

11   A.    Yes.

12         MS. BLOOM:  I would offer Exhibit KD as 387.

13         MR. O'HARA:  No objection.

14         THE COURT:  KD is admitted, Exhibit 387.

15         (Exhibit 387, marked.)

16   Q.    Does this document have an e-mail that starts down

17   below?

18   A.    Yes.

19   Q.    And who is that from?

20   A.    Rosalind to me.

21   Q.    And what did she say?

22   A.    "Gregg, this guy has the paperwork for a hedge

23   fund which states he has a percentage of the company, he

24   never paid a dime for it, what the hell?" and a number

25   of question marks.

Q.     What is this about?

A.     Daniel Laroque.

Q.     Can you explain what was going on?

A.     Danny had wanted to purchase a unit in the hedge fund, he had some, um, limited cash liquidity in his account.  There were a number of, um, nonpublic assets which we had been told by the sponsor were in the process of being liquidated, um, ongoing for many months, and we kept on holding the unit for him seeing that these liquidations would ultimately take place and he would be able to pay the money, but the liquidations didn't take place and he was still in a position where he had the units and I had done the paperwork showing he had the units as if he had paid for the units and at this point he had paid nothing for the units -- the unit.

Q.     And how did Ms. Herman know about this?

A.     She saw copies of the paperwork.

Q.     And, um, what did you tell Ms. Herman about this in this e-mail?

A.     I said:  "I spoke with him myself today and will speak again this afternoon, I told him we needed the money or the paperwork.  I will protect your interest as always, Gregg."

Q.     Did Mr. Laroque end up putting some money into the

1    supposed hedge fund?

2    A.    He did.

3    Q.    And do you recall how much?

4    A.    $4,000.

5    Q.    And do you know whether his wife put any money in?

6    A.    Um, his ex-wife purchased a quarter unit, I

7    believe, for $26,000 and change.

8         MS. BLOOM:   I'd now like to have you take a look

9    at what has previously been marked as Exhibit BR.

10        (On screen.)

11   Q.    Is this an e-mail from you to Ms. Rena Hilgemeier

12   and her son?

13   A.    It is.

14   Q.    Dated May 14, 2011?

15   A.    Yes.

16        MS. BLOOM:   I would offer it, Exhibit BR in

17   evidence as Exhibit 167.

18        MR. O'HARA:   No objection.

19        THE COURT:   BR is admitted, Exhibit 167.

20        (Exhibit 167, marked.)

21   Q.    Now, if you could take a look at the top of this

22   e-mail and explain who "Boston GJH" and "Rena HO1" are?

23   A.    "Boston GJH" is Rena's son, Gavin.   Excuse me.

24   Q.    And who is Rena Hilgemeier?

25   A.    Rena Hilgemeier and her deceased husband were

1    long-term clients.

2    Q.    And did you copy this e-mail to anyone?

3    A.    Yes, it's copied to Rosalind.

4    Q.    What was this e-mail about?

5    A.    It was a, um -- it was a response to a meeting

6    that I had had the prior day with both Mrs. Hilgemeier

7    and her son.

8    Q.    And if you look down the e-mail, um, can you read

9    the second paragraph there?

10   A.    Could you make it bigger?

11   Q.    Yes.

12   A.    "Per our conversation I have also attached

13   information concerning Insight Onsite Strategic Fund,

14   LLP.  We expect to begin operation of the fund with an

15   initial investment of approximately $80 million on or

16   before June 15th, 2011.  This fund is not currently

17   operational and this is not a solicitation for you to

18   invest in the fund.  The ownership structure we

19   discussed is diagrammed at the bottom of the first

20   overview page in the Insight Onsite Strategic Fund LP

21   PPM."

22   Q.    And going down to the next paragraph and onto the

23   next page, what did you write?

24   A.    (Pause.)

25   Q.    Let's start up here with "I am providing" --

1   A.    "I am providing you with the attached spreadsheet,

2   the offering memorandum, the limited partnership

3   agreement, subscription documents, and the explanation

4   contained in this cover e-mail concerning Insight Onsite

5   Strategic Funds, LP."

6   Q.    And did you provide copies of all those things

7   along with this e-mail?

8   A.    I did.

9   Q.    And were those also provided to the people copied

10   on the e-mail?

11   A.    Yes.

12   Q.    And down below there's a paragraph that begins "In

13   order to meet the requirements of most institutional

14   funds, the fund must have a minimum of 25 million in

15   planned assets with a target for our seed investors to

16   provide 75 to 100 million.  We have completed

17   negotiation with the seed investor and expect to meet

18   our June 15th, 2011 deadline with an 80 million initial

19   startup."

20   Did you ever receive $75 or $80 million?

21   A.    We did not.

22   Q.    Did you ever receive any seed capital for this

23   money?

24   A.    No.

25   Q.    "The spreadsheet shows a return for purchase of 1

1  percent interest in the Insight Onsite Strategic

2  Partners, LLC at the cost of $100,000 utilizing a 9

3  percent growth assumption, the return for the 1 interest

4  purchases is slightly less that 6,000 over the five-year

5  period.  These amounts are simply projections and will

6  differ from actual results."

7  Did you attach projections that provided that

8  information?

9  A.    I did.

10       MS. BLOOM:  I'd now like to show you -- I want to

11  make sure.  I'd now like to show you what's been marked

12  as Exhibit BT.

13       (On screen.)

14  Q.    Are those the projections you attached?

15  A.    They are projections that I did.  Each set of

16  projections had an individual file name, so without

17  seeing the file name, I don't know if it's specifically

18  these that are the projections, but they look like them.

19       MS. BLOOM:  At this time I would offer Exhibit BT

20  as Exhibit 169.

21       MR. O'HARA:  No objection.

22       THE COURT:  BT is admitted, Exhibit 169.

23       (Exhibit 169, marked.)

24       MS. BLOOM:  And now I'd like to show you what was

25  marked as Exhibit S.

```
1            MR. O'HARA:  That was "S"?

2            MS. BLOOM:  "S."

3            (On screen.)

4            MS. BLOOM:  Oh, before I get to that.

5     Q.    What was Ms. Hilgemeier's response to your

6     proposal to invest in this supposed hedge fund?

7     A.    She did not wish to do it.

8     Q.    And, um, what did you -- did you take any money

9     from her?

10    A.    I did.

11    Q.    And how did you do that?

12    A.    Um, there was a form that had been previously

13    signed which -- by Ms. Hilgemeier, which we used to make

14    monthly distributions or quarterly distributions, I

15    don't remember which, from her account on her behalf.

16    Q.    And so what did you do?

17    A.    We took 20, 25, $26,000 out of her account.

18    Q.    And did you just use a presigned -- are you saying

19    you used a presigned form?

20    A.    Yes.

21    Q.    As if -- had she authorized that transfer?

22    A.    Absolutely not.

23    Q.    Um, I'm now going to ask you to take a look at

24    what's been marked as Exhibit S.

25            Do you see that that is an e-mail from
```

1    rherman14@cox.net to you on October 4, 2012?

2    A.    I do.

3          MS. BLOOM:  I would offer Exhibit S as Exhibit

4    116.

5          MR. O'HARA:  No objection.

6          THE COURT:  S is admitted, Exhibit 116.

7          (Exhibit 116, marked.)

8    Q.    If you could look down to the bottom of the

9    e-mail.

10          How does this e-mail begin?

11   A.    The first part of the e-mail is an e-mail from

12   Eric Zinger, who was a customer service rep at

13   Lightspeed Financial, sending me the confirmation number

14   for the fact that a wire, a wire number had been sent

15   to, um, Town & Country Bank, Rosalind's account, the

16   Insight Onsite Strategic Management account in Town &

17   Country.

18   Q.    Is that the unauthorized transfer you just

19   described?

20   A.    It is.

21   Q.    And what did you do with that information?

22   A.    I forwarded it to Rosalind, which I discussed with

23   her on the phone that there is a wire coming.

24   Q.    Um, and -- and what was her response?

25   A.    "Stop."  "Stop with e-mailing this.  Why do you

1   not follow the rules?  They apply to everyone."

2   Q.    What was the rule you understand her to be

3   referring to?

4   A.    Um, the not to use the e-mail for any writing.

5         MS. BLOOM:  At this time I'd ask you to look at

6   Exhibit LV, what has marked for identification as

7   Exhibit LV.

8         (On screen.)

9         MS. BLOOM:  That's LV, "L" as in "Lady," "V" as in

10  "Valentine."

11        (On screen.)

12        MS. BLOOM:  Thank you.

13  Q.    I'd like to have you take a look at what is in

14  evidence as Exhibit 132.

15        MS. BLOOM:  We're going to move on to 132.

16        (On screen.)

17  Q.    Do you recognize this document?

18  A.    I do.

19  Q.    What is it?

20  A.    It's a promissory note between Financial Family

21  Holdings and Cesidio Salvucci and Irene Burt for

22  $200,000.

23  Q.    And did you have any discussions about this note

24  with Rosalind Herman?

25  A.    I did.

Q.    And what were those discussions?

A.    The fact that we had an opportunity to borrow $200,000 from the Burts.  Mr. Burt, who was acting as the power of attorney for Mr. Salvucci, who was, um, suffering from dementia and was a resident at Belmont Manor Nursing Home in Belmont, um, to begin -- these were the first -- the second of the first two investors that we were able to get money from for the purported hedge fund.

Q.    And, um, when you had these discussions with Ms. Herman about getting the $200,000 pursuant to this note with Mr. Burt, um, do you know whether Ms. Herman was aware of Mr. Salvucci's situation and how --

        MR. O'HARA:  Objection.

        THE COURT:  On that foundation, sustained.

Q.    Had you had any discussions with Ms. Herman prior to this note about Mr. Salvucci's situation?

A.    I had.

Q.    And, um, what were the discussions and in what context?

A.    Well, there was also Mr. Burt and, um, Mrs. Burt had met in Ms. Herman's office in Waltham -- excuse me, in Woburn with both Rosalind and myself.

Q.    And approximately when had that meeting taken place?

1   A.   At the beginning of Mr. and Mrs. Burt's

2   relationship with the firm, so I would say at least two

3   years prior to that.

4   Q.   And in that meeting what did the Burts tell you

5   and Ms. Herman about their money and whose money they

6   were managing?

7   A.   They had told us that Mr. Salvucci, um, who was

8   Mrs. Burt's uncle, um, had been in Belmont Manor and

9   with the exception of his cognitive ability, was in very

10   good health, even though he was well into his 90s, and

11   that they were very concerned that they would have

12   sufficient assets to maintain him in the Belmont Manor.

13   They were very concerned that they maintain him in a

14   place like Belmont, which was a very nice nursing home

15   and he was taken excellent care of, and they wanted to

16   make sure he stayed there.

17   Q.   And what did you and Ms. Herman say to the Burts

18   in that meeting?

19   A.   We discussed various techniques that could be

20   used.  There was money put into -- we suggested the use

21   of Strategic Storage, which was a nonpublic REIT, and

22   also the use of individual equities in Ms. Herman's

23   managed -- under Mrs. Herman's management that we could

24   use to both maintain growth and generate income to pay

25   the bill.

1    Q.    And was there any discussion about the philosophy

2    of Insight Onsite Strategic Management and you and

3    Ms. Herman towards investments and managing money?

4    A.    Yes, there was.

5    Q.    Can you describe that?

6    A.    It was the same thing we had said to every client

7    for 20 years, um, that Rule Number 1 was "Don't lose the

8    money," and Rule Number 2 was, "When in doubt see Rule

9    Number 1."

10   Q.    And, um, when, um, this promissory note was

11   prepared, who prepared it?

12   A.    I believe I did.

13   Q.    Okay.

14        MS. BLOOM:  And if we could go to the last page.

15        (On screen.)

16        MS. BLOOM:  And blow up the signature lines.

17        (On screen.)

18   Q.    Do you see the signature for Rosalind Herman?

19   A.    Yes.

20   Q.    Does that appear to you to be Rosalind Herman's

21   signature?

22   A.    It does not.

23   Q.    Who signed it?

24   A.    I did.

25   Q.    Why did you sign it?

1    A.    Ms. Herman was in Las Vegas.

2    Q.    And did she know that you were having this note

3    prepared and signing it?

4    A.    She did.

5    Q.    Where did the money go, the $200,000?

6    A.    I believe it was wired to Knew Finance Experts.

7    Q.    Did you have any signatory authority over that

8    account?

9    A.    I did not.

10         MS. BLOOM:  If we could go up just a little bit in

11   this document to the two paragraphs.

12         (Scrolls on screen.)

13   Q.    And I don't know if you can see it, but there's a

14   paragraph that begins "The lender at their sole

15   discretion."

16         MS. BLOOM:  Let me see if I can blow that up.

17         (Enlarges on screen.)

18   Q.    Can you read that now?

19   A.    "The lender at their sole discretion may convert

20   the principal balance to two units of the HermCat

21   Management, LLC, 2 percent of ownership on the second

22   anniversary date of this note and on each subsequent

23   anniversary date.  Said conversion will terminate this

24   note in full.  If conversion right is not exercised by

25   the fourth anniversary date, then all principal and any

1    unpaid interest will be due in full on July 24th, 2012."

2    Q.    Can you explain that?

3    A.    Mr. Burt was not interested initially in buying

4    the units, so we created this lending situation so that

5    the money came in, he was going to be paid 12 percent

6    interest while he waited, and once there was a track

7    record and monies -- the seed monies had been received,

8    he would have the option, at his choosing, to convert

9    the interest into two units.

10   Q.    And when you discussed this promissory note with

11   Mr. Burt, what did you tell him the money was going to

12   be used for?

13   A.    Startup fees on the hedge fund.

14   Q.    Did you ever suggest to him that he was giving a

15   gift to Ms. Herman?

16   A.    No.

17   Q.    Did you make any recommendation to him as to

18   whether this would be a wise investment?

19   A.    I did.

20   Q.    Did Ms. Herman make any recommendation to him as

21   to whether this would be a wise investment?

22   A.    She did.

23   Q.    And what was the recommendation?

24   A.    That it would be a wise investment.

25         MS. BLOOM:  Now I'd like to have you take a look

1    at Exhibit 133.

2         (On screen.)

3    Q.    Do you recognize what is in evidence as Exhibit

4    133?

5    A.    I do.

6    Q.    What is that?

7    A.    It's a check drawn on Knew Finance Expert which

8    was sufficient to bring the note -- the interest on the

9    Salvucci note current.

10   Q.    And if you look at the handwriting in the upper

11   right-hand corner, on November 8th, 2012, do you know

12   whose handwriting that is?

13   A.    The date is my handwriting.

14   Q.    And the numbers, "$34,000" written in the box,

15   whose handwriting is that?

16   A.    I'm uncertain but I believe that is Rosalind's

17   handwriting.

18        MR. O'HARA:  Objection.

19        THE COURT:  Well, no, that may stand, and the jury

20   will give it the weight that they decide is appropriate.

21   He's uncertain, but he believes so.

22   Q.    And the, um, handwriting from Mel Burt, do you

23   know whose handwriting that is?

24   A.    That's Rosalind's handwriting.

25   Q.    And how are you familiar with Rosalind Herman's

1    handwriting?

2    A.    I've seen thousands, if not tens of thousands, of

3    examples of it over the 20-plus years.

4    Q.    And then below where the $34,000 is written in

5    letters, whose handwriting is that?

6    A.    That is my handwriting.

7    Q.    And where it says "Interest through 11-1-2012,"

8    whose handwriting is that?

9    A.    Again my handwriting.

10   Q.    And do you recognize the signatures on the check?

11   A.    I do.

12   Q.    And what are they?

13   A.    The top one is Brian Herman's and the bottom one

14   is possibly Brad Herman's, or possibly someone else

15   signing Brad Herman's name.

16   Q.    What happened -- who initially prepared this

17   check?

18   A.    Rosalind.

19   Q.    And how did you get it?

20   A.    It was sent to the office, I believe, in an

21   overnight package.

22   Q.    And what did you do with it?

23   A.    I met with Mr. Burt.

24   Q.    And at that time that you were, um -- that you met

25   with Mr. Burt, what was Mr. Burt -- had there been any

1    phone calls with Mr. Burt prior to that?

2    A.    Yes.

3    Q.    And can you describe what happened in those phone

4    calls?

5    A.    Mr. Burt was threatening that if his interest was

6    not caught up, he would go to the state regulators.

7    Q.    Who was on those phone calls?

8    A.    I'm certain I was and I believe on at least one of

9    them Rosalind was, but I'm not certain of that.

10   Q.    And, um, what did you do with this check?

11   A.    I ultimately gave it to Mr. Burt.

12   Q.    And what did you tell him when you gave it to him?

13   A.    That there were insufficient funds in the account

14   to make the check good.

15   Q.    And what else did you say to him?

16   A.    He asked me to give him the check, he said he was

17   a smart enough person not to deposit an insufficient

18   fund check, but he felt that it was a gesture of good

19   faith if he had the check because he had been promised

20   funds previous times, numerous times, and had not yet

21   received them.

22   Q.    And did he ever tell you what he had done with the

23   check?

24   A.    To my knowledge he still has the check.  He was

25   calling the bank on a regular basis to see if the check

1   ever had sufficient fund to negotiate.

2   Q.    And what did you with respect to, um, providing

3   funds to Mr. Burt at that time?

4   A.    I went out and took additional monies.

5   Q.    From whom did you take those monies?

6   A.    On the time frame I believe it was Ms. Schneider

7   and Ms. Hilgemeier.

8   Q.    And, um, why did you do that?

9   A.    Because I knew that if the check wasn't made good

10  for Mr. Burt, the whole thing was going to come down

11  around our ears.

12  Q.    Was the check ever made good?

13  A.    It was not.

14        MS. BLOOM:  I'd now like you to take a look at,

15  um, Exhibit 181.

16        (On screen.)

17        MS. BLOOM:  If you could look to the bottom to the

18  check down there.

19        (On screen.)

20  Q.    Do you recognize this check?

21  A.    I do.

22  Q.    And what is it?

23  A.    It's a check for $3,000 that I delivered, um, to

24  Mr. Leuci and Mr. Savage at their home in Newburyport.

25  Q.    And where did you get the check?

1    A.    From Rosalind.

2    Q.    And prior to delivering that check, did you have

3    any discussions with Rosalind Herman about this?

4    A.    Yes.

5    Q.    And prior to delivering the check, had you had any

6    calls with Mr. Leuci or Mr. Savage?

7    A.    Primarily with Mr. Leuci, but certainly Mr. Savage

8    was on at least some of the calls, and there were

9    numerous, numerous calls.

10    Q.    Did Ms. Herman participate in any of those calls?

11    A.    At least some of them.

12    Q.    And what was happening in those calls?

13    A.    Mr. Leuci and Mr. Savage had been given some

14    deadlines as to when monies were going to be in the

15    account and when they should begin to receive

16    distributions.  Carl and David had been clients of mine

17    for 25 years or more and, um, they were very upset that

18    these deadlines came and passed and came and passed and

19    came and passed, that this was not how they were used to

20    dealing with me.

21    Q.    Um, did they threaten to do anything?

22    A.    Yes, Carl said he would go to the appropriate

23    state and federal regulators.  In fact I believe he sent

24    a letter, a draft of a letter that he was going to send

25    if he didn't receive any money.

1    Q.    Did you have discussions with Ms. Herman about

2    what to do about this?

3    A.    I did.

4    Q.    And what were the discussions?

5    A.    That we had to get him a distribution.

6    Q.    At this time did you have any operational hedge

7    fund?

8    A.    We did not.

9    Q.    And whose handwriting is on this check?

10   A.    That is Ms. Herman's.

11   Q.    Is all of it Ms. Herman's?

12   A.    I believe so.

13   Q.    And who signed the check?

14   A.    Rosalind Herman.

15   Q.    And why does it say "gift"?

16   A.    Um, because Rosalind was dead set against writing

17   the check, said that he shouldn't deserve it, that he

18   didn't deserve it, and, um, that was her shot at him.

19   Q.    Okay.

20         MS. BLOOM:   I'd now like to have you take a look

21   at Exhibit 424.

22         (On screen.)

23         MS. BLOOM:   Actually if we could we begin at the

24   bottom of 424.

25   Q.    I think you just mentioned, um, a communication

1    from Mr. Leuci about going to the authorities.

2    Is this the communication you were referring to?

3    A.    Um, this is an e-mail that Carl sent to Rosalind

4    and I in which he said, um, he asked the same question

5    that he had been asking numerous times verbally, either

6    in person when I was at his home or by telephone.

7    Q.    Okay.

8         MS. BLOOM:  And then if we can move up through the

9    e-mail.

10        (Interruption by Juror.)

11        MS. BLOOM:  I think we're still --

12        (Pause.)

13        THE COURT:  Yeah, we're going to take a brief

14   recess at this time.  We've not heard all the testimony,

15   so keep your minds suspended, do not discuss the case

16   either among yourselves nor with anyone else.  We'll

17   stand in recess.

18        (Jury leaves, 10:10 a.m.)

19        THE COURT:  Please be seated.

20        Just so you can gauge the schedule, to accommodate

21   the juror's situation, we're going to stop at -- it's

22   the one we talked about yesterday, and we're going to

23   stop at 12:30.  So I'll give them 10 minutes now, since

24   they asked for a rest hall, and then at a courteous time

25   we'll take another 10 minutes stopping at 12:30.  So

1   we'll stand in recess for 10 minutes.

2          (Recess, 10:10 a.m.)

3          (Resumed, 10:30 a.m.)

4          THE COURT:  Go ahead, Ms. Bloom.

5          MS. BLOOM:  Exhibit 261 in evidence.

6          (On screen.)

7   Q.    I'm going to ask you to look first at the bottom

8   of this e-mail.

9   Do you recognize, um, the e-mail at the bottom of

10  Exhibit 261?

11  A.    (Reads.)  I do.

12  Q.    Who is that from?

13  A.    The first e-mail at the bottom of the page is an

14  e-mail from Rosalind to Carl Leuci with a copy to the

15  office in, um, Wilmington.

16  Q.    And it says:  "I will talk to you when you get

17  back, not with e-mails.  Sorry, but I just told you

18  that."

19  What is that a reference to?

20  A.    I believe it's a reference to a phone conversation

21  that Rosalind had with Carl.

22  Q.    And did Mr. Leuci stop e-mailing?

23  A.    No.

24          MS. BLOOM:  And then if we can go up to the top of

25  the e-mail.

1           (On screen.)

2    Q.     Did you e-mail back to Mr. Leuci?

3    A.     I did.

4    Q.     And, um, you say, "Rosalind would prefer to have a

5    conference call to discuss any questions you have," and

6    later in there, "She does not like to do these types of

7    items by e-mail.  The hedge fund is fine.  There's

8    absolutely no need to cut your vacation short."

9    Were those messages also relayed on the phone call with

10   Ms. Herman?

11   A.     I'm sorry.  Can you repeat the question?

12   Q.     Let me ask a better question.

13   Did you copy anyone on this e-mail?

14   A.     Yes.

15   Q.     Who did you copy?

16   A.     Rosalind and a file copy back to the office.

17   Q.     And, um, in the phone call that you had had with

18   Mr. Leuci and Ms. Herman prior to that, what had

19   Ms. Herman communicated to Mr. Leuci?

20   A.     Um, I don't have perfect recall of the

21   conversation but words to the effect that everything was

22   going along as it was supposed to, um, and that he

23   had -- that he should enjoy his vacation.  And I believe

24   that this is the vacation in which David took ill and

25   was rushed to a hospital in, um, ultimately in Miami, I

1    believe.

2         MS. BLOOM:  At this time I would like to take a

3    look at Exhibit U.

4         (On screen.)

5    Q.    What is this?

6    A.    Um, it's an e-mail that was sent from Rosalind --

7    Is there anything below this?

8    Q.    I believe that's everything on the e-mail.

9    A.    Okay.

10   I believe this is a response to an e-mail that I had

11   previously forwarded to Rosalind that I had received

12   from Lightspeed concerning -- well, I don't know whether

13   it was myself in the office or someone else in the

14   office, I don't remember, who had attempted to place a

15   trade via an e-mail which Lightspeed or any other

16   brokerage house will not accept, it has to be by --

17   either by electronic interface or by speaking with a

18   live person on a recorded line.

19        MS. BLOOM:  And I would now offer Exhibit U as

20   118.

21        MR. O'HARA:  No objection.

22        THE COURT:  Exhibit U is admitted, Exhibit 118.

23        (Exhibit 118, marked.)

24   Q.    Did you forward the Lightspeed e-mail to anyone?

25   A.    Well --

1   Q.    I'm sorry.  What does this e-mail chain begin with

2   at the bottom?

3   A.    It's a response to an e-mail that -- you don't see

4   it but I must have forwarded it to Rosalind from, um --

5   which pretty much was my normal practice on all e-mails,

6   um, that Lightspeed had refused some instruction.

7   Q.    And what did Ms. Herman say?

8   A.    "See, even Lightspeed does not accept anything

9   about trades on e-mails."

10  Q.    And what did you write back?

11  A.    "No big surprise."

12  Q.    Why was it no big surprise?

13  A.    Because I knew that they wouldn't take trade

14  instructions over the e-mail.

15  Q.    And what did she write back.

16  A.    "Tell that to fucking Carl."

17  Q.    And what you understand that to be a reference to?

18  A.    Carl Leuci.

19  Q.    And anything about e-mail?

20  A.    It was -- you know, once again hammering home the

21  point of not doing anything via electronic references.

22  Q.    And was Carl Leuci trying to e-mail to place

23  electronic trades?

24  A.    No.

25  Q.    Can you explain what the difference was?

A.    Well, Carl was communicating with us and over the
long time I had worked with Carl and David most of our
conversations had been simply over the phone or I often
was at their home, first in Revere and then in
Newburyport, but as the tension ramped up and Carl and
David -- but I think primarily Carl, began to feel that
things were being told to him and then they were not
happening, Carl took to putting things in writing via
e-mails, and this did not make Rosalind happy.

Q.    What was her position about putting things in
writing?

A.    She said nothing belonged in writing, certainly
not in e-mails.

     MS. BLOOM:  And I'm now going to ask you to look
at what's been marked as Exhibit FO.

     (On screen.)

Q.    What is this?

     MS. BLOOM:  If we can just blow up the top?

     (Enlarges on screen.)

A.    It's the end of an e-mail chain that was the last
communication in this e-mail chain, at least this part
of this e-mail chain.  It is a communication from
Rosalind to me, um, on December 21st, in which she says,
"Do not let Carl use e-mails about these things, please.
We do not allow it.  Remember to tell him to call or

1   fax."

2   Q.    Did Mr. Leuci have a fax?

3   A.    I don't recall.

4         MS. BLOOM:  I would offer this as Exhibit 268.

5         MR. O'HARA:  No objection.

6         THE COURT:  The letters?  Excuse me, the letters?

7         MS. BLOOM:  Oh, I'm sorry, FO.

8         THE COURT:  FO is admitted, Exhibit 268.

9         (Exhibit 268, marked.)

10        MS. BLOOM:  I'd now like you to take a look at

11  what is in Exhibit C.

12        (On screen.)

13        MS. BLOOM:  Just blow up the first section of

14  Exhibit C.

15        (Enlarged on screen.)

16  Q.    Do you recognize Exhibit C, Mr. Caplitz?

17  A.    I do.

18  Q.    What is Exhibit C?

19  A.    It's a list of monies that were sent from various

20  clients to various bank accounts on behalf of the hedge

21  fund, the purported hedge fund.

22        MS. BLOOM:  At this time I would offer Exhibit C

23  as Exhibit 103.

24        MR. O'HARA:  No objection.

25        THE COURT:  Exhibit C is admitted as Exhibit 103.

1           (Exhibit 103, marked.)

2           MS. BLOOM:  And I have a copy of Exhibit C going

3      up on a board.  Yes, that may be easier to follow along.

4      Tell me when I've got it at the right -- (Puts on

5      easel.)

6           Can you all read that, everybody?  Okay.

7      Q.    So let's just talk about what's in this chart for

8      a minute and we'll go through the first few lines.

9      On the left side there's a date and then what's next in

10     the next column?

11     A.    The bank account where the monies were sent.

12     Q.    Okay.  And first I see written there, "WAMU, Knew

13     Finance."  Can you explain what that is?

14     A.    Washington Mutual was the bank and the receiving

15     account was Knew Finance Experts, Inc.

16     Q.    And whose money does that line reflect?

17     A.    John and Carl Bigelow's.

18     Q.    And how much did they send?

19     A.    $100,000.

20     Q.    Who controlled the WAMU Knew Finance account?

21     A.    Rosalind Herman and her family members.

22     Q.    And did you have any signatory authority over that

23     account?

24     A.    I did not.

25     Q.    Could you control the monies in that account?

1    A.    I could not.

2    Q.    And do you recognize the account listed at

3    2-25-09?

4    A.    Yes.

5    Q.    And what account is that?

6    A.    That's the new bank that Rosalind made

7    arrangements to use, which was Town & Country Bank.

8    When they opened it?  I don't remember.  But by this

9    time they had ceased using Washington Mutual.  I think

10   Washington Mutual had actually been taken over, but I'm

11   not sure.

12   Q.    And when -- where did the Connells' money, the

13   second $100,000 from the Connells go to?

14   A.    To Town & Country Bank in the Knew Finance Experts

15   account.

16   Q.    And then I'm going to keep -- well, looking down

17   here I see here on 10-15-09 there's an entry for "BOFA

18   FRNI" and then "Town & Country, Knew Finance."

19   Can you explain what happened?

20   A.    There was a deposit made in the local branch of

21   Bank of America for Financial Resources Network, and

22   then I believe but I'm not certain, that there was a

23   wire sent from FRN to Knew Finance.

24   Q.    And did you have any control over the Town &

25   Country account or Knew Finance?

1    A.    I did not.

2    Q.    And who controlled that account?

3    A.    Rosalind Herman.

4    Q.    And going further down on this chart you see at

5    some point an account listed "Town & Country, Insight

6    Onsite."  What is that?

7    A.    That is an account that was established for, I

8    believe, Insight Onsite Strategic Management at Town &

9    Country Bank.

10   Q.    And who controlled that account?

11   A.    Rosalind Herman.

12   Q.    And did you have any control over that account?

13   A.    I did not.

14   Q.    And in this chart did all of these clients agree

15   to put money in this supposed hedge fund?

16   A.    No.

17   Q.    How did the other monies come into the hedge fund?

18   A.    We simply took them out of the account.

19   Q.    And going to the bottom, what is the total amount

20   reflected?

21   A.    $1,385,257.

22   Q.    And where did that money go?

23   A.    Into various corporate accounts.

24   Q.    And do you know where it went from there?

25   A.    It was spent.

1  Q.     And, um, do you know -- well, what was it spent

2  on?

3  A.     Primarily lifestyle for the Hermans.

4  Q.     Did you ever tell any of the clients that the

5  money they were putting in these investments would be

6  spent on your -- or Ms. Herman's lifestyle?

7  A.     Absolutely not.

8  Q.     Do you believe that if you had they would have

9  entrusted the money with you?

10  A.     No.

11  Q.     Did you make recommendations -- did you and

12  Ms. Herman make recommendations to these clients to make

13  these investments?

14  A.     Yes.

15  Q.     And was that consistent with your obligations as

16  investment advisors?

17  A.     No.

18  Q.     Why not?

19  A.     Because a Registered Investment Advisor and the

20  agents of a registered investment are fiduciaries, which

21  in simple terms means that they are required to put the

22  interests of the client in front of their own interest

23  and to fully disclose any potential conflict.

24  Q.     In the course of your business did you have any

25  discussions with Ms. Herman about the financial and

1   personal situations of the clients?

2   A.    Of course.

3   Q.    And, um, did you discuss Mr. Connell's situation?

4   A.    I did.

5   Q.    And what did you discuss about the Connells'

6   personal situation with Ms. Herman?

7   A.    That, um, Linda Connell had been diagnosed with

8   cancer, that that cancer had metastasized, and that her

9   outlook was not very good.

10  Q.    And did the Connells ever ask for at least some

11  money back to deal with that situation?

12  A.    They asked for money out of their accounts, yes.

13  Q.    And did you provide it to them?

14  A.    Yes, we took it out of the other remaining assets

15  in the account.

16  Q.    And did you discuss those issues with Ms. Herman?

17  A.    Yes.

18  Q.    And did you have any discussions with Ms. Herman

19  about Ms. Wentzell's situation?

20  A.    I did.

21  Q.    And, um, did you have discussions about her

22  financial situation?

23  A.    I did.

24  Q.    And how large her assets were or were not with

25  Ms. Herman?

1    A.    I did.

2    Q.    And how well off was she?

3    A.    Um, Pat had retired from, um, New England

4    Telephone prior to its becoming Verizon, I believe, and

5    she was originally an operator, and then as they phased

6    operators out, she became something else.  The money she

7    had in her account was -- was pretty much everything she

8    had with the exception of some bonds and she was -- and

9    she had some assets, but she was certainly not wealthy.

10   Q.    And did Ms. Herman know that information?

11   A.    Yes, she did.

12   Q.    How do you know?

13   A.    Because I told her.

14   Q.    Um, did Ms. Herman know about Ms. Wentzell's

15   disability?

16   A.    She did.

17   Q.    How do you know?

18   A.    I told her.

19   Q.    Um, did you do anything to try and get life

20   insurance for Ms. Wentzell?

21   A.    I did.

22   Q.    And did you discuss that with Ms. Herman?

23   A.    Yes, and copied her on all of the e-mails.  It was

24   a difficult case because, um, Ms. Wentzell suffered from

25   cerebral palsy, had her whole life, and cerebral palsy

1    is a tough thing to get life insurance on the individual

2    because they're -- well, it doesn't really affect their

3    life, but because they're prone to falling and therefore

4    could hurt themselves, it's very difficult to get life

5    insurance.  She used two walking sticks, so she was

6    completely disabled, but was still not in a wheelchair

7    at that point.  I don't know if she is today.

8    Q.    We talked earlier about some civil lawsuits that

9    you were involved in.

10   Did those result in a judgment?

11   A.    They did, two settled judgments.

12   Q.    And against whom were the judgments?

13   A.    Um, the judgment from Miselman was against myself,

14   Ms. Herman personally, and then a number of, um, I

15   believe at least two other entities, one was a

16   profit-sharing plan and one was a corporate entity.

17   Q.    One of these corporate entities on the chart that

18   is Exhibit 410?

19   A.    Yes.

20   Q.    And did those cases involve a judgment against you

21   and the entities for a misrepresentation and breach of

22   fiduciary duty?

23   A.    They did.

24   Q.    Did Ms. Herman know that?

25   A.    Yes.

Q.    Did you discuss that on occasion?

A.    Um, many, many, many, many times.

Q.    And when did those judgments come down?

A.    My recollection may be foggy as to the, um, date, but I believe it was in February of 2005.

Q.    Was it before you started making money for the purported hedge fund?

A.    Yes.

Q.    At some point were you indicted, just yourself for tax fraud?

A.    I was.

Q.    And when was that?

A.    I believe it was in January of 2012.

Q.    And did you share that information with Ms. Herman?

A.    Immediately.

Q.    And did you two keep, um, raising money for the purported hedge fund after that?

A.    Yes.

Q.    And at some point was she also indicted, just initially on the tax charge?

A.    Yes.

Q.    And when was that?

A.    I believe it was March of 2012.

Q.    And did you keep raising money for the purported

1    hedge fund after that?

2    A.    Yes.

3    Q.    Okay.  I'd like to now have you take a look at

4    Exhibit 1.01, Page 24.

5    A.    (Looks.)

6    Q.    And what do you see this is?

7    A.    I believe it's a bank statement for the Knew

8    Finance Experts.

9    Q.    Was this a bank statement that you, um, had

10   control over?

11   A.    Absolutely not.

12   Q.    Well, who controlled it?

13   A.    I'm not sure who the signatories on the account

14   were, but it was certainly people in the Herman family.

15   Q.    And from your interactions with the Herman family

16   and Ms. Herman, do you have an understanding as to who

17   made the decisions about how the money was spent?

18   A.    Always Rosalind.

19   Q.    Now, if you could look on this page, do you see an

20   entry for --

21   Well, first of all, what's the beginning balance of the

22   account?

23   A.    Thank you.  (Blows up.)   Minus $313.35.

24   Q.    And this is a May 2008 statement, is that correct?

25   A.    I believe so.

1  Q.    So just to tie this up, is that the month that the
2  money came from the Bigelows?
3  A.    Yes.
4  Q.    Okay.  And do you see the entry for the Bigelows'
5  money on there?
6  A.    Yes, I do.
7        MS. BLOOM:  Can we highlight that, please.
8        (Highlights on screen.)
9  Q.    Can you see how much was left in the account at
10 the end of the month?
11 A.    $26,311.85.
12 Q.    If we could now look down through that account
13 statement just briefly.
14 Do you see the first entry, "Shell Service Station," do
15 you recognize that?
16 A.    I believe I do.
17 Q.    What is it?
18 A.    I believe it's the gas station that was closest to
19 Rosalind's house in Las Vegas.
20 Q.    And the next entry is the "Nevada School of
21 Insurance."  Do you recognize that?
22 A.    I do.
23 Q.    What is that?
24 A.    I believe both Brad and Brian were signed up to
25 take an insurance licensing course to receive their

1    insurance licenses in Nevada.

2           MS. BLOOM:  And if we could turn to the next page.

3           (On screen.)

4    Q.    Do you see entries for Vonn's?  What is that?

5    A.    It's a grocery store that's not far from their

6    house.

7    Q.    And do you also see entries for Albertson's?

8    A.    Yes.

9    Q.    And what is that?

10   A.    It's another grocery store not far from the house.

11          MS. BLOOM:  And if we could now scroll down --

12   actually I'm going to ask you to look at Exhibit 1.4 at

13   Page 3.

14          (On screen.)

15   Q.    Do you see there a check dated May 16th, 2008?

16   A.    I do.

17   Q.    On the Knew Finance account?

18   A.    Yes.

19   Q.    To whom is the check made out?

20   A.    Robert Cohan.

21   Q.    Who is Robert Cohan?

22   A.    He's an attorney in Boston who represented myself,

23   Ms. Herman, individually and a number of her entities in

24   the civil litigation.

25   Q.    Did that civil litigation have anything to do with

1   the startup of a purported hedge fund?

2   A.    It did not.

3         MS. BLOOM:  If we could now turn to Page 34 of

4   Exhibit 1.01.

5         (On screen.)

6         MS. BLOOM:  I'm sorry.  Can we go to 2.02 at 1.

7         (On screen.)

8   Q.    What is this?

9   A.    I believe it's another bank statement for the Knew

10  Finance Experts.

11  Q.    And who controlled this account?

12  A.    The same individuals who had previously controlled

13  it.

14  Q.    And is that the account that is listed on Exhibit

15  103 starting from the entries in February 25th, 2009?

16  A.    I believe it is.

17  Q.    And if you look at the, um, previous balance, what

18  was the balance on 2-24-09?

19  A.    It looks like it was 0.

20  Q.    And how much money came in?

21  A.    $100,000.

22  Q.    And whose money was that?

23        MR. O'HARA:  Objection.

24  Q.    Do you know whose money that was?

25        THE COURT:  All right.  Withdrawn.

1    A.    I'm sorry, without seeing the list at this time I

2    can't tell you, and I can't see the list from here.

3    Q.    Okay, I'll show you Exhibit 103.

4    Does that help you?

5    A.    Yes.

6    Q.    Can you read it from there?

7    A.    No, ma'am.

8          (Moves easel closer.)

9          MS. BLOOM:  Do you know what I'm going to do?  I'm

10   going to give you an extra copy of it.

11         THE WITNESS:  That would be helpful.

12   Q.    I'm putting in front of you a copy of Exhibit 108.

13   Take a look at that.

14   A.    Thank you. (Looks.)  It would appear to be the

15   money that was sent from James and Linda Connell on or

16   about 2-25-09.

17   Q.    Okay.  And going down, um, this list.  Do you see

18   an entry for the "Nevada Secretary of State"?

19   A.    Yes.

20   Q.    Do you know what that is?

21   A.    I believe it would be the appropriate renewals of

22   the Nevada entities.  I'm not certain.

23   Q.    And then I see entries here at Wal-Mart for $451.

24   Do you know what that is?

25   A.    Other than it's an expense at Wal-Mart, no.

1  Q.    And going down there is "NNT Trenton Smoke," what
2  is that?
3  A.    It is a smoke shop that's located not too far from
4  Rosalind's house.
5  Q.    Who smoked at the house?
6  A.    Pretty much everyone, um, except me.
7  Q.    Sorry?
8  A.    I said pretty much everyone except me.
9  Q.    And further down there's an entry for "GNC."  Do
10 you know what that is?
11 A.    Yes.
12 Q.    What is it?
13 A.    It's a vitamin and supplement company.
14 Q.    To your understanding are these charges related to
15 the startup hedge fund?
16 A.    No.
17       MS. BLOOM:  Now I'd like to have you take a look
18 at, um, Exhibit 1.01 at Page 33.
19       (On screen.)
20       MS. BLOOM:  I think we might need to go to Page
21 32.  Sorry.
22       (Blows up.)
23 Q.    What is that?
24 A.    It's a bank statement for, um, the month of July
25 of '08 for Knew Finance Experts.

```
1    Q.    And looking down --
2          MS. BLOOM:  If we could blow up the beginning and
3    ending balance chart.
4          (Enlarged on screen.)
5    Q.    What was the beginning balance at the beginning of
6    the month?
7    A.    $207.72.
8    Q.    And I see an entry there for $200,010.  Do you
9    know what that is?
10   A.    Yes, I believe that that's the wire from Mr. Burt
11   -- um, Mr. Salvucci and Mrs. Burt.
12         MS. BLOOM:  And then if you could take a look at
13   what is in evidence as 1.03 at Page 1.
14         (On screen.)
15   Q.    While that's coming up, let me ask you this.  Who
16   are John and Amelia Collins?
17   A.    John and Amelia Collins are probably my oldest
18   clients.
19   Q.    And do you know --
20         MS. BLOOM:  Now, if you would take a look at 1.03.
21         (On screen.)
22   Q.    You see that that is a wire transfer form to John
23   and Amelia Collins?
24   A.    Yes.
25   Q.    Who is the originator?
```

1    A.    Brian J. Herman.

2    Q.    From your -- are you familiar with this wire?

3    A.    I am.

4    Q.    Can you tell us how this came about?

5    A.    It was money that was wired into a bank account

6    for Mr. -- that was nominally Mr. Collins' that was used

7    as collateral for an insurance financing program.

8    Q.    Did that have anything to do with the startup of

9    the hedge fund?

10   A.    No, it did not.

11   Q.    And whose money was used to send that $100,000 to

12   your client, Mr. Collins?

13   A.    Mr. Burt's.

14         MS. BLOOM:  I'd now like to have you look at

15   Exhibit 3.02, Page 97.

16         (On screen.)

17   Q.    What is this?

18   A.    It's a bank statement for Insight Onsite Strategic

19   Management for the month of March of 2012.

20   Q.    And who controlled that account?

21   A.    Rosalind Herman.

22   Q.    Now, if you look at the previous balance for this

23   month, how much was in the account?

24   A.    $70.69.

25   Q.    And you'll see that there are nine deposits

1    totaling approximately $108,000.  And looking at Exhibit

2    103, can you tell the jury where that money came from?

3    A.   It would be, um, three wires that are -- I'm

4    sorry, 1, 2, 3, 4, it would be five wires sent in the

5    month of March, two from Priscilla Laroque, one from

6    Daniela Laroque, one from Bruce Gilmartin, and one from

7    the Paleys.

8    Q.   Okay.  And now looking at this statement, um, do

9    you know what "US Toy Construction Playthings" is?

10   A.   I do not.

11   Q.   I see there's an entry here on March 5, 2012 for

12   an ATM.  What is your understanding of what that is?

13   A.   It's an ATM withdrawal from the account.

14   Q.   And then further down there's an entry for "LTF

15   Lifetime MO Dues," do you know what that is?

16   A.   I'm sorry, I do not.

17   Q.   And further down I see an entry for "Red Rock

18   Smoke," do you know what that is?

19   A.   I believe that is a smoke shop that was also

20   located not too far from Rosalind's house.

21        MS. BLOOM:  And go to the next page.

22        (On screen.)

23   Q.   I see that there are -- there's an entry for "R &

24   D Hipster," do you know what that is?

25   A.   I have no idea.

1   Q.    What about "West Flamingo Animal Hospital"?

2   A.    I believe that's a veterinary clinic where their

3   dogs were treated.

4   Q.    And further down I see a foreign ATM, "WIT GCA Red

5   Rock Stack," do you know what that is?

6   A.    I believe it's an ATM withdrawal that took place

7   at Red Rock Casino, which was about two miles from their

8   house in Las Vegas.

9   Q.    And further down I see an entry,

10  "budsgunshop.com," do you know what that is?

11  A.    I do not.

12  Q.    Um, let's see.  I'll go down just a little

13  further.

14        (Scrolls further.)

15        MS. BLOOM:  Let's just go to the next page,

16  please.

17        (On screen.)

18  Q.    At the top -- and we'll go through just a few more

19  of these.

20  There's an entry for "American Shooters LAS," do you

21  know what that is?

22  A.    I do not.

23  Q.    And then there's an entry for "Nevada Power Pro

24  and PC payment," do you know what that is?

25  A.    Yes.

Q.     What is it?

A.     That's the electric bill for the house at 10916

Summer Grill Ave in Las Vegas.

Q.     Okay.  And as you look down the rest of this

statement, are these charges related to the startup of

the hedge fund?

A.     They are not.

Q.     Okay.

MS. BLOOM:  And if we can now go to the next page

and then the page after that.

(Next page on screen.)

Q.     Do you see that there is --

MS. BLOOM:  If you can blow up the bottom half of

that page.

(Blows up.)

Q.     Do you see a list of withdrawals and checks paid

on the account?

A.     I do.

MS. BLOOM:  Can we go down a little further, to

the next page.

(On screen.)

Q.     Looking at these three incoming wire transfer

statements, do you recognize those?

A.     Yes.

Q.     What are they?

1    A.    They are three wires, one directly from Daniel

2    Laroque and the other two are from "Penson," which was

3    the trustee of the IRA accounts for the clients at that

4    time.

5    Q.    Okay.

6          MS. BLOOM:  And now if we could scroll down

7    through this document to the checks that are further

8    below.  And keeping them.  And starting there.  Let's

9    start with the one that says "State Farm."

10         (On screen.)

11   Q.    Um, do you recognize the handwriting on that

12   check?

13   A.    I do.

14   Q.    Whose handwriting is it?

15   A.    Rosalind Herman's.

16   Q.    Do you recognize the signature?

17   A.    I do.

18   Q.    Whose is it?

19   A.    Rosalind Herman's.

20   Q.    And do you know why there's a payment to State

21   Farm?

22   A.    They were the insurance carrier on the vehicles in

23   Las Vegas and on the house, I believe.

24   Q.    And the next check is to "US Bank."  Do you

25   recognize the handwriting on that check?

1    A.    Yes.

2    Q.    Whose is it?

3    A.    The handwriting appears to be Rosalind's.

4    Q.    And what about the signature?

5    A.    I believe that's Brian Herman's.

6    Q.    And going down to the next check, do you see a

7    check to "Denner Pelegrino"?

8    A.    I do.

9    Q.    And whose handwriting is "Denner Pelegrino" and

10   the -- well, everything but the signature?

11   A.    I believe those are all Rosalind's.

12   Q.    Who is "Denner Pelegrino"?

13   A.    They are a criminal defense firm.

14   Q.    And what's the date on the check?

15   A.    March 12th of 2012.

16   Q.    And why was there payment to a criminal defense

17   firm at that time?

18   A.    Um, Brian and Brad Herman had been called in front

19   of a grand jury that was investigating this matter and

20   Rosalind wanted to make sure that they did not appear

21   there without representation, so Mr. Denner was hired to

22   represent both of them.

23   Q.    And did this have anything to do with the startup

24   of a hedge fund?

25   A.    It did not.

1    Q.    And going down to the next check.

2    Do you see a check to "Morrison Mahoney" for $5,000?

3    A.    Yes.

4    Q.    And why was there a payment to Morrison Mahoney?

5    A.    They had been hired to consider an appeal on the

6    civil matters.

7    Q.    And did that have anything to do with the startup

8    of a hedge fund?

9    A.    It did not.

10   Q.    And if you look down through the additional checks

11   here, who made out these checks, can you tell the

12   handwriting?

13   A.    Um, they all appear to be Rosalind's handwriting.

14   Q.    And going down a little further, do you see an

15   entry for "Somerland North"?

16   A.    Yes.

17   Q.    And do you know what "Somerland North" is?

18   A.    I believe it's the homeowner's association or one

19   of the entities that they had to pay fees that were

20   incumbent with the ownership of the property located at

21   10916 Summer Grill Avenue in Las Vegas.

22   Q.    Okay.  Are you familiar with a Mr. Jeffrey Lerner?

23   A.    I am.

24   Q.    Who is Mr. Jeffrey Lerner?

25   A.    Mr. Lerner is an attorney, and I don't remember

1    where he's from, who was hired to review the civil cases

2    to determine whether or not there were additional

3    options that were available.

4    Q.    Did he have anything to do with the startup of the

5    hedge fund?

6    A.    He did not.

7          MS. BLOOM:  At this time I'd like to show you what

8    has been marked for identification as Exhibit MF, and

9    I'll give you a hardcopy of it.  (Hands to witness.)

10   It's easier to flip through.

11         THE WITNESS:  Thank you.

12   Q.    Do you recognize the stack of documents that are

13   Exhibit MF?

14   A.    (Looks.)  I do.

15   Q.    What are they?

16   A.    Um, they are a series of communications with Cyber

17   Bingo and Full Tilt Poker.

18   Q.    With whom?

19   A.    Cyber Bingo.

20   Q.    And who is on the other side of the communication?

21   A.    Primarily Rosalind, but there are communications

22   between Rosalind and myself included as well.

23         MS. BLOOM:  I now offer this as Exhibit 441.

24         MR. O'HARA:  No objection.

25         THE COURT:  MF is admitted as Exhibit 441.

1          (Exhibit 441, marked.)

2     Q.    Okay, let's take a look at a few of these.

3     If you could look at the first page, it's dated August

4     8th, 2006.

5     Who is that from?

6     A.    Um, it's from an individual at Cyber Bingo, um, to

7     Rosalind at her rherman14@cox.net.

8     Q.    And what is Cyber Bingo?

9     A.    Cyber Bingo is an online gambling site for bingo

10    and electronic slots, I believe.

11    Q.    And can you explain what this e-mail is about?

12    A.    It's a purchase of almost $250 that was made, um,

13    by Ms. Herman at Cyber Bingo.

14          MS. BLOOM:   Okay.   If we could go to the next

15    document.

16          (On screen.)

17    Q.    What is the date of this document?

18    A.    March 26th of 2008.

19    Q.    And, um, who is it from?

20    A.    Mrs. Herman.

21    Q.    And it's from the "Insight Onsite Comcast."   Can

22    you tell who wrote the e-mail?   Oh, yeah, I see.   Okay.

23    And to whom did the e-mail go to?

24    A.    It goes to, um -- it apparently goes to a person

25    called "Belle" at Cyber Bingo.

1   Q.      Okay.  And, um --

2   A.      May I correct an earlier answer?

3   Q.      Uh-huh.

4   A.      I believe I wrote this e-mail.

5   Q.      And why do you believe that?

6   A.      Because it's from InsightOnsite@Comcast.net and

7   the writing style is mine, so my guess is I did this for

8   Rosalind at her request.

9   Q.      In this e-mail it says "Thank you for your

10  response.  I don't know understand why my account was

11  considered inactive, I normally played it almost daily."

12  Do you know whether Ms. Herman played Cyber Bingo almost

13  daily?

14  A.      Yes.

15  Q.      How do you know that?

16  A.      She would tell me, or if I was -- if I had been

17  out there or when she had been in Massachusetts, I would

18  see her do it.

19  Q.      And then did you -- did anyone living at the Las

20  Vegas house gamble, to your knowledge?

21  A.      Yes.

22  Q.      Who gambled?

23  A.      To some extent all of them.

24  Q.      Did you gamble?

25  A.      Yes.

1   Q.    And can you describe the practices with respect to

2   gambling?

3   A.    I was primarily a poker player.  Rosalind would

4   primarily play slots.  Brad and Brian would play

5   whatever they were interested in playing, including

6   table games.  And Keith Herman was primarily a slot

7   player.

8   Q.    Did any of the money provided by your clients and

9   investors listed on Exhibit 103, to your knowledge, go

10  to gambling?

11  A.    Yes.

12  Q.    Do you know how much?

13  A.    I do not.

14        MS. BLOOM:  If we could turn to, further down in

15  this e-mail on March 17th, 2008 -- actually I'm just

16  going to keep going.

17        (On screen.)

18        MS. BLOOM:  If we could bring up what's marked for

19  identification as FR, but is also within this exhibit.

20        Could you bring up that page, Ms. Rojas?  Oh, I'm

21  sorry.  FX.

22        (On screen.)

23  A.    I'm sorry.  Are we still on this document?

24  Q.    We are.  If you can find the e-mail dated

25  September 9th, 2008 to "Poker Stars"?

1    A.    (Looks.)  What date again, please?

2    Q.    September 9, 2008.

3    A.    Yes.

4          MS. BLOOM:  And if we can scroll down in that

5    e-mail.

6          (Scrolls.)

7    Q.    Do you see an e-mail dated September 9th, 2008

8    from rherman14@cox.net?

9    A.    Yes.

10   Q.    And who wrote that e-mail?

11   A.    Rosalind.

12   Q.    To whom?

13   A.    "Support@pokerstars.com."

14   Q.    Can you read the text of the e-mail?

15   A.    "I am legally blind and I did not realize in was

16   in a 80,000 sit and go because I could not see.  I only

17   play in the $300s.  Would you help me?  When I realized

18   it, I left.  What if anything can I do????"

19   Q.    Is Rosaline Herman legally blind?

20   A.    She is not.

21         MS. BLOOM:  And now I'd like to bring up FR on the

22   screen, Ms. Rojas.

23         (On screen.)

24         MS. BLOOM:  And if you could turn to the e-mail in

25   there dated March 26th, 2008 at 4:39 p.m.

```
 1          (On screen.)
 2   A.     I'm sorry, one more time with the date, please?
 3   Q.     March 26th, 2008.
 4   A.     March 26th, 2008?
 5   Q.     Yes.  I think it's the one on the top.
 6   A.     Yes.
 7   Q.     Okay.  And going down in that e-mail, if you find
 8   the e-mail, um, that says "To Belle@CyberBingo.com,
 9   Wednesday, March 26th, 2008 at 4:03 p.m."  I have it up
10   on the screen now.
11   A.     Yes, I see it.
12   Q.     Do you see that it says, "Thank you for speaking
13   with my husband today, your assistance in solving this
14   problem would be greatly appreciated.  You may reply to
15   my home e-mail of rherman14@cox.net or this e-mail"?
16   A.     Yes.
17   Q.     With whom had the person at Cyber Bingo spoken
18   that day?
19   A.     With me.
20   Q.     Did you and Rosalind Herman ever hold yourself out
21   as husband and wife?
22   A.     Yes.
23          (Pause.)
24          MS. BLOOM:  Your Honor, would this be a good time
25   for a short break?
```

1          THE COURT:  I see no reason not.  We'll take

2     another short break, 10 minutes, and we're taking

3     shorter breaks because to accommodate one of you that

4     has important business that we knew about before we

5     started the trial.

6          So we're going to stop at 12:30 today.  We're

7     really right on track in the case, so we're not losing

8     any time, but the break is only for 10 minutes and that

9     includes the people in the courtroom.  Be ready to go in

10    10 minutes time, 25 after 11:00.

11         Now, keep your minds suspended.  Do not discuss

12    the case either among yourselves nor with anyone else.

13    You may recess for 10 minutes.

14              (Jury leaves, 11:15 a.m.)

15              (Resumed, 11:30 a.m.)

16         MS. BLOOM:  Put 103 up, please, again.

17         Oh, I'm sorry, Ms. Gaudet, could we clear the

18    screen?

19              (Clears screens.)

20    Q.   There are just a couple of names on this chart

21    that I'm not sure we have talked about.

22    At 12-19-2011, there is an entry for "Town & Country

23    Insight Onsite, Bottom Line Specialists," who is that?

24    A.   It's the accounting firm that did the corporate

25    returns, Mrs. Herman's personal returns and my personal

1    return.

2    Q.    And who ran that company?

3    A.    Daniel Goodness.

4    Q.    And what was Mr. Goodness told about what his

5    $4,000 would go to?

6    A.    He was told that he would receive a unit that was

7    nominally $100,000 for all of his efforts in supporting

8    us, um, but that we had to have at least a token

9    contribution from him.

10    Q.    Okay.  And then going down to the end of the

11    chart.

12    First, um, there are some entries here for Ruth

13    Schneider, $10,000 and $20,000, in the fall of 2012.

14    Who is Ruth Schneider?

15    A.    Ruth Schneider is a personal friend, a Chelsea

16    resident, I've known her almost my whole life, and she

17    was one of my oldest clients back from when I was a

18    representative at First Investors.

19    Q.    Did she ever authorize any investment in

20    connection with the hedge fund?

21    A.    She did not.

22    Q.    How did that money get transferred?

23    A.    I took it out of the account.

24    Q.    And for the entries of the rest of the fall of

25    2012 and 2013, did any of those people authorize those

1   payments?

2   A.    I believe the answer is "No."

3   Q.    And for all of the payments from the investors and

4   clients on this chart, were any of the clients told the

5   truth about how their money would be used?

6   A.    No.

7   Q.    Would any have agreed to give you the money if you

8   told them the truth, do you believe?

9   A.    No.

10  Q.    And, um, was the information about these

11  investments and what was happening to the clients, was

12  that information you shared with Ms. Herman?

13  A.    Yes.

14  Q.    And did you also share with her what you were

15  telling the clients about the investments and not

16  telling them?

17  A.    Yes.

18        MS. BLOOM:  No further questions.

19        THE COURT:  Mr. O'Hara?

20        MR. O'HARA:  Sidebar.

21        THE COURT:  And I take it you want to take that

22  down?

23

24        AT THE SIDEBAR

25        MR. O'HARA:  Just two issues.  Counsel for the

1    government brought to my attention during the break that

2    Mr. Caplitz suffers from MS and, um, apparently there

3    was some --

4         MS. BLOOM:  I think he's okay to go forward with

5    cross, and if there's a problem, he's supposed to let us

6    know.

7         MR. O'HARA:  Okay, it's just that I'd be willing

8    to delay my cross until tomorrow rather than start it

9    and then have to delay because he has a problem.

10         THE COURT:  Um, well, I don't mean to press, but I

11   just assume start and if you think he's not -- or the

12   government thinks he's getting into difficulty, then

13   we'll stop and I'll make a neutral statement about his

14   not feeling right.

15         MR. O'HARA:  Okay.

16         The other thing was that I was provided with a

17   letter about an hour ago from my client that she, um,

18   supposedly mailed to Mr. Caplitz, back in November of

19   2012, regarding the $34,000 check that was, um, to be

20   given to Mr. Burt.  Mr. Caplitz has testified that the

21   check had been overnighted.  Ms. Herman apparently sent

22   the check with her son, Brad, with a cover letter

23   telling him not to steal the money and to --

24         THE COURT:  Telling whom?

25         MR. O'HARA:  Mr. Caplitz.

1          THE COURT:  Not to steal the money?

2          MR. O'HARA:  Yes, and to provide the money, as

3     they had discussed, to, um, Mr. Burt.  And I'd like to

4     use that if I can.

5          And I apologize for the late disclosure, I didn't

6     have any knowledge of it until she brought it to my

7     attention.

8          MS. BLOOM:  I'm going to object.

9          THE COURT:  Well, wait a minute.  It isn't an

10    exhibit, it's a communication between a client and their

11    lawyer and he wants to use it affirmatively to

12    cross-examine this witness.  He may, um --

13         This letter is supposed to have been sent to him?

14         MR. O'HARA:  My understanding was that it was

15    given to her son, along with her check, with

16    instructions to provide the check to Mr. Caplitz with

17    the letter.

18         THE COURT:  With the letter, and I see it's

19    addressed to "Gregg."

20         MR. O'HARA:  Yes.

21         THE COURT:  All right.

22         Now recognizing the late disclosure, I'm hardly

23    going to be in a position to admit it, but the document,

24    as a document, may be used to refresh his recollection,

25    it may be used to, um, cross-examine him.

1    And you now have a copy of it, correct?

2    MS. BLOOM:  Yes.

3    THE COURT:  He may use the document.

4    MR. O'HARA:  Thank you.

5

6    (In open court.)

7

8  CROSS-EXAMINATION BY MR. O'HARA:

9  Q.    Good morning, Mr. Caplitz.

10  A.    Good morning, sir.

11  Q.    Now, you have testified that the hedge fund that

12  you were interested in starting was a hedge fund that

13  would have been minority owned, right?

14  A.    Yes, sir.

15  Q.    And I believe your testimony was that up until

16  2005, 2006, you were bringing in significant revenue by

17  way of commissions you were receiving for insurance

18  policies, is that a fair statement?

19  A.    It is a fair statement.

20  Q.    Okay.  And you had, I believe, basically two

21  streams of revenue that you could raise, the insurance

22  commissions and also you had your investment clients,

23  right?

24  A.    Yes, sir.

25  Q.    And with the insurance commissions those checks

1    were paid to you using your Social Security number,

2    right?

3    A.     Yes, sir.

4    Q.     And as far as the fees that you were charging your

5    clients for managing their finances, how were they paid

6    to you?

7    A.     They were not paid to me, they were paid directly

8    to the entity.

9    Q.     To the?

10   A.     To the RIA.

11   Q.     To the RIA, which was?

12   A.     What time are you talking about, sir?

13   Q.     Let's say 2005.

14   A.     It would have been Financial Resources Network.

15   Q.     And before Financial Resources Network was

16   established, they were paid to New England Financial

17   Independence Group?

18   A.     Yes.

19   Q.     Okay.  And your statement was that Ms. Herman

20   established FRNI in 1994, right?

21   A.     Um, I'm uncertain as to the exact date.  I believe

22   it was 1995.

23   Q.     Okay, but the -- up until that point in time you

24   were doing business through New England Financial

25   Independence Group, right?

1    A.    Yes.

2    Q.    And that was your company, right?

3    A.    I had started it.

4    Q.    You had started it.  And I know that you had

5    minority owners with you, but it was your company,

6    right?

7    A.    Yes, until I transferred the stock to Mrs. Herman.

8    Q.    And the revenue that you were receiving from the

9    insurance companies when you were the primary

10   shareholder, the majority shareholder of New England

11   Financial Independence Group, you were using the

12   flow-through taxation that you described?

13   A.    Yes.

14   Q.    So you were the primary shareholder, right?

15   A.    Yes.

16   Q.    The commission checks were coming to you, using

17   your Social Security number, right?

18   A.    Yes.

19   Q.    And then you were depositing those commission

20   checks into your company, you would assign them to your

21   company, right?

22   A.    I believe that's correct.

23   Q.    And then you were using the flow-through taxation

24   so that the monies that were being paid to you would

25   show up as income on your, um, personal financial income

1   tax return, right?

2   A.   Not quite correct.

3   Q.   Well, correct me then.

4   A.   Um, New England Financial was a C-Corporation.

5   Q.   Oh, okay.  So you didn't have the flow-through

6   taxation?

7   A.   That is correct.

8   Q.   So you had to expense it out?

9   A.   Correct.

10  Q.   Okay.  But when Mrs. Herman started FRNI, that was

11  an S-Corporation?

12  A.   No, FRNI was also a C-Corp.

13  Q.   That was also a C-Corporation.  Okay.  And you

14  were assigning the income that you were receiving from

15  your insurance commissions to that entity?

16  A.   For a period of time before the other entities

17  were created, yes.

18  Q.   Okay.  Now, fair to say that the, um, most of the

19  income or the revenue that you were generating through

20  your profession was through the -- was more through the

21  insurance commissions than through the investment

22  counseling, right?

23  A.   Yes, over time it became much more related to the

24  insurance side.

25  Q.   Because I believe you were saying that you were

1    making up to a million plus a year, right, you were

2    bringing in that amount?

3    A.    Correct.

4    Q.    And that was primarily through commissions you

5    were receiving from insurance companies?

6    A.    Correct.

7    Q.    And as a result of some legal problems back in

8    2002, 2003 and related lawsuits, your ability to

9    generate those large amounts of insurance commission

10   checks was severely restricted, right?

11   A.    I don't believe it started as early as 2002, but

12   the gist of the question is correct.

13   Q.    Okay, let me rephrase the question.

14   Your legal problems began in 2002 but the restrictions

15   on how much you could make from insurance commissions

16   kicked in later, like 2005, 2006, is that accurate or

17   was it later?

18   A.    I believe it was later, sir.

19   Q.    So 2007, 2008?

20   A.    I believe the legal suits began in 2004 and the

21   legal difficulties, and the judgment was in 2006.

22   Q.    Okay.  So after 2006 your ability to generate the

23   large insurance commission checks was restricted because

24   one of the companies in particular that you were working

25   with were no longer allowing you to be their agent,

1    right?

2    A.    Yes, sir.

3    Q.    So you were in a situation where you knew that

4    there were large legal expenses regarding the lawsuits,

5    right?

6    A.    Only if they were pursued.

7    Q.    Well, you were sued collectively with Ms. Herman

8    and some of Ms. Herman's companies, right?

9    A.    Yes.

10   Q.    You needed lawyers to defend you in those

11   lawsuits?

12   A.    By this time the suits had already -- there were

13   judgments in place.

14   Q.    But my question to you is that, when you were

15   sued, you said in 2004 --

16   A.    Yes.

17   Q.    -- you needed to hire lawyers to defend you in

18   those lawsuits?

19   A.    Yes.

20   Q.    And there were suits that were initiated on your

21   behalf and on Miss Herman's behalf and on behalf of Miss

22   Herman's companies against other parties, right?

23   A.    Yes, sir.

24   Q.    And most of those suits, they were interrelated,

25   weren't they, without going into the details?

1    A.    Yes.

2    Q.    And you had to pay lawyers to bring those lawsuits

3    and you had to pay lawyers to defend the lawsuits where

4    you were a defendant, right?

5    A.    (Pause.)  Yes.

6    Q.    And the expenses for the lawyers you knew, from

7    speaking with Miss Herman, were significant?

8    A.    Yes.

9    Q.    And we've come to an agreement that all of those

10   legal expenses with all of those lawsuits were

11   completely unrelated to anything dealing with the hedge

12   fund, right?

13   A.    Yes.

14   Q.    But at that time that your ability to generate

15   revenue was being restricted is also at the time where

16   the legal expenses had been put into place and were

17   ongoing, right?

18   A.    Yes.

19   Q.    And those expenses continued, didn't they?

20   A.    Yes.

21   Q.    Because the judgments, if they were against you,

22   were appealed, right?

23   A.    Yes.

24   Q.    And there were other legal problems related to

25   your profession that flowed out of those lawsuits,

1    right?

2    A.    Yes.

3    Q.    And all those legal expenses were paid for, to

4    your knowledge, through bank accounts and entities

5    formed and controlled by Mrs. Herman?

6    A.    To the best of my recollection, yes.

7    Q.    She was paying the legal expenses to defend

8    herself and her companies and also to defend you, right?

9    A.    Yes.

10   Q.    And she was paying to have lawsuits brought also

11   on her behalf and your behalf?

12   A.    Yes, sir.

13   Q.    And you weren't paying those expenses, were you?

14   A.    With the exception of one check, I believe the

15   answer to that is "No."

16   Q.    Okay.  And as far as you know the expenses in, um,

17   those legal issues were also north of a million dollars,

18   weren't they?

19   A.    They were.

20   Q.    So there was a need for revenue to keep being

21   generated to maintain the businesses and to pay debts,

22   right?

23   A.    Yes.

24   Q.    And this also comes in 2007, 2008 when we enter

25   into the recession?

1    A.    Correct.

2    Q.    So as a result of all of those factors your

3    ability to generate the revenue for the companies that

4    you were working with was restricted and you had to come

5    up with something new?

6    A.    Correct.

7    Q.    So you began doing your own research and you began

8    consulting with people in the financial industry to find

9    a new vehicle that could be use to generate revenue?

10   A.    Yes.

11   Q.    And you came up with the idea of forming a

12   minority-run hedge fund?

13   A.    Yes.

14   Q.    And that was based upon your research and your

15   consultations?

16   A.    Not solely mine.

17   Q.    Well, you spoke with other people, right?

18   A.    I spoke with other people, I also spoke with

19   Rosalind.

20   Q.    Okay.  But at that point in time she wasn't living

21   in Massachusetts, was she?

22   A.    She was not.

23   Q.    So any communication you had with her had to be by

24   telephone or by e-mail or by text message?

25   A.    Yes.

1   Q.    And there were times when she would come back and
2   you could meet with her face to face?
3   A.    Limited, but, yes.
4   Q.    Because you testified at the beginning of your
5   testimony yesterday that when you proposed this idea of
6   the hedge fund to her, she was reluctant?
7   A.    Yes.
8   Q.    And you had to talk her into it?
9   A.    Um, I don't agree with the wording.
10   Q.    Well, she was reluctant and then you said, I
11   believe after you explained it to her or pitched it to
12   her, that she then became enthusiastic?
13   A.    Right, but that didn't mean I convinced her.  She
14   made up her own mind.
15   Q.    I'm not saying that, sir.  I didn't ask that
16   question.
17   So you came up with the idea of the minority-owned hedge
18   fund, right?
19   A.    Yes.
20   Q.    And you have no background in, um, institutional
21   banking, right?
22   A.    I do not.
23   Q.    You never worked for a large brokerage firm like
24   Merrill Lynch?
25   A.    Worked for?  No.

1    Q.    No.   So correct me if I'm wrong but in terms of

2    your professional experience as a financial advisor it

3    appears that most of the people you were advising were

4    individuals and not institutions, right?

5    A.    Correct.

6    Q.    And these are people that you had met through

7    family connections, some of them, right?

8    A.    My family connections?

9    Q.    Yes.

10   A.    No.

11   Q.    Well, they were people that were referred to you

12   word of mouth, right?

13   A.    Yes.

14   Q.    And some of the people you made connections with I

15   believe you referred to a woman whom you knew since you

16   were in the 8th grade, right?

17   A.    Yes.

18   Q.    And who was that?

19   A.    Ruth Schneider.

20   Q.    Right.   And Miss Schneider, I believe, also knew

21   your father, didn't she?

22   A.    She did.

23   Q.    So you developed a core of investors through your

24   own hard work over a period of years?

25   A.    Not solely my hard work, but, yes.

1    Q.    Okay.  I understand that when you began working as

2    a financial advisor you were in business with other

3    people but once you formed New England Financial

4    Independence Group you were pretty much on your own,

5    weren't you?

6    A.    No, I wasn't the only one that brought clients

7    into the business, Mrs. Herman brought clients into the

8    business as well.

9    Q.    When you started New England Financial Group,

10   before you met Ms. Herman, you were on your own, right?

11   A.    Yes.

12   Q.    And many of the people whom you brought with you

13   when you began working with Mrs. Herman after she formed

14   her own corporation were people who had been with you

15   before you met Mrs. Herman, is that a fair statement?

16   A.    That is a fair statement.

17   Q.    She didn't bring any clients to you on her own who

18   needed financial advice, did she?

19   A.    As of what date, sir?

20   Q.    As of 1995.

21   A.    No, sir.

22   Q.    And as a matter of fact, when she moved out to Las

23   Vegas you knew that she was conducting seminars but in

24   terms of her ability to generate people who were willing

25   to invest with you, um, compared to your number of

1    clients, she came up with very little, right?

2    A.    A smaller number, yes.

3    Q.    So when you decided to go forward with this hedge

4    fund proposition, it was something that was too big for

5    you to handle on your own, wasn't it?

6    A.    Yes.

7    Q.    You needed to find help on how this could be set

8    up, right?

9    A.    Yes.

10   Q.    And after consulting with people in the industry,

11   um, you eventually agreed that a law firm by the name

12   of, I think it was Sadis & Goldberg, would perform the

13   initial documentation, correct?

14   A.    Yes.

15   Q.    And in order to retain the services of Sadis &

16   Goldberg, they had to be paid between 35 and $40,000?

17   A.    Yes.

18   Q.    And that money was paid by Mrs. Herman, wasn't it?

19   A.    It was.

20   Q.    And once again at this point in time your belief

21   was that you could start this hedge fund up and it would

22   be attractive to investors because it would be minority

23   run?

24   A.    That was our joint decision, yes.

25   Q.    "Minority run" meaning run by a woman?

A.    Correct.

Q.    And you had found an article -- I noticed that on
a lot of the brochures and solicitation information you
provided to your clients you testified that you showed
them projections about how much money they could make if
things worked out the way that you wanted it to, right?

A.    Yes, sir.

Q.    And also at the bottom of each one of those
communications you make reference to an article in the
New York Times?

A.    Yes.

Q.    And the article in the New York Times was one that
you had found?

A.    (Pause.)  I'm not sure who found it, I believe it
may have been sent to us.

Q.    Okay, but she didn't find it, Ms. Herman, did she?

A.    It's possible she found it, she was on the
internet researching things.

Q.    But your answer is you're not sure whether she
found it or not?

A.    That is my answer, sir.

Q.    But you used that newspaper article and you
attached that newspaper article to solicitations that
you were making to potential investment clients to show
them what the value was of having a minority-run hedge

1  fund as opposed to a hedge fund run by a white person?

2  A.     Absolutely.

3  Q.     And how did you plan on having this hedge fund

4  work, where was the investment money coming from based

5  upon the research you did and the consultations you

6  made?

7  A.     Institutional money.

8  Q.     And what do you mean by "institutional lenders"?

9  A.     Um, "investors," not "lenders," sir.

10  Q.     Oh, you said "institutional" --

11  A.     "Investors."

12  Q.     "Investors."  What do you mean by "institutional

13  investors"?

14  A.     Primarily large qualified plans.

15  Q.     And can you define for us what a "large qualified

16  plan" is?

17  A.     We are normally pensions of profit and nonprofit

18  corporations and a good example would be say the MBTA

19  employee pension, which has north of $3 billion in

20  assets.

21  Q.     So was your plan that by having a minority-managed

22  hedge fund, that this would become attractive to

23  institutional investors who had a large amount of money?

24  A.     Yes.

25  Q.     And did you have any connections or contact to --

1    excuse me --

2           (Cell phone rang in audience.)

3    Q.    You didn't have any inside information or

4    connection with large institutional investors, did you?

5    A.    Could you repeat the question, please?

6    Q.    Did you have any experience or connections with

7    large institutional investors?

8    A.    Yes.

9    Q.    Who were they?

10   A.    We had met, um, with an individual who served on

11   or ran a large minority law firm in Boston and was a --

12   and had a seat on the MBTA's pension board at the time.

13   Q.    Who was that?

14   A.    (Pause.)  I'm sorry, I can't recall his name.

15   Q.    Okay.  And where did you meet him?

16   A.    I was referred to him.

17   Q.    By?

18   A.    We actually had gone in and talked to him about

19   civil litigation.

20   Q.    Civil litigation involving lawsuits from the past?

21   A.    Correct.

22   Q.    I couldn't hear you?  I'm sorry.

23   A.    Correct.

24   Q.    Okay.  And, um, you also, um, consulted with an

25   attorney by the name of Richard Gotlieb, right?

1    A.    Richard Gotleib and also other individuals.

2    Q.    And Mr. Gotleib was referred to you by a person by

3    the name of Jesus Cartilucci or Cartilachi, do I have

4    that right?

5    A.    Paraliticci.

6    Q.    Okay.  And you knew that Jesus, and I'll just

7    refer to him by his first name, was from Venezuela?

8    A.    Yes.

9    Q.    And you believed that people from Venezuela, who

10   were coming up to get away from the political turmoil

11   from what you knew or you were told, had the ability to

12   make large investments of money?

13   A.    That was one of the sources that we discussed.

14   Q.    But that never panned out, did it?

15   A.    No.

16   Q.    And it was through this Jesus person that you were

17   introduced to Mr. Gotleib?

18   A.    I don't believe that's correct, but I'm not

19   certain.

20   Q.    Okay.  But with Mr. Gotlieb you, um, eventually

21   came into contact with a lawyer in Rhode Island, right?

22   A.    (Pause.) I came into contact with a lawyer in -- I

23   dealt with many lawyers, sir.  I'm certainly not sure I

24   can remember which one.

25   Q.    But Mr. Gotlieb and you wired $83,500 to a person

1   whose last name was Long, L-O-N-G?

2   A.    Yes, but he's not an attorney, and he's not in

3   Rhode Island.

4   Q.    All right.  But tell what happened with that

5   $83,500, first of all, where did it come from?

6   A.    It was wired out from one of the corporate

7   accounts.

8   Q.    By Mrs. Herman?

9   A.    Yes.

10  Q.    And that money was wired out to help start up the

11  hedge fund, right?

12  A.    Yes.

13  Q.    And when you paid Sadis & Goldberg, or when she

14  did, between 35 and $40,000, is it fair to say that

15  Sadis & Goldberg did provide you with a template for

16  putting the structure together for a hedge fund?

17  A.    Yes.

18  Q.    And the additional $83,500 that was paid to

19  Mr. Long, what was that money for?

20  A.    Um, after consultation with Mrs. Herman and a

21  number of phone conversations with Mr. Long, um,

22  Mr. Long represented -- and this is -- I'm not certain

23  of the exact date, but it's certainly post 2008, I

24  believe, and we were looking for sources of the seed

25  capital.

Q.    Okay, because you were having trouble getting the seed capital money, right?

A.    Correct.

Q.    And in fact you were trying to, um -- you were trying to find investors who would invest with you and you were having trouble raising the minimum amount of capital that you needed in order to get the hedge fund off the ground?

A.    Yes.

Q.    So you found out about a procedure that you could use to raise a large amount of money that was referred to as a "standby letter of credit"?

A.    Yes.

Q.    And when you were involved with Mr. Long and your purposes of meeting with Mr. Long with Mr. Gotleib was to get this standby letter of credit?

A.    Um, get the funds that would have been created by the standby letter of credit, yes.

Q.    And what do you understand the standby letter of credit to do?

A.    A standby letter of credit, as it was explained to me, was a means by which, um, European banks, and it was specifically European banks, would issue documents which were guarantees of payment of funds and that these standby letter of credits could then be monetized,

1   meaning turned into cash, for some significant

2   percentage of them and that those monies were available

3   to -- would have gone into Insight Onsite's account and

4   then Insight Onsite would have then made the initial

5   startup capital investment.

6   Q.    And what was the amount of money you felt you'd be

7   able to get through a standby letter of credit?

8   A.    It varied over time but it was certainly expected

9   to have been the $25 million at a minimum and then over

10  time it grew to 75 or 80 and then at one time they were

11  talking about 150 million, um, none of which ever

12  happened.

13  Q.    None of it ever happened.

14  A.    No.

15  Q.    And you had trouble understanding exactly how it

16  worked yourself, didn't you?

17  A.    Yes.

18  Q.    And in fact when you spoke with federal agents

19  about your involvement in this case, back in 2013, you

20  described for the agents that the SBLC deal, the StandBy

21  Letter of Credit, sounded like magic to you?

22  A.    I don't remember those exact words.

23  Q.    Okay, that it sounded like magic to you even

24  though others had said it had worked for them, you don't

25  remember saying that to the agent?

1    A.    I'm not saying I didn't say it, I just don't

2    remember specifically those words.

3    Q.    That's a fair answer.

4         THE COURT:  Well, you can't evaluate his answers,

5    so strike that out.

6         MR. O'HARA:  I'm sorry.

7    Q.    And it was difficult for you to raise the money in

8    the United States through a standby letter of credit

9    because you didn't have enough of a downpayment to make

10   that work?

11   A.    It was basically impossible to do in the United

12   States because bank letters of credit in the states,

13   which I knew this personally and Mrs. Herman knew this

14   personally, you had to post 100 percent collateral.  So

15   if you wanted a million dollar standby letter of credit,

16   you had to post a million dollars of liquid collateral.

17   Q.    So that was told to you, right, you found that

18   out?

19   A.    I can't remember whether I found that out or

20   Rosalind found that out or both of us found it out.

21   Q.    Or you told it to her?

22   A.    Certainly.  Certainly we discussed it.

23   Q.    Well, that's how she knew it because you told her?

24   A.    Oh, I don't know whether I told her or she told

25   me, but we certainly discussed it.

1    Q.    Okay.  Now, you talked briefly yesterday about

2    your educational background.

3    You're an honor's graduate of Boston College, aren't

4    you?

5    A.    Yes.

6    Q.    And you had a dual major, didn't you?

7    A.    Yes.

8    Q.    In economics and finance, right?

9    A.    Yes, sir.

10   Q.    And after you, um, graduated from Boston College,

11   you followed up and had post graduate courses and

12   eventually got a master's of science in financial

13   planning, right?

14   A.    Yes, sir.

15   Q.    And you also became a Certified Financial Planner?

16   A.    Yes, sir.

17   Q.    And you also hold licenses through the, um, or you

18   did hold licenses through the Securities & Exchange

19   Commission, right?

20   A.    Yes, sir.

21   Q.    And I believe you held 1, 2, 3, 4, 5, 6, 7

22   licenses, is that a fair representation, through the

23   Securities & Exchange Commission?

24   A.    At one time it was probably more.

25   Q.    Okay.  But I notice that in your debriefings with

1    law enforcement you mention that you had a Series 6

2    license through the SEC, or "FINRA" as it's known now,

3    right, "FINRA"?

4    A.    Yes, I had a Series 6.

5    Q.    And a Series 6 license, in order to get that, you

6    had to take a 135-minute exam, didn't you?

7    A.    I have no idea how long the exam was, sir.

8    Q.    You had to pay for the exam too, it wasn't free?

9    A.    Yes.

10   Q.    And according to the FINRA website, in order to

11   get a Series 7 license, you had to take a three-hour

12   exam, which cost $250?

13   A.    Yes.

14   Q.    And you did that?

15   A.    Yes.

16   Q.    And in order to get a Series 22 license, which you

17   also had, according to the website, you took an exam

18   that that was 2 1/2 hours long and cost you $100?

19   A.    Again the cost -- if you say so.  I have no reason

20   to disbelieve you.

21   Q.    And to get a Series 24 license, a General

22   Securities Principal examination, that's another 2 1/2

23   hour exam that you took and passed, right?

24   A.    Yes.

25   Q.    And a Series 26, another 2 1/2 hour exam that you

1    took and passed, right?

2    A.    Yes.

3    Q.    And a Series 65, the Uniform Investment Advisor

4    Law examination, it's three hours and you took that and

5    passed it, right?

6    A.    Yes.

7    Q.    And the Uniform Combined State Law examination,

8    another 2 1/2 hour exam that you took and passed, right?

9    A.    Yes.

10   Q.    And all of those exams are administered

11   independent of each other, you don't take them all at

12   once, right?

13   A.    No, I took many of them back in the '80s.

14   Q.    But the Series 7, which is the General Securities

15   Representative examination, that was one of the more

16   important ones that you had, right?

17   A.    They are all important.

18   Q.    Well, through your experience and technical

19   qualifications, you're allowed to make trades on major

20   stock exchanges, right?

21   A.    I was, yes.

22   Q.    Mrs. Herman had none of those, did she?

23   A.    That's correct.

24   Q.    As far as you know she never even went to college?

25   A.    That's not correct.

1    Q.    You don't know whether she went to college or not,

2    do you?

3    A.    I know she told me she went to college.

4    Q.    She told you so.  But she told you a lot the

5    things, didn't she?

6    A.    I'm not sure I understand the question.

7    Q.    Well, when you met her you said that you pursued

8    her, you went back and saw her many times before she

9    went out with you.

10   She didn't tell you she was married, did she?

11   A.    No, she told me she was divorced.

12   Q.    She told you she was divorced.  And that wasn't

13   true, was it?

14   A.    It was not.

15   Q.    And whether or not she went to college, she never

16   showed you a diploma?

17   A.    I don't recall if I ever saw her diploma or not.

18   Q.    Where did she go to college, to your knowledge?

19   A.    My understanding was Northeastern University.

20   Q.    Northeastern University.  Because when you filed

21   paperwork with the Securities and Exchange Commission as

22   the minority female managing partner of the proposed

23   hedge fund, there was also a listing of her

24   qualifications, wasn't there?

25   A.    Yes, there was.

```
1    Q.    And you had worked with Sadis & Goldberg before

2    that was filed, right?

3    A.    Which document are we talking about, the offering

4    memorandum or the RIA?  I'm not sure I follow the

5    question.

6    Q.    The memorandum that was filed with the Securities

7    and Exchange Commission indicates that Mrs. Herman had

8    graduated from the University of Massachusetts?

9    A.    To my knowledge, sir, that memorandum was never

10   filed with the SEC.

11   Q.    Okay, but her qualifications were written, and you

12   were aware of that, weren't you?

13   A.    Yes.

14   Q.    She had graduated from UMass and the degree she

15   got was a bachelor of science in business, without

16   specifying what the business was?

17   A.    I don't believe it was UMass.

18   Q.    Okay, but you also had heard that she attended

19   Northeastern University?

20   A.    The paralegal program, I was aware of that

21   personally.

22   Q.    The paralegal program?

23   A.    Yes.

24   Q.    And you were aware of that?

25   A.    Yes.
```

1    Q.    She was a glorified legal secretary?  She was a

2    paralegal?

3    A.    She was a paralegal.

4    Q.    And she attended paralegal school while she was

5    working with you?

6    A.    Yes.

7    Q.    And you weren't running a law office, were you?

8    A.    No.

9    Q.    And you know that paralegals work in law offices

10   to assist attorneys, right?

11   A.    That's my general understanding.

12   Q.    They are not allowed to practice law?

13   A.    That is also my understanding.

14   Q.    So she went to paralegal school back in the late,

15   like 1996, 1997, is that a fair statement?

16   A.    I don't remember the exact date.

17   Q.    But outside of that paralegal experience you

18   didn't know, from your own personal knowledge, whether

19   she had any other kind of educational background?

20   A.    My personal knowledge that I had gone out and

21   independently verified?  No.

22   Q.    You saw no diplomas, no certificates, no degrees,

23   nothing that you can remember?

24   A.    Nothing that I can remember, no.

25   Q.    And it was based upon her interactions with you

1   that you felt that she was a highly-educated,

2   sophisticated person?

3   A.    Yes.

4   Q.    Now, she became the, um, 100 percent owner, as it

5   was proposed, of this hedge fund, right?

6   A.    Yes.

7   Q.    And you had received information through that

8   newspaper article about the necessity to have at least a

9   90 percent minority ownership of the hedge fund in order

10  for it to be, I guess, classified as a minority-owned

11  hedge fund?

12  A.    I'm not sure I recall what the actual standard is,

13  but clearly we had intended that there would be at least

14  a 90 percent minority ownership, yes.

15  Q.    But she was a 100 percent owner, right?

16  A.    Initially, yes.

17  Q.    And there's somebody else involved afterwards who

18  was not with her?

19  A.    Yes.

20  Q.    Who?

21  A.    All of the individuals who purchased.

22  Q.    Okay.  But when the fund was proposed it was

23  minority owned and she was a 100 percent owner, right?

24  A.    Yes.

25  Q.    That was what the attraction was to draw in all

1    this institutional investment money, right?

2    A.    Yes.

3    Q.    And you stated to, um, investigative officers from

4    the federal government that your opinion, based upon

5    your research, is that the key issue with the

6    minority-run hedge fund was the minority ownership as

7    opposed to the performance necessarily of the fund?

8    A.    Um, I believe what I -- again I'm not trying to

9    remember the exact words but I believe what we said was

10   that as long as -- words to the effect that monies -- as

11   long as you had decent performance the minority

12   ownership was more important that stellar performance,

13   yes.

14   Q.    Okay.  So it was the fact that she was the woman

15   who was the 100 percent owner of this fund was important

16   to you, right?

17   A.    Important to me or important to us?

18   Q.    Well, important as in putting the whole thing

19   together and in your knowledge attracting investors?

20   A.    Based on our research, yes.

21   Q.    And you told agents, in June of last year, that

22   Mrs. Herman wanted an investment company where she could

23   do whatever she pleased and that she believed that what

24   she was selling, when she was selling shares of the

25   funds, she was selling assets, her assets, of her

1    company?

2    A.    I believe that's correct.

3    Q.    And you told the jury here, when you testified

4    yesterday, that a lot of what was done between you and

5    her was done just to make her happy?

6    A.    I don't know that I said words to that effect.

7    Q.    But you also told agents, when you met with them

8    after you decided to plead guilty, that you believed

9    that the money would come rolling in once the hedge fund

10   got off the ground, right?

11   A.    Yes.

12   Q.    You thought that you had worked hard enough that

13   you could solve the monetization problem, right?

14   A.    Yes.

15   Q.    And even after you were indicted, you felt that if

16   you could successfully monetize this standby letter of

17   credit, then the money would have come in and you would

18   have taken care of everybody?

19   A.    Yes.

20   Q.    And by "everybody" you mean Mrs. Herman, right?

21   A.    You're continuing to clarify this as if I was

22   doing this by myself and I wasn't doing this by myself.

23   Q.    I'm not asking that question, sir.

24   You told agents, after you were indicted, that if you

25   could successfully monetize the standby letter of

1    credit, then the money coming in would have taken care

2    of everybody.  Now, whether it was you or her, it was

3    your belief that if the standby letter of credit came in

4    the money that would accompany that would take care of

5    everybody, right?

6    A.    Yes.

7    Q.    And when you say "everybody," you're referring to

8    Mrs. Herman, right?

9    A.    In addition to other people, yes.

10   Q.    I didn't ask that question.

11   A.    I'm sorry.

12   Q.    You're talking about taking care of Mrs. Herman,

13   right?

14   A.    Yes.

15   Q.    All the investment people who you had worked with

16   for years whom you had taken money from, right?

17   A.    Yes.

18   Q.    And yourself?

19   A.    Less so myself.

20   Q.    And getting the standby letter of credit consumed

21   you almost 24 hours a day, didn't it?

22   A.    It did.

23   Q.    And you told her on occasions that everything was

24   legal, didn't you?

25   A.    Quite probably.

1    Q.    Quite probably?  You spoke with agents as recently
2    as October 22nd of last year and you told agents that on
3    some occasions you told Mrs. Herman that everything was
4    legal, right?
5    A.    If that's what I said, I'm not going to question
6    what I said.
7    Q.    You don't remember saying that or you did say it?
8    A.    I don't remember the exact words.
9    Q.    Okay.  Now, um, Attorney Gotleib worked with you
10   in trying to help you get the monetization, right?
11   A.    Yes.
12   Q.    And I believe you testified before that that there
13   was some person from Venezuela who introduced you to
14   Mr. Gotleib, right, or did you know Mr. Gotleib
15   independently of Mr. Cartilucci or Cartilacci?
16   A.    Carliticci.  Yes, I knew him independent of
17   Mr. Carliticci.
18   Q.    Okay.  And it's fair to say that your experience
19   with lawyers is that lawyers, like doctors, have
20   different specialties, right?
21   A.    Yes.
22   Q.    For example, dentists go to medical school but if
23   you need to have heart surgery you're not going to go to
24   a dentist, right?
25   A.    Yes, sir.

1    Q.    And you consulted and worked with Mr. Gotleib in

2    attempts to monetize this hedge fund, this standby

3    letter of credit, but Mr. Gotleib, by virtue of his

4    letterhead, is a specialist in bankruptcy law, right?

5    A.    On his letterhead, yes.

6    Q.    And as a matter of fact you used him, he

7    represented you in your most recent bankruptcy filing,

8    didn't he?

9    A.    He did.

10   Q.    So you were using a bankruptcy lawyer to help you

11   get a standby letter of credit, right?

12   A.    Not correct.

13   Q.    You were using an attorney who represented himself

14   as being board certified as a corporate and individual

15   bankruptcy specialist to help you monetize the standby

16   letter of credit?

17   A.    Mr. Gotleib had worked at the FDIC, had an LLM in

18   banking --

19   Q.    My question was you're using an attorney who has a

20   letterhead which states that he's board certified as a

21   personal and a corporate bankruptcy attorney to help you

22   get a standby letter of credit, right?

23   A.    Yes, sir.

24   Q.    There was nothing on his letterhead which

25   indicated that he had experience or expertise or a

1    specialty in putting together hedge funds, was there?

2    A.    There was not.

3    Q.    And you want this jury to believe that you made a

4    decision to associate yourself with Mr. Gotleib and pay

5    out $84,000 and you ran it by Mrs. Herman?

6    A.    I did.

7    Q.    And she said it's okay?

8    A.    I certainly couldn't have sent the letter.

9    Q.    Well, you didn't tell her that Mr. Gotleib was

10   board certified as your bankruptcy attorney, did you?

11   A.    I most certainly did, in fact she had paid the

12   bankruptcy fee for me.

13   Q.    But you were associated with Mr. Gotleib before or

14   after your second bankruptcy?

15   A.    After.

16   Q.    After.

17   Now, there's been testimony that you provided, regarding

18   a $3,000 check, that was, um, given to Mr. Carmine

19   Leuci, right?

20   A.    Yes, sir.

21   Q.    And before that check was delivered to Mr. Leuci,

22   you had had a series of conversations and communications

23   with Mr. Leuci, hadn't you?

24   A.    Yes.

25   Q.    And Mr. Leuci, to quote you, was a "pain in the

1   ass," wasn't he?

2   A.    I've certainly said that about Carl.

3   Q.    Excuse me?

4   A.    I've certainly said that about Carl.

5   Q.    Okay.  You wanted to get him off your back, right?

6   A.    Off of my back or off of our back?

7   Q.    Off of your back.

8   A.    Not just mine.

9   Q.    You had loaned money from him, hadn't you?  You

10  borrowed money from him?

11  A.    Personally?

12  Q.    Yeah.

13  A.    25 years ago.

14  Q.    You borrowed money from him recently, $4,000,

15  before this whole thing blew up with the hedge fund, you

16  don't remember that or you didn't do that?

17  A.    I don't remember it off the top of my head.

18  Q.    And you don't remember him hounding you to have

19  that money repaid until you finally repaid it with

20  interest and more?

21  A.    Yes, I do.

22  Q.    Okay.  So he could be a pain in the ass, couldn't

23  he?

24  A.    I'm not sure I agree with the characterization.

25  Q.    He could be relentless in terms of his

1   communication with you expecting payback for money that

2   he had loaned you, right?

3   A.   Yes.

4   Q.   And when you made representations to him about a

5   return he was going to get on a significant investment,

6   he was equally relentless on that when the return didn't

7   come in, right?

8   A.   Yes.

9   Q.   And you had a communication with him, by e-mail

10   and otherwise, at a point in time when you believed that

11   the funding was going to be imminent on the hedge fund,

12   right?

13   A.   Yes.

14   Q.   And you told him you couldn't wait to see the

15   expression on his face when you drove up to his house

16   and you gave him and his partner a check, right?

17   A.   I don't recall those exact words, but it wouldn't

18   surprise me if I said something like that.

19   Q.   And when the check came, it was only for $3,000?

20   A.   Yes.

21   Q.   And you testified earlier that you delivered that

22   check to him?

23   A.   I may not have delivered it, I was visiting Carl a

24   number of times during that period of time, it may have

25   been gone in the mail, it may have been delivered by me,

1    I don't really remember.

2    Q.    You didn't want to see the look on his face when

3    you gave him a check for $3,000 with "gift" written on

4    it, did you?

5    A.    No.

6    Q.    You didn't deliver it to him, did you?

7    A.    I don't remember.

8    Q.    When you were in the office in Massachusetts,

9    okay, um, it wasn't unusual for you to be communicating

10   with Ms. Herman out in Nevada, was it?

11   A.    Unusual?  It was normal course.

12   Q.    It was normal course.  And you used to use a

13   speaker phone, didn't you?

14   A.    Sometimes.

15   Q.    Sometimes.  And it's your testimony that she told

16   you that she was going to write "gift" on this $3,000

17   check and she was going to send it to Mr. Leuci?

18   A.    I believe she told me that, but I don't know when

19   she told me that.

20   Q.    But you didn't tell her to write "gift" on the

21   check, did you?

22   A.    No.

23   Q.    Were you aware, any time in the last 15 to 20

24   years, of Mrs. Herman's personal identifying information

25   being accessed or hacked?

A.    Identity theft?

Q.    Yeah.

A.    Um, it's vaguely familiar.

Q.    Okay.  And it's also fair to say that a lot of the communication that you had with Ms. Herman regarding investment clients, um, dealt with personal financial information, right?

A.    Yes.

Q.    Okay.  Now, you've admitted that you have lied, um, repeatedly in a number of instances related to this and related to the other lawsuits that took place back in the earlier 2000s, right?

A.    Yes.

Q.    And not only did you lie under oath, when you were testifying in depositions during those lawsuits, you also lied to federal agents when you were first being investigated for tax evasion, didn't you?

A.    Yes, I did.

Q.    And you have been interviewed by federal agents ten times since, um, June of 2011?

A.    (Silence.)

Q.    And if you don't know the number, you don't need to answer.

A.    I don't know the number.

Q.    And I'm not going to go over each and every time

1    when you sat down with the agents.

2    But on June of 2011, that was when you first sat down

3    with agents who were questioning you about, um, tax

4    evasion, taxes, your personal taxes that you had paid or

5    not had paid, right?

6    A.    Um, I'm uncertain as to the date, but there

7    certainly was a meeting that took place.

8    Q.    You received correspondence from the Internal

9    Revenue Service, correct, something in the mail you

10   received or a telephone call initially?

11   A.    No, I don't believe --

12   Q.    If you can remember, if you can't --

13   A.    I don't believe that's how it occurred.

14   Q.    Okay.  But you had a conversation with an agent

15   and you asked the agent what the nature of the

16   investigation was and when he told you it was criminal

17   you decided to hire an attorney, right?

18   A.    Yes.

19   Q.    And you hired Attorney Richie Clayman from

20   Chelsea?

21   A.    Yes.

22   Q.    And in June of 2011, you and Attorney Clayman met

23   with federal agents about your income tax problems,

24   right?

25   A.    Yes.

1   Q.    And it's fair to say that during that interview

2   you lied?

3   A.    Yes.

4   Q.    Before you went into the interview you were warned

5   that it was necessary to tell the truth, correct?

6   A.    Yes.

7   Q.    And you lied anyway?

8   A.    Yes.

9   Q.    And you knew, from consultations with your

10  attorney or warnings that you were given, that it's a

11  federal crime to lie to federal agents, right?

12  A.    Yes, sir.

13  Q.    Punishable up to five years in prison?

14  A.    Yes.

15  Q.    So you lied in June of 2011, and then you went

16  back again in July of 2011, right?

17  A.    Um, I don't remember the exact date, but

18  I certainly went back for a second visit.

19  Q.    Okay.  So there were two times in the summer of

20  2011 when you went and met with federal agents, right?

21  A.    Yes.

22  Q.    Both times you had your attorney with you?

23  A.    Yes.

24  Q.    And both times you lied repeatedly?

25  A.    Yes.

1    Q.    After you had met with the agents in July of 2011,

2    you had Attorney Clayman write a letter to the U.S.

3    Attorney's Office and the agents explaining your lack of

4    criminal conduct regarding those tax issues, right?

5    A.    Yes.

6    Q.    And those letters were information that he

7    provided based upon lies that you were telling him?

8    A.    Yes.

9    Q.    (Pause.)  You also testified, by my count, in five

10   depositions in the related lawsuits, right?

11   A.    Yes.

12   Q.    And you also filed a number of affidavits that

13   were signed under the pains and penalties of perjury,

14   right?

15   A.    Yes.

16   Q.    And during those depositions where you were

17   warned, when you began testifying, that you were under

18   oath, you lied repeatedly?

19   A.    Yes.

20   Q.    You lied about how you met Mrs. Herman?

21   A.    I'm not certain that's correct.

22   Q.    Well, let me rephrase the question.

23   You lied about your initial relationship with

24   Mrs. Herman, right?

25   A.    Yes.

1    Q.    You told people during the depositions that you

2    had a purely business or professional relationship?

3    A.    Yes.

4    Q.    And your testimony now is that you were involved

5    in a passionate affair with her?

6    A.    Yes.

7    Q.    You've said that you're madly in love with her?

8    A.    Was.

9    Q.    Was.  But you indicated that your relationship

10   began from the time you met her, at least on your half,

11   your -- well, let me strike that.

12   Your relationship, you said, in the beginning of your

13   testimony yesterday, was romantic and it existed up

14   through 2013?

15   A.    Yes.

16   Q.    So while you were assigning income to her

17   businesses, you were madly in love with her, right?

18   A.    Yes.

19   Q.    While you were putting together the hedge fund,

20   you were madly in love with her?

21   A.    Yes.

22   Q.    While you were stealing money from your investment

23   clients, your long-term investment clients, you were in

24   love with her?

25   A.    Yes.

1    Q.    And up until the time after your indictment, you
2    were in love with her?
3    A.    Yes.
4    Q.    And you testified that during the years that you
5    were generating large amounts of insurance commission
6    checks, you were assigning a million dollars a year or
7    more to the woman you loved, the businesses that she
8    controlled?
9    A.    Yes.
10   Q.    And in return for that million dollars plus that
11   you were giving her, um, you were getting in return what
12   you described as a subsistence benefit, $450 a week?
13   A.    Yes.
14   Q.    She also was paying your mortgage --
15   A.    Yes.
16   Q.    -- on your personal property?
17   A.    Yes.
18   Q.    She also was paying your health insurance, wasn't
19   she?
20   A.    While we had it, yes.
21   Q.    We had it or she had it?
22   A.    While she had it.
23   Q.    She had it, she paid for it.  You didn't pay for
24   it?
25   A.    No, I did not.

Q.    And that was a personal benefit you received from
her?

A.    Yes.

Q.    And the arrangement you had with her was that you
would assign this income to her, this revenue that you
were receiving, and she would run your office for you,
right?

A.    Yes.

Q.    You're not good at running your office, are you?

A.    No.

Q.    You're disorganized at times, aren't you?

A.    Yes.

Q.    And you needed somebody to go in there and
organize your office, right?

A.    Yes.

Q.    You didn't need somebody to be your co-equal as an
investment advisor, did you?

A.    (Pause.)  I'm not sure I agree with that
statement.

Q.    So your answer is "No"?

A.    My answer is "No."

Q.    Back in 1992 you didn't need Mrs. Herman to be
your co-equal in your business as an investment advisor,
did you?

A.    No, I did not.

Q.    You knew that she had an interest in the stock
market, she told you that right when she first met you?

A.    Yes.

Q.    You knew that she was like an amateur stock picker
and she had done that with her father, right?

A.    Yes.

Q.    And you liked her?

A.    Yes.

Q.    You told agents you liked her style?

A.    Her investment style?

Q.    No, no, her physical style.

A.    Yes.

Q.    You told agents you like her shape?

A.    Yes.

Q.    You told agents you thought she was smart?

A.    Yes.

Q.    And she didn't seem crude or uneducated to you in
any way?

A.    No.

Q.    And after she began working with you -- actually,
um, she began working at a, um -- after you met her she
began working at a tobacco shop, right?

A.    Yes.

Q.    And she managed to come over, unpaid in the
beginning, and help run your office?

1    A.     Yes.

2    Q.     Do the books?

3    A.     Yes.

4    Q.     She wasn't giving you any tax advice, was she?

5    A.     That's not correct.

6    Q.     So you're saying that in 199 -- well, let me just

7    rephrase the question.

8    As far as you knew, when you met Mrs. Herman, her prior

9    work experience was one as an employee, right?

10   A.     Yes.

11   Q.     And as an employee you understand that you worked

12   for an employer and the employer's required to withhold

13   certain expenses including income taxes from your

14   paycheck, right?

15   A.     Well, I'm sorry, repeat the question, please?

16          MS. BLOOM:  Objection, your Honor.

17   Q.     As an employee --

18          THE COURT:  Well, just a moment.  He's asked to

19   have it repeated and it will be repeated.  Go ahead.

20          MR. O'HARA:  If I can remember what it was.

21   Q.     So let me rephrase the question in a way that we

22   can all understand, hopefully.

23   You understood as an employee, okay, that your income

24   taxes are withheld, it's called "withholding," right?

25   A.     Yes.

1    Q.    And as an independent contractor the income is not

2    withheld?

3    A.    Yes.

4    Q.    And the checks that you were receiving from the

5    insurance companies were independent contractor checks

6    being paid to you?

7    A.    Yes.

8    Q.    All right.  And your understanding of

9    Mrs. Herman's prior work experience when you met her was

10   that she had been an employee, right?

11   A.    She had been the manager of those businesses.

12   Q.    My question, sir, is a very simple "yes" or "no"

13   question.

14   She was an employee, wasn't she?

15   A.    I believe she was.

16   Q.    And when she was working at Adam Men's Warehouse,

17   that was a chain, wasn't it?

18   A.    I'm not certain.

19   Q.    They had outlets in New Hampshire, they had

20   outlets on Washington Street here in Boston, and they

21   had outlets throughout New England and she worked at one

22   of them?

23   A.    I believe that's correct.

24   Q.    Okay.  And after that chain went out of business,

25   she began working for a tobacco shop?

```
1    A.    Correct.

2    Q.    As an employee?

3    A.    As the general manager, yes.

4    Q.    As an employee, she was getting a paycheck, right?

5    A.    I believe so.

6    Q.    She wasn't an independent contractor, was she?

7    A.    Not to my knowledge.

8    Q.    No, not to your knowledge.  So she was getting a

9    paycheck.

10   And you were running a business where you weren't

11   getting a paycheck, were you?

12   A.    No.

13   Q.    You were getting paid as an independent

14   contractor?

15   A.    Yes.

16   Q.    And you brought her in to help run your office,

17   your secretarial staff, right?

18   A.    Yes.

19   Q.    She wasn't giving you tax advice, was she?

20   A.    There was tax advice that I received from her,

21   yes.

22   Q.    On how to run your business in 1992?

23   A.    Yes, sir.

24   Q.    She was telling you how to take care of your taxes

25   in 1992?
```

1    A.    Yes, she specifically told me to fire the

2    accountant I had and hire someone else.

3    Q.    I'm asking you, sir, questions about taxes, not

4    about decisions about who to hire and who to fire.  She

5    wasn't giving you tax advice, was she?

6    A.    I'm not certain I remember that far back.

7    Q.    She wasn't --

8         THE COURT:  All right, I'm interrupting only

9    because I want to honor what we've said to the jury and

10   you can pick up here tomorrow morning.  As I said, we'd

11   stop at 12:30, and so we will.

12        You have not heard all the evidence, therefore --

13   or testimony, so therefore please keep your minds

14   suspended, do not discuss the case either among

15   yourselves nor with anyone else.  And we'll start

16   promptly at 9:00 a.m. tomorrow morning.  The jury may

17   stand in recess until that time.

18        (Jury leaves, 12:30 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5     do hereby certify that the foregoing record is a true

6     and accurate transcription of my stenographic notes,

7     before Judge William G. Young on Thursday, March 31,

8     2016, to the best of my skill and ability.

9

10

11

12

13    /s/ Richard H. Romanow 09-16-16
      _____
14    RICHARD H. ROMANOW  Date

15

16

17

18

19

20

21

22

23

24

25