1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                          No. 1:12-cr-10015-WGY

4

5

6  UNITED STATES OF AMERICA

7

8  vs.

9

10  ROSALIND HERMAN

11

12                    * * * * * * * * *

13

14              For Jury Trial Before:
               Judge William G. Young
15

16

17              United States District Court
               District of Massachusetts (Boston)
18              One Courthouse Way
               Boston, Massachusetts 02210
19              Monday, April 4, 2016

20                    * * * * * * * *

21

22          REPORTER: RICHARD H. ROMANOW, RPR
               Official Court Reporter
23            United States District Court
       One Courthouse Way, Room 5510, Boston, MA 02210
24              bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    SARA M. BLOOM, ESQ.
      MARY B. MURRANE, ESQ.
 4       United States Attorney's Office
         J. Joseph Moakley U.S. Courthouse
 5       1 Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
 6       (617) 748-3971
         Email: Sara.bloom@usdoj.gov
 7       For the United States

 8

 9    RAYMOND A. O'HARA, ESQ.
         Law Office of Raymond A. O'Hara
10       1 Exchange Place
         Worcester, Massachusetts 01608
11       (508) 831-7551
         Email: Oharalaw@hotmail.com
12  and
      JASON G. BENZAKEN, ESQ.
13       Benzaken and Wood, LLP
         1342 Belmont Street, Suite 102
14       Brockton, Massachusetts 02301
         (508) 897-0001
15       Email: Attorneybenzaken@gmail.com
         For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
1                        I N D E X

2

3  WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

4

5  GREGG D. CAPLITZ  (Continued.)

6       By Ms. Bloom:                    49

7       By Mr. O'Hara:            7              66

8

9  PAUL WHITE

10      By Ms. Murrane:     69

11      By Mr. O'Hara:            98

12

13  THOMAS ZAPPALA

14      By Ms. Bloom:      110

15      By Mr. O'Hara:

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T S

 2

 3      EXHIBIT 101...............................   114

 4      EXHIBIT 102...............................   116

 5      EXHIBIT 104...............................   127

 6      EXHIBIT 105...............................   128

 7      EXHIBIT 411...............................    75

 8      EXHIBIT 412...............................    90

 9      EXHIBIT 413...............................    88

10      EXHIBIT 414...............................    92

11      EXHIBIT 415...............................    94

12      EXHIBIT 416...............................    96

13      EXHIBIT 433...............................   144

14      EXHIBIT 434...............................   142

15      EXHIBIT 435...............................   143

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          (Begins, 9:15 a.m.)
 4          THE COURT:  We're down one juror, but have
 5     received no call, so I assume he's on his way.
 6          How do we stand here?
 7          MR. O'HARA:  Your Honor, I'm waiting for --
 8     Mr. Benzaken is getting Mrs. Herman.
 9          I found out yesterday afternoon that Mrs. Herman
10     was in the hospital and that she had checked herself
11     into the emergency room approximately -- it looks like
12     5:00 in the afternoon.  I was not, um -- I was taken
13     aback by the information because I had been trying to
14     get communication from the family since Friday about
15     what her medical condition was and I did have
16     conversations with her sister and her son about the
17     necessity for Mrs. Herman to be present here today.  I
18     had no information regarding the reason why she was in
19     the hospital and I was informed that she had been
20     admitted and that, um, whoever was treating her was not
21     recommending that she be released.
22          I communicated with her family my concern over the
23     fact that (A) I didn't know why she was in the hospital,
24     and (B) that we had a jury in the box ready to go
25     forward and that there would be -- the necessity for
```

1   something to be communicated to the Court by this

2   morning or else she would have to be here.

3          I found out this morning, as I was coming in, that

4   she had checked herself out of the hospital and

5   apparently did so against the advice of her treating

6   physicians, and I do have a confirmation of that, that

7   she did leave against medical advice.  I'm not a

8   physician, I have no medical background, I don't know

9   what her physical problems are besides the obvious one

10  that she is extremely emaciated, but I'm told that she

11  has a history of heart problems, and I have no way of

12  confirming that, but I do have the, um, form that she

13  left against medical advice, if the Court wishes to look

14  at it, and I've already shown it to the government.  And

15  I have had conversations with Mrs. Herman and

16  Mr. Benzaken who are out in the hallway.

17         I believe that she's willing to go forward today,

18  but I think that given her condition, that it might be

19  necessary for us to have more frequent brief breaks, if

20  she's having difficulty following what's going on, and I

21  will entertain any suggestions from either the

22  government or the Court about how to handle this issue.

23         THE COURT:  Well, first of all, your suggestion

24  makes sense and we will proceed, just inform me if we

25  need a brief break.  And I appreciate Counsel's report.

1          Does the government have anything it wants to say?

2          MS. BLOOM:  No, your Honor.

3          THE COURT:  All right.  Well, for the moment --

4    for the moment that's the best way to proceed and that's

5    what we'll do.  Just as soon as the juror is here, we'll

6    commence, we'll continue with the witness who's on the

7    stand and we'll see how it goes today.

8          All right.  We'll recess.

9          Mr. O'Hara, why don't you give us that report that

10   you just made mention of.

11         (Hands to the judge.)

12         (Recess, 9:20 a.m.)

13         (Jury present, 9:30 a.m.)

14         THE COURT:  Good morning, ladies and gentlemen,

15   thank you for all your efforts to be here on time.

16   We're all ready to go.

17         And if you'd remind the witness he's still under

18   oath.

19         THE CLERK:  I'd like to remind you, sir, that

20   you're still under oath.  Do you understand?

21         THE WITNESS:  I do.

22         THE COURT:  Proceed, Mr. O'Hara.

23         MR. O'HARA:  Thank you, your Honor.

24

25   CROSS-EXAMINATION BY MR. O'HARA: (Continued.)

1    Q.    Okay.  Mr. Caplitz, when we were speaking last

2    week you were referencing some of the approximately 10

3    or 11 times you've spoken to law enforcement about your

4    activity regarding this case.

5    You remember that, right?

6    A.    Yes.

7    Q.    Okay.  And you told agents during your debriefing

8    that, um, Mrs. Herman had fiduciary responsibility for

9    the money in the bank accounts controlled by her

10   businesses because she was the officer, director, and

11   sole shareholder of those companies, right?

12   A.    I don't remember those exact words.

13   Q.    But that's true, isn't it?  It's not the exact

14   words, but the tenor of what I just read to you?

15   A.    I believe it is.

16   Q.    She had complete legal control over those

17   entities, right?

18   A.    Yes.

19   Q.    And she also had control over the bank accounts

20   that were controlled by those entities, right?

21   A.    Yes, sir.

22   Q.    And to quote you, "When the funds came in, they

23   were placed in her account and it was her duty to report

24   the income and pay taxes," right?

25   A.    Yes.

1    Q.    And you told the agents that after you began

2    assigning commission checks to companies under the

3    control of Mrs. Herman, that the strategy was to

4    maximize her assets and minimize your assets?

5    A.    I don't recollect those exact words but if

6    they're --

7    Q.    It's accurate?

8    A.    I believe it is.  I'm sure you have a transcript

9    in front of you.

10   Q.    No, sir, it's an accurate statement, isn't it?

11   A.    Could you repeat the question, please.

12   Q.    You told the agents during a debriefing last year

13   that after you began assigning commission checks to the

14   companies under the control of Mrs. Herman, the strategy

15   was to maximize her assets and to minimize your assets?

16   A.    I believe that's accurate.

17   Q.    You told her to report the income but to be

18   liberal with the expenses that she was categorizing,

19   right?

20   A.    Yes.

21   Q.    To take as many deductions as possible?

22   A.    Yes, sir.

23   Q.    And you admitted to agents that you were part of

24   hiding income from authorities?

25   A.    Yes, sir.

1   Q.    And you did things over the years to hide income?

2   A.    Yes, sir.

3   Q.    For example, you didn't think that expensing the

4   automobiles was a good thing to do in terms of a

5   business expense, they were too high, right?

6   A.    Yes, sir.

7   Q.    And I think the term you used when you spoke with

8   the agents was that you wanted to "beat up the expenses

9   to minimize the tax exposure"?

10  A.    Is sounds like an accurate representation.

11  Q.    In fact you admitted to agents that you saw the

12  returns that had been prepared for the businesses?

13  A.    I saw some of the returns, I did not see all of

14  the returns.

15  Q.    Okay.  Some of them were filed electronically

16  without her signature on them, right?

17  A.    I believe that's correct.

18  Q.    And in fact once the software broke on the

19  computers that was being used to categorize the

20  expenses, the bank statements and the check ledgers had

21  to be delivered to Mr. Goodness to prepare the returns?

22  A.    That is accurate.

23  Q.    And after the software broke, you became more

24  involved, right?

25  A.    Yes.

1    Q.    And the checks and the check ledgers on the

2    accounts from the banks in Nevada were mailed to the

3    office, right?

4    A.    I believe that's correct.

5    Q.    And the checks from the local banks in

6    Massachusetts, for example, they arrived in the office

7    by regular mail?

8    A.    I believe that's accurate.

9    Q.    And all the statements were put together like in a

10   box, right?

11   A.    I don't recall exactly, but it sounds accurate.

12   Q.    And either you -- either Mr. Goodness would come

13   to the office and pick that information up or you would

14   hand-deliver that information to Mr. Goodness in his

15   office in Waltham?

16   A.    Correct.

17   Q.    And in fact you admitted to agents that

18   Mr. Goodness would call you with questions about the

19   returns?

20   A.    Yes, sir.

21   Q.    And you told the agents that you knew that some of

22   the deductions were not legal, but you, quote, "did not

23   want to waive a red flag in front of a pole"?

24   A.    Yes.

25   Q.    Now, the commission checks from the insurance

1   companies were mailed directly to you, right?

2   A.    Yes, sir.

3   Q.    And they came to you using your Social Security

4   number?

5   A.    Yes, sir.

6   Q.    And you've testified that you would sign the backs

7   of the checks and endorse them over to Mrs. Herman?

8   A.    I testified that I signed some of them and other

9   people signed my name, but I was aware of the process if

10  they signed my name.

11  Q.    Okay.  But in fact you didn't assign all the

12  checks to Mrs. Herman, did you?

13  A.    That is correct.

14  Q.    In fact in 2003 you withheld about $100,000 worth

15  of commission checks that you kept for yourself, right?

16  A.    That is accurate.

17  Q.    And you didn't declare that $100,000 on your

18  personal return for that year, did you?

19  A.    I did not.

20  Q.    Now, you have no ownership interest in any of the

21  companies that Mrs. Herman formed, right?

22  A.    Correct.

23  Q.    You were not a director of any of these companies?

24  A.    I was a director of Financial Resource Network at

25  sometime in the '90s, but I don't remember exactly when

1    or when I stopped.

2    Q.    Okay.  But in terms of companies that she formed

3    out in Nevada and the two or three that she formed here

4    in Massachusetts, you were not a director of those after

5    like let's say 2000?

6    A.    That's accurate.

7    Q.    You weren't an officer in those companies?

8    A.    That is accurate.

9    Q.    And you most certainly were not a shareholder,

10   right?

11   A.    That is accurate.

12   Q.    And you did not have check-writing privileges on

13   any of the accounts maintained by those companies, did

14   you?

15   A.    I did not.

16   Q.    Now, when you began trying to seed the hedge fund,

17   um, you got money from a variety of investment clients

18   with whom you'd been working for years, right?

19   A.    That is correct.

20   Q.    And you told agents, as early as December of 2013,

21   that some of this money went to pay lawyers, some of it

22   went to pay expenses for the fund, and some of it went

23   to pay for you and for Ms. Herman to live off of?

24   A.    I'm not sure I understand your question.

25   Q.    You were interviewed -- actually you were indicted

1    in March of 2013, right?

2    A.    I believe I was originally indicted in January of

3    2013.

4    Q.    Okay.  But it was sometime between January and

5    March when the final indictment against you came down,

6    and I believe it was March, but if I'm wrong, correct

7    me?

8    A.    I believe I was indicted in January and then there

9    was a superseding indictment in March, that's correct.

10   Q.    Okay, thank you.  And nine months later, on

11   December 20th, 2013, that was the first time that you

12   decided to sit down with your attorneys, um, with

13   representatives of the U.S. Attorney's Office, and with

14   investigating case agents, and were provided information

15   about what you were doing and what Mrs. Herman was

16   doing, right?

17   A.    I believe that's accurate.

18   Q.    And during that first interview that you had back

19   in December of 2013, you told the agents that the

20   initial amount of money that was taken from your

21   investment clients was used to pay expenses for the

22   fund, expenses to pay lawyers, and to pay for you and

23   for Mrs. Herman to live off of?

24   A.    Of the initial amount?  Yes, that's accurate.

25   Q.    You also told agents, as early as December of

1   2013, that Mrs. Herman was selling shares of her company

2   and that after it was received it was Mrs. Herman's to

3   use -- excuse me, it was Mrs. Herman's to use as she saw

4   fit?

5   A.    I believe that's what I said to the --

6   Q.    And that this was understood both by you and by

7   her?

8   A.    Agreed.

9   Q.    And according to the agent's notes, you did not

10  specifically tell clients that the money they were

11  giving you was Mrs. Herman's to use as she saw fit, did

12  you?

13  A.    I did not.

14  Q.    And in fact you told agents during that initial

15  interview that the clients were told that the entity was

16  owned by Herman and her family and that the company was

17  selling shares to the clients?

18  A.    I believe that's accurate.

19  Q.    You didn't tell your clients that the hedge fund,

20  if it was not created, um, their money would be gone?

21  A.    I did not.

22  Q.    But you had trouble generating seed money for the

23  hedge fund?

24  A.    That's correct.

25  Q.    You told agents that in all you and Mr. Gotlieb

1    spent about $300,000 in document creation, marketing

2    materials, and upfront payments to get the venture

3    going?

4    A.    (Pause.)  I'm uncertain if the amount is correct,

5    but there were certainly substantial sums spent.  I have

6    to think about the amount.  I'm sorry.

7    Q.    All right.  Now, you've admitted that you're not

8    an expert when it comes to standby letters of credit?

9    A.    I am not.

10   Q.    You consulted with a number of people including

11   Mr. Gotlieb?

12   A.    That's correct.

13   Q.    Um, you indicated that even Mr. Gotlieb can barely

14   give a comprehensible explanation of what a standby

15   letter of credit is?

16   A.    I don't recall those exact words, sir.

17   Q.    Well, on your first interview, your first

18   debriefing back in December of 2013, you told the

19   investigating agents that "even Mr. Gotlieb can barely

20   give a comprehensible explanation of how standby letters

21   of credit work"?

22   A.    Um, I'm not arguing with you, sir, I just don't

23   recall those exact words.

24   Q.    But that's an accurate statement?

25   A.    It's an accurate statement.  I won't argue with

1    the statement.

2    Q.    They're difficult to understand?

3    A.    Very.

4    Q.    And you've referred to them, during that

5    interview, as they appear to you "to be magic"?

6    A.    I believe I used those words.

7    Q.    And you and Mr. Gotlieb sent $84,500 to a

8    Mr. James Long and eventually that money was wired into

9    an IOLTA account of a law firm or an attorney in Rhode

10   Island, right?

11   A.    That is not right.

12   Q.    Did you send the money to Mr. Long?

13   A.    The money to Mr. Long was long before that

14   process.

15   Q.    All right.  And that was also part of the expenses

16   involved in seeding the hedge fund?

17   A.    Yes.

18   Q.    Was $84,500 sent to a law firm in Rhode Island?

19   A.    No, sir.

20   Q.    Did Mr. Gotleib do a background check on a law

21   firm in Rhode Island?

22   A.    Yes, he did.

23   Q.    And regarding the $84,500 and all the other money

24   that was spent as seed money to start this hedge fund,

25   nothing came to fruition, right?

1   A.    Yes, sir.

2   Q.    Well, you've told the agents, during the first

3   time you were interviewed, that you and Attorney Gotleib

4   contacted the FBI in Rhode Island to report a scam that

5   had happened with money that you had forwarded there?

6   A.    It was not money we had forwarded there, there

7   were other clients who were involved in letters of

8   credit that we were trying to assist and they had

9   forwarded money to, um, an attorney in Rhode Island.

10  But, yes, sir, we did contact the FBI.

11  Q.    And you told agents that you paid approximately

12  $135,000 to a Mike Schwartz of Strategic Properties in

13  due diligence fees for the standby letter of credit

14  venture?

15  A.    No, sir, we received $135,000 from him.

16  Q.    And what did you do with that money?

17  A.    That money went into the checking account.

18  Q.    And in spite of all your efforts, nothing came to

19  fruition regarding this hedge fund, did it?

20  A.    No, sir, it did not.

21  Q.    (Pause.)  You knew that Mrs. Herman was spending

22  the money and that it wouldn't be there to refund your

23  investment clients if the hedge fund failed?

24  A.    Yes.

25  Q.    You knew that the revenue stream that you were

1   generating from investment advising fees had been

2   reduced to a trickle compared to what you'd been

3   generating when you had the insurance commissions?

4   A.     Yes, sir.

5   Q.     And you knew that as early as 2008?

6   A.     Yes, sir.

7   Q.     In 2010, Mrs. Herman flew you and your attorney to

8   Washington, D.C. to appear before the board of review

9   for the Bureau of Standards for Certified Financial

10  Planners, right?

11  A.     Yes, sir.

12  Q.     And it was important to you that you attend that

13  hearing because you wanted to maintain your designation

14  as a Certified Financial Planner?

15  A.     Yes, sir.

16  Q.     You had, um, studied on a graduate level financial

17  planning, right?

18  A.     Yes, sir.

19  Q.     You had received your certification as a financial

20  planner, correct?

21  A.     Yes, sir.

22  Q.     It was an arduous course that you had to take in

23  order to get that designation, right?

24  A.     Yes, sir.

25  Q.     And there were also continuing educational

1    requirements which you complied with?

2    A.    Yes, sir.

3    Q.    And you knew that Mrs. Herman had paid for

4    Attorney Cohan to accompany you to Washington, D.C. for

5    the purposes of that hearing?

6    A.    Yes, she did.

7    Q.    And you were in danger of losing your designation

8    and you didn't want to lose it, right?

9    A.    I did not.

10   Q.    And during that hearing that took place in 2010 in

11   Alexandria, Virginia, you lied during that hearing too,

12   didn't you?

13   A.    I believe I did.

14   Q.    And your attorney, Mr. Cohan, was successful in

15   keeping your designation as a Certified Financial

16   Planner after that hearing, right?

17   A.    He was.

18   Q.    Now, the people whose money was lost, the

19   investment clients, for the most part those people were

20   not, um, sophisticated investors, were they?

21   A.    I don't believe any of them would meet the

22   definition of "sophisticated investors."

23   Q.    And none of them were extremely wealthy either,

24   were they?

25   A.    None of them were.

1    Q.    You told investigators, in June of last year, that
2    you did not tell Mrs. Herman that you were stealing from
3    your investment clients?
4    A.    I believe that's accurate.
5    Q.    You also didn't tell her that you were borrowing
6    from your clients?
7    A.    I also believe that's accurate.
8    Q.    Now, you've described Mrs. Herman as being
9    "combative," right?
10   A.    Yes, she could be combative at times.
11   Q.    You disagreed with her frequently?
12   A.    Disagreed?  I'm not sure "frequently" is the
13   appropriate adjective.
14   Q.    But you told agents that you never want to fight
15   with her?
16   A.    That's correct.
17   Q.    But you admitted to agents, in January of 2014,
18   that Mrs. Herman would ask you questions about taxes and
19   investment money?
20   A.    That's accurate.
21   Q.    And you would tell her what you believed she
22   wanted to hear?
23   A.    I'm not sure that's accurate.
24   Q.    Well, sir, on January 23rd of 2014, you told
25   agents that:  "Mrs. Herman would ask you questions about

1    things like this, taxes, and Caplitz would say what

2    Herman wanted to hear."  That's what you said on January

3    of 2014, more than two years ago.

4    Are you stating that you didn't make that statement?

5    A.    I'm saying I don't recall that exact statement.

6    Q.    Well, is your memory today better than it was two

7    years ago?

8    A.    That statement assumes that I would always do

9    that.  I'm not suggesting I didn't sometimes do that.  I

10   did.

11   Q.    Okay.  You also told agents that if Mrs. Herman

12   asked you if the sale of her shares in the company would

13   be income to her, you would tell her, "No, it wasn't"?

14   A.    I believe that's accurate.

15   Q.    Now, when you first began cooperating with law

16   enforcement, a frequent topic of conversation -- through

17   the first debriefings when you were lying to the

18   subsequent debriefings when you say you were telling the

19   truth, a frequent topic of conversation was your

20   relationship with Mrs. Herman, right?

21   A.    I believe that's been covered in all the

22   debriefings, yes.

23   Q.    And the agents specifically wanted to know how it

24   came about, for example, that you gave New England

25   Financial Independence Group to Mrs. Herman?

1 A.  Yes.

2 Q.  They also wanted to know why you were giving her

3 significant amounts of money, up to $1 million I think

4 in 2003 to 2005, and were taking a $42,000 a year draw

5 in return for that income you were giving her, right?

6 A.  Yes, sir.

7 Q.  And also they wanted to know why you had elderly

8 investment clients buy into a hedge fund management

9 company under, um -- actually let me rephrase the

10 question.

11 They also wanted to know why you had your elderly

12 investment clients buy into a hedge fund management

13 property that was controlled by Mrs. Herman, right?

14 A.  Yes, I believe that's correct.

15 Q.  And you told the investigators, as you told this

16 jury, that it was because you were madly in love with

17 her?

18 A.  Yes, sir.

19 Q.  And that you had met her in a men's clothing

20 store?

21 A.  Yes, sir.

22 Q.  And I'm not going to rehash what you said last

23 week, but it's fair to say that you told agents that

24 your relationship was emotional and physical?

25 A.  Yes, sir.

Q.    Sexual?

A.    Yes, sir.

Q.    And that your love for this woman was so strong that after you met her and pursued her, you decided you wanted to marry her?

A.    Yes, sir.

Q.    Had you ever proposed marriage before to a woman?

A.    Yes, sir.

Q.    But this was a significant event in your life, right?

A.    Very significant.

Q.    This woman was the answer to your dreams?

A.    She was.

Q.    Not only did you find her attractive and smart, she also is of the same faith as you are, right?

A.    Yes.

Q.    And, um, it was important to you that this woman of your dreams be a person who worships Judaism as you do, right?

A.    Yes.

Q.    And as you had contact with Mrs. Herman, your love for her grew and grew, right?

A.    That's correct.

Q.    And you did not know, at the time, that she was married?

```
1    A.    I had been told she was divorced.

2    Q.    So your answer was you didn't know she was married

3    at the time?

4    A.    I did not know.

5    Q.    Okay.  And, um, you didn't notice a wedding band

6    on her finger?

7    A.    She did not wear a wedding band.

8    Q.    And you decided, um, based upon the nature of your

9    relationship with her and your love for this woman that

10   you would ask her the big question.

11   A.    I did.

12   Q.    And you hoped that she would say "Yes"?

13   A.    I did.

14   Q.    So you chose to propose to her on December 8th,

15   1994?

16   A.    That is the correct date.

17   Q.    A Thursday?

18   A.    If you say so.

19   Q.    And the location you chose for this momentous

20   occasion was the top of the Mystic Tobin Bridge?

21   A.    It was.

22   Q.    And I assume that in December you and she did not

23   stroll up to the top of the Mystic Tobin Bridge, right?

24   A.    We did not.

25   Q.    You drove up there in your car?
```

1    A.    We did.

2    Q.    And you pulled your car over into a breakdown

3    lane?

4    A.    I did.

5    Q.    And you got out on one knee?

6    A.    I did.

7    Q.    And you proposed marriage to her?

8    A.    I did.

9    Q.    And you are aware of the fact that the Mystic

10   Tobin Bridge is -- it connects Chelsea to Boston?

11   A.    Sir, I grew up in Chelsea, sir.  Yes.

12   Q.    On Route 1?

13   A.    Yes.

14   Q.    One of two major thoroughfares from the North

15   Shore to Boston, the other one being Route 93, right?

16   A.    The other major thoroughfare is -- it's 1A, but

17   I'm not going to argue that with you.

18   Q.    But Route 1 going over the Mystic Tobin Bridge,

19   that's a limited access highway?

20   A.    Yes.

21   Q.    There's no stop lights on it?

22   A.    There are none.

23   Q.    And there's a toll booth?

24   A.    There was at the time, yes.

25   Q.    Did you propose marriage to her before or after

1    the toll booth?

2    A.    I believe it was either -- it was the toll plaza,

3    but whether we were before the tolls or after the tolls,

4    I don't remember.

5    Q.    And after she accepted your proposal, you

6    continued to see her?

7    A.    Yes, sir.

8    Q.    And in 1993 you transferred your controlling

9    interest in New England Financial Independence Group to

10   Mrs. Herman?

11   A.    I believe that's an accurate date.

12   Q.    And at that point in time you had an arrangement

13   where you were assigning insurance commission checks to

14   that company?

15   A.    Yes, sir.

16   Q.    And you were reporting that income to the Internal

17   Revenue Service?

18   A.    The corporations were reporting the income, yes.

19   Q.    Okay.  After 1995, Mrs. Herman began forming

20   companies in Massachusetts, right?

21   A.    I believe she only formed one corporation in

22   Massachusetts, yes.

23   Q.    And that's Financial Resource Network

24   Incorporated?

25   A.    Yes, sir.

1  Q.    And you began assigning your insurance commission

2  checks to that company?

3  A.    That's correct, as well as the investment

4  commissions.

5  Q.    Okay.  And in return for this money, she was

6  paying, um -- and you testified to this last week and I

7  don't want to go over it too much, but she was paying

8  you a $42,000 a year, um, payment as an independent

9  contractor, right?

10  A.    Approximately.

11  Q.    And some of your personal expenses?

12  A.    Yes, sir.

13  Q.    And you knew the difference between a personal

14  expense and a business expense, right?

15  A.    Yes, sir.

16  Q.    So you knew that by her paying you personal

17  expenses out of her business that she was creating a tax

18  problem?

19  A.    It depends on whether -- if you pay a personal

20  expense with a corporate check, it's a tax problem, yes.

21  Q.    Uh-huh.  And you're familiar with taxation issues,

22  right?

23  A.    I am.

24  Q.    It's necessary, given the work that you were doing

25  as an investment counselor, that you've become aware of

1    tax consequences, you know, for your clients' investment

2    money, right?

3    A.    Investment tax consequences, yes.

4    Q.    And also, um, you were a Certified Financial

5    Planner so you were concerned about -- or your clients

6    were concerned about preserving their assets into their

7    retirement years, right?

8    A.    Yes, sir.

9    Q.    So you had to be familiar with taxation issues as

10   far as that part of your work, right?

11   A.    Yes, sir.

12   Q.    Plus you had formed a small business of your own

13   and you were familiar in general terms with the

14   requirements of personal income tax reporting?

15   A.    In a general sense, yes.

16   Q.    Now, you've testified that, um, there were a

17   number of e-mails that you sent to Mrs. Herman in 2005

18   in which you were making, um, romantic comments to her?

19   A.    I believe my specific testimony was that the

20   e-mails they showed me, which were romantic in nature,

21   were from 2005.  I don't think we ever -- I was ever

22   asked or discussed whether I sent them any other time.

23   Q.    Okay.  So when you testified last week you

24   identified e-mails that you had sent to Mrs. Herman?

25   A.    Yes, sir.

1    Q.    And in those e-mails you referred to her as

2    "Rosalind, my love" and other terms of endearment,

3    right?

4    A.    Yes, sir.

5    Q.    You've testified that Mrs. Herman never responded

6    to those e-mails because she didn't want anybody to know

7    that she was involved in a romantic relationship with

8    you?

9    A.    I'm not sure that was my testimony, sir.

10    Q.    Well, at one point in time you told agents that

11    she wouldn't respond to your e-mails because she didn't

12    want it known that she was your quote, unquote "hussy"?

13    Q.    "Hussy"?

14    A.    Yes.

15    Q.    The word you used when you were being debriefed by

16    federal agents.

17    A.    I don't ever remember using that word and nor

18    would I.

19    Q.    And also you told agents that Mrs. Herman was

20    afraid that because she was married and she had

21    testified that she was married, that if she admitted

22    that she was having a relationship with you, that it

23    could have legal consequences for her?

24    A.    Yes, sir.

25    Q.    And this relationship you had with her which

1    began, according to you, sometime in 1992, continued for

2    21 years?

3    A.    Yes, sir.

4    Q.    In 2000 to 2001, she moved to Nevada, right?

5    A.    I believe that's an accurate date.

6    Q.    She moved 3,000 miles away from you?

7    A.    She did.

8    Q.    And you told agents that you went out to Las Vegas

9    a few times?

10   A.    Yes, sir.

11   Q.    You also told agents that she came back more or

12   less six times from 2003 onward?

13   A.    I don't remember the exact number, but she

14   certainly did come back to Boston.

15   Q.    But even though she wasn't here and you were, you

16   kept funneling money into bank accounts controlled by

17   her businesses?

18   A.    I did.

19   Q.    After you proposed marriage to her, um, you found

20   out that she was married, right?

21   A.    It was quite some time after that, and I don't

22   know that I ever found out, I just sort of figured it

23   out.

24   Q.    At some point in time she told you that she had

25   reached a separation agreement with her husband and they

1    were going to get divorced?

2    A.    No, sir.

3    Q.    That they had some kind of a marriage where they

4    were living together but they were going to get

5    divorced?

6    A.    No, sir.

7    Q.    (Pause.)  And you've also told agents that the

8    sexual nature of your relationship with Mrs. Herman, at

9    least from 2003 to 2013, was rare?

10   A.    That's accurate.

11   Q.    In fact you told the agents that during that

12   10-year period of time, um, you had sexual relations

13   with Mrs. Herman a handful of times?

14   A.    That's accurate.

15   Q.    So this is not a situation where you were telling

16   agents that Mrs. Herman was withholding her sexual

17   favors from you in order to get money, right?

18   A.    I did not say that.

19   Q.    Well, she wasn't, was she?

20   A.    I didn't say she was.

21   Q.    She was not having or withholding her sexual

22   favors from you in order to get you to pay her money?

23   A.    She was not.

24   Q.    Now, last week you identified a couple of e-mails

25   that Mrs. Herman sent, um, one of them specifically

1    regarding a problem you were having with Mr. Leuci's

2    $100,000 investment, right?

3    A.    I believe the e-mails you're discussing were

4    specific to the distributions on that.

5    Q.    Okay, but I believe it was Mr. Leuci's --

6    A.    It was Mr. Leuci, yes, sir.

7    Q.    And during -- and in one of those e-mails, um,

8    which was sent, according to you, she dropped the

9    proverbial f-bomb, right?

10   A.    Yes, sir.

11   Q.    And in the other e-mails I believe there was also

12   crude and profane language, right?

13   A.    I don't specifically remember whether there was or

14   there wasn't.

15   Q.    Well, she had a tendency to use crude and profane

16   language, didn't she?

17   A.    I believe we all do.

18   Q.    I'm going to ask the question again.

19   She had a tendency to use crude and profane language,

20   didn't she?

21   A.    Yes.

22   Q.    And you've told the agents that she had difficulty

23   writing business letters?

24   A.    That's a correct statement.

25   Q.    You used to write business letters for her?

1    A.    Yes.

2    Q.    You also told agents that you had to put together

3    e-mails for her?

4    A.    Yes, sir.

5    Q.    And in fact you identified an e-mail last week

6    that you said you recognized because you recognized the

7    style of writing?

8    A.    Yes, sir.

9    Q.    And you're not -- you were a business major when

10   you were in college?

11   A.    Finance and economics.

12   Q.    Finance and economics.  And although you're

13   obviously articulate and intelligent, you were not an

14   English major?

15   A.    No, I'm not an English major.

16   Q.    But you're familiar with the rules of grammar and

17   spelling?

18   A.    To some extent.

19   Q.    And she has trouble with grammar and spelling,

20   doesn't she?

21   A.    (Pause.)  Yes.

22   Q.    And her writing tends to be disjointed,

23   misspelled, and occasionally profane?

24   A.    Yes.

25   Q.    As does her persona at times, right?

1    A.    I'm not sure I would agree with that

2    characterization.

3    Q.    You don't agree that she is occasionally profane?

4    A.    I agree with that.

5    Q.    Okay.

6    In fact you told agents that her e-mails and writings

7    were so bad that she had a way of writing that, quote,

8    unquote, "pissed people off"?

9    A.    Yes.

10   Q.    And those few of your investment clients who met

11   with her didn't like her, did they?

12   A.    Some did, some didn't.

13   Q.    Well, in terms of physical contact, there were

14   very few people who met her face to face among the 10 to

15   12 people whose money was stolen as part of this hedge

16   fund scheme, right?

17   A.    That's correct.

18   Q.    Mr. Gilmartin, for example, met her once while he

19   was in your office and he couldn't stand her?

20   A.    I -- if that's true, he never expressed that to

21   me.

22   Q.    Okay.  But you don't remember having a meeting

23   with Mr. Gilmartin once in your office and, um, seeing

24   Mrs. Herman come through?

25   A.    Yes, that meeting took place.

1    Q.    And after that encounter Mr. Gilmartin would have
2    nothing to do with her?
3    A.    That's not accurate.
4    Q.    He did want to have something to do with her, is
5    that what you're saying?
6    A.    He spoke to her a number of times on the phone.
7    Q.    Really?
8    A.    Yes.
9    Q.    Now, you've also told agents that during the
10   period of time that you were working with Mrs. Herman in
11   an investment advisory capacity, that she only brought
12   in one or two clients over the years?
13   A.    I believe that's correct.
14   Q.    Excuse me, I didn't hear your answer?
15   A.    I believe that's correct.
16   Q.    Thank you.
17   So the bulk, the overwhelming bulk of the investment
18   advising business that was being conducted was being
19   conducted through people whom you had met and you had
20   developed, right?
21   A.    Yes.
22   Q.    You didn't bring Mrs. Herman with you when you
23   drove to Newburyport to meet with Mr. Leuci and
24   Mr. Savage, did you?
25   A.    I did not.

1   Q.    You didn't bring her with you when you went and
2   visited Mrs. Wentzell in her home in Somerville, did
3   you?
4   A.    I did not.
5   Q.    You didn't bring her with you when you met with
6   Mrs. Hilgemeier?
7   A.    I did not.
8   Q.    Or Mr. Schneider?
9   A.    I did not.
10  Q.    You didn't bring Mrs. Herman with you when you
11  visited the Bigelows in Shirley, Massachusetts, right?
12  A.    I did not.
13  Q.    You didn't bring her with you when you visited
14  Mr. Connell and his ill wife, did you?
15  A.    I did not.
16  Q.    She was in Las Vegas, right?
17  A.    Most of the time.
18  Q.    But when she was here in Massachusetts, you didn't
19  bring her to meet with clients, right?
20  A.    I did not, they usually came to see her.
21  Q.    (Pause.)  She wasn't with you when you forced
22  Mr. Gilmartin's signature, was she?
23  A.    She was not.
24  Q.    She wasn't with you when you stole money from
25  Mrs. Hilgemeier, was she?

1    A.    She was not.

2    Q.    She wasn't with you when you made unauthorized

3    withdrawals from your client's IRA accounts as you

4    related last week?

5    A.    She was not.

6          MR. O'HARA:  Can I have a moment, your Honor?  I'm

7    sorry.

8          THE COURT:  You may.

9          (Pause.)

10         MR. O'HARA:  Thank you.

11         (Pause.)

12   Q.    Now, you filed for bankruptcy twice since 1994,

13   right?

14   A.    Yes, sir.

15   Q.    And you know that when you go through a bankruptcy

16   filing you list basically -- you list your assets on one

17   side and then you have your debts and your debits on the

18   other side, is that generally a fair statement?

19   A.    That's a fair statement.

20   Q.    And you know that, um, bankruptcy filings have

21   adverse consequences on your credit rating, right?

22   A.    They do.

23   Q.    In fact I don't believe you can apply for

24   institutionalized credit for maybe 7 years after a

25   bankruptcy filing, right?

1   A.    No, I don't believe that's accurate.

2   Q.    Well, you know that when you go through a

3   bankruptcy filing, you're going to do it when the amount

4   of debt that you have far outweighs your assets, right?

5   A.    They must outweigh your assets, absolutely.

6   Q.    But you're not going to file for bankruptcy relief

7   if you owe $60,000 and you have $20,000 in assets,

8   right?

9   A.    I'm not certain I understand the generalization,

10  sir.  I'm sorry.

11  Q.    When you filed for bankruptcy relief in 2009, you

12  listed debts of $2,397,450.59, almost $2.4 million,

13  that's what you filed, right?

14  A.    Right, because of the judgments.  Yes.

15  Q.    You had assets that you listed of $328,525?

16  A.    That's accurate.

17  Q.    When you filed for bankruptcy in 1994, you had

18  similar debts and similar assets, right?

19  A.    I don't remember.

20  Q.    But you know that when you file a bankruptcy

21  petition and when the bankruptcy trustee approves your

22  petition, you wipe out your debt?

23  A.    Yes, sir.

24  Q.    The proverbial slate is wiped clean?

25  A.    Yes, sir.

1   Q.    And when you filed your bankruptcy petition in

2   1994, what was missing among your assets at that time

3   was your controlling interest in New England Financial

4   Independence Group, right?

5   A.    Yes, sir.

6   Q.    Because you had given that business to Mrs. Herman

7   a year before?

8   A.    Yes, sir.

9   Q.    And when you filed your bankruptcy petition back

10  in 1994, that was a result of debts that you would occur

11  before 1994?

12  A.    I agree with that.

13  Q.    Excuse me?

14  A.    I agree with that.

15  Q.    Yeah.  (Pause.)  Now, you've admitted to lying,

16  um, almost continually for the 20 years that you were

17  involved with Mrs. Herman?

18  A.    (Pause.)  I don't understand your question.

19  Q.    You told agents that for 20 -- when you spoke to

20  the agents in 2013, the first time, you told them that

21  your life, for the last 20 years, was, quote, "one

22  never-ending lie"?

23  A.    I did say that.

24  Q.    And, by the way, at each one of these debriefings

25  you attended, you had at least one lawyer with you,

1  right?

2  A.     Yes, sir.

3  Q.     And as we stated before, there were at least one

4  or two representatives of law enforcement, right?

5  A.     Yes, sir.

6  Q.     Along with members of the U.S. Attorney's Office?

7  A.     Yes, sir.

8  Q.     And you've testified in general terms that you

9  lied at depositions, you lied at hearings, you lied face

10  to face to people, right?

11  A.     Yes, sir.

12  Q.     You're an experienced liar, right?

13  A.     Unfortunately, yes.

14  Q.     You've had lots of practice?

15  A.     Yes.

16  Q.     You're good at it?

17  A.     Yes.

18  Q.     And when you lie, you're trying to convince the

19  people you're lying to to believe that you're telling

20  the truth?

21  A.     Yes.

22  Q.     And even when you were lying, sometimes the people

23  you were lying to did believe you?

24  A.     Yes.

25  Q.     And some of your investment clients believed your

1    lives and gave you some of their money, right?

2    A.    Yes, sir.

3    Q.    And as you were lying, the people you were lying

4    to couldn't tell that you were lying, right?

5    A.    Yes, sir.

6    Q.    Because if they did, they wouldn't have believed

7    your lies and done what you wanted them to do?

8    A.    That's correct.

9    Q.    And you did certain things when you were lying so

10   that people would believe that you were telling the

11   truth, right?

12   A.    I'm not sure I understand the question.

13   Q.    Well, you wouldn't, for example, um, you know,

14   blink nervously or tap your foot, you would keep a

15   straight face, right?

16   A.    Um, I'm not sure I can answer that question.  I

17   apologize.

18   Q.    You would smile and be friendly, wouldn't you?

19   A.    Yes.

20   Q.    And one of the things you did when you were lying

21   to people was to keep telling them the lie?

22   A.    Yes.

23   Q.    Keep insisting that the investment in the hedge

24   fund management company, for example, was a great

25   investment?

1    A.      Yes.

2    Q.      Talk enthusiastically about it?

3    A.      Yes.

4    Q.      Mention to your clients the good investment advice

5    you had given them in the past and maybe gloss over to

6    some of the investment advice you hadn't worked out in

7    the past, right?

8    A.      Yes.

9    Q.      And without telling them how seriously risky an

10   investment in the hedge fund management company was?

11   A.      Yes.

12   Q.      In other words when you were deliberately not

13   telling your clients how risky the investment was, you

14   were in essence lying to them, weren't you?

15   A.      Yes.

16   Q.      You were lying by omission?

17   A.      Yes.

18   Q.      And when you had your attorney write a letter

19   packed with lies to the U.S. Attorney's Office back in

20   2011, you were lying by proxy?

21   A.      Yes.

22   Q.      So your strength, in terms of the money you were

23   able to generate at least after the commission checks

24   were gone, your strength was interpersonal with

25   investment clients?

1    A.    Yes.

2    Q.    Your strength was out on the road?

3    A.    Yes.

4    Q.    And Mrs. Herman, directly or indirectly, ran the

5    office?

6    A.    Yes.

7    Q.    Now, if -- and correct me if I'm wrong, but I

8    believe you testified that, um -- actually let me

9    withdraw the question.  I'm confused.

10   You knew that Mrs. Herman and her sisters and her entire

11   family were heavy smokers, right?

12   A.    Yes.

13   Q.    And in fact in the office that you had where she

14   worked and her sisters worked, they smoked inside the

15   office, right?

16   A.    They did.

17   Q.    Your office smelled of stale cigarette smoke all

18   the time, didn't it?

19   A.    It did.

20   Q.    And Mrs. Herman's vehicles smelled of cigarette

21   smoke too, didn't they?

22   A.    They did.

23   Q.    You have never been a smoker, right?

24   A.    Other than briefly in high school.

25   Q.    Okay.  But when you were involved in your

1    relationship with Mrs. Herman, you were not smoking?

2    A.    No.

3    Q.    And she wreaks of tobacco, doesn't she?

4    A.    Yes.

5    Q.    Her clothing, right?

6    A.    Yes.

7    Q.    Her hair?

8    A.    Yes.

9    Q.    This was the woman you loved?

10   A.    Absolutely.

11   Q.    (Pause.)  When you met with agents on January

12   23rd, 2014, you told the agents that your arrangement

13   with Mrs. Herman, assigning insurance commission checks

14   to her, her businesses, enabled you to avoid paying

15   taxes personally because you didn't have any of the

16   money.  You made that statement on January 23rd, 2014?

17   A.    If you say I made that statement, then I must

18   have.

19   Q.    If money came in, none of it would go to pay

20   taxes, you said.  The agents noted that you had a tax

21   deduction background and that you were willfully blind

22   when it came to this because you knew that taxes should

23   have been paid on the money, and that was a statement

24   based upon what you were telling them back in January of

25   2014.

1  A.   Are you suggesting that that's the agent's

2  statements?  You'd have to ask them that question.  How

3  can I make a determination of that?

4  Q.   I'm saying that you sat in a room with seven or

5  eight people and there were people taking notes and the

6  notes reflect that you told them that the arrangement

7  that you had to assign insurance commission checks to

8  Mrs. Herman enabled you to avoid paying taxes personally

9  because you did not have the money.

10 Are you saying that you never made that statement, sir?

11 A.   I'm not saying I didn't make the statement or did.

12 I don't remember the specific statement.  But it did

13 allow me to avoid paying income taxes.  That's why I

14 pled guilty.

15 Q.   And Mrs. Herman would ask you if the sale of her

16 shares in the company would be income to her and you

17 told her, "No"?

18 A.   I believe I did tell her "No."

19 Q.   Now, you have pleaded guilty?

20 A.   Yes, sir.

21 Q.   That's right?

22 A.   Yes, sir.

23 Q.   And you mentioned that, um, there is a recommended

24 sentence in your case of between 6 1/2 and 8 years,

25 right?

1    A.    Yes, sir.

2    Q.    And you understand that that sentence is not

3    mandatory or required, right?

4    A.    I'm not sure I follow.

5    Q.    When you're sentenced, that 6 1/2 to 8 years is an

6    advisory sentence, a recommended sentence, it's not?

7    A.    Yes, it's the guideline sentence.

8    Q.    It's the guideline sentence.  Thank you.

9    A.    Yes, sir.

10   Q.    And you understand that your sentence could be

11   shorter or longer, right?

12   A.    Yes, sir.

13   Q.    And by pleading guilty you've entered into an

14   agreement with the government where you have to tell the

15   truth and if you provide what is, quote, unquote

16   "substantial assistance," the government can file a

17   motion with the court and ask that your sentence be less

18   than 6 1/2 years?

19   A.    Yes, sir.

20   Q.    And you don't want to go to prison for 6 1/2

21   years, do you?

22   A.    No, sir.

23   Q.    So you're here today in an effort to provide

24   something of substance to the government, right?

25   A.    No, sir.

1   Q.     You're here to provide substantial assistance so

2   that they file a motion with the Court recommending that

3   Judge Young impose a sentence shorter than 6 1/2 years,

4   right?

5   A.     No, sir, I'm here to tell the truth.

6   Q.     You are here, sir, because you do not want to go

7   to jail for 6 1/2 years, that is your hope and

8   expectation, isn't it?

9   A.     I would hope to not go to jail for 6 1/2 years?

10  Q.     Right.

11  A.     That's not why I'm here.

12  Q.     But if you're not cooperating, you understand that

13  your guideline-recommended range is between 6 1/2 and 8

14  years?

15  A.     Yes, sir.

16  Q.     And you're hoping that based upon what you've done

17  in this court and what you've done with the government

18  would result in a sentence that's going to be shorter

19  than 6 1/2 years?

20  A.     Yes.

21  Q.     Thank you.

22         MR. O'HARA:  May I have a moment, your Honor?

23         THE COURT:  You may.

24         (Pause.)

25         MR. O'HARA:  Thank you.

1        THE COURT:  Anything further?

2        MS. BLOOM:  Yes, your Honor.

3        THE COURT:  Go ahead, Ms. Bloom.

4

5    REDIRECT EXAMINATION BY MS. BLOOM:

6    Q.    Mr. Caplitz, do you understand that if you do not

7    testify truthfully today that your sentence could be

8    longer than the 6 1/2 to 8 years?

9    A.    I do.

10   Q.    You were asked about an attorney letter that was

11   referred to as "lying by proxy" to the U.S. Attorney's

12   Office, do you recall that letter?

13   A.    The one written by Mr. Clayman?

14   Q.    Yes.

15   A.    Yes, I do.

16   Q.    Did you review that with Ms. Herman prior to

17   sending it?

18   A.    I believe I did.

19   Q.    And did she know the true facts as well?

20   A.    She did.

21   Q.    And so did you two agree together to send a false

22   letter to the U.S. Attorney's Office?

23   A.    We did.

24   Q.    And the times that you lied in your depositions

25   and went to the government and lied prior to agreeing to

1    come in and plead guilty, did Ms. Herman know that you

2    were going to make those statements?

3              MR. O'HARA:  Objection.

4              THE COURT:  Sustained.  Don't lead the witness.

5    He can't testify to what's going on in her mind.

6    Q.    Did you have discussions with Ms. Herman prior to

7    testifying in your depositions in the civil suits?

8    A.    Yes.

9    Q.    Did you work out any plan?

10             MR. O'HARA:  Objection.

11             THE COURT:  The objection is sustained.  You can't

12   lead the witness.

13   Q.    What were the discussions?

14   A.    The discussions were specifically that, um,

15   Mrs. Herman did not want to -- it to come out that we

16   were involved in a relationship.  This was before she

17   actually testified, but she told me that she intended to

18   testify, tell them that she was happily married and

19   involved in a relationship with Keith and living with

20   Keith, and if I told them about our relationship, she

21   would look like a liar.

22   Q.    And what did you two discuss that you would do?

23   A.    That I would lie about my sexuality.

24   Q.    Did you have discussions -- any discussions about

25   how you would testify about other matters and the merits

1    of those lawsuits?

2    A.    Yes.

3    Q.    Did you have any discussions about whether you

4    should testify --

5          MR. O'HARA:  Objection.

6          THE COURT:  Well, that may stand, um, but you are

7    leading, Ms. Bloom.  You cannot lead.

8          Go ahead.

9    Q.    Did you have any discussion -- what were the

10   discussions about how you would testify about the merits

11   in those lawsuits?

12   A.    There were many many detailed conversations about

13   the merits.  These cases were an attempt, in some sense,

14   to overturn the initial --

15         MR. O'HARA:  Objection.

16         THE COURT:  No, um, we'll stop it at that point,

17   there were many discussions about the merits.  That may

18   stand.

19   Q.    Were there any discussions about how each of you

20   --

21         MR. O'HARA:  Objection.

22   Q.    -- would testify in those matters?

23         THE COURT:  Sustained.

24   Q.    What discussions, if any, did you have about

25   testifying in those cases?

A.     We had discussions specifically about the matters
of our personal life, we had discussions about business
details that we would discuss, we had discussions about
how we would talk about the initial transfer of the
stock, there was a decision to make up a loan document
so that it wouldn't appear that I had simply gifted her
the stock because gifting her the stock would have led
to a conversation as to why the stock was gifted, which
would have led to the relationship, so we actually
drafted and backdated a note for $12,000 with the
collateral being the stock and, um, supposed -- and the
story I believe I told at the depositions was that when
I couldn't pay off the loan, I transferred the stock,
and that I still stayed working in the business.

Q.     And did you have discussions with Ms. Herman about
that story prior to testifying to it?

A.     Absolutely.

Q.     Was the story true?

A.     No.

Q.     When you went into initially meet with
representatives of the government, um, and -- did you
talk with Ms. Herman prior to those meetings?

A.     The initial meetings with Mr. Clayman?

Q.     Yes.

A.     Yes.

1    Q.    And did those meetings occur before or after the

2    time when you decided to plead guilty?

3    A.    Before.

4    Q.    Okay, focusing on the meetings that you had with

5    the government before you made the determination to

6    plead guilty, what discussions, if any, did you have

7    with Ms. Herman about what you would say in those

8    meetings prior to the meeting?

9    A.    The conversations were about the, um, process of

10   assigning commissions, the fact that that had been done,

11   the fact that I had done that since 1985, that she

12   thought that the whole, um -- excuse me, that the whole

13   tax case was not meritorious and that we would fight it

14   and that she was concerned that she was potentially

15   going to be the next person indicted, and that it was,

16   um, my plan, my objective, my life-long desire to head

17   that off at the pass and make sure that no matter what

18   happened, Rosalind wasn't indicted.

19   Q.    And, um, when you went into those meetings with

20   the government prior to your agreement to plead guilty,

21   did you tell the truth?

22   A.    I did not.

23   Q.    Did you tell the truth about how you and

24   Ms. Herman handled your taxes?

25         MR. O'HARA:  Objection.

1          THE COURT:   No, she may have that.   Yes.

2    A.     I did not.

3    Q.     And prior to those discussions with the

4    government, had you had discussions with Ms. Herman

5    about what you would tell the government about how you

6    and she had handled your taxes?

7    A.     I did.

8    Q.     What had you agreed -- had you and she made any

9    agreement -- what if anything had you decided about how

10   you would describe how you and she had handled your

11   taxes?

12   A.     We discussed how the additional monies that had

13   been paid on my behalf, um, include -- based on the fact

14   that I had agreed in writing previously to assume 50

15   percent of the legal fees, which were quite substantial.

16   So we agreed that we were going to use that as a basis

17   and create documentation showing that there had been a

18   loan in place from me to the corporation, that I would

19   owe that money back upon subsequent payment.   And the

20   story that we told was that if the hedge fund had been

21   successful, I was in place to receive substantial funds

22   as a bonus and that those monies would then be used to

23   repay that loan with interest, therefore it was a

24   bonafide loan and not really income.

25   Q.     Is all that true?

1  A.    Absolutely not.  Well, the bonuses were.  And the

2  original agreement on paying back that 50 percent of the

3  legal fees were.  The rest of it wasn't.

4  Q.    All right.  Now, you were asked some questions by

5  Mr. O'Hara about when you were first indicted and you

6  said, um, January.  Was that January of 2012?

7  A.    I believe that's correct.

8  Q.    And then, um, was Ms. Herman indicted shortly

9  thereafter?

10 A.    I believe it was March of 2012 when I had a

11 superseding -- an additional indictment which added more

12 charges.

13 Q.    And those initial indictments, were they for tax

14 charges essentially?

15 A.    Yes.

16 Q.    And then approximately a year later in March of

17 2013, were the investment fraud charges added?

18 A.    They were.

19 Q.    You were also asked some questions about e-mails

20 and who wrote e-mails and the style of e-mails.  So I'd

21 like to have you take a look at Exhibit 441.

22       (On screen.)

23 Q.    If we can look at that first e-mail.

24 A.    (Looks.)

25 Q.    You see it is an e-mail from Cyber Bingo to

1    rherman14@cox.net.

2    Did you write e-mails from the rherman14@cox.net

3    address?

4    A.    There may have been occasions when I was actually

5    in Las Vegas where I had, very infrequently, used this

6    e-mail, but not on a regular basis, no.

7    Q.    Who regularly used that address?

8    A.    Rosalind Herman.

9    Q.    And what e-mail address did you use?

10   A.    Insightonsite@comcast.net.

11   Q.    Okay.  So if we could go to the next e-mail, you

12   see that there's an e-mail that says from Rosalind

13   Herman and then, bracket, "Insightonsite@comcast.net."

14   Who do you believe wrote that e-mail?

15   A.    I believe I wrote that e-mail.

16   Q.    And there's a "to" and a "cc."  Can you explain

17   that?

18   A.    Yes, the "to" -- it's tough to tell but my best

19   guess would be that the "to" is to rherman --

20         MR. O'HARA:  Objection.

21         THE COURT:  Wait.  Wait.  "Guess" is a word that

22   we don't use because I'm going to tell the jury they

23   cannot guess.

24         THE WITNESS:  I'm sorry, your Honor.

25         THE COURT:  Now, if it's true you can ask him, you

1    can say "within this range," or something that's less

2    precise, but you can't just guess because that's

3    suggests you're just throwing a dart at a wall and they

4    can't do that.  You testify as best you actually recall

5    and I will tell them they can't guess and they'll decide

6    what they believe of your testimony.

7          THE WITNESS:  Thank you, your Honor.

8          THE COURT:  So put your question again.

9    Q.    Let me try a different question.

10   Did you have a practice with respect to copying on

11   e-mails of this type?

12   A.    It was my normal practice to copy

13   rosalind@rherman14 on effectively all of my e-mails.

14   Q.    And if we go down below in this e-mail, you see

15   that there is an e-mail from rherman14@cox.net, on March

16   26th, 2008, forwarded to Rosalind Herman, forwarding a

17   Cyber Bingo chat, 3408, and then forwarding an e-mail.

18   Can you explain why you wrote this e-mail, the top

19   e-mail?

20   A.    Yes.  The e-mail was sent to me by Rosalind and

21   she required a response and she -- to the best of my

22   recollection, asked me to comprise a response, which I

23   then did, and as was my -- and this is not very helpful,

24   but as is my normal practice, I would send a copy of the

25   e-mail to the rherman14 and then a file copy back to

1    Insight Onsite.  But because of the e-mail program that

2    I had that we used, um, both of those e-mails were named

3    "Rosalind."

4    Q.    Okay.

5          MS. BLOOM:  I'd like to turn now to the e-mail

6    that is February 9, 2009, I think it's about five pages

7    in.

8          And, Ms. Rojas, if we could just page down to the

9    one that has February 9, 2009 in the packet.  Yes, thank

10   you.

11         (On screen.)

12   Q.    You'll see there a response from "Full Tilt

13   Poker."

14         MS. BLOOM:  If we can go down to the bottom of the

15   e-mail where the original message is.

16         (On screen.)

17   Q.    The original message says:  "I live in Vegas.  You

18   people do not teach people to play a real game of poker,

19   you teach them to bet the house on 3 and a 6, and that

20   is a great way to make them in the poor house, not a

21   great way to help people keep gambling in perspective.

22   That is not the art of poker, people.  You are a bunch

23   of fools who should be brought the trash, making these

24   fools believe you should bet on 3 and 6 off-suits and

25   think that that is a good hand.  Now I believe what they

1   say about your site in the casino.  It's true."

2   Who wrote that e-mail?

3   A.    Rosalind Herman.

4   Q.    How do you know?

5   A.    I believe we actually discussed this e-mail.

6   Q.    Okay.

7   Turning to the next e-mail on April 20, 2009.  If you go

8   down to the bottom of the page again, to the original

9   message, and you see the original message, "I am at

10  88350487," and can you read the rest of that?

11  A.    I can't see it.  Sorry.

12        MS. BLOOM:  Oh, I'm sorry.  I will both blow it up

13  and read it.

14        (Blown up on screen.)

15  Q.    Can you see it now?

16  A.    Yes.

17  Q.    And "Critalia was saying horrible things to me,

18  please stop him all because I won a hand from him.  Look

19  at the chat log, very bad to say to a lady, able I."

20  Who wrote that message?

21  A.    Rosalind.

22  Q.    Turn to the next page.

23  A.    (Turns.)

24        MS. BLOOM:  Can we blow that up.

25        (On screen.)

1    Q.    Can you tell who wrote that message?

2    A.    Yes.

3    Q.    And what e-mail address is that from?

4    A.    Rherman14@cox.net.

5    Q.    All right.  If we could turn to the e-mail, it's

6    about five pages in, it's September 9th, 2008.

7    A.    (Turns.)

8          MS. BLOOM:  And now if we could go to the bottom

9    of that.  And maybe go to the next page.

10         (On screen.)

11   Q.    Do you see the e-mail from rherman14@cox.net,

12   September 9th, 2008, to "support at poker stars.com":

13   "I am legally blind and I do not realize in was in a

14   $80,000 sit, I go because I could not see, I only play

15   in the 300s.  Could you help me?  When I realized it, I

16   left.  What if anything can I do?"

17   Who wrote that e-mail?

18   A.    Rosalind.

19   Q.    How do you know?

20   A.    It's from her e-mail address and it's in her

21   style, so I should say that I don't know, but I believe

22   it to be true.

23   Q.    Was she legally blind?

24   A.    She was not.

25   Q.    Did you ever know her to pretend to obtain an

1    advantage?

2         MR. O'HARA:  Objection.

3         THE COURT:  No, he may answer that question "yes"

4    or "no."

5    A.    Yes.

6    Q.    I'd like to turn now to some questions you were

7    asked about payment to, um, Sadis & Goldberg and to

8    Mr. Gotleib.

9    A.    Okay.

10   Q.    The payments to Sadis & Goldberg, what were those

11   for?

12   A.    Legal services in preparation of documentation

13   concerning the hedge fund.

14   Q.    And did you get any documents concerning a hedge

15   fund?

16   A.    Yes, we did.

17   Q.    What did you use those for?

18   A.    We used the documents as part of the marketing

19   program to our clients to raise money.

20   Q.    Was it useful to have official-looking documents?

21   A.    Yes.

22   Q.    Did you ever get in any actual money under

23   management at the hedge fund?

24   A.    No.

25         THE COURT:  All right, let's take the morning

1    recess at this time.

2           Is that all right?

3           MS. BLOOM:  That's fine, your Honor.

4           THE COURT:  And we'll take the morning recess at

5    this time till 5 minutes after 11:00.

6           You have not heard all the testimony, please

7    therefore keep your minds suspended, do not discuss the

8    case either among yourselves nor with anyone else.

9           We'll recess for one half hour, till 5 minutes

10   after 11:00.  We'll recess.

11          THE CLERK:  All rise for the jury.

12          (Jury leaves, 10:35 a.m.)

13          (Resumed, 11:05 a.m.)

14          THE COURT:  Go ahead, Ms. Bloom.

15          MS. BLOOM:  Thank you, your Honor.

16   Q.    Mr. Caplitz, did you have any communications with

17   Ms. Herman about her educational background?

18   A.    Yes.

19   Q.    What was your understanding of her education?

20   A.    That she had an undergraduate degree.

21   Q.    In what?

22   A.    Bookkeeping and accounting.

23   Q.    And were you aware of any other training that she

24   had?

25   A.    Yes, she had a paralegal certificate.

1    Q.    And, um, do you know when she got that?

2    A.    Sometime in the mid '90s from Northeastern.

3    Q.    Okay.  Now, you've talked somewhat about these

4    lawsuits that occurred in the 2000s time period, um, and

5    I believe you mentioned that there were some lawsuits

6    where you and Ms. Herman's companies were defendants and

7    some where you were not.  Can you explain what the other

8    lawsuits were?

9    A.    Yes, they were suits against -- initially against

10   Mr. -- the attorney in the matter --

11   Am I allowed to say his name?

12   Q.    Yes.

13   A.    Attorney Murphy and his alleged partners.  Also

14   there was a suit against the provider of my, um, errors

15   and omissions coverage.

16   Q.    Who made the decision to file those suits?

17   A.    Mrs. Herman.

18   Q.    And the bulk of the -- for what did the bulk of

19   the legal fees that were occurred, for which lawsuits

20   were they?

21   A.    The bulk of the legal fees were in the suit

22   against Murphy and, um, his associates as well as the

23   Cal. insurance case, although there certainly were some

24   fees that were expended fighting the judgment in the

25   Meiselman case.

1          THE COURT:  Hold up.  We're getting somewhat far
2    afield here because it's agreed, it's stipulated that
3    those earlier civil suits have nothing to do with the
4    criminal charges brought in this case, that's before
5    you.  Now having said that, I've let you hear about
6    those because, um, issues such as their relationship and
7    issues about whether people were telling the truth in
8    those lawsuits, you're entitled to know that because
9    you're going to have to evaluate the truth-telling of
10   each of the witnesses before you and maybe their
11   relationship is going to bear on your analysis in this
12   case.  But that's a civil case or cases.
13          So I think we're getting a little far afield.  Go
14   ahead.
15   Q.    Did you, um, count discussions with Ms. Herman
16   about the money being received from the investors?
17   A.    Yes.
18   Q.    And, um, did you have discussions about whether or
19   not that was taxable?
20   A.    Taxable income?
21   Q.    Taxable in any form.
22   A.    Yes.
23   Q.    Can you explain what the discussion was?
24   A.    I told her that they were clearly not income
25   because it was the sale of an asset.  I said that that

1   would have been a capital gain based on whatever we

2   determined the basis of the shares were.

3   Q.    And if it was a capital gain, would it need to be

4   recorded and any --

5          MR. O'HARA:  Objection.

6          THE COURT:  Sustained.

7   Q.    Did you have discussion about what tax reporting,

8   if any, might be necessary if it was a capital gain?

9   A.    Yes.

10  Q.    What was it?

11  A.    That if it was a capital gain, it would have to

12  have been reported on the Schedule D of the return as a

13  capital gain.

14  Q.    And do you know whether or not Ms. Herman reported

15  any of the investor payments as a capital gain?

16  A.    To the best of my knowledge, no.

17  Q.    She did not or you don't know?

18  A.    To the best of my knowledge she did not report

19  that.

20  Q.    In the course of your dealings with Ms. Herman

21  over the years, did you have discussions about the

22  concepts of misrepresentations and breach of fiduciary

23  duty?

24  A.    Yes.

25  Q.    And did you ever tell Ms. Herman that it was legal

1    to lie to her clients?

2    A.    No.

3    Q.    Did you ever tell Ms. Herman that it was legal to

4    deceive them?

5          MR. O'HARA:  Objection.

6          THE COURT:  Wait a minute.  No, she may have the

7    question.  She can have it in that form.

8    Q.    Did you ever tell Ms. Herman that it was legal to

9    deceive them?

10   A.    No.

11   Q.    Did you ever tell her that it was legal to sell

12   them worthless investments?

13   A.    No.

14   Q.    Did you ever tell Ms. Herman that it was legal to

15   deceive the firm's clients into entrusting their money

16   to her and spending it all herself?

17   A.    No.

18         (Pause.)

19         MS. BLOOM:  No further questions.

20         THE COURT:  Nothing further for this witness?

21         MR. O'HARA:  I have a couple of questions, your

22   Honor.

23         THE COURT:  Go ahead.

24

25   RECROSS-EXAMINATION BY MR. O'HARA:

1    Q.    Regarding e-mails, you testified that the Insight

2    Onsite e-mail was the one that you used?

3    A.    Almost exclusively, yes.

4    Q.    And there were e-mails that were presented to you

5    about 10 minutes ago, actually 10 minutes before when

6    you were testifying before the break, which showed

7    e-mails that said "rosalind@insightonsite" that you

8    identified as coming from you?

9    A.    Yes.

10   Q.    You also testified that you would use

11   Mrs. Herman's e-mail address when you were in Nevada?

12   A.    Yes.

13   Q.    And when you spoke to agents back on June 2nd of

14   last year you told them that you had remote access to

15   her e-mail address?

16   A.    I don't recall that comment.

17   Q.    You're saying you didn't make that statement or

18   you don't recall making that statement?

19   A.    I don't recall that statement, sir.

20   Q.    Is it an accurate statement?

21   A.    (Silence.)

22        MS. BLOOM:  Objection, your Honor.  Could we just

23   get a clarification as to which e-mail address we're

24   talking about at this point.

25        THE COURT:  Well, I understood the question and I

1  understood it to be that, um, address to which

2  Mr. O'Hara just referenced that had the name "Rosalind"

3  on it, is that right?

4        MR. O'HARA:  That's right, your Honor.

5        THE COURT:  All right.

6        Did you have remote access so that you could send

7  mail from a remote access with that address?

8        Is that your question?

9        MR. O'HARA:  Yes.

10       THE COURT:  That's the question.

11  A.    I believe at one time we were able to go online

12  and access that e-mail.

13       MR. O'HARA:  Your Honor, I move to strike the

14  answer as not being responsive, it was a simple "yes" or

15  "no" question.

16       THE COURT:  No, I'm going to let it stand in that

17  form.  That's his answer.

18       MR. O'HARA:  Okay.

19  Q.    And when you spoke during the debriefing on June

20  2nd of last year, you were present with your attorney,

21  with members of the U.S. Attorney's Office, there were

22  five people in the room with you, and at that point in

23  time you told all people who were gathered there that

24  you may have used your e-mail to send messages when you

25  were in Nevada, and you've adopted that, but also in the

```
1    notes of the agent who was writing this down, was that

2    Mr. Caplitz also had remote access.

3    Are you saying that's not a true statement?

4    A.    I believe that references the

5    Insightonsite@comcast.net e-mail, which I did have

6    remote access to.

7            MR. O'HARA:  I have nothing further, your Honor.

8            THE COURT:  Nothing further for this witness?

9            MS. BLOOM:  Nothing further, your Honor.

10           THE COURT:  You may step down.

11           THE WITNESS:  Thank you, your Honor.

12           (Witness steps down.)

13           THE COURT:  Call your next witness.

14           MS. MURRANE:  The government calls Paul White.

15           THE COURT:  He may be called.

16           (Pause.)

17           (PAUL WHITE, sworn.)

18

19           * * * * * * * * *

20           PAUL WHITE

21           * * * * * * * * *

22

23    DIRECT EXAMINATION BY MS. MURRANE:

24    Q.    Good morning.

25    A.    Good morning.
```

```
 1    Q.     Can you please state your name for the jury.
 2    A.     My name is Paul White.
 3    Q.     Where do you work?
 4    A.     I work for the Internal Revenue Service.
 5    Q.     What is your title there?
 6    A.     I'm an internal revenue agent.
 7    Q.     How long have you been a revenue agent with the
 8    Internal Revenue Service?
 9    A.     Approximately 32 years.
10    Q.     Do you work in any particular group?
11    A.     Yes, I work in the Special Enforcement Program
12    Group.
13    Q.     And can you describe briefly for the jury what it
14    is that a revenue agent in that group does?
15    A.     Well, a revenue agent gets assigned cases, tax
16    returns, and reviews them and can select them for
17    examination and will go out there and ensure the
18    taxpayer and the tax returner are complying with federal
19    tax laws.  In my particular group I assist the, um --
20    Special Agent Doherty in criminal investigation, I do
21    assist them in criminal investigations and I assist the
22    Department of Justice in, um, criminal tax cases.
23           THE COURT:  Let's -- let me give a caution here.
24           However they bureaucratically set up the IRS
25    doesn't make it more likely or less likely that the
```

1   person who's charged here, Ms. Herman, was engaged in

2   anything criminal.  It just doesn't.  We'll see what

3   evidence he has to give us.

4        Go ahead.

5        MS. MURRANE:  Thank you, your Honor.

6   Q.    Were you always working with the Special

7   Enforcement Program in your IRS career?

8   A.    No, I had other positions for the first five years

9   of my career.

10  Q.    And what were those positions?

11  A.    Um, I was a tax auditor where we did, um, desk

12  audits of people who would come in with their, um --

13  well, we would do just a review of their 1040s, and

14  before that I did some work up at the service center and

15  I worked on the review staff, which we would review

16  other tax auditors and revenue agents' work.

17  Q.    So what's the total number of years that you've

18  worked for the IRS?

19  A.    37 years.

20  Q.    Can you describe briefly, for the jury, what your

21  educational background is?

22  A.    I have a bachelor's of science in business

23  administration from the University of New Hampshire.

24  Q.    In the course of your duties as a revenue agent,

25  were you assigned to an investigation of Rosalind

Herman?

A.     Yes, I was.

Q.     When were you assigned to that case?

A.     I believe it was March of 2011.

Q.     Did you review records related to that

investigation?

A.     Yes, I did.

Q.     What kind of records did you review?

A.     I reviewed bank records and I reviewed third-party

records.  Um, Gregg Caplitz was working as representing

different insurance companies and he received payments

for those.  I reviewed checks that they submitted to him

and I also reviewed 1099 documents that they sent to

him.

Q.     Did you review any IRS records?

A.     Yes, I did, I reviewed all the tax returns in this

case and in some cases the lack of filing of those tax

returns.

Q.     And how about filings with any state authorities?

A.     Um, I looked into -- for the corporations

involved, um, the articles of incorporation for each of

the corporations.

Q.     What state records would those have been?

A.     Um, through the Commonwealth of Massachusetts, the

state of Delaware, and the state of Nevada.

1          MS. MURRANE:   If we could pull up on the screen

2     what has already been marked and admitted into evidence

3     as Exhibit 410.

4          (On screen.)

5     Q.    Mr. White, can you describe for the jury what this

6     chart is?

7     A.    Yes, these are the various corporations and

8     partnerships, um, that are controlled or run by Rosalind

9     Herman.

10          MS. MURRANE:   And if we could, um -- I'll just

11     concentrate on one box.

12          (On screen.)

13     Q.    Could you describe for the jury what information

14     is contained in each box?

15     A.    Yes, it's Financial Resources Network, Inc., it

16     was established in 1995, and Rosalind Herman is listed

17     on the articles of incorporation as the treasurer,

18     clerk, director, and incorporator.

19     Q.    And what was the source of information that's

20     contained in each of these boxes?

21     A.    They were all from the articles of incorporation.

22     Q.    All right.   Thank you.

23          Now, when you first started working on this

24     investigation, what did you do?

25     A.    Um, well, I met with Special Agent Doherty and he

1    gave me some information about the case and the initial

2    investigation involved Gregg Caplitz and, um, his

3    filings with the Internal Revenue Service.  I looked at

4    bank records and I looked at tax filing documents.

5    Q.    And did you expand that search of tax filing

6    documents to include other people or entities?

7    A.    Yes, we did, we included -- we looked into the

8    filings of Rosalind Herman.

9    Q.    Did you compile that tax filing information

10   somewhere?

11   A.    Yes, I did.

12         MS. MURRANE:  If we could bring up, for the

13   witness only, what's been premarked as Exhibit "L," as

14   in "Larry," "B," as in "Boy."

15         (On screen.)

16   Q.    Mr. White, can you explain, um, in a general sense

17   what this document shows?

18   A.    This shows the, um -- the corporations that

19   Ms. Herman was involved with and, I believe in the last

20   column, her own filings or tax return history for the

21   years 2003 through 2011.

22   Q.    And what's the information that you used to put

23   together this chart?

24   A.    Um, for this I used, um, IRS transcripts, Internal

25   Revenue transcripts, they have a transcript that shows a

1     filing history and will show particular years -- it will

2     show the entire filing history for that, um, particular

3     identification number, be it a Social Security number

4     for an individual or an employer identification number

5     in the case of a business corporation or partnership.

6          MS. MURRANE:  The government would offer into

7     evidence what's been premarked as Exhibit LB.

8          MR. O'HARA:  No objection.

9          THE COURT:  LB may be admitted, it will be exhibit

10    number?

11         MS. MURRANE:  411.

12         THE COURT:  411 in evidence.

13         (Exhibit 411, marked.)

14    Q.   Now, let's go over this chart and kind of walk the

15    jury through what its parts are.

16         THE COURT:  Let me, um -- and this isn't a

17    caution, just an explanation.

18         This is something -- this chart is something the

19    government made up as part of this investigation.  That

20    doesn't mean this can't be used as evidence.  It's what

21    we call a summary of voluminous papers, documents.

22    Because if you believe this witness, or believe this

23    exhibit -- and it's entirely up to you whether you

24    believe it, disbelieve it, believe parts of it, you have

25    to look at a lot of different tax filings that go into

1    this chart.  So again to save time and to make things

2    understandable, we let the parties, any parties, the

3    government, someone who's charged in a civil action, the

4    rule is the same, where you've got voluminous papers you

5    can create a summary and then the witness testifies from

6    the summary and can be cross-examined about it.

7         Now, when you come to look at a summary in the

8    jury room, you want to ask yourself is the summary

9    accurate, does it accurately summarize other documents?

10   And if you believe it does, you can use it to figure out

11   how -- what it tells you about the case.  It's entirely

12   up to you.  Like any other exhibit or testimony, you can

13   believe it, disbelieve it, believe parts of it.  So this

14   is a summary exhibit.

15        And go ahead, Ms. Murrane.

16        MS. MURRANE:  Thank you, your Honor.

17   Q.   Let's concentrate on the top part of this chart.

18   And across the top row, what's represented there?

19   A.   The very top row is the, um, names of the four

20   corporations that were likely to file tax returns and

21   the last column would be the, um -- would be Ms. Herman,

22   her record.

23   Q.   Are the companies that are listed here all of the

24   companies that were on the chart that we were just

25   looking at?

1    A.    No, they're not.

2    Q.    What's missing and why?

3    A.    Um, the New England Financial, um, is not in there

4    because I believed they had dissolved that corporation

5    prior to 2003 and there wouldn't have been -- well, they

6    wouldn't have had to have a -- they wouldn't have had a

7    filing requirement.  Also the Insight Onsite, um, I

8    believe on the previous chart it's listed three

9    different corporations, they were all incorporated

10   basically at the same time, and, um, only one of them --

11   we figured only one of them would actually be required

12   to file returns.

13   Q.    And does this chart include Financial Family

14   Holdings?

15   A.    No, it does not, also.

16   Q.    Why not?

17   A.    That was a parent company and it was holding title

18   to one of the other corporations and Family Financial

19   Holdings was also owned by or run by Ms. Herman.

20   Q.    Now, let's look at the next couple of lines on

21   this chart and we'll just look at the first two columns

22   as an example.  It says on the left "IRS Form" and then

23   there are some numbers following along from that.  Can

24   you explain what those are?

25   A.    Sure.  Do you see under "Financial Resources

1    Network" the form is an 1120 form?  1120 is a

2    corporation income tax return similar to what you file

3    every year, the 1040, but this one, the 1120, is for

4    corporations.  Now, this entity reports its income at

5    the end of its year and it deducts expenses and if there

6    was a gain or if there was income left after that they

7    pay income tax direct to the IRS.  Okay?

8    Q.    And then if we look at the second column I see

9    that underneath "Financial Designing Consultants" is

10   "1120s," so what is the difference?

11   A.    "1120s," it's a corporate tax return, they file

12   every year, they report their income, they deduct their

13   expenses, and then whatever the gain or loss was

14   remaining after they make their computation, the profit

15   or loss, they don't pay taxes on it, the shareholders --

16   um, the income gets distributed to the shareholders or

17   it gets assigned to the shareholders and it gets taxed

18   on the shareholder's Form 1040.  So the 1120 pays taxes

19   directly, the 1120s, it follows through to the partners

20   or the shareholders, and the shareholders can report the

21   gain or loss from that business activity on their own

22   return.

23   Q.    So for Financial Designing Consultants, Inc., who

24   would any gain or loss flow through for that

25   corporation?

1    A.    That would have been Rosalind Herman.

2          MS. MURRANE:  Now let's take a look at the next

3    few entities.  And let me make that a little bigger.

4          (On screen.)

5    Q.    And what's the tax reporting for Knew Finance

6    Experts and Insight Onsite?

7    A.    Okay, they're also an 1120s corporation, so any

8    profit or loss from their activities during the year

9    would flow through to the shareholder's tax returns.

10   Q.    And for the Knew Finance Experts, who should that

11   flow through to?

12   A.    Rosalind Herman.

13   Q.    How about Insight Onsite Strategic Management?

14   A.    Okay, um, for I believe up until -- I'm not sure

15   because the chart doesn't it show it right here, but

16   they were not -- if you go back to the previous chart,

17   they weren't incorporated, um, there were no articles of

18   incorporation filed until the year 2008.  So from 2003

19   through 2007 they were not required to file tax returns

20   because it was not a recognized entity.  And in 2008

21   they had an employer identification number, it's a

22   corporate, um, social security number, but, um, they did

23   not file any returns.  Okay?  And so the first five

24   years they weren't required, they were not required to

25   file because they didn't exist, and the next four years

1    they didn't file returns.

2         But we did find, when we reviewed, um, Rosalind

3    Herman's, I believe, her 2011 return, on her own return

4    she filed what's known as a "Schedule C."  Schedule A is

5    for itemized deductions for an individual return,

6    Schedule B is where you report your interest income and

7    dividend income, if you have any, and Schedule C for an

8    individual is where you report profit or loss from your

9    being a sole proprietorship.  And so Rosalind Herman

10   reported income and expenses on Schedule C, her own

11   Schedule C, and the activity was listed as "Insight

12   Onsite," um, "Strategies" or -- but she listed that as

13   the business name on her personal Schedule C for 2011.

14   That's the only place it ever showed up with the filing

15   history that I was able to determine.

16   Q.   If we take a look at the last column there, um, in

17   blue, at the top it says "Rosalind Herman" -- excuse me,

18   and then underneath it says "1040."  What does "1040"

19   mean?

20   A.   "1040" is, um, what most of us here in this room

21   hopefully file, um, it's an individual tax return, a

22   federal income tax return that we generally file

23   hopefully by April 15th, though for us folks in

24   Massachusetts this year I believe we have until the

25   19th.

1    Q.    And, Mr. White, underneath the various tax filing

2    forms that we've just gone through on that line there

3    were some states listed and for Rosalind Herman it says

4    "NA," what is that information?

5    A.    The states listed are where I found the articles

6    of incorporation.  You can go online, go to, um --

7    through Delaware, go to the Secretary of State's office,

8    and you can research any corporate filings, um, based on

9    the name of the corporation, if you know it.

10   Massachusetts allows you to search, um, a corporation

11   based on the name of the corporation as well as any of

12   the corporate offices individually.

13   Q.    And let's talk a little bit about the information

14   that's contained in the boxes underneath on each of

15   these columns and let's just start with the first one in

16   the upper left, "Financial Resources Network, Inc.," and

17   then across for 2003 what's the information contained in

18   that box?

19   A.    Okay, in that box at the top it says "filed," and

20   that is the date, February 12th, 2007, that the IRS

21   received the 2003 tax return for Financial Resource

22   Network.  It was due, um -- like an individual tax

23   return is due April 15th, but for a corporation -- which

24   is 3 1/2 months after the end of the calendar year, but

25   for a corporation they have 2 1/2 months to file their

1    corporate return after the end of their calendar year or

2    fiscal year.  So in this case the 2003 return for

3    Financial Resources was due March 15th of 2004.

4    Q.    And when was it actually filed?

5    A.    February 12th, 2007.

6    Q.    Now, let's go to a slightly different block here

7    under "Financial Designing Consultants," and for the

8    year 2004 what's the information in that box mean?

9    A.    Um, that indicates for the year 2004 Financial

10   Designing, um, did not file a return.  They did file for

11   an extension of time to file, that's why I show the

12   "EXT," an extension was filed, and, um, it's generally

13   automatic from the Internal Revenue Service, it's a 6

14   month extension, and so they normally would have been

15   required to file that on March 15th, 2005, but since

16   they asked for an extension it wasn't due until

17   September 15th, 2005.  But they never filed.

18   Q.    Now, it seems like there's some kind of

19   color-coding going on with this chart, is that right?

20   A.    Yes.

21   Q.    Can you explain to the jury what the color-coding

22   is?

23   A.    Sure.  Um, the brighter orange represents, um, tax

24   returns and years for these entities including, um,

25   Ms. Herman where returns were not filed.  That would be

1    the -- yeah, the darker orange.  The lighter orange,

2    like what we saw for -- yeah, for Financial Resources

3    for that first year, it's, um -- those indicate the

4    returns were filed but they were filed late.

5    Q.    And then I think we talked a little bit, but just

6    remind the jury what the gray boxes mean?

7    A.    Okay.  As I said, Insight Onsite, um, was not

8    required to file since it wasn't an existing entity

9    until 2008.

10   Q.    And then here there's a lighter color.

11   A.    Um, there are two instances where Rosalind Herman

12   filed returns on time.

13   Q.    So how many times did Ms. Herman and her companies

14   file taxes but file them late?

15   A.    I believe there are 18 instances that they filed

16   late.

17   Q.    So it would be each of these orange boxes here?

18   A.    The lighter orange, yes.

19   Q.    Okay.  (Counts.)

20   A.    Oh, it may be 20.

21   Q.    So 20 times?

22   A.    Right, 20 times they filed and filed late.

23   Q.    Okay.  And were the late filings filed late by

24   just a matter of days or was it a longer, generally more

25   significant period?

1    A.    Generally, um, or at least so in the first

2    instance it was three years late.  Um, the 2007

3    through 2009 returns were all filed approximately at the

4    same time in August of 2011.  So substantially late.

5    Q.    Well, how many times did Ms. Herman and her

6    companies not file taxes at all?

7    A.    I believe that number is 18.

8    Q.    How many potential filings are shown on this

9    chart?

10   A.    40.

11   Q.    And of those 40 filings, how many times were the

12   taxes timely filed?

13   A.    Twice.

14   Q.    Did you also look at, um, filings for each of

15   these entities and for Ms. Herman for the year 2012?

16   A.    Yes, I did.

17   Q.    And what were the results of that inquiry?

18   A.    Um, no returns were filed.

19   Q.    Does a failure to file taxes have an impact on the

20   IRS?

21   A.    It certainly does.

22   Q.    Can you tell the jury a little bit about that?

23   A.    Well, if people don't file when they're required

24   to file, um, the IRS has to expend resources like my

25   time, Agent Doherty's time, we -- you know as I said I

 1    started this case back in 2011 and Agent Doherty

 2    probably started it a few months before that, so a lot

 3    of time and effort has gone into, um, you know, these

 4    four entities and Ms. Herman, and of course Mr. Caplitz

 5    as well.  But a lot of resources and time and effort.

 6    If we had to do that for every -- for every case in this

 7    country, well, we wouldn't be doing a -- um, we couldn't

 8    do the job.  The IRS and the federal government require

 9    or we ask for voluntary compliance, in other words we

10    ask all American taxpayers and corporations to give

11    their best effort to report their income and take their

12    expenses they're entitled to and voluntarily comply with

13    the tax laws because we just don't have the manpower to

14    audit everybody.

15         THE COURT:  If you grant a taxpayer an extension,

16    what period do you grant it for?

17         THE WITNESS:  6 months from the due date.

18         THE COURT:  Okay.  Now, when you were saying "some

19    of them were filed late," were they filed late with

20    extensions and inside the extensions or outside the

21    extensions or can't we tell from the chart?

22         THE WITNESS:  You can tell.

23         THE COURT:  You tell the jury.

24         THE WITNESS:  In the case where an extension was

25    filed, I put that down as the due date, and if that came

1    for a corporation, a 6-month extension would have been

2    granted until September 15th of whatever -- the

3    following year.

4         THE COURT:  Can you get more than one?

5         THE WITNESS:  Um, yes, but you'd have to request

6    an additional extension and the IRS at that point would

7    have to approve it.

8         THE COURT:  So automatically -- or pretty much

9    automatically, if you request, the IRS will give you

10   another 6 months?

11        THE WITNESS:  They'll give you the first 6 months

12   free, but you have to request and the IRS has to approve

13   your extension for an additional period of time.  It's

14   not automatic, it's up to the IRS to decide, and you

15   have to give a reason why you need the extension.

16        THE COURT:  Thank you.  I'm just curious.

17        Go ahead, Ms. Murrane.

18        MS. MURRANE:  Thank you.

19        If we could bring up, um, for the witness only,

20   what has been premarked for identification as Exhibit

21   "L," as in "Larry," "D" as in "Dog."

22        (On screen.)

23   Q.   And can you give just a general overview of what

24   this document shows?

25   A.   Okay.  I'm sure you all remember Gregg Caplitz, he

1    preceded me, and he earned commissions from selling life

2    insurance.  Um, so this exhibit, what I did is I took

3    all of his commission checks that were put into entities

4    controlled by Ms. Herman -- and these are just

5    Mr. Caplitz's commission checks, they don't represent

6    all the checks because Mr. Caplitz did negotiate some

7    into his personal bank account, he cashed some, and

8    there were also some that we were unable to determine

9    where they went.

10   Q.    So what records did you rely on to --

11   A.    I relied on bank records provided by the entity's

12   banker and, um, I reviewed the information from the

13   insurance companies who provided checks and in some

14   cases 1099 documents which report their commission

15   income per year paid to Gregg Caplitz.

16         MS. MURRANE:  Your Honor, the government would

17   offer into evidence what's been premarked as Exhibit LD.

18         MR. O'HARA:  No objection.

19         THE COURT:  It may be received.  And the numbers

20   are?

21         MS. MURRANE:  413.

22         THE COURT:  LD in evidence, Exhibit 412, it's

23   another summary exhibit.

24         MS. MURRANE:  413, your Honor.

25         THE COURT:  413 in evidence.

1          (Exhibit 413, marked.)

2     Q.    All right, Mr. White, if we can do what we did

3     before and kind of walk the jury through what this chart

4     shows across the top, what is shown here?

5     A.    Um, those were the four entities controlled by

6     Ms. Herman and on the last column is a bank account

7     controlled by, um, both, um, Ms. Herman and Mr. Caplitz,

8     and in that case there's only a commission check of

9     $260.

10          And so in 2003, um, there were -- going into --

11    deposited into Financial Resources's bank account were

12    $62,028.67, that was all -- that whole amount is from

13    Gregg Caplitz's commission checks, they were deposited

14    to Financial Resource Network's bank account.

15    Q.    And then as you go along each of these columns,

16    what's shown there?

17    A.    It's shown the amount of commission checks that

18    went into the bank accounts of these entities for that

19    year for Gregg Caplitz's commission checks.

20    Q.    And then if we take a look at the last column

21    here, what does that show?

22    A.    Um, the -- well, for instance, in 2003, between

23    all the entities, um, Caplitz's commission checks

24    deposited into these entities totaled $1,302,442.96.

25    Q.    And if you go down the column, what do each of

1   those numbers reflect?

2   A.    They represent the total Caplitz commission checks

3   deposited into all the entities by year.

4   Q.    So the last three here where there's 0 dollars

5   with respect to commission checks, why is there 0

6   dollars?

7   A.    Well, he did not receive any commission checks

8   after that, um, after 2009 there were no more commission

9   checks.

10          MS. MURRANE:  Now, if we can bring up, for the

11   witness only, what's been premarked for identification

12   as Exhibit LC as in "cat."

13          (On witness screen.)

14   Q.    And, Mr. White, if you could explain briefly what

15   this document shows?

16   A.    Okay.  As I said, I went through all the bank

17   records, I went through all the third-party information

18   from insurance companies and other payors, um, and I

19   determined, as best I could, from going basically

20   through the bank records and those third-party records,

21   the income of each of the entities, as determined

22   through their bank records and the other third-party

23   records, that should have been reported by year.

24          MS. MURRANE:  And the government would offer into

25   evidence what's been premarked as Exhibit LC.

1        MR. O'HARA:  No objection.

2        THE COURT:  LC is admitted.  The number?

3        MS. MURRANE:  412.

4        THE COURT:  In evidence, 412.

5        (Exhibit 412, marked.)

6    Q.    All right.  So then we see the same companies

7    listed here across the top.  What's the information

8    that's contained in each column then?

9    A.    Um, that is the amount of income that I was able

10   to determine from going through the bank records and the

11   third-party records for Financial Resources Network for

12   the years 2003 through 2012.

13   Q.    And how is this chart different than the chart we

14   just looked at?

15   A.    This represents not only Caplitz's income but

16   other income that, um, was traceable to Financial

17   Resources, they had other sources of income.

18   Q.    I see.  And then the column at the bottom that

19   shows the total, what is that figure and what does that

20   show?

21   A.    That's the income that I determine, um, should

22   have been reported or that I was able to trace, um, for

23   Financial Resource Network for 2003 through 2012 and

24   that amount was $1,293,109.

25   Q.    Now, in your review of, um, bank records from

1    2003, were you able to take a look at the entirety of

2    bank records for that year?

3    A.    No, um, the banks are really on a tight schedule

4    now so every 6 years, and I think they do it monthly,

5    they start destroying records.  We were not able to get

6    complete records for the year 2003, and the first set

7    that we have started in April of 2003.  So we were not

8    able to include, um, January through March of 2003.

9    Q.    Were you able to look at bank records for the full

10   years for all the other years listed on this chart?

11   A.    Yes, I was.

12         MS. MURRANE:  And let's just take a look at the

13   last column.

14         (On screen.)

15   Q.    And can you talk about the final figure here on

16   the bottom right?

17   A.    All right.  You add across for each of the years

18   with the income from all of the entities and I came up

19   with a total of $4,798,988, that I traced as income.

20         MS. MURRANE:  If we could bring up what's been

21   premarked, for the witness only, as Exhibit LE.

22         (On witness screen.)

23   Q.    And can you describe briefly for the jury what

24   this document shows?

25   A.    This is strictly information from the filed tax

 1    returns.  For the corporations they reported a gross

 2    receipts amount, and I just pulled that number from

 3    whatever they did for each year and put it onto the

 4    schedule, it's just simply taking the numbers right off

 5    the tax return, the gross figures.  And in the case of,

 6    um, Rosalind Herman -- and I did discuss this a little

 7    earlier, for 2011 she did report, um, gross income on

 8    her Schedule C, which is her own return, from Insight

 9    Onsite, she reported $188,634 on her Schedule C.

10         MS. MURRANE:  The government would offer into

11    evidence what's been premarked as Exhibit LE.

12         MR. O'HARA:  No objection.

13         THE COURT:  LE is admitted and what is the exhibit

14    number?

15         MS. MURRANE:  414.

16         THE COURT:  414 in evidence.

17         (Exhibit 414, marked.)

18    Q.    Mr. White, I think you were just telling the jury

19    about, um, how you did see Insight Onsite income

20    reflected in some tax filing.  Can you just show them

21    where that is on this chart?

22    A.    Um, you can see it in, um -- it's actually the

23    only number there for 2011, $188,634, and I found that

24    on Rosalind Herman's personal 1040 for that year on her

25    Schedule C, which is income or loss from a sole

1    proprietorship, and on it she listed the name of the

2    entity as "Insight Onsite."

3    Q.    And for each of the other years, 2003 through

4    2012, what was the income that Rosalind Herman reported

5    on her tax filings?

6    A.    On just Rosalind Herman?

7    Q.    Yes.

8    A.    Um, that was it on her return, $188,634.

9    Q.    Now, again can you just describe how this chart,

10   which is titled "Reported Gross Receipts," is different

11   from the chart we just looked at, which was titled

12   "Traced Receipts"?

13   A.    The traced receipts is what I determined -- what

14   was shown going through the evidence, the tax returns --

15   not the tax returns, the bank records, the deposit

16   items, and third-party records, the -- and before 2009

17   the, um -- after -- up to 2009 I looked at insurance,

18   third-party records for commissions.  So the trace

19   receipts represented what I -- what should have been

20   reported at least -- at the very least.  This reflects

21   what was actually reported.

22   Q.    So the information that forms the basis for the

23   numbers here is which documents?

24   A.    The tax returns.

25   Q.    All right.  So let's take a look at the totals

1    column here and can you talk to the jury about the

2    figure on the bottom right and what that is and what it

3    represents?

4    A.    Sure.  The total gross receipts, for 2003 through

5    2012, um, reported by Rosalind Herman and her corporate

6    entities was $3,239,322.

7         MS. MURRANE:  If we could bring up, for the

8    witness only, what has been premarked as Exhibit LF.

9         (On witness screen.)

10   Q.    Briefly, Mr. White, what does this document show?

11   A.    Okay, this, um, I take the sum from when I got --

12   the previous couple of exhibits ago, the traced

13   receipts, what I determined by going through the

14   records, okay, and I compared that to what, um, I had on

15   the last exhibit, the reported receipts from the tax

16   returns, and I show what the difference is.

17        MS. MURRANE:  The government would offer into

18   evidence what's been premarked as Exhibit LF.

19        MR. O'HARA:  No objection.

20        THE COURT:  And its number?

21        MS. MURRANE:  415.

22        THE COURT:  LF admitted, Exhibit 415 in evidence.

23        (Exhibit 415, marked.)

24   Q.    So, Mr. White, um, you said this chart showed

25   traced receipts and reported receipts, um, can you walk

1    the jury through those columns?

2    A.    Sure.  Once again the traced receipts column is

3    the income that I was able to determine that were

4    reflected in the records that I reviewed.  The reported

5    receipts, once again are just off the tax returns.  And

6    the last column, the amount not reported, is the

7    difference between the two.  And a negative in this case

8    being, um, that they reported -- my analysis showed they

9    underreported their income by, um -- their gross income

10   by that amount.

11   Q.    And what is that total amount?

12   A.    Um, $1,849,921.

13   Q.    Now, I see, in this orange column here, that's

14   showing the differences and for 2003 there's an "NA,"

15   why is that?

16   A.    As we discussed, we didn't find -- we didn't have

17   records for the first three months of 2003 because of

18   the, um, banks, the way they get rid of records now.

19   Q.    If you had done the calculations based on the

20   information that you had available to you, how would

21   that have changed your total figure here on the bottom?

22   A.    Um, the difference would have probably been about

23   $1.5 million.

24   Q.    In underreporting?

25   A.    Underreported income.

1          MS. MURRANE:  If we could bring up, for the

2     witness only, what's been premarked for identification

3     as LG.

4          (On witness screen.)

5     Q.    Mr. White, what is this document?

6     A.    Um, this again, um, it's the exact same as the

7     last exhibit except the, um -- instead of having the

8     difference between reported and traced receipts, this

9     one shows the actual amount of taxes paid by all of

10    Ms. Herman's entities and on her own tax return, her

11    personal tax return, how much taxes she paid.

12         MS. MURRANE:  The government would offer into

13    evidence what's been premarked as Exhibit LG.

14         MR. O'HARA:  No objection.

15         THE COURT:  LG is admitted, and the number?

16         MS. MURRANE:  416.

17         THE COURT:  Exhibit 416 in evidence.

18         (Exhibit 416, marked.)

19    Q.    Now, Mr. White, before I ask you about this chart

20    I did have one other question, which was whether in your

21    review of documents you looked to see if there were W-2s

22    or 1099s issued by the companies, the Rosalind Herman

23    entities and Rosalind Herman?

24    A.    Um, Rosalind Herman received W-2s for a couple of

25    years, two or three years maybe.

Q.    Were there other W-2s or 1099s issued by those
entities that you found based on your review?

A.    No.

      MS. MURRANE:  Now, um, so turning your attention
to what's been marked as Exhibit 416.

      (On screen.)

Q.    Can you describe what this shows again?

A.    Um, once again by year, 2003 through 2012, the
first column is my determination, which we call "Trace
Receipts," the second column being "Reported Receipts,"
which are the ones right off of the tax return, and then
the third column, "Taxes Paid," that is the actual tax
that was paid, um, through all the entities and
Ms. Herman on their tax returns.

Q.    So if we look at those totals along the bottom,
the $4.7 million reflects what number?

A.    The -- what we're calling "traced receipts," what
I determined.

Q.    And then $3.2 million is what?

A.    What was actually reported on the tax returns.

Q.    And then the final figure is how much?

A.    Um, $24,608, the total amount of tax paid by all
the entities and Ms. Herman from 2003 through 2012.

Q.    And I'm not going to make you get your calculator
out, Mr. White, but, um, give us just an estimate of

1    what percentage is 24,000 of 4.798 million?

2    A.    Well, less than 1/2 a percent.

3    Q.    How can taxes paid be so low on such a large

4    amount?

5    A.    They have very high expenses.

6    Q.    And does underreporting of income have an impact

7    on the IRS?

8    A.    Yes.

9    Q.    What kind of impact?

10   A.    Well, we're the money-maker for the federal

11   government and, um, you know, if people don't

12   voluntarily comply with the tax laws and pay their fair

13   share, then we have to make it up somehow.

14         MS. MURRANE:  No further questions, your Honor.

15         THE COURT:  Any questions for this witness?

16         MR. O'HARA:  Yes, your Honor.  Thank you.

17         THE COURT:  You may.

18

19   CROSS-EXAMINATION BY MR. O'HARA:

20   Q.    Mr. White, good morning.

21   A.    Good morning.

22   Q.    I have some questions to ask you and I ask you to

23   bear with me because I know very little about taxes and

24   you have 37 years of experience.

25   A.    Right.

1    Q.    You're aware of the fact that all of these

2    insurance commission checks were issued to Mr. Caplitz,

3    right?

4    A.    Yes.

5    Q.    And the insurance companies who issued those

6    checks to him issued those checks to him under his

7    Social Security number?

8    A.    Yes.

9    Q.    So, um, those, um, checks were issued to him and

10   then at the end of the tax year the companies issued,

11   um, forms, right --

12   A.    Yes.

13   Q.    -- that were given to Mr. Caplitz and were given

14   to the Internal Revenue Service?

15   A.    That's correct.

16   Q.    And they're called "1099s"?

17   A.    "Form 1099."

18   Q.    Okay, and a Form 1099 is given to a person or an

19   entity who receives money from a business but is not an

20   employee, right?

21   A.    Correct.

22   Q.    Because if Mr. Caplitz was an employee, let's say

23   of Indianapolis Life Insurance Company, they would have

24   given him a W-2, right?

25   A.    If he was an employee, yes.

1    Q.    And then they would have withheld taxes from his

2    paycheck and they're required to withhold taxes and send

3    those taxes to the Internal Revenue Service, right?

4    A.    That's correct.

5    Q.    And at the end of the year then the taxpayer can

6    apply for a refund if too much is held back?

7    A.    Correct.

8    Q.    But in Mr. Caplitz's case, because he wasn't an

9    employee, there were no taxes withheld from the money he

10   was earning from the insurance companies?

11   A.    Correct.

12   Q.    And you learned from your investigation into this

13   case that Mr. Caplitz, um, was, um, assigning those

14   commission checks, some of those commission checks to

15   companies under the control of Mrs. Herman?

16   A.    That's correct.

17   Q.    And you told the jury about the, um, concept of

18   flow-through taxation, and correct me if I'm wrong, but

19   if income goes into a corporation, and it's a small

20   corporation, then the shareholders of that corporation

21   are responsible ultimately for the tax consequences of

22   that income revenue?

23   A.    For an 1120, yes.

24   Q.    Okay.  So the small corporation, the S-Corporation

25   has to file its own return, right?

1    A.    Yes.

2    Q.    And then after there are, um, deductions made for

3    business purposes, for example, what's left over is a

4    profit which then appears on the shareholder's income tax

5    return?

6    A.    On their personal income tax return.

7    Q.    So I got it right?

8    A.    Yes.

9    Q.    Okay.  Now, Mr. Caplitz -- and when you're talking

10   about "business expenses," you're talking about expenses

11   that are legitimately part of the business that receives

12   the income, right?

13   A.    Yes.

14   Q.    And it's fair to say that a payment of a personal

15   mortgage for a person who is not an employee of the

16   company would not be a legitimate business deduction,

17   would it?

18   A.    No, it wouldn't.

19   Q.    In fact if a person who is not a legitimate

20   employee of a company were to have let's say $1,000 a

21   month paid on their personal mortgage, that would be a

22   taxable event for the person who had the mortgage paid

23   for, right?

24   A.    Yes.

25   Q.    And that would not be a legitimate business

1    deduction for the business that paid him the money?

2    A.    They could claim it as part of his commission

3    income.

4    Q.    Okay.  But regarding Mr. Caplitz, he was not an

5    employee, as far as you understood, and, um, if the

6    companies that were receiving commission checks from him

7    were paying for his health insurance, and he was not an

8    employee, the money or the value of those health

9    insurance premiums, wouldn't they be taxable events to

10   him?

11   A.    Yes.

12   Q.    And as far as you know from your investigation

13   into this case, Mr. Caplitz never declared on his

14   personal income tax returns any of the personal expenses

15   that were being paid on his behalf by the corporations

16   he was depositing money into, right?

17   A.    He reported amounts on his, um, 1040s, on his

18   Schedule C, probably around like $41,000, and it got

19   less as time went by.

20   Q.    Well, the $41,000, um -- let me strike that.

21         He received, a couple of times, 1099s from

22   businesses controlled by Mrs. Herman, didn't he?

23   A.    I don't believe so.

24   Q.    He was receiving, from Mrs. Herman's businesses,

25   $41,450 a year, is that a ballpark figure?

1    A.    Um, I believe that's correct for a couple years,

2    yeah.

3    Q.    Yeah, and he received the same amount for a two-

4    or three-year period of time?

5    A.    Correct.

6    Q.    And you're aware of the fact that, um, Mr. Caplitz

7    was investigated by agents from your office regarding

8    his tax consequences with the commission checks he was

9    receiving from the insurance companies, right?

10   A.    In prior years?

11   Q.    Yeah.

12   A.    I was aware of that generally, yeah.

13   Q.    Are you aware of an investigation that was done by

14   Mr. Sinnot from the Internal Revenue Service regarding

15   Mr. Caplitz's practice with the commission checks he was

16   receiving?

17   A.    Um, I know Mr. Sinnot at the time, he was a, um, a

18   collections officer, he's really not trained in the, um

19   -- he didn't get the same training that I received.  I

20   received --

21   Q.    Okay, but he was in charge of collecting taxes

22   that weren't paid?

23   A.    Correct.

24   Q.    And you're aware that he was -- that he had

25   contact with Mr. Caplitz about the money that he was

1    receiving from the insurance companies, right?

2    A.    I know there was some sort of investigation that

3    Mr. Sinnot did.  I do not know if he had any contact

4    with him.

5    Q.    But from years 2003, I think, through 2009, there

6    was a determination made that Mr. Caplitz, um, had not

7    been paying his taxes that were his responsibility for

8    the 1099s he was receiving from the insurance companies?

9    A.    Um, well, he entered into a plea agreement.

10   Q.    Yes.  But you're aware of the fact that the, um,

11   money that was received by companies controlled by

12   Mrs. Herman, in which you've testified that proper taxes

13   were not paid, all that money were insurance commission

14   checks that were made payable to Mr. Caplitz, right?

15   A.    Not all the income, but a good portion of it.

16   Q.    At least 95 percent?

17   A.    Well, through 2003 through 2008 maybe, and you saw

18   his commission checks go down substantially during that

19   period.

20   Q.    But the lion's share of the money that were

21   deposited into bank accounts of companies controlled by

22   Mrs. Herman through that period of time were commission

23   checks that were made payable to Mr. Caplitz under his

24   Social Security number?

25   A.    Up to like 2008, yes, the lion's share.

1   Q.    Okay.  And you're also aware of the fact, from

2   having looked into the articles of incorporation of

3   various companies that were formed by Mrs. Herman, that

4   Mr. Caplitz was not an officer or a director of any of

5   those companies, right?

6   A.    Um, I don't believe he was, right.

7   Q.    And he definitely wasn't a shareholder in any of

8   those companies, was he?

9   A.    No.

10  Q.    So that income, through the theory of flow-through

11  taxation, any income that came into companies of which

12  he was not a shareholder, technically speaking, he would

13  not be responsible for any taxation on that through the

14  flow-through?

15  A.    (Silence.)

16  Q.    Well, let me rephrase the question so we can all

17  understand it.

18  A.    Thank you.

19  Q.    Mr. Caplitz, you know, is not an officer of any of

20  those corporations that you identified were formed by

21  Mrs. Herman, right?

22  A.    Correct.

23  Q.    Each one of those businesses had its own tax

24  identification number, right?

25  A.    Correct.

Q.    Which is the business version of a Social Security
number?

A.    Yes.

Q.    Mr. Caplitz was receiving, in 2003, like a
million-three in commission checks under his Social
Security number, right?

A.    Correct.

Q.    And he assigned all of that income to businesses
controlled by Mrs. Herman?

A.    Correct.

Q.    He was not an officer, a director, or a
shareholder of those businesses, right?

A.    Right.

Q.    So those monies were not taxable to him -- let me
rephrase it.

      If money came into Mrs. Herman's accounts from
legitimate investors, for example, okay, and it was put
in those accounts, because she's the shareholder of
those companies she's responsible ultimately for the
taxation on that money?

A.    I don't like your use of the word "investors," um,
but if she's -- well, he should have reported his
income.

Q.    Yeah, but he didn't?

A.    He didn't.

1    Q.    He put the income into her business, right?

2    A.    Yes.

3    Q.    And the loss that you described that was

4    underreported by her returns, those -- 95 percent of

5    that money was money that was supposed to be paid

6    tax-wise by Mr. Caplitz, right?

7    A.    Up until 2009, yes.

8    Q.    Okay.

9    A.    Not after 2009.

10   Q.    Now, you're also aware of the fact that in modern

11   ages people can file their tax returns electronically,

12   right?

13   A.    Yes.

14   Q.    And for people as old as I am, I can distinctly

15   remember having to sign them in person and mail them in

16   the old-fashioned way, right?

17   A.    Yes.

18   Q.    And given the complexity of the tax laws to us lay

19   people, we frequently use the services of licensed tax

20   preparers, right?

21   A.    Yes, we do.

22   Q.    And are you aware of the fact -- you're aware of

23   the fact that some of the returns that were filed on

24   behalf of Mrs. Herman's companies were filed

25   electronically by a licensed tax preparer?

A.      Um, I guess -- I don't recall that any were

e-filed, no.

Q.      All right, there were some years --

A.      Generally if they're late you can't e-file.

Q.      Okay.  Um, there were some years where her

signature doesn't appear on the returns, do you know

that?

A.      Right.

Q.      Okay.  And it's the taxpayer's responsibility to

file their return, right?

A.      Yes.

Q.      If the licensed tax preparer, an accountant,

whatever, is negligent in his responsibilities,

ultimately it goes back to the taxpayer?

A.      Um, generally, but we can go after -- we have been

known to go after unscrupulous preparers.

Q.      Okay.  And there are also penalties that are

imposed on people or entities who file their taxes late,

right?

A.      Yes.

Q.      And also there are -- is there any, um,

calculation process that's used to determine the

penalties?

A.      Yes, um, there's the, um --

        One thing I should probably point out on the

1    extension filed that I mentioned --

2    Q.    Um-hum.

3    A.    -- it's an extension of time to file, not to pay.

4    Q.    Right.

5    A.    So if they have a tax due and owing that they know

6    of at the time of the filing, they have to pay it even

7    if they don't file on time.

8         But anyway, the penalty is, um, I believe it's 4

9    1/2 percent a month, um, for filing late and it's

10   another half a percent a month, um, for a maximum

11   penalty of, I believe, 25 percent, unless there's fraud

12   involved, then it goes up to 75 percent.

13   Q.    So there's a way that you can collect arrearages

14   on taxes and also penalties from people who aren't

15   complying with their obligations?

16   A.    Um, yes.

17   Q.    And, um -- and I just lost my train of thought

18   here.

19        If once a business, a company, receives a tax

20   identification number, is it required to file a tax

21   return every year until the company is dissolved?

22   A.    No.

23   Q.    So if a company has no income in a given year,

24   there's no obligation for the company to file a return?

25   A.    Correct.

1        MR. O'HARA:  May I just have a moment, your Honor?

2        THE COURT:  Yes.

3        (Pause.)

4        MR. O'HARA:  Okay.  Thank you.

5        THE COURT:  Nothing further, Ms. Murrane?

6        MS. MURRANE:  Nothing further, your Honor.

7        THE COURT:  You may step down.  Call your last

8   witness.

9        (Witness steps down.)

10        MS. BLOOM:  The United States calls Thomas

11   Zappala.

12        THE COURT:  He may be called.

13        (THOMAS ZAPPALA, sworn.)

14

15        * * * * * * * * * * * * * *

16        THOMAS ZAPPALA

17        * * * * * * * * * * * * * *

18

19   DIRECT EXAMINATION BY MS. BLOOM:

20   Q.    Could you identify yourself.

21   A.    Yes, my name is Thomas Zappala.

22   Q.    How are you employed?

23   A.    I'm employed as a financial investigator for the

24   United States Attorney's Office here in the District of

25   Massachusetts.

1    Q.    How long have you been in that position?

2    A.    24 years.

3    Q.    What are your duties?

4    A.    I assist in the investigation and, um, of matters,

5    um, of financial crimes, involving financial crimes.

6    Q.    How were you previously employed?

7    A.    I worked in the banking industry for 10 years for

8    a commercial bank and a savings bank.

9    Q.    Can you describe your educational background.

10          THE COURT:  Just a moment.  The same caution.

11          The fact we're hearing from him and he's employed

12   in the same office as the prosecuting attorneys are

13   doesn't make it more likely or less likely that any

14   crimes have been committed, it's just he's a witness

15   like any other witness, and he's entitled to give you

16   his background because you're going to assess, as you

17   can with any witness, whether you believe him,

18   disbelieve him, or believe parts of what he said.

19          Go ahead, Ms. Bloom.

20          Your background, sir, that's what she asked.

21          THE WITNESS:  Yes, sir.

22   A.    I have an undergraduate degree from Boston College

23   in economics.  I have a master's in business

24   administration from Babson College.  I attended nights.

25   Q.    And, um, have you been asked to review records and

1    documents in this case?

2    A.    I have.

3    Q.    Could you generally describe the records and

4    documents you have reviewed?

5    A.    Certainly.  Um, primarily the records of bank

6    accounts, which include bank statements, checks, deposit

7    items, wire transfers, et cetera.  I've also reviewed

8    tax return records provided by customers, um, filings

9    with the state of Massachusetts and Nevada, um, and

10   other assorted records.

11   Q.    Okay.  I'll now ask you to take a look at what is

12   in evidence as Exhibit 68 at Page 2.

13   A.    (Turns.)

14         MS. BLOOM:  And, I'm sorry, yes, if we could just

15   blow up the top.

16         (Enlarges on screen.)

17   Q.    What is this document, Mr. Zappala?

18   A.    This is the, um, 2003 tax return for Financial

19   Designing Consultants, Inc.

20   Q.    Is it signed?

21   A.    It is at the bottom.

22   Q.    And can you read that signature?

23   A.    Yes, it's signed "Rosalind Herman."

24   Q.    Um, and now going back to the center of this first

25   page, can you tell us what the total revenue reported

1    for Financial Designing Consultants, Inc. is in 2003?

2        MS. BLOOM:   Sorry, if we could go to "Revenue"

3    first, Line 1.

4        (On screen.)

5    A.    Yes, the revenue reported is $1,504,231.

6    Q.    And what were the total deductions reported for

7    FD, Financial Designing Consultants, Inc., in 2003?

8    A.    The total deductions were $1,388,798.

9    Q.    And is there a breakdown, um, of the other

10   deductions listed on Line 19?

11   A.    There is later in the return.

12   Q.    Okay.

13       MS. BLOOM:   Could we go to Exhibit 68, Page 10,

14   for that breakdown.

15       (On screen.)

16   Q.    What is that?

17   A.    This is the, um, breakdown of the, um, other

18   deductions listed on, I believe, it was on Line 19.

19   Q.    And did you review the activity in the Financial

20   Designing Consultants, Inc. bank account for 2003?

21   A.    I did, I reviewed the checks and, um, debit items,

22   outgoing wires, for the period of April 1st through

23   December 31st, 2003.

24   Q.    And, um, did you see evidence in those bank

25   accounts that the expenses listed here, on Page 10 of

1     Exhibit 68, were incurred by Financial Designing

2     Consultants, Inc.?

3     A.    I did not, um, not to the degree they're reported

4     here.

5     Q.    Okay.  And did you search for them?

6     A.    I did.

7     Q.    Okay.

8           MS. BLOOM:  I'm showing you what's been marked for

9     identification as Exhibit A.

10          (On screen.)

11    Q.    What is this?

12    A.    This is a chart I prepared which lists the -- um,

13    in summary form, the banking activity for the Financial

14    Designing Consultants, Inc. account for the years 2003

15    and 2004, it lists the month-end balance, the deposits

16    and withdrawals or disbursements by month, and totals

17    are by year.

18          MS. BLOOM:  I would now offer Exhibit A as Exhibit

19    101.

20          MR. O'HARA:  No objection.

21          THE COURT:  A is admitted, Exhibit 101.

22          (Exhibit 101, marked.)

23          MS. BLOOM:  Okay, if we could just blow up the

24    first half of that chart.

25          (Enlarges on screen.)

1   Q.    If you can now explain to the jury what this chart

2   shows?

3   A.    Sure.  It shows the activity in the account, um,

4   for which I was able to review, that is from April 1st

5   of 2003 through December 31st, 2003, again in summary

6   format.  It shows the beginning balance, um, as of March

7   31st, 2003, which would be the beginning balance on

8   April 1st, and, for example, it shows in that month

9   there were $3,902.45 in deposits, there were withdrawals

10  of $24,367.31, and the account had an ending balance of

11  $113,180.01.

12  Q.    And what does this, um, chart show was spent in

13  2003?

14  A.    Um, in 2003?  $698,847.17.

15  Q.    Okay.

16        MS. BLOOM:  I'd now like to show you what's been

17  premarked as Exhibit B for identification.

18        (On screen.)

19  Q.    Could you briefly summarize what that chart is?

20  A.    Yes, this is a summary I prepared, um, calculating

21  the expenses, the possible expenses for Financial

22  Designing Consultants, um, in the year 2003.

23  Q.    And when you say "possible expenses," did you make

24  any determination for this calculation as to whether

25  those were legitimate business expenses or not?

A.     I did not.

Q.     And so what is -- how did you determine what were "possible expenses"?

A.     Um, what I took from the tax return -- the income tax return, was the beginning balance reported in the account as of the end of the prior fiscal year.  I did this because I didn't have the --

Q.     I'm sorry, let me stop you.

       MS. BLOOM:  May I offer this Exhibit B into evidence as Exhibit 102.

       MR. O'HARA:  No objection.

       THE COURT:  B is admitted, Exhibit 102.

       (Exhibit 102, marked.)

Q.     Sorry, um, if you could begin again to explain this chart now that it's in front of the jury.

A.     Sure.  To calculate the expenses, um, as I didn't have the bank balance at the beginning of the year, I took what the company reported in their 2003 tax return as the beginning cash balance, that's the $181,627 that is the first number on the page, I added to that the $1,504,231 that the company reported as their receipts, and I came up with a total of $1,685,858.  I then subtracted what the company had left in the bank account at the end of the year, which number I took from the bank account statement, and that's the $721,211, and I

1    calculated then the most that the company could have

2    spent, based on the beginning balance and the receipts,

3    which was $964,647.  I compared that to what was

4    reported in the tax return as, um, reported deductions

5    less the amount deducted for depreciation, which is not

6    a cash expense, and I came up with a difference of

7    $419,759.

8    Q.    So based on your analysis of these records, did

9    Financial Designing Consultants, Inc. actually incur the

10   reported $1.3 million in expenses?

11   A.    They did not.

12   Q.    And was it mathematically possible for them to

13   have incurred that?

14         MR. O'HARA:  Objection.

15         THE COURT:  Well, the jury can calculate what's

16   mathematically possible.

17         Go ahead.

18         MS. BLOOM:  Okay.  Now I'd like to have you take a

19   look at Exhibit 68, Page 5.  And if we could blow up the

20   first line, Line 1, "Cash."

21         (Enlarged on screen.)

22   Q.    How much was reported as cash at the beginning of

23   the year by Financial Designing Consultants, Inc. for

24   the year 2003?

25   A.    $181,627.

1   Q.    And how much was reported as cash at the end of

2   the year?

3   A.    $183,333.

4   Q.    And did you compare that number to anything?

5   A.    I did, I compared it to what was in the bank

6   account for this company, Financial Designing

7   Consultants, at the end of that year.

8        MS. BLOOM:  Could we now also bring up Exhibit

9   5.01 in evidence, Page 17.

10       (On screen.)

11  Q.    And could you explain to the jury the document,

12  what is the document on the right, Exhibit 5.01, Page

13  17?

14  A.    Yes, this is the bank account statement for

15  Financial Designing Consultants, Inc. for the month

16  ended December 31st, 2003.

17  Q.    And how much was reflected as the ending balance

18  at that time in that account?

19  A.    $721,211.47.

20  Q.    And how does that compare to what was reported in

21  the tax return for that year as cash at the end of

22  December, 2003?

23  A.    It's significantly larger.

24  Q.    Is what is reflected as cash at the end of the

25  year for 2003 accurate?

1   A.    I believe it's accurately reflected in the bank

2   account statement and not accurately reflected in the

3   tax return.

4   Q.    Did you compare the disbursements from the bank

5   account to those reported for Financial Designing

6   Consultant's, Inc. on its 2004 tax return?

7   A.    Um, I did not.

8   Q.    Why not?

9   A.    There was not a tax return filed for, um, 2004 for

10  Financial Designing Consultants based on my review of

11  the records.

12  Q.    Okay.

13       MS. BLOOM:  I'd now like to turn you to 2006 and

14  another company, Financial Resources Network, Inc.  I

15  think we can clear the screen, please.

16       (Puts on screen.)

17  Q.    I'm showing you what's been marked as Exhibit

18  45.01 in evidence, can you identify this document?  I'm

19  sorry, that was mine, not yours.

20       What is 45.01?

21  A.  Yes, this is an American Express account statement

22  for an account in the name of "Rosalind Herman Financial

23  Resources Network."

24  Q.    Um, and what kind of company was Financial

25  Resources Network, do you know whether it was a

1   C-Corporation or an S-Corporation?

2   A.    Um, I don't know offhand.  I don't recall offhand.

3   I've seen the records.

4   Q.    Um, turning to Page 163.  What is this?

5   A.    (Turns.)

6         MS. BLOOM:  And if we can blow up the first line

7   of charges.

8         (Enlarges on screen.)

9   A.    This is one of the monthly account statements.

10  Q.    And do you see an entry for May 7th, 2006 to

11  "Promises to Keep," Derry, New Hampshire?

12  A.    I do.

13  Q.    And do you know what that is?

14  A.    I do.

15  Q.    What is it?

16  A.    It's the venue for the wedding of Brian and

17  Charlene Herman.

18  Q.    And how was that paid for?

19  A.    It was paid for by this American Express account.

20  Q.    And from what account was this American Express

21  account paid?

22  A.    I'm sorry, I don't understand the question?

23  Q.    I'm sorry, I'll keep going and then we'll look at

24  the documents.

25        MS. BLOOM:  And if we could also go to Page 175.

1          (On screen.)

2     Q.     Do you see an entry as June 22nd, 2006?

3     A.     I do.

4     Q.     And what is that?

5     A.     It's a charge in the amount of $2,576.84, um,

6     described as the "on-board cruise charges for the

7     Tahitian Princess."

8          MS. BLOOM:   Okay, I'd now like you to take a look

9     at Exhibit 5.05 in evidence at Page 486.

10         (On screen.)

11    Q.     What is that?

12    A.     This is a check from Financial Designing

13    Consultants, Inc. payable to American Express on June

14    12th, 2006 in the amount of $5,728.44.

15    Q.     And, um, what did that pay for?

16    A.     This paid for the American Express bill which

17    included the Promises to Keep charge we just looked at.

18    Q.     Okay.

19         MS. BLOOM:   I'd now like to have you take a look

20    at Exhibit 408 in evidence.

21         (On screen.)

22    Q.     Do you know what this is?

23    A.     I do, I know this is part of the listing of

24    on-board cruise charges for the Tahitian Princess cruise

25    for Brian Herman and Charlene Herman -- or Charlene

1    St. Lawrence.

2         MS. BLOOM:  If we could go to the next page.  Now,

3    if we could just blow up the first half of that.

4         (Enlarges on screen.)

5    Q.    What is this a listing of?

6    A.    It's a listing of on-board charges.

7         MS. BLOOM:  And if we could now go to Exhibit 5.05

8    at Page 506.

9         (On screen.)

10   Q.    What is this?

11   A.    This is a check on the account of Financial

12   Designing Consultants, Inc., um, payable to Wells Fargo.

13        MS. BLOOM:  This does not appear to be the correct

14   check, is it?  Let's just go to 505.  Yes.  I'm sorry

15   about that.

16        (On screen.)

17   Q.    Do you recognize this check?

18   A.    I do.

19   Q.    What is that check?

20   A.    This is a check that is drawn on the account of

21   Financial Designing Consultants, Inc. payable to

22   American Express on July 20th, 2006 in the amount of

23   $4600, it's the check that paid the American Express

24   bill which included the on-board cruise charges for the

25   Tahitian Princess.

1    Q.    Who signed this check?

2    A.    Rosalind Herman.

3          MS. BLOOM:   I'd now like to show you what are --

4    what have been marked as Exhibits 2.05, 3.05, 4.08,

5    5.07, 6.06, 1.07, 2.04, 3.04, 4.07, 5.05, and 6.05, all

6    of which are in evidence.

7          (On screen.)

8          (Hands paper copies to witness.)

9    Q.    Can you tell the jury what those are?

10   A.    (Looks through them.)

11   A.    Yes, these are each exhibits, um, which include

12   copies of the checks payable to Brian Herman, the stack

13   on my right, and Brad Herman, the stack on my left.

14   Q.    And is there one check payable to one or the other

15   on every single page of those exhibits?

16   A.    For the accounts of Financial Designing

17   Consultants and Financial Resources Network there's one

18   check on each page, and for the Town and Country Bank

19   records for the Knew Finance Experts account and the

20   Insight Onsite Strategic Management account, there are

21   multiple checks on each page, some of which are payable

22   to Brad or Brian Herman, some of which are payable to

23   other parties.

24   Q.    So there is at least one check on each of those

25   pages to either Brad or Brian Herman?

1  A.    There are.  And there are also some withdrawals

2  also included, which are not checks but which are

3  withdrawal slips, that identify Brad Herman or Brian

4  Herman.

5  Q.    And what does a "withdrawal slip" mean?

6  A.    Um, when someone goes to the bank and withdraws

7  money and presents a withdrawal ticket.

8  Q.    Okay.

9       MS. BLOOM:  At this time I'd like to have you take

10  a look at Exhibit 103 in evidence.

11      (On screen.)

12      MS. BLOOM:  And I'll just put that chart back up

13  too.

14      (On screen.)

15  Q.    What is this chart?

16  A.    This is a chart, um, I prepared, which lists the

17  individuals and amounts credited to the accounts of the

18  Knew Finance Expert at Washington Mutual Bank and Town

19  and Country Bank and credited to the account of Insight

20  Onsite Strategic Management at Town and Country Bank, it

21  lists the dates of the bank account, the name of the

22  individual, and totals the amounts at the bottom.

23  Q.    And what is the total amount of the funds

24  transferred into these accounts from these clients and

25  investors?

1   A.    It's 1 million and --

2         MS. BLOOM:   I'm sorry, I blew up the wrong thing

3   here.

4         (On screen.)

5   A.    $1,385,257.

6   Q.    Okay.  And what were the -- who were the holders

7   of the bank accounts into which these funds were

8   transferred, what companies?

9   A.    The companies were the Knew Finance Experts, um,

10  which had accounts at Washington Mutual Bank and Town

11  and Country Bank, and Insight Onsite Strategic

12  Management had an account at Town and Country Bank also.

13        MS. BLOOM:   And now I'm showing you Exhibit 85,

14  Page 12 in evidence, could you take a look at that.

15        (On screen.)

16  Q.    What is this document?

17  A.    This is a -- an initial list of officers,

18  directors, and resident agent of the Knew Finance

19  Expert, Inc. filed with the Secretary of State of the

20  state of Nevada.

21  Q.    And if we can look down to the listing of

22  directors and officers, who's listed as the president?

23  A.    Rosalind Herman.

24  Q.    Who's listed as the secretary?

25  A.    Rosalind Herman.

```
1    Q.    The treasurer?

2    A.    Rosalind Herman.

3    Q.    And one of the directors?

4    A.    Also Rosalind Herman.

5    Q.    And who are the other directors?

6    A.    Brian Herman and Brad Herman.

7    Q.    Okay.

8          MS. BLOOM:  Now, if we could look to Exhibit 3.01,

9    Page 1.

10         (On screen.)

11   Q.    What is this?

12   A.    This is the account agreement or signature card

13   for the Insight Onsite Strategic Management, LLC account

14   at Town and Country Bank.

15   Q.    And who are the authorized signers for Insight

16   Onsite account at Town and Country Bank?

17   A.    Rosalind Herman and --

18         MS. BLOOM:  Would you blow that up at the bottom.

19   Yes, all the way to the right.

20         (Enlarges on screen.)

21   A.    Rosalind Herman and Brian Herman.

22   Q.    Okay.  In the course of your duties did you look

23   at the activity in the Knew Finance and Insight Onsite

24   accounts to which the client investor funds were

25   deposited?
```

```
 1   A.     I did.
 2          MS. BLOOM:   And I'm going to ask you to look at
 3   what has been marked for identification as Exhibit D.
 4          (On screen.)
 5   Q.     What is this?
 6   A.     This is a chart or a graph that I prepared showing
 7   the account balances for the Knew Finance Expert
 8   accounts at Washington Mutual Bank and Town and Country
 9   Bank over time and I've indicated on there the names of
10   individuals making deposits that are reflected on
11   Exhibit 103.
12          MS. BLOOM:   I would offer this as Exhibit 104.
13          MR. O'HARA:   No objection.
14          THE COURT:   The letters?
15          MS. BLOOM:   "D" as in "dog."
16          THE COURT:   D is Exhibit 104 in evidence.
17          (Exhibit 104, marked.)
18          MS. BLOOM:   I'd like to put up what's been marked
19   for identification as Exhibit E.
20          (On screen.)
21   Q.     What is Exhibit E?
22   A.     Exhibit E is a similar graph I prepared showing
23   the daily account balance in the account of Insight
24   Onsite Strategic Management at Town and Country Bank,
25   um, over time and again I've indicated where there are
```

1  deposits made by the individuals reflected on Exhibit

2  103.

3          MS. BLOOM:  I would now offer what has been marked

4  as Exhibit E as Exhibit 105.

5          MR. O'HARA:  No objection.

6          THE COURT:  Exhibit E is admitted, Exhibit 105.

7          (Exhibit 105, marked.)

8          MS. BLOOM:  Okay, let's go back to Exhibit 104.

9          (On screen.)

10 Q.    Now that this is in front of the jury, can you

11 explain to the jury what this chart is?

12 A.    Yes, again I have graphed the daily account

13 balance for the accounts of the Knew Finance Experts,

14 um, the two accounts.  I added the balances together, I

15 obtained the daily balance from the account at Town and

16 Country Bank, from the account statements, and from

17 Washington Mutual.  I calculated the daily balance, I

18 added them together, and graphed the combined balance in

19 the accounts, um, over time beginning in, um, April of

20 2008 and going through March of 2011 when the activity

21 stopped in the account, or virtually stopped.

22 Q.    Okay.  So just looking to this first spike here.

23 What is the line going right up to the name "John and

24 Carla Bigelow"?

25 A.    Um, that would reflect the day that the funds were

1    transferred into the account from John and Carla Bigelow

2    and that transfer was in the amount of $100,000.

3    Q.    Does that correlate to the first line of Exhibit

4    103?

5    A.    It does, yes.

6    Q.    Okay.  And then as that purple line goes down,

7    what does that indicate is happening?

8    A.    That the funds in the account are being spent.

9    Q.    And how long is it before it goes down to zero?

10   A.    About two months.

11   Q.    Okay.  And then, in July of '08, this next big

12   spike, what is that?

13   A.    That was the $200,000 deposit from, um, Melvin and

14   Irene Burt.

15   Q.    And what happens to that money?

16   A.    Again that money is spent down over the next

17   couple months.

18   Q.    Okay.  And then is that pattern repeated in these

19   next entries here with the other investors and clients?

20   A.    It is.

21         MS. BLOOM:  And then if we look at the second

22   chart, Exhibit 105.

23         (On screen.)

24   Q.    And what does that cover?

25   A.    Again this is the activity in the account of

1   Insight Onsite Strategic Management.

2   Q.    And does that show the rest of the entry on

3   Exhibit 103 and how quickly they're spent out of the

4   account?

5   A.    It does.

6        MS. BLOOM:  I'd now like you to take a look at

7   Exhibit 1.01 at Page 24.

8        (On screen.)

9   Q.    What is this?

10  A.    This is the account of the Knew Finance Experts at

11  the Washington Mutual Bank.

12  Q.    Okay.

13       MS. BLOOM:  And if we could go to the beginning

14  balance section.

15       (On screen.)

16  A.    This is the statement for the March -- for the

17  month ending March 31st.

18  Q.    I'm sorry, is that "May 31st"?

19  A.    I'm sorry, it's "May 31st."  Thank you.

20  Q.    Okay.  And what was the beginning balance?

21  A.    The beginning balance was an overdraft of $313.35.

22  Q.    And did any money come in that month?

23  A.    Yes, $100,000.

24  Q.    Do you know what that 100,000 is?

25  A.    I do, it's the $100,000 wire transfer from the

1    Burts -- oh, I'm sorry, from the Bigelows.

2    Q.    Okay.

3          MS. BLOOM:  I'm going to just move this back so

4    the jury can see Exhibit 104.

5          (On screen.)

6    Q.    Is that the first line on this, the first spike on

7    Exhibit 104?

8    A.    It is.

9    Q.    And then looking down below, what happens to the

10   Bigelow's money?

11   A.    Um, the statement reflects there are, um, current

12   purchases and ATM withdrawals of $5,000 and change

13   during the month, um, there are some cash withdrawals

14   and then there are some checks paid.  Um, here --

15   Q.    Okay, yes, go ahead.

16   A.    The statement shows the wire transfer coming in on

17   May 16th, that's the top item there.  The first part of

18   the statement here, which carries over to the next page,

19   shows card purchases and ATM withdrawals.

20   Q.    Is there a separate place where there are --

21         MS. BLOOM:  Okay, can we go all the way down.

22         (Scrolls on screen.)

23   Q.    What's in the next section below?

24   A.    (Looks.)  There are electronic and miscellaneous

25   withdrawal items to include customer withdrawals,

1    payments to American Express, um, BMW Financial, and a

2    Sprint charge.

3    Q.    And going down to the last section, what does that

4    reflect?

5    A.    It reflects that there are checks paid on the

6    account.

7    Q.    Okay.

8          MS. BLOOM:   I see that there's an entry here for

9    $35,000.   Could we go to Exhibit 1.04, Page 3.

10         (On screen.)

11   Q.    What is that check?

12   A.    This is a check to "Robert Cohan, Esq." in the

13   amount of $35,000.

14   Q.    And do you have an understanding as to whether

15   Mr. Cohan had any relation to the purported hedge fund

16   investment?

17   A.    I had the understanding that he had no

18   relationship with the --

19         MR. O'HARA:   Objection.

20         THE COURT:   Yeah, to begin with "I understand," I

21   think I'm going to sustain that, so strike out the

22   answer.

23         Go ahead.

24   Q.    Who's money paid for the check to Mr. Cohan?

25   A.    The money from John and Carla Bigelow.

1    Q.    And how much money was --

2          MS. BLOOM:  If we go back to Exhibit 1.01, Page

3    24, again.

4          (On screen.)

5    Q.    How much money was left at the end of the month?

6    A.    There was $26,311.85.

7    Q.    What happened to that money in the next month?

8    A.    There was further spending in the account.

9    Q.    Okay.

10         MS. BLOOM:  I'm going to show you what has been

11   marked in evidence as Exhibit 01 at Page 32.

12         (On screen.)

13   Q.    What is this?

14   A.    This is the account statement for the Knew Finance

15   Expert's account at Washington Mutual Bank for the next

16   month -- I'm sorry, for the month of July, 2008.

17   Q.    And looking at the beginning and ending balances

18   for July of 2008, how much was in the account at the

19   beginning of the month?

20   A.    $207.72.

21   Q.    How much money came into the account that month?

22   A.    $200,010.

23   Q.    Who's money was that?

24   A.    That was the money from the Burts.

25   Q.    How much money was there left in the account at

1    the end of the month?

2    A.    $79,488.77.

3    Q.    And have you reviewed the payments from this

4    account as well?

5    A.    I have.

6    Q.    Um, and did you review the charges and the checks?

7    A.    I did.

8          MS. BLOOM:  Can we go to the next page.

9          (Turns on screen.)

10   Q.    Is this section the charges to the account?

11   A.    This is, yes.

12         MS. BLOOM:  And then down below.

13         (On screen.)

14   Q.    I notice at the beginning there are some overdraft

15   charges, can you explain that?

16   A.    Yes, when the -- the account was overdrawn at some

17   point during the month including just before the money

18   from the Burts came in -- from the Burts.

19   Q.    And then there is, down here, a $100,000 domestic

20   outgoing wire, do you know what that is?

21   A.    I do.

22   Q.    What is that?

23   A.    It's a wire transfer to John and Amelia Collins.

24   Q.    And, um, was that a different client of the

25   Insight Onsite Management Company or the Knew Finance

1    Experts?

2    A.    I don't understand it to be -- I don't know it to

3    be a client of either of those two companies.

4    Q.    And do you have any understanding as to whether

5    that is an expense related to the hedge fund?

6    A.    I understand from the testimony of Mr. Caplitz,

7    which I listened to.

8         MR. O'HARA:  Objection.

9         THE COURT:  Yeah, yeah, sustained.  Sustained.

10   Q.    Okay.

11        MS. BLOOM:  I'm now going to Exhibit 2.02, Page 1.

12        (On screen.)

13   Q.    Can you identify this?

14   A.    Yes.  This is the March 31st, 2009 account

15   statement for the Knew Finance Experts, Inc. account at

16   Town and Country Bank.

17   Q.    And how much was in this account at the beginning

18   of the month?

19   A.    Um, zero, the account was just opened.

20   Q.    Okay.

21        MS. BLOOM:  And looking at Exhibit 103, just turn

22   to that for a moment.  I'll try to pull this up so you

23   can see it and the jury can see it.

24        (On screen.)

25   Q.    Is that for February of 2009, is that correct?

A.     Yes, that's correct.

Q.     And what account now are we looking at?

A.     This is the Knew Finance Experts account at Town and Country Bank?

Q.     And who's money is reflected in the account?

A.     James and Linda Connell.

Q.     Is that the second payment by James and Linda Connell from Exhibit 103.

A.     It is.

Q.     And what is the -- okay.  And looking down at the statement, what are the entries there reflected in this account statement?

A.     (Silence.)

Q.     Do you recognize the first one on 2-27-09, "Telephone transfer"?

A.     I do.

Q.     What is that?

A.     I recognize that from the supporting documents which follow in this exhibit that it's a wire transfer in the amount of $6,250 to Melvin Burt, and there's a $20 wire transfer fee.

Q.     So whose money, who provided the money for the transfer to Mr. Burt?

MR. O'HARA:  Objection.

Q.     Where did the money come from?

1          THE COURT:  Do you know of your own knowledge?

2          THE WITNESS:  I know from reviewing this bank

3     statement, yes.

4          THE COURT:  From the bank statement.  All right.

5     You may tell us what you infer from the bank statement,

6     yes.

7     A.    I infer from the bank statement, since the balance

8     was zero, and the only deposit made was the $100,000

9     from the Connells, that the money for -- to be used to

10    pay Mr. Burt came from the Connells money.

11    Q.    And, um, what were the only source of money

12    available for all of the other charges in this account,

13    including Upper Crust Pizza, and Borders Books, and

14    E-Harmony, and Little Tykes?

15    A.    The source of those payments was also the money

16    from the Connells.

17         MS. BLOOM:  Now I'm going to ask you to look at

18    2.02, Page 145.

19         (On screen.)

20    Q.    What is this?

21    A.    This is the account statement for the Knew Finance

22    Experts accounts at Town and Country Bank for the month

23    ended November 30th, 2010.

24    Q.    And how much was in the account at the beginning

25    of the month?

1    A.     $44.37.

2    Q.     And then how much money came into the account?

3    A.     There was, um, $100,020 came into that account.

4    Q.     Where did that $100,000 come from?

5    A.     If I could just look at Exhibit 103?

6    Q.     Yes.

7           MS. BLOOM:  Yes, it's not a memory test.  You

8    could also look further down.

9           (On screen.)

10   Q.     Would it be helpful if I provided you a copy of

11   that bank statement?

12   A.     Oh, I'm sorry, that's -- on November 9th, 2010 is

13   the money from Carmine Leuci and David Savage.

14          MS. BLOOM:  Now if we could look to Page 147.

15          (On screen.)

16   Q.     What are we looking at here?

17   A.     These are some of the supporting documents that

18   are included in the account records for the Town and

19   Country Bank account of the Knew Finance experts, and

20   the first document shows the incoming wire transfer from

21   Carmine Leuci on November 9th, 2010.

22   Q.     And then if you look down two entries, there's an

23   entry made out to the beneficiary, Robert D. Cohan.

24   What is that?

25   A.     This is an outgoing wire transfer on the same

1    date, November 9th, 2010, in the amount of $60,020.

2    Q.    And from your review of the records, where did the

3    funds come from for the payment to Mr. Cohan?

4    A.    From Mr. Leuci.

5          MS. BLOOM:  I'd now like you to take a look at

6    Exhibit 3.02.

7          (On screen.)

8    Q.    What is this document?

9    A.    This is the account statement of Insight Onsite

10   Strategic Management, LLC at Town and Country Bank.

11         MS. BLOOM:  Okay, if we could go to Page 97.

12         (On screen.)

13   Q.    What month is this?

14   A.    This is the month of March, 2012.

15   Q.    And how much was in this account at the beginning

16   of the month?

17   A.    $70.69.

18   Q.    And how much came in?

19   A.    $108,422.18.

20   Q.    And what was the source of that $108,000?

21   A.    Um, there were a number of wire transfers, um,

22   incoming wire transfers, there were five of them that

23   are reflected on the bottom of the page here.  There was

24   a direct deposit from Fay McNall and a credit in the

25   amount of $21.99.

1   Q.    Okay.  And those wire transfers, can you identify

2   them on Exhibit 103?

3   A.    I can.

4   Q.    What are they?

5   A.    (Looks.)  There is $20,000 from Priscilla Laroque.

6   There's 4,000 from Daniel Laroque.  There's another

7   6,000 from Priscilla Laroque.  There's $51,000 from

8   Bruce Gilmartin.

9   Q.    And the final 26,000?

10   A.    And the final 26,000 is from Martin and Susan

11   Paley on the 12th.

12   Q.    Okay.

13       MS. BLOOM:  If we can now look down below.

14       (On screen.)

15   Q.    How does this statement reflect how those funds

16   are being spent?

17   A.    There are several ATM withdrawals, there are

18   charges, um, for Shell station, Walgreens, um, Car Wash,

19   um, Itune store, Albertson's, Costco.

20   Q.    Okay.

21       MS. BLOOM:  Turn to the next page.

22       (On screen.)

23       MS. BLOOM:  I'm sorry, why don't we just, um, go

24   to the next page.  Yes, keep going.

25       (Turns on screen.)

1    Q.    And there does it reflect also checks and other

2    withdrawals out of this account?

3    A.    It does.

4    Q.    Now, um, Mr. Zappala, if the jury wants to review

5    the records showing these charge in more detail, can you

6    tell them what the exhibit numbers are for the bank

7    records?

8    A.    Certainly.  Exhibit 1 are the records for the

9    Washington Mutual Bank account of the Knew Finance

10   Experts.  1.01 is the account statements and the

11   deposits and checks follow that.  Exhibit 2.02 are the

12   account statements and debit and credit items for the

13   Knew Finance Experts account at Town and Country Bank.

14   And Exhibit 3.02 are the account statements and debit

15   and credit items for the Insight Onsite account at Town

16   and Country Bank.

17           MS. BLOOM:  I'm showing you what's been marked as

18   Exhibit LY for identification.

19           (On screen.)

20   Q.    What is this?

21   A.    (Silence.)

22           MS. BLOOM:  I'm going to hand you what has been

23   marked Exhibit LY for identification.

24           (Hands to witness.)

25   Q.    What is that?

1    A.    This is a schedule I prepared of payments to

2    attorneys from the accounts of the, um, Knew Finance

3    Experts and Insight Onsite, um, the accounts we just

4    discussed, the Knew Finance Experts accounts at

5    Washington Mutual Bank and Town and Country Bank and the

6    Insight Onsite Strategic Management account at Town and

7    Country Bank.

8         MS. BLOOM:  I would offer Exhibit LY as Exhibit

9    434.

10        MR. O'HARA:  No objection.

11        THE COURT:  LY is admitted, Exhibit 434 in

12   evidence.

13        (Exhibit 434, marked.)

14   Q.    Now, um, what is this list here?

15   A.    It's a list of payments to, um, certain attorneys,

16   um, from these three bank accounts, the two accounts of

17   Knew Finance and the one account of Insight Onsite that

18   we've been discussing.

19   Q.    Those are the bank accounts listed in Exhibit 103,

20   the investor list?

21   A.    That's correct.

22   Q.    And for what time period are these payments --

23   from what time period do these payments to attorneys

24   come?

25   A.    From May 20th, 2008 to 12-13-2012.

1    Q.    Is that the time period of Exhibit 103?

2    A.    It is.

3          MS. BLOOM:  I'd now like to have you take a look

4    at what's been marked for identification as Exhibit LZ,

5    and maybe if you hit the clear button on that screen

6    those arrows will go away.

7          (On screen.)

8          MS. BLOOM:  Thank you.

9    Q.    Is this a schedule of payments to Melvin and Irene

10   Burt?

11   A.    It is.

12         MS. BLOOM:  I would offer Exhibit LZ as Exhibit

13   435.

14         MR. O'HARA:  No objection.

15         THE COURT:  LZ is admitted as Exhibit 435.

16         (Exhibit 435, marked.)

17   Q.    Could you explain to the jury what this list is?

18   A.    Yes, again I reviewed the account activity for the

19   Washington Mutual Bank account of Knew Finance in the

20   Town and Country Bank accounts of Knew Finance and

21   Insight Onsite for payments to Melvin or Melvin and

22   Irene Burt, and I just listed them here.

23   Q.    And is this during the same time period, the time

24   period of Exhibit 103?

25   A.    It is.

```
 1   Q.    And what's the total?

 2   A.    $58,450.

 3   Q.    Okay.

 4         MS. BLOOM:  I'm now going to show you what has

 5   been marked for identification as Exhibit LX.

 6         (On screen.)

 7   Q.    Is this a listing of cash withdrawals from the

 8   same accounts during the same time period?

 9   A.    It is.

10         MS. BLOOM:  I would offer that as Exhibit 433.

11         MR. O'HARA:  No objection.

12         THE COURT:  And this is?

13         MS. BLOOM:  LX.

14         THE COURT:  You have a -- Oh, no, that's LY, I'm

15   sorry.  LX is admitted, 433.

16         (Exhibit 433, marked.)

17         MS. BLOOM:  And going to the last -- sorry.

18   Q.    So how many pages are there of cash withdrawals

19   and ATM withdrawals in that exhibit?

20   A.    12.

21   Q.    If we can go to the last page, what's the total?

22   A.    $157,820.

23         THE COURT:  Are you done with this witness now?

24         MS. BLOOM:  I only have about 5 minutes more.

25         THE COURT:  That will be 5 minutes tomorrow.  But
```

1    come to the sidebar, if you would.

2

3         AT THE SIDEBAR

4         THE COURT:  That's fine, but I hoped to tell them

5    that they're going to get the case tomorrow, to be

6    prepared to stay with us throughout the afternoon.

7         MS. BLOOM:  Yes, your Honor.

8         MR. O'HARA:  Yes.

9         THE COURT:  Okay.

10

11        (In open court.)

12        THE COURT:  Well, you know what I'm doing, I'm

13   asking them, "Are we going to give the case to the jury

14   tomorrow?" and both sides assure me that they are.  Now

15   that isn't a promise, things could go differently.  But

16   as near as we can see, you will have the case in your

17   hands tomorrow.  Therefore we expect you to be able to

18   stay with us tomorrow afternoon.  No one's going to be

19   kept more than 5:00.  But tomorrow is a full business

20   day.  We'll take care of lunch, cafeteria food, but

21   lunch is on the court.

22        You've not heard all the evidence though.  If this

23   is the government's last witness, Mr. O'Hara hasn't had

24   a chance to ask any questions of him.  So keep your

25   minds suspended, do not discuss the case either among

1    yourselves nor with anyone else.

2         Now I really do want to start promptly at 9:00

3    because we can get the case into your hands sooner in

4    the day the sooner that we start.  So I want to start

5    promptly at 9:00 a.m. tomorrow.  So keep your minds

6    suspended, no talking either among yourselves nor with

7    anyone else.  We'll recess until 9:00 a.m. tomorrow

8    morning.  We'll stand in recess.

9         THE CLERK:  All rise for the jury.

10        (Jury leaves, 1:00 p.m.)

11        THE COURT:  And just so we can see how tomorrow's

12   going to work.  Once this witness is done, I expect the

13   government will rest.  When the government rests, I will

14   invite counsel to the sidebar to receive any motions and

15   make appropriate inquiry.  Having resolved those

16   matters, if the defense then rests, we'll take a recess,

17   no more than about 15 minutes.  Then the arguments of

18   the attorneys, as we discussed, another 15 minute

19   recess, my instructions to the jury, and the jury will

20   retire.

21        All right.  We'll recess until 9:00 a.m. tomorrow

22   morning.  We'll recess.

23        (Adjourned, 1:00 p.m.)

24

25

1                    C E R T I F I C A T E

2

3

4         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

5    do hereby certify that the foregoing record is a true

6    and accurate transcription of my stenographic notes,

7    before Judge William G. Young, on Monday, April 4, 2016,

8    to the best of my skill and ability.

9

10

11

12    /s/ Richard H. Romanow 09-16-16
      _____
13    RICHARD H. ROMANOW   Date

14

15

16

17

18

19

20

21

22

23

24

25