1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3                              No. 1:12-cr-10015-WGY

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   ROSALIND HERMAN

11

12                        * * * * * * * * *

13

14                      For Jury Trial Before:
                        Judge William G. Young

15

16

17                      United States District Court
                        District of Massachusetts (Boston)
18                      One Courthouse Way
                        Boston, Massachusetts 02210
19                      Tuesday, April 5, 2016

20                          * * * * * * * *

21

22              REPORTER: RICHARD H. ROMANOW, RPR
                       Official Court Reporter
23                 United States District Court
             One Courthouse Way, Room 5510, Boston, MA 02210
24                   bulldog@richromanow.com

25

```
 1                 A P P E A R A N C E S

 2

 3   SARA M. BLOOM, ESQ.
     MARY B. MURRANE, ESQ.
 4      United States Attorney's Office
        J. Joseph Moakley U.S. Courthouse
 5      1 Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
 6      (617) 748-3971
        Email: Sara.bloom@usdoj.gov
 7      For the United States

 8

 9   RAYMOND A. O'HARA, ESQ.
        Law Office of Raymond A. O'Hara
10      1 Exchange Place
        Worcester, Massachusetts 01608
11      (508) 831-7551
        Email: Oharalaw@hotmail.com
12   and
     JASON G. BENZAKEN, ESQ.
13      Benzaken and Wood, LLP
        1342 Belmont Street, Suite 102
14      Brockton, Massachusetts 02301
        (508) 897-0001
15      Email: Attorneybenzaken@gmail.com
        For the defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   WITNESS              DIRECT  CROSS  REDIRECT  RECROSS

 4

 5   THOMAS ZAPPALA  (Continued.)

 6        By Ms. Bloom:        5

 7        By Mr. O'Hara:           15

 8

 9   DEPOSITION TESTIMONY OF DEFENDANT (EXCERPTS READ.)  18

10

11   JANICE GOODRICH

12        By Mr. O'Hara:     23

13        By Ms. Bloom:           42

14

15   CLOSING ARGUMENT BY MS. BLOOM................  47

16   CLOSING ARGUMENT BY MR. O'HARA..............  62

17   REBUTTAL BY MS. BLOOM.......................  76

18   JUDGE'S CHARGE TO JURY......................  80

19   VERDICT....................................  115

20

21

22

23

24

25
```

E X H I B I T S

EXHIBIT 289.................................... 44

EXHIBIT 436.................................... 14

EXHIBIT 437.................................... 9

EXHIBIT 438.................................... 9

EXHIBIT 443.................................... 10

```
 1          P R O C E E D I N G S
 2          (Jury enters, 9:00 a.m.)
 3          THE COURT:  Well, good morning, ladies and
 4     gentlemen.  I really appreciate you all being here on
 5     time, and we're all ready to go.
 6          Mr. Zappala, I remind you that you are still under
 7     oath, sir.
 8          THE WITNESS:  Thank you, sir.
 9          THE COURT:  You understand?
10          THE WITNESS:  I do understand.
11          THE COURT:  Ms. Bloom, continue.
12          MS. BLOOM:  Thank you.
13
14     DIRECT EXAMINATION BY MS. BLOOM:  (Continued.)
15     Q.   Good morning.
16          MS. BLOOM:  Could we bring back up Exhibit 435.
17          (On screen.)
18     Q.   Mr. Zappala, we talked about this briefly
19     yesterday.  What is this?
20     A.   This is a schedule of payments to Melvin and Irene
21     Burt that I prepared.
22     Q.   Okay.  And what was the total of payments during
23     this time period to Melvin and Irene Burt?
24     A.   $58,450.
25     Q.   Now, I see down below there's an 11-8-2012 entry
```

1    for $34,000, is that included in the total?

2    A.    It is not.

3    Q.    Why not?

4    A.    This was not one of the bank records but it was a

5    check that I believe Mr. Burt provided.

6    Q.    And, um, what was the state of the bank account on

7    which that check was written?

8    A.    There was no activity in the account at the time,

9    um, the balance was 0, and the account was closed

10   actually, and the check wasn't --

11   Q.    And that you have an asterisk down here indicating

12   the bank account was closed?

13   A.    Yes.

14         MS. BLOOM:   And if we could bring up Exhibit 2.02,

15   Page 197.

16         (On screen.)

17   Q.    What is that page?

18   A.    This is the account statement for the month ending

19   November 30th, 2011 for the Knew Finance Experts

20   account, the account that that check was drawn on.

21   Q.    And how much money was in the account?

22   A.    Um, 38 cents at the end of that month.

23   Q.    And was there ever, after that, any more money in

24   that account?

25   A.    There were no more deposits in the account, no.

1    Q.    And how much money was in the account when the

2    check was written in November -- to the Burts in

3    November of 2012?

4    A.    There was no money in the account.

5    Q.    Okay.

6          MS. BLOOM:  Now, taking you back to Exhibit 433.

7          (On screen.)

8    Q.    What is this?

9    A.    This is a schedule of ATM and customer withdrawals

10   that I prepared, um, for the three accounts into which

11   the funds for the hedge fund went, the two accounts of

12   the Knew Finance Experts and the one account of Insight

13   Onsite strategic Management.

14   Q.    And what time period is covered by these cash

15   disbursements?

16   A.    It begins on, um, May 16th, 2008, that was the

17   date of that transfer into the Washington Mutual

18   account, um, of Knew Finance, of the Bigelows, the

19   $100,000 from the Bigelows.

20         MS. BLOOM:  And if we could go to the last page.

21         (On screen.)

22   Q.    When does it end?

23         MS. BLOOM:  That's Page 12.

24         (On screen.)

25   A.    That it ends on March 14th of 2013.

1    Q.    And the grand total of the ATM and cash

2    withdrawals from those three accounts, what is it?

3    A.    $157,820.

4    Q.    Okay.

5          MS. BLOOM:  I'm now going to ask you to look at

6    Exhibit NB.

7          THE COURT:  Say again the letters?

8          MS. BLOOM:  NB.

9          THE COURT:  Thank you.

10          (On screen.)

11          MS. BLOOM:  I'm going to actually show you what

12    has been marked for identification on the paper as

13    Exhibits MB and NB together.

14          (On screen.)

15    Q.    What are those?

16    A.    (Looks.)

17    Q.    Sorry, what are those?

18    A.    These are two schedules I prepared.  One is a

19    schedule of checks and withdrawals to the order of Brad

20    Herman by account and date, and the second is, um, a

21    similar chart of checks and withdrawals to the order of

22    Brian Herman by account and date.  And these withdrawals

23    relate to the, um, the three accounts into which the

24    funds on Exhibit 103 were credited.

25          MS. BLOOM:  Okay, I would offer Exhibit MB as

1    Exhibit 437.

2          MR. O'HARA:  No objection.

3          THE COURT:  MB is admitted, Exhibit 437.

4          (Exhibit 437, marked.)

5          MS. BLOOM:  And I would also offer Exhibit MC as

6    Exhibit 438.

7          MR. O'HARA:  No objection.

8          THE COURT:  MC is admitted, Exhibit 438.

9          (Exhibit 438, marked.)

10          MS. BLOOM:  We are looking now at Exhibit 437.

11          (On screen.)

12   Q.    Whose checks and withdrawals is this document?

13   A.    Oh, these are Brad Herman.

14   Q.    And, um, for what time period?

15   A.    Um, again, beginning here, beginning on March 13th

16   of 2009.

17   Q.    And the ending time period on the last page?

18   A.    10-27-2011.

19   Q.    And what was the total of cash withdrawals and

20   payments to Brad Herman during this time period?

21   A.    $41,285.

22   Q.    Okay.

23          MS. BLOOM:  And going to Exhibit 438.

24          (On screen.)

25   Q.    Whose checks and withdrawals is that?

1    A.    These are checks and withdrawals to the order of

2    Brian Herman.

3    Q.    Is this for the same time period?

4    A.    It is.

5          MS. BLOOM:  Okay, and going to the last page, Page

6    4.

7          (On screen.)

8    Q.    What's the grand total of checks and withdrawals

9    to Brian Herman during this time period?

10   A.    $126,249.

11         MS. BLOOM:  Okay, I would like to have you look at

12   what has been marked for identifications as Exhibit MH.

13         (On screen.)

14         MS. BLOOM:  And I'll just bring that up to you.

15         (Brings to witness.)

16   Q.    What is this document?

17   A.    This is a schedule I prepared of certain payments

18   that are made, um, summarizing certain payments from the

19   three accounts that we've been talking about, the two

20   accounts of Knew Finance Experts and the one account of

21   Insight Onsite Strategic Management.

22         MS. BLOOM:  I would offer MH as Exhibit 443.

23         MR. O'HARA:  No objection.

24         THE COURT:  MH is admitted, Exhibit 443.

25         (Exhibit 443, marked.)

1    Q.    Could you just walk the jury through this chart.

2    A.    Certainly.  The first item, "Payments to

3    Attorneys" of $456,000, corresponds to an exhibit we

4    reviewed yesterday, it was a list of payments to certain

5    attorneys.

6    Q.    Okay.  Does that list include the payment for the

7    preparation of any documents relating to the hedge fund?

8    A.    Um, it does not.

9    Q.    Okay.  The next item?

10   A.    The second item was a payment to John and Amelia

11   Collins, that was the $100,000 transfer out of the

12   accounts of the, um, Knew Finance Experts at Washington

13   Mutual Bank, um, we talked of -- I spoke of yesterday

14   how it came from the Burts' funds.

15   Q.    Okay.

16   A.    The third item is the schedule of payments to

17   Melvin and Irene Burt, $58,450, which we just reviewed a

18   few minutes ago.

19   Q.    Okay.

20   A.    The next item, "Customer and ATM Withdrawals,"

21   relates to the schedule we just reviewed, $157,820.  And

22   the last item, "Payments to Brian Herman and Brad

23   Herman," is the total of the two schedules we just

24   looked at, um, Exhibits 437 and 438.  That total is

25   $167,534.

1   Q.    And what is the total of all of those?

2   A.    $939,804.

3   Q.    And is that all amounts that were paid out of the

4   accounts into -- during the time period of the payments

5   of Exhibit 103?

6   A.    No.

7   Q.    I'm sorry, what is it?

8   A.    Um, these are payments that were made -- these are

9   all -- the payments listed here are all payments that

10  are made from these three accounts, yes, but it is not

11  all of the payments made from those accounts.

12  Q.    Oh, I'm sorry.  But all of these payments were

13  made during the time period that the funds came in that

14  are listed in Exhibit 103?  That's what I meant to ask.

15  A.    Yes, that's correct.

16  Q.    Thank you.

17        And were there any other -- does this 939,804

18  number include the charges on the bank statements for

19  things like Chucky Cheeses --

20        MR. O'HARA:  Objection.

21        THE COURT:  No, you're leading the witness and the

22  objection is well taken.  Sustained.

23  Q.    Were there any other charges from these accounts

24  other than what you've listed on this list?

25  A.    There were.

1    Q.    And could you describe some of them.

2    A.    Certainly.  They were charges that are reflected

3    on the account statements, some of which have been

4    reviewed here, there are debit items, um, ACH items,

5    automatic payments, and there are also checks that are

6    drawn on the accounts and which, which are not the checks

7    included here, these checks are for a variety of

8    purposes including, um, mortgage payments, um, utility

9    payments, including, um, gas and electric bills, pest

10   control services, pool service, um, water services, and

11   a variety of other expenses.

12          MS. BLOOM:  Okay.  I'm now going to ask you to

13   look at what has been marked for identification as

14   Exhibit MA?

15          (On screen.)

16          THE COURT:  Ms. Bloom, yesterday you said 5

17   minutes.  I'm not holding you to that, but that did give

18   me an idea.  But go ahead.

19          MS. BLOOM:  I apologize, your Honor, I remembered

20   some things overnight.

21          THE COURT:  Yes.

22          (Laughter.)

23   Q.    I'm showing you what has been marked for

24   identification as Exhibit MA, can you briefly describe

25   this?

A.    Yes, this is a graph that I prepared which charts

two things, the total of funds received into the Knew

Finance Experts and Insight Onsite Strategic Management

accounts that are identified on Exhibit 103, um, and

plots that over time and compares that to the total

balances, um, the total of the daily account balances in

those three accounts.

MS. BLOOM:  I'm would offer this as Exhibit 436.

MR. O'HARA:  No objection.

THE COURT:  It may be received, Exhibit 436, MA,

436 in evidence.

(Exhibit 436, marked.)

Q.    And can you now, now that this is actually in

front of the jury, can you explain the chart to the

jury.

A.    Certainly.  The red line, um, reflects the

deposits into the Knew Finance and Insight Onsite

accounts, um, over time.  For example, the first rise

reflects the deposit of John and Carla Bigelow, which

brings the total to 100,000.  The second rise adds to

that, the 200,000 that was transferred in from the

Burts.  The third rise reflects the first 100,000 that

came in from John and Linda Connell.  And so forth.

Q.    Okay.  And what is the total at the end for the

red line?

1    A.    It's $1,385,257, that's the total of what's

2    reflected on Exhibit 103.

3    Q.    Okay.  And what does the blue line show?

4    A.    The blue line shows the total balances in the

5    three accounts that these funds went into over this time

6    period.

7          MS. BLOOM:  I'll just bring back up Exhibits 104

8    and 105.

9          (On screen.)

10   Q.    Is this a combination of those two exhibits, what

11   the lines show on this exhibit?

12   A.    It is, essentially I added the daily account

13   balance of each of those accounts together for each day

14   and plotted that over time.

15   Q.    And how much of that $1.3 million is left at the

16   end?

17   A.    It was about $12,000.

18         MS. BLOOM:  No further questions.

19         THE COURT:  Mr. O'Hara, any questions?

20         MR. O'HARA:  Thank you, yes.

21

22   CROSS-EXAMINATION BY MR. O'HARA:

23   Q.    Regarding the, um, cash withdrawals and the

24   checks -- excuse me, the ATM and the cash withdrawals, I

25   believe you stated, just a few minutes ago, that that

1    came out to $157,000, right, and change?

2    A.    The customer and ATM withdrawals was $157,000,

3    yes.

4    Q.    Okay.  You don't know how much of that money was

5    given to Gregg Caplitz, do you?

6    A.    I don't, no.

7    Q.    You don't know how much of that money was given to

8    Mrs. Herman?

9    A.    I do not.

10   Q.    And regarding the checks and the withdrawals that

11   were made to Brad and Brian Herman, that came out to

12   $167,534, right?

13   A.    It did.

14   Q.    And you don't know what happened to that money

15   either, do you?

16   A.    I don't.

17   Q.    Just that the checks were written to them and the

18   withdrawals were made by them?

19   A.    That's correct.

20   Q.    But as far as what they did with the money once

21   they received it, you have no personal knowledge, do

22   you?

23   A.    I do not.

24   Q.    And regarding what you identified as, um, charges

25   that were made to credit cards --

A.      Yes.

Q.      -- you don't know who was using the cards when those charges were made, do you?

A.      I don't know.

Q.      And, um, you know what the charges were for, you just don't know who made them?

A.      That's correct.

Q.      So if there were charges that were made to Borders Bookstore to buy a book, you don't know whether Mrs. Herman was buying the book or whether Mrs. Herman had given her credit card to Mr. Caplitz, for example, to buy the book?

A.      I don't know.

        (Pause.)

        MR. O'HARA:  Thank you.  I have nothing further.

        THE COURT:  Nothing further for this witness?

        MS. BLOOM:  Nothing further for this witness, but I do have a few administrative items.

        THE COURT:  Very well.  He may step down.  And why don't you take that blow-up down.

        MS. BLOOM:  Sure.  Thank you, your Honor.

        (Witness steps down.)

        THE COURT:  And they are?

        MS. BLOOM:  First, I want to note that what was previously read as the second set of stipulations is now

 1    marked, just to keep track of it, as Exhibit 444.

 2          THE COURT:  Very well.

 3          MS. BLOOM:  Um, and the second thing is that we

 4    have certain deposition testimony which we have

 5    designation to read into evidence.  It's quite short.

 6          THE COURT:  It may be read.

 7          Now, in a civil case, and we've had reference to

 8    this civil case -- the case is supposed to have nothing

 9    to do with our case, but various testimony has been made

10    about that so you're better able to size things up in

11    our case.  In a civil case you can take depositions.

12          Now, a deposition, the witness comes to the

13    lawyer's office, the lawyers who were representing the

14    people back then, um, are present, both sides, and

15    there's a stenographer, much like our Court Reporter,

16    and the witness is sworn and is asked questions by the

17    lawyers.  And this helps them get ready for the civil

18    case.  Now that testimony, that testimony is evidence.

19          So even though we don't have the person here, or

20    if it's Mr. Caplitz, we did have him here, but he's not

21    on the stand now, what is said in answer to those

22    questions on deposition, that's evidence even though a

23    lawyer is going to read it, and like any other evidence

24    from a witness, you can believe it, you can disbelieve

25    it, you can believe parts of it, and disbelieve other

1    parts.

2         Go ahead, Ms. Bloom.

3         MS. BLOOM:  So the first designations that I will

4    read are from the testimony of Rosalind Herman on

5    September 11th, 2009.

6         THE COURT:  And just so we're clear, in this

7    unrelated civil case?

8         MS. BLOOM:  In this unrelated civil case.

9         THE COURT:  Very well.  You may read it.

10        MS. BLOOM:  "Ms. Herman" -- and this is on Page

11   76, Line 12 or 13.

12        "Ms. Herman, earlier in your testimony you

13   referred to having two e-mail addresses that you've

14   used, what are those e-mail addresses?"  Answer, "There

15   was one, 'Rherman@ibcm,' I think it is '.com.'" "And

16   what's the other one?"  Answer, "It was switched by the

17   company to 'rherman14@cox.net.'"

18        The next entry is at Page 45, Line 17.

19        Question, "Please tell me all of the banks that

20   you presently use?"  Answer, "Me?"  Question, "Yes."

21   Answer, "I don't use any banks."

22        THE COURT:  You know, depositions have a date, so

23   why don't you tell us the date that deposition was

24   taken.

25        MS. BLOOM:  September 11th, 2009.

1          THE COURT:   Thank you.   Go ahead.

2          MS. BLOOM:   Page 170 -- Page 170, Line 17, the

3     same date, September 2009.

4          "I'm asking whether in 2003 you had access to

5     e-mails sent to 'insightonsite@attbi.com'?"   Answer,

6     "Sure I did."

7          Now turning to a separate sworn statement of

8     Rosalind Herman.

9          THE COURT:   Now this isn't a deposition, it's an

10    affidavit?

11         MS. BLOOM:   No, this is a deposition, a separate

12    deposition given on January 5th, 2007.

13         THE COURT:   A deposition.   Go ahead.

14         MS. BLOOM:   "Do you have any college degrees?"   "I

15    went to Umass in Boston.   I went to Suburban Business

16    School in Waltham.   I went to Northeastern University in

17    Boston.   I've taken a lot of courses.   I went to

18    Lafayette Academy."   Question, "What degrees do you

19    hold?"   Answer, "I hold a business degree."   Question,

20    "Is that from Umass, Boston?"   Answer, "Actually I think

21    it is, I had to do summer courses at Suburban Business

22    School.   I don't know."   Question, "When did you obtain

23    -- I'm sorry, when did you obtain your degree?"   Answer,

24    "'78."

25         The government rests, your Honor.

1        THE COURT:  The government rests.  Come to the

2    sidebar.

3

4        AT THE SIDEBAR

5        THE COURT:  Do you move for a directed verdict?

6        MR. O'HARA:  Yes.

7        THE COURT:  All right.  I accept the motion, the

8    oral motion for a directed verdict as to all counts.

9    The motion is denied.

10        MR. O'HARA:  If I -- I don't mean to interrupt,

11    but do you want me to argue that?

12        THE COURT:  Well, I'm not disposed to argument at

13    this time.

14        MR. O'HARA:  Oh, okay.

15        THE COURT:  But for the formality of it, I'm going

16    to deny it, your rights are saved.

17        Are you going to put on an affirmative case?

18        MR. O'HARA:  Yes.

19        THE COURT:  You are.

20        Is she going to testify?

21        MR. O'HARA:  No.

22        THE COURT:  Fine.  Then I've denied it.  What will

23    happen is after you've put in your affirmative case,

24    I'll ask you back here again to renew the motion, which

25    I'm disposed to deny, but that will set you up to argue

 1   after the verdict.

 2         All right.

 3

 4         (In open court.)

 5         (Pause.)

 6         THE COURT:  You may proceed.

 7         MR. O'HARA:  All right.  I'm sorry.  I would ask

 8   that Janice Goodrich take the stand.

 9         THE COURT:  She may be called, Janice Goodrich.

10         (Pause.)

11         THE COURT:  Sometimes we have witnesses waiting in

12   the hall and sometimes they wander off.  If we can't

13   find them, I'll tell you stories about the courtroom.

14   They have nothing to do with the case.  Oh, here we are.

15         (Witness enters.)

16         (JANICE GOODRICH, sworn.)

17         THE CLERK:  Can you please state your name and

18   spell your last name for the record.

19         THE WITNESS:  Janice Goodrich, G-O-O-D-R-I-C-H.

20         THE COURT:  Ms. Goodrich, get comfortable in that

21   chair and move that microphone so it's closer to --

22   that's it, move it just so it's closer to you.  There

23   you are.  It didn't seem to be picking you up.

24         THE WITNESS:  Sorry.

25         THE COURT:  And go ahead, Mr. O'Hara.

1        MR. O'HARA:   Thank you.

2

3        * * * * * * * * * * * * * * *

4        JANICE GOODRICH

5        * * * * * * * * * * * * * * *

6

7     DIRECT EXAMINATION BY MR. O'HARA:

8     Q.    Good morning, Ms. Goodrich.

9     A.    Good morning.

10    Q.    Where do you currently live?

11          THE COURT:   Just the city and town is adequate.

12    A.    Woburn, Massachusetts.

13    Q.    And are you currently employed?

14    A.    Yes.

15    Q.    Where?

16    A.    A gas station.

17    Q.    And what do you do?

18    A.    A cashier.

19    Q.    Excuse me?

20    A.    A cashier.

21    Q.    A cashier.   How long have you worked at that job?

22    A.    Um, for 4 1/2 years.

23    Q.    Where were you born?

24    A.    I believe Arlington, Massachusetts.

25    Q.    And how many children were in your family?

1    A.    Eight.

2    Q.    And what's your relationship to Rosalind Herman?

3    A.    I'm her sister.

4    Q.    Of the eight children, what was your birth order

5    relationship to Mrs. Herman, is she older or younger

6    than you are?

7    A.    She's older.

8    Q.    By how much?

9    A.    About a year, a year and a half.

10   Q.    Can you describe the nature of your relationship

11   with her as you and she were growing up?

12   A.    We're very close.

13   Q.    Are you still very close?

14   A.    Yes, we are.

15   Q.    Do you communicate with each other?

16   A.    Every day.

17   Q.    And how long have you been communicating with each

18   other every day?

19   A.    All our lives.

20   Q.    And do you also consider her to be your best

21   friend?

22   A.    I do.

23   Q.    Where did you go to school?

24   A.    I started in Arlington school system and then we

25   moved to Lexington.  So Lexington.

```
1    Q.    Did you graduate from high school?

2    A.    I did not.

3    Q.    What about your sister?

4    A.    She went to, um, I think it was Lafayette Academy.

5    Q.    Did she graduate from high school?

6    A.    As far as I know.

7    Q.    Did she receive a GED or did she get a high school

8    diploma from the high school she attended?

9    A.    I believe the high school.

10   Q.    And, um, did your sister ever go to college?

11   A.    Um, other than Northeastern for a paralegal

12   course, not to my knowledge.

13   Q.    Okay.  And as far as her attending the University

14   of Massachusetts, are you aware of whether she ever did

15   that?

16   A.    She did not, not to my knowledge.

17   Q.    Okay.  And, um, do you remember when she went to

18   paralegal school?

19   A.    I don't remember the year.

20   Q.    Do you remember for how long she went to paralegal

21   school?

22   A.    I'm sorry, I just don't remember how long.

23   Q.    Okay.  So at some point in time did you and

24   Mrs. Herman leave the family home?

25   A.    Yes.
```

1    Q.    What time did you leave the family -- how old were
2    you when you left?
3    A.    Um, probably 18 or 19.
4    Q.    And as far as Mrs. Herman?
5    A.    When she got married.
6    Q.    And how long ago was that?
7    A.    Um, approximately around 40 years, 41 years ago.
8    Q.    I'm sorry.  Who's her husband?
9    A.    Keith Herman.
10   Q.    And are they still married?
11   A.    Yes, they are.
12   Q.    Are you aware of his medical condition?
13   A.    Yes, I am.
14   Q.    What is it?
15   A.    Well, he's disabled, he has an amputated leg,
16   severe high blood pressure, clogged arteries, and so
17   much more that I can't even think of at this particular
18   moment.
19   Q.    Okay.  When you were growing up, did you notice a
20   hobby or a habit that your sister had with your father?
21   A.    Yeah, they would always talk about stocks and
22   things like that.
23   Q.    And they would read the financial section of the
24   newspaper?
25   A.    Yes, they would.

1    Q.    When did Mrs. Herman begin working?

2    A.    Um, 18 years old, I think.

3    Q.    And what kind of work did she do when she was 18?

4    A.    She did all sorts of work, she was in retail, she

5    worked at a tobacco shop, but that was much later, um,

6    Adam's Men's warehouse, um, Dyer's Leather, um, Zaires.

7    Q.    What kind of work did she do, for example, at

8    Zaires?

9    A.    A cashier.

10   Q.    And Zaires was what kind of a store?

11   A.    It was a retail store.

12   Q.    And to your knowledge did she ever stop working?

13   A.    Not to my knowledge, no.

14   Q.    Except to have children?

15   A.    Well, long enough to have them.

16   Q.    Did she work one job or more than one job at

17   times?

18   A.    More than one job at times.

19   Q.    And you stated that she worked in a tobacco shop?

20   A.    Correct.

21   Q.    Can you describe the tobacco shop?

22   A.    Um, it was just very small.  It was in the mall.

23   Q.    It was in the mall?

24   A.    Uh-huh.

25   Q.    Okay.  And at some point in time did you meet a

1  person by the name of Gregg Caplitz?

2  A.    Yes.

3  Q.    How did you meet him?

4  A.    Um, I think he was in the tobacco shop one day

5  when I was there.

6  Q.    Excuse me?

7  A.    I think he was at Adams one day when I was there,

8  he was there.

9  Q.    Okay.  Did you at some point in time begin working

10  at an office that he maintained?

11  A.    Yes.

12  Q.    Where was that office?

13  A.    In Woburn.

14  Q.    And what did you do when you began working there?

15  A.    I answered the phones and I filed.

16  Q.    Did you do any typing for him?

17  A.    No, I did not.

18  Q.    Why not?

19  A.    Because I don't type.

20  Q.    Okay.  So can you provide us with a time frame, if

21  you can, of when you began doing that work there?

22  A.    It was sometime in the '90s, I believe.

23  Q.    And did you continue working there from the '90s

24  right on through today or was there a period of time

25  when you stopped?

1    A.     No I left for a while.

2    Q.     Do you recall when you left?

3    A.     I had my son in '92, so I would say around '93 or

4    '94.

5    Q.     Did you, at some point in time after '93 or '94,

6    go back and work with him again?

7    A.     Yeah.

8    Q.     Approximately when was that?

9    A.     It was in early 2000.

10   Q.     And what kind of work did you do with him in early

11   2000?

12   A.     The same thing, filing, um, answering phones.

13   Q.     And how long did you continue working in an office

14   that he maintained?

15   A.     Um, till 2013.

16   Q.     And that was the same kind of work that you had

17   done in the past, right?

18   A.     Correct.

19   Q.     Did you have set hours when you were working

20   there?

21   A.     No.

22   Q.     What was the nature and relationship of the hours

23   that you worked?

24   A.     Well, if they needed someone to come in and answer

25   the phone, if someone wasn't going to be there, I would

1    come in and answer the phone.

2    Q.    And when you say "they," who are you referring to?

3    A.    Rosalind or Gregg, Rosalind would call me or Gregg

4    would call me.

5    Q.    And at some point in time did your sister leave

6    Massachusetts?

7    A.    Yes, she did.

8    Q.    That was when?

9    A.    It had to be around 2000.

10   Q.    And did you continue working at the office?

11   A.    Yes.

12   Q.    And who did you work with in the office?

13   A.    Gregg.

14   Q.    Was he in the office every day?

15   A.    Not all the time, no.

16   Q.    What did you see him doing when he was in the

17   office?

18   A.    Well, he'd, you know, answer the phone, make

19   calls.

20   Q.    Okay.  Did you ever see him interacting with

21   clients in the office?

22   A.    Yes.

23   Q.    How often?

24   A.    Not often.

25   Q.    Who were some of the people you remembered he

1    interacted with in the office?

2    A.    Um, Carl Leuci, um, James Connell, Linda Connell.

3    Q.    And when he wasn't in the office, did you know

4    where he was?

5    A.    Not all the time, no.

6    Q.    You said you did some filing.  How was the filing

7    done?

8    A.    It was in filing cabinets, you'd file it according

9    to alphabetical order.

10   Q.    What were you filing?

11   A.    I would file client files, I would file bills, I

12   would file all sorts of things.

13   Q.    Did you ever receive checks or check ledgers for

14   bank accounts that were run by businesses?

15   A.    Say it one more time?

16   Q.    Did you ever receive copies of bank statements or

17   cancelled checks that were mailed in?

18   A.    Yes, absolutely.

19   Q.    Where were those statements and cancelled checks

20   mailed from?

21   A.    Well, Rosalind would mail boxes of them from

22   Nevada and then the regular bank statements that would

23   come in through the mail.

24   Q.    And when you say the "regular bank statements"

25   you're talking about bank statements on banking

1    institutions in Massachusetts, right?

2    A.    Right.

3    Q.    What would you do with all of those bank

4    statements and those cancelled checks?

5    A.    I would box them up, put them in the boxes that it

6    already had come in.  I'd put a --

7    Q.    I'm sorry, I didn't mean to interrupt.  What would

8    happen then after you had boxed everything up?

9    A.    It would be left there and put aside for Gregg to

10   take.

11   Q.    And what would Gregg do with them?

12   A.    He would take them to Dan Goodness.

13   Q.    And who was Dan Goodness?

14   A.    The accountant.

15   Q.    And, um, had you ever met Dan Goodness?

16   A.    Um, I think once or twice before that in the

17   Woburn office, that's where I first met him.

18   Q.    Okay.  And what was the atmosphere in the office

19   while you were working there with Mr. Caplitz when he

20   was present?

21   A.    Um, Gregg was a volatile guy.

22   Q.    How, um, would you describe him when you say

23   "volatile"?

24   A.    Snap, crackle, pop.

25   Q.    And what do you mean by "snap, crackle, pop"?

1   A.    Exactly what I said, that is how he is, that's his

2   mentality.

3   Q.    Well, could you be a little bit more specific?

4   A.    He would talk on the phone, he would crack the

5   phone down -- I can't tell you how many receivers, I had

6   to go to Staples, but then it was Comp USA, to buy

7   because he broke the receivers by slamming the phone

8   down.

9   Q.    And how did he interact verbally with people on

10  the phone and with you?

11  A.    He would yell a lot.

12  Q.    Okay.  And did he have a favorite expression that

13  he used that you heard over and over again?

14  A.    "I'll take care of it," "It's done," that's

15  basically his repertoire.

16  Q.    And what were the context -- what was happening

17  when he would make statements to that effect?

18  A.    Well, all different things.  I mean when things

19  weren't done that he said he was going to do or just

20  things in general, that was Gregg's answer to

21  everything.

22  Q.    And what tone of voice would he use when he would

23  make that statement?

24  A.    Oh, he'd be screaming.

25  Q.    And did you hear him interacting with people on

1    the telephone?

2    A.    Yes.

3    Q.    At times did he use a speaker phone?

4    A.    Yes, he did.

5    Q.    And could you hear the people he was interacting

6    with on the phone?

7    A.    Yes.

8    Q.    And who were they, if you know?

9    A.    Well, Rosalind, a few times clients.

10   Q.    And what would happen during those telephone

11   conversations?

12   A.    He'd be screaming.

13   Q.    Now, going to July of 2012.

14         Were you present in the office during a

15   conversation where Mr. Caplitz was on the cell phone

16   speaking with your sister in Nevada?

17   A.    Yes.

18   Q.    And what were they talking about?

19   A.    They were talking about, um -- he had wanted her

20   to write a check for Mr. Leuci for $3,000 and she said,

21   "Why would I do that?"  And he said, "Because he didn't

22   get a distribution check," or "It was lost" or

23   something, I'm not really sure, but he wanted her to

24   write this check.  And she asked, um, Gregg if he'd

25   followed up to see if Lightspeed, um, what happened and

1    he said, "I talked to them and they're not sure, they

2    have to track it," and on and on he went.  And he said,

3    "Just write the check," and he was screaming at her.

4    And she said, "Well, if I write the check, I'm going to

5    put 'gift' on it."  And he said, "It's not a gift," and

6    he went into this whole big rage about it.

7    Q.    Now, did you have any understanding of the details

8    of the business that Mr. Caplitz and your sister were

9    conducting?

10   A.    The details as to?

11   Q.    Did you know what they were doing specifically in

12   terms of the business that they were operating?

13   A.    Well, I don't understand investments, I'll tell

14   you that right now.

15   Q.    So your answer is you didn't understand exactly

16   what they were doing?

17   A.    No, I don't understand investments, I don't

18   understand those things.

19   Q.    So you answered the phone and you gathered the

20   checks and you filed things?

21   A.    Correct.

22   Q.    Did Mr. Caplitz make a statement regarding why he

23   wanted money sent to Mr. Leuci, was there any particular

24   reason why he wanted that money sent to him?

25   A.    Well, Mr. Leuci was going on vacation and he

1   needed the money for entertainment, I guess.  That was

2   what was said.

3   Q.   That's what you overheard?

4   A.   Correct.

5   Q.   Now, um, after your sister moved to Arizona --

6   excuse me, Nevada, did she come back on an annual basis

7   every year?

8   A.   Yes.

9   Q.   When she first went to Arizona -- Nevada in 2000,

10  did her husband go with her?

11  A.   No, he stayed -- he stayed, I think, for a little

12  while and then met her.

13  Q.   In Massachusetts?

14  A.   Yeah.

15  Q.   And where were they living when they were living

16  in Massachusetts?

17  A.   At Davis Street, Woburn.

18  Q.   In Woburn.  And that's the house you're living at

19  now, right?

20  A.   Correct.

21  Q.   When your sister was in Nevada and your brother-

22  in-law, Keith, was in Massachusetts, approximately how

23  often did she come back?

24  A.   Well, she came a few days after he did.

25  Q.   Excuse me?

```
1    A.    She came back -- when he was living there --
2    Q.    Yes.
3    A.    -- she came back a few days and then -- well, a
4    couple of weeks, and then they went back together.
5    Q.    So he went back to Nevada with her?
6    A.    Uh-huh.
7    Q.    And while she was living in Nevada with him, how
8    frequently would she come back to Massachusetts?
9    A.    Not a lot, not -- unless they came together.
10   Q.    Okay.  But when you say "not a lot," would it be
11   like once a year?
12   A.    No, I'd say a couple times a year.
13   Q.    And when, um, she was out in Nevada, were there
14   times -- well, did you have any responsibilities, um, on
15   behalf of Mr. Caplitz regarding his pets?
16   A.    Yes, I took care of his pets.
17   Q.    And what pets did he have?
18   A.    A dog.
19   Q.    He had a dog?
20   A.    A dog, yeah.
21   Q.    Okay.  Were there times when Mr. Caplitz would be
22   out of state or for long periods of time?
23   A.    Yes.
24   Q.    Where would he go?
25   A.    Nevada.
```

```
 1    Q.    And how often would he go to Nevada?
 2    A.    Well, he'd go for two weeks and then he wouldn't
 3    come back for another two weeks.
 4    Q.    So he would go out to Nevada for a month at a
 5    time?
 6    A.    Sure.
 7    Q.    And how often did he do that on an annual basis?
 8    A.    I'd say three or four times.
 9    Q.    So he would go three or four times a year for
10    maybe a month at a time?
11    A.    Correct.
12    Q.    And while he was in Nevada, what were you doing
13    regarding his pet?
14    A.    I was taking care of him.
15    Q.    And you were in the office then by yourself?
16    A.    Yes.
17    Q.    And how was the atmosphere in the office when he
18    wasn't there?
19    A.    Peaceful.
20    Q.    And did these prolonged absences from the office
21    continue from 2000 and go right up until 2013?
22    A.    Yes.
23    Q.    At some point in time, um, your brother-in-law
24    became ill, didn't he?
25    A.    Yes.
```

```
 1   Q.     What happened to trigger his illness?

 2   A.     Um, so many things.  He had congestive heart

 3   failure.

 4   Q.     Well, specifically did he suffer a heart attack?

 5   A.     Yes.

 6   Q.     When was that?

 7   A.     I have to say mid 2000s, roughly.

 8   Q.     And did his physical health get better or get

 9   worse after he suffered the heart attack?

10   A.     Oh, it declined severely.

11   Q.     And that was an area of concern for you and your

12   entire family?

13   A.     Of course.

14   Q.     Did you go to Nevada?

15   A.     Once.

16   Q.     Just once?

17   A.     Uh-huh.  I'm not a flyer.

18   Q.     And were there periods of time when your brother-

19   in-law was hospitalized in Massachusetts?

20   A.     Yes.

21   Q.     And during those periods of time when he was in

22   Massachusetts, did your sister, Rosalind Herman, come

23   back?

24   A.     Absolutely.

25   Q.     How frequently?
```

1    A.    She never left him when she came here.

2    Q.    Okay.  But when they were out in Nevada together,

3    how often would she come back?

4    A.    She wouldn't.

5          MR. O'HARA:  Can I have a moment, your Honor?  I'm

6    sorry.

7          THE COURT:  Yes.

8          (Pause.)

9    Q.    Did you ever see Mr. Caplitz with money, cash

10   money?

11   A.    Yeah.

12   Q.    And what denomination bills did he have?

13   A.    Hundreds.

14   Q.    When did you see him with hundred dollar bills?

15   A.    Um, plenty of times, I mean, over the years.  I

16   can't pick out one particular time.

17   Q.    Well, would he have the hundred dollar bills on

18   his person before he went to Nevada?

19   A.    Yes.

20   Q.    And would he have hundred dollar bills on him when

21   he came back from Nevada?

22   A.    I'd have to say probably.

23   Q.    And what would he do with that money?

24   A.    He'd have it in his pocket, he would do whatever

25   he wanted to do with it.

```
1    Q.    Well, how would you see it?

2    A.    Well, because he took it out.

3    Q.    And showed it to you?

4    A.    Correct.

5    Q.    Okay.  Did he say anything when he was showing you

6    the 100 dollar bills he had?

7    A.    No.  Well, one time I asked him to get me a pack

8    of cigarettes, I gave him $20, and he came back and he

9    was giving me the change out of his pocket and he put

10   the money down on the desk and he was taking it out of

11   his own money, the change.

12   Q.    And you saw what?

13   A.    Hundred dollar bills.

14   Q.    How many?

15   A.    Um, they were folded over, so I couldn't venture

16   to say.

17   Q.    Okay.

18         MR. O'HARA:  I think that's it, your Honor, I just

19   beg your indulgence for a second.

20         THE COURT:  Of course.

21         (Pause.)

22         MR. O'HARA:  No, I have nothing further of this

23   witness.

24         THE COURT:  Any questions for this witness?

25         MS. BLOOM:  Just very quickly.
```

1

2    CROSS-EXAMINATION BY MS. BLOOM:

3    Q.    Ms. Goodrich, didn't Mr. Caplitz go to the bank

4    and get cash and pay you in cash on a regular basis?

5    A.    Yes, on Fridays.  Yes.

6    Q.    And --

7          MS. BLOOM:  No further questions.

8          THE COURT:  Nothing further for this witness?

9          MR. O'HARA:  Excuse me.

10         (Pause.)

11         MR. O'HARA:  No, your Honor.

12         THE COURT:  Thank you.  You may step down.

13         (Steps down.)

14         THE COURT:  Is that the defense's case?

15         MR. O'HARA:  Your Honor, we have a stipulation

16   that we'd like to read in the record, if that's okay?

17         THE COURT:  It may be read.  And I've explained

18   what stipulations are.

19         (Pause.)

20         MR. O'HARA:  Your Honor, just a sidebar briefly?

21         THE COURT:  You may.

22

23         AT THE SIDEBAR

24         MR. O'HARA:  I apologize for the confusion.

25         THE COURT:  No confusion.

1          MR. O'HARA:  There is an exhibit that was produced

2     by the government regarding, um, Mrs. Herman's lack of

3     attendance at the University of Massachusetts, and while

4     I was questioning Ms. Goodrich Mr. Benzaken was, I

5     think, attempting to work out a way that we could

6     introduce this, and I'm not really sure --

7          MS. BLOOM:  We're not going to object.

8          MS. MURRANE:  Yeah, I think it can just be

9     introduced as evidence and you can say you're offering

10    the exhibit, whatever number is it, and then --

11         THE COURT:  And we'll have the next numbers, which

12    are?

13         MS. BLOOM:  It's been assigned a number already.

14         THE COURT:  All right.  So --

15         MS. BLOOM:  We can give you the letter.

16         THE COURT:  Well, you don't need the letter.  If

17    you simply say, "We offer this document," and they'll be

18    no objection, and it will have the number, whatever.

19         And then you're going to rest?

20         MR. O'HARA:  Yes, your Honor.

21         THE COURT:  Do you renew your motion for a

22    directed verdict?

23         MR. BENZAKEN:  I will, your Honor.

24         THE COURT:  For the record it's denied.  So post

25    verdict you may renew it and argue it.

1          Before the jury I will ask you back here, just

2     when this is done, and you'll say you rest, and we'll

3     take the recess and set up for final argument.

4

5          (In open court.)

6          THE COURT:  Okay, Mr. Benzaken.

7          MR. BENZAKEN:  Thank you, your Honor.

8          Your Honor, pursuant to a stipulation of the

9     parties, I move to introduce Exhibit Number 289, which

10    is a response to a subpoena by Umass, the University of

11    Massachusetts, and they say that they have no records

12    for Ms. Rosalind Herman attending.

13         THE COURT:  Well, let's slow down a second.  We'll

14    give that document what number again, 289?

15         MR. BENZAKEN:  Yes, your Honor.

16         THE COURT:  All right.  So that will be admitted

17    in evidence, 289.

18         (Exhibit 289, marked.)

19         THE COURT:  And you characterized it.

20         And I take it you have no objection to that

21    characterization?

22         MS. BLOOM:  No objection, your Honor.

23         THE COURT:  And again the characterization is that

24    Umass has no records of Rosalind Herman attending its

25    programs?

1    MR. BENZAKEN:  Correct, your Honor.

2    THE COURT:  So stipulated, Mrs. Bloom?

3    MS. BLOOM:  Yes, your Honor.

4    THE COURT:  And with that, the defense rests?

5    MR. O'HARA:  Yes, your Honor.

6    THE COURT:  Very well.  All right.  Now at least I

7  know what the schedule is.

8       Now you have heard and seen all the evidence

9  you're going to have in this case.  So as I explained

10  yesterday, what we'll do is we'll take a recess, we'll

11  recess for 15 minutes, and in 15 minutes we'll be back

12  for the most important part of the case, it's not

13  evidence, but it's the most important part of the case,

14  the lawyers will get a chance to argue, to sum up for

15  you and make their arguments as to what conclusions you

16  ought draw from the evidence you've seen and heard.

17  That will take about an hour.  Because the information

18  comes faster when we talk directly to you than question

19  and answer, we'll take another recess, 15 minutes, and

20  then I will instruct you, teach you the law which you

21  must follow in a case such as this.

22       Therefore, while you've heard all the evidence,

23  these two important parts of the case remain, so don't

24  start talking about the case, keep your minds suspended,

25  don't talk about the case among yourselves nor with

1    anyone else.

2         You may stand in recess now for 15 minutes until,

3    um, 10:15.  The jury may recess.

4         (Jury leaves 10:00 a.m.)

5         (Resumed, 10:20 a.m.)

6         THE COURT:  All right.  Now we come to the most

7    important part of the case where the lawyers stand

8    before you and candidly argue to you for the conclusion

9    on behalf of their client that they are urging you to

10   draw.  Now, this is what we think of when we think of

11   lawyers, standing before an American jury and arguing on

12   behalf of the client.  And I know you're going to give

13   the attorneys the same careful and courteous attention

14   that you've given me and you've given each of the

15   witnesses.

16        I have this caution for you.  None of these

17   attorneys were there when any of the things that

18   supposedly happened in the course of our lawsuit took

19   place.  These attorneys don't know of their own

20   knowledge what went on.  They, through witnesses, have

21   marshaled the evidence, pointed out its strengths,

22   pointed out its weaknesses, and they will argue that, by

23   they themselves don't personally know, so they are not a

24   source of evidence, they'll argue from the evidence.  If

25   your memory of the evidence is different from what an

1    attorney argues to you now, your memory governs.

2         Now, just as the case has been tried to you, you

3    have in mind Ms. Herman started this trial truly

4    innocent and this burden of proving things, that rests

5    on the government and it never shifts, it never moves

6    from the government.  So consistent with the way the

7    case has been presented to you, we turn first to the

8    Assistant United States Attorney to see which one's

9    going to make a closing argument on behalf of the

10   government.

11        Ms. Bloom?

12        MS. BLOOM:  Thank you, your Honor.

13        Your Honor, can we have the screens on?

14        THE CLERK:  Yes, I will.

15        MS. BLOOM:  Thank you.

16

17   CLOSING ARGUMENT BY MS. BLOOM:

18        Rosalind Herman ran investment advisory companies.

19   Rosalind Herman and her companies were supposed to

20   protect their clients' money, she was supposed to invest

21   for her clients, but for these victims on Exhibit 103,

22   she didn't do that, she spent her clients' money right

23   out of the corporate bank account.  She spent it for

24   herself, she spent it for her lifestyle, she spent it

25   for her Las Vegas house, she spent it for her cars, she

1    spent it eating, drinking, smoking, gambling.  She spent

2    it all.  And she knew -- she knew that she was not

3    supposed to have taken her clients' money and been using

4    it all for herself.  And she didn't pay any taxes.

5    That's what this case is about.

6            And looking back at the documents --

7            (Interruption by Court Reporter.)

8            THE COURT:  Yeah, you have to speak up.  I can't

9    hear you either, Ms. Bloom.  Speak up.

10           MS. BLOOM:  And the records in this case, the

11   documents prove, beyond any reasonable doubt, that she

12   committed all the crimes charged here, the investment

13   advisor fraud, the wire fraud, the tax evasion, and the

14   conspiracy.

15           Now, at the beginning of this case Mr. O'Hara

16   argued that Gregg Caplitz was a lying thief.  Well, duh?

17   Ms. Murrane came and told you that Gregg Caplitz pled

18   guilty to all these crimes, Gregg Caplitz got on that

19   stand and told you himself he lied, he scammed these

20   clients out of the money, and he knew Ms. Herman was

21   spending it, but the fact that Gregg Caplitz was a lying

22   thief does not in any way make Rosalind Herman innocent.

23   Rosalind Herman was also a lying thief and they did this

24   together.  They were a couple of lying thieves.  And

25   together they scammed all these clients out of all this

1    money, $1.3 million.

2         Now, you don't have to rely on the word of Gregg

3    Caplitz, no doubt, of course not, think about all the

4    other evidence you saw.  You saw the bank records,

5    Exhibits 1.01, 2.02, and 3.03 show where the money was

6    going.  All you need to do is follow the money through

7    the bank records to see that it was Rosalind Herman who

8    spent the $1.3 million that came into these bank

9    accounts.  The corporate records, the bank records, they

10   show she controlled the accounts.

11        And think about the other witnesses.  Charlene

12   Herman.  Rosalind had Charlene Herman sign checks and

13   Charlene Herman signed checks.  Rosalind Herman wrote

14   out all the checks.  Rosalind Herman controlled who got

15   a car, who got money to go to the grocery store, paid

16   all the expenses for the Las Vegas house, for all seven

17   of them living out there, Rosalind Lynn Herman was in

18   control.  How else do you know that Rosalind Herman was

19   in on this, that she knew that they were taking money?

20        Well, first of all, if the question is how did she

21   know that it was illegal, as an investment advisor, to

22   take all of her clients' hard-earned money, their life

23   savings, which they had entrusted to her business to

24   invest, and spend it all on herself?  The question

25   answers itself, right?  There's no explanation for it.

1   But there's more.

2        You heard that Rosalind Herman met with the

3   clients, not a lot, some of those clients didn't want to

4   meet with her very often, they even asked -- as much of

5   a yeller as Gregg Caplitz was reported to be, she was

6   worse and some of the clients just wouldn't deal with

7   her.  But on occasion people wanted to talk to the boss

8   and when they wanted to talk to the boss or meet with

9   the boss, they met Rosalind Herman.

10       And remember that initial meeting with the Burts?

11  Do you remember when Mr. Burt described coming in with

12  Mrs. Burt and talking to Gregg Caplitz and Rosalind

13  Herman about how they wanted to protect the money that

14  Mr. Salvucci had saved for his entire life, because he

15  was in a nursing home, he had dementia, and he had to

16  pay to it, and they wanted to find a conservative

17  investment that would preserve that capital and Rosalind

18  and Gregg Caplitz told them the mantra of their company,

19  "First preserve the capital."  But she wasn't preserving

20  capital, was she, she was spending the money.

21       And then how do we know if she knew about the

22  whole hedge fund scheme?  Well, she signs all sorts of

23  documents about the hedge fund, which is not just about

24  documents about the hedge fund, she signs the hedge fund

25  document, Exhibit 176, she's copied on the projections

1   that were sent out to the clients, those projections

2   that say "You're going to get a 700 percent return, your

3   $100,000 is going to turn to $700,000 in five years."

4   Gregg Caplitz was sending those back and forth to her to

5   prepare the projections before they send it out to the

6   clients, he's talking to her before and after.  Look at

7   the exhibits to the Ekmans, 154, 155 through 160, look

8   at 408, 485, all copies of e-mails going to her talking

9   about this hedge fund.

10          How else do we know that she was in on it?  Well,

11  think about her conversations with Mr. Leuci.  When

12  they're thinking about putting $100,000 into this hedge

13  fund and Gregg Caplitz is telling him, "This is a great

14  idea," Mr. Leuci says, "I'm going to talk to the boss,

15  this is supposedly Rosalind Herman's hedge fund, I'm

16  going to talk to her."  So he gets on the phone with

17  Rosalind Herman and Rosalind Herman says, "You're going

18  to be very happy with this investment."  She's already

19  stole all of these other clients' money, it's already

20  disappeared by the time she gets on the phone with

21  Mr. Leuci and convinces him to put his 100,000 in.

22          He's not going to be very happy with this

23  investment, he's going to be miserable with this

24  investment because this wasn't an investment.  The

25  clients came to them to make investments to get returns,

1    but this wasn't an investment.  Look at the bank

2    records, there's no investment, it's just being spent,

3    it's being spent to buy gas, it's being spent for pest

4    control, for the pool service.

5         And then what happens when clients start calling

6    for their money, when they want it now, they want to get

7    it back?  The Bigelows, they want their money back, they

8    can't get it.  The Ekmans sent a letter, they want their

9    money back, they were promised that if the hedge fund

10   wasn't funded, they could have their money back, and

11   Mr. Ekman suffers a stroke and they want their money.

12   These people have saved their entire lives for this

13   money, but they can't get the money back.  She wouldn't

14   even return the call.

15        But Mr. Leuci, he's more persistent, he calls and

16   talks to Greg Caplitz, he gets these stories about where

17   the money is, "It's not coming," "It's going to come,"

18   "It's going to get funded," and he wants to talk to

19   Rosalind Herman.  So he gets Rosalind Herman on the

20   phone too and she tells the same story, "The money is

21   coming, it just takes a little longer," "You're going to

22   be paid."  Meanwhile she's already spent all this money.

23   There's no hedge fund.

24        And then he says -- he starts sending e-mails.

25   Now, you know Rosalind Herman's rule, "Don't put it in

1    an e-mail and especially don't put anything about this

2    hedge fund in an e-mail from her."  So she says, "We

3    don't want to talk about it in an e-mail."  She doesn't

4    really want to talk with the clients at all, but when he

5    insists, she does.

6         And finally, in the summer of 2012, Mr. Leuci is

7    getting very upset, rightfully so, he hasn't seen a dime

8    on his $100,000 investment in a couple of years and he

9    threatens to go to the Attorney General and he puts it

10   in an e-mail and he sends it to Rosalind Herman and

11   Gregg Caplitz.  Look at Exhibit 424.  And Rosalind

12   Herman says again, "We don't want to be using e-mail,"

13   but she calls him up and she says, "Good news, the hedge

14   fund is funded."

15        And you heard it was Gregg Caplitz, you heard from

16   Rosalind Herman's own sister, it was Gregg Caplitz who

17   insisted on sending some money to Carl Leuci.  Leuci was

18   about to go to the authorities.  She didn't even want to

19   part with $3,000 at that point, but here Mr. Leuci was

20   threatening to go to the Attorney General and they

21   decide to send the check.  But she says, "I'm going to

22   write on it 'gift.'"  That's what Mr. Caplitz told you

23   and that's what Rosalind's own sister told you.  And in

24   fact, of all the things that she didn't remember that

25   had happened at this business, the one memorable moment

1    was when Rosalind Herman finally wrote a check back to a

2    client.  It was a rare moment.

3         And what about the Burts?  Mr. Burt signed that

4    promissory note to invest $200,000 into this hedge fund

5    and at first he got interest payments, those were sent

6    out of the bank accounts of Rosalind Herman.  She knew

7    about the note, she was sending the payments.  And the

8    payments didn't come on time, they were always late, he

9    always had to call, and he finally got a call from

10   Rosalind Herman and Gregg Caplitz because Rosalind

11   Herman was the one to whom he had left the money, and

12   she said, "Oh, I don't know why you didn't get a check."

13   Well, of course she knew why he didn't get the check,

14   she was the one sending the checks.  And he wrote a

15   letter, it's Exhibit 429, and he confirmed, "I don't

16   know why you think I got the check," but I'm tired of

17   waiting, would you start sending me my checks on time

18   and if not then pay off the note," and he wrote it to

19   Rosalind Herman.  And what did she do?  She paid him a

20   small dividend, and when she did pay she was using

21   Patricia Wentzell's money or James Connell's money to

22   pay the Burts.  There was no investment.  There was no

23   dividend.  There was no business.

24        And then Mr. Burt -- by late 2012, Mr. Burt had

25   been counting on them, but he was not getting any money,

1   and he's trying to get at least his interest and he gets

2   on the phone and he talks to Rosalind Herman and Gregg

3   Caplitz and they agreed to send him a check to bring him

4   current because he is threatening to go to the

5   authorities.  And the one thing she knows is she doesn't

6   want these people to go to the authorities.  Why?

7   Because she knows she's pulling a scam, she's stolen all

8   their money.

9        So she writes a $34,000 check and she gives it to

10  Gregg Caplitz and at first they just want to show it to

11  Mr. Burt but eventually they give it to Mr. Burt, only

12  the check on which she wrote the $34,000, the account is

13  closed, there hasn't been more than 38 cents in that

14  account for a year.  She has an account, she's writing

15  checks, at that point off the Insight Onsite account,

16  which has a little bit of money, but she's goes and

17  writes a check on a closed account.  She's in on it,

18  she's hiding things, she's deceiving Mr. Burt and

19  Mr. Leuci and everyone else.  And how else do you know

20  that?  Because she is so insistent in not writing

21  e-mail, that they're not being traced to her.  Look at

22  Exhibit 431.  Maybe you can bring that one up.

23        (On screen.)

24        Gregg Caplitz sends her a copy of the supposed

25  hedge fund agreement and he's talking about which

clients are in and which clients are out, and so is her
response, "Gregg, I don't know what you're talking
about, what hedge fund is this you're talking about?"
or is it, "How are we doing?  When are we getting these
people their returns?"  No.  When he sends this to her,
what is her response?  "Are you nuts to put this in an
e-mail?"  She doesn't want a trail to her.  Why?  For
this very reason, because now you can see this e-mail
and you can see that she knew exactly what was going on.

How else do you know that Rosalind Herman knew
what was going on?  Well, you saw the documents, you
heard the testimony of her own son, her daughter-in-law,
that she was in charge, she tracked everything, she
wanted to know where every dime was.  A "control freak"
doesn't begin to describe the way Rosalind Herman ran
this business.  She was not duped into this by Gregg
Caplitz, she was not pushed around by anyone, she was
very much entitled and in actuality in control and she
controlled the spending of all that money.

If you go back to Exhibit 104, you see the roller
coaster of the money, the Bigelows, $100,000 of their
life savings, gone, the Burts, $200,000, almost all
gone, the Connells' money was their life savings, it's
gone, the money that Patricia Wentzell had saved for her
entire life, working 28 years as a telephone operator,

1    gone.  So now let's talk about what the charges are, the

2    charges in the case.  I'm going to go through them.

3    Just one more here.

4         (On screen.)

5         These are the charges, there are seven counts that

6    you'll have to render a verdict on, and I'm going to

7    begin at the bottom.

8         Count 9, obstructing or impeding the functions of

9    the IRS.  What this count is is basically doing

10   something, with the intent to do something wrong, to

11   impede the IRS in either collecting taxes or in

12   assessing taxes, and it can be any one thing from 2003

13   through 2012.  And you have so many to choose from.

14        So, for example, Rosalind Herman got in all this

15   money and whether you call it "theft" or you call it a

16   "gain," she didn't report them on her taxes and she

17   didn't pay any taxes, she spent it all.  She certainly

18   wasn't going to share any of that with the IRS.  What

19   else did she do?

20        Well, you heard that over the total time period

21   they got in about $4.8 million of receipts and she paid

22   about $24,000 in taxes, less than a half a percent.  And

23   you heard how sometimes she just didn't pay -- she

24   didn't file any tax returns.  Now, we all hate filing

25   tax returns, right, we all hate paying taxes, but

1    Rosalind Herman took this to a different level, she took

2    it to the criminal level, she intentionally didn't file

3    and made up expenses.

4         Do you remember Mr. Zappala telling you how it was

5    mathematically -- showing you how it was mathematically

6    impossible for her to have the expenses she claimed in

7    her 2003 tax return?  She falsely reported how much cash

8    she had and she falsely signed the return.  There was no

9    electronic return.  She made up expenses.  She charged

10   every personal expense possible to the corporate

11   accounts, paid them through the corporate credit cards,

12   entered them as business expenses.  Even her son's

13   honeymoon went through the corporate accounts, she

14   charged it.  She didn't file the returns, she didn't

15   withhold wages, she didn't withhold deductions for

16   employees, she didn't report them as employees with

17   W-2s, she didn't file 1099s.  Any one thing to impede or

18   impair the function of the IRS.

19        Okay.  Counts 4 through 7 and Count 2 both have

20   fraud in them.  What's a "fraud"?  A scheme to deceive,

21   a scam, done intentionally, not by accident, not by

22   mistake, willfully, and knowing.  Well, that's what this

23   is, that's what we've been talking about, taking her

24   clients' money out of the corporate account and spending

25   it on herself and lying about it and hiding it.

1      Now, you -- I believe you'll hear from Judge Young

2  that actually she can be guilty of fraud if she was

3  merely willfully blind, if she simply did this

4  (Indicates.) when Gregg Caplitz did all the bad deeds,

5  but here the evidence shows that she knew, she

6  controlled the bank accounts, she told lies, she said

7  "Don't put it in an e-mail," so this wasn't merely this

8  (Indicates.) this was this, "Keep the money coming

9  because I've said we need more."

10      Now, what else do you need for wire fraud?  Well,

11  you need a wire in interstate commerce, but fortunate

12  for you we have a stipulation.  If you look at Exhibit

13  100, Paragraphs 2 and 3, you will see that there is an

14  agreement between the parties, that each of the counts

15  charged as the wires traveled in interstate commerce,

16  and the four wire counts are the three wirings of money

17  by Mr. Connell and the e-mail to Mr. Leuci, Exhibit 424,

18  so the three wires, Exhibits 10, 11, 12, and Exhibit

19  424.  And all they have to be -- they don't have to be

20  by Rosalind Herman or by anyone in particular, they just

21  have to be an interstate wire in furtherance of a scheme

22  that was foreseeable, that they knew that there would

23  be.  Well, if you're trying to get people to give you

24  money and they're wiring you money, that's foreseeable.

25  Here Mr. Caplitz actually sends that e-mail.

The difference for investment advisor fraud is you don't need the wires, you do need the interstate commerce, which is stipulated, and you need someone, a person associated with an investment advisor.  So you heard some questions about whether it was he who was your investment advisor, whether it was she who was your investment advisor?  She owned the companies so she was a person associated with an investment advisor.  In fact if you look at Exhibits 14 and 15 you'll see she was a registered investment advisor.

In Count 1, conspiracy.  Conspiracy means an agreement to do something the law forbids and somebody takes one step in furtherance of that conspiracy.  So who are the conspirators here?  Gregg Caplitz and Rosalind Herman.  And the agreement that they're charged with is an agreement to do all those other crimes.  So they agreed to do the investment advisor fraud, the wire fraud, and to impede the IRS, and somebody did something in furtherance, anything in furtherance, going out and asking people for the money, sending the wires, sending the e-mails, putting together the baloney hedge fund documents, anything in furtherance of the agreement.  So those are the charges.

Now, at the beginning of this trial Ms. Herman -- sorry, Ms. Murrane told you that this is a case about

1   greed and control.  Well, she got that right, huh?  I'm

2   going to bring back up this chart, Exhibit 436.

3        (On screen.)

4        One way to think about this is this red line,

5   that's the greed line, that's all the money they took

6   from all clients in this case, all of these victims over

7   here.  But the blue line, think about that as a control

8   line, and that one is Rosalind Herman, that one is her

9   control of the bank accounts, that's the money coming

10  in, it's got the Burts' money coming in and the

11  Connells' money is here, and until you come to the end,

12  (Writes.) and there's no money left.  (Circles.)

13       Now, at the beginning of this trial Judge Young

14  told you that Rosalind Herman stands before you

15  innocent, innocent until proven guilty, but now, now

16  you've seen the proof, now you've heard the testimony,

17  now the evidence has proven that she is guilty beyond a

18  reasonable doubt, guilty of all crimes that she is

19  charged with, guilty of scamming John and Carla Bigelow,

20  Melvin and Irene Burt, the Connells, Mr. Leuci,

21  Ms. Wentzell, and all the many others here, and I ask

22  that you render a verdict of guilty on all the charges.

23  Thank you.

24       THE COURT:  Counsel?

25       MR. O'HARA:  Thank you, your Honor.

```
 1            THE COURT:  Mr. O'Hara.

 2

 3    CLOSING ARGUMENT BY MR. O'HARA:

 4            Mr. and Mrs. Bigelow, Carl Leuci, David Savage,

 5    the Ekmans, the Paleys, Ruth Schneider, Rita Hilgemeier,

 6    Patricia Wentzell, John and Linda Connell, they were all

 7    investment clients of Gregg Caplitz, and when he

 8    testified here on Thursday he kept trying to change the

 9    answers around, he denied the fact that they were his

10    clients.  Every victim who testified in this case

11    identified Gregg Caplitz as their personal financial

12    advisor.  He went into the inner sanctums of their homes

13    and sat in their living rooms and he deceived them in

14    order to get their money, he lied to them in order to

15    get their money, and when they wouldn't go along with

16    what he wanted to do, he stole their money, he forged

17    their signatures, he made unauthorized withdrawals of

18    their money, because he could, all in line with this

19    plan he had to join the overnight millionaires club by

20    becoming the compliance officer of a hedge fund.  He

21    uses people, he uses institutions, to his own benefit

22    and he's trying to use you people also.

23            I'm not going to claim that Mrs. Herman was an

24    innocent victim of his deception, but it's important

25    that you keep in mind that from 2008 until 2012 the only
```

1   thing that she knew about the hedge fund was what he

2   told her, that it was about to take off, that it was

3   about to be funded, that he needed the money to pay for

4   the lawyers and the advisors to get the templates in

5   place, to get the filings with the Securities and

6   Exchange Commission, and she did that.

7           Ladies and gentlemen, it's important to follow the

8   timeline.  He met her back in 1992 when she sold him a

9   suit.  He decided, according to his testimony, that he

10  was in love with her and, um, I don't know what planet

11  he's on when he claims that he can meet someone in that

12  short notice and fall madly in love and advise the

13  person to become involved in tax evasion with him,

14  because he's so in love with her, and that he can't

15  dissuade her from overstating the deductions on her tax

16  returns because he can't win an argument with her, yet

17  he loves her, and yet she's crude and profane and

18  obnoxious and sometimes insults his personal investment

19  clients, but he loves her.

20      1993 was an important year regarding the chain of

21  events in this case in the relationship between

22  Mr. Caplitz and Mrs. Herman.  He tells you that she

23  didn't want to work for him because they were so in

24  love, so in order to get her to work for him he decides

25  to give her the controlling interest of a company he had

1    formed.  That is pure horse manure.  Because in 1994,

2    what did he do?  He filed for personal bankruptcy.

3         When you file for personal bankruptcy you list

4    your assets on one side and you balance your assets

5    against your debts, and when the bankruptcy petition is

6    approved, you are shafting your creditors, you are

7    wiping out all of your debts.  And when he dumps that

8    company on her in 1993, it enables him to avoid listing

9    that company and the assets and that it's his company as

10   an asset.  So not only do his creditors get screwed

11   because of the disbalance between the debt and what

12   assets he has, he manages to hide that asset from them

13   by using her.

14        And then after 1995, after the bankruptcy petition

15   has been approved, he has her set up companies in

16   Massachusetts and he assigns insurance commissions to

17   those companies.  Keep in mind he told you that when you

18   file for bankruptcy your credit history is destroyed,

19   you can't get loans, you can't get mortgages, and you

20   can't get credit cards, and who in this day and age

21   walks around without any credit?  So he has her

22   establish a couple of companies and he starts assigning

23   insurance commission checks to those companies, okay,

24   and that provides him with a number of advantages.

25        First of all he's admitted that he talked her into

paying his personal mortgage even though he knew it was
illegal, that that wasn't a business deduction, he has
her do it anyway.  He has her provide him with health
insurance, which he doesn't report as income to himself,
which is illegal, and he has her do it anyway because he
loves her so much.  She pays the business expenses for
that dump of an office he maintains.  She provides
payment to the receptionist, her sister, who can't type,
while she's the office manager, and she can't write, but
most importantly she picks up some of his personal
expenses and the big one is that he's allowed to use the
corporate credit card.

So after he shafts his debtors through her, then
he's able to get back on his feet again, bring some
money in, he dumps some income on her businesses, and
this is the quid pro quo they worked out.  And in terms
of the insurance commission checks, who were those
checks coming into, whose Social Security number is
going to be on the 1099 reported to the Internal Revenue
Service?  Gregg Caplitz.

And he told agents, during one of the many
debriefings, because they had trouble, I suggest to you,
believing what he was saying anyway, he admitted he
didn't worry about taxes, because Mrs. Herman was the
one dealing with the taxes.  He didn't care.  The

arrangement, assigning income to her properties enabled
Mr. Caplitz to avoid paying taxes personally because he
didn't have any of the money.  So he's taking advantage
of her for the bankruptcy filing so he can keep his
company, then he gets the company going under her name
and he avoids having to pay taxes on it, except that he
got caught in the end, didn't he?  And then when the
insurance commissions run out, he decides to beat the
bushes, do some research, and come up with the get-rich
scheme, "Let's start a hedge fund."

       And how is he going to start a hedge fund?  Let's
be honest here, he's not much of an investment advisor,
is he?  He's an insurance salesman.  95 percent of his
income post 2000 was insurance commission checks and
after he screws that up, he's not getting that money
either.  In the meantime the money he's been taking in,
because of all the screw-ups, is being dissipated with
attorneys fees, which he says he didn't want to do, he
advised against getting involved in these lawsuits.
Well, the most important thing to him always is himself
and he wanted to be able to generate those commission
checks again with the insurance companies and that
basically was one of the problems they were having, the
legal expenses, so he's dumping this money into
businesses under her name.

1          And flow-through taxation, who's on the hook for

2     the taxes with flow-through taxation?  What did

3     Mr. White tell you?  It's the shareholder in the

4     company.  So when the companies are set up, he makes

5     sure he's not an officer, he's not a director, and he

6     sure as heck is not a shareholder, because he's dumping

7     the tax responsibility on her so he doesn't have to

8     worry about it.  He doesn't care.  He's a sociopath.  He

9     has a major personality disorder and he has no

10     conscience whatsoever and whoever gets in his way, the

11     heck with it.  You saw him over a two-day period of time

12     testify about money he stole from people he had known

13     for up to 25 years and I suggest to you he does not have

14     a hint or a twinge of remorse for what he did, he's just

15     telling you another story.

16          And the hedge fund.  He needs 75 to 85 million

17     dollars that he's going to get from, he told you, large

18     institutional investors.  Are you kidding me?  The MBTA

19     is going to give him 75 to 85 million dollars to run a

20     hedge fund?  And what's the attraction to this hedge

21     fund he's going to set up?  Well, he talked to his

22     bankruptcy lawyer and he found out that minority-run

23     hedge funds are a real hot item, that the large

24     institutional investors don't really care that much

25     about how good the hedge funds are going as long as they

```
 1    are run by a minority member.  And who is the minority
 2    member that he can turn to to start this ridiculous
 3    venture?  Her.  With all of her flaws, chain-smoking, a
 4    little bit rough around the edges to the point of being
 5    jagged, with the knowledge that many of his investment
 6    clients can't stand her, and General Electric is going
 7    to take their employment pension funds and invest it
 8    with him because he has her as the face of the hedge
 9    fund?
10         And he admitted that he didn't really understand
11    the whole schlameel about standby letters of credit, it
12    was magic to him, and he manages to transfer over
13    $300,000 that he steals from his clients into a bank
14    account controlled by her, and he makes sure he doesn't
15    even have signing powers on the account because he wants
16    to keep himself separate from it, and then he takes the
17    $300,000 and he pays $84,500 to one group of lawyers,
18    another $34,000 to $40,000 to Sadis & Goldberg to come
19    up with a template, another $125,000 to somebody else he
20    finds, and guess what?  Just like magic, abracadabra,
21    poof, the money's gone.  So what does he do?  He goes
22    down to Rhode Island with his bankruptcy attorney, after
23    they lost $300,000, and reports the theft to the FBI.
24    The sociopath managed to get scammed.
25         It's important to look at what was going on here
```

1    and the relationship between the two of them.  She has

2    problems, one of her problems, I suggest to you, is him.

3    To quote my teenage daughter, "He's kind of creepy."  I

4    mean he's sending her these e-mails and she never

5    responds to them and he tells you, "I was madly in love

6    with her," but she didn't want to respond, she didn't

7    want it in writing, she was afraid her husband would

8    find out about it, so she didn't want to respond, "But

9    we were in love, we had this passionate affair," so she

10   didn't want any public record.

11          Did you see a Valentine's card, a little love

12   note, a ring, jewelry, a shamrock pressed in a book?

13   Are you kidding me?  He's so in love with her that he

14   proposes marriage to her on the top of the Mystic Tobin

15   Bridge on a Thursday in December and he has the gall to

16   tell you that he got out on the top of the Mystic Tobin

17   Bridge in December and he got down on one knee and

18   proposed marriage to her and she accepted.  At the top

19   of the Mystic Tobin Bridge in 1994?  Those of you who

20   have been in this area for more than 35 or 40 years

21   probably remember back in 1989 when a young couple was

22   coming out of child-rearing classes over by Roxbury and

23   Longwood, over by the hospitals, and they were

24   supposedly attacked by a black man --

25          MS. BLOOM:  Objection, your Honor.

1          THE COURT:  Yeah, let's stick to this case.  Let's

2     stick to this case.

3          MR. O'HARA:  In any event, the Mystic Tobin Bridge

4     is iconic not as a place where lovers meet, but as a

5     place where people go to commit suicide, and that was

6     the situation, the location that he tells you he chose

7     to make this overture to his lover.  And what does she

8     do?  She moves to Arizona -- excuse me, Nevada.  I keep

9     getting them confused.  I've never been to either one.

10    She moves to Nevada to get away from him.

11         He's giving her a lot of money and she has

12    problems of her own, okay?  she's hard-scrabble, she has

13    a husband who's seriously ill, she has a son who has

14    brain damage, she has another son and a daughter-in-law

15    who just came out to visit and decided to stay.  So all

16    of a sudden she's living in Nevada, trying to develop

17    investment business, she gets two clients in a period of

18    20 years, and she's supporting five adults, and then

19    when her son gets married she's also supporting two

20    children, and he's giving her the money.  And from 2008

21    to 2012 he's telling her everything is okay.

22         He admits he tells her what she wants to hear,

23    "The money is yours, Rosalind, you can spend it as you

24    want, okay, if you have a tax issue with this money that

25    we're funneling into you, it's going to be reported as

1    capital gains," and I think most of you know that
2    capital gains -- if you buy a house for $100,000 and you
3    sell it 20 years later for $2 million, you have a $1.9
4    million capital gain.  Capital gains are taxes that are
5    assessed on what you owe, okay?  So he's telling her,
6    "It's yours, go ahead and do what you want with the
7    money, don't worry about it, you're selling assets in
8    your company and you're the face of the hedge fund,
9    okay, so go ahead and spend the money as you see fit,"
10   and then two or three times a year he goes out there and
11   he spends a month at a time.
12        Keep in mind in 2009 what does he do again?  He
13   files for personal bankruptcy.  This time he dumps more
14   than $2 million worth of debt that he had and leaves his
15   creditors once again holding the bag, once again he has
16   no credit history, once again he has no ability to
17   borrow money.  So he goes out to Nevada two or three
18   times a year, he stays a month at a time, and he gets to
19   go to the casino, he gets to tell her everything is
20   okay, and he makes sure that his name doesn't appear on
21   anything, it all appears under her name because he wants
22   to put as much distance between her and him as possible
23   because he knows what's going on, he knows what he did.
24   And most significantly, as he admitted to agents and
25   that he had to admit on the stand, he never told her, he

never told her that he was stealing money from the clients, he told her that they were investing money in her business, that they were buying her assets, he told her exactly what she wanted to hear because he loved her or because he wanted to keep the situation going.

She asked Caplitz if the sale of her shares in the company would be income to her and he said, "No," that it might create a capital gains problem for her, and he told the agents in June of last year that she wanted an investment that she would run and she could do whatever she pleased and she believed that what she was doing was selling assets that were personal to her and that she could do what she wanted to do with the money.

The wire, the three wires that came from the Connells' account, who wired that money?  It was Gregg Caplitz, okay?  Mrs. Herman had nothing to do with that. She didn't induce the wire transfer.  Caplitz talked them into it.  Caplitz did it.

The conversations with Mr. Leuci?  After Caplitz talks Leuci into investing the $100,000 -- and he says, "Hey, listen, you know you're going to get a return of between 9 and 20 percent a year," and then he gets her on the phone with Mr. Leuci, not to induce Mr. Leuci to make an investment but to get Mr. Leuci to calm down and get off his back.  And he's telling Mrs. Herman, "Look,

```
 1   look, look, look, we're right on the verge, we're right
 2   on the verge of entering the overnight millionaires
 3   club, the funding's about to come in, this Carl Leuci
 4   guy is a pain in the ass, tell him everything's okay."
 5   And she doesn't want to send him a distribution because
 6   why should he get a distribution when every other person
 7   who's involved in the fund wants to get a distribution
 8   also?  So they have a fight on the phone and she tells
 9   him, "I'll send you a check for $3,000, but I'm going to
10   write "gift" on it because it's not really a
11   distribution, it's not fair to the other investors."  He
12   deliberately keeps her as much in the dark as possible,
13   the same way he does with everybody else, and it's all
14   for his own benefit because he is a sociopath.
15        And when he decides to cooperate with law
16   enforcement it's nine months after he's been indicted
17   and he's had ample time to think about what he wants to
18   say and how he's going to spin it.  And when he
19   testified on the stand for two days in this case, he
20   also had ample time to think it over.  He's a bright
21   person, okay?  He's a bright person, but he's got some
22   wires crossed, and you can't accept at face value
23   anything he says.  And Judge Young will tell you what
24   your duties are regarding credibility, you can accept
25   all of it, you can reject all of it, you can do what you
```

1   want, but he's not an honest person and he's incapable

2   of giving an honest answer.

3        Just imagine for a moment what it must have been

4   like when he went over to Mrs. Wentzell's house in

5   Somerville and talked to her about the Red Sox and maybe

6   helped her with her crutches and then got her to

7   liquidate a $170,000 life insurance policy so that he

8   could get the money transferred to Mrs. Herman and then

9   use it to go out on his venture to start a hedge fund.

10  Think about it what it must have been like when he went

11  to the Leucis and he commiserated with them and said,

12  "Congratulations on coming out," and "By the way, guess

13  what, Carl?  I'm gay too and I've got a great investment

14  for you, it's going to be a return between 9 and 20

15  percent, just, you know, give me permission to take

16  $100,000 of your money and, man, you're going to be

17  happy, man, I can't wait to see the look on your face

18  when I give you those distribution checks."  And then he

19  had the gall to get on the stand and say, "Well, I

20  delivered the distribution check personally to

21  Mr. Leuci," when Mr. Leuci told you he didn't have the

22  guts to come and give him a $3,000 check when he was

23  expecting a distribution of at least $9,000.

24        And think about what happened when he spoke to the

25  Gilmartins and the Schneiders and Hilgemeiers, people

1   who didn't want to invest in a hedge fund, and

2   Mrs. Bigelow says specifically, "I don't want any hedge

3   fund, I'm afraid of happening to me what happened to the

4   victims of Bernie Madoff."  But they trusted him, at

5   least the Bigelows did, so he took their money.  She

6   didn't, okay?  And then the Connells.  Disgusting.  A

7   woman is dying of Stage 4 cancer and he goes to their

8   house and he holds her hand and he commiserates with her

9   and he talks her husband into wiring money into an

10  investment, wiring money that Mr. Caplitz wired in.  And

11  it goes on and on from there.  He's been taking

12  advantage of people and telling stories for years and

13  he's telling a story to you.

14      If you're not convinced beyond a reasonable doubt

15  that Mrs. Herman knowingly participated with Mr. Caplitz

16  in what he was doing, you have to find her not guilty.

17  Okay?  That's the law as the law pertains in this case.

18  He has an interest in the outcome of this case, he

19  doesn't care about her, he doesn't care about his

20  victims, he doesn't care about you, all he cares about

21  is himself, and he's trying to do something of substance

22  so he gets some kind of credit and maybe possibly when

23  he appears for sentencing his sentence will be reduced.

24  But don't make his life any easier by adopting his

25  latest series of lies that he's trying to force down

1    your throats also.  Thank you.

2         THE COURT:  A brief rebuttal?

3         MS. BLOOM:  Yes, thank you, your Honor.

4         THE COURT:  Okay.

5

6    REBUTTAL BY MS. BLOOM:

7         Now Mr. O'Hara just talked a lot about Gregg

8    Caplitz, but we agree, the government prosecuted Gregg

9    Caplitz, no one is disputing that he is guilty and he

10   did horrible things, but Mr. O'Hara said something else

11   very interesting, he said he's not going to claim his

12   client is an innocent victim.  That's exactly the point.

13   Today is the day that Rosalind Herman is on trial and,

14   yes, Gregg Caplitz and Rosalind Herman worked together

15   to get these clients to put all the money into the bank

16   accounts, the bank accounts that were controlled by

17   Rosalind Herman.  The bank records show what she did

18   with the money.

19        She owned the companies.  She may not have been a

20   rocket scientist, but nobody is dumb enough to think

21   that it is okay to steal Patricia Wentzell's money.  She

22   knew about these clients, they were clients of her

23   business, they had been clients for years, she had met

24   with the Burts, she had talked to the Leucis, she knew

25   and she just kept spending the money.  These were her

1    businesses.

2         And she was the boss, that was clear, not just

3    from Mr. Caplitz, it was clear from the records, but

4    more than that it's clear from the testimony of the

5    people who dealt with them.  Even from her own family

6    members, Charlene Herman, Brad Herman, he said he

7    wouldn't be standing here if he had ever given the money

8    to Gregg Caplitz instead of to his mother.  Do you

9    remember at first he tried to claim that "Maybe I did

10   give some of it to Gregg Caplitz," and then I went back

11   over his prior testimony with him, he had said, "She was

12   so controlling, I'm surprised she didn't have a GPS on

13   my mouth right now."  This woman was not duped, she was

14   not dragged into this.

15        And this is a really strange way to take advantage

16   of someone, to give her millions of dollars, because

17   that's what Gregg Caplitz was doing all these years.

18   Yes, he was getting some of the money, but he was giving

19   her money and then the fact is she didn't pay the taxes.

20   They did all sorts of schemes between them not to pay

21   the taxes and to get money from these victims which she

22   controlled and spent on the Las Vegas house, on Smoker's

23   Haven, on Red Rock Casino -- just look through those

24   records, and on family members.

25        THE COURT:  Sum up, Ms. Bloom, this is rebuttal.

1          MS. BLOOM:  I'm sorry, your Honor?

2          THE COURT:  Sum up.

3          MS. BLOOM:  Sum up.

4          So the evidence is clear and it's clear from her

5     e-mails telling him not to put it in writing, her

6     communication with Mr. Leuci, with Mr. Burt, trying to

7     keep them from going to the authorities, she was part of

8     this too, she was no victim, they were in this together,

9     they were a couple of lying thieves, and she too is

10    guilty on all counts.

11         THE COURT:  All right.  Still now keep your minds

12    suspended because you have not heard my instructions as

13    to the law.  Do not commence discussing the case among

14    yourselves and naturally don't discuss it with anyone

15    else.  We'll give you another 15 minute recess, you'll

16    be in again, and I will instruct you as to the law.  The

17    jury may stand in recess for 15 minutes.

18         (Jury leaves, 11:10 a.m.)

19         THE COURT:  I'll remain on the bench.  Please be

20    seated.

21         With respect to the four wire fraud counts, they

22    rest on specific communications.  I asked about this

23    before and Ms. Bloom you answered.

24         Do you want to hand up those exhibits, um, Count

25    4, on or about November 17, 2008, and that's Exhibit

1    what?

2         MS. BLOOM:  10.

3         THE COURT:  May I have it?

4         MS. BLOOM:  Yes, we're going to get it right now.

5         THE COURT:  All right.  And Count 5, February 25,

6    2009.

7         MS. BLOOM:  Well, I believe it's 10, 11 and 12,

8    and 424.  We'll pull those right out.

9         THE COURT:  Okay, why don't you do that, if you

10   just give me the packet of those.  And you can give them

11   to Ms. Gaudet.

12        MS. BLOOM:  I think Jennifer has 424.

13        THE COURT:  Well, you put them together.

14        A 15-minute recess.  We'll recess.

15        (Recess, 11:11 a.m.)

16        (Resumed, 11:30 a.m.)

17        THE COURT:  I'll ask the members of the jury if

18   they won't stand up for just one moment, please.  You're

19   not taking any notes while you're standing.

20        (Jury stands.)

21        THE COURT:  It's a tradition in this session of

22   the court and in the court where I started my judicial

23   service that at the beginning of the judge's charge in a

24   so-called criminal case the judge and the jury stood and

25   faced one another, and this is not why we all stand up,

```
1    as you go in and out, out of respect for the jury's role
2    in our process, you and I stand now, together, out of an
3    acknowledgement that we live under a Constitution that
4    by its guarantee ensures that both the government and
5    Ms. Herman will have in this case a fair and an
6    impartial trial and that the jurors and the judge in
7    such a trial will be as fair and impartial as the lot of
8    humanity will admit.  And it is that shared
9    responsibility that we all acknowledge now.  Please be
10   seated.
11          (Jury is seated.)
12
13   JUDGE'S CHARGE TO THE JURY:
14          This is the part of the case where I will explain
15   to you, it's like a law school class, I will teach you
16   the law that you must follow in analyzing the evidence
17   in this case.  If I don't make anything plain, by all
18   means you can write out a question, we'll have you back
19   in here -- you can do it at any time during your
20   deliberations.  If you have -- if you have any question
21   about the law in this case -- I have nothing to say
22   about the evidence, but if you have any question about
23   the law, write your question out, we'll have you back in
24   here, I will further explain the law, and send you back.
25          We ask you to do justice, which of course we mean
```

1    fairly and impartially apply the law to the evidence as

2    you find it to be.  You can't do that unless you

3    understand what the law is, so don't hesitate to ask me

4    questions.  This will also prove to you that I work in

5    the afternoons, I'll be here while you're deliberating.

6    Let's start where I started when first we met.

7         There are two great principles that govern this

8    case.  First, Ms. Herman started this trial innocent,

9    truly innocent.  You don't hold it against her that we

10   had a trial, that she's here, that's completely unfair,

11   she started the trial innocent.  If she were to be found

12   guilty on one or more of these charges, it could only be

13   because you, the jury, come unanimously to believe that

14   the government has proved the essential elements of that

15   charge beyond a reasonable doubt.  And of course I've

16   now invoked the second great principle.

17        The burden of proving here rests on the government

18   and it never ever shifts to Ms. Herman.  She has nothing

19   to explain to you.  She is not required to.  You do not

20   hold it against her if something is left unexplained

21   because that would shift to her some duty of explaining.

22   That can't be right.  That's not our way.  The

23   government can't make a charge, bring someone into

24   court, and say "Explain yourself."

25        And of course have in mind everything that was

```
 1    done here.  Mr. O'Hara, Mr. Benzaken, they have examined
 2    these witnesses, they have asked the witnesses
 3    questions, they have called a witness, they have
 4    introduced documents, stipulations, all of those things,
 5    and to the extent they have asked questions, you can
 6    make the information that's been elicited what you will,
 7    it could tend against her as well as for her.  It makes
 8    no difference where evidence comes from, you make of it
 9    what you will.  The important thing is the burden of
10    proof rests on the government and it never moves and the
11    burden of proof is proof beyond a reasonable doubt.
12         A moment about your function.  There are two
13    alternates in this jury.  Two of you, when I'm done
14    teaching you, we're going to pick the two alternates,
15    we'll ask you to come down and sit in these chairs here,
16    and when we send the 12 deliberating jurors out, the two
17    alternates take a left and go in my little office there.
18    They call it the "robing room," but I consider that
19    incredibly pompous, but I didn't make up the signs.  And
20    you'll just relax there and we can bring in magazines
21    and books, you have access to a phone, and you don't get
22    to deliberate.
23         And so you say, "Well, I've wasted all my time,
24    why are you doing that?"  Please don't think that.  We
25    have two alternates -- and I'm talking to all of you.
```

1    We have two alternates and that ensures just how serious

2    this matter is.  And the alternates will stay through

3    the entire deliberation of the jury, if it takes longer

4    than today, however many days it takes, and when the

5    verdict is returned, the two alternates will be sitting

6    right there, they are members of the jury, they just

7    don't deliberate because the rule says that 12 members

8    of the jury deliberate.

9          Now, I don't expect this, but I've been at this

10   for a while and it has happened.  What if, among the

11   deliberating jurors, it turns out there's a real

12   emergency at home or one of the deliberating jurors gets

13   sick, that's happened, and we have to excuse a

14   deliberating juror?  In that case I have the alternates

15   and I send an alternate in.  If that were to happen, and

16   I'm emphasizing how important alternates are, I will

17   instruct the jury that the deliberations start all over

18   again right from the beginning.  It isn't eleven of you

19   who have been talking for two or three hours and then we

20   send an alternate in and you tell the alternate, "Now,

21   here's what we think, this or that," it's a different

22   jury then because it has eleven who have been

23   deliberating and it has one additional alternate.  It's

24   not additional because we've lost one.

25          So all of you, you are going to determine the

1    facts in this case from the evidence as you've seen it

2    and heard it, nothing else whatsoever, no bias, no

3    prejudice, no sympathy for anyone, no desire that anyone

4    have revenge, just that cool, careful sifting of this

5    evidence so that here, in this courtroom, justice truly

6    may be done.

7        I'm the judge of the law.  You truly must take the

8    law from me.  Don't think that because I explain all

9    aspects of the law that I think anything's been proved

10    here or nothing's been proved.  That's not my business.

11    I have nothing to say about that.  What I'm doing for

12    you is building for you a mental framework within which

13    you, and you alone, will decide what the evidence shows

14    or fails to show.  Don't grab on to something that I say

15    and say, "Ah-ha, the case turns on this or that."  Not

16    so.  Listen to the entire charge, all of it should fit

17    together.

18        When I say you must take the law from me in its

19    most practical way I mean the following.  I'm going to

20    tell you as to each of the charges here the essential

21    elements, those particular things that the government

22    has to prove.  As to those things you've got to decide

23    whether unanimously you believe the government has

24    proved those things beyond a reasonable doubt.  If any

25    one of those things is -- on that particular charge, is

not proved beyond a reasonable doubt, Ms. Herman must be
acquitted, she must be found not guilty of that charge.
If those things the government has proved to you are
satisfied to you beyond a reasonable doubt, then you may
find her guilty of that charge.  But you can't add
anything to those essential elements and equally you
can't subtract anything.  You can't say to yourself,
"I'm not particularly concerned with that, whether they
proved that."  If I tell you the government has to prove
it, that's one of those things they have to prove beyond
a reasonable doubt and you have to unanimously come to
believe it.

        I keep talking about proof.  What do I mean?
There are two types of proof that we accept in court,
direct evidence and circumstantial evidence.  Direct
evidence is evidence directly of a specific point.  An
example would be a witness who was there and you believe
the witness, it's entirely up to you what you believe,
but the witness says, "I saw this," "She said that," and
also direct evidence is the actual, for example, bank
records, the evidence of payments in, payments out, the
documents that are used in business to evidence those
commercial transactions, perhaps the actual tax returns,
that type of evidence.

        Circumstantial evidence is evidence of a

1    circumstance which, when coupled with other

2    circumstances, leads to a conclusion.  A case may be

3    proved on direct evidence entirely, on circumstantial

4    evidence entirely, or on any combination of direct and

5    circumstantial evidence.  If those are the types of

6    proof that you may rely on, what tools have you in this

7    case upon which to make up your minds?  Actually there's

8    a variety of them in this case.  Let me touch on each

9    one.  There is the -- and I'm not picking -- I'll start

10   with the testimony of the witnesses but only because it

11   comes into my mind first, not that it's the most

12   important, it's up to you what's important, but the

13   testimony of the witnesses.

14        If I let a witness testify to something, you can

15   believe it, but equally you can disbelieve it.  You can

16   disbelieve it, you can disbelieve everything a witness

17   said as though that witness never took the stand.  And

18   you can believe some things a witness said and

19   disbelieve other things that the witness said.

20        Now, how do you do it?  You're entitled to use

21   everything you know, as you are reasonable men and

22   women, about these witnesses, everything that you know

23   about them from their testimony and the testimony of

24   others, and you're entitled to use all your abilities to

25   size the witness up from watching the witness on the

1   witness stand.  How did the witness respond to questions

2   both on direct and on cross-examination?  What was the

3   witness's ability accurately to recall events in the

4   past, to relate those events, to understand, to

5   comprehend the matters about which the witness

6   testified?  Does the witness stand to gain or lose

7   anything depending upon how this case comes out?  Does

8   the witness bring any feelings or interests into the

9   case?

10          Certain people have testified that they are out

11   money in this case.  Does that engender emotions, did

12   the emotions affect their testimony, cause them to

13   embellish or say things that are exaggerated in any way,

14   do they have any interests?  Other witnesses are -- a

15   couple of them are employed by the government.  Does the

16   fact of that employment, does that cause them to

17   embellish or see things in the way that the government

18   seeks to have them presented or are they accurate?

19          One witness, Mr. Caplitz, he has pleaded guilty

20   and he has testified to you that he's a conspirator and

21   that he has done various things himself relative to

22   these specific events.  The law says that you must take

23   the testimony of such a witness as Mr. Caplitz and view

24   it with special scrutiny because the law recognizes that

25   a person in that position may seek to inculpate, to

1   involve other people, exaggerating their role and

2   minimizing his role, in order to seek a better outcome

3   from the criminal justice system.

4       At the same time a witness such as Mr. Caplitz may

5   be telling the entire truth.  Witnesses employed by the

6   government may be telling the entire truth.  People who

7   have lost money may be telling the entire truth.

8   Ms. Herman's sister testified, so there's that

9   relationship, and she testified about her close

10   relationship to her sister.  Did that affect her

11   testimony?  But she may be telling the entire truth.

12       In short, the law imposes this duty of special

13   scrutiny on Mr. Caplitz, but it's entirely up to you

14   people, as you are reasonable men and women, you use

15   everything you know about these witnesses.  How does the

16   testimony -- does it hang together?  Is the testimony --

17   it isn't just testimony in this case, is the testimony

18   backed up by other evidence in the case, the exhibits in

19   the case, or does that testimony take away from it, make

20   it less believable, less credible?  You're the judges of

21   credibility, the only judges of credibility, and your

22   powers are extremely broad.  If a witness has testified,

23   you may believe everything the witness said, you may

24   disbelieve everything the witness said, you may believe

25   some things a witness said and disbelieve other things.

1   You may sum up a witness's testimony as you are

2   reasonable men and women.

3        So I mention exhibits.  Now, the exhibits, you're

4   going to have all these exhibits and there's over 400 of

5   these exhibits, not all of them have been mentioned in

6   the case nor need they be mentioned.  Certain of them

7   are mentioned, but these are the exhibits that I have

8   determined that at least you ought to look at and

9   whether they mention them or not, this is what the

10  lawyers put together to have in this case.  Your power

11  with respect to exhibits is as broad as your power with

12  respect to witnesses.

13       With respect to an exhibit, you want to analyze it

14  really on two points, take a look at the exhibit and

15  then see is it genuine?  Now in this day of digital

16  reproductions, don't worry about whether something's a

17  copy, I haven't heard any evidence that something was

18  fake here, but it's entirely up to you, so check it out,

19  is this real, is it accurate?  And if it is accurate and

20  you believe the document is what it purports to be, what

21  does it tell you about this case?  How does it fit?

22  What do you know about the case because of the exhibit?

23  Your powers are just as broad.  If you have an exhibit,

24  you may believe what it says, equally you may disbelieve

25  it and disregard it, you may believe parts of it and

1    disbelieve other parts.

2         Now, we've got some summary exhibits that the

3    government made out or at least they put together and

4    those are summarizing of other documents and to the

5    extent you have those documents maybe you want to make a

6    comparison to see if they are in fact an accurate

7    summary, but if they're in evidence before you, you may

8    believe them, but you need not.

9         A couple of the exhibits, because they marked them

10   as exhibits even though they were read, there's been

11   stipulations here.  Now, stipulations should really save

12   you time because not everything is disputed.  So where a

13   stipulation was read to you, that's agreed, there's no

14   dispute about it, it's agreed, so you don't have to do

15   any analysis about it, you can just take it as given.

16   Still so powerful is your role as jurors, you can

17   disregard it.  I'm telling you they agree to it, but you

18   could disregard it.

19        And then I think the last thing is, because

20   reference is made or because apparently there was this

21   other unrelated civil case, that civil case involved

22   what we called depositions, and I've explained what they

23   are, and some answers given on deposition were read to

24   you, and that's like the witness testifying, that's like

25   that person testified, and if the person said those

1    things, you may believe what was said, but you need not,

2    you can disbelieve it.

3         So those are the sources of evidence that you have

4    in this case.  Now, what do you do with that evidence?

5    Look, you don't check your common sense at the door to

6    the jury room, just the reverse, I charge you to apply

7    your common sense to the evidence in this case to the

8    end that justice may be done.  But the burden of proof

9    here is not common sense, of course you can use your

10   common sense, the burden of proof here is proof beyond a

11   reasonable doubt, and there must be no guesswork, no

12   speculation, no "maybe this happened," "perhaps,"

13   "possibly," "it could have," not even that it's likely

14   that this or that happened, it has to be proved beyond a

15   reasonable doubt.

16        You are entitled to draw what are known as

17   reasonable inferences, logical deductions.  Let me give

18   you an example both to tell you what a logical deduction

19   is, a reasonable inference, but also to warn you away

20   from what you cannot do, and it has nothing to do with

21   the case.

22        Suppose we have a witness and the witness says

23   she's walking along a road and off to one side there's a

24   field of barley.  You all know barley, they make scotch

25   from barley, beautiful long green stalks, gray tassels.

And she's passing the field and she notices that in an
irregular course through the field the barley has all
flattened out.  Now that's my supposition here.  And
suppose you believe that witness, you believe that
witness is telling the truth.

Now, from that testimony alone you see that
circumstance which you believe, you can reasonably infer
something went through the field.  The witness didn't
see it, but something went through there.  If for
instance it was a wind storm, it would have knocked all
the barley down.  Something went through that field.
But if that's all the testimony you have, you don't know
what it was, an animal, a person, big, small, a dog, a
wild animal, an adult, a child, someone on a dirt bike,
you don't know any of that, you just know something went
through the field.  So, yes, you may draw reasonable
inferences, but no, you may not guess nor speculate.

Now, I'm going to have the Clerk pass out the
verdict slips here.  We only need one verdict slip back
and that's the one from the foreman and he signs it on
your behalf.  But now that I'm going to go through the
different charges, it makes sense if you each get a look
at the verdict slips so you see how it -- the questions
that it asks you.  And while it's being passed out, I
want to mention two things that are not evidence, but

1    I -- well, actually three things that are not evidence.

2    The first is this.

3         Don't you draw any conclusions against

4    Ms. Herman -- and I've already said this, but my verdict

5    slip makes reference to certain counts.  Counts are the

6    paragraphs in the charging document and I just wanted to

7    tie the verdict slip into particular counts, and you'll

8    see really that the counts are not numerically in

9    sequence and some counts are omitted and that's because

10   some things we're not asking you about, they either

11   involve other people or they involve different things,

12   and we're not asking you about them, so don't speculate

13   about them.

14        But the first thing that's not evidence is the

15   fact that charges have been made.  It doesn't amount to

16   anything.  Nothing.  Zero.  She started the trial

17   innocent.

18        Second, and I'm privileged to say this, the

19   lawyers here for the government, for Ms. Herman, you

20   have done a fine job as officers of the court, you have

21   marshaled the evidence, its strengths, its weaknesses,

22   you have advocated on behalf of your clients, it's a

23   privilege to preside over a case that has been well and

24   truly tried.  I don't say that in every case.  I think

25   you know that.

1        Now that's the truth.  Disregard it.  And the

2   reason I point that out is I don't want you deciding

3   this case in any way, shape, manner or form, based upon

4   how you react to these attorneys as people.  I mean if

5   you think the presentation has been understandable, has

6   helped you grasp the evidence and understand it, its

7   strengths or its weaknesses, that's fine, that's what

8   attorneys are supposed to do.  They've done a fine job.

9   But you decide the case on the evidence.

10       Now, that's equally important the other way.  If

11  any attorney has done anything to offend you here,

12  somehow just the presentation, the questioning has

13  grated on you, don't hold that against the client, the

14  government or Ms. Herman, that's not fair.  Stick to the

15  evidence.

16       And lastly, if you think that I think anything at

17  all about this case, I most earnestly instruct you to

18  disregard it.  And I tell you as surely as I know my own

19  heart, I have no views about how this case will come

20  out.  I do not talk about this case with the judge or

21  the dean or any of my law clerks, or at least the

22  substance of the case, I talk about the law with the law

23  clerks, but like I've just said to you, I'm -- I've got

24  more than enough to do out here, but I'm not the judge

25  of the facts in this case, you are.  So if you think

that I have some view about this case from the manner in
which I presided over it, disregard it, I don't, I have
no clue to give.  But I do have this bias and it is a
strong and intense bias, I believe that you people will
do justice in this case.  I believe in the jury system.

Now, let's come to this verdict slip and I have
arranged it more or less in the way it was argued to you
though that isn't numerically how these so-called counts
set out, and I want to look first, the first question
charges Ms. Herman with this corrupt endeavor to impede
the IRS and I've given you the years over which the
government has charged that she did it.  So what does
that mean?  And let's go over the essential elements of
that first one.

First of all, for the corrupt endeavor to impede
the due operations of our Internal Revenue Service,
first, she, Ms. Herman -- not Mr. Caplitz, though you
could, and I'm not suggesting you would, but you could
find they were operating together, that's what the
government has argued to you, but you've got to find
that Ms. Herman was acting corruptly.  What does that
mean?  It means she was acting with an evil motive.

People make mistakes on their taxes all the time,
that's not a crime, it just isn't.  She has to act
intentionally to either underreport what monies she was

1    supposed to report, on her own behalf or on behalf of

2    some sort of entity that would pass through to her, or

3    overclaim deductions that she knew or reasonably

4    understood she had no right to claim with the idea that

5    the government would not get its due, and she's got to

6    do that knowing what she's doing, intentionally, or the

7    government can, and it's appropriate, they can prove --

8    they can succeed if you come to believe unanimously that

9    she was acting with willful blindness.

10          Now, what does "willful blindness" mean?  "Willful

11   blindness" is -- well, first, it's willful.  "Willful"

12   means reckless, heedless of the consequences, not caring

13   what taxes were due, not caring what the proper

14   deductions were or the proper accounting of income, just

15   not caring about anything such as that and turning a

16   blind eye toward it, letting other people do it

17   without -- without, one, caring, and willfully blinding

18   oneself to what was being reported in circumstances

19   where it's reasonably understood that the tax return, if

20   tax return was filed, is inaccurate.  So it's got to be

21   done corruptly or through willful blindness.

22          And then it's a corrupt endeavor, it doesn't have

23   to succeed, but you've got to try, that's what

24   "endeavor" means, that's the second thing.

25          And then third, obstruct or impede the due

administration of the Internal Revenue Laws.  That
simply means to foul up the government agents who have
to carry out those laws, make their jobs more complex,
more difficult, more costly.

Now, in one respect I must correct something that
the government said.  The government charges that she
was doing it throughout the tax years 2003 through 2012
and the government has put on whatever evidence it has,
but it was argued twice to you that any one thing during
all that time makes her guilty.  No, it doesn't.  And
that's because they charged her from 2003 to 2012.  And
when you make a charge, the charge has to be
sufficiently detailed that a person who is being charged
knows what the government says you did wrong.

Now, here, in terms of charging, she knows that
they say she was corruptly endeavoring to impede the IRS
throughout the years 2003 to 2012.  The government does
not have to prove beyond a reasonable doubt every single
one of those years, it's on or about, but they do have
to prove that the bulk of that time, because that's what
they charged, the bulk of that time, beginning at least
as early as 2003 and running as late as 2012, she was
corruptly, or with willful blindness, endeavoring to
impede or obstruct the IRS in collecting the taxes.
That's what they have to prove, that's that first

1   question.

2       Now, the second question, the second question

3   charges her with an alleged violation of the Investment

4   Advisors Act and the alleged violation is fraud.  So

5   let's talk about what it is that the government has to

6   prove with respect to a violation of the Investment

7   Advisors Act.

8       Well, they have to prove that she did -- she, she

9   herself, or acting in concert with Mr. Caplitz -- if she

10  and Caplitz were in doing it together, that's sufficient

11  under this charge, that she, or she and Caplitz

12  together, employed a device, scheme, to defraud a client

13  or a prospective client, she engaged in a transaction,

14  practice or course of business which operated as a fraud

15  or a deceit upon a client or a prospective client or she

16  engaged in an act, practice, or a course of business

17  which was fraudulent, deceptive, or manipulative.

18      Now, any one of those three, if the government

19  proves any one of those three, that's sufficient.  What

20  the government has argued to you is the fraud is the

21  setting up, the alleged setting up of this hedge fund

22  and the selling of shares in the management of the hedge

23  fund, it won't matter the way they've argued it, without

24  any intention that anyone actually get any recovery and

25  in fact spending the money.  That's what they've argued

```
 1    to you.  And so you ask yourself, is that a device --
 2    have they proved it, and is that a device, scheme,
 3    artifice to defraud.
 4         "Fraud" means saying something that makes a
 5    difference, is material, makes a difference to an
 6    investor which you know is not true or failing to say
 7    something which under the circumstances you'd have to
 8    say in order to make something you have said true with
 9    the idea that the person will part with money and you
10    will get the benefit -- and it's not just money, it's
11    money or property, and that you will get the benefit of
12    that money or property on account of the
13    misrepresentation of material fact.  That's fraud.  And
14    I've explained the three different ways that the
15    government could prove that.
16         The second thing that the government has to prove
17    as to investment advisory fraud is that Ms. Herman did
18    so, did the acts knowingly, knowing that's what she was
19    doing, willfully, heedless of the consequences, with the
20    idea, the intent to deceive, manipulate, or defraud.
21         Third, that she was an investment advisor or she
22    was a person associated with an investment advisor.  Now
23    what does that mean?  Be specific here.  That means that
24    they must prove the following.  The term "person
25    associated with an investment advisor" means any
```

1     partner, officer, director of such investment advisor,

2     or any person performing similar functions, or any

3     person directly or indirectly controlling or controlled

4     by such investment advisor, including any employee of

5     such investment advisor.

6          Now the government argues it both ways, they say

7     they've got evidence that she was a registered

8     investment advisor herself and, if you don't believe

9     that, they say well she was a person associated with an

10    investment advisor, the investment advisor being

11    Mr. Caplitz.  That's what they argue to you.  But

12    they've got to prove one of those, either she was an

13    investment advisor or a person associated with an

14    investment advisor.

15         And lastly they have to prove that the fraudulent

16    scheme or transaction involved direct or indirect use of

17    the mail or some other means or instrumentality of

18    interstate commerce.  That's as important as the other

19    essential elements.  That's what brings us into the

20    courts of the United States.  Congress can regulate

21    commerce.  There has to be some relationship to

22    commerce.  Now, it can be direct or indirect, but there

23    has to be some effect on the commerce of the United

24    States, however slight, from this fraudulent scheme, if

25    you believe it was, setting up this hedge fund.  So

that's count -- that's the second question, Count Number
2.   And then we jump to really Questions 3, 4, 5 and 6,
they charge wire fraud.

Now, wire fraud is similar in many respects
because what is required to be proved is the same scheme
or artifice to defraud, just like I've explained it,
they have to prove that she engaged in it herself
knowingly or willfully, either she or she in concert
with Mr. Caplitz, but what makes it different is that
the wire communications of the United States have to be
used by somebody in order to make that fraud come about.
Again that's the commerce piece.

Now she doesn't have to know it, but it's got to
be reasonably foreseeable that in order to make this
scheme work, the wire communications of the United
States are going to be used.   And what's different about
wire fraud is, in investment advisor fraud they've
charged what they allege is the scheme, one charge, but
wire fraud, every time the wire communications of the
United States are used, that theoretically constitutes
another crime and they charged four such communications.

Now, I put the dates down there.   They don't have
to prove that the communication was actually on that
specific date.   But again in order to give her fair
notice of what the government's charging, they have to

1    prove that there was a wire communication on or about

2    that date.

3         Just so you're clear, the one thing the government

4    says as to Count 4, this one allegedly on November 17,

5    2008, they've introduced Exhibit 10.  On the one they

6    say was Count 5, my Question 4, on February 25th, 2009,

7    they've introduced Exhibit 11.  On Count 6, my question

8    5, the one they say on May 18, 2009, that's Exhibit 12.

9    And when you go over to the second page, as to Count 7,

10   my Question 6, the one they say on July 24, 2012, that's

11   what they say, or what they've introduced anyway, and

12   argued from Exhibit 424.  That's how those exhibits

13   supposedly tie in with those specific questions.  So

14   that's wire fraud.

15        And then lastly conspiracy.  Now, conspiracy is

16   different again, there has to be something different in

17   each one of these charges or else it would just be the

18   same alleged crime and I wouldn't ask a separate

19   question.

20        Conspiracy requires that they prove three things.

21   First, that Mrs. Herman entered into a conspiracy with

22   Gregg Caplitz, that she and Gregg Caplitz entered into a

23   conspiracy, knowing -- knowing what they were doing.

24   You're not a member of a conspiracy because you hung

25   around with the wrong person.  You're not a member of a

1   conspiracy because someone that you were associated

2   with, that person was breaking the law, you're not

3   guilty of conspiracy.  You're not guilty of conspiracy

4   if someone you're associating with is breaking the law

5   and you know about it.  Conspiracy requires that

6   Ms. Herman and Mr. Caplitz had an agreement, had a deal,

7   had a genuine understanding that they were going to go

8   about breaking the law.

9       Now, they don't have to say to themselves "We're

10  going to break the law," but it has to be they have to

11  agree to do acts which constitute violations of the law.

12  You don't have to know specifically about the Investment

13  Advisors Act, you don't have to know about wire fraud,

14  but you have to knowingly enter into a deal to do those

15  acts which violate the law.

16      So the deal doesn't have to be in writing, it

17  doesn't have to be a handshake, it doesn't have to be a

18  wink or a nod, but it's got to be an actual deal between

19  both of them.  That's the first thing.  That Ms. Herman

20  knowingly entered into a conspiracy with Mr. Caplitz to

21  do various activities that violated the law.

22      Second, they both have to agree on the specific

23  intent, there has to be a specific intent as to what

24  activities they're going to do.  For example -- and

25  here's what the government has charged.  The government

1    has framed it.  They say the government charges these

2    two people were in a conspiracy which, perhaps among

3    other things, but we're only dealing with what's

4    charged, which involved corruptly endeavoring to impede

5    the IRS over the bulk of those years that I mentioned,

6    engaging in investment advisor fraud, violating that

7    act, and engaged in wire fraud in a variety of ways,

8    trying to set up this, the government says, fraudulent

9    alleged hedge fund and sell shares in its management.

10   So that's got to be the specific intent.

11        Now follow this.  The government charged that all

12   three of these different types of crime have to be

13   encompassed in the deal between the two, corruptly

14   endeavoring to impede the collection of taxes, engaging

15   in investment advisor fraud, engaging in wire fraud.

16   That's the second thing the government has to prove.

17   Now, if that wasn't their intent, if the conspiracy

18   wasn't that broad, if it was more narrow, and, yeah,

19   there was a conspiracy to do one of those three

20   different types of criminal activity or even to do two

21   of those types of criminal activity, then she's not

22   guilty of conspiracy the way the government charged it

23   here, she and Caplitz have to knowingly agree together

24   to do all three of those things.  That's the second

25   thing.

1       But with conspiracy, they don't have to do it,

2   they don't have to succeed at any of these crimes.  In

3   other words, your verdict could be not guilty all the

4   way up to conspiracy.  But then they have to prove -- if

5   they prove those first two points on conspiracy, the

6   government has to prove that somebody -- and logically

7   it would either be Ms. Herman or Mr. Caplitz, one of the

8   co-conspirators, if you think there's a conspiracy, did

9   something to make the conspiracy come about, whether it

10  was successful or not they did something.

11      So for conspiracy the government has three things

12  to prove, that she knowingly entered into a conspiracy,

13  that the specific intent of their conspiracy encompasses

14  the different charges here, the impeding the IRS

15  corruptly, the investment advisor fraud, and wire fraud,

16  and then one of them did something to make that come

17  about.

18      Now a few words about your deliberations.

19  Mr. Foreman, as foreman it doesn't mean you do all the

20  talking, nor does it mean you keep your mouth shut, and

21  really I'm talking to all of you.  Set things up there

22  now so that all of you can discuss the case together.

23      Now, when I send you out now, I'm not going to say

24  keep your minds suspended, now is the time to start

25  discussing the case, and mechanically it's going to work

1    like this.  We'll send you out, take your notebooks, and

2    a word about notebooks.  Your notebooks are just for

3    you, you may have them, you may of course refresh your

4    recollection with your notes, that's why we let you take

5    notes, but don't pass your notes around, your notes are

6    not evidence of anything, it doesn't make you a better

7    juror as opposed to a juror who didn't take notes, it's

8    to help you, just use your notes yourself.

9         So you go out and you start your deliberations.

10   Ms. Gaudet's going to come back and sit down with the

11   lawyers and go over all of the exhibits that you should

12   have.  She'll come in -- you can start, but she'll come

13   in then with all the exhibits, so physically you have

14   the exhibits, then she'll leave you and then you have --

15   you can go on with your deliberations.

16        It's -- deliberations are deliberations of all 12

17   of you in the jury room, not 10 of you talking about the

18   case and two of you wondering what they're doing over at

19   Vertex and who is the owner of the big frog in the

20   window up there.

21        (Laughter.)

22        You focus on this case.  Now is the time to

23   deliberate together.

24        It is probably not a good idea to take a straw

25   vote.  I know we've asked you seven different questions,

 1    but it's probably not a good idea, right at the outset,

 2    to say, "Well, how many people think this?  How many

 3    people think that?" and the reason for that is this.  If

 4    you do that right at the outset of your deliberations,

 5    you may think that under your oath as jurors you're

 6    required to stick to that view.

 7         Now, if you have any strong view about any aspect

 8    of this case, I most earnestly instruct you to adhere to

 9    it.  Adhere to it.  We ask you for your verdict, we do

10    not demand your verdict.  At the same time listen to the

11    views of your fellow jurors, they are under the same

12    oath to do justice as are you, they have heard the same

13    evidence that you have.  Jury deliberations are just

14    that, deliberations to see whether twelve people can

15    come to a conclusion, a unanimous conclusion, and it has

16    to be unanimous, unanimous as to not guilty, unanimous

17    as to guilty, as to each of the seven questions, and you

18    treat each one separately, each one charges a separate

19    crime.  So you deliberate about that.

20         Now, if your view changes, there's nothing the

21    matter with that if that's sincere, but a verdict is not

22    a true verdict if it's ten of you think something and

23    the other two go along so you can go home.  You have

24    failed in your duty if you do that.  It's unfair.  It's

25    not why -- it's not how this process is intended to

1    work.  The law requires a unanimous verdict, unanimous

2    as to not guilty, unanimous as to guilty.

3         We've ordered lunch for?

4         THE CLERK:  12:30.

5         THE COURT:  12:30, it's cafeteria food, we'll

6    bring it to you, we'll bring it to the alternates.  We

7    won't bother you.  If you are still deliberating at

8    about 10 minutes of 5:00, I have some instructions, I'm

9    going to bring you in, I'm going to let you go.  In fact

10   we knew going in that I was going to be out of state

11   tomorrow.  I'm not having you come in tomorrow, you can

12   continue your deliberations on Thursday, which is the

13   day we planned to be sitting in this case.  Another

14   judge could take your verdict, but I'm the only one who

15   could answer your questions, so I have to be here, and

16   tomorrow I'll be in Washington.  So you're going to go

17   till 5:00 today, but as I said, no further.

18        If you decide -- and once we send you out, you're

19   in charge, but if sometime this afternoon you decide

20   you've talked about it enough and you'd all simply like

21   to go home and sleep on it -- but not to talk to anyone

22   else because no one else can influence you at all, but

23   if you want to stop, you just send out a message that

24   you'd like to stop for the day and I'll give you your

25   instructions and send you home and you'll start in again

1    on Thursday morning.

2         When you have reached a verdict, whatever that is,

3    you tell the Court Security Officer you have reached a

4    verdict, don't give it to him, just tell him you've

5    reached a verdict.  He'll set things up in here.

6    Whatever we're doing in here, whatever other case I'm

7    working on, that will be off to one side, you come

8    first.

9         So we all come in and the alternates come in too,

10   and, um, this is how we take a verdict.  Ms. Gaudet will

11   say, "Ladies and gentlemen, have you agreed upon a

12   unanimous verdict?"  And if you're back with a verdict,

13   I imagine you'll say "Yes."  And she will say, "Will you

14   please pass the paper."  And the paper gets passed and

15   everyone's looking at it.  I look at it.  Now I look at

16   it for only one reason, I look at it just to see that

17   the verdict is logical, and in this case any combination

18   of possibilities is logical.  You could return a verdict

19   of not guilty on all seven questions.  You could return

20   a verdict of guilty on all seven questions.  You could

21   return a verdict of not guilty on some and guilty on

22   others.  Any one of those combinations is logical.  You

23   could return a verdict of guilty on certain of the

24   doing-it charges, but a not guilty on conspiracy,

25   because each one requires slightly different elements.

1    So I look at it to see if it's logical.

2         If it's logical -- now it's not logical if you

3    leave one of the questions blank, I don't know what to

4    do then, it's not logical if you check both not guilty

5    and guilty, I don't know what to do then, but so long as

6    it's logical, I say "The verdict is in order, it may be

7    recorded," and I give it to Ms. Gaudet.  She'll ask you

8    all to stand up.  It's the only time in the whole

9    proceeding where you all stand and we sit here and we

10   all look at you.  And then she will read out your

11   verdict in open court and read it out grammatically.

12   And if at that time, as you stand there and the Clerk

13   reads your verdict, you are, each one of you, satisfied

14   with the consciousness of your duty faithfully

15   performed, you will have done what's required of you.

16   The word "verdict" comes from two Latin words, it means

17   "to speak the truth" and that is what is asked of you at

18   this time, to speak the truth about these matters.

19         I may have left something out.  I may have

20   misstated the law.  Before we send you out the lawyers

21   get a chance to bring that to my attention.

22         Counsel?

23

24         AT THE SIDEBAR

25         THE COURT:   The government?

1    MS. BLOOM:  Yes, your Honor, a couple of things.

2  When you mentioned -- the tax count, when you mentioned

3  that it could be overreporting or underreporting, you

4  didn't mention that it could be not filing at all.

5    THE COURT:  I will.

6    MS. BLOOM:  That's one of the points I made.

7    THE COURT:  All right.

8    MS. BLOOM:  Um, when you went through the elements

9  for the investment advisor, you mentioned that there --

10  we could meet the element of interstate commerce.  I

11  believe there's an alternate element of being a

12  registered investment advisor, which is also applicable

13  here.

14    THE COURT:  I will say that.

15    MS. BLOOM:  Um, you gave the willful blindness

16  instruction at the beginning with respect to the tax

17  count, but I don't believe that you mentioned that that

18  instruction would be applicable to the other.

19    THE COURT:  I'll say that.

20    MS. BLOOM:  That's it.

21    THE COURT:  The defense satisfied?

22    MR. O'HARA:  I just object to having a willful

23  blindness instruction given to the conspiracy count.

24    THE COURT:  Oh, that's a good point.

25    MS. BLOOM:  Yeah, okay.

1          THE COURT:   And she accepts that.

2          MR. O'HARA:   Thank you.

3          MS. BLOOM:   Okay.

4          THE COURT:   Okay.   Thank you.

5

6          (In open court.)

7          THE COURT:   There are some corrections, um, and I

8     won't call them "minor," they are as important as

9     anything else.

10          First, and go to Question 1 which has to do with

11     corruptly impeding the IRS.   I mentioned various

12     possibilities like over, um, or underreporting income,

13     overclaiming deductions, but I didn't mention not filing

14     at all and I should have mentioned that, if you

15     intentionally, or through willful blindness don't file.

16          Also on that count I said, "Now, look, it can't

17     just be any one thing, it has to be the bulk of the

18     charges over those years, though it doesn't have to be

19     every single year."   You've all got to agree as to what

20     it is, you can't agree to a bunch of things, some of you

21     thinking it's that and some of you thinking it's another

22     bunch of things under this corrupt endeavor, you all

23     have to agree as to what it is.   So that's on that one.

24          On violation of the Investment Advisors Act, I did

25     tell you, and I'm accurate, that there has to be an

interstate involvement in the investment advisor fraud,
but another way the government could prove that is if
you are satisfied that she did register as an investment
advisor.  If there's evidence here and you believe it
that she registered as an investment advisor, that is
evidence that she was acting in interstate commerce.

And lastly, I made mention of willful blindness
and I defined it when I was talking about corruptly
endeavoring to impede the IRS.  Well, with willful
blindness, the same exact definition, the government can
take advantage of that, if they've proved it, with
respect to a violation of the Investment Advisor Act and
any one of the four wire fraud counts, but not
conspiracy.  Conspiracy is eyes open knowingly agreeing.

Is the supplemental charge satisfactory,
Ms. Bloom?

MS. BLOOM:  Yes, your Honor.

THE COURT:  Mr. O'Hara.

MR. O'HARA:  Yes, your Honor.

THE COURT:  The jury my retire and commence its
deliberations.  Oh, I should announce the alternates.
I'm sorry.

The alternates are Suzanne Piscitelle and Connie
McKelvey.  Would you two step down.  And when we go out,
turn right and go into my little office.

1          (Alternates step down.)

2          THE COURT:  All right, the jury may retire and

3     commence its deliberations.

4          (Jury leaves, starts deliberating, 12:35 p.m.)

5          THE COURT:  Please be seated.

6          First of all, the compliment was genuine, it was a

7     fine job on everyone's part and I do appreciate it.  I

8     have to go into -- I put them in the robing room and I

9     have to go into the robing room to take the robe off, so

10    I will be in the presence of the alternates.  We will

11    not discuss the substance of the case.  And I take it

12    you have no objection to that.

13         Stay here with Ms. Gaudet and make sure you know

14    what's going back to the jury room.  This afternoon is

15    the court meeting, Ms. Gaudet will bring me out of it

16    whenever there's a question or as soon as we have a

17    verdict.  You will be consulted as to the answer of any

18    question if we can reach you within 5 minutes.  Now, the

19    assistants, you have an office here, but the defense,

20    with the court meeting, I have no hearings this

21    afternoon and you're welcome to make use of the

22    courtroom.  But we need to be able to go to lunch.  We

23    need to be able to find you if you want to be consulted

24    as to the answer to a question.

25         About 10 minutes of 5:00, if they haven't reached

1    a verdict, I of course have a charge to give them.

2    We'll bring them in, usually people like to be here, so

3    I'm putting you on notice.

4         All right.  We'll recess.

5         (Recess, 12:40 p.m.)

6         (Verdict, 2:15 p.m.)

7         THE CLERK:  Mr. Foreman, members of the jury, has

8    the jury reached a unanimous verdict?

9         THE FOREPERSON:  Yes, we have.

10        THE CLERK:  please pass it forward.

11        (Passes verdict slip forward.)

12        THE COURT:  (Reads.)  The verdict is in order.  It

13   may be recorded.

14        THE CLERK:  Mr. Foreman, members of the jury,

15   please stand and listen to the verdict as the Court

16   records it.

17        In the matter of the United States of America

18   versus Rosalind Herman, Criminal Action Number 12-10015,

19        "We find Rosalind Herman, as to Count 9, alleging

20   a corrupt endeavor to impede the IRS during the years

21   2003 through 2012:

22        Guilty.

23        As to Count 2, alleging violation of the

24   Investment Advisors Act:

25        Guilty.

1          As to Count 4, alleging wire fraud on or about

2   November 17, 2008:

3          Guilty.

4          As to Count 5, alleging wire fraud on or about

5   February 25, 2009:

6          Guilty.

7          As to Count 6, alleging wire fraud on or about May

8   18, 2009:

9          Guilty.

10          As to Count 7, alleging wire fraud on or about

11   July 24, 2012:

12          Guilty.

13          As to Count 1, alleging conspiracy:

14          Guilty.

15          So say you, Mr. Foreman, is that your verdict?

16          THE FOREPERSON:  Yes, it is.

17          THE CLERK:  So say you, members of the jury?

18          THE JURY:  (In unison.)  Yes.

19          THE COURT:  Please be seated.

20          Ladies and gentlemen, I want to thank you -- I

21   thank you not for your verdict, I thank you whatever

22   your verdict was, but I do most sincerely thank you for

23   the obvious case, the consideration you've given to

24   every aspect of this case, the courtesy that you have

25   shown to everyone, and your diligence as jurors.

1          The case is over.  You have every right to say
2     anything to anyone about anything having to do with this
3     case.
4          In one respect I ask you -- I can't charge you,
5     because the case is over, but I ask you, it's best that
6     you not talk to anyone about what went on in the jury
7     room.  By your verdict you have spoken the truth about
8     these matters.  Your verdict is that speech.  It's best
9     that you not talk to anyone about what went on in the
10    jury room.
11         Now, no one involved in the case, literally no one
12    has any right to approach you and no one will.  I can't
13    say the press wouldn't, though there's been no press
14    about the case, and if they came you can say what you
15    want, but I do caution you, please, don't talk about
16    what went on in the jury room.
17         I'll ask you to wait for just a moment because I'd
18    like to come back and thank you personally for your
19    service.
20         The jury may stand in recess.  I'll remain on the
21    bench.
22         THE CLERK:  All rise for the jury.
23         (Jury leaves, 2:30 p.m.)
24         THE COURT:  I propose sentencing for Wednesday the
25    29th of June at 2:00 p.m.

```
 1            Is that satisfactory for the government?
 2            MR. O'HARA:  I didn't hear you, your Honor?
 3            THE COURT:  Wednesday the 29th of June at
 4       2:00 p.m.
 5            MS. BLOOM:  Your Honor, I will be in trial from
 6       May 23rd until July 23rd, 10:00 till 4:00.
 7            THE COURT:  Well, that's fine, but Ms. Murrane is
 8       here.
 9            MS. BLOOM:  Okay.
10            THE COURT:  is that satisfactory?
11            MS. MURRANE:  That's fine for the government.
12            MR. O'HARA:  Yes.
13            THE COURT:  Very well.
14            Status of bail?
15            MS. MURRANE:  So the government would ask that the
16       defendant still be released but to be released on
17       conditions and we would ask that she be on home
18       confinement until her sentencing.
19            THE COURT:  And by "home confinement" you mean
20       that she be at home save for necessaries, is that right?
21            MS. MURRANE:  That's right, to the extent she
22       needs to seek medical treatment or --
23            THE COURT:  And buy food and necessities and that
24       includes her husband as well.
25            You're okay with that?
```

1          MS. MURRANE:   Um, yes.

2          THE COURT:   That seems not unreasonable,

3    Mr. O'Hara, let me mention what I think are the

4    appropriate exceptions, leaving home to meet with you,

5    attend religious services, medical appointments of

6    herself or her husband, um, by necessity such as food,

7    clothing and the like, but otherwise at home?

8          MR. O'HARA:   I would ask that -- can I be heard

9    now?

10          THE COURT:   I'm making that proposal and I'd like

11    to hear you.

12          MR. O'HARA:   I would suggest that the conditions

13    that she's currently under, of which quite frankly I'm

14    not aware, remain in effect.   Those conditions were set

15    long before I was appointed on this case.

16          THE COURT:   They were and I have a report, so far

17    as I can tell, she's in compliance with those

18    conditions, but the situation has changed.   I hear you

19    but I do impose those conditions.

20          She is confined to her home.   She is to leave home

21    or may leave home -- I'm not imposing electronic

22    monitoring, but she's either to be in that home -- to

23    leave for medical care, for religious observances, to

24    attend to the medical care of her husband or herself,

25    she may leave to buy food, clothing, other necessities

1    for the home.  But other than that, she's to be in that

2    home.

3            That's the order of the Court.  We'll recess.

4            THE CLERK:  All rise.

5            (Ends, 2:30 p.m.)

6

7                    C E R T I F I C A T E

8

9        I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

10   do hereby certify that the foregoing record is a true

11   and accurate transcription of my stenographic notes,

12   before Judge William G. Young, on Tuesday, April 5,

13   2016, to the best of my skill and ability.

14

15

16

17   /s/ Richard H. Romanow 09-16-16
     _____
18   RICHARD H. ROMANOW  Date

19

20

21

22

23

24

25