1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF MASSACHUSETTS

3                                   No. 1:12-cr-10015-WGY

4

5

6    UNITED STATES OF AMERICA

7

8    vs.

9

10   ROSALIND HERMAN

11

12                          * * * * * * * * *

13

14                        For Hearing Before:
                         Judge William G. Young

15

16                       Enhancements Hearing

17

18                       United States District Court
                         District of Massachusetts (Boston)
                         One Courthouse Way
19                       Boston, Massachusetts 02210
                         Wednesday, June 29, 2016

20

21                          * * * * * * * *

22

                       REPORTER: RICHARD H. ROMANOW, RPR
23                          Official Court Reporter
                         United States District Court
24        One Courthouse Way, Room 5510, Boston, MA 02210
                         bulldog@richromanow.com

25

```
 1                    A P P E A R A N C E S

 2

 3    SARA M. BLOOM, ESQ.
      MARY B. MURRANE, ESQ.
 4       United States Attorney's Office
         J. Joseph Moakley U.S. Courthouse
 5       1 Courthouse Way, Suite 9200
         Boston, Massachusetts 02210
 6       (617) 748-3971
         Email: Sara.bloom@usdoj.gov
 7       For the United States

 8

 9    RAYMOND A. O'HARA, ESQ.
         Law Office of Raymond A. O'Hara
10       1 Exchange Place
         Worcester, Massachusetts 01608
11       (508) 831-7551
         Email: Oharalaw@hotmail.com
12   and
      JASON G. BENZAKEN, ESQ.
13       Benzaken and Wood, LLP
         1342 Belmont Street, Suite 102
14       Brockton, Massachusetts 02301
         (508) 897-0001
15       Email: Attorneybenzaken@gmail.com
         For the defendant

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         (Begins, 11:25 a.m.)
 3         THE CLERK:  Now hearing Criminal Matter 12-10015,
 4    the United States of America versus Rosalind Herman.
 5         THE COURT:  Good morning.  Would counsel identify
 6    themselves.
 7         MS. MURRANE:  Good morning, your Honor, Mary
 8    Murrane on behalf of the United States.
 9         MR. O'HARA:  Good morning, your Honor, Raymond A.
10    O'Hara on behalf of Ms. Herman.
11         MR. BENZAKEN:  Good morning, your Honor, Jason
12    Benzaken on behalf of Ms. Herman.
13         THE COURT:  Who is present in the courtroom.
14         This is a hearing concerning the sentence but this
15    is not the sentencing.  Ms. Herman waived her right to a
16    jury trial on sentencing enhancements and this is the
17    hearing to address that matter.  The government and I
18    appreciate it both as to format and layout.
19         The government has filed a sentencing memorandum.
20    The government bears the burden as to each of these
21    enhancements and it's very specific as to what it seeks.
22    The burden on the government is proof beyond a
23    reasonable doubt.  The government, however, is entitled
24    to rely upon the evidence at trial, that is to say that
25    it -- those matters that were introduced in evidence in
```

1    the trial are in evidence before the Court now and the

2    Court can rely upon the transcript and notes that it

3    made of the trial.  So I'm not clear as to whether any

4    additional evidence -- well, let me ask the question.

5         All right.  Is the government going to rest on the

6    trial evidence?

7         MS. MURRANE:  Yes, your Honor, the only addition

8    that we've made is in our submission at Exhibit A, there

9    are two additional tables which don't present any

10   further evidence, they simply summarize evidence from

11   the trial and apply the applicable tax percentages to

12   each of those figures.  So I can go through and explain

13   those charts when we get to them, but they don't include

14   any new information, it's really just new calculations.

15        THE COURT:  I understand.

16        All right.  Mr. O'Hara, any objection to my

17   entertaining Exhibit A?

18        MR. O'HARA:  No.

19        THE COURT:  Very well.

20        So does Ms. Herman desire to introduce any

21   evidence on these issues?

22        MR. O'HARA:  No, your Honor.

23        THE COURT:  Very well.  We'll hear the government,

24   then we'll hear the defense, and this is in the nature

25   of a closing argument on these matters.

1        MS. MURRANE:  Okay, thank you, your Honor.

2        So first I'd like to address the charges of wire

3    fraud and investment advisor fraud and in -- um, with

4    respect to those charges the government seeks certain

5    sentencing enhancements.

6        The first would be the loss calculation and this

7    actually goes to two purposes, one would be the specific

8    offense characteristics leading to an additional point

9    calculation and then also this is a figure that would be

10    relied upon for determining any appropriate restitution

11    and forfeiture.

12        The government asserts that the loss with respect

13    to the wire fraud and investment advisor fraud is

14    $1,323,807, and the best exemplar of this figure is what

15    was admitted as Trial Exhibit Number 103, and we've

16    included that at Exhibit B for your Honor's reference

17    with our memorandum.

18        THE COURT:  And the range though since what we're

19    talking about is guideline enhancements, the range that

20    you think this puts her in is what?

21        MS. MURRANE:  That would be more than $550,000 and

22    less than $1.5 million.

23        THE COURT:  Thank you.  Go ahead.

24        MS. MURRANE:  The calculation of this figure

25    derives from a review of the bank records and the

1    particular deposits that were made from each of the

2    victims in this case.  Your Honor heard testimony from

3    several of those victims, including Carla Bigelow,

4    Carmine Leuci, Melvin Burt, Bruce Gilmartin, Susan

5    Paley, James Connell, and Patricia Wentzell, detailing

6    the monies that they paid to the defendant and to

7    Mr. Caplitz, and summary witness Thomas Zappala

8    described for your Honor, going through those bank

9    records, the process that he used to create what was

10   marked as Exhibit 103.

11        This exhibit shows the date on which each of the

12   payments were made from the various victims, how much

13   the payment was, and the particular bank account that it

14   went into.  The calculation for this relies upon the

15   total of that chart and then subtracts out two

16   payments -- well, it's payments to two sets of victims

17   made by the defendants when the victims threatened to

18   report the defendant to law enforcement.  Those were

19   reflected at Trial Exhibit Numbers 181 and 435 and they

20   show a check for $3,000 to Carmine Leuci and then a

21   series of payments totaling $58,450 to Melvin and Irene

22   Burt.

23        So based upon, um, a loss that exceeds $550,000

24   but is less than $1.5 million, the government asserts

25   that there should be a 14-point enhancement to the base

1    level offense.

2         The second issue is whether the, um, conduct

3    resulted in substantial financial hardship to five or

4    more victims.  Under the notes, Note 4(f) of 2(b)(1.1),

5    one of the considerations for substantial financial

6    hardship is whether the victim suffered substantial loss

7    of a retirement or other savings or investment fund.

8    And your Honor heard testimony from Patricia Wentzell,

9    who lost $275,000 in retirement savings, which was for

10   her a very very significant portion of her retirement

11   savings, from James and Linda Connell, who similarly

12   lost $275,000 in retirement savings, Bruce Gilmartin

13   testified regarding his loss of $141,600 in retirement

14   and investment savings, Melvin Burt testified regarding

15   his, um, management of Cesidio Salvucci's retirement

16   savings, which he needed to pay for end-of-life care and

17   that was $141,550 in losses, Charles and Virginia Ekman

18   also lost significant retirement savings, $104,850,

19   Carmine Leuci and his partner David Savage lost $100,000

20   in retirement savings, and John and Carla Bigelow also

21   testified that they lost $100,000 in retirement

22   investment savings.  Those people totaled 11 victims,

23   which is well above the five or more necessary for the

24   four, the additional four-level enhancement.

25        The next category is whether the offense involved

```
 1   violation of securities law and the defendant was an
 2   investment advisor or person associated with an
 3   investment advisor.  This one is perhaps the easiest for
 4   your Honor to determine because there are numerous trial
 5   exhibits which lay out the status of the entities and
 6   were signed by the defendant as owner/managing member or
 7   whatever her title would be at the time.
 8        THE COURT:  My problem with this one is a little
 9   different and it's this.
10        MS. MURRANE:  Okay.
11        THE COURT:  Given the offenses of conviction,
12   isn't it true that the jury finding -- that in order to
13   convict her, the jury had to find that she was an
14   investment advisor, and to find that she was an
15   investment advisor -- because I remember a discussion
16   about how I should charge in my charge, I charged that a
17   way of doing it would be to find that she was a person
18   associated with an investment advisor and that if they
19   found Caplitz was a registered investment advisor.
20        So don't we have double -- I'm worried about
21   double counting.  What do you say to that?  In other
22   words here you get the base offense level for these
23   convictions, you get whatever grouping calculus the
24   guidelines are because that's the jury verdict, we don't
25   question the jury verdict, I must give all intendments
```

1    in favor of the jury verdict.

2         Now you're proving enhancements.  On this one I'm

3    concerned it's double counting, you want another four

4    levels for things you proved to the jury, given the

5    nature of these charges.

6         MS. MURRANE:  Well, your Honor, there are two

7    different charges to which this could apply.  So when

8    you think about the investment advisor component, I

9    agree that in terms of the finding it would be

10   duplicative.  I'm not sure I agree that it is double

11   counting because --

12        THE COURT:  Well, let's see if I understand your

13   argument.  There are various counts of conviction here.

14   You've just made the point, which seems sensible, that

15   in certain of those counts, this would be duplicative,

16   but as to other counts it's not.

17        MS. MURRANE:  Certainly as to the wire fraud, it's

18   not duplicative.

19        THE COURT:  Precisely, precisely, because wire

20   fraud has nothing to do with securities.

21        MS. MURRANE:  That's right.

22        THE COURT:  All right, take that as an example.

23   But the way the sentencing guidelines are supposed to

24   work is that they're supposed to take into account all

25   relevant conduct.  I see your point.  I see your point.

1     But if it's double counting as to some of the counts of

2     conviction, I have to say I'm troubled by counting it

3     here.  But as a matter of evidence anyway, you say

4     little doubt and you've laid it out here.

5          MS. MURRANE:  Yeah, your Honor, I would say, um,

6     two points on that.  I agree with the Court that, um,

7     the finding here is the same as the finding that the

8     jury had to make with respect to the investment advisor

9     charges.  I -- the government's position isn't that that

10    is double counting because the guidelines, if they

11    didn't want to double count on that, would have excluded

12    this enhancement as to those charges, which it doesn't,

13    but as we -- but as you just discussed, it doesn't apply

14    to the wire fraud count.  And if we were to exclude it

15    here where you have both a wire fraud and an investment

16    advisor fraud count, then the practical effect would be

17    that when they are charged with two crimes, the

18    enhancements would be lower than if they had simply been

19    charged with the wire fraud.

20         THE COURT:  Yes, but the guidelines pick up for

21    that because the guidelines have their grouping

22    calculus, the commission has figured all that out.

23         MS. MURRANE:  But these two charges are grouped

24    together.

25         THE COURT:  All right.

1      MS. MURRANE:  So if this enhancement shouldn't

2  apply where there is a charge that includes this element

3  of the offense and another charge that doesn't, but then

4  would apply --

5      THE COURT:  I agree that it's a conundrum.  You

6  see it stems in part from my approach, um, espoused

7  interestingly in a recent speech by Judge Pryor to the

8  American Law Institute, of treating the enhancements as

9  elements of the offense.  Judge Pryor proposes to amend

10  the guidelines to make that explicit.

11      If it were clear that these were all elements of

12  the offense, yeah, you could not have duplicative

13  charges because one subsumes the other, do you

14  understand, one's a lesser-included offense of the

15  other?

16      MS. MURRANE:  But if that were the case, if we

17  went to that hypothetical where these were actually

18  elements of the offense, then I think that the

19  guidelines, in that circumstance, should appropriately

20  reflect the fact that that element would have an

21  increased calculation, so that violation, the investment

22  advisor fraud, would have a calculation that would be

23  different than --

24      THE COURT:  -- wire fraud.

25      MS. MURRANE:  Yes, wire fraud.

1          THE COURT:  I follow that.

2          MS. MURRANE:  And that it should be more.

3          THE COURT:  Well, as you say, it should be four

4    levels more because this wire fraud involved a violation

5    of the Investment Advisors Act.  I follow.  All right.

6          MS. MURRANE:  But I don't think we have to get to

7    that hypothetical here because we do have the wire fraud

8    count which would give you the basis to add the four-

9    level enhancement without delving into the question of

10   whether it is or isn't double counting on the investment

11   advisor piece.

12         THE COURT:  Thank you.  Go ahead.

13         MS. MURRANE:  Then the last determination with

14   respect to the wire fraud and investment advisor fraud

15   count is the victim-related adjustment and that's under

16   Section 3(b)(1.1)(E)(i), and for that finding your

17   court -- the Court heard argument -- I'm sorry, heard

18   testimony from James Connell regarding his personal

19   circumstances during the time that he made the

20   investment into the supposed hedge fund company.  His

21   wife was diagnosed and struggling with Stage 4 cancer,

22   so it was certainly a particularly vulnerable period of

23   time for him and his wife to be receiving that

24   particular bad investment advice.

25         In addition, Patricia Wentzell, who testified

before this Court, and by her physical appearance was
quite obviously someone who was a vulnerable victim in
terms of the handicap that she has but as that relates
very specifically to these charges because her
particular life situation made it all the more important
that her, um, retirement savings be preserved to cover
the health expenses that she was most -- that she will
most certainly have as she ages with the, um, diagnosis
that she has.

So in this circumstance your Honor can find at
least two vulnerable victims, only one is required for
application of that enhancement.

Then turning to the charges of corrupt endeavor to
impede administration of Internal Revenue Laws, there's
two considerations for your Honor, the first is the base
level offense, and that's where we get to the two tables
that I've included with the memorandum.

So under the sentencing guidelines they have two
different calculations based upon whether the tax loss
stems from a corporation or from an individual.  So in
this case we have one entity that was a standalone
corporation, and that was Financial Resources
Network, Inc., and then the other entities which were
all what IRS Revenue Agent Paul White testified were
flow-through companies, so those were companies whose

1    income should appear on Ms. Herman's individual tax

2    return.

3         So what I've done with these two charts is split

4    them out into those two categories.  And to create it,

5    the first place to start was what was marked as Trial

6    Exhibit Number, I think it's 411.  That was the matrix

7    that showed in which years tax filings were and were not

8    made.  And the reason that that is important is because

9    under the guidelines if there is no filing of taxes, 1

10   percentage is applied to the figure to determine the tax

11   loss, and if there was a filing but income was not

12   reported in that filing, a different percentage is used.

13        So using that matrix we included, I included the

14   traced receipts, which was from Trial Exhibit Number

15   412, compared against the receipts that were reported to

16   the IRS, which was included at Exhibit 414.  We totaled

17   the amount that was not reported, which was also

18   reflected in Trial Exhibit --

19        THE COURT:  Where do you get these multipliers,

20   the 25 percent and 34 percent?

21        MS. MURRANE:  From the notes of the guidelines.

22        THE COURT:  I see.  I see.  This comes straight

23   out of the guidelines?

24        MS. MURRANE:  Yes.  And if you look at our

25   memorandum I included, at Footnote 2, the language from

1    those notes that lays out what the percentages should

2    be.

3           THE COURT:  I -- it's Footnote 3 but I'm looking

4    at it right now.  And I thank you.

5           MS. MURRANE:  Yes, Footnote 3, I'm sorry.

6           THE COURT:  And I thank you.  Right, that answers

7    that question.  Thank you.

8           MS. MURRANE:  So then the next column, "Amount Not

9    Reported," is just a simple math calculation of traced

10   receipts versus reported receipts, that was also

11   detailed in our Trial Exhibit Number 415, and then we

12   apply the applicable tax rate.

13          So for years in which there was a tax filing but

14   it included income that was not reported for Financial

15   Resources Network, Inc., that multiplier is 34 percent,

16   and then for years when there was no tax filing, the

17   multiplier is 25 percent.

18          The total column on the right that's in orange

19   shows what the result of that multiplier is against the

20   unreported amount and then totals it at the bottom.

21          So when you flip to the second page of that, this

22   is a summary of Rosalind Herman's individual tax returns

23   as well as any tax returns from the three listed

24   entities below, Financial Designing Consultants and Knew

25   Finance Experts and Insight Onsite.

1          So again using Trial Exhibit 411, we look at the

2    matrix to determine what years there were and were not

3    tax filings.  We totaled the traced receipts and

4    reported receipts from Exhibits Number 414 and 412.  We

5    calculate the amount that was not reported.  Then we

6    multiply the appropriate multiplier and here, where it's

7    an individual, those rates are different than when it's

8    a corporation, so it's 28 percent versus 20 percent.  We

9    arrive at that figure, which is in the total column, and

10   we tally those up.

11         I then add the tax loss from the FRNI chart on the

12   first page to arrive at a total.  I subtract out the

13   taxes that were paid, which was included in testimony

14   from Revenue Agent Paul White and shown on Trial Exhibit

15   Number 416.  And we arrive at a total tax loss of

16   $495,584.87.

17         The second, which under the table at 2(t)(4.1)(G)

18   --

19         THE COURT:  Go ahead.

20         MS. MURRANE:  -- adds 18 points because it is more

21   than $250,000 and less than $550,000.

22         THE COURT:  It's more than 250 and less than 550.

23         MS. MURRANE:  Less than 550.

24         THE COURT:  Okay.  All right.

25         MS. MURRANE:  And then the only other specific

1    offense characteristic that the government argues for,

2    with respect to the tax charge, is that there was a

3    failure to report the source of income exceeding $10,000

4    in any year that was derived from criminal activity.

5            THE COURT:  And how is this different than the tax

6    loss that you've just detailed?

7            MS. MURRANE:  This is different because it looked

8    at a particular year and whether there was an aggregate

9    amount that exceeded $10,000 and whether the tax loss

10   itself derived from criminal conduct versus just

11   unreported income that might be legitimate or

12   illegitimate.

13           THE COURT:  And you see and you've just answered

14   my question, again it's this concern about duplication.

15           MS. MURRANE:  Uh-huh.

16           THE COURT:  But here, even were these elements of

17   the offense, you would say, as in many cases, they

18   overlap but each would require the proof of an element

19   not present in the other and you've just pointed out

20   what it is.

21           MS. MURRANE:  Yes, your Honor.

22           THE COURT:  I understand.

23           Mr. O'Hara?

24           MR. O'HARA:  Thank you, your Honor.

25           I have some statements I'd like to make.  When I

1    was in my office yesterday afternoon I received the
2    government's memorandum and then late last night I
3    compiled, um, three very rudimentary charts and I had
4    forgotten that we're not in front of a jury, we won't be
5    using a projector.  So what I'm going to do is I'm going
6    to address any remarks to the Court and then I'll have
7    Mr. Benzaken, at the appropriate time, just show the
8    charts and you can make a decision based upon what the
9    government has said and what we're arguing.
10           THE COURT:  Um, may I have them?
11           MR. O'HARA:  Sure.
12           THE COURT:  While I consider this an evidentiary
13   hearing, I'm perfectly willing to take these charts as
14   charts, as briefs.
15           MR. O'HARA:  They're not evidence, your Honor.
16           THE COURT:  That's right.  As aids from evidence.
17   Thank you.
18           (Hands up.)
19           THE COURT:  Yes, sir.  Go ahead.
20           MR. O'HARA:  Thank you.
21           You will recall, your Honor, that Mr. Caplitz
22   testified at trial and admitted that he had forged
23   signatures, filled in wire transfer forms, cajoled,
24   deceived, and in some instances stole money from
25   investment clients who had been using his services as a

1    Certified Financial Planner for years, none of these

2    clients, according to his testimony, had been with him

3    for less than 10 years and some had been using him as

4    their trusted investment advisor for at least 25.  He

5    also testified during his direct and his cross-

6    examination testimony that he never told Mrs. Herman

7    that he was stealing from his investment clients and we

8    would suggest to the Court that if he had made these

9    disclosures to Ms. Herman about what nefarious deeds he

10   was up to, we may not be here today.

11        Of the victims who did testify during the trial, I

12   believe that only two of them testified that they had

13   any contact at all, directly or indirectly with

14   Ms. Herman, regarding the hedge fund or the proposed

15   hedge fund management company, most of the victims who

16   testified at trial indicated that they had never seen

17   Ms. Herman or spoke with her.  And the two people who I

18   believe testified that they did have some contact with

19   her were Mr. Burt and Mr. Leuci.

20        That people other than Mr. Burt, who was acting on

21   behalf of Mr. Salvucci, and Mr. Leuci, may have been

22   victimized by Mr. Caplitz by having their money stolen

23   or transferred into bank accounts controlled by

24   Ms. Herman, was not made known to her.  Mr. Caplitz

25   testified that he was in constant contact with

1    Ms. Herman, but there's a relative lack of corroborative

2    information to back up what he was saying and in essence

3    the jury and your Honor has to take his word at face

4    value.

5         He also admitted that he told Ms. Herman that he

6    had sold shares in the management company of the hedge

7    fund to customers and that the money deposited into

8    those accounts was hers to do what she wished and he

9    testified to that on direct examination when he was

10   presented by the government and also during cross-

11   examination by me.  We don't deny that she spent all the

12   money, but we do suggest that there's a lack of credible

13   evidence to convince you beyond a reasonable doubt that

14   she should be held accountable for having victimized

15   five or more vulnerable victims.  She was not aware that

16   these people were being victimized and the people with

17   whom she had direct involvement are Mr. Burt and

18   Mr. Leuci.  Mr. Burt, I believe, had loaned $200,000 to

19   the hedge fund through Mr. Caplitz and the contact that

20   Ms. Herman had with Mr. Burt, I believe, was just a

21   telephone call when he was asking when he was going to

22   get a return on his money.  And we suggest that the

23   four-level increase was not proven beyond a reasonable

24   doubt.

25        Regarding the 14-level increase for the amount of

loss.   The government has alleged that Ms. Herman is
responsible for the total amount of money lost by the
investors, which was $1.385,257 minus the money that was
sent back to Mr. Burt and the $3,000 that was paid back
to Mr. Leuci.  Most of this money, as I stated earlier,
was stolen, transferred, or falsely induced by
Mr. Caplitz, not by Ms. Herman, who had no contact with
the people whose money was being fleeced.  We suggest
that the evidence is not sufficient to convince you
beyond a reasonable doubt that she is responsible for
the losses that were occasioned by Mr. Caplitz, not
Ms. Herman, especially in light of Mr. Caplitz's
admission during trial that he counseled Ms. Herman that
she was selling shares in a business she was forming and
that the money was hers to spend as she wished.  The
jury found her guilty but we suggest that the evidence
is not sufficient beyond a reasonable doubt for her to
be held accountable for the total amount of loss and her
base offense level should remain at 7 without the
14-level enhancement.

     If the Court decides not to adopt this argument,
we would suggest that she should not be held responsible
for any amount higher than $300,000, that's the $200,000
lost by the Burts to the loan they made, plus the
$100,000 lost by Mr. Leuci, which is a total of

1    $300,000.  Before you factor in the money that was

2    returned to Mr. Leuci and to the Burts, I believe that

3    if -- if the Court uses that calculation the enhancement

4    would be Level 10 and not 14.

5         Regarding the tax loss.  We understand the

6    government is arguing that Ms. Herman is accountable for

7    the taxes that would have been due and payable had she

8    reported all the income received by all of her companies

9    and herself personally from 2004 to 2012.  For various

10   years during that timeframe Ms. Herman did not file

11   returns and the traced income in her bank accounts,

12   compared with the income reported in returns that was

13   filed, um, that income was underreported, we don't

14   contest that.

15        The government, in its memorandum at Exhibit 415,

16   contends that the total amount of loss was

17   $1,849,921.63.  Your Honor, that exhibit contains a

18   mathematical error.  On Exhibit 415 there is an entry,

19   um, for one year where Ms. Herman actually overreported

20   income of $52,000, and I made the same mistake when I

21   was going through the tables yesterday and the day

22   before.  The amount of loss, which is not significant

23   regarding the guidelines at this point in time, should

24   be $1,797,384.60, which would reduce the total amount by

25   the $52,537.04 that she overreported for one year.

1         Mr. Caplitz testified during the trial that he

2    advised Ms. Herman that the money transferred into her

3    bank accounts from the investment funds, and by my

4    memory that was 2008 to 2012, were not taxable to her

5    and she didn't need to report those receipts on any

6    returns.  The unreported income from those years, 2008

7    to 2012, comes out to $1,305,894.90.  If that amount is

8    subtracted from the total amount of unreported income

9    for the total years of 2004 through 2012, the total is

10   reduced to $491,489.70, and the amount of taxes due on

11   that amount at 29 percent, which I agree is a reasonable

12   rate, would have been $142,000 and change.  And under

13   Section 2(t)(4.1), the tax loss table, the amount of tax

14   loss would have subjected Ms. Herman to a 16-level

15   increase, not a 20-level increase as alleged by the

16   government.

17        Regarding the adjustment for vulnerable victim.

18   According to Footnote 4(d) to Guideline Section

19   2(b)(1.1), there is an application note at 4, capital D,

20   which states that, um, the two-level -- the adjustment

21   under 3(a)(1.1)(B)(ii) does not apply and I've included

22   in the chart I believe the operative language which

23   indicates that the enhancement which is -- it's not an

24   enhancement, it's an adjustment, but it shouldn't apply.

25        THE COURT:  You'll have to help me out with this

1    one.

2           MR. O'HARA:  Sure.

3           THE COURT:  The Application Note 4(D) to Section

4    2(b)(1.1) precludes the enhancement for vulnerable

5    victims to what or it precludes it at all here?

6           (Pause.)

7           MR. O'HARA:  I actually have, um, a copy of it and

8    I can present it to the Court, it just has an

9    underlining "vulnerable victims" if Section (b)(C)(B) or

10   (C) applies, and these are the sections under 2(b)(1.1)

11   which apply to the vulnerable victim.

12          THE COURT:  Give me a second.

13          (Pause.)

14          THE COURT:  So we start with 2(b)(1.1), all right,

15   and then we go to 4 --

16          (Hands up.)

17          THE COURT:  Yes, all right, it's on Page 93, we're

18   using the same document.  (Looks.)  And you flagged the

19   language that appears at the bottom of the page.

20          MR. O'HARA:  Uh-huh.

21          THE COURT:  It's Subsection --

22          (Pause.)

23          THE COURT:  Well, so we go to Subsection B of

24   (ii)(B) -- where's that found?

25          MR. O'HARA:  Excuse me?

```
 1          (Pause.)
 2          THE COURT:  Well, you're saying if Subsection B,
 3   (ii)(B) or (C) applies, the enhancement that we're
 4   talking about here shall not apply.
 5          MR. O'HARA:  I believe that's at 2(b)(1.1)(B)(ii),
 6   Subsection (B) or (C).
 7          THE COURT:  Well, where is it?
 8          MR. O'HARA:  It's on Page 83 of the guidelines,
 9   your Honor.
10          THE COURT:  Yes, thank you, that's what I'm
11   getting at.
12          (Looks.)
13          THE COURT:  Oh, I see.
14          So -- so the effect here is if we're going to
15   increase because either -- because of financial hardship
16   to five or more victims, which they've argued, then
17   "vulnerable victims" does not also apply, that's your
18   point?
19          MR. O'HARA:  I believe that's correct, your Honor.
20          THE COURT:  I understand.  Well, respond to that,
21   Ms. Murrane.
22          MS. MURRANE:  Well, I think it is important to
23   look at the subsections here.  So I agree that this
24   says, um, if the financial hardship to five or more
25   victims applies, then you would not add the enhancement
```

```
 1    under 3(a)(1.1)(B)(ii).  So if you flip to Page 343 --
 2         THE COURT:  Wait a minute.  (Reads.)  Yes, all
 3    right, now you're going to take us to 3(a) -- and where
 4    is that found?
 5         MS. MURRANE:  343.
 6         THE COURT:  (Looks.)  All right.  Go ahead.
 7         MS. MURRANE:  So what the notes say is that if the
 8    hardship to five or more victims applies, then you do
 9    not add the enhancement under 3(a)(1.1)(B)(ii).  And the
10    government is not arguing for an enhancement under
11    (B)(ii), we are arguing for the enhancement under
12    (b)(1).
13         THE COURT:  I follow.
14         And, Mr. O'Hara?
15         MR. O'HARA:  Um, no, your Honor, I missed that.
16         THE COURT:  All right.  I understand.  Thank you.
17         Very well.  I think I'm in a position to make my
18    findings.
19         Yeah, go ahead.
20         MR. O'HARA:  I just -- if I could, just in
21    conclusion, we'd ask the Court to keep in mind that
22    Ms. Herman is relatively uneducated, Mr. Caplitz engaged
23    in a pattern of behavior dating back to 1995 where he
24    took advantage of her lack of education and
25    sophistication, he transferred ownership of an
```

1  investment business to her name and shortly thereafter

2  filed for bankruptcy, hiding assets from creditors, he

3  began assigning his commission checks to bank accounts

4  controlled by her in an effort to avoid personal tax

5  liability and he has pleaded guilty to income tax

6  evasion, but he also used Ms. Herman as the minority

7  face of the hedge fund in his failed attempts to secure

8  investment funds from major institutional investors.

9       He admitted that even after his release was

10  revoked and he was sent to the Wyatt Correctional

11  facility in Rhode Island, he still believed that he

12  could pull everything together, get the hedge fund off

13  the ground, pay back all the money he had stolen, and

14  live comfortably.  He made sure that all corporations

15  and their bank accounts were owned and controlled by

16  Ms. Herman from 1995 forward, therefore ensuring that

17  his fingerprints would not appear on any corporate

18  filings or bank accounts, if things went wrong, and as

19  the Court is well aware, Mr. Caplitz was an honor's

20  graduate of Boston College with a major in finance, he

21  has a master's degree in taxation along with

22  certification as a financial planner, he also held

23  numerous licenses through the Securities and Exchange

24  Commission and all these certifications were the result

25  of fairly rigorous study and examinations.  He was a

member of a number of professional organizations that
specialized in financial planning and investments and he
was able, through his training and experience and
contacts within the industry, to concoct this plan which
he ardently believed would be successful.

Now, your Honor, as the trier of fact on the issue
of these enhancements, you're under the same obligations
as were the jurors in this case, you're the sole judge
of credibility of Mr. Caplitz's testimony during the
trial.  There's very little documented communication
between Mr. Caplitz and Ms. Herman, and although
Mr. Caplitz testified that he discussed what he was up
to numerous times a day with her, there's no
corroboration to speak of that he ever discussed with
her his thefts and deceptions.  The only proof that she
was aware of what he was up to came through his
testimony and you must make a determination whether you
wish to accept his credibility in whole or in part.  And
you're under the same obligations, I would suggest, as
the jurors in your assessment of Mr. Caplitz's testimony
because he was a cooperating witness with a vested
interest in the outcome of this case.  The instruction
you gave to the jury, in essence telling them about the
inherent problems with the credibility of cooperating
witnesses should apply with equal force here and I'm

1   sure you'll take that instruction to heart.  And what

2   we're suggesting, your Honor, is that the enhancements

3   that have been alleged in this case were not proven

4   beyond a reasonable doubt.  Thank you.

5          THE COURT:  Thank you.

6          The Court makes the following findings.  First,

7   let me say I thank counsel for their able and thorough

8   arguments, which have been of great help.

9          Based upon all the credible evidence the Court

10  finds, beyond a reasonable doubt, that there is

11  appropriately attributable to Ms. Herman the following.

12  Loss of more than 550,000, but less than 1.5 million

13  pursuant to the Guideline Section 2(b)(1.1)(B)(1)(h), a

14  14-level upward adjustment.  That the conduct resulted

15  in substantial financial hardship to five or more

16  victims as provided in Section 2(b)(1.1)(B)(2)(b),

17  adding another 4 levels.  That there has been proved a

18  violation of securities law and that the defendant was

19  an investment advisor or a person associated with an

20  investment advisor pursuant to Section

21  2(b)(1.1)(B)(19)(a)(iii), and add 4 levels only to the

22  wire fraud conviction, and no other.  You can brief how

23  that will all work out.  But that's the only one that

24  that enhancement should be added to.  Here there were

25  vulnerable victims as provided in Section

1    3(b)(1.1)(B)(1), another 2 levels.

2         The government's loss, tax loss here for this

3    corrupt endeavor to impede the administration of the

4    Internal Revenue laws, the Court does accept the

5    defense's argument that there was an arithmetic error

6    here, but it makes no difference to the ultimate

7    calculus because the Court finds that the tax loss

8    exceeds 250,000, but is less than $550,000, pursuant to

9    Section 2(t)(1.1)(A)(1) and 2(t)(4.1)(G), adding 18

10   points.  The Court also finds that there was a failure

11   to report a source of income exceeding $10,000 in a

12   particular year from criminal activity pursuant to

13   2(t)(1.1)(B)(1) adding another 2 points.

14        The rights of Ms. Herman are saved.  And those are

15   the calculations that will go into the preparation of

16   the presentence report.

17        The Court had before it today a motion for a post-

18   verdict juror inquiry, that motion is denied, and the

19   grounds are set forth in the Court's order.  And we'll

20   recess.

21        MR. O'HARA:  Your Honor, sorry to interrupt?

22        THE COURT:  That's quite all right.

23        MR. O'HARA:  I'm confused as to when sentencing is

24   going to take place, I was out and I had to --

25        THE COURT:  Oh, you're quite right.

1      (Pause.)

2      THE COURT:  Thursday the 21st of July at 2:00 p.m.

3      Is that day -- since we're all here, is that day

4   satisfactory, Ms. Murrane?

5      MS. MURRANE:  Um, July 21st?  Yes, your Honor.

6      MR. O'HARA:  Actually could you schedule it for

7   the following week because I was out for about a month

8   and I have everything that's backing up on me from when

9   I --

10      THE COURT:  I understand and I'm very sorry,

11   Mr. O'Hara.  I do appreciate it.

12      MR. O'HARA:  I did have written in my book, I

13   believe --

14      THE COURT:  Go ahead.

15      MR. O'HARA:  -- I believe from an e-mail I

16   received from your Clerk about the 27th of July, is that

17   still --

18      THE COURT:  Let me confer with the Clerk.

19      (Pause.)

20      THE COURT:  How about the morning of the 27th, say

21   at 10:00?

22      MR. O'HARA:  Yes.

23      MS. MURRANE:  That's fine with the government.

24      THE COURT:  10:00 on the morning of the 27th --

25      MR. O'HARA:  I'm sorry, your Honor, Mr. Benzaken

 1   is not available that morning.

 2           THE COURT:  Well --

 3           MR. BENZAKEN:  I'm on trial that day.  I start a

 4   trial that day in Brockton Superior Court.

 5           MR. O'HARA:  He's starting a trial in Brockton

 6   Superior Court on that date.

 7           THE COURT:  Um -- I don't need you both,

 8   respectfully.

 9           Mr. Benzaken, I'm delighted to have you here, but

10   I'm somewhat jammed up for time.  I can't do it in the

11   afternoon that day.

12           MR. BENZAKEN:  Understood.

13           THE COURT:  So 10:00 the morning of the 27th of

14   July.

15           MR. O'HARA:  And one further question.  There's

16   going to be an amended presentence report that will be

17   generated for purposes of filing objections?  I'm not

18   really sure --

19           THE COURT:  Actually my statement is what I'm

20   going to go on.

21           MR. O'HARA:  Okay.

22           THE COURT:  I'm not requiring -- they're entitled

23   to do what they want on a fair preponderance of the

24   evidence.  You can be assured that I am making the

25   calculations that I have just made.

1          MR. O'HARA:  All right.  Thank you.

2          (Pause.)

3          THE COURT:  Ms. Gaudet, who's always helpful, um,

4     probation has reached out to her and she will get the

5     result of this hearing.

6          MR. O'HARA:  All right.  Thank you.

7          THE COURT:  All right.  We'll recess.

8          (Recess, 12:15 p.m.)

9

10                 C E R T I F I C A T E

11

12          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

13     do hereby certify that the foregoing record is a true

14     and accurate transcription of my stenographic notes,

15     before Judge William G. Young, on Wednesday, June 29,

16     2016, to the best of my skill and ability.

17

18

19

20     /s/ Richard H. Romanow 09-16-16

21     _____
       RICHARD H. ROMANOW  Date

22

23

24

25